IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
(Baltimore Division)

In re:                                    *

FIRST MARINER BANCORP          *          Case No: 14-11952 DER
                                                            (Chapter 11)
        Debtor                           *

        *       *       *       *       *       *       *       *       *       *       *       *

MOTION OF THE DEBTOR FOR THE ENTRY OF INTERIM AND FINAL ORDERS
ESTABLISHING NOTIFICATION AND HEARING PROCEDURES FOR
TRANSFERS OF CERTAIN EQUITY SECURITIES, AND GRANTING RELATED RELIEF
(*Request for Emergency Determination*)

First Mariner Bancorp ("FMAR" or the "Debtor") submits this motion ("Motion") for

entry of an interim order, substantially in the form attached hereto as **Exhibit A** (the "Interim

Order"), and a final order, substantially in the form attached hereto as **Exhibit B** (the "Final

Order"), authorizing the Debtor to establish procedures that certain of FMAR's shareholders

must follow prior to acquiring or transferring their equity interests in FMAR.  In support of the

Motion, the Debtor respectfully states as follows:

## JURISDICTION AND VENUE

1.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157

and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper in this

District pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory bases for the relief requested herein are sections 105(a), 362(a)(3),

and 541 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), Rule

2002 of the Federal Rule of Bankruptcy Procedure (the "Bankruptcy Rules"), and rules 2002-1

and 9013-1 of the Local Bankruptcy Rules for the District of Maryland (the "Local Bankruptcy

Rules").

## RELIEF REQUESTED

3.       The Debtor seeks authorization, under sections 105(a), 362(a)(3), and 541 of the Bankruptcy Code, to protect and preserve valuable net operating loss carryforwards and certain built-in losses and deduction items (collectively, the "NOL" or "NOLs").  In furtherance thereof, the Debtor requests that the Court (i) establish certain notification and hearing procedures (the "Trading Procedures") that certain shareholders must follow prior to acquiring or transferring equity interests in FMAR, and (ii) direct that any acquisition or transfer of such interests in violation of the Trading Procedures be void *ab initio*.

## EMERGENCY RELIEF PURSUANT TO AN INTERIM ORDER

4.       As discussed further below, under section 382 of the Internal Revenue Code of 1986 (as amended, the "IRC"), the ability of the Debtor and its subsidiary, First Mariner Bank (the "Bank"), to utilize their NOLs may be reduced or eliminated as a result of certain transfers of the Debtor's equity.  If an equity interest has been transferred, the transfer cannot be readily undone, and once the NOLs are limited as a result of such transfer, their use is severely limited.

5.       The Debtor requests that the Court enter the Interim Order as soon as possible.  If the Court were to approve the relief requested herein in accordance with the usual notice procedures set forth in the Bankruptcy Rules and Local Bankruptcy Rules, which generally require 14-days' notice for such relief, FMAR's shareholders might rush to transfer their stock before the restrictions set forth herein are imposed.  Indeed, following the announcement of the Debtor's bankruptcy, there is a serious chance of substantial trading in the stock of FMAR.  Such trading, as described below, could jeopardize the NOLs, compromise the value of the Debtor's primary asset (i.e., the Bank), prevent consummation of the M&A Transaction (as defined below) and undercut the Debtor's objectives in seeking this relief.

6.     In order to avoid such irreparable harm, the Debtor seeks emergency relief pursuant to section 105(a) of the Bankruptcy Code in the form of an immediate entry of this Interim Order, which will be effective until the consummation of the transfer and sale of the Debtor's assets.

## BACKGROUND

### A.  General Background[1]

7.     On February 10, 2014 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.  The Debtor is operating its business as debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

8.     No official committee of unsecured creditors has been appointed by the United States Trustee for the District of Maryland.

9.     Founded in 1995, FMAR is a Maryland corporation registered as a bank holding company under the Bank Holding Company Act of 1956 (as amended).  FMAR owns 100% of the issued and outstanding shares of the Bank.  FMAR does not have its own operations and has virtually no employees.  Other than the NOLs, FMAR's assets consist of (i) the equity in the Bank and interests in certain Trusts, as described below, (ii) approximately $337,000 in cash and investment accounts, and (iii) a receivable from the sale of its former consumer finance division, Mariner Finance, LLC, which was sold in late 2009, in the amount of approximately $345,000.

10.     The Bank, which is *not* a debtor and continues to operate in the ordinary course of business, was formed in 1995 through the merger of two predecessor banks.  It is the largest bank headquartered in Baltimore, Maryland, with 465 employees and 16 retail bank branches

---

[1]  Additional facts related to the Debtor's and the Bank's background are set forth in the *Declaration of Mark A. Keidel in Support of the Debtor's Chapter 11 Petition and Certain Motions*, which was filed contemporaneously herewith.

located throughout Maryland and 12 mortgage offices located throughout Maryland, Virginia and Delaware.

### B.  The Debtor's Capital Structure and Business Operations

<u>*Trust Preferred Securities*</u>.

11.     As of the Petition Date, FMAR has outstanding unsecured obligations totaling approximately $60 million, primarily consisting of principal and interest owing under certain junior subordinated debentures (the "Debentures") as well as under FMAR's guarantees (the "TruPS Guarantees") of certain related "trust preferred securities" (the "TruPS").   The Debentures were issued in a series of transactions – of a type commonly used by bank holding companies to take advantage of favorable regulatory, tax, and accounting treatment – that enabled FMAR to raise capital in the public markets.

12.     Each of the Debentures allows FMAR, in certain circumstances, to defer the payment of interest thereon for a period of up to 20 calendar quarters.  A deferral by FMAR, in turn, causes a deferral of the corresponding distributions in respect of the TruPS for the same period.  At the end of the deferral period, if FMAR fails to pay the deferred distributions on the Debentures, which, in turn, causes the distributions in respect of the TruPS, the Institutional Trustees for the Trusts, or, in certain cases, the holders of a specified percentage of the liquidation amount of the TruPS, have the right (after expiration of any applicable grace period) to declare an event of default.

13.     Beginning in December 2008, FMAR exercised its right to defer interest payments under each of the Debentures.  Thereafter, FMAR continued to defer interest for the maximum permitted period of 20 calendar quarters.  All accrued, unpaid, deferred interest under each of the Debentures will, or has, become due and payable on various dates during the first quarter of 2014, with the first such date having occurred on January 7, 2014 under Mariner Trust

III ("Trust III") and the related Debenture and TruPS Guarantee.  FMAR did not pay the deferred

interest that became due on January 7 and, after a 30-day grace period thereunder, on February 6,

2014, an event of default was triggered under Trust III, and the related Debenture and TruPS

Guarantee.  On February 7, 2014, certain holders of the TruPS issued by Trust III filed a lawsuit

against FMAR in the Southern District of New York for a breach of contract due to FMAR's

failure to pay the deferred interest.

> *Equity*.

14.     FMAR's charter, as in effect on the Petition Date, authorizes the issuance of up to

75 million shares of common stock.  FMAR's common stock is listed on NASDAQ and, as of

February 9, 2014, the stock price was $0.68 per share.  As of January 30, 2014, there were

19,714,592 issued and outstanding shares of common stock, which were held by approximately

909 holders of record.

### C.  The M&A Transaction

15.     Before the Petition Date, FMAR conducted a multi-year process to market and

recapitalize the Bank.  This process culminated in a transaction to transfer and sell FMAR's

shares in the Bank along with certain Bank-related assets (together, the "Purchased Assets") to

certain investors (the "M&A Transaction") pursuant to that certain Merger and Acquisition

Agreement, dated February 7, 2014 (the "M&A Agreement").

16.     The M&A Transaction is functionally a transfer of the Debtor's shares in the

Bank (as well as certain Bank-related assets) to the "Investors" (as defined in the M&A

Agreement) for consideration of $4.775 million (the "Purchase Price").[2]  As a technical matter,

---

[2] The Purchase Price will be reduced on a dollar-for-dollar basis for each dollar that the Bank's "Tier 1 Capital"
(calculated in accordance with the M&A Agreement) as of the closing of the M&A Transaction is less than $29
million.  The Purchase Price will not be increased if the closing date Tier 1 Capital is more than $29 million.

this transfer is structured as a merger between the Bank and a newly chartered interim bank formed by the Investors (i.e., RKJS). The merged Bank will be the surviving entity following the merger. Once the merger takes place, FMAR's shares in the pre-merger Bank will be cancelled and new shares in the merged Bank will be issued to the Investors.

17.     As part of the M&A Transaction, the Investors have also agreed to recapitalize the Bank to comply with the applicable regulatory capital requirements.

18.     On the Petition Date, the Debtor filed a motion seeking approval of, among other things, bidding and auction procedures, and for authority to enter into the M&A Agreement and consummate the M&A Transaction.

## THE NET OPERATING LOSSES

19.     The primary benefit of NOLs is to improve a corporation's future financial position by enabling it to carry forward and offset such NOLs against future taxable income, thereby reducing the corporation's tax liability. See IRC § l72(b). Here, the Debtor and the Bank filed joint U.S. federal income tax returns reflecting NOLs of approximately $49.5 million through the end of the taxable year ending December 31, 2012, of which amount approximately $47 million is attributable to the Bank. In addition, the Debtor's tax professionals estimate that the Debtor's and the Bank's combined NOLs for the taxable year ending December 31, 2013 will be approximately $21 million, most of which will be attributable to the Bank. If the Bank's NOLs are preserved, they can be applied to the fullest extent against the Bank's future income.[3]

---

[3] Although the Debtor and the Bank file a consolidated tax return and the NOLs, therefore, belong to them both, upon a deconsolidation of the Debtor and the Bank (i.e., when the Debtor's sale of its equity in the Bank is consummated), the Bank will be entitled to use the NOLs that it generated. *See Treas. Reg.* § 1.1502-21. As discussed below, however, the Bank's NOLs can be compromised as a result of certain transfers made by the Debtor's shareholders prior to the deconsolidation.

20.     The Debtor will also gain a substantial benefit from the preservation of the NOLs. As discussed above, the Debtor's equity interests in the Bank are being sold to the Investors pursuant to the M&A Transaction (or another bidder).  The value that the Investors are willing to pay for the Bank takes into consideration the financial benefit that the NOLs will provide to the Bank's future profitability.  If the NOLs are jeopardized prior to the consummation of the M&A Transaction, RKJS Bank is expressly permitted to terminate the M&A Agreement.  In addition, it is likely that other potential bidders will place value on the Bank's NOLs as well, and the ability to utilize the NOLs to the fullest extent may impact the purchase price such potential bidders are willing to pay.  As such, preserving the NOLs will protect the Debtor's only viable opportunity to maximize the value of its primary asset for the benefit of its estate and creditors.

21.     A corporation's ability to use its NOLs may be reduced or eliminated under certain circumstances.   *See, e.g.*, IRC §§ 269, 382.   One such circumstance is where a corporation experiences an "ownership change."

22.     In general, under IRC section 382, if a corporation undergoes an "ownership change" (described below), the amount of NOLs that the corporation can use in any given year following an ownership change to reduce its taxable income is generally limited to an amount equal to (i) the value of the corporation's equity on the date that the "ownership change" occurred, multiplied by (ii) the long-term tax-exempt rate on that date.  Given that the stock of the Debtor is currently trading at approximately $0.68 per share, an ownership change would effectively wipe out the use of the NOLs.

23.     Pursuant to IRC section 382(g), an "ownership change" occurs if, during a rolling three year "testing period," the percentage of a corporation's stock (measured by value) held by Five Percent Shareholders (defined hereafter) increases by an aggregate of more than 50

percentage points.[4] "Five Percent Shareholders" means all shareholders who own, or are deemed to own, 5% or more of a corporation's stock. The percentage point increase of share accumulation by Five Percent Shareholders is referred to under the IRC as an "owner shift." Thus, an ownership change occurs if the owner shift by multiple Five Percent Shareholders increases, and when added to the owner shifts that have already occurred during the testing period, would aggregate to an aggregate owner shift of 50% or more (e.g., if 11 persons each purchase 5% of the Debtor's equity).[5]

24.     While the Bank will undergo an "ownership change" upon consummation of the M&A Transaction, the resulting limitation on the use of the NOLs from that transaction is less severe than the limitation that would arise as a result of the ownership change prior to the closing of the M&A Transaction.

25.     Importantly, because the Bank is a wholly owned subsidiary of FMAR, an ownership change at FMAR is also deemed an "ownership change" at the Bank and will result in a limitation on the use of the NOLs of the consolidated group, in turn threatening the M&A Transaction.  IRC § 382(g) and (l)(3); *Treas. Reg.* §§ 1.382.2T and 1.502-92(a)(1).  The Debtor believes, based on discussions with its tax professionals, that the Debtor has not undergone any ownership change since the NOLs (or substantially all NOLs) were incurred.  However, an ownership change at FMAR may occur if (a) too many shareholders increase their ownership to

---

[4]     A "testing period" generally consists of the three-year period prior to any given testing date, which occurs when there is a change in the percentage of stock owned by a Five Percent Shareholder before or after the change.

[5]     Under IRC section 382(g)(4)(A), all stockholders who individually hold less than 5% of the shares of stock of a company are aggregated into one or more "public groups," each of which generally is treated as a single Five Percent Shareholder throughout the three-year testing period. Transfers between such stockholders are disregarded for purposes of determining whether an "ownership change" has occurred. Thus, so long as half or more of the corporation's stock is owned by less than 5% stockholders throughout the three-year testing period, and there are no segregation events, generally there will be no "ownership change" under IRC section 382.

become Five Percent Shareholders or (b) too many shares are added to or sold from Five Percent Shareholders during the period before the consummation of the M&A Transaction.

26.     If the Debtor's equity is transferred without certain restrictions and such transfer causes an ownership change, this result cannot be readily nullified.  Further, once all or part of an NOL is limited under IRC section 382 on account of an "ownership change," that NOL's use is severely, if not entirely, limited.   Accordingly, unrestricted transfers of the Debtor's equity interests could jeopardize the Bank's NOLs and thereby threaten the Debtor's ability to realize value from the Bank through the M&A Transaction.

27.     In order to avoid such irreparable harm, the Debtor requests that the Court immediately implement the procedures that require notice of certain transfers of, and allow the Debtor to monitor or object to other changes in the ownership of, common stock in FMAR, to ensure that an ownership change does not occur before the closing of the M&A Transaction.

## PROPOSED TRADING PROCEDURES

28.     As discussed below, trading procedures similar to those proposed herein have been used in other bankruptcy cases.  The proposed procedures establish a mechanism for the Debtor to closely monitor certain transfers of the Debtor's stock and to seek expeditious substantive relief to prevent such transfers, if necessary, in order to avoid an "ownership change" and preserve the NOLs.  Indeed, it is important to note that the procedures, in the first instance, are more properly characterized as notice procedures, rather than outright actual trading restrictions.  The proposed relief would generally affect shareholders who either directly or indirectly owns more than 4.75% of equity interests in FMAR.

29.     These procedures are set forth below (collectively, the "Trading Procedures"):

    a.     Any Person (as defined in paragraph "f" below) who currently is or becomes a Substantial Shareholder (as defined in paragraph "f" below) must file with the Court, and serve upon the Debtor's

counsel, a declaration of such status in the form of **Exhibit C** attached hereto (each, a "Declaration of Status"), on or before the later of (i) 30 days after the date the Debtor serves a notice of entry of an interim order approving this Motion (the "Notice of Order"), in the form of **Exhibit D** attached hereto, and (ii) ten days after becoming a Substantial Shareholder.

b.  If a Person intends to effectuate any transfer of Beneficial Ownership (as defined in paragraph "f" below) of Equity Securities that would result in either (i) an increase in the amount of Equity Securities (as defined in paragraph "f" below) of which a Person has Beneficial Ownership, if such Person is already a Substantial Shareholder, or (ii) such Person becoming a Substantial Shareholder, such Person must file with the Court, and serve upon counsel to the Debtor, an advance written declaration of the intended transfer of Equity Securities, in the form of **Exhibit E** attached hereto (each, a "Declaration of Intent to Purchase").

c.  Prior to effectuating any transfer of Beneficial Ownership of Equity Securities that (i) would result in a decrease in the amount of Equity Securities of which a Substantial Shareholder has Beneficial Ownership or (ii) would result in a Person ceasing to be a Substantial Shareholder, such Substantial Shareholder must file with the Court, and serve upon counsel to the Debtor, an advance written declaration of the intended transfer of Equity Securities in the form of **Exhibit F** attached hereto (each, a "Declaration of Intent to Sell" and with a Declaration of Intent to Purchase, each, a "Declaration of Proposed Transfer").

d.  The Debtor will have 15 calendar days after receipt of a Declaration of Proposed Transfer to file with the Court, and serve on such Substantial Shareholder or potential Substantial Shareholder, an objection to any proposed transfer of Beneficial Ownership of Equity Securities described in the Declaration of Proposed Transfer on the grounds that such transfer might adversely affect the Debtor's or the Bank's ability to utilize NOLs. If the Debtor files an objection, such transaction is not effective unless such objection is withdrawn by the Debtor or such transaction is approved by a final order of the Court that is no longer subject to appeal.  If the Debtor does not object within such 15-day period, such transaction can proceed solely as set forth in the Declaration of Proposed Transfer.  Further transactions within the scope of this paragraph 29 must be the subject of additional notices in accordance with the procedures set forth herein, with an additional 15-day waiting period for each such additional Declaration of Proposed Transfer.

e.     Any acquisition, disposition, or other transfer of the Equity Securities of the Debtor in violation of the Trading Procedures shall be null and void *ab initio* as an act in violation of the automatic stay under section 362 of the Bankruptcy Code.

f.     For purposes of the Trading Procedures:

"Beneficial Ownership" of Equity Securities is determined under IRC section 382 and related regulations and includes direct and indirect ownership (e.g., a holding company would be considered to beneficially own all shares owned or acquired by its subsidiaries and a partner in a partnership would be considered to own its proportionate share of any equity securities owned by such partnership), ownership by such holder's family members and entities acting in concert with such holder to make a coordinated acquisition of equity securities and ownership of equity securities that such holder has an Option or warrant to acquire.

"Equity Securities" means common stock of FMAR or of any beneficial interest therein (including Options with respect thereto).

"Option" means an option to acquire equity securities, including any contingent purchase, warrant, convertible debt, put, call, stock subject to risk of forfeiture, contract to acquire stock or similar interest, regardless of whether it is contingent or otherwise not currently exercisable.

"Person" shall have the same meaning as the term "person" in IRC section 7701(a)(1).

"Substantial Shareholder" means any Person that has Beneficial Ownership of at least 936,443 shares of FMAR's common stock (representing approximately 4.75% of all issued and outstanding shares of FMAR common stock).[6]

## BASIS FOR RELIEF

**A.    The NOLs are Property of the Debtor's Estate and are Entitled to the Protection of the Automatic Stay.**

30.    Section 541 of the Bankruptcy Code broadly defines "property of the estate" to include "all legal or equitable interests of the debtor in property as of the commencement of the

---

[6]    Based on a total of 19,714,592 shares of common stock outstanding as of January 30, 2014.

case" and "[a]ny interest in property that the estate acquires after the commencement of the case." *See* 11 U.S.C. § 541(a). In addition, section 362 of the Bankruptcy Code operates as a stay, immediately applicable to all entities on the Petition Date, of "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." 11 U.S.C. § 362(a)(3). It is well recognized that a debtor's NOLs constitute property of the estate under section 541 of the Bankruptcy Code and, as such, the Court has the authority to implement certain protective measures to preserve the NOLs, including the protection of the automatic stay.

31.     In the seminal case on this issue, *In re Prudential Lines, Inc.*, 928 F.2d 565 (2d Cir. 1991), *cert. denied* 502 U.S. 821 (1991), the Court of Appeals for the Second Circuit affirmed a decision by the Bankruptcy Court enjoining a parent corporation from taking a worthless stock deduction with respect to its wholly-owned debtor subsidiary on the grounds that allowing the parent to do so would impair its debtor-subsidiary's NOLs. In ruling that the subsidiary's NOLs were property of the estate under section 541 of the Bankruptcy Code the court wrote:

> Including NOL carryforwards as property of a corporate debtor's estate is consistent with Congress' intention to "bring anything of value that the debtors have into the estate." Moreover, "[a] paramount and important goal of Chapter 11 is the rehabilitation of the debtor by offering breathing space and an opportunity to rehabilitate its business and eventually generate revenue." Including the right to a NOL carryforward as property of [the debtor's] bankruptcy estate furthers the purpose of facilitating the reorganization of [the debtor].

*Id.* at 573 (citations omitted); *see also In re White Metal Rolling & Stamping Corp.*, 222 B.R. 417, 424 (Bankr. S.D.N.Y. 1998) ("It is beyond peradventure that NOL carrybacks and carryovers are property of the estate of the loss corporation that generated them."); *In re Cumberland Farms, Inc.*, 162 B.R. 62, 67 (Bankr. D. Mass. 1993) (stating that a debtor's NOLs are part of its bankruptcy estate); *In re Phar-Mor, Inc.*, 152 B.R. 924, 927 (Bankr. N.D. Ohio

- 12 -

1993) ("[T]he sale of stock is prohibited by § 362(a)(3) as an exercise of control over the NOL, which is property of the estate.").

32.     Here, the NOLs are the property of the Debtor's estate under section 541 of the Bankruptcy Code.  Because the Debtor and the Bank currently file consolidated tax returns, the NOLs generated by the Bank are treated as NOLs of the consolidated group, including the Debtor.  Moreover, as described above, any impact on the NOLs will directly impair the Debtor's ability to maximize the value of the Bank shares through the M&A Transaction.

33.     Given that the NOLs are property of the Debtor's estate, this Court may impose the automatic stay to impose certain limited restrictions and notice requirements with respect to the transfer of Equity Securities that could jeopardize this valuable asset.

**B.     The Requested Relief is Narrowly Tailored and Appropriate Under the Circumstances**

34.     Section 105 of the Bankruptcy Code provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).  The limited restrictions and notice procedures contained in the proposed procedures are both necessary and appropriate to protect the Debtor's valuable NOLs in this case, without unduly burdening the rights of existing shareholders.

35.     *First,* the proposed Trading Procedures do not affect all transfers of the Debtor's equity.  Instead, the requested relief has been narrowly tailored to apply only to those shareholders who own, or could own as a result of a proposed transfer, more than 4.75% of equity in the Debtor.

36.     *Second*, even with respect to those few shareholders of the Debtor's equity that are subject to the Trading Procedures, their ability to trade such equity will not be unduly restricted.  If a Substantial Shareholder wishes to transfer its Equity Securities (or a shareholder

wishes to become a Substantial Shareholder through a proposed transfer), then it may comply with the specified notice procedures and then demonstrate, on a case-by-case basis, that a particular proposed transaction or set of transactions will not harm the estate by diminishing the value of the Debtor's and the Bank's NOLs.

37.    *Third*, the interim relief requested herein will be in place for a limited time.  At this juncture, the Debtor is only requesting that the Trading Procedures remain in place until the closing of the M&A Transaction, which is projected to take place in two months.  Interim relief of this type is routinely granted on little-to-no notice in this and other jurisdictions.[7]  *See, e.g.*, *In re National Energy & Gas Transmission, Inc.*, No. 03-30459 (PM), Dkt. Nos. 67, 207, 706, 778 (granting emergency relief in form of an interim order imposing notice and hearing procedures with respect to trading of certain stock) (Bankr. D. Md. July 10, 2003, Aug. 7, 2003, Nov. 17, 2003, Dec. 8, 2003); *see also, In re Citadel Broad. Corp.*, No. 09-17442 (BRL), Dkt. No. 30 (Bankr. S.D.N.Y. Dec. 22, 2009) (approving interim notification procedures and restricting certain transfers of equity interests within one day of the debtor's motion); *In re Nortel Networks, Inc.*, No. 09-10138, Dkt. No. 55 (Bankr. D. Del. Jan. 15, 2009) (same); *In re Portola Packaging, Inc.*, No 08-12001, Dkt. No. 51 (Bankr. D. Del. Aug. 29, 2008) (approving interim notification procedures and restricting certain transfers of equity interests); *In re Northwest Airlines Corp.*, No. 05-17930, Dkt. No. 88 (Bankr. S.D.N.Y. Sept. 15, 2005) (same).

38.    On balance, the limitations imposed by the Trading Procedures are greatly outweighed by the benefit that such procedures will provide to the Debtor's estate.  The Trading Procedures will prevent an ownership change prior to the consummation of the M&A

---

[7]    Because of the voluminous nature of the orders cited herein, they are not attached to the Motion.  Copies of these orders are available on request of the Debtor's counsel.

Transaction and safeguard the Bank's use of the NOLs, and, accordingly, the Bank's value to the Debtor's estate. Without the Trading Procedures, if an ownership change occurs, and the NOLs are limited as a result, the harm to the Debtor's estate may be irreparable because the M&A Transaction will not be consummated. It is thus critical that the Debtor have immediate near-term protection and be afforded the key information necessary to evaluate transactions that could increase the risk of an "ownership change."

### C.    Bankruptcy Courts Routinely Grant the Relief Requested in the Motion

39.    Courts have routinely restricted or enjoined transfers of common stock or claims, or issued other injunctive relief to protect a debtor against the possible loss of its tax attributes.[8] *See, e.g., In re The Boyds Collection, Ltd.*, No. 05-43793 (DK), Dkt. No. 106 (Bankr. D. Md. Nov. 1, 2005); *In re National Energy & Gas Transmission, Inc.*, No. 03-30459 (PM), Dkt. Nos. 67, 207, 706, and 778 (Bankr. D. Md. July 10, 2003, Aug. 7, 2003, Nov. 17, 2003, Dec. 8, 2003) (approving trading restrictions on an interim basis three times before the debtor withdrew the motion as the relief was no longer necessary); *In re US Airways, Inc.*, No. 04-13819 (SSM), Dkt. No. 2034 (Bankr. E.D. Va. Apr. 1, 2005); *In re Citadel Broad. Corp.*, No. 09-17442 (BRL), Dkt. No. 30 (Bankr. S.D.N.Y. Dec. 21, 2009); *In re Gen. Motors Corp.*, No. 09-50026 (REG), Dkt. No. 2539 (Bankr. S.D.N.Y. June 25, 2009).

40.    Courts granting such relief generally have done so by imposing notice and hearing requirements (similar to the Trading Procedures) on any proposed transfer of stock to or by any person whose holdings of such stock exceeds, or would exceed as a result of the proposed transfer, a certain threshold amount. To accomplish this, the court and the debtor are given

---

[8]    Because of the voluminous nature of the orders cited herein, they are not attached to the Motion. Copies of these orders are available on request of the Debtor's counsel.

notice of any proposed transfers of stock by persons whose aggregate stock holdings exceed a certain dollar or share threshold, giving the debtor an opportunity to object to such transfer at a hearing.  For example, in *The Boyds Collection, Ltd.*, this Court entered an order imposing a duty on any entity intending to acquire, accumulate, or sell more than a prescribed number of shares of the debtor, or to add additional shares to such a block, to provide notice to the court and to the debtor's counsel, after which the debtor was afforded 30 days to object to such transaction with a hearing to be held so that the court could decide whether to allow any such transfer to be consummated.  No. 05-43793 (DK), Dkt. No. 106 (Bankr. D. Md. Nov. 1, 2005) (claims trading restrictions applied to claimholders who were, or would become as a result of the proposed transfer a 4.5% stockholder).

41.    Other courts have likewise imposed restrictions on trading of equity securities through notice and hearing procedures similar to those proposed here.  *See, e.g., id.*; *In re Dura Auto. Sys., Inc.*, No. 06-11202 (KJC), Dkt. No. 276 (Bankr. D. Del. Nov. 20, 2006) (same); *In re Calpine Corp.*, No. 05-60200 (BRL), Dkt. No. 37 (Bankr. S.D.N.Y. Dec. 21, 2005) (same).  Although the relief that the Debtor requests in this Motion is similar to that granted in *The Boyds Collection* and other similar cases, it is significantly less burdensome because it seeks to address only the Equity Securities and does not seek to also restrict transfers by claimholders.

42.    The Debtor's interests in its and the Bank's NOLs are valuable assets of its estate, the preservation of which will inure to the benefit of its stakeholders, through the consummation of the M&A Transaction.  Unrestricted trading in the Equity Securities with no advance warning of such trades jeopardizes these assets and impairs their value for the Debtor's stakeholders at large.  The requested relief imposes a minimal burden to achieve a substantial benefit for the Debtor, its creditors, and all other parties-in-interest.  Accordingly, this Court should grant the

requested relief and establish a notice and hearing procedures governing the trading of Equity Securities.

## NOTICE

43.    No trustee or examiner has been appointed in the Debtor's Chapter 11 Case. Notice of this Motion has been provided to (i) the U.S. Trustee; (ii) counsel for the official committee of unsecured creditors (if such committee has been appointed), (iii) the 20 largest unsecured creditors of the Debtor; (iv) the applicable taxing authorities; (v) the FDIC, (vi) the Maryland CFR; (vii) the FRB; and (viii) any party in interest who has requested notice pursuant to Bankruptcy Rule 2002 (entities listed in (i) through (viii) are hereby collectively referred to as the "General Notice Parties").   The Debtor submits that no other or further notice need be provided.

## NO PREVIOUS REQUEST

44.    No previous request for the relief sought herein has been made to this or any other court.

## STATEMENT PURSUANT TO LOCAL BANKRUPTCY RULE 9013-2

45.    Pursuant to Local Bankruptcy Rule 9013-2, the Debtor states that, in lieu of submitting a memorandum in support of this Motion, it will rely solely upon the grounds and authorities set forth herein.

WHEREFORE, for the reasons set forth herein, the Debtor respectfully requests that the Court enter interim and final orders, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B** respectively, granting the relief requested herein and such other and further relief as the Court deems appropriate.

Dated: February 10, 2014

                                                       /s/ Lawrence J. Yumkas
                                         Lawrence J. Yumkas, 06357
Yumkas, Vidmar & Sweeney, LLC
2530 Riva Road, Suite 400
Annapolis, Maryland  21401
(443) 569-0758
lyumkas@yvslaw.com

Robert T. Schmidt
Joshua K. Brody
Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, New York  10036
(212) 715-9100
rschmidt@kramerlevin.com
jbrody@kramerlevin.com

*Proposed Counsel for the Debtor*

## CERTIFICATE OF SERVICE

I hereby certify that on this 10th day of February 2014, notice of filing of the Motion of the Debtor for the Entry of Interim and Final Orders Establishing Notification and Hearing Procedures for Transfers of Certain Equity Securities, and Granting Related Relief was sent electronically to those parties listed on the docket as being entitled to such electronic notice, and a copy of the Motion was mailed first class, postage prepaid to the parties on the attached service list.

/s/ Catherine Nownes-Whitaker
Catherine Nownes-Whitaker

First Mariner Bank
Attn: Joseph F. Howard,
Sr. Vice President, General Counsel
1501 S. Clinton St.
Baltimore, MD 21224

The Bank of New York, Trustee
f/b/o Mariner Capital Trust II
Attn: Corporate Trust Administration
White Clay Center, Route 273
Newark, DE 19711

Wells Fargo Bank, NA, Trustee
f/b/o Mariner Capital Trust III
Attn: Corporate Trust Administration
919 Market St. Suite 700
Wilmington, DE 19801

Wells Fargo Bank, NA, Trustee
f/b/o Mariner Capital Trust IV
Attn: Corporate Trust Administration
919 Market St. Suite 700
Wilmington, DE 19801

Wells Fargo Bank, NA, Trustee
f/b/o Mariner Capital Trust VI
Attn: Corporate Trust Administration
919 Market St. Suite 700
Wilmington, DE 19801

Wilmington Trust Company, Trustee
f/b/o Mariner Capital Trust V
Attn: Corporate Trust Administration
Rodney Square N 1100 N. Market St.
Wilmington, DE 19890-1600

Comptroller of Maryland
Compliance Division
110 Carroll Street
Annapolis, MD 21411

Internal Revenue Service
P.O. Box 7346
Philadelphia, PA 19101-7346

IRS
Special Procedures – Insolvency Unit
31 Hopkins Plaza Room 1150
Baltimore, MD  21201

Federal Deposit Insurance Corporation
Julie Howland
350 Fifth Avenue
New York, NY 10118-0110

Federal Reserve Bank of Richmond
Richard Gilbert
701 East Byrd Street
Richmond, VA23219
Local: 804-697-8000

Richard Wasserman, Esquire
Venable, LLP
750 E Pratt St #900
Baltimore, MD 21202

The following parties received
electronic notice of the filing:

Office of the U.S. Trustee
101 West Lombard Street
Baltimore, Maryland  21201

Gary R. Bronstein, Esquire
Kilpatrick Townsend & Stockton LLP
607 14th Street, NW Suite 900
Washington, DC 20005-2018

Joel Rappoport, Esquire
Kilpatrick Townsend & Stockton LLP
607 14th Street, NW Suite 900
Washington, DC 20005-2018

Joshua Brody, Esquire
Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, NY 10036

Robert T. Schmidt, Esquire
Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, NY 10036

Edward S. Stein
Sandler O'Neill & Partners LP
1251 Avenue of the Americas
6th Floor
New York, NY 10020