IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
(Baltimore Division)

| | | |
|---|---|---|
| In re: | * | |
| FIRST MARINER BANCORP | * | Case No: 14-11952-DER |
| | | (Chapter 11) |
| Debtor | * | |

\* \* \* \* \* \* \* \* \* \* \* \*

MOTION OF THE DEBTOR FOR AN ORDER PURSUANT TO SECTIONS 105, 362, AND 364 OF THE BANKRUPTCY CODE (A) AUTHORIZING AND APPROVING DEBTOR-IN-POSSESSION FINANCING AND GRANTING SECURITY INTERESTS AND A SUPERPRIORITY ADMINISTRATIVE CLAIM IN CONNECTION THEREWITH, (B) APPROVING THE TERMS AND CONDITIONS OF THAT CERTAIN SUPERPRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT AND RELATED DOCUMENTS, AND (C) MODIFYING THE AUTOMATIC STAY TO THE EXTENT NECESSARY TO ENTER INTO THE DIP FINANCING AND EFFECTUATE THE TERMS THEREOF

First Mariner Bancorp ("FMAR" or the "Debtor") submits this motion (the "Motion"),[1] pursuant to sections 105, 362, and 364 of title 11 of the United States Code (the "Bankruptcy Code"), for an order, substantially in the form attached hereto as **Exhibit A** (the "DIP Order"): (a) authorizing the Debtor to obtain postpetition loans, advances and other credit accommodations from RKJS Bank ("RKJS" or, in its capacity as a lender, the "Lender") under that certain Superpriority Debtor-in-Possession Credit Agreement by and between the Lender and the Debtor, attached hereto as **Exhibit B** (the "DIP Credit Agreement") and that certain Superpriority Debtor-in-Possession Security Agreement between the Lender and the Debtor, attached hereto as **Exhibit C** (the "DIP Security Agreement," and together with the DIP Credit Agreement and any other documents required to be executed in connection therewith,

---

[1] Contemporaneously with the filing of this Motion, the Debtor has filed its *Motion to Shorten Time Period to Respond to (A) the Bid and Auction Procedures and Stalking Horse Provisions Contained in Debtor's Sale Motion and (B) the Debtor's Motion for Authority to Obtain Debtor-In-Possession Financing* (the "Motion to Shorten"). In the Motion to Shorten, the Debtor requests that the Court set a hearing date and objection deadline with respect to approval of the Auction Procedures and DIP Motion that will permit the Debtor to comply with certain deadlines contained in the M&A Agreement.

collectively, the "DIP Loan Documents"), pursuant to which the Lender will be granted (i) a superpriority administrative claim pursuant to 11 U.S.C. § 364(c)(1), (ii) first priority security interests in and liens upon substantially all unencumbered property of the Debtor's estate pursuant to 11 U.S.C. § 364(c)(2), and (iii) junior security interests in and liens upon property of the Debtor's estate that is subject to a lien pursuant to 11 U.S.C. § 364(c)(3); (b) approving the terms and conditions of the DIP Loan Documents; and (c) modifying the automatic stay solely to the extent necessary to enter into the proposed financing and effectuate the terms thereof.  In support of the Motion, the Debtor relies upon the *Declaration of William L. Boyan, III in Support of the Debtor's Motions to Sell Certain Assets and to Obtain Postpetition Financing* (the "Boyan Declaration") and the *Declaration of Mark A. Keidel in Support of the Debtor's Chapter 11 Petition and Certain Motions* (the "Keidel Declaration"), each of which was filed simultaneously herewith, and respectfully represents as follows:

## PRELIMINARY STATEMENT

Contemporaneously with the filing of this Motion, the Debtor has filed a motion (the "Sale Motion") seeking authority to effectuate a transfer and sale of its primary asset, 100% of the equity of First Mariner Bank (the "Bank"), together with certain related assets (collectively, the "Purchased Assets").  Because the Debtor does not have any independent operations, it lacks sufficient funds to consummate the proposed transaction as set forth in the Sale Motion (the "M&A Transaction"), including the funds to pay the costs of administering its Chapter 11 Case and obligations required to be satisfied in connection with the M&A Transaction.  By the instant Motion, the Debtor seeks authority to enter into a secured, superpriority, non-priming postpetition delayed-draw term loan facility (the "DIP Facility") provided by RKJS (who is also the "stalking horse" bidder under the M&A Transaction), in an

amount of up to $2,500,000, to function as a "bridge" to the closing of the M&A Transaction. The Debtor also seeks certain other and related relief, including contingent approval of replacement debtor-in-possession financing, on substantially the same terms set forth in the DIP Credit Agreement, from a competing bidder in the event that such competing bidder, rather than the "stalking horse" bidder, prevails at the auction for the Purchased Assets. Importantly, if RKJS is the successful bidder for the Purchased Assets, and subject to the closing of the M&A Transaction, the Debtor will not be obligated to pay any interest on the DIP Facility – i.e., RKJS will have provided interest-free postpetition financing. In light of the favorable terms of the DIP Facility and the necessity for the financing, the Debtor respectfully requests that the Motion be approved.

## JURISDICTION AND VENUE

1. The Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334. The Motion is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(D) and (G). Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

2. The statutory predicates for the relief requested in the Motion are sections 105(a), 362, and 364(c) of the Bankruptcy Code, Rules 2002, 4001, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 4001-4 of the Local Bankruptcy Rules for the District of Maryland (the "Local Bankruptcy Rules").

## CONCISE STATEMENT OF RELIEF REQUESTED

3. In accordance with Bankruptcy Rule 4001(c) and Local Bankruptcy Rule 4001-4, the Debtor submits this concise statement of the material terms of the DIP Loan Documents and the DIP Order:[2]

---

[2] This concise statement is qualified in its entirety by reference to the provisions of the DIP Loan Documents and DIP Order. To the extent of any inconsistency between this concise statement and the provisions of the DIP Loan

| Provision | Summary Description |
|---|---|
| **Lender** | RKJS Bank |
| **Maximum Amount of Borrowing**<br>DIP Credit Agreement §§ 1.1 (definition of "Commitment") and 2.1<br>DIP Order ¶ 1 | $2,500,000.00 |
| **Interest Rate**<br>DIP Credit Agreement § 2.5(a) | 6% per annum, which rate will increase to 8% if an Event of Default (as defined below) occurs or after the Maturity Date (as defined below); *provided*, that, if RKJS is the winning bidder and the M&A Transaction is consummated, the Debtor will not be charged any interest (i.e., if RKJS is the winning bidder, it will have provided the Debtor with an interest-free loan). |
| **Repayment Terms**<br>DIP Credit Agreement § 2.3 | Although interest will accrue, so long as RKJS is still obligated under the M&A Agreement (i.e., prior to the Sale Hearing and, if RKJS is the winning bidder, prior to the closing), the Debtor will not be required to make any interest payments. |
| **Collateral**<br>DIP Security Agreement § 1<br>DIP Credit Agreement § 2.9 | The collateral pledged to secure the DIP Facility includes all of the issued and outstanding shares of the Bank and all of the other current and subsequently-acquired personal and real property and fixtures of the Debtor other than claims or causes of action arising under Chapter 5 of the Bankruptcy Code. |
| **DIP Liens and Priority**<br>DIP Credit Agreement §2.9(a)(ii)-(iii)<br>DIP Order ¶¶ 2, 7 | The Lender is granted: (i) pursuant to section 364(c)(2) of the Bankruptcy Code, a valid and perfected senior security interest in all Collateral that is not subject to an existing properly perfected and unavoidable lien; and (ii) pursuant to section 364(c)(3) of the Bankruptcy Code, a valid and perfected junior security interest in all Collateral that is subject to an existing properly perfected and unavoidable lien. |
| **Superpriority Administrative Claim**<br>DIP Credit Agreement §2.9(a)(i)<br>DIP Order ¶ 2 | The Lender is granted a superpriority administrative claim pursuant to section 364(c)(1) of the Bankruptcy Code, with priority over any and all of the Debtor's other administrative expenses. |

Documents and DIP Order, the latter two documents shall control. Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the DIP Credit Agreement.

| Provision | Summary Description |
|---|---|
| **Maturity Date**<br>DIP Credit Agreement § 1.1 (definition of "Maturity Date") | The Maturity Date is the date that is the earliest of (i) four months from the date of the first loan (*provided*, *however*, that if the Lender is the winning bidder at the auction and the closing is delayed due to the need for governmental approval, such date will be extended to the earlier of (a) the Acquisition Closing and (b) such date when the Lender terminates the M&A Agreement under section 8.01(b)(ii) thereof), (ii) the Acquisition Closing, (iii) the first business day after the Court approves a sale transaction with a winning bidder that is not RKJS, (iv) the effective date as of which the M&A Agreement terminates in accordance with its terms (as long as such termination is not due to a breach by the Lender), (v) the earlier of the effective date or the date of substantial consummation of the Debtor's Chapter 11 plan of reorganization, (vi) such earlier date when all of the obligations become due under the DIP Credit Agreement (i.e., following the occurrence of an Event of Default), and (vii) the date that the Federal Deposit Insurance Corporation is appointed as a receiver or a conservator of the Bank. |
| **Fees, Costs, and Expenses**<br>DIP Credit Agreement §8.5<br>DIP Order ¶ 6 | In the event that an alternative transaction (other than the M&A Transaction) is consummated, or the Court enters an order approving such alternative transaction, on the first business day following the entry of such order, the Debtor will reimburse the Lender for its reasonable documented costs, fees and expenses incurred in connection with the DIP Facility whether incurred prepetition or postpetition; *provided*, *however*, that if the Lender is the winning bidder with respect to the Purchased Assets, the Debtor will not have any obligation to reimburse the Lender for such costs, fees and expenses. |
| **Proposed Use of Proceeds**<br>DIP Credit Agreement §5.2<br>DIP Order ¶ 2 | The Debtor will be authorized to use the proceeds for the payment of postpetition obligations, including without limitation, to pay administrative costs associated with this bankruptcy case. |
| **Limitation on Use of Proceeds**<br>DIP Order ¶ 5 | The DIP Facility proceeds cannot be used to pay any fees or expenses of any party in connection with (i) the initiation or prosecution of any proceedings or other litigation against the Lender, including without limitation to challenge in any way the Lender's superpriority claims or liens granted under the DIP Order; or (ii) any claims or actions to hinder or delay the Lender's enforcement or realization on the Collateral in accordance with the DIP Loan Documents or the DIP Order. Notwithstanding the foregoing, the Debtor may use proceeds of the DIP Facility to enforce rights under the DIP Order, the documents related to the Loans, or the M&A Agreement. |

| Provision | Summary Description |
|---|---|
| **Conditions to Borrowing**<br><br>DIP Credit Agreement § 4.2 | Obligations of the Lender to make Loans under the DIP Credit Agreement are subject to the following conditions precedent: (i) the DIP Order has been entered and it is effective and not subject to amendment, modification or stay, (ii) all the representations and warranties made in the DIP Credit Agreement remain true in all material respects, (iii) no Default or Event of Default has occurred or will occur after giving effect to the Loan, (iv) the Lender has received a notice of borrowing as specified in section 2.2 of the DIP Credit Agreement, and (v) all proceedings in connection with the making of the Loan and the other transactions contemplated by the DIP Credit Agreement are satisfactory to the Lender. |
| **Events of Default**<br><br>DIP Credit Agreement § 7.1 | In addition to the other standard events of defaults, the occurrence and continuance of the following events constitute an "Event of Default": (i) the M&A Agreement has terminated in accordance with its terms (other than due to a material breach thereunder by RKJS); and (ii) the Debtor fails to pay all of the outstanding Loans by the date that is one business day following the Court's approval of an alternative sale transaction with a bidder other than RKJS. |
| **Limited Modification of Automatic Stay**<br><br>DIP Order ¶ 11 | The automatic stay is lifted to permit the Lender to exercise any remedies available under the DIP Loan Documents upon the occurrence of any Event of Default after five business days' written notice to the Debtor and its bankruptcy counsel, counsel to the Committee, and the United States Trustee. |
| **Automatic Perfection**<br><br>DIP Order ¶ 7 | The DIP Order is sufficient and conclusive evidence of the priority, perfection and validity of the security interests in and liens upon the Collateral, without the necessity of filing, recording or serving any financing statements or other documents that may otherwise be required under federal or state law in any jurisdiction or the taking of any other action to validate or perfect the security interests and liens granted to Lender in the DIP Order and DIP Credit Agreement. |
| **Waiver of Section 551 of the Bankruptcy Code**<br><br>DIP Order ¶ 8 | Property that is encumbered by any prepetition lien or security interest that is avoided will become subject to Lender's first priority lien; the Debtor and its estate waiving the benefits of section 551 of the Bankruptcy Code. |
| **Waiver of Section 506(c) of the Bankruptcy Code**<br><br>DIP Order ¶ 4 | The Debtor has waived any right to surcharge the Collateral to recover from the Lender any costs of preserving and disposing of the Collateral under section 506(c) of the Bankruptcy Code. |

## BACKGROUND

### A. General Background[3]

4. On February 10, 2014 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. The Debtor is operating its business as debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5. No official committee of unsecured creditors has been appointed by the United States Trustee for the District of Maryland (the "U.S. Trustee").

6. Founded in 1995, FMAR is a Maryland corporation registered as a bank holding company under the Bank Holding Company Act of 1956 (as amended). FMAR owns 100% of the issued and outstanding shares of the Bank. FMAR does not have its own operations and has virtually no employees. Its assets consist of (i) the equity in the Bank and interests in certain statutory trusts (as described below), (ii) approximately $337,000 contained in cash and investment accounts, and (iii) a receivable due from the sale of its former consumer finance division, Mariner Finance, LLC, which was sold in late 2009, in the amount of approximately $345,000.

7. The Bank, which is not a debtor and continues to operate in the ordinary course of business, was formed in 1995 through the merger of two predecessor banks. It is the largest bank headquartered in Baltimore, Maryland, with 465 employees and operations in 16 retail bank branches located throughout Maryland and 12 mortgage offices located throughout Maryland, Virginia and Delaware.

8. As of the Petition Date, FMAR has outstanding unsecured obligations totaling approximately $60 million, primarily consisting of principal and interest owing under

---

[3] Additional facts related to the Debtor's and the Bank's background are set forth in the Keidel Declaration and the Boyan Declaration.

certain junior subordinated debentures, as well as its guarantee of certain related trust preferred securities. As described further in the Sale Motion, the Debentures were issued in a series of transactions – of a type commonly used by bank holding companies that take advantage of favorable regulatory, tax and accounting treatment – that enabled FMAR to raise capital in the public markets.

### B. The M&A Transaction

9. Before the Petition Date, FMAR conducted a multi-year process to market and recapitalize the Bank. This process culminated in FMAR, the Bank, and RKJS entering into the Merger and Acquisition Agreement, dated February 7, 2014 (the "M&A Agreement") to consummate the M&A Transaction.

10. The M&A Transaction is functionally a transfer of the Debtor's shares in the Bank (as well as certain Bank-related assets) to the "Investors" (as defined in the M&A Agreement) for consideration of $4.775 million (the "Purchase Price").[4] This transfer is structured as a merger between the Bank and a newly chartered interim bank formed by the Investors (i.e., RKJS). The merged Bank will be the surviving entity following the merger. Once the merger takes place, FMAR's shares in the pre-merger Bank will be cancelled and new shares in the merged Bank will be issued to the Investors.

11. As part of the M&A Transaction, the Investors have also agreed to recapitalize the Bank to comply with the applicable regulatory capital requirements.

---

[4] The Purchase Price will be reduced on a dollar-for-dollar basis for each dollar that the Bank's "Tier 1 Capital" (calculated in accordance with the M&A Transaction) as of the closing of the M&A Transaction is less than $29 million. This mechanic may have a material impact on the ultimate Purchase Price. The Purchase Price will not be increased if the closing date Tier 1 Capital is more than $29 million.

12. A more detailed description of the terms of the M&A Transaction and the sale process with respect to the Purchased Assets is set forth in the Boyan Declaration and the Sale Motion.

## C. **The Replacement DIP Facility**

13. Given that it does not have any independent operations, the Debtor will not have sufficient funds to pay the fees and expenses to consummate the M&A Transaction without financing and, as such, the DIP Facility is functionally a "bridge" to the closing of the M&A Transaction. However, if a competing bidder prevails at the auction for the Purchased Assets, the DIP Facility will become due and payable shortly thereafter and the Debtor will require alternative financing to fund any fees and expenses necessary to consummate the alternative sale transaction. Accordingly, the Debtor requires that any potential overbidder must (in addition to providing sufficient funds to repay the obligations outstanding under the DIP Facility upon its maturity) commit to provide postpetition financing to the Debtor to replace the DIP Facility on terms that are substantially the same, and at least as favorable to the Debtor, as the terms of the DIP Credit Agreement (the "Replacement DIP Facility").

## **RELIEF REQUESTED**

14. The Debtor respectfully requests the relief set forth in the DIP Order, including:

    (a) authority to borrow up to $2,500,000 from the Lender, pursuant to the terms and conditions of the DIP Order and the DIP Loan Documents;

    (b) authority to grant the liens and superpriority claims specified in the DIP Order and the DIP Loan Documents;

    (c) authority to execute and deliver the DIP Loan Documents;

    (d) authority to enter, as applicable and necessary, into the Replacement DIP Facility;

    (e)    modification of the automatic stay to the extent necessary to implement the terms and provisions of the DIP Order and DIP Loan Documents; and

    (f)    waiver of any applicable stay and provide for the immediate effectiveness of the DIP Order.

## BASIS FOR RELIEF REQUESTED

### A. Entry into the DIP Facility is in the Best Interest of the Debtor's Estate, is Necessary to Preserve Estate Assets and is an Exercise of the Debtor's Sound Business Judgment

15. Section 364 of the Bankruptcy Code governs requests for approval of postpetition financing. *See* 11 U.S.C. § 364; *Modanlo v. Ahan (In re Modanlo)*, No. DKC 2006-1181, 2006 WL 4606303, \*4 (D. Md. Aug. 16, 2006). If a debtor cannot obtain postpetition credit on an unsecured, administrative expense basis under section 364(b) of the Bankruptcy Code, section 364(c) of the Bankruptcy Code authorizes a debtor to incur debt that is entitled to superpriority administrative expense status, secured by a senior lien on otherwise unencumbered property and by a junior lien on encumbered property. *See* 11 U.S.C. § 364(c).

16. To obtain postpetition financing pursuant to section 364(c) of the Bankruptcy Code, a debtor must demonstrate: "(1) that the trustee is unable to obtain unsecured credit per 11 U.S.C. § 364(b), (2) the credit transaction is necessary to preserve the assets of the estate; and (3) the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender." *Modanlo*, 2006 WL 4606303 at \*5 (citation and quotations omitted). A debtor's decision to enter into a postpetition lending facility is governed by the business judgment standard. *See, e.g., In re Mastercraft Interiors, Ltd.*, No. 06-12769, 2006 WL 4595946, \*4 (Bankr. Md. Aug. 10, 2006) (approving financing as exercise of debtor's business judgment); *In re Ames Dep't Stores*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (noting courts generally defer to debtor's business judgment).

17. Here, the Debtor proposes to incur indebtedness under section 364(c) of the Bankruptcy Code as a superpriority administrative expense secured by non-priming liens on substantially all of the Debtor's assets. The Debtor's decision to obtain the proposed financing reflects sound business judgment and easily meets the three part standard set forth above for approval of financing under section 364(c).

18. *First*, as set forth in the Boyan Declaration (¶ 49), despite its best efforts, the Debtor's investment banker, Sandler O'Neill & Partners, L.P., was unable to locate any party that was willing to provide the Debtor with postpetition financing on an unsecured, administrative priority basis under section 364(b) of the Bankruptcy Code. *Second*, the DIP Facility is necessary to preserve the value of the Debtor's primary asset – its equity interest in the Bank. Without the DIP Facility, the Debtor would not have the funds to administer this bankruptcy case and consummate the M&A Transaction, which is the best (and currently only) means to maximize and preserve the value of the Bank shares (as well as the other Purchased Assets). As such, the DIP Facility is necessary to consummate the M&A Transaction and thereby maximize and preserve the value of the Purchased Assets. *Lastly*, as set forth in the Boyan Declaration (¶ 48), the terms and conditions of the DIP Facility are generally market, and are fair and reasonable under the circumstances. Not only are the terms and conditions fair and reasonable, but in certain circumstances – i.e., if RKJS is the winning bidder – the DIP Facility will become interest-free financing, which was a significant concession by RKJS.

19. Based on the foregoing, the Debtor believes that the DIP Facility should be approved under section 364(c) of the Bankruptcy Code.

### B. The DIP Facility Was Negotiated in Good Faith and at Arm's Length and the Lender Should Therefore be Afforded the Protections of Section 364(e) of the Bankruptcy Code

20. Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect on loans extended to a debtor, and its rights in and to any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal. *See* 11 U.S.C. § 364(e). The Bankruptcy Code does not define "good faith" as used in section 364(e), but courts have held that the forms of misconduct that would defeat good faith status include "fraud, collusion, or an attempt to take grossly unfair advantage of others." *Keltic Fin. Partners, LP v. Foreside Mgmt. Co. (In re Foreside Mgmt. Co.)*, 402 B.R. 446, 452-53 (1st Cir. B.A.P. 2009) (citation and quotations omitted); *see also Evergreen Int'l Airlines, Inc. v. Pan Am Corp. (In re Pan Am Corp.)*, No. 91 Civ. 8319, 1992 WL 154200, *4 (S.D.N.Y. June 18, 1992) (citation and quotations omitted).

21. Here the terms of the DIP Facility were negotiated in good faith and at arm's length between the Debtor and the Lender, each of whom was represented by experienced professionals. As explained above, the DIP Facility reflects an exercise of the Debtor's sound business judgment that the terms and conditions of the financing are fair and reasonable and inure to the benefit of the Debtor's estate. The proceeds of the DIP Facility will be extended by the Lender in good faith and will be used only for purposes that are permissible under the Bankruptcy Code. Further, as described in the executive summary, the Lender will not receive any interest or be reimbursed for any of its costs and expenses incurred in connection with the DIP Facility if RKJS is the winning bid and the M&A Transaction is consummated.

22. As such, the Lender is a "good faith" lender within the meaning of section 364(e) of the Bankruptcy Code and is entitled to all of the protections afforded by that section to

the extent any of the provisions of the DIP Order or the DIP Credit Agreement are hereafter modified or reversed on appeal.

### C. The Replacement DIP Facility Should Not Require Further Approval of the Court and the DIP Order Should Apply to It In All Respects

23. A Replacement DIP Facility that will be offered by any qualified overbidder must be on terms that are substantially the same, and at least as favorable to the Debtor, as those provided under the DIP Facility. Thus, the terms of the Replacement DIP Facility will not be materially different from those of the DIP Facility. Given that any objectionable terms of the DIP Facility will have been addressed by the time that any Replacement DIP Facility is evaluated by the Court (at the sale hearing), the Replacement DIP Facility should not have any objectionable terms. Nevertheless, any party wishing to object to the terms of the Replacement DIP Facility will have notice and an opportunity to do so at the sale hearing, as contemplated by the proposed order governing the auction procedures.

24. Based on the foregoing, the Debtor respectfully submits that (i) the Debtor should not be required to file a separate motion with respect to the approval of the Replacement DIP Facility and compliance with any requirements under the Bankruptcy Rules or the Local Bankruptcy Rules that may require it to do so should be waived and (ii) the terms of the DIP Order should apply to the Replacement DIP Facility to the same extent as it applies to the DIP Facility.

## NOTICE

25. No trustee or examiner has been appointed in the Debtor's Chapter 11 Case. Notice of this Motion has been provided to Notice of this Motion has been provided to (i) the U.S. Trustee; (ii) counsel for the official committee of unsecured creditors (if such committee has been appointed), (iii) the 20 largest unsecured creditors of the Debtor; (iv) the applicable

taxing authorities; (v) the FDIC, (vi) the Maryland CFR; (vii) the FRB; and (viii) any party in interest who has requested notice pursuant to Bankruptcy Rule 2002 (entities listed in (i) through (viii) are hereby collectively referred to as the "General Notice Parties"), and the notice contains the information required under Local Bankruptcy Rule 4001-4.  The Debtor submits that no other or further notice need be provided.

## NO PREVIOUS REQUEST

26. No previous request for the relief sought herein has been made to this or any other court.

## STATEMENT PURSUANT TO LOCAL BANKRUPTCY RULE 9013-2

27. Pursuant to Rule 9013-2 of the Local Bankruptcy Rules, the Debtor states that, in lieu of submitting a memorandum in support of this Motion, it will rely solely upon the grounds and authorities set forth herein.

WHEREFORE, the Debtor respectfully requests that the Court enter an order granting the relief requested and such other or further relief as is just.

Dated:  February 10, 2014

/s/ Lawrence J. Yumkas
Lawrence J. Yumkas, 06357
Yumkas, Vidmar & Sweeney, LLC
2530 Riva Road, Suite 400
Annapolis, Maryland  21401
(443) 569-0758
lyumkas@yvslaw.com

Robert T. Schmidt
Joshua K. Brody
Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, New York  10036
(212) 715-9100
rschmidt@kramerlevin.com
jbrody@kramerlevin.com

*Proposed Counsel for the Debtor*

CERTIFICATE OF SERVICE

I hereby certify that on this 10th day of February 2014, notice of filing of the Motion of the Debtor for a Final Order Pursuant to Sections 105, 362, and 364 of the Bankruptcy Code (A) Authorizing and Approving Debtor-in-Possession Financing and Granting Security Interests and a Superpriority Administrative Claim in Connection Therewith, (B) Approving the Terms and Conditions of that Certain Superpriority Debtor-in-Possession Credit Agreement and Related Documents, and (c) Modifying the Automatic Stay to the Extent Necessary to Enter into the DIP Financing and Effectuate the Terms Thereof (the "Motion") was sent electronically to those parties listed on the docket as being entitled to such electronic notice, and a copy of the Motion was mailed first class, postage prepaid to the parties on the attached service list.

/s/ Catherine Nownes-Whitaker
Catherine Nownes-Whitaker

First Mariner Bank
Attn: Joseph F. Howard,
Sr. Vice President, General Counsel
1501 S. Clinton St.
Baltimore, MD 21224

The Bank of New York, Trustee
f/b/o Mariner Capital Trust II
Attn: Corporate Trust Administration
White Clay Center, Route 273
Newark, DE 19711

Wells Fargo Bank, NA, Trustee
f/b/o Mariner Capital Trust III
Attn: Corporate Trust Administration
919 Market St. Suite 700
Wilmington, DE 19801

Wells Fargo Bank, NA, Trustee
f/b/o Mariner Capital Trust IV
Attn: Corporate Trust Administration
919 Market St. Suite 700
Wilmington, DE 19801

Wells Fargo Bank, NA, Trustee
f/b/o Mariner Capital Trust VI
Attn: Corporate Trust Administration
919 Market St. Suite 700
Wilmington, DE 19801

Wilmington Trust Company, Trustee
f/b/o Mariner Capital Trust V
Attn: Corporate Trust Administration
Rodney Square N 1100 N. Market St.
Wilmington, DE 19890-1600

Comptroller of Maryland
Compliance Division
110 Carroll Street
Annapolis, MD 21411

Internal Revenue Service
P.O. Box 7346
Philadelphia, PA 19101-7346

IRS
Special Procedures – Insolvency Unit
31 Hopkins Plaza Room 1150
Baltimore, MD  21201

Federal Deposit Insurance Corporation
Julie Howland
350 Fifth Avenue
New York, NY 10118-0110

Federal Reserve Bank of Richmond
Richard Gilbert
701 East Byrd Street
Richmond, VA 23219
Local: 804-697-8000

The following parties received
electronic notice of the filing:

Office of the U.S. Trustee
101 West Lombard Street
Baltimore, Maryland  21201

Gary R. Bronstein, Esquire
Kilpatrick Townsend & Stockton LLP
607 14th Street, NW Suite 900
Washington, DC 20005-2018

Joel Rappoport, Esquire
Kilpatrick Townsend & Stockton LLP
607 14th Street, NW Suite 900
Washington, DC 20005-2018

Joshua Brody, Esquire
Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, NY 10036

Robert T. Schmidt, Esquire
Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, NY 10036

Edward S. Stein
Sandler O'Neill & Partners LP
1251 Avenue of the Americas
6th Floor
New York, NY 10020

Richard Wasserman, Esquire
Venable, LLP
750 E Pratt St #900
Baltimore, MD 21202