IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
(Baltimore Division)

| | | |
|---|---|---|
| In re: | * | |
| FIRST MARINER BANCORP | * | Case No: 14-11952 DER |
| | | (Chapter 11) |
| Debtor | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

MOTION OF THE DEBTOR FOR (I) AN ORDER (A) APPROVING BIDDING
AND AUCTION PROCEDURES WITH RESPECT TO THE SALE OF CERTAIN
ASSETS, (B) APPROVING BIDDING PROTECTIONS FOR THE STALKING
HORSE BIDDER, (C) APPROVING PROCEDURES RELATED TO THE
ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS
AND UNEXPIRED LEASES, (D) APPROVING THE FORM AND MANNER OF
NOTICES RELATED TO THE AUCTION AND SALE, AND (E) SCHEDULING
THE SALE HEARING, AND (II) AN ORDER (A) APPROVING SUCH
SALE FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES
AND OTHER INTERESTS AND (B) GRANTING RELATED RELIEF

First Mariner Bancorp ("FMAR" or the "Debtor") submits this motion (the

"Motion")[1] for (I) an order, substantially in the form attached hereto as **Exhibit A** (the "Auction

Procedures Order"), (a) approving bidding and auction procedures (the "Auction Procedures")

governing the transfer and sale of all of the issued and outstanding shares (the "Bank Shares") of

First Mariner Bank, a Maryland chartered trust company (the "Bank") and certain assets related

thereto (the "Other Purchased Assets" and together with the Bank Shares, the "Purchased Assets");

(b) approving the breakup fee and expense reimbursement for RKJS Bank, a Maryland chartered

trust company ("RKJS"), which serves as the "stalking horse" bidder (in such capacity, the

"Stalking Horse Bidder") pursuant to that certain Merger and Acquisition Agreement dated

February 7, 2014 (as further described below, the "M&A Agreement"), by and among the Debtor,

---

[1] Contemporaneously with the filing of this Motion, the Debtor has filed its *Motion to Shorten Time Period to Respond to (A) the Bid and Auction Procedures and Stalking Horse Provisions Contained in Debtor's Sale Motion and (B) the Debtor's Motion for Authority to Obtain Debtor-In-Possession Financing* (the "Motion to Shorten"). In the Motion to Shorten, the Debtor requests that the Court set a hearing date and objection deadline with respect to approval of the Auction Procedures and DIP Motion that will permit the Debtor to comply with certain deadlines contained in the M&A Agreement.

the Bank, and RKJS, attached hereto as **Exhibit B**; (c) approving procedures related to the assumption and assignment of certain executory contracts and unexpired leases related to the Bank (as further described below, the "Designated Contracts"); (d) approving the form and manner of certain notices related to the auction and sale of the Purchased Assets; and (e) scheduling a hearing (the "Sale Hearing") to approve the transfer and sale of the Purchased Assets pursuant to the M&A Agreement (such transactions, including the merger thereunder, collectively, the "M&A Transaction") or pursuant to an alternate transaction with another successful bidder; and (II) an order, substantially in the form attached hereto as **Exhibit C** (the "Sale Order"), (a) approving the transfer and sale of the Purchased Assets free and clear of liens, claims, encumbrances and other interests to RKJS (in accordance with the M&A Agreement) or another successful bidder and (b) granting related relief.  In support of the Motion, the Debtor relies upon the *Declaration of William L. Boyan III in Support of the Debtor's Motions to Sell Certain Assets and to Obtain Postpetition Financing* (the "Boyan Declaration") and the *Declaration of Mark A. Keidel in Support of the Debtor's Chapter 11 Petition and Certain Motions* (the "Keidel Declaration"), each of which was filed simultaneously herewith and is incorporated herein, and respectfully represents as follows:

## PRELIMINARY STATEMENT

After nearly four years of marketing efforts, and following a payment default relating to the Debtor's unsecured junior subordinated debentures (and a lawsuit related thereto), FMAR has filed for bankruptcy protection to sell its primary asset, 100% of its equity in the Bank, and thereby maximize recoveries for its estate and creditors.

To implement this transaction, the Debtor files this Motion seeking two distinct, but related, forms of relief.  *First*, the Debtor seeks entry of an order that (a) approves (i) the Auction Procedures, pursuant to which the Debtor will solicit and consider additional "qualified"

bids to purchase the Purchased Assets, (ii) the breakup fee and expense reimbursement for the Stalking Horse Bidder, (iii) procedures governing the conduct of an auction, which will take place in the event the Debtor receives more than one "qualified" bid, (iv) procedures for the assumption and assignment of the Debtor's executory contracts and unexpired leases in connection with the sale of the Purchased Assets, and (v) the form and manner of notices related to the auction and the sale process; and (b) schedules the Sale Hearing to approve, among other things, the successful bid.

   *Second*, the Debtor seeks entry of the an order that (a) approves the transfer and sale of the Purchased Assets to the successful bidder free and clear of liens, claims, encumbrances and other interests, and (b) the assumption and assignment of certain executory contracts and unexpired leases designated by the successful bidder.

## JURISDICTION AND VENUE

  1. <u>Jurisdiction and Venue</u>.  This Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334.  The Motion is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A).  Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

  2. <u>Statutory Predicates</u>.  The statutory predicates for the relief requested in the Motion are sections 105(a), 363(b), (f), and (m), 365, 503, and 507 of title 11 of the United States Code (the "Bankruptcy Code"); Rules 2002(a)(2), 6004(a), (b), (c), (e), (f), and (h), 6006(a) and (c), 9007, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"); and Rules 2002-1, 2002-2, 6004-1, and 6006-1 of the Local Bankruptcy Rules for the District of Maryland (the "Local Bankruptcy Rules").

## BANKRUPTCY BACKGROUND

3.      On February 10, 2014 (the "Petition Date"), the Debtor filed a voluntary

petition for relief under Chapter 11 of the Bankruptcy Code.  The Debtor is operating its business

as debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

4.      No official committee of unsecured creditors has been appointed by the

United States Trustee for the District of Maryland (the "U.S. Trustee").

## BUSINESS BACKGROUND

5.      Founded in 1995, FMAR is a Maryland corporation registered as a bank

holding company under the Bank Holding Company Act of 1956 (as amended).  FMAR owns

100% of the issued and outstanding shares of the Bank.  FMAR does not have its own operations

and has virtually no employees.  Its assets consist of (i) the equity in the Bank and interests in

certain statutory trusts (as described below), as described below, (ii) approximately $337,000

contained in cash and investment accounts, and (iii) a receivable due from the sale of its former

consumer finance division, Mariner Finance, LLC, which was sold in late 2009, in the amount of

approximately $345,000.

6.      The Bank, which is *not* a debtor and continues to operate in the ordinary

course of business, was formed in 1995 through the merger of two predecessor banks.  It is the

largest bank headquartered in Baltimore, Maryland, with 465 employees and 16 retail bank

branches located throughout Maryland and 12 mortgage offices located throughout Maryland,

Virginia and Delaware.

### *Bank's Products and Services*

7.      In addition to traditional banking products and services (e.g., consumer

deposit and checking accounts), the Bank offers a variety of modern products and services (e.g.,

debit cards, mobile banking, electronic bill payment, and personal financial management services), as well as consumer loan products (e.g., home equity lines of credit, fixed-rate second mortgages, and unsecured personal credit lines).    As of the Petition Date, the Bank holds in excess of $880 million in total deposits.

8.    The Bank also operates a commercial loan unit that focuses on loan originations to small and mid-sized businesses (i.e., with up to $20 million in annual sales).  The Bank's commercial loan products include (among other things): commercial mortgage loans for the purchase or refinance of commercial properties; real estate construction and development loans; working capital loans and lines of credit; demand, term, and time loans; and equipment, inventory, and accounts receivable financing.  The Bank also offers an array of cash management services and deposit products to the Bank's commercial customers, including computerized on-line banking and remote deposit.  As of the Petition Date, the Bank holds approximately $290 million in face amount of commercial loans in its portfolio.

9.    In addition to its core banking activities, a division of the Bank known as First Mariner Mortgage is dedicated to mortgage-banking activities.  First Mariner Mortgage's products include Federal Housing Administration and the Federal Veterans Administration loans, conventional and nonconforming first- and second-lien mortgages, and construction and permanent financing.  Most of the mortgages originated by First Mariner Mortgage are sold into the secondary market.  As of the Petition Date, the Bank holds approximately $190 million in face amount of mortgage loans.

### *Regulatory Oversight*

10.    Both FMAR and the Bank are subject to significant regulatory oversight. FMAR's principal regulators are the Board of Governors of the Federal Reserve System and the

- 5 -

Federal Reserve Bank of Richmond (the "FRB"). The Bank's principal regulators are the Federal Deposit Insurance Corporation (the "FDIC") and the Office of the Commissioner of Financial Regulation for the State of Maryland (the "Maryland CFR" and together with the FRB and FDIC, the "Regulators"). As described in more detail below, the Regulators have substantial enforcement authority with respect to FMAR and the Bank's activities.

## FMAR'S CAPITAL STRUCTURE

### *Trust Preferred Securities*

11.     As of the Petition Date, FMAR has outstanding unsecured obligations totaling approximately $60 million, primarily consisting of principal and interest owing under certain junior subordinated debentures (the "Debentures") as well as under FMAR's guarantee of certain "trust preferred securities" related to the Debentures. As described below, the Debentures were issued in a series of transactions – of a type commonly used by bank holding companies that take advantage of favorable regulatory, tax, and accounting treatment – that enabled FMAR to raise capital in the public markets.

12.     Between 2002 and 2005, FMAR formed eight Delaware statutory trusts, six of which remain in existence (the "Trusts"). The Trusts issued certain preferred securities – commonly known as "trust preferred securities" ("TruPS") – in the aggregate principal amount of $82 million, which were sold to third party investors.[2] The Trusts then delivered the proceeds of the sale of the TruPS to FMAR in return for the Debentures. The Debentures have the same principal and interest payment schedule as the TruPS such that the payments made by FMAR on the Debentures provide the Trusts with a source of payment with respect to the principal and interest due on the TruPS. FMAR also guaranteed the TruPS for the benefit of the TruPS holders

---

[2] As of the Petition Date, approximately $5 million in principal amount of the TruPS are held by current or former officers and directors of FMAR and the Bank.

(the "TruPS Guarantee").  Since their issuance, approximately $31 million of TruPS have been refinanced or redeemed in exchange for common stock and warrants, leaving approximately $51 million in principal amount of TruPS outstanding as of the Petition Date.

13.    Each of the Debentures allows FMAR, in certain circumstances, to defer the payment of interest thereon for a period of up to 20 calendar quarters.  A deferral by FMAR, in turn, also permits the Trusts to defer the corresponding distributions in respect of the TruPS for the same period.   At the end of the deferral period, if FMAR fails to pay the deferred distributions on the Debentures to the Trusts (which, in turn, causes the Trusts to be unable to pay distributions to the holders of the TruPS), the Institutional Trustees for the Trusts, or, in certain cases, the holders of a specified percentage of the liquidation amount of the TruPS, have the right (after expiration of any applicable grace period), to declare an event of default.  The occurrence of an event of default on the Debentures entitles the Institutional Trustees and the TruPS holders (as applicable) to exercise various remedies, including demanding immediate payment of the entire outstanding principal amount of the Debentures.

14.    Beginning in December 2008, FMAR exercised its right to defer interest payments under each of the Debentures.  Thereafter, FMAR continued to defer interest for the maximum permitted period of 20 calendar quarters.  All accrued, unpaid, deferred interest under each of the Debentures will, or has, become due and payable on various dates during the first quarter of 2014, with the first such date having occurred on January 7, 2014 under Mariner Trust III ("Trust III") and the related Debenture and TruPS Guarantee.  FMAR did not pay the deferred interest that became due on January 7 and, after a 30-day grace period thereunder, on February 6, 2014, an event of default was triggered under Trust III, and the related Debenture and TruPS Guarantee.  On February 7, 2014, certain holders of the TruPS issued by Trust III filed a lawsuit

against FMAR in the Southern District of New York for breach of contract due to FMAR's failure to pay the deferred interest.

### *Equity*

15.     FMAR's Amended and Restated Articles of Incorporation, as in effect on the Petition Date, authorize the issuance of up to 75 million shares of common stock.  As of January 30, 2014, there were 19,714,592 issued and outstanding shares of common stock, which were held by approximately 909 holders of record.

## PRIOR EFFORTS TO MARKET AND RECAPITALIZE THE BANK

16.     The global credit and financial crisis that commenced in 2007 had a significant negative impact on FMAR and the Bank.  Beginning that year, the Bank began to incur significant losses that impaired its ability to meet certain regulatory requirements for capital, profitability, and credit quality.  Unlike certain other banks at that time, the Bank did not receive any financial support under the Troubled Asset Relief Program.  The Bank's deteriorating financial condition had a direct negative impact on FMAR, which also began to report net losses beginning in 2007.

17.     As a result of these financial issues, on September 18, 2009, the FDIC and the Maryland CFR imposed a cease and desist order on the Bank (the "C&D Order") directing it to, among other things, raise sufficient capital to achieve specified capital ratio levels.  On November 24, 2009, FMAR entered into an agreement with the FRB (the "FRB Agreement") that, among other things, required FMAR to submit a plan to achieve certain minimum capital requirements.  As of the Petition Date, neither FMAR nor the Bank met the capital requirements imposed by the Regulators.

18.     The Maryland Commissioner and the FDIC have extensive enforcement authority over the Bank and failure to comply with the capital raising directives could, under certain circumstances, authorize the Regulators to seize the Bank and have a receiver or conservator appointed. Such action would likely result in a total loss for FMAR and its stakeholders.

19.     To help raise capital and comply with the regulatory directives, in October 2009, FMAR and the Bank hired Sandler O'Neill & Partners, L.P. ("Sandler O'Neill"), one of the premier advisors in the financial institutions sector, to assist in raising capital.  Over the course of the ensuing four years, Sandler O'Neill contacted over 135 potential financial investors and strategic buyers to gauge their interest in pursuing an investment in, or purchase of, FMAR and/or the Bank.  As described in more detail below, before entering into the M&A Agreement, FMAR and the Bank negotiated with multiple parties regarding a number of different potential transactions.  At least five of these negotiations progressed well past the preliminary stages, but ultimately failed to come to fruition: (i) a proposed $160 million private placement in 2011; (ii) a proposed sale pursuant to section 363 of the Bankruptcy Code in 2012; and (iii) a proposed "prepackaged" bankruptcy in the fall of 2012; (iv) a proposed "prepackaged" bankruptcy in early 2013; and (v) a proposed sale of the Bank in August 2013.

*FMAR's Initial Capital Raising and Debt Reducing Efforts*

20.     As part of its efforts to meet the requisite capital levels and reduce its debt, FMAR engaged in a series of smaller transactions in 2009 and 2010.  In December 2009, FMAR sold 95% of its equity in its consumer finance division, Mariner Finance, LLC, for a purchase price of $10.5 million in cash.[3]  In April 2010, FMAR conducted both a rights offering and a

---

[3] In May 2013, FMAR sold its remaining 5% stake in Mariner Finance, LLC.

"community" offering (i.e., an offering of common stock to investors located near Baltimore, Maryland) that raised gross proceeds of $10.9 million.

21.     In March and July 2010, FMAR reduced its level of debt by exchanging $21 million of TruPS held by members and former members of FMAR's board of directors for shares of FMAR's common stock and warrants to acquire FMAR's common stock.

22.     Notwithstanding FMAR's traditional capital raising processes and various attempts at debt reduction, FMAR was unable to increase its capital ratios to comply with regulatory directives.  Accordingly, FMAR began to explore a sale of FMAR to strategic buyers and other capital raising alternatives.  From 2010 to 2013, FMAR and Sandler O'Neill contacted numerous potential financial and strategic investors to gauge interest in various types of capital raising transactions, including investment transactions and a sale of the Bank pursuant to section 363 of the Bankruptcy Code or a "prepackaged" Chapter 11 plan.  Unfortunately, as discussed below, due to regulatory requirements, a lack of interested or viable parties, and/or an inability to reach agreement on an appropriate purchase price or other material terms, none of these potential transactions were able to be consummated.

*The Proposed 2011 Investment Transaction and Discounted Tender Offer*

23.     Beginning in 2010, Sandler O'Neill contacted over 100 potential financial investors that it identified through its extensive experience in the financial industry.  Twenty-one of these parties executed a non-disclosure agreement with FMAR and eight met with Sandler O'Neill and FMAR to discuss a potential transaction.  None of these discussions, however, resulted in a viable proposal.

24.     In early 2011, FMAR was contacted by a private equity firm interested in investing in FMAR and/or the Bank.  After extensive negotiations, in April 2011, FMAR entered into an agreement with this firm pursuant to which it agreed to invest approximately $36 million

in FMAR (the "2011 Investment Transaction"). The 2011 Investment Transaction was intended to be part of a $160 million private placement and was conditioned upon, among other things, FMAR raising capital from additional investors. Despite FMAR's and Sandler O'Neill's best efforts, however, FMAR was unable to secure the remainder of the capital and the 2011 Investment Transaction was subsequently terminated.

25.     Following termination of the 2011 Investment Transaction, in late 2011, in an effort to further delever FMAR's balance sheet, FMAR extended a discounted cash tender offer for FMAR's outstanding TruPS. The offer contained a number of significant conditions – including obtaining regulatory approval and acceptance of the offer by 100% of the TruPS holders. The conditions to the tender offer ultimately were not met, and the offer was terminated in early 2012.

### *The Proposed Sale Transactions*

26.     In late 2011, Sandler O'Neill initiated a traditional sale process of FMAR, through which Sandler O'Neill contacted approximately 35 strategic buyers whom Sandler O'Neill believed would have an interest in, and the financial ability to, purchase FMAR. Of the parties contacted, seven potential buyers executed non-disclosure agreements to obtain additional information from FMAR, but ultimately no bids or indications of interest were received. This process was terminated in early 2012.

27.     In October 2011, FMAR determined to pursue a transaction to recapitalize the Bank through a bankruptcy, such as a sale pursuant to section 363 of the Bankruptcy Code or a "prepackaged" Chapter 11 plan. Sandler O'Neill re-marketed FMAR to most of the over 100 financial investors previously contacted and a few new potential investors identified by Sandler

O'Neill to gauge interest in such a bankruptcy transaction, of which three executed non-disclosure agreements with FMAR to begin conducting due diligence.

28.    In December 2011, two private equity firms who had executed non-disclosure agreements (together, the "PE Parties") – one of whom was also a party to the proposed 2011 Investment Transaction – expressed an interest in acquiring the Bank Shares through a bankruptcy transaction.    After seven months of due diligence and extensive negotiations, these parties, together with certain other investors, executed a non-binding letter of intent with FMAR to purchase the Bank Shares through a sale under section 363 of the Bankruptcy Code (the "2012 Sale Transaction").

29.    Beginning in late 2011 and continuing through 2012, FMAR and the Bank returned to profitability.  This was primarily due to significant improvements in the mortgage refinancing market, whereby historically low interest rates led to a significant increase in loan volume and prices that the Bank realized on its loan sales.  In addition, during 2012, real estate conditions improved in the Bank's market area, stabilizing the Bank's asset quality.  Differing views regarding the value of FMAR and the Bank due to the changes in the then-current market conditions and the Bank's then-record earnings and projections made it extremely challenging for the parties to agree on an appropriate purchase price in the proposed 2012 Sale Transaction.

30.    Because of the difficulty in negotiating a purchase price for the proposed 2012 Sale Transaction, Sandler O'Neill re-initiated dialogue with potential strategic buyers that might be interested in purchasing FMAR and/or the Bank in light of the improved conditions in the market and FMAR's record earnings.  Specifically, Sandler O'Neill contacted approximately 20 of the previously contacted potential acquirers, plus one additional party identified by Sandler O'Neill.  In November 2012, the Bank received a proposal from one of these institutions to

purchase FMAR through a prepackaged Chapter 11 plan.  To proceed with this transaction, however, the financial institution required that FMAR cease negotiations with all other parties. Because the proposed transaction would have provided a significantly better return for FMAR, its creditors, and other stakeholders than the proposed 2012 Sale Transaction, which was at a standstill due to valuation differences between the parties, FMAR terminated discussions with respect to the proposed 2012 Sale Transaction and pursued negotiations with the financial institution.  After extensive negotiations, and informal discussions with FMAR's regulators, FMAR came to the conclusion that this transaction was unlikely to receive regulatory approval. As a result, FMAR terminated discussions with this financial institution in December 2012.

### *The Proposed Prepackaged Bankruptcy*

31.    In January 2013, FMAR resumed negotiations with the PE Parties to consummate a transaction.  This time, the PE Parties agreed to invest in FMAR through a prepackaged bankruptcy transaction. Also included in the negotiations were representatives of almost 20% of the face amount of the TruPS.  Following extensive negotiations, the parties agreed to pursue a comprehensive recapitalization transaction pursuant to a prepackaged Chapter 11 plan that would address both the capital needs of the Bank and FMAR and would be on terms acceptable to those TruPS holders that were involved.  During the parties' negotiations of the transaction documents, FMAR began to express concerns about the ability of the Bank to meet the minimum capital ratios required in the transaction documents even if the prepackaged Chapter 11 plan was successfully consummated.  The investors were unwilling to renegotiate the investment amount or the target capital ratios and, in June 2013, the investors terminated discussions and abandoned the prepackaged bankruptcy transaction.

*Subsequent Efforts in 2013*

32.     In August 2013, Sandler O'Neill again marketed the Bank to 24 potential strategic acquirers, most of whom were contacted previously by Sandler O'Neill, to discuss a potential sale of FMAR and/or the Bank.  Of these parties, four executed non-disclosure agreements with FMAR, two conducted limited due diligence, and one ultimately expressed an interest in pursuing a transaction and submitted a term sheet to FMAR.  Although at first this party proposed to purchase the Bank, ultimately, after conducting due diligence, it was only willing to purchase certain of the Bank's best branches and deposits and certain of the Bank's best performing loans.  This offer was unsatisfactory, however, as it would have depleted the Bank of its most valuable assets and yet not provided sufficient capital for the Bank to satisfy the capital requirements under the applicable regulatory directives or otherwise address FMAR's financial distress.  As a result, FMAR concluded that regulatory approval for such a transaction would not likely be obtained.  Accordingly, FMAR did not pursue the transaction further.

## THE M&A TRANSACTION

33.     In the fall of 2013, FMAR received a letter of intent from RKJS Inc., which had identified a group of six investors – including certain investors that were part of the 2011 Investment Transaction and the 2012 Sale Transaction – that were interested in acquiring the Bank Shares.[4]  After extensive negotiations, on November 21, 2013, the parties entered into a term sheet that set forth the material terms of a sale and merger transaction to be consummated pursuant to section 363 of the Bankruptcy Code, whereby certain investors would (i) purchase the Bank Shares through a merger of an interim bank into the Bank, and (ii) recapitalize the Bank to comply with the applicable regulatory directives.

---

[4] In addition, two of the investors, Jack E. Steil and Robert D. Kunisch Jr., were previously employed as independent consultants by the Bank from July 1, 2011 to July 31, 2013.

34.    After months of extensive negotiations, on February 7, 2014, FMAR, the Bank and RKJS entered into that certain Merger and Acquisition Agreement (the "M&A Agreement") to consummate the M&A Transaction.  The M&A Transaction is functionally a transfer of the Debtor's shares in the Bank (as well as certain Bank-related assets) to the "Investors" (as defined in the M&A Agreement) for consideration of $4.775 million (the "Purchase Price").[5]  As a technical matter, this transfer is structured as a merger between the Bank and a newly chartered interim bank formed by the Investors (i.e., RKJS).  The merged Bank will be the surviving entity following the merger.  Once the merger takes place, FMAR's shares in the pre-merger Bank will be cancelled and new shares in the merged Bank will be issued to the Investors.

35.    As part of the M&A Transaction, the Investors have also agreed to recapitalize the Bank in an amount between $85 million and $100 million, less the Purchase Price (such amount, the "Recapitalization Amount").

36.    As is customary in a sale transaction under section 363 of the Bankruptcy Code, the M&A Agreement permits the Debtor to consider certain higher or otherwise better competing bids (each a "Competing Bid") by certain overbidders ("Competing Bidders").  RKJS has agreed to set the "floor" price for Competing Bidders to outbid by serving as a "stalking horse" bidder in the bankruptcy auction process.

37.    In consideration for serving as the stalking horse bidder, if a Competing Bid is ultimately selected as the winning bid at the auction, or upon termination of the M&A Agreement (provided that RKJS is not in material breach thereof), RKJS will be entitled to (i) a

---

[5] The Purchase Price will be reduced on a dollar-for-dollar basis for each dollar that the Bank's "Tier 1 Capital" (calculated in accordance with the M&A Transaction) as of the closing of the M&A Transaction is less than $29 million.  This mechanic may have a material impact on the ultimate Purchase Price.  The Purchase Price will not be increased if the closing date Tier 1 Capital is more than $29 million.

breakup fee in the amount of $1 million, consisting of $250,000 due from FMAR and $750,000 due from the Bank, and (ii) reimbursement of the actual fees and expenses incurred by RKJS and the Investors in connection with the M&A Transaction, up to an amount of $1.75 million ((i) and (ii) referred to herein as the "Stalking Horse Bidder Fee").

38.     In light of the nature of the Bank's business and its current regulatory constraints, the M&A Transaction must be consummated on a strict timeline to avoid an erosion of consumer confidence that could harm the Bank, and thereby threaten the consummation of this transaction, which would compromise recoveries to the Debtor's creditors. To this end, the M&A Transaction must be consummated no later than April 30, 2014 (unless the parties agree to extend such date).

## THE DIP LOAN FINANCING

39.     Because FMAR does not have any independent operations, it does not have sufficient funds to pay the cost of consummating the M&A Transaction, which will primarily include the cost of administering its Chapter 11 estate. To enable FMAR to pay these costs pending the closing of the M&A Transaction, RKJS has agreed to provide to the Debtor a postpetition delayed-draw term loan (the "DIP Loan") in an amount of up to $2.5 million (together with any interest, fees and costs outstanding under the DIP Loan, the "DIP Obligations") pursuant to that certain Super-Priority Debtor-in-Possession Credit Agreement between RKJS and FMAR (the "DIP Credit Agreement"). Simultaneously herewith, the Debtor has filed a motion (the "DIP Motion") seeking authority to obtain the DIP Loan pursuant to the DIP Credit Agreement. Significantly, RKJS has agreed that if it is the winning bidder, it will not charge the Debtor any interest or fees on the DIP Loan.

40.     If the winning bidder for the Purchased Assets is not RKJS, the DIP Obligations will have to be repaid shortly after the approval of such winning bid. In such

circumstance, because the DIP Credit Agreement is functionally a "bridge" to the closing of the M&A Transaction, the winning bidder will be required to provide debtor-in-possession financing, with substantially similar (and no less favorable) terms as those of the DIP Loan, to replace the DIP Loan and finance the consummation of the sale of the Purchased Assets to such Competing Bidder. Thus, in the DIP Motion, the Debtor seeks contingent approval of the winning bidder's replacement debtor-in-possession financing in the event that such bidder is the winner at the auction for the Purchased Assets.

## AUCTION PROCEDURES ORDER

A.    *Auction and Bidding Procedures*

41.    In an effort to ensure that the Debtor obtains the highest or otherwise best price for the Purchased Assets, the Debtor seeks approval of certain procedures (i.e., the Auction Procedures) that will govern the bidding process and the conduct of the auction with respect to such Purchased Assets (the "Auction"). A copy of the Auction Procedures is attached hereto as **Exhibit D.**

42.    The following is a summary of certain provisions of the Auction Procedures:[6]

(a)    <u>Initial Participation Requirement</u>. In order to be eligible to receive confidential due diligence information and submit an initial overbid, any interested party must, as set forth in the Auction Procedures, sign a confidentiality agreement and submit financial statements demonstrating that it will have the financial capability to consummate the purchase of the Purchased Assets and provide the Recapitalization Amount. Such information must be submitted by no later than 10 days prior to the Bid Deadline (as defined below).

(b)    <u>Bid Deadline</u>. Any interested party that satisfies the above initial participation requirement must submit the rest of its bid package,

---

[6] To the extent that there are any inconsistencies between the summary description of the Auction Procedures contained herein and the terms and conditions the Auction Procedures, the terms of the Auction Procedures control.

in electronic form, to the parties specified in the Auction Procedures, by no later than 30 days after the Auction Procedures Order is entered (the "Bid Deadline").

(c)     "Qualified Bid" Requirements.   In order to participate in the Auction, each eligible overbidder must submit a bid package satisfying, among other things, the following criteria:

(i)     The package must include an executed transaction agreement (using the form of, and on substantially the same terms as, the M&A Agreement) (the "Competing Acquisition Agreement"), along with a mark-up comparing it to the M&A Agreement.

(ii)    The package must include a commitment to provide a Replacement DIP Facility to replace the DIP Loan, on terms that are substantially the same, and at least as favorable to the Debtor, as the terms of the DIP Agreement. To this end, the overbidder must include an executed revised credit agreement (using the form of the DIP Credit Agreement), along with a mark-up comparing it to the DIP Credit Agreement.

(iii)   The minimum overbid must be at least $250,000 more than the aggregate sum of the Purchase Price and the Stalking Horse Bidder Fee.  The bid must also include a commitment to recapitalize the Bank in at least the Recapitalization Amount.

(iv)    The overbidder must provide a deposit in an amount equal to the sum of: (a) $250,000, (b) the Stalking Horse Bidder Fee, and (c) the sum of (i) the "Obligations" (as defined in the DIP Credit Agreement) outstanding under the DIP Credit Agreement as of seven days before the Bid Deadline (the "DIP Measuring Date"), and (ii) the aggregate amount of additional draws under the DIP Facility that FMAR anticipates to make between the DIP Measuring Date and the Sale Hearing, which will be estimated in good faith by the Debtor, in writing, one day after the DIP Measuring Date and served on the Stalking Horse Bidder and each potential bidder.

(v)     The overbidder may not request a breakup fee.

(d)     Determination of Qualified Bids.  The Debtor may determine that a bid that satisfies all the requirements set forth above is qualified to participate in the Auction (such bid, a "Qualified Bid") if such bid

is not materially more burdensome than the Stalking Horse Bid and can be consummated prior to April 30, 2014. The Stalking Horse Bid and any subsequent bids made by RKJS during the Auction (so long as such subsequent bids comply with the Auction Procedures) are each deemed a "Qualified Bid."

(e)    No Auction if Only One Qualified Bid.  No Auction will be held if there is no Qualified Bid other than the bid from RKJS.

(f)    Auction.  If more than one Qualified Bid is received, the Debtor will conduct the Auction on a date that is no later than five days after the Bid Deadline, at a location to be selected by the Debtor.[7]

(g)    Auction Procedures.  The following procedures will govern the Auction:

(i)    Bidding will commence at the highest or otherwise best Qualified Bid submitted by the Bid Deadline.  Subsequent bids will be made in increments of at least $250,000.

(ii)    RKJS will have the right to credit bid all outstanding DIP Obligations.  No other credit bids will be permitted.

(iii)    In calculating each successive overbid made by RKJS, any other Qualified Bid will be deemed to be reduced by the amount of the Stalking Horse Bidder Fee.

(iv)    Bidding will continue until there is only one bid that the Debtor determines is the highest or otherwise best offer (the "Successful Bid"), subject to subsequent Court approval at the Sale Hearing. The bidder that submitted the Successful Bid will hereinafter be referred to as the "Successful Bidder."

B.    *Procedures for the Assumption and Assignment of Designated Contracts*

43.    In connection with the M&A Agreement, the Debtor is required to assume certain Bank-related executory contracts and unexpired leases as designated by RKJS (i.e., the Designated Contracts) and assign such agreements to the Bank.

44.    On or before three business days after the entry of the Auction Procedures Order, the Debtor will serve on the non-Debtor counterparties to the Designated Contracts (and

---

[7] Under the M&A Agreement, the Auction must occur no later than five days after the Bid Deadline.

such party's attorney, if such attorney has filed a notice of appearance in the Debtor's Chapter 11 Case) (collectively, the "Counterparties") a notice, substantially in the form attached hereto as **Exhibit E** (together with any supplemental notices served in accordance with the Auction Procedures, the "Assignment Notice"), notifying them of potential assumption and assignment of the Designated Contracts and any amounts necessary to cure any default outstanding thereunder (the "Cure Amount").

      45.    If the Successful Bidder (i) designates for assumption and assignment a different set of Designated Contracts than what was designated in the initial Assignment Notice, or (ii) provides a different Cure Amount(s) than those listed in the initial Assignment Notice, then the Debtor will serve on the applicable Counterparties a supplemental Assignment Notice setting forth such list of Designated Contracts and/or amended Cure Amounts.  The supplemental Assignment Notice will be served as part of the Notice of Successful Bidder (as defined below).

      46.    Objections to the assumption and assignment of the Designated Contracts, including any Cure Amounts with respect thereto, must be served in accordance with the Auction Procedures Order.  If a Counterparty does not serve a timely objection, such party will be deemed to have (i) consented to the assumption of the applicable Designated Contract by the Debtor and assignment thereof to the Bank; (ii) agreed that it has received adequate assurance of future performance within the meaning of section 365(b)(1)(C) of the Bankruptcy Code; (iii) consented to the relevant Cure Amount; (iv) agreed to the terms of the Sale Order; and (v) waived any and all objections in connection with items (i) through (iv) hereof.

C.    *Auction and Sale Hearing Notice*

      47.    Within three business days of entry of the Auction Procedures Order, the Debtor will serve a notice, substantially in the form annexed hereto as **Exhibit F**, together with copies of the Auction Procedures and the Auction Procedures Order (such notice package, the

"Auction and Sale Hearing Notice") on the following parties: (i) all potential purchasers identified by the Debtor or its professionals; (ii) the U.S. Trustee; (iii) counsel for the official committee of unsecured creditors (if such committee has been appointed), (iv) the 20 largest unsecured creditors of the Debtor; (v) the applicable taxing authorities; (vi) the FDIC, (vii) the Maryland CFR; (viii) the FRB; (ix) the Counterparties; (x) any party in interest who has requested notice pursuant to Bankruptcy Rule 2002; and (xi) RKJS and its counsel (entities listed in (i) through (xi) are hereby collectively referred to as the "Special Notice Parties").

D.    *Notice of Successful Bidder*

48.    No later than one business day following the Debtor's selection of the Successful Bidder – either following the Auction or, if no Auction is held, the Bid Deadline – the Debtor will file with the Court, and serve on the parties specified in the Auction Procedures Order, a notice substantially in the form annexed hereto as **Exhibit G** (the "Notice of Successful Bidder"). If no Auction is held, the Notice of Successful Bidder will so state and will identify the Successful Bidder – i.e., the Stalking Horse Bidder. If an Auction is held, the Notice of Successful Bidder: (i) will summarize the Auction results, including the identity of the Successful Bidder, (ii) if the Successful Bidder is the Stalking Horse Bidder, will annex a blacklined copy of the amended M&A Agreement, (iii) if the Successful Bidder is not the Stalking Horse Bidder, will annex blacklined copies of the Competing Acquisition Agreement and the Replacement DIP Facility documents of the Successful Bidder, and (iv) will include the supplemental Assignment Notice, if the Successful Bidder identified additional Designated Contracts or changes the Cure Amount from that set forth in the initial Assignment Notice.

E.    *Objections*

49.    Objections, if any, to the transfer and sale of the Purchased Assets pursuant to the M&A Agreement or the Competing Acquisition Agreement (as applicable) must:

(i) be in writing; (ii) comply with the Bankruptcy Rules and the Local Bankruptcy Rules; and (iii) be filed with the Court, and received by the parties specified in the Auction Procedures Order, on or before 4:00 p.m. (Eastern Standard Time) on the date that is ten business days before the Sale Hearing.

50.     The following objections may be raised at the Sale Hearing: (i) objections to the conduct of the Auction; (ii) objections to the selection of the Successful Bidder; and (iii) objections to the terms of the Competing Acquisition Agreement or the Replacement DIP Facility, *provided*, *that* objections with respect to items in section (iii) may only be raised with respect to those terms of the Competing Acquisition Agreement and Replacement DIP Facility that are materially different from the terms of the M&A Agreement and DIP Credit Agreement (as applicable).[8]

*F.      Sale Hearing*

51.     Subject to the Court's availability and schedule, in order to comply with the deadline set forth in the M&A Agreement, the Debtor has requested that, in accordance with the M&A Agreement, the Sale Hearing take place no later than two days following the Auction, or, if there are no Qualified Overbidders and an Auction is not held, no later than five days following the Bid Deadline.  The Sale Hearing may be adjourned from time to time without further notice to creditors or other parties-in-interest other than by announcement of the adjournment in open court or by filing a notice thereof with the Court as soon as reasonably practicable before the Sale Hearing.

---

[8]   Under the DIP Credit Agreement, the DIP lender will provide summary invoices of its fees and expenses in connection with the DIP Loan to certain enumerated parties, which must be paid if RKJS is not the winning bidder at the Auction.  Any objections to such fees and expenses, to the extent unresolved between the parties, will also be heard at the Sale Hearing.

52.     At the Sale Hearing, the Debtor will request that the Court (i) approve the M&A Transaction, or if the Successful Bidder is not the Stalking Horse Bidder, the transaction contemplated by such bidder's Successful Bid; (ii) approve the Successful Bid; (iii) approve the assumption and assignment of the Designated Contracts and the related Cure Amounts, and (iv) enter the Sale Order providing for this and related relief.

**BASIS FOR RELIEF**

A.     *The Auction Procedures are Reasonable and Appropriate*

53.     The Debtor believes that the proposed procedures (i.e., the Auction Procedures) that will govern the evaluation of additional bids for the Purchased Assets and the conduct of the Auction are appropriate under the circumstances and will maximize the value that the Debtor will receive for the Purchased Assets.

54.     The Auction Procedures have been structured to establish parameters under which the value of the Purchased Assets (primarily the Bank Shares) may be tested by attracting the maximum number of potential investors that would be interested in acquiring such assets, and promoting active bidding from such investors through a fair and competitive bidding process.  In particular, the proposed Auction Procedures will allow the Debtor to (i) identify financially capable bidders who demonstrate the ability to close a transaction, (ii) conduct an auction in a controlled, fair and open fashion that will encourage participation, (iii) undertake an auction in as expeditious and efficient a manner as possible, and (iv) select the winning bid that provides maximum value to the Debtor's estate.  *See* Boyan Declaration, ¶ 39.

55.     The Auction Procedures contemplate an open and transparent sale and auction process that will provide interested parties with sufficient notice and opportunity to submit bids for the Purchased Assets.  The Debtor anticipates that the interested parties will have

30 days from the entry of the Auction Procedures Order to submit their bids for the Purchased Assets, which, given the extensive (four year) prepetition marketing process, is sufficient time for such parties to conduct due diligence and submit a bid.  *See* Boyan Declaration ¶¶ 37-38.

56.    As described above and in the Boyan Declaration, during the past four years, Sandler O'Neill has contacted approximately 135 potential investors and strategic buyers; Sandler O'Neill believes that these 135 parties represent a substantial portion of the universe of potentially interested and qualified investors.  In light of Sandler O'Neill's prior efforts and communications with these investors, these parties already have a basic understanding of the Bank's operations and financial background such that 30 days will be sufficient time for them to conduct due diligence and submit bids for the Purchased Assets.

57.    To the extent that any additional interested parties come forward and express an interest in acquiring the Purchased Assets, the Debtor and Sandler O'Neill will work closely with such parties to facilitate and expedite the due diligence process such that those parties will have sufficient time to conduct the necessary review and submit a bid by the applicable deadline.  Indeed, FMAR has already established a data room to provide potentially interested investors with access to the necessary documents and materials to conduct due diligence, and any new potential investors will be granted immediate access to such data room upon executing a confidentiality agreement pursuant to the Auction Procedures.  Accordingly, the Auction Procedures establish a reasonable timeline for any interested parties to conduct due diligence and submit a bid for the Purchased Assets.

58.    Similar bidding and auction procedures are frequently implemented and have been approved in this and other jurisdictions.  *See*, *e.g*., *In re Neogenix Oncology, In*c., No. 12-23557 (TJC), Dkt. No. 122 (Bankr. D. Md. Sept. 20, 2012) (approving bidding procedures);

*In re Frank Parsons, Inc.*, No. 11-10338 (RAG), Dkt. No. 255 (Bankr. D. Md. Apr. 20, 2011) (same); *In re Cloverleaf Enters., Inc.*, No. 09-20056 (PM), Dkt. No. 712 (Bankr. D. Md. Jan. 21, 2011) (same); *In re N. Texas Bancshares, Inc.*, No. 13-12699 (KG), Dkt. No. 134 (Bankr. D. Del. Nov. 25, 2013) (same); *In re Mercantile Bancorp, Inc.*, No. 13-11634 (KJC), Dkt. No. 109 (Bankr. D. Del. Aug. 8, 2013) (same); *In re Americanwest Bancorporation*, No. 10-06097 (PCW), Dkt. No. 131 (Bankr. E.D. Wash. Nov. 3, 2010) (same).

59.    Accordingly, the Debtor believes that the Auction Procedures are reasonable, appropriate and represent the exercise of the Debtor's sound business judgment and should be approved.

B.    *The Stalking Horse Bidder Fee is Necessary,*
    *Reasonable and Appropriate under the Circumstances*

60.    The Debtor believes that the Stalking Horse Bidder Fee is necessary to preserve and maximize the value of the Purchased Assets, is reasonable and appropriate under the circumstances, is within the range of fees approved in similar cases, and should be approved.

61.    Breakup fees and expense reimbursements, such as the Stalking Horse Bidder Fee, are frequently sought and approved in connection with a debtor's sale of assets under section 363 of the Bankruptcy Code. *See, e.g.*, 3 Collier on Bankruptcy ¶ 363.02[7] (16th ed. 2010) (noting common practice of seeking such protections).  Such protections encourage a stalking horse bidder to invest the requisite time, money and effort to conduct due diligence and sale negotiations despite the inherent risks of a Chapter 11 sale process, including the fact that the debtor will likely have to subject the stalking horse bid to higher or better offers and may not ultimately select the stalking horse bid. *See, e.g.*, *In re Ryan*, 261 B.R. 867, 870 (Bankr. E.D. Va. 2001) ("The basic justification for breakup fees is that the initial offeror provides a valuable service by establishing a minimum price for the assets to be sold and in creating a market for the

assets . . . ."); *Off. Comm. of Subordinated Bondholders v. Integrated Resources, Inc. (In re Integrated Resources, Inc.)*, 147 B.R. 650, 660 (S.D.N.Y. 1992) (noting fees may be necessary to convince "white knight" to offer initial bid by providing compensation for expenses incurred and risks bidder faces by having its offer held open, subject to higher and better offers).

62.    In evaluating whether proposed bidding incentives, such as the Stalking Horse Bidder Fee, should be approved, courts generally apply one of two tests.  A number of courts have approved breakup payments under the deferential "business judgment" standard. *See*, *e.g.*, *Integrated Resources*, 147 B.R. at 656-57; *In re Metaldyne Corp.*, 409 B.R. 661, 667-70 (Bankr. S.D.N.Y. 2009).  Collier notes that the business judgment standard is the "better and more widely held view" for such fees.  Collier ¶ 363.02[7].  Under the business judgment standard, courts will consider such factors as (i) whether the relationship between the parties is tainted by self-dealing, (ii) whether the fee hampers, rather than encourages, bidding, and (iii) whether the amount of the fee is reasonable relative to the consideration being paid by the stalking horse bidder.  *See Integrated Resources*, 147 B.R. at 657.

63.    Other courts have applied the administrative expense standard of section 503(b) of the Bankruptcy Code to evaluate whether such incentives are in the best interests of the estate.  *See*, *e.g.*, *Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527, 535 (3d Cir. 1999) (holding that bidding incentives are governed by section 503(b) administrative expense standard).  Under this standard, whether a bidding incentive may be paid "depends upon the requesting party's ability to show that the fees were actually necessary to preserve the value of the estate."  *Id*.  A benefit to the estate justifying the payment of a breakup fee might be found, for instance, if "assurance of a breakup fee promoted more

competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." *Id.* at 537.

64.    Here, regardless of the standard employed, the Stalking Horse Bidder Fee should be approved, as it represents a sound exercise of the Debtor's business judgment and is necessary to preserve the value of the Debtor's estate.  Under the business judgment standard, each of the factors set forth in *Integrated Resources* (discussed above) favors approval of the Stalking Horse Bidder Fee.  *First*, the Stalking Horse Bidder Fee is the result of an agreement negotiated in good faith and at arm's length between the Debtor and the Stalking Horse Bidder, each of whom was represented by experienced counsel.  Boyan Declaration ¶ 42.  *Second*, the Stalking Horse Bidder Fee encourages bidding because the Stalking Horse Bidder will not proceed with its bid absent the approval of the Stalking Horse Bidder Fee, *see* Boyan Declaration ¶ 41, and without the Stalking Horse's bid to set a "floor" for the Purchase Price, the bids for the Purchased Assets may be too low.  Further, the Debtor is unaware of any other parties that are currently willing to act as a stalking horse.  *Third*, the amount of the fee is reasonable in comparison to the size of the proposed transaction, and is not so large as to have a chilling effect on the Debtor's ability to attract other bids at auction.  Boyan Declaration ¶¶ 44-45.  Moreover, the fee is reasonable in light of the expenses incurred by RKJS and the Investors in connection with the transaction, including expenses associated with the complex tasks of obtaining investments from numerous unaffiliated Investors and coordinating with the regulators to enhance the likelihood of obtaining regulatory approval of the M&A Transaction in a timely manner.

65.    Indeed, the size of the Stalking Horse Bidder Fee is in line with the size of fees approved in similar sales transactions in other cases.  The Stalking Horse Bidder Fee, as

noted, consists of a "breakup fee" of $1 million (of which $250,000 is to be paid by the Debtor) and an expense reimbursement of up to $1.75 million. *See* M&A Agreement § 5.17. The Debtor submits that the proper measure of the reasonableness of the Stalking Horse Bidder Fee is to compare it to the Stalking Horse Bidder's total commitment under the M&A Transaction (i.e., $85 million to $100 million) rather than just the $4.775 million to be paid to the Debtor. *See, e.g., In re Capitol Bancorp Ltd.*, No. 12-58409, Dkt. No. 519 (Bankr. E.D. Mich. July 15, 2013) (order approving stalking horse bidder fee of up to 3% of total of cash purchase price paid to holding company debtor and equity contribution made to non-debtor bank).[9]  *First*, the recapitalization of the Bank is an integral component of the transaction, without which regulatory approval could not be obtained and the sale would not go forward. *Second*, the Stalking Horse Bidder must fund the entire Recapitalization Amount, not just the $4.775 million of the Purchase Price, as part of the completion of the transaction. Even when viewed on a standalone basis, however, the breakup fee and expense reimbursement are reasonable.

66. Specifically, the $250,000 portion of the breakup fee to be paid by the Debtor represents 0.29% of the Stalking Horse Bidder's $85 million minimum total commitment, and 5.2% of the $4.775 million consideration to be paid to the Debtor.[10]  Whether the breakup fee is viewed as being 0.29% or 5.2%, it falls well within the range of comparable transactions. *See*, *e.g.*, *In re First Place Fin. Corp.*, No. 12-12961, Dkt. No. 110 (Bankr. D. Del. Nov. 28, 2012) (in sale of bank, approving breakup fee of $3 million, equal to 6.7% of $45 million purchase price); *In re Premier Bank Holding Co.*, No. 12-40550, Dkt. No. 73 (Bankr. N.D. Fla.

---

[9] The Order in *Capitol Bancorp* was entered over the objection of the creditors' committee, who argued that the stalking horse bidder fee should be limited to 3% of the cash purchase price paid to the holding company debtor. *See Capitol Bancorp*, No. 12-58409, Dkt. No. 471 at 5 (committee's objection); *see also id.* Dkt. No. 536 at 14-16 (transcript of hearing).

[10] The portion of the breakup fee to be paid by the Bank should not be considered in this analysis, because the Bank is not a debtor.

Sept. 13, 2012) (in sale of bank, approving breakup fee of $150,000, equal to 10.6% of $1,415,000 purchase price); *In re North Texas Bancshares of Delaware, Inc.*, No. 13-12699, Dkt. No. 134 (Bankr. D. Del. Nov. 25, 2013) (approving breakup fee of $250,000, equal to 3.4% of $7,350,000 purchase price for the bank shares); *see also In re Big Sandy Holding Co.*, No. 12-30138, Dkt. No. 67 (Bankr. D. Col. Oct. 25, 2012) (in sale of bank, approving "stalking horse bidder fee" of $1 million, equal to 18.2% of $5.5 million purchase price).[11]

      67.    Similarly, the expense reimbursement component of the Stalking Horse Bidder Fee is appropriate. An expense reimbursement "is typically an amount in addition" to the breakup fee. *See* Collier ¶ 363.02[7]. As such, the expense reimbursement component need not be capped or limited to a certain percentage of the purchase price. *See, e.g., AgriProcessors, Inc. v. Fokkena (In re Tama Beef Packing, Inc.)*, 321 B.R. 496, 498 (B.A.P. 8th Cir. 2005) (noting "breakup fees are . . . usually limited to one to four percent of the purchase price, whereas there is no such cap for actual fees and expenses incurred"). Here, the expense reimbursement of up to $1.75 million is 2.1% of the Stalking Horse Bidder's minimum total commitment of $85 million. While the percentage is much higher if calculated based only on the $4.775 Purchase Price (36.6%), the Debtor submits that the expenses incurred by the Stalking Horse Bidder are reasonable in light of the complexity of the transaction. In addition to the due diligence, negotiation, and structuring costs associated with any transaction, the M&A Transaction involved significant regulatory hurdles that added an additional layer of complexity and required significant time and effort to address.

      68.    Not only is the Stalking Horse Bidder Fee a reasonable exercise of the Debtor's business judgment, but it fully satisfies *O'Brien*'s section 503(b) standard as well, as it

---

[11] The percentages contained in the foregoing parentheticals are calculated based on the consideration actually received by the holding company debtor in each case. In each of the cited cases, as in this case, there was also a large recapitalization amount paid to the non-debtor bank.

is an actual and necessary cost of preserving the estate.  As detailed herein and in the Boyan Declaration, despite the Debtor's extensive efforts during the past four years, the Stalking Horse Bid represents the only transaction with respect to the Bank Shares that has come to fruition. The Stalking Horse Bid provides a material benefit for the Debtor, its estate and its creditors by: (i) committing the Stalking Horse Bidder to consummate the M&A Transaction, (ii) establishing a "floor" for the sale of the Purchased Assets, including the Bank Shares, (iii) creating a template for an expeditious sale process, and (iv) encouraging competitive bidding that will realize the highest possible price for the Purchased Assets, including the Bank Shares.  Importantly, the Stalking Horse Bid, with its attendant benefits, is conditioned on the approval of the Stalking Horse Bidder Fee – i.e., approval of the fee will "induc[e] a bid that otherwise would not have been made." *See O'Brien*, 181 F.3d at 537.  Because the Stalking Horse Bidder is unwilling to proceed with the proposed transaction absent the award of the Stalking Horse Bidder Fee, approval of the fee is necessary to preserve the value of the Debtor's assets and provide the benefits discussed above.

69.     Based on the foregoing, the Stalking Horse Bidder Fee is reasonable under the circumstances, is necessary to maximize the value for the Purchased Assets, including the Bank Shares, and should be approved.

C.     *Assumption and Assignment of Designated Contracts*
       *is Proper under Section 365 of the Bankruptcy Code*

70.     The Debtor requests that, as part of the M&A Transaction, the Court approve the assumption of the Designated Contracts (if any) so that they can be assigned to the Bank in accordance with the M&A Agreement.

71.     Section 365(a) of the Bankruptcy Code provides that, subject to the court's approval, a trustee "may assume or reject any executory contracts or unexpired leases of the

debtor." 11 U.S.C. §365(a). The assumption and assignment should be approved by the bankruptcy court (subject to satisfaction of the requirements set forth in section 365(b) of the Bankruptcy Code) if it represents an exercise of the debtor's sound business judgment. *See*, *e.g.*, *US ex rel. Rahman v. Oncology Associates, PC. et al. (In re Equimed, Inc.)*, 269 B.R. 139, 161-2 (D. Md. 2001), aff'd. 61 Fed. Appx. 860 (4th Cir. 2003). Here, the assumption and assignment of the Designated Contracts represents the exercise of the Debtor's sound business judgment because the Stalking Horse Bidder or a Competing Bidder require that such contracts be transferred to them as part of the transfer and sale of the Purchased Assets.

72.    Section 365(b)(1) of the Bankruptcy Code sets forth requirements for assuming contracts and leases that are in default, which include:

- curing the default;

- providing adequate assurance that the debtor will promptly compensate the Counterparty for any actual pecuniary loss that resulted from a default; and

- providing adequate assurance of future performance.

11 U.S.C. §365(b)(1)(A)-(C). In turn, under section 365(f)(2) of the Bankruptcy Code, if a debtor properly assumes the contract and/or lease, it may assign such contract and/or lease so long as the assignee provides adequate assurance of future performance. 11 U.S.C. §365(f)(2)(A)-(B).

73.    The Debtor submits that all the requirements of sections 365(b)(1) and 365(f)(2) of the Bankruptcy Code are satisfied or will be satisfied at the Sale Hearing. Because FMAR is not an operating entity, it has only a few executory contracts and unexpired leases and FMAR believes that it is not in default of any obligations thereunder. As such, the Debtor believes that there will be no Cure Amounts that will need to be satisfied as a precondition of assumption under section 365 of the Bankruptcy Code. Further, the Debtor believes that the

Bank (as recapitalized by the Successful Bidder) will have the financial ability to satisfy the "adequate assurance" requirements imposed by section 365(f)(2)(B).  Finally, as set forth above, the Debtor will provide appropriate notice of assumption and assignment through the Assignment Notice(s) and will provide all Counterparties an opportunity to object to any aspect thereof.

74.    Accordingly, the Court should authorize the Debtor to assume the Designated Contracts and assign them to the Bank.

D.    *The Auction and Sale Hearing Notice Constitutes Good and Adequate Notice of the Auction and Sale Process*

75.    The Debtor believes that the Auction and Sale Hearing Notice constitutes good and adequate notice of the auction and sale process and complies with the Bankruptcy Rules and the Local Bankruptcy Rules.

76.    The Bankruptcy Rules and the Local Bankruptcy Rules set out certain requirements with respect to a debtor's sale of property outside of the ordinary course of business, which requirements are designed to ensure that all interested parties receive good and sufficient notice thereof and are afforded a reasonable opportunity to object.  Local Bankruptcy Rule 2002-1 and Bankruptcy Rules 2002(a) and 6004 require that the Debtor provide 21 days' notice of any proposed sale of property not in the ordinary course of business.  Bankruptcy Rule 2002(c), in turn, requires that such notice include the time and place of any auction, a sale hearing, and the time fixed for objections to the sale.

77.    The Auction and Sale Hearing Notice sets forth all the information a potential bidder and any other party-in-interest may require about the auction and sale process, including: (i) an announcement that the Court has approved the bidding and auction procedures pursuant to the Auction Procedures; (ii) information on how to obtain a copy of the Auction

Procedures and the Auction Procedures Order; (iii) the Bid Deadline; (iv) the time, date, and location of the Auction; (v) the time, date, and location of the Sale Hearing; and (vi) procedures for objecting to the Auction and the sale contemplated by the Motion.

78.     The Debtor believes that it will obtain the maximum recovery for its estate if the transactions contemplated by this Motion (i.e., transfer and sale of the Purchased Assets including the Bank Shares, and the recapitalization of the Bank) are well-advertised.  To this end, the Debtor and Sandler O'Neill have already identified potential investors to whom the Auction and Sale Hearing Notice will be provided.  In addition, the Debtor also proposes to publish the Auction and Sale Hearing Notice in the *Baltimore Sun*, a local, well circulated newspaper, to supplement the mail notice, pursuant to Bankruptcy Rule 2002(l).

79.     Given that the Auction and Sale Hearing Notice will be published and served within three business days of the entry of the Auction Procedures Order, the time frame between the service of such notice, the applicable Bid Deadline, the Auction and the Sale Hearing will provide interested investors sufficient time to participate in the process and for any party-in-interest to make objections with respect thereto.  Moreover, most of the potential bidders that the Debtor will be contacting are the same parties that Sandler O'Neill contacted during its prior marketing efforts and, thus, will have had an opportunity to conduct due diligence with respect to the Purchased Assets including the Bank Shares.

E.       *The Notice of Successful Bidder Provides Sufficient Notice*
         *of the Replacement DIP Facility*

80.      As discussed above, the Notice of Successful Bidder will include copies of the documents relating to the Replacement DIP Facility that highlight any changes from the DIP Credit Agreement.

81.      Under the Auction Procedures, the Replacement DIP Facility offered by any Qualified Bid must be on terms that are substantially the same, and at least as favorable to the Debtor, as the terms of the DIP Agreement.  Thus, the Debtor does not anticipate that the terms of the Replacement DIP Facility will be materially different from those of the DIP Credit Agreement.

82.      Simultaneously with this Motion, the Debtor has filed the DIP Motion seeking approval of the DIP Credit Agreement.  Although all objections to any terms in the DIP Credit Agreement should have been addressed by the time that any Replacement DIP Credit Agreement is considered by the Court at the Sale Hearing, parties wishing to object to the terms of the Replacement DIP Facility will nevertheless have an opportunity to make objections at the Sale Hearing.

83.      Because any Replacement DIP Facility will be provided on terms that are as beneficial to the Debtor as the DIP Credit Agreement, which the Court will have already approved, the Debtor respectfully submits that the Debtor should not be required to file a separate motion with respect to the approval of the Replacement DIP Facility and any requirements under the Bankruptcy Rules or the Local Bankruptcy Rules that may require it to do so should be waived.

F.     *The Transfer and Sale of the Purchased Assets in Accordance with the M&A Agreement*
       *or Competing Acquisition Agreement (if applicable) Should be Authorized*
       *Under Section 363(b) as a Sound Exercise of the Debtor's Business Judgment*

84.     Section 363(b) of the Bankruptcy Code governs transactions outside the

ordinary course of business involving property of a debtor's estate.  The section provides, in

relevant part, that, "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in

the ordinary course of business, property of the estate." 11 U.S.C. § 363(b).

85.     Although section 363 of the Bankruptcy Code does not specify a standard

for determining when it is appropriate for a court to authorize a sale of property of the estate,

such a transaction should be approved by the court if a debtor demonstrates a sound business

justification therefor.  *See*, *e.g.*, *In re Naron & Wagner, Chartered*, 88 B.R. 85, 87 (Bankr. D.

Md. 1988) (debtor may sell all or substantially all of its assets provided it establishes a "good

business reason" for the sale and provides appropriate notice); *In re Mattress Discounters Corp.*,

No. 08-21642, 2008 WL 4542989, *4 (Bankr. D. Md. Oct. 10, 2008) (court approving section

363(b) application must "expressly find from the evidence presented before him at the hearing a

good business reason to grant such an application") (citation omitted); *see also In re Gen. Motors*

*Corp.*, 407 B.R. 463, 489 (Bankr. S.D.N.Y. 2009) (noting that sales under § 363(b) are

commonly approved when there is a good business reason to do so).  In addition, section 105(a)

of the Bankruptcy Code grants the Court the authority to "issue any order, process, or judgment

that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C.

§ 105(a).  This provision is "the basis for a broad exercise of power [by the Bankruptcy Court] in

the administration of a bankruptcy case." 3 Collier on Bankruptcy ¶ 105.01 (16th ed. 2010).

86.     The primary goal in any proposed sale of property of the estate is to

maximize the proceeds received by the estate.  *See*, *e.g.*, *In re Food Barn Stores, Inc.*, 107 F.3d

558, 564-65 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the Code [is] to

enhance the value of the estate at hand"); *In re Integrated Resources, Inc.*, 147 B.R. 650, 659 (S.D.N.Y. 1992) ("It is a well-established principle of bankruptcy law that the . . . Debtor's duty with respect to such  sales is to obtain the highest price or greatest overall benefit possible for the estate.") (internal citations omitted).  As long as the sale appears to enhance a debtor's estate, court approval of a debtor-in-possession's decision to sell should be withheld only if the debtor's judgment is clearly erroneous, too speculative, or contrary to the provisions of the Bankruptcy Code.  *See GBL Holding Co., Inc. v. Blackburn/Travis/Cole, Ltd.*, 331 B.R. 251, 255 (N.D. Tex. 2005).

87.    The Debtor submits that the proposed M&A Transaction satisfies the business judgment rule and should therefore be approved under section 363 of the Bankruptcy Code.

88.    *First*, the M&A Transaction provides the best opportunity for the Debtor to realize the maximum value for the Purchased Assets including the Bank Shares.  Indeed, the M&A Transaction contemplated by the M&A Agreement is the only viable expression of interest for such Purchased Assets.

89.    *Second*, the Debtor submits that in light of (i) the thorough four-year marketing efforts to sell the Purchased Assets that did not result in a successful transaction, (ii) the willingness of the "stalking horse" bidder to promptly consummate the M&A Transaction, (iii) the possibility of higher and better bids in light of the further market testing of the Purchased Assets through the auction process, the M&A Transaction is fair, reasonable, and in the best interests of the Debtor's estate and creditors under the current circumstances, and (iv) the significant uncertainty created by the trigger of an event of default under the Debentures and the TruPS.  As described in further detail in the Boyan Declaration, under the circumstances, the

M&A Transaction – which is the only current viable expression of interest for the Purchased Assets – and the relief requested herein provide the best available opportunity for the Debtor to realize the maximum value for the Purchased Assets at this time and remove the uncertain future of the Bank.

90.     *Finally*, the Debtor also believes that the consideration being provided by the Stalking Horse Bidder for the Purchased Assets is fair and reasonable.    Boyan Declaration ¶ 33.  Courts have recognized that a debtor is entitled to "'great judicial deference' in deciding which bid to accept as the best and highest bid."  *In re Gulf States Steel, Inc. of Ala.*, 285 B.R. 497, 516 (Bankr. N.D. Ala. 2002) (internal citation omitted). Based on the extensive prior marketing efforts and negotiations of the M&A Agreement described above, the Debtor has determined that the Stalking Horse Bidder's offer is fair and reasonable (indeed, it is currently the *only* offer available).    Moreover, any concern that the Debtor may be able to sell the Purchased Assets on better overall terms than the Stalking Horse Bid provided under the M&A Agreement should be allayed by the auction process that the Debtor will undertake pursuant to the Auction Procedures.  As such, the Debtor submits that the M&A Transaction with respect to the Purchased Assets offers the greatest financial benefits to the Debtor's estate, is an exercise of the Debtor's sound business judgment, and warrants approval by the Court.

G.     *The Assets Should be Sold Free and Clear of Liens, Claims, Encumbrances and Other Interests Under Section 363(f) of the Bankruptcy Code*

1.     <u>*The Debtor Has Complied with Section 363(f) of the Bankruptcy Code*</u>

91.     Pursuant to the M&A Agreement, the transfer and sale of the Purchased Assets must be free and clear of all liens, claims, encumbrances and other interests thereon or therein (collectively, the "Encumbrances").  The Debtor submits that it is authorized to transfer

and sell the Purchased Assets including the Bank Shares "free and clear" of all Encumbrances under section 363(f) of the Bankruptcy Code.

92.    Pursuant to section 363(f), a debtor may sell property under section 363(b) of the Bankruptcy Code free and clear of Encumbrances if:

- applicable nonbankruptcy law permits sale of such property free and clear of such interest;

- the entity holding the lien, claim or encumbrance consents to the sale;

- the interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on the property;

- the interest is in bona fide dispute; or

- the entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f)(1)-(5).  Because section 363(f) of the Bankruptcy Code is drafted in the disjunctive, satisfaction of any one of its five requirements will suffice to permit a sale "free and clear" of any Encumbrances. *See, e.g.*, *Michigan Employment Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.)*, 930 F.2d 1132, 1147 n.24 (6th Cir. 1991) (section 363(f) is written in the disjunctive, such that the court may approve sale "free and clear" provided at least one of the subsections of section 363(f) is met).

93.    As an initial matter, the Debtor does not believe that any of the Purchased Assets, including the Bank Shares, is subject to any Encumbrances.  In any event, one or more of the conditions set forth in section 363(f) of the Bankruptcy Code are, or will be, satisfied.  In particular, section 363(f)(2) of the Bankruptcy Code will be satisfied as to those holders of Encumbrances, if any, that do not object to the proposed transfer and sale of the Purchased Assets.  The Debtor will provide notice of the M&A Transaction to all of its known creditors, who will be given sufficient opportunity to object to the transaction, and any entity that does not

object to the M&A Transaction should be deemed to have consented to its consummation.  *See Futuresource LLC v. Reuters Ltd.*, 312 F.3d 281, 285 (7th Cir. 2002) (noting that "lack of objection (provided of course there is notice) counts as consent") (internal citations omitted); *Hargrave v. Township of Pemberton (In re Tabone, Inc.)*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (failure to object to sale free and clear of liens, claims and encumbrances satisfies section 363(f)(2)); *Citicorp Homeowners Serv., Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 345 (E.D. Pa. 1988) (same).  As such, to the extent that no party holding an Encumbrance objects to the relief requested in this Motion, the transfer and sale of the Purchased Assets will satisfy section 363(f)(2) of the Bankruptcy Code.

94.    In addition, section 363(f)(3) of the Bankruptcy Code will be satisfied because, to the extent there are any Encumbrances with respect to any of the Purchased Assets, the value of such Encumbrances will most likely be significantly less than the Purchase Price that the Debtor will receive for the Purchased Assets.  Furthermore, any holder of an Encumbrance in the Purchased Assets will be adequately protected by having such Encumbrance attach to the Purchase Price, with the same priority, validity, force and effect that it had before the M&A Transaction, subject to the same claims and defenses that the Debtor possessed.[12]

95.    Accordingly, the Debtor is authorized to transfer and sell the Purchased Assets, including the Bank Shares, pursuant to the M&A Agreement free and clear of any Encumbrances in accordance with section 363(f) of the Bankruptcy Code.

---

[12] To the extent that any party claiming an Encumbrance with respect to the Purchased Assets objects to the M&A Transaction, the Debtor reserves the right to argue that sections 363(f)(1), (4) and (5) of the Bankruptcy Code are satisfied as well, depending on the nature of the claimed interest.

2. _The Transfer and Sale should be "Free and Clear" of Successor Liability_

96.    Under the M&A Agreement, the transfer and sale of the Purchased Assets, including the Bank Shares, must also be free and clear of any successor liability claims related thereto.

97.    Although section 363(f) of the Bankruptcy Code provides for the sale of assets "free and clear of any interests," the term "any interest" is not defined anywhere in the Bankruptcy Code.    However, courts have consistently interpreted section 363(f) of the Bankruptcy Code to allow a sale of a debtor's assets free and clear of successor liability resulting from pre-existing claims.  _See_, _e.g._, _United Mine Workers of Am. 1992 Benefit Plan v. Leckie Smokeless Coal Co (In re Leckie Smokeless Coal Co.)_, 99 F.3d 573, 585 (4th Cir. 1996 ) (holding "Bankruptcy Court may extinguish Coal Act successor liability pursuant to 11 U.S.C. § 363(f)(5)"); _see also In re Trans World Airlines, Inc._, 322 F.3d 283, 288-90 (3d Cir. 2003) (sale of assets pursuant to section 363(f) barred successor liability claims for employment discrimination and rights under travel voucher program).

98.    Here, the transfer and sale of the Purchased Assets, including the Bank Shares, free and clear of successor liability claims is a critical inducement for the Stalking Horse Bidder to enter into the M&A Transaction.  _See Licensing by Paolo, Inc. v. Sinatra (In re Gucci)_, 126 F.3d 380, 387 (2d Cir. 1997) (stating that a sale pursuant to §363 of the Bankruptcy Code "maximizes the purchase price of assets because without this assurance of finality, purchasers could demand a large discount for investing in a property that is laden with the risk of endless litigation as to who has rights to estate property.").

99.    Accordingly, consistent with the above-cited case law, the Purchased Assets including the Bank Shares should be transferred and sold pursuant to the M&A Transaction free and clear of any successor liability.

H.      *The Stalking Horse Bidder is a Good Faith Purchaser Under*
        *Section 363(m) of the Bankruptcy Code*

        100.    Section 363(m) of the Bankruptcy Code protects a good faith purchaser's

interest in property purchased from a debtor notwithstanding that the sale conducted under

section 363(b) was later reversed or modified on appeal.  Specifically, section 363(m) states that:

> The reversal or modification on appeal of an
> authorization under [section 363(b)] . . . does not
> affect the validity of a sale . . . to an entity that
> purchased . . . such property in good faith, whether
> or not such entity knew of the pendency of the
> appeal, unless such authorization and such
> sale . . . were stayed pending appeal."

*See Allstate Ins. Co. v. Hughes*, 174 B.R. 884, 888 (S.D.N.Y. 1994) ("Section

363(m) . . . provides that good faith transfers of property will not be affected by the reversal or

modification on appeal of an unstayed order, whether or not the transferee knew of the pendency

of the appeal."); *see also Willemain v. Kivitz (In re Willemain)*, 764 F.2d 1019, 1023-24 (4th Cir.

1985) (dismissing appeal of unstayed sale order to good faith purchaser as moot under section

363(m) of the Bankruptcy Code).

        101.    Although the Bankruptcy Code does not define "good faith," courts have

held that the "requirement that a purchaser act in good faith . . . speaks to the integrity of his

conduct in the course of the sale proceeding.  Typically, the misconduct that would  destroy a

purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser

and the other bidders or the trustee, or an attempt to take grossly unfair advantage of other

bidders."  *In re Abbotts Dairies of Penn., Inc.*, 788 F.2d 143, 147 (3d Cir. 1986) (internal

citations omitted).  As such, a party would have to show "fraud, collusion between the [stalking-

horse bidder] and other bidders or the [debtor] or an attempt to take grossly unfair advantage of

other bidders" to demonstrate a lack of good faith.  *See In re Tempo Tech. Corp.*, 202 B.R. 363,

370 (D. Del. 1996) (rejecting good faith challenge by unsecured creditors at a sale hearing) (internal citations omitted).

102.    Here, the Stalking Horse Bidder is entitled to the protections of a "good faith" purchaser within the meaning of section 363(m) of the Bankruptcy Code.  The M&A Agreement is the result of extended arm's length, good faith negotiations between the Debtor and the Stalking Horse Bidder, each of whom was represented by experienced professionals. Accordingly, the Debtor requests that the Court make a finding that the Stalking Horse Bidder  is entitled to the protections of section 363(m) of the Bankruptcy Code.

103.    To the extent that the Stalking Horse Bidder  is not the Successful Bidder at the Auction, the Debtor will seek a finding from the Court at the Sale Hearing that the Successful Bidder is a good faith purchaser entitled to the protections of section 363(m) of the Bankruptcy Code.

I.    *Relief from the Fourteen-Day Waiting Period*
      *Under Bankruptcy Rule 6004(h) is Appropriate*

104.    Pursuant to Bankruptcy Rule 6004(h), unless the court orders otherwise, all orders authorizing a sale of property pursuant to section 363 of the Bankruptcy Code are automatically stayed for fourteen days after entry of such order.  The purpose of Bankruptcy Rule 6004(h) is to provide sufficient time for an objecting party to appeal before the order is implemented.  *See* Advisory Committee Notes to Fed. R. Bankr. P. 6004(h).

105.    The Debtor requests that the fourteen-day stay be waived so that the Sale Order may become effective immediately after its approval and entry by the Court.  It is in the interest of the Debtor's estate and stakeholders that the transfer and sale of the Bank Shares be consummated as quickly as possible because a prolonged sale process may cause the value of the Bank Shares to dissipate.  Although the Bank is not a debtor and its operations should not be

affected by these bankruptcy proceedings, there is nevertheless a risk that the Debtor's bankruptcy may cause the Bank's customers to make mass deposit withdrawals, which may in turn cause the regulators to respond by placing the Bank in a receivership or conservatorship. As such, consummating the transfer and sale of the Bank Shares as promptly as possible will restore customer confidence and maintain the value of the Bank Shares.

106.    Moreover, such relief is justified given that all parties that have expressed interest in the Purchased Assets including the Bank Shares will have (i) received notice of this Motion and any entry of the Auction Procedures Order, and (ii) had the opportunity to participate in the Auction at which the Debtor proposed to sell the Purchased Assets.

## NOTICE

107.    No trustee or examiner has been appointed in the Debtor's Chapter 11 Case. Notice of this Motion has been provided to the Special Notice Parties, as described above. The Debtor submits that no other or further notice with respect to the Motion is required.

## NO PREVIOUS REQUEST

108.    No previous request for the relief sought herein has been made to this or any other court.

## STATEMENT PURSUANT TO LOCAL BANKRUPTCY RULE 9013-2

109.    Pursuant to Local Bankruptcy Rule 9013-2, the Debtor states that, in lieu of submitting a memorandum in support of this Motion, it will rely solely upon the grounds and authorities set forth herein.

WHEREFORE, the Debtor respectfully requests that the Court enter the Auction Procedures Order and the Sale Order, as requested herein, and such other or further relief as is just.

Dated:   February 10, 2014

_____/s/ Lawrence J. Yumkas_____
Lawrence J. Yumkas, 06357
Yumkas, Vidmar & Sweeney, LLC
2530 Riva Road, Suite 400
Annapolis, Maryland  21401
(443) 569-0758
lyumkas@yvslaw.com

Robert T. Schmidt
Joshua K. Brody
Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, New York  10036
(212) 715-9100
rschmidt@kramerlevin.com
jbrody@kramerlevin.com

*Proposed Counsel for Debtor*

# **EXHIBIT A**

**Proposed Auction Procedures Order**

## **EXHIBIT B**

**M&A Agreement**

# **EXHIBIT C**

**Proposed Sale Order**

# **EXHIBIT D**

**Proposed Auction Procedures**

## **EXHIBIT E**

**Proposed Assignment Notice**

**EXHIBIT F**

**Auction and Sale Hearing Notice**

# **EXHIBIT G**

**Proposed Notice of Successful Bidder**

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 10th day of February 2014, notice of filing of the Motion of the Debtor for (I) an Order (A) Approving Bidding and Auction Procedures with Respect to the Sale of Certain Assets, (B) Approving Bidding Protections for the Stalking Horse Bidder, (C) Approving Procedures Related to the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (D) Approving the Form and Manner of Notices Related to the Auction and Sale, and (E) Scheduling the Sale Hearing, and (II) an Order (A) Approving such Sale Free and Clear of Liens, Claims, Encumbrances and Other Interests and (B) Granting Related Relief was sent electronically to those parties listed on the docket as being entitled to such electronic notice, and a copy of the Motion was mailed first class, postage prepaid to the parties on the attached service list.


_____/s/ Catherine Nownes-Whitaker_____
Catherine Nownes-Whitaker

First Mariner Bank
Attn: Joseph F. Howard,
Sr. Vice President, General Counsel
1501 S. Clinton St.
Baltimore, MD 21224

The Bank of New York, Trustee
f/b/o Mariner Capital Trust II
Attn: Corporate Trust Administration
White Clay Center, Route 273
Newark, DE 19711

Wells Fargo Bank, NA, Trustee
f/b/o Mariner Capital Trust III
Attn: Corporate Trust Administration
919 Market St. Suite 700
Wilmington, DE 19801

Wells Fargo Bank, NA, Trustee
f/b/o Mariner Capital Trust IV
Attn: Corporate Trust Administration
919 Market St. Suite 700
Wilmington, DE 19801

Wells Fargo Bank, NA, Trustee
f/b/o Mariner Capital Trust VI
Attn: Corporate Trust Administration
919 Market St. Suite 700
Wilmington, DE 19801

Wilmington Trust Company, Trustee
f/b/o Mariner Capital Trust V
Attn: Corporate Trust Administration
Rodney Square N 1100 N. Market St.
Wilmington, DE 19890-1600

Comptroller of Maryland
Compliance Division
110 Carroll Street
Annapolis, MD 21411

Internal Revenue Service
P.O. Box 7346
Philadelphia, PA 19101-7346

IRS
Special Procedures – Insolvency Unit
31 Hopkins Plaza Room 1150
Baltimore, MD  21201

Federal Deposit Insurance Corporation
Julie Howland
350 Fifth Avenue
New York, NY 10118-0110

Federal Reserve Bank of Richmond
Richard Gilbert
701 East Byrd Street
Richmond, VA 23219
Local: 804-697-8000

Richard Wasserman, Esquire
Venable LLP
750 E Pratt St #900
Baltimore, MD 21202

The following parties received
electronic notice of the filing:

Office of the U.S. Trustee
101 West Lombard Street
Baltimore, Maryland  21201

Gary R. Bronstein, Esquire
Kilpatrick Townsend & Stockton LLP
607 14th Street, NW Suite 900
Washington, DC 20005-2018

Joel Rappoport, Esquire
Kilpatrick Townsend & Stockton LLP
607 14th Street, NW Suite 900
Washington, DC 20005-2018

Joshua Brody, Esquire
Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, NY 10036

Robert T. Schmidt, Esquire
Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, NY 10036

Christopher S. Hooper
Sandler O'Neill & Partners LP
1251 Avenue of the Americas
6th Floor
New York, NY 10020

4812-1606-7096, v.  1

7585566