IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
(Baltimore Division)

| | | |
|---|---|---|
| In re: | * | |
| FIRST MARINER BANCORP | * | Case No: 14-11952-DER (Chapter 11) |
| Debtor | * | |

\* \* \* \* \* \* \* \* \* \* \* \*

DECLARATION OF MARK A. KEIDEL IN SUPPORT OF
THE DEBTOR'S CHAPTER 11 PETITION AND CERTAIN MOTIONS

I, Mark A. Keidel, declare as follows:

1. I am the Interim Chief Executive Officer of First Mariner Bancorp, a bank holding corporation organized under the laws of the State of Maryland ("FMAR" and in its capacity as debtor and debtor-in-possession in the above-captioned chapter 11 case, the "Debtor"). I was appointed Interim CEO in December of 2011. Previously, I served as Chief Operating Officer since May of 2009 and Chief Financial Officer starting in June of 2000. I am generally familiar with the operations, financial condition, business affairs, and regulatory status and obligations of the Debtor.

2. Today (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Maryland (the "Chapter 11 Case"). The Debtor is operating its business as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in this Chapter 11 Case.

3. As discussed more fully below, FMAR's primary asset is 100% of the outstanding shares of First Mariner Bank (the "Bank"), a bank that is headquartered in Baltimore, Maryland. The Bank, which has regional retail and commercial deposit, loan and

mortgage operations, is not a debtor in this Chapter 11 Case and continues to operate in the ordinary course of business.  In addition to my position at the Debtor, I am also the Interim CEO of the Bank, a position I have held since December 2011.

4. The Debtor has filed a motion (as further described below, the "Sale Motion") seeking authority to transfer and sell its shares in the Bank (along with certain other related assets) pursuant to a court-approved auction process.  To finance this transaction (including costs of the Chapter 11 Case and certain other costs), the Debtor has also filed a motion (as further described below, the "DIP Motion") seeking authority to obtain postpetition financing from RKJS Bank, which is the stalking horse bidder for the Debtor's assets.

5. I submit this declaration (the "Declaration") in support of the Sale Motion and the DIP Motion, and to provide the Court with certain factual background pertinent to the Chapter 11 Case.  Unless otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge; my discussions with other members of FMAR's and the Bank's Board of Directors, management, employees and/or advisors; my review of relevant documents; and/or my opinion based upon my experience and knowledge of FMAR's and the Bank's operations, financial condition, business affairs, and regulatory issues.  If I were called to testify, I would testify to the facts set forth in this Declaration.

6. The remainder of this Declaration is divided into five parts.  Part I provides an overview of FMAR's and the Bank's business and operations.  Part II provides an overview of the Debtor's capital structure.  Part III describes the circumstances leading to the commencement of the Chapter 11 Case and the Sale Motion, including the Company's prepetition marketing and recapitalization efforts.  Part IV describes the relevant facts in support

of the Sale Motion and the relief requested therein.  Part V describes the relevant facts in support of the DIP Motion and the relief requested therein.

      I.    <u>Company's Business and Operations</u>

      7.    Founded in 1995, FMAR is a Maryland corporation registered as a bank holding company under the Bank Holding Company Act of 1956 (as amended).  FMAR does not have its own operations and has virtually no employees.  Its assets consist of (i) the equity in the Bank and interests in certain statutory trusts, as described below, (ii) approximately $337,000 contained in cash and investment accounts, and (iii) a receivable due from the sale of its former consumer finance division, Mariner Finance, LLC, which was sold in late 2009, in the amount of approximately $345,000.

      8.    The Bank, which was formed in 1995 through the merger of two predecessor banks, is the largest bank headquartered in Baltimore, Maryland.  It has 465 employees and 16 retail bank branches located throughout Maryland and 12 mortgage offices located throughout Maryland, Virginia and Delaware.

      A.    *<u>Bank's Products and Services</u>*

      9.    In addition to traditional banking products and services (e.g., consumer deposit and checking accounts), the Bank offers a variety of modern banking products and services (e.g., debit cards, mobile banking, electronic bill payment, and personal financial management services), as well as consumer loan products (e.g., home equity lines of credit, fixed-rate second mortgages, and unsecured personal credit lines).  As of the Petition Date, the Bank holds in excess of $880 million in total deposits.

      10.    The Bank also operates a commercial loan unit that focuses on loan originations to small and mid-sized businesses (i.e., with up to $20 million in annual sales).  The

Bank's commercial loan products include (among other things): commercial mortgage loans for the purchase or refinance of commercial properties; real estate construction and development loans; working capital loans and lines of credit; demand, term, and time loans; and equipment, inventory, and accounts receivable financing. The Bank also offers an array of cash management services and deposit products to the Bank's commercial customers, including computerized on-line banking and remote deposit. As of the Petition Date, the Bank holds approximately $290 million in face amount of commercial loans in its portfolio.

11. In addition to its core banking activities, a division of the Bank known as First Mariner Mortgage is dedicated to mortgage-banking activities. First Mariner Mortgage's products include Federal Housing Administration and the Federal Veterans Administration loans, conventional and nonconforming first- and second-lien mortgages, and construction and permanent financing. Most of the mortgages originated by First Mariner Mortgage are sold into the secondary market. As of the Petition Date, the Bank holds approximately $190 million in face amount of mortgage loans.

### B. *Regulatory Oversight*

12. Both FMAR and the Bank are subject to significant regulatory oversight. FMAR's principal regulators are the Board of Governors of the Federal Reserve System and the Federal Reserve Bank of Richmond (the "FRB"). The Bank's principal regulators are the Federal Deposit Insurance Corporation (the "FDIC") and the Office of the Commissioner of Financial Regulation for the State of Maryland (the "Maryland CFR" and together with the FRB and FDIC, the "Regulators"). As described in more detail below, the Regulators have substantial enforcement authority with respect to FMAR and the Bank's activities.

> II. The Debtor's Capital Structure
>
> > A. *Trust Preferred Securities*

13. As of the Petition Date, FMAR has outstanding unsecured obligations totaling approximately $60 million, primarily consisting of principal and interest owing under certain junior subordinated debentures (the "Debentures") as well as FMAR's guarantee of certain "trust preferred securities" related to the Debentures. As described below, the Debentures were issued in a series of transactions – of a type commonly used by bank holding companies to take advantage of favorable regulatory, tax, and accounting treatment – that enabled FMAR to raise capital in the public markets.

14. Between 2002 and 2005, FMAR formed eight Delaware statutory trusts, six of which remain in existence (the "Trusts"). The Trusts issued certain preferred securities – commonly known as "trust preferred securities" ("TruPS") – in the aggregate principal amount of $82 million, which were sold to third party investors.[1] The Trusts then delivered the proceeds of the sale of the TruPS to FMAR in return for the Debentures. The Debentures have the same principal and interest payment schedule as the TruPS such that the payments made by FMAR on the Debentures provide the Trusts with a source of payment with respect to the principal and interest due on the TruPS. FMAR also guaranteed the TruPS for the benefit of the TruPS holders (the "TruPS Guarantee"). Since their issuance, approximately $31 million of TruPS have been refinanced or redeemed in exchange for common stock and warrants, leaving approximately $51 million in principal amount of TruPS outstanding as of the Petition Date.

---

[1] As of the Petition Date, approximately $5 million in principal amount of of the TruPS are held by current or former officers and directors of FMAR and the Bank.

- 5 -

15. Each of the Debentures permits FMAR, in certain circumstances, to defer the payment of interest thereon for a period of up to 20 calendar quarters. A deferral by FMAR, in turn, also permits the Trusts to defer the corresponding distributions in respect of the TruPS for the same period. At the end of the deferral period, if FMAR fails to pay the deferred distributions on the Debentures to the Trusts (which, in turn, causes the Trusts to be unable to pay such distributions to the holders of the TruPS), the Institutional Trustees for the Trusts, or, in certain cases, the holders of a specified percentage of the liquidation amount of the TruPS, have the right (after expiration of any applicable grace period), to declare an event of default. The occurrence of an event of default on the Debentures entitles the Institutional Trustees and the TruPS holders (as applicable) to exercise various remedies, including the right to demand immediate payment of the entire outstanding principal amount of the Debentures.

16. Beginning in December 2008, FMAR exercised its right to defer interest payments under each of the Debentures. Thereafter, FMAR continued to defer interest for the maximum permitted period of 20 calendar quarters. All accrued, unpaid, deferred interest under each of the Debentures will, or has, become due and payable on various dates during the first quarter of 2014, with the first such date having occurred on January 7, 2014 under Mariner Trust III ("Trust III") and the related Debenture and TruPS Guarantee. FMAR did not pay the deferred interest that became due on January 7 and, after a 30-day grace period thereunder, on February 6, 2014, an event of default was triggered under Trust III, and the related Debenture and TruPS Guarantee. On February 7, 2014, certain holders of the TruPS issued by Trust III filed a lawsuit against FMAR in the Southern District of New York for breach of contract due to FMAR's failure to pay the deferred interest.

B.  *Equity*

17.  FMAR's Amended and Restated Articles of Incorporation, as in effect on the Petition Date, authorize the issuance of up to 75 million shares of common stock.  As of January 30, 2014, there were 19,714,592 issued and outstanding shares of common stock, which were held by approximately 909 holders of record.

III.  Events Leading to the Chapter 11 Case

18.  The global credit and financial crisis that commenced in 2007 had a significant negative impact on FMAR and the Bank.  Beginning that year, the Bank began to incur significant losses that impaired its ability to meet certain regulatory requirements for capital, profitability, and credit quality.  Unlike certain other banks at that time, the Bank did not receive any financial support under the Troubled Asset Relief Program.  The Bank's deteriorating financial condition had a direct negative impact on FMAR, which also began to report net losses beginning in 2007.

19.  As a result of these financial issues, on September 18, 2009, the FDIC and the Maryland CFR imposed a cease and desist order on the Bank (the "C&D Order") directing it to, among other things, raise sufficient capital to achieve specified capital ratio levels.  To comply with these regulatory directives,  FMAR completed capital raises and sold its consumer finance subsidiary in 2009 and 2010, and contributed the proceeds to the Bank.  Nevertheless, continuing operating losses throughout this period prevented the Bank from achieving the ratios required by the C&D Order.  As of the Petition Date, the Bank does not meet these capital ratios.

20.  On November 24, 2009, FMAR entered into an agreement with the FRB (the "FRB Agreement") that directed FMAR to submit a plan to achieve, among other things, certain minimum capital requirements and prohibited FMAR from paying interest on the TruPS

without FRB approval.  As of the Petition Date, FMAR also failed to meet the minimum capital requirements under the FRB Agreement.

21. The Maryland Commissioner and the FDIC have extensive enforcement authority over the Bank.  Failure to comply with the capital raising directives could, under certain circumstances, authorize the regulators to seize the Bank and have a receiver or conservator appointed.  Given that the Bank is FMAR's primary asset, a receivership or a conservatorship would likely result in a total loss for FMAR and its stakeholders.

22. To comply with the C&D Order and the FRB Agreement, starting in 2009, the Company undertook multi-faceted recapitalization efforts.  To assist them in these efforts, in October 2009, the Company and the Bank hired Sandler O'Neill & Partners, L.P. ("Sandler O'Neill"), one of the premier advisors in the financial institutions sector, to advise them on potential capital raising options.

23. As described further in the Sale Motion and the *Declaration of William L. Boyan III in Support of the Debtor's Motions to Sell Certain Assets and to Obtain Postpetition Financing* (the "Boyan Declaration"), over the course of the ensuing four years, Sandler O'Neill's marketing efforts included contacting, on multiple occasions, over 135 potential financial investors and strategic buyers to gauge their interest in pursuing an investment in, or purchase of, FMAR and/or the Bank.  Before entering into the transaction contemplated by the Sale Motion (the "M&A Transaction"), the Company negotiated with multiple parties regarding a number of different transactions.  At least five of these negotiations progressed well past the preliminary stages, but ultimately failed to come to fruition: (i) a proposed $160 million private placement in 2011; (ii) a proposed sale pursuant to section 363 of the Bankruptcy Code in 2012;

and (iii) a proposed "prepackaged" bankruptcy in the fall of 2012; (iv) a proposed "prepackaged" bankruptcy in early 2013; and (v) a proposed sale of the Bank in August 2013.

IV. <u>The Sale Motion</u>

24. In the fall of 2013, the Company received a proposal from RKJS, Inc., in the form of a term sheet, for a transaction through which certain investors would acquire FMAR's shares in the Bank. After months of extensive negotiations, on February 7, 2014, FMAR, the Bank and RKJS Bank entered into that certain Merger and Acquisition Agreement (the "M&A Agreement") to consummate the M&A Transaction.

25. The M&A Transaction is functionally a transfer of the Debtor's shares in the Bank (as well as certain Bank-related assets) to the "Investors" (as defined in the M&A Agreement) for consideration of up to $4.775 million (the "Purchase Price").[2] As a technical matter, this transfer was structured as a merger between the Bank and a newly chartered interim bank formed by the Investors (i.e., RKJS Bank). The merged Bank will be the surviving entity following the merger and, once the merger takes place, FMAR's shares in the pre-merger Bank will be cancelled and new shares in the merged Bank will be issued to the Investors.

26. As part of the M&A Transaction, the Investors have also agreed to recapitalize the Bank in an amount between $85 million and $100 million (less the Purchase Price).

27. On or about February 7, 2014, FMAR's Board of Directors unanimously authorized the Debtor to enter into the M&A Agreement and consummate the M&A Transaction.

---

[2] The Purchase Price will be reduced on a dollar-for-dollar basis for each dollar that the Bank's "Tier 1 Capital" (calculated in accordance with the M&A Transaction) as of the closing of the M&A Transaction is less than $29 million. This mechanic may have a material impact on the ultimate Purchase Price. The Purchase Price will not be increased if the closing date Tier 1 Capital is more than $29 million.

28. The M&A Agreement permits the Debtor to consider certain higher or otherwise better competing bids and to conduct an auction with respect to the Purchased Assets. RKJS Bank has agreed to serve as "stalking horse" bidder in order to set the "floor" price for competing bidders to outbid.

29. Pursuant to the M&A Agreement, the M&A Transaction must be consummated through section 363 of the Bankruptcy Code. To this end, the Debtor has commenced the Chapter 11 Case and filed the Sale Motion seeking authority to consummate the M&A Transaction pursuant to the M&A Agreement.

30. The Debtor has also requested certain other relief in the Sale Motion, as more fully described therein. For example, to ensure that the Debtor obtains the highest or otherwise best bids for the Purchased Assets, the Debtor is seeking approval of procedures that will govern the bidding process and the conduct at an auction with respect to the Purchased Assets. In addition, the Debtor is seeking approval of a breakup fee and reimbursement of certain M&A Transaction-related fees and expenses to be paid to RKJS Bank if a competing bid is ultimately selected as the "successful" bid at an auction, in consideration for RKJS Bank agreeing to serve as "stalking horse" bidder.

31. The Debtor has two principal business reasons for pursuing the M&A Transaction and for the other relief requested in the Sale Motion.

32. *First*, under the circumstances – including that (i) the Debtor remains under a regulatory directive to raise capital at the Bank, (ii) the end of the interest deferral period under the TruPS has occurred, and (iii) it is uncertain that the Bank can be viable without executing a sale or infusion of capital – the M&A Transaction and the relief requested in the Sale Motion provide the best available opportunity for the Debtor to realize the maximum value for

the Purchased Assets at the current time and remove the uncertain future of the Bank. Indeed, as described in the Boyan Declaration, after a marketing process that has spanned several years, the M&A Transaction is the only current viable expression of interest for the Purchased Assets.

33. *Second*, in light of (i) the failure of the Debtor's multi-year marketing efforts to identify an acceptable and viable alternative transaction, (ii) the willingness of the "stalking horse" bidder to consummate the M&A Transaction promptly so as to avoid the Bank risking negative consequences as a result of the bankruptcy, (iii) the significant uncertainty created by reaching the end of the TruPS deferral period, and (iv) the possibility of higher and better bids in light of the further market testing of the Purchased Assets through the bankruptcy auction process, the M&A Transaction is fair, reasonable, and in the best interests of the Debtor's estate and creditors under the current circumstances.

V. The DIP Motion

34. Because it has no operations, the Debtor will not have funds to pay the fees and expenses related to the M&A Transaction without financing. As such, as part of the M&A Transaction, RKJS Bank has agreed to provide postpetition financing (the "DIP Loan") to the Debtor to pay the fees and expenses that it incurs in connection with the M&A Transaction.

35. The proposed DIP Loan will be in an amount of up to $2,500,000 and will be secured by a non-priming lien on all of the Debtor's assets (including the Bank Shares). The DIP Loan will generally carry an interest rate of 6%, which will increase by 2% upon the occurrence of an event of default or after the maturity date of the DIP Loan if it is not repaid by then. However, if the Stalking Horse Bidder becomes the winning bidder and the M&A Transaction is consummated, RKJS will forego the payment of any interest on the DIP Loan, which I understand from my advisors was a significant concession by RKJS. In addition, if the

Stalking Horse Bidder becomes the winning bidder, the Debtor will not have any obligation to reimburse RKJS Bank for any fees and costs incurred in connection with the DIP Loan.

36. The DIP Loan will finance any fees and expenses that the Debtor incurs, and represents the best possible option to "bridge" the Debtor to the closing of the sale of the Purchased Assets.

37. If the winning bidder at the auction for the Purchased Assets is not RKJS Bank, the outstanding obligations under the DIP Loan will be repaid using proceeds of the winning bidder's deposit and the winning bidder will, in turn, be required to provide replacement postpetition bridge financing to the Debtor to consummate the alternative sale transaction. As contemplated by the Auction Procedures, such replacement postpetition financing must be provided on terms that are no less favorable than those provided under the DIP Loan. As such, the Debtor has requested in the DIP Motion that, if a Competing Bid is approved, the order approving the DIP Loan apply to the same extent to the replacement postpetition financing as it would to the DIP Loan without the need for the Debtor to request separate approval therefor. This mechanism will ensure that the Debtor will always have adequate financing to be able to consummate the sale transaction.

\*   \*   \*

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct. Executed on this 10th day of February, 2014 in Baltimore, Maryland.

By: /s/ Mark A. Keidel
   Mark A. Keidel
   Interim Chief Executive Officer of
   First Mariner Bancorp

- 13 -

## CERTIFICATE OF SERVICE

I hereby certify that on this 10th day of February 2014, notice of filing of the Declaration of Mark A. Keidel in Support of the Debtor's Chapter 11 Petition and Certain Motions (the "Declaration") was sent electronically to those parties listed on the docket as being entitled to such electronic notice, and a copy of the Declaration was mailed first class, postage prepaid to the parties on the attached service list.

                                                /s/ Catherine Nownes-Whitaker
                                                Catherine Nownes-Whitaker

*FMAR Draft as of February 8, 2014*
*Privileged and Confidential*
*Attorney Work Product*

First Mariner Bank
Attn: Joseph F. Howard,
Sr. Vice President, General Counsel
1501 S. Clinton St.
Baltimore, MD 21224

The Bank of New York, Trustee
f/b/o Mariner Capital Trust II
Attn: Corporate Trust Administration
White Clay Center, Route 273
Newark, DE 19711

Wells Fargo Bank, NA, Trustee
f/b/o Mariner Capital Trust III
Attn: Corporate Trust Administration
919 Market St. Suite 700
Wilmington, DE 19801

Wells Fargo Bank, NA, Trustee
f/b/o Mariner Capital Trust IV
Attn: Corporate Trust Administration
919 Market St. Suite 700
Wilmington, DE 19801

Wells Fargo Bank, NA, Trustee
f/b/o Mariner Capital Trust VI
Attn: Corporate Trust Administration
919 Market St. Suite 700
Wilmington, DE 19801

Wilmington Trust Company, Trustee
f/b/o Mariner Capital Trust V
Attn: Corporate Trust Administration
Rodney Square N 1100 N. Market St.
Wilmington, DE 19890-1600

Comptroller of Maryland
Compliance Division
110 Carroll Street
Annapolis, MD 21411

Internal Revenue Service
P.O. Box 7346
Philadelphia, PA 19101-7346

IRS
Special Procedures – Insolvency Unit
31 Hopkins Plaza Room 1150
Baltimore, MD 21201

Federal Deposit Insurance Corporation
Julie Howland
350 Fifth Avenue
New York, NY 10118-0110

Federal Reserve Bank of Richmond
Richard Gilbert
701 East Byrd Street
Richmond, VA 23219
Local: 804-697-8000

The following parties received electronic notice of the filing:

Office of the U.S. Trustee
101 West Lombard Street
Baltimore, Maryland 21201

Gary R. Bronstein, Esquire
Kilpatrick Townsend & Stockton LLP
607 14th Street, NW Suite 900
Washington, DC 20005-2018

Joel Rappoport, Esquire
Kilpatrick Townsend & Stockton LLP
607 14th Street, NW Suite 900
Washington, DC 20005-2018

Joshua Brody, Esquire
Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, NY 10036

Robert T. Schmidt, Esquire
Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, NY 10036

Edward S. Stein
Sandler O'Neill & Partners LP
1251 Avenue of the Americas
6th Floor
New York, NY 10020

Richard Wasserman, Esquire
Venable, LLP
750 E Pratt St #900
Baltimore, MD 21202