IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
(Baltimore Division)

| | | |
|---|---|---|
| In re: | * | |
| FIRST MARINER BANCORP | * | Case No: 14-11952-DER |
| | | (Chapter 11) |
| Debtor | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

DECLARATION OF WILLIAM L. BOYAN, III IN SUPPORT
OF THE DEBTOR'S MOTIONS TO SELL CERTAIN
ASSETS AND TO OBTAIN POSTPETITION FINANCING

I, William L. Boyan, III, declare as follows:

1.  I am a Managing Director in the Investment Banking Group of Sandler O'Neill & Partners, L.P. ("Sandler O'Neill"), the proposed investment banker and financial advisor to First Mariner Bancorp ("FMAR" or the "Debtor"). I submit this declaration (the "Declaration") in support of the relief sought in the following two motions filed by the Debtor contemporaneously herewith: (a) *Motion of the Debtor for (I) an Order (A) Approving Bidding and Auction Procedures with Respect to the Sale of Certain Assets; (B) Approving Bidding Protections for the Stalking Horse Bidder; (C) Approving Procedures Related to the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; (D) Approving the Form and Manner of Notices Related to the Auction and Sale; and (E) Scheduling the Sale Hearing, and (II) an Order (A) Approving Such Sale Free and Clear of Liens, Claims, Encumbrances and Other Interests and (B) Granting Related Relief* (the "Sale Motion"), and (b) *Motion of the Debtor for a Final Order Pursuant to Sections 105, 362, and 364 of the Bankruptcy Code (A) Authorizing and Approving Debtor-In-Possession Financing and Granting Security Interests and a Superpriority Administrative Claim in Connection Therewith, (B) Approving the Terms and Conditions of that Certain Superpriority Debtor-In-Possession Credit Agreement and Related*

*Documents, and (C) Modifying the Automatic Stay to the Extent Necessary to Enter Into the DIP Financing and Effectuate the Terms Thereof* (the "DIP Motion").[1]

2.      For over four years, I have been one of the primary professionals at Sandler O'Neill responsible for advising and assisting the Debtor and its subsidiary, First Mariner Bank (the "Bank"), in connection with the Debtor's efforts to recapitalize the Bank, as described more fully herein.  In this capacity, I am familiar with the details of such efforts, as well as the Debtor's financial goals, business, and operations, and was involved in the negotiations that led to the proposed M&A Transaction.

3.      Except as otherwise indicated, all statements in this Declaration are based upon my personal knowledge and experience, my discussions with the Debtor and the Bank and their other professionals, and my review of relevant documents, including, without limitation, the M&A Agreement, the Sale Motion, the Auction Procedures, internal non-public financial data concerning the Debtor furnished to Sandler O'Neill by the Debtor's management, the Bank's quarterly Consolidated Report of Condition and Income reports filed with the FDIC (i.e., FDIC call report filings), and other publicly available information about the Debtor and the Bank. References to the Bankruptcy Code and all related legal matters, including information relative to the Chapter 11 bankruptcy process, are based on my understanding of those matters in reliance upon explanations provided to me by counsel.  If I were called upon to testify, I would competently testify to each of the facts set forth below.

4.      This Declaration is divided into five parts.  Part I provides an overview of Sandler O'Neill's business along with my background and expertise.  Part II describes the Debtor's prepetition marketing and recapitalization efforts.  Part III describes the M&A

---

[1]  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Sale Motion.

Transaction and provides relevant facts in support of the Debtor's decision to proceed with the M&A Transaction. Part IV describes the proposed auction and bidding procedures, including the proposed fee to be paid to the Stalking Horse Bidder, and the terms and basis for the Auction Procedures and the Stalking Horse Bidder Fee. Part V describes the terms of the proposed postpetition financing to be provided by the Stalking Horse Bidder and the need for such financing.

## I.    QUALIFICATIONS OF SANDLER O'NEILL AND DECLARANT

5.      Sandler O'Neill is a full-service investment banking firm and broker-dealer focused on the financial services sector. Its clients include a wide variety of financial institutions. Sandler O'Neill provides clients with a full range of investment banking services, including merger and acquisition advising, capital raising, fixed income and equity trading and sales, equity research, balance sheet management, mortgage finance, and consulting services.

6.      I have over 24 years of experience advising financial institutions in buy-side and sell-side mergers and acquisitions, divestitures, government-assisted transactions and debt and equity capital raising projects. For example, since the beginning of 2013, I represented Virginia Commerce Bancorp Inc. in its sale to United Bankshares Inc., Annapolis Bancorp Inc. in its sale to F.N.B. Corporation, United Financial Banking Companies in its sale to Cardinal Financial Corporation, Prince George's Federal Savings Bank in its pending sale to Southern National Bancorp of Virginia, Inc. and Love Savings Holding Company in the pending sale of its wholly-owned subsidiary, Heartland Bank, to Midland States Bancorp, Inc.

7.      I joined Sandler O'Neill as a Managing Director in the Investment Banking Group in October 2003. Before joining Sandler O'Neill, I was a Managing Director in the Financial Institutions Group of Friedman, Billings, Ramsey Group, Inc. (n/k/a Arlington

Asset Investment Corporation), and before that I was a Vice President in the Investment Banking Group at Hovde Financial, and an analyst at Salomon Brothers Inc. Throughout my career I have worked with investment banks that provide products and services to financial services companies, with a particular focus on banks and thrifts.

8.    Sandler O'Neill has acted as financial advisor to the Debtor and the Bank since October 2009. In connection with these efforts, Sandler O'Neill has familiarized itself with FMAR's and the Bank's business and internal operations. Among other things, Sandler O'Neill attended and participated (either telephonically or in person) in an overwhelming majority of the meetings of FMAR's Board of Directors (the "Board") and the Bank's Board of Directors from 2009 through the present, and has conducted due diligence of FMAR's and the Bank's assets, financial condition and regulatory directives applicable to each of FMAR and the Bank.

9.    Accordingly, I, along with other members of the team at Sandler O'Neill, have developed substantial and detailed knowledge regarding the Debtor and the Bank.

## II.    PREPETITION MARKETING AND SALE EFFORTS

10.    I understand that, beginning in 2007, the Bank began to incur significant losses relating to credit quality and its mortgage business that ultimately impaired its ability to meet certain regulatory requirements for capital. The Bank's deteriorating financial condition had a direct negative impact on FMAR, which also began to report losses beginning in 2007. As a result of these financial issues, on September 18, 2009, the FDIC and the Maryland CFR imposed a cease and desist order on the Bank directing it to, among other things, raise sufficient capital to achieve specified capital ratio levels. On November 24, 2009, FMAR and the Federal Reserve Bank of Richmond ("FRB") entered into an agreement that, among other things, required FMAR to submit a plan to achieve certain minimum capital requirements.

11.     To help FMAR  and the Bank comply with the regulatory directives, in October 2009, FMAR and the Bank engaged Sandler O'Neill to assist FMAR in considering strategic alternatives, to help FMAR develop a capital plan to enhance the value of the company, and to advise on potential capital raising options.

12.     Since its engagement, Sandler O'Neill has worked closely with the Debtor's management, financial staff, and other professionals as part of the Debtor's restructuring and recapitalization efforts, including providing significant advisory services relating to the proposed M&A Transaction.

13.     Sandler O'Neill's efforts to date have included contacting over 100 potential financial investors and approximately 35 strategic buyers to gauge their interest in pursuing an investment in, or purchase of, FMAR and/or the Bank.  As described in more detail below, before determining to proceed with the transaction embodied in the M&A Agreement, FMAR and the Bank negotiated with multiple parties regarding a number of different potential transactions.  At least five of these negotiations progressed well past the preliminary stages, but ultimately failed to come to fruition: (i) a proposed $160 million private placement in 2011; (ii) a proposed sale pursuant to section 363 of the Bankruptcy Code in 2012; (iii) a proposed "prepackaged" bankruptcy in the fall of 2012 to a financial institution; (iv) a proposed "prepackaged" bankruptcy in early 2013; and (v) a proposed sale of the Bank in August 2013 to a financial institution.

A.    *FMAR's Initial Capital Raising and Debt Reducing Efforts*

14.     As part of its efforts to meet the requisite capital levels and reduce its debt, FMAR engaged in a series of smaller transactions in 2009 and 2010.  In December 2009, FMAR sold 95% of its equity in its consumer finance division – Mariner Finance, LLC – for a purchase

price of $10.5 million in cash.[2]  In April 2010, FMAR conducted both a rights offering and a "community" offering (i.e., an offering of common stock to investors located near Baltimore, Maryland) that raised gross proceeds of $10.9 million.

15.    In March and July 2010, FMAR reduced its level of debt by exchanging $21 million of TruPS held by members and former members of FMAR's Board for shares of FMAR's common stock and warrants to acquire FMAR's common stock.

16.    Notwithstanding FMAR's traditional capital raising processes and various attempts at debt reduction, FMAR was unable to increase its capital ratios to comply with its various regulatory directives.  Accordingly, FMAR, primarily through the assistance of Sandler O'Neill, began to explore a sale of FMAR to strategic buyers and other capital raising alternatives.  From 2010 to 2013, FMAR and Sandler O'Neill contacted numerous potential financial and strategic investors to gauge interest in various types of capital raising transactions, including investment transactions and a sale of the Bank through section 363 of the Bankruptcy Code or a "prepackaged" Chapter 11 plan.  Unfortunately, as discussed below, due to regulatory requirements, a lack of interested or viable parties, and/or an inability to reach agreement on an appropriate purchase price or other material terms, none of these potential transactions were able to be consummated.

B.    *The Proposed 2011 Investment Transaction and Discounted Tender Offer*

17.    Beginning in 2010, Sandler O'Neill contacted over 100 potential financial investors that it identified through its extensive experience in the financial industry (including through capital raising and merger transactions with other financial institutions) and based on those parties that Sandler O'Neill believed had an interest in FMAR's business and who had the

---

[2] In May 2013, FMAR sold its remaining 5% stake in Mariner Finance, LLC.

financial ability to consummate an investment in FMAR. Twenty-one of these parties executed a non-disclosure agreement with FMAR, and eight met with Sandler O'Neill and FMAR to discuss a potential transaction. None of these discussions, however, resulted in a viable proposal given FMAR's then-current financial condition and significant debt obligations.

18.     In early 2011, FMAR was contacted by a private equity firm that expressed an interest in investing in FMAR and/or the Bank. After extensive negotiations, in April 2011, FMAR entered into an agreement with this private equity firm pursuant to which this party agreed to invest approximately $36 million in FMAR (the "2011 Investment Transaction"). The 2011 Investment Transaction was intended to be part of a $160 million private placement and was conditioned upon, among other things, FMAR raising capital from additional investors. Despite FMAR's and Sandler O'Neill's best efforts, however, FMAR was unable to secure the remainder of the capital and the 2011 Investment Transaction was subsequently terminated.

19.     After the termination of the 2011 Investment Transaction, in late 2011, in an effort to further delever FMAR's balance sheet, FMAR extended a discounted cash tender offer for FMAR's outstanding TruPS. The offer contained a number of significant conditions — including obtaining regulatory approval and acceptance of the offer by 100% of the TruPS holders. Despite the fact that FMAR (twice) extended the offer deadline, the conditions were not met as no TruPS were tendered, and the offer was terminated in early 2012.

C.  *The Proposed Sale Transactions*

20.     In late 2011, Sandler O'Neill initiated a traditional sale process of FMAR, through which Sandler O'Neill contacted approximately 35 strategic buyers whom Sandler O'Neill believed may have had an interest in, and the financial ability to, purchase FMAR. Of the parties contacted, seven potential buyers executed non-disclosure agreements to obtain

additional information from FMAR.  Sandler O'Neill delivered marketing books and several telephonic meetings took place between FMAR, Sandler O'Neill, and the potential buyers, but ultimately no bids or interest were received.  Thus, the process was terminated in early 2012.

21.    In October 2011, FMAR determined to pursue a transaction to recapitalize the Bank through a bankruptcy, such as a sale pursuant to section 363 of the Bankruptcy Code or a "prepackaged" Chapter 11 plan.  Sandler O'Neill re-marketed FMAR to most of the over 100 financial investors previously contacted by Sandler O'Neill and a few new potential investors identified by Sandler O'Neill to gauge interest in such a bankruptcy transaction, of which three executed non-disclosure agreements with FMAR to begin conducting due diligence.

22.    In December 2011, two of the parties who had executed non-disclosure agreements, both private equity firms (together, the "PE Parties"), and one of whom was the party to the proposed 2011 Investment Transaction, expressed an interest in acquiring the Bank Shares through a bankruptcy transaction.  After seven months of due diligence and extensive negotiations, these parties, together with certain other investors, executed a non-binding letter of intent with FMAR to purchase the Bank Shares through a sale under section 363 of the Bankruptcy Code (the "2012 Sale Transaction").

23.    Beginning in late 2011 and continuing through 2012, FMAR and the Bank returned to profitability.  This was primarily due to significant improvements in the mortgage refinancing market, whereby historically low interest rates led to a significant increase in loan volume and in the prices that the Bank realized on its loan sales.  In addition, during 2012, real estate conditions improved in the Bank's market area, stabilizing the Bank's asset quality. Differing views regarding the value of FMAR and the Bank due to the changes in the then-current market conditions and the Bank's then-record earnings and projections made it extremely

challenging for the parties to agree on an appropriate purchase price in the proposed 2012 Sale Transaction.

24.     Because of the difficulty in negotiating a purchase price for the proposed 2012 Sale Transaction, Sandler O'Neill re-initiated dialogue with potential strategic buyers that it determined might have been interested in purchasing FMAR and/or the Bank in light of the new conditions in the market and FMAR's record earnings.  Specifically, Sandler O'Neill contacted approximately 20 of the previously contacted potential acquirers, plus one additional party identified by Sandler O'Neill.  In November 2012, the Bank received a proposal from one of these institutions to purchase FMAR through a prepackaged Chapter 11 plan.  To proceed with this transaction, however, the financial institution required that FMAR cease negotiations with all other parties.  Because the proposed transaction would have provided a significantly better return for FMAR, its creditors, and other stakeholders than the proposed 2012 Sale Transaction, which was at a standstill due to valuation differences between the parties, FMAR terminated discussions with respect to the proposed 2012 Sale Transaction and pursued negotiations with the financial institution.  After extensive negotiations and informal discussions with FMAR's regulators, FMAR came to the conclusion that this transaction was unlikely to receive regulatory approval.  As a result, FMAR terminated discussions with this financial institution in December 2012.

D.  *The Proposed Prepackaged Bankruptcy*

25.     In January 2013, FMAR resumed negotiations with the PE Parties to consummate a transaction.  This time, the PE Parties agreed to invest in FMAR through a prepackaged bankruptcy transaction. Also included in the negotiations were representatives of almost 20% of the face amount of the TruPS.  Following extensive negotiations, the parties

agreed to pursue a comprehensive recapitalization transaction pursuant to a prepackaged Chapter 11 plan that would address the capital needs of the Bank and FMAR and was on terms acceptable to those TruPS holders that were involved.  During the parties' negotiations of the transaction documents, FMAR began to express concerns about the ability of the Bank to meet the minimum capital ratios required in the transaction documents even if the prepackaged Chapter 11 plan was successfully consummated.  The investors were unwilling to renegotiate the investment amount or the target capital ratios and, in June 2013, the investors terminated discussions and abandoned the prepackaged bankruptcy transaction.

   E.  *Subsequent Efforts in 2013*

    26.  In August 2013, Sandler O'Neill again marketed the Bank to 24 potential strategic acquirers, most of whom were contacted previously by Sandler O'Neill, to discuss a potential sale of FMAR and/or the Bank.  Of these parties, four executed non-disclosure agreements with FMAR, two conducted limited due diligence, and one ultimately expressed an interest in pursuing a transaction and submitted a term sheet to FMAR.  Although at first this party proposed to purchase the Bank, ultimately, after conducting due diligence, it was only willing to purchase certain of the Bank's best branches and deposits and certain of the Bank's best performing loans.  This offer was unsatisfactory, however, as it would have depleted the Bank of its most valuable assets and yet not provided sufficient capital for the Bank to satisfy the capital requirements under the applicable regulatory directives or otherwise address FMAR's financial distress.  As a result, FMAR concluded that regulatory approval for such a transaction would not likely be obtained.  Accordingly, FMAR did not pursue the transaction further.

III.    **THE M&A TRANSACTION WILL YIELD MAXIMUM VALUE FOR THE DEBTOR'S ASSETS AND REPRESENTS  A GOOD FAITH AND ARM'S LENGTH TRANSACTION**

27.    As a result of FMAR's and Sandler O'Neill's continued efforts to solicit investors for a possible sale, reorganization and/or recapitalization transaction, in the fall of 2013, FMAR received a letter of intent from RKJS, Inc., which identified a group of six investors, including certain investors that were part of the proposed 2011 Investment Transaction and the proposed 2012 Sale Transaction, that were interested in acquiring the Bank Shares.[3] After extensive negotiations and due diligence by all the parties, the Board determined, in an exercise of its business judgment, to pursue a possible transaction with RKJS, Inc.  To this end, on November 21, 2013, the parties entered into a term sheet that set forth the material terms of a sale and merger transaction to be consummated through a transfer and sale pursuant to section 363 of the Bankruptcy Code, whereby the investors identified by RKJS, Inc. would (i) purchase the Bank Shares through a merger between an interim bank and the Bank, and (ii) recapitalize the Bank with the capital needed to comply with the applicable regulatory directives.

28.    After months of extensive negotiations, on February 7, 2014, FMAR, the Bank and RKJS entered into that certain Merger and Acquisition Agreement (the "M&A Agreement") to consummate the M&A Transaction.[4]

29.    The M&A Transaction is functionally a transfer of the Debtor's shares in the Bank (as well as certain Bank-related assets) to the "Investors" (as defined in the M&A

---

[3]    In addition, two of the investors, Jack E. Steil and Robert D. Kunisch Jr., were previously employed as independent consultants by the Bank from July 1, 2011 to July 31, 2013.

[4]    The complete terms of the M&A Transaction are set forth in the M&A Agreement and if there is any inconsistency between this Declaration and the terms of the M&A Agreement, the terms of the M&A Agreement shall govern.

Agreement) for consideration of up to $4.775 million (the "Purchase Price").[5]  The transfer was structured as a merger between the Bank and a newly chartered interim bank formed by the Investors (i.e., RKJS Bank).  The Bank will be the surviving entity following the merger and, once the merger takes place, FMAR's shares in the pre-merger Bank will be cancelled and new shares in the merged Bank will be issued to the Investors.

30.    As part of the M&A Transaction, the Investors have also agreed to recapitalize the Bank in an amount between $85 million and $100 million less the Purchase Price (such amount, the "Recapitalization Amount").

31.    The M&A Agreement was unanimously approved by the Debtor's Board on February 7, 2014.

32.    I believe that the M&A Transaction, including the M&A Agreement, is a product of good faith and arm's length negotiations between FMAR and the Stalking Horse Bidder, each of whom was represented by their respective experienced professionals.

33.    I also believe that the Stalking Horse Bid reflects fair and reasonable consideration for the Purchased Assets, and any concern that the Debtor may be able to sell the Purchased Assets for higher consideration or on otherwise better overall terms than provided under the M&A Agreement should be allayed by the overbidding process that the Debtor will undertake, as outlined in the Auction Procedures.

34.    I also believe that the M&A Transaction represents the most value-maximizing proposal for the sale of the Bank Shares and the Other Purchased Assets and the Debtor exercised sound business judgment in entering into the M&A Agreement.  I believe that,

---

[5]  The Purchase Price will be reduced on a dollar-for-dollar basis for each dollar that the Bank's "Tier 1 Capital" (calculated in accordance with the M&A Transaction) as of the closing of the M&A Transaction is less than $29 million.  This mechanic may have a material impact on the ultimate Purchase Price.  The Purchase Price will not be increased if the closing date Tier 1 Capital is more than $29 million.

after the four-year prepetition marketing and recapitalization process described above, the Stalking Horse Bidder emerged as the only viable party with the interest, financing resources, and ability to obtain regulatory approval for a transaction that will allow for (i) FMAR to maximize the value of its primary asset – i.e., the Bank – for the benefit of its estate and creditors, and (ii) the Bank to be recapitalized in compliance with the applicable regulatory directives so as to avoid consequences that would result in a total loss for FMAR and its stakeholders.

## IV.    THE PROPOSED AUCTION PROCEDURES, INCLUDING THE STALKING HORSE BIDDER FEE, ARE FAIR AND REASONABLE

35.    To ensure that any sale of the Purchased Assets is fair and will achieve the maximum value for stakeholders, the M&A Agreement permits the Debtor to solicit additional higher or otherwise better offers for the Purchased Assets.  To this end, the Debtor is requesting approval of the Auction Procedures that will govern the process for evaluating overbids for the Purchased Assets and the conduct at the Auction.  As further described in the Sale Motion, the Auction Procedures establish a process through which qualified interested parties will be provided with due diligence and sufficient opportunity to submit bids for the Purchased Assets, with the Stalking Horse Bid serving as the floor for the purchase price for the Purchased Assets and the minimum amount of recapitalization for the Bank.

36.    I believe that the Auction Procedures are the product of extensive good faith and arm's length negotiations between the Debtor's and the Stalking Horse Bidder's professionals, and the Stalking Horse Bidder has indicated that it would not proceed with the transaction absent the approval of the proposed Auction Procedures.  In addition, the Auction Procedures were designed to provide a fair, accessible, and transparent process through which

FMAR will solicit, receive, and evaluate bids so that it may realize the highest or otherwise best bid for the Purchased Assets.

37.    The Auction Procedures contemplate an open and transparent sale and auction process that will provide interested parties with sufficient notice and opportunity to submit bids for the Purchased Assets.  In accordance with the terms of the M&A Agreement, interested parties will have 30 days from the entry of the Auction Procedures Order to submit their bids for the Purchased Assets.  A notice of the entry of the Auction Procedures Order will be served and published as soon as practicable after its entry on the Court's docket, but in no event later than three days thereafter.  During the past four years, Sandler O'Neill has contacted over 135 potential investors and/or purchasers – both financial and strategic – that it believes represents a substantial portion of the universe of potentially interested and qualified counterparties.  In light of Sandler O'Neill's prior efforts and communications with these investors and/or purchasers, these parties already have a basic understanding of the Bank's operations and financial background such that they will have sufficient time to conduct due diligence and submit bids for the Purchased Assets.

38.    To the extent that any additional interested parties come forward and express an interest in acquiring the Purchased Assets, the Debtor and Sandler O'Neill will work closely with such parties to facilitate and expedite the due diligence process such that those parties will have sufficient time to conduct the necessary review of the financial condition and operations of the Bank and submit a bid by the applicable deadline.  FMAR has already established a data room to provide potentially interested investors with access to the necessary documents and materials to conduct due diligence and any new potential investors will be granted immediate access to such data room upon executing the necessary confidentiality

agreement.  Accordingly, I believe that the Auction Procedures establish a reasonable timeline for any interested parties to conduct due diligence and submit a bid for the Purchased Assets.

39.    The proposed Auction Procedures will allow the Debtor to (i) identify financially capable bidders who demonstrate the ability to close a transaction, (ii) conduct an auction in a controlled, fair and open fashion that will encourage participation, (iii) undertake an auction in as expeditious and efficient a manner as possible, which the Debtor believes is essential to maximizing the value of the Debtor's estate for its creditors, and (iv) select the winning bid that provides maximum value to the Debtor's estate.

40.    The Auction Procedures are therefore properly structured to attract the maximum number of potential investors interested in acquiring the Purchased Assets and recapitalizing the Bank, and promote active bidding from such investors through a fair and competitive bidding process.

41.    The Auction Procedures also contemplate the payment of a break-up fee and expense reimbursement (together, the "Stalking Horse Bidder Fee") to the Stalking Horse Bidder.  The Stalking Horse Bidder Fee consists of (i) a break-up fee in the amount of $1 million (consisting of $250,000 due from FMAR and $750,000 due from the Bank), and (ii) reimbursement of fees and expenses incurred by RKJS Bank and the Investors in connection with the M&A Transaction, up to an amount of $1,750,000.  The Stalking Horse Bidder Fee was required by RKJS as consideration for serving as "stalking horse" in the bankruptcy sale process, and shall be paid to the Stalking Horse Bidder if it is not the winning bidder in the auction process or if the M&A Agreement is otherwise terminated (unless the Stalking Horse Bidder is in material breach thereof).

42.     I believe that the Stalking Horse Bidder Fee, like other terms of the M&A Transaction, is a product of good faith and arm's length negotiations between FMAR and the Stalking Horse Bidder, each of whom was represented by their respective experienced professionals.

43.     I believe that the Stalking Horse Bid provides a material benefit for the Debtor, its estate, and its creditors by: (i) committing the Stalking Horse Bidder to consummate the M&A Transaction (in accordance with the M&A Agreement), (ii) establishing a "floor" for the sale of the Purchased Assets and the recapitalization of the Bank, and (iii) encouraging competitive bidding that will realize the highest possible price for the Purchased Assets and the maximum amount of recapitalization for the Bank.

44.     Based on the foregoing, I believe that the Stalking Horse Bidder Fee is fair, reasonable, and necessary to induce RKJS Bank and the Investors to serve as the stalking-horse bidder for the Purchased Assets and to continue to expend efforts in order to consummate the M&A Transaction notwithstanding the fact that the M&A Agreement is subject to higher or better offers.  I also believe that the expense reimbursement portion of the Stalking Horse Bidder Fee (in an amount of up to $1.75 million) is reasonable in light of the complexity of the transaction.  In addition to the due diligence, negotiation, and structuring costs associated with any transaction, the M&A Transaction involved significant regulatory hurdles that added an additional layer of complexity and required significant time and effort to address. Moreover, the expense reimbursement of the Stalking Horse Bidder Fee is limited to the actual out-of-pocket fees and expenses incurred in connection with the M&A Transaction.

45.     Moreover, in light of the relative size of the Stalking Horse Bidder Fee as compared to the total amount of consideration provided for the Purchased Assets (including the

Recapitalization Amount) and the "overbid" requirements contemplated by the Auction Procedures, the Stalking Horse Bidder Fee is unlikely to chill bidding at the Auction.

46.     Accordingly, I believe that the Auction Procedures, including the Stalking Horse Bidder Fee, are fair, reasonable, and appropriate, and will serve to maximize the value that the Debtor will recover on account of the proposed sale.

## V.     THE PROPOSED DIP FACILITY

47.     Given that it does not have any independent operations, the Debtor will not have funds to pay the fees and expenses related to the consummation of the M&A Transaction (i.e., to fund the Chapter 11 administrative costs) without financing.  Accordingly, the Stalking Horse Bidder has agreed to provide postpetition financing to the Debtor in order to pay the fees and expenses that the Debtor will incur in connection with consummation of the M&A Transaction, including, for example, the costs of administering the Debtor's Chapter 11 case.

48.     The proposed DIP Facility will be in an amount of up to $2.5 million and will be secured by a non-priming lien on all of the Debtor's assets (primarily the Bank Shares). The terms and conditions of the DIP Facility are fair and reasonable under the circumstances. Specifically, the DIP Facility will generally carry an interest rate of 6%, which such rate will increase an additional 2% upon the occurrence of an event of default or after the maturity date if the DIP Facility is not repaid by then.  One significant concession the Debtor was able to obtain from the Stalking Horse Bidder is that if the Stalking Horse Bidder prevails as the winning bidder and the M&A Transaction is consummated, the Stalking Horse Bidder will forego any interest or fees under the DIP Facility (both accrued and unaccrued).  Put another way, if the Stalking Horse Bidder is the winning bidder at the Auction, the Debtor will have the benefit of

an interest-free loan.[6]   Even if another bidder is selected and the interest is payable, based upon my review of comparable debtor-in-possession financing loans, I believe that both the standard and default interest rates under the DIP Facility are market rates for this type of transaction.

49.     Prior to executing the DIP Agreement, FMAR attempted to solicit other parties to provide postpetition financing to the Debtor on better terms than those proffered by the Stalking Horse Bidder.  To this end, Sandler O'Neill solicited unsecured financing from seven financial institutions.  Those efforts, however, proved futile as no financial institutions were willing to extend any unsecured financing to FMAR.  As such, I believe that the proposed DIP Facility represents the best possible option to "bridge" the Debtor to the closing of the sale of the Purchased Assets.

*      *      *

---

[6] Under these circumstances, any interest that was already paid by the Debtor will be applied to reduce any outstanding principal obligations and any remaining interest obligations will be forgiven.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.  Executed on this 10th day of February, 2014 in Baltimore, Maryland.

By: /s/ William L. Boyan, III
    William L. Boyan, III, Managing Director
    Sandler O'Neill & Partners, L.P.

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 10th day of February 2014, notice of filing of the Declaration of William L. Boyan III in Support of the Debtor's Motions to Sell Certain Assets and to Obtain Postpetition Financing (the "Declaration") was sent electronically to those parties listed on the docket as being entitled to such electronic notice, and a copy of the Declaration was mailed first class, postage prepaid to the parties on the attached service list.

         /s/ Catherine Nownes-Whitaker
        Catherine Nownes-Whitaker

First Mariner Bank
Attn: Joseph F. Howard,
Sr. Vice President, General Counsel
1501 S. Clinton St.
Baltimore, MD 21224

The Bank of New York, Trustee
f/b/o Mariner Capital Trust II
Attn: Corporate Trust Administration
White Clay Center, Route 273
Newark, DE 19711

Wells Fargo Bank, NA, Trustee
f/b/o Mariner Capital Trust III
Attn: Corporate Trust Administration
919 Market St. Suite 700
Wilmington, DE 19801

Wells Fargo Bank, NA, Trustee
f/b/o Mariner Capital Trust IV
Attn: Corporate Trust Administration
919 Market St. Suite 700
Wilmington, DE 19801

Wells Fargo Bank, NA, Trustee
f/b/o Mariner Capital Trust VI
Attn: Corporate Trust Administration
919 Market St. Suite 700
Wilmington, DE 19801

Wilmington Trust Company, Trustee
f/b/o Mariner Capital Trust V
Attn: Corporate Trust Administration
Rodney Square N 1100 N. Market St.
Wilmington, DE 19890-1600

Comptroller of Maryland
Compliance Division
110 Carroll Street
Annapolis, MD 21411

Internal Revenue Service
P.O. Box 7346
Philadelphia, PA 19101-7346

IRS
Special Procedures – Insolvency Unit
31 Hopkins Plaza Room 1150
Baltimore, MD  21201

Federal Deposit Insurance Corporation
Julie Howland
350 Fifth Avenue
New York, NY 10118-0110

Federal Reserve Bank of Richmond
Richard Gilbert
701 East Byrd Street
Richmond, VA23219
Local: 804-697-8000

The following parties received
electronic notice of the filing:

Office of the U.S. Trustee
101 West Lombard Street
Baltimore, Maryland  21201

Gary R. Bronstein, Esquire
Kilpatrick Townsend & Stockton LLP
607 14th Street, NW Suite 900
Washington, DC 20005-2018

Joel Rappoport, Esquire
Kilpatrick Townsend & Stockton LLP
607 14th Street, NW Suite 900
Washington, DC 20005-2018

Joshua Brody, Esquire
Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, NY 10036

Robert T. Schmidt, Esquire
Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, NY 10036

Edward S. Stein
Sandler O'Neill & Partners LP
1251 Avenue of the Americas
6th Floor
New York, NY 10020

Richard Wasserman, Esquire
Venable, LLP
750 E Pratt St #900
Baltimore, MD 21202