1   UNITED STATES BANKRUPTCY COURT

2   DISTRICT OF MARYLAND

3   CASE NO. 14-11952-DER

4   - - - - - - - - - - - - - - - - - - x

5   In the Matter of:

6

7   FIRST MARINER BANCORP,

8

9           Debtors.

10  - - - - - - - - - - - - - - - - - - x

11

12                        U.S. Bankruptcy Court

13                        101 West Lombard Street

14                        Baltimore, Maryland

15

16                        March 7, 2014

17                        10:02 AM

18

19  B E F O R E :

20  HON. DAVID E. RICE

21  U.S. BANKRUPTCY JUDGE

22

23

24

25  ECRO - JOYCE YALLEY

Page 2

1    HEARING Re (6) Motion of the Debtor for the entry of interim

2    and final orders establishing notification and hearing

3    procedures for transfers of certain equity securities, and

4    granting related relief filed by First Mariner Bancorp

5

6    HEARING Re (9) Motion for authority to obtain credit under

7    Section 364(b), Rule 4001(c) or (d) (filed under Section

8    364(c), NOT Section 364(b)) filed by First Mariner Bancorp

9

10   HEARING Re (15) Motion for sale of property under Section

11   363(b) for (I) An order (A) Approving bidding and auction

12   procedures with respect to the sale of certain assets, (B)

13   Approving bidding protections for the stalking horse bidder,

14   (C) Approving procedures related to the assumption and

15   assignment of certain executory contracts and unexpired

16   leases, (D) Approving the form and manner of notices related

17   to the auction and sale, and (E) Scheduling the sale

18   hearing, and (II) An Order (A) Approving such sale free and

19   clear of liens, claims, encumbrances and other interests and

20   (B) Granting related relief filed by First Mariner Bancorp

21

22   HEARING Re (43) Application to employ Sandler O'Neill &

23   Partners LP as independent financial advisors and verified

24   statement of proposed party filed by First Mariner Bancorp

25

```
 1    HEARING Re (76) Response on behalf of Sparrow Creek I, LLC,

 2    Sparrow Creek II, LLC, Sparrow Creek III, LLC, Sparrow Creek

 3    IV, LLC filed by Joel I. Sher

 4

 5    HEARING Re (99) Objection on behalf of Sparrow Creek, I,

 6    LLC, Sparrow Creek II, LLC, Sparrow Creek III, LLC, Sparrow

 7    Creek IV, LLC filed by Joel I. Sher (related document(s) 9

 8    Motion for Authority to obtain credit under Section 364 and

 9    notice of motion filed by Debtor First Mariner Bancorp, 15

10    motion for sale of property under Section 363(b) and notice

11    of motion filed by Debtor First Mariner Bancorp)

12

13    HEARING Re (100) Motion to Seal Official Committee of

14    unsecured creditors' unredacted objection to debtor's

15    auction procedures motion (Dkt 15) and DIP Motion (Dkt. 9)

16    filed by Sparrow Creek I, LLC, Sparrow Creek II, LLC,

17    Sparrow Creek III, LLC, Sparrow Creek IV, LLC

18

19

20

21

22

23

24

25
```

Page 4

1    HEARING Re (104) Objection on behalf of Wilmington Trust

2    Company filed by Jeffrey Neil Rothleder (related document(s)

3    9 motion for authority to obtain credit under Section 364

4    and notice of motion filed by Debtor First Mariner Bancorp,

5    15 motion for sale of property under Section 363(b) and

6    notice of motion filed by Debtor First Mariner Bancorp, 99

7    Objection filed by Creditor Sparrow Creek I, LLC, Creditor

8    Sparrow Creek II, LLC, Creditor Sparrow Creek III, LLC,

9    Creditor Sparrow Creek IV, LLC)

10

11   HEARING Re (107) Objection on behalf of US Trustee filed by

12   Edmund A. Goldberg Re: 9 motion for authority to obtain

13   credit under Section 364 and notice of motion filed by

14   Debtor First Mariner Bancorp. (Goldberg, Edmund). RE: 15

15   motion for sale of property under Section 363(b) for (I) an

16   order (A) Approving bidding and auction procedures with

17   respect to the sale of certain assets, (B) Approving bidding

18   protections for the stalking horse bidder, (C) Approving

19   procedures related filed by Debtor First Mariner Bancorp

20

21

22

23

24

25

Page 5

1    HEARING Re (108) Objection on behalf of Bank of New York

2    Mellon filed by Martin H. Schreiber II (related document(s)

3    9 motion for authority to obtain credit under Section 364

4    and notice of motion filed by Debtor First Mariner Bancorp,

5    15 motion for sale of property under Section 363(b) and

6    notice of motion filed by Debtor First Mariner Bancorp, 99

7    objection filed by Creditor Sparrow Creek I, LLC, Creditor

8    Sparrow Creek II, LLC, Creditor Sparrow Creek III, LLC,

9    Creditor Sparrow Creek IV, LLC)

10

11   HEARING Re (114) Motion to seal debtor's omnibus reply in

12   support of its motions for (I) An order approving, among

13   other things, bidding and auction procedures with respect to

14   the sale of certain assets and bidding protections for the

15   stalking horse bidder filed by First Mariner Bancorp

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Sheila Orms, Dawn South, Melissa Looney

1    A P P E A R A N C E S :

2

3    U.S. DEPARTMENT OF JUSTICE

4         Office of the United States Trustee

5         101 West Lombard Street

6         Suite 2625

7         Baltimore, MD   21201

8

9    BY:  EDMUND A. GOLDBERG, ESQ.

10

11   KRAMER LEVIN HAFTALIS & FRANKEL, LLP

12        Attorneys for the Debtor

13        1177 Avenue of the Americas

14        New York, NY   10036

15

16   BY:  JOSHUA K. BRODY, ESQ.

17        P. BRADLEY O'NEILL, ESQ.

18        ROBERT T. SCHMIDT, ESQ.

19        CRAIG SIEGEL, ESQ.

20

21

22

23

24

25

Page 7

1    YUMKAS, VIDMAR & SWEENEY, LLC

2         Attorneys for Debtors

3         2530 Riva Road

4         Suite 400

5         Annapolis, MD  21401

6

7    BY:  LAWRENCE JOSEPH YUMKAS, ESQ.

8

9    KIRKLAND & ELLIS, LLP

10        Attorneys for Official Committee of Unsecured

11        Creditors

12        300 North LaSalle

13        Chicago, IL  60654

14

15   BY:  DAVID R. SELIGMAN, ESQ.

16        JUDSON D. BROWN, ESQ.

17        JEFFREY S. POWELL, ESQ.

18

19   ARENT FOX LLP

20        Attorneys for Wilmington Trust Company

21        1717 K Street N.W.

22        Washington, D.C.  20036

23

24   BY:  JEFFREY NEIL ROTHLEDER, ESQ.

25

Page 8

```
1   EMMET MARVIN & MARTIN, LLP
2        Attorneys for Bank of New York Mellon
3        120 Broadway
4        New York, NY  10271
5
6   BY:  THOMAS ANGELO PITTA, ESQ.
7
8   VENABLE LLP
9        Attorneys for RKJS Bank
10       750 East Pratt Street
11       Suite 900
12       Baltimore, MD  21202
13
14  BY:  RICHARD WASSERMAN, ESQ.
15       MICHAEL SCHIFFER, ESQ.
16
17
18
19
20
21
22
23
24
25
```

1                    P R O C E E D I N G S

2          (Call to Court)

3                THE CLERK:  On the 10 o'clock docket, calling the

4     case of First Mariner Bancorp, Case No. 14-11952.  Counsel,

5     please identify yourselves and your clients for the record.

6                MR. BRODY:  Good morning, Your Honor, Josh Brody

7     from Kramer Levin Naftalis & Frankel on behalf of the

8     Debtor, First Mariner Bancorp.

9                With me in the room are my colleagues, Brad

10    O'Neill and Bob Schmidt, as well as Craig Siegel.  My

11    client's in the room, the company CEO, Mark Keidel.

12                THE COURT:  Good morning to all of you.

13                MR. SELIGMAN:  Good morning, Your Honor, David

14    Seligman from Kirkland & Ellis on behalf of the committee.

15    It's nice to be in front of Your Honor this morning.

16                THE COURT:  Good to see you.

17                MR. SELIGMAN:  I'm here with my colleagues Judson

18    Brown and Jeffrey Powell on behalf of the committee.

19                THE COURT:  Thank you.

20                MR. GOLDBERG:  Good morning, Your Honor, Edmund

21    Goldberg for the U.S. Trustee.

22                THE COURT:  Good morning.  We have some others in

23    the back.

24                MR. YUMKAS:  Good morning, Your Honor, Lawrence

25    Yumkas, local counsel to the debtor.

```
 1              THE COURT:  Good morning to you.

 2              MR. ROTHLEDER:  Good morning, Your Honor, Jeffrey

 3     Rothleder, Arent Fox on behalf of Wilmington Trust as

 4     trustee.

 5              THE COURT:  Good morning.

 6              MR. PITTA:  Good morning, Your Honor, Thomas Pitta

 7     of Emmet Marvin & Martin on behalf of Bank of New York

 8     Mellon as trustee.

 9              THE COURT:  Good morning.

10              MR. WASSERMAN:  Good morning, Your Honor, Richard

11     Wasserman and Michael Schiffer on behalf of RKJS Bank.

12              THE COURT:  Good morning to you.

13              We're here today for a hearing in this case.

14     There are a number of items on the docket, according to my

15     count, we have without counting all of the responses, we

16     have six items before the Court, the application to employ

17     Sandler O'Neill, the equity securities trading notice

18     motion, the motion for approval of debtor in possession,

19     financing, what is perhaps I guess the main event, the

20     bidding procedures, and two motions to file pleadings under

21     seal.

22              Mr. Brody, I suppose what I would like to do is

23     hear from you and the other parties who have entered an

24     appearance or wish to be heard what the status of the --

25     these matters is, what remains in dispute, and how you would
```

1    propose we proceed today.

2              MR. BRODY:  Certainly, Your Honor.  I think my

3    high level, the trading motion, which is unopposed, I think

4    I would propose we take that first.  The next I would go to

5    the Sandler O'Neill application which my understanding from

6    discussions with Mr. Seligman is they're not -- the

7    committee is not opposing the application.  They want to

8    make a statement on the record with respect to their -- so

9    again, it's not opposed.

10             I think I would next move to the sealing motions,

11   because those kind of set the tenor for, you know, who's

12   going to be in the courtroom and what's going to be

13   discussed on the DIP and on the bid procedures.

14             And those two motions, Your Honor, I'm happy to

15   tell the Judge -- tell Your Honor that after a lot of work,

16   we've managed to settle the committee's objections to the

17   DIP, which I will walk Your Honor through the changes we're

18   making.

19             As Your Honor hopefully as seen, we filed last

20   night amended bidding procedures which do not address all of

21   the committee's issues, and I think there are a couple of,

22   you know, I'll call high level issues that are still -- Your

23   Honor needs to decide on.  But for the most part, I think a

24   lot of the smaller issues have been, if not resolved

25   completely, at least we've gotten as far as we can trying to

1    limit the issues that need to be heard.

2              THE COURT:  All right.

3              MR. BRODY:  I guess from the outset, Your Honor,

4    I'd also note, I know Mr. Yumkas I believe may have called

5    Your Honor's chambers earlier.  I have a hard stop today

6    around 5 o'clock, and I appreciate Your Honor giving us the

7    time today, and our goal is to get through everything today

8    as best as we can.

9              THE COURT:  Good, okay.

10             MR. BRODY:  So I guess starting, Your Honor, with

11   the trading motion, essentially, Your Honor, I would in

12   large part rely on everything that was entered into the

13   record, and the arguments that were made at the interim

14   hearing.  No objections have been filed.  There was one

15   notice of substantial shareholder that was filed by Mr. Hale

16   (ph), which is pretty much what we expected.

17             The only other comment that we go, we received a

18   call from the Securities and Exchange Commission asking that

19   we file the notice as part of a Form 8K which we -- I had

20   forgotten we did that for the interim order and we'll do it

21   again for the final order.  But other than that, Your Honor,

22   there have been no even informal objections or calls that

23   we've received on that motion.

24             So I guess I would, relying on the interim

25   hearing, would ask Your Honor to enter the final order.

1           THE COURT:  I see.  All right.  Thank you.

2           Is there anyone present in court today who wishes

3    to be heard one way or the other on the motion with respect

4    to equity securities trading?

5        (No response)

6           THE COURT:  Let the record reflect there's no

7    response.

8           Very well.  I'm satisfied from the evidence that

9    was -- and arguments made at the prior hearing as well as

10   counsel has indicated there being no further objections to

11   the entry of a final order on the trading of equity

12   securities or notification with respect to the trading of

13   equity securities.  I'm going to grant on a final basis that

14   motion.

15          MR. BRODY:  Thank you, Your Honor.

16          The next item I'd like to address it the debtor's

17   retention, application to retain Sandler O'Neill.  I guess

18   at this point, I'll -- you know, we don't -- I don't have

19   anything further to add other than what's in the

20   application, and I would turn it over to Mr. Seligman for

21   any comments he wants to make.

22          THE COURT:  Very well, thank you.  Mr. Seligman.

23          MR. SELIGMAN:  Your Honor, again, David Seligman

24   for the record.

25          Your Honor, we had initially filed a response with

1    respect to Sandler O'Neill application --

2              THE COURT:  Right.

3              MR. SELIGMAN:  -- because we wanted to take some

4    time to discuss the issue with the committee and consider it

5    further.

6              After further consideration, we are not objecting

7    to the retention.  I think the issues that we had raised

8    with respect to the dual engagement by Sandler O'Neill at

9    the debtor level as well as the bank, are issues that will

10   probably be discussed in the context of the bidding

11   procedures and any issues of that sort, and we'll take it up

12   in argument, but as far as the -- that goes to the question

13   of bidding procedures and the propriety of the bidding

14   procedures from our perspective.  But at least in terms of

15   the application to employ Sandler O'Neill, we don't have any

16   objection to that engagement.

17             THE COURT:  All right.  Thank you.  Is there

18   anyone else in court who wishes to be heard on the

19   engagement of the Sandler O'Neill firm?

20       (No response)

21             THE COURT:  Let the record reflect there's no

22   response.  I've reviewed the application and I've considered

23   what's been said, I'm going to grant the application.

24             MR. BRODY:  Thank you, Your Honor.

25             With that I think before I turn to the main event,

1    I think it makes sense at this point to turn it over to Mr.

2    Yumkas to deal with the two sealing motions.

3              THE COURT:  All right.

4              MR. BRODY:  Or actually, I mean, Your Honor, there

5    are actually two sealing motions because --

6              THE COURT:  Yes.

7              MR. BRODY:  -- one is ours and one -- I think

8    that, you know, to tell Your Honor, the committee and the

9    debtor are both in the same position as far as the need for

10   both those motions be granted.  So I don't know, I think Mr.

11   Yumkas will handle it.

12             MR. YUMKAS:  Thank you, Your Honor, Lawrence

13   Yumkas on behalf of the debtor.

14             Your Honor, the debtor has filed a request to --

15   for permission to file a redacted copy of the reply to the

16   objections.  The various objections made to the bid

17   procedures, that motion, were a principal topic of

18   discussion today is going to be about sensitive financial

19   information related to the bank.  The parties are pretty

20   much in agreement that it's in everyone's interests not to

21   publish information about that subject publicly today in

22   order to preserve the maximum value of the debtor's assets.

23             The debtor's assets are its interest in the bank,

24   it's in everyone's interest to maintain the highest value of

25   the bank.  And on -- that requires, at this moment in time,

1      at least from the perspective of the parties that we keep

2      certain financial information confidential and limited to

3      the parties who have signed confidentiality agreements and

4      not to anyone else.

5              And in addition to seeking permission about filing

6      -- if -- on the record of the case is a redacted version, we

7      would also be seeking permission to limit whoever's in this

8      courtroom today to the same group of people who have signed

9      non-disclosure agreements.

10             THE COURT:  So what affect is that going to have

11     on the folks gathered behind you?

12             MR. YUMKAS:  We would ask the Court to direct

13     people who have not signed, I think a confidentiality

14     agreement, to leave during the rest of these proceedings.

15             THE COURT:  All right.  I understand your

16     position.  Does the committee have anything to add to that?

17             MR. SELIGMAN:  Your Honor, while we maybe don't

18     share the exact level of heightened sensitivity to the

19     information as the debtors do, we don't have any problem

20     with their request to seal because in an abundance of

21     caution, we want to just make sure that there's no

22     information that could potentially be problematic.  Although

23     we have done -- I've been counsel to several committees

24     where case -- where bid procedures have been done completely

25     in open court, but we understand the debtor's position, and

1    so we don't have any objection to that.

2           I would -- you know, and we're fine if Your Honor

3    wants to clear the courtroom for the entire scope of the

4    proceedings.  We're happy, Your Honor, if there were

5    portions that were -- of the hearings that could be done

6    where there was -- where there could be an open court, where

7    there'd be no confidential information.  That may be a

8    little unworkable because of the way it's going to be -- it

9    would be herky jerky to split it up.

10          So probably in an abundance of caution, we are

11   fine with the procedure as suggested by the debtors.

12          THE COURT:  I see, all right.  I see some standing

13   up.  Mr. Goldberg, do you wish to be heard?

14          MR. GOLDBERG:  Your Honor, I'm generally okay with

15   the concept that the parties who are negotiating the terms

16   of this position of the assets in this case wish to maximize

17   its value by limiting exposure of certain sensitive

18   information, that's understandable and appropriate.

19          What I don't want the Court to do is to enter an

20   order that would preclude anyone from seeking

21   reconsideration of it for cause.  If someone believes that

22   the public interest requires disclosure or some other

23   interest requires disclosure, that -- this order ought not

24   bar such a motion for being considered.

25          So I'm generally okay with it.  I think it's

1    measured.  I think it's understandable.  We have to look at

2    those things with an eye that recalling this is a public

3    court, this is a public proceeding, bankruptcy requires

4    transparency, and with those caveats, I think that as long

5    as no one will be precluded from asking formally for the

6    Court to reconsider this order, then we're fine with it.

7              MR. PITTA:  Your Honor, Thomas Pitta, Emmet Marvin

8    on behalf of Bank of New York Mellon.

9              Your Honor, we filed and joined the committee's

10   objection, we are an interested party here.  I think that

11   the relief that's being sought here is kind of overbroad.

12   We're talking about a -- you know, a motion to establish

13   bidding procedures, and we're going to exclude all the

14   parties who have not signed confidentiality agreements,

15   which we haven't been offered one, Your Honor, but --

16             THE COURT:  So your client hasn't signed the

17   confidentiality agreement at this point?

18             MR. PITTA:  We have not.

19             THE COURT:  All right.

20             MR. PITTA:  You know, I would be prepared to agree

21   not to disclose any of the confidential information, the

22   sensitive information that's being discussed here.  But I

23   think that it would be overbroad for us to be excluded from

24   an entire DIP and bid procedures hearing based on the fact

25   that there may be some financial information discussed as

```
 1    part of that hearing.

 2               THE COURT:  All right.  I understand.

 3               MR. ROTHLEDER:  Good morning, Your Honor, Jeffrey

 4    Rothleder from Arent Fox on behalf of Wilmington Trust, the

 5    trustee.  We're in the same position as Bank of New York.  I

 6    would also be willing to agree not to disclose any financial

 7    information, but we also have not been offered the

 8    opportunity to sign a confidentiality or should we be

 9    excluded.

10               THE COURT:  All right.  Thank you.  Mr. Yumkas?

11               MR. YUMKAS:  Your Honor, just a follow-up as to

12    Mr. Seligman's suggestion that we bring people in and out is

13    just impractical.

14               THE COURT:  Well, I think he was suggesting that

15    that was impractical.

16               MR. YUMKAS:  Okay.  It is.

17               THE COURT:  Not that he was suggesting that that's

18    what should be done.

19               MR. YUMKAS:  Also technically, the U.S. Trustee's

20    Office has not signed a confidentiality agreement, but we

21    have no objection to their continuing presence, and

22    similarly counsel to the board of the debtor and First

23    Mariner Bank has -- we don't believe has signed one, but we

24    have no objection to their presence today either.

25               And as far the parties who just agreed to be
```

Page 20

1    bound, as long as the Court's order binds them to that

2    confidentiality, we're fine with them staying as well.

3            THE COURT:  Well, before coming to court today I

4    read your motions to seal and the papers that were filed

5    that are the subject of the motions to seal in their

6    redacted form and frankly I thought they made a pretty

7    persuasive case for the various positions that the parties

8    are advocating, without consideration of the redacted

9    information.

10           I then thought about what was being asked, and I

11   decided to look at the unredacted versions of these

12   documents that the Court had been provided because the

13   redacted information is, as I understand what the parties

14   are saying, it relates to facts on which the parties want

15   the Court to base its ruling.  It's not like a situation

16   where you're trying to exclude social security numbers,

17   private information, some sort of technical commercial

18   information that would give an advantage to somebody about

19   some particular aspect of the debtor's business, but is

20   really collateral to the ultimate decision.

21           And so I looked at the unredacted versions of

22   these documents.  And with one or two exceptions, couldn't

23   understand why the parties had redacted what was redacted.

24   So looking at this from the perspective of the cases to

25   which I was referred, where the Court -- where there's a

1   presumption of open proceedings, where the Court is supposed

2   to take a skeptical look, yes, under Section 107 if it's

3   confidential commercial information the Court should, must

4   enter an order to protect that, I wasn't particularly

5   persuaded from what I have in front of me that the

6   information that you wish to submit under seal really meets

7   the test.

8           And I'm a little alarmed frankly at the idea that

9   we're going to have a secret proceeding in a pretty

10  significant case, even taking into account that it's a

11  public company, even taking into account that the most

12  significant asset is a bank.  And so I found myself in a

13  troubled position.  I don't really understand why the

14  requested information is to be sealed and my take on it was,

15  and I'm not sure that this really addresses the parties'

16  concerns, but my take on it was to say, well, these motions

17  ask the Court to accept the redacted pleadings as filed.

18  And that's all they really ask.

19          And so my inclination, I'll hear you on whatever

20  you wish me to hear or do to make a ruling on this, but my

21  inclination was to say, okay, fine, we'll accept the

22  redacted pleadings pursuant to your motion, but to -- and

23  treat them as your respective pleadings.

24          To the extent that you wish the Court to rely upon

25  any of the redacted information as a basis for a ruling

Page 22

1    today, we'll take that up when you propose to submit it to

2    the Court.  Because it's not clear to me which, if any, of

3    these objections really remains, and it's not clear to me

4    which, if any, of this information is really necessary for

5    the Court to make a decision.

6              And I'm concerned about the appearance of

7    bankruptcy proceedings being conducted in secret.  This is

8    not the Soviet Union.  Bankruptcy is the opposite of that.

9    It's supposed to be fully transparent.

10             So those are the concerns I'm grappling with, and

11   I'd be happy to hear from you on what might address them.

12             I'll tell you what, I'll take a five minute recess

13   while you discuss how you might want to proceed in light of

14   what I've said.

15             THE CLERK:  All rise.  Court is in recess.

16         (Recessed at 10:21 a.m.; reconvened at 10:28 a.m.)

17         (Call to Court)

18             THE COURT:  Mr. Yumkas.

19             MR. YUMKAS:  Thank you, Your Honor.

20             Your Honor, the parties are mindful of the tension

21   between the need for this to be a public proceeding and the

22   need not to convey, whether intentional or not, anything

23   that would undermine the value of the assets.

24             We've spoken with the committee and what we're

25   proposing to the Court is the following procedure.  If the

Page 23

1    Court would consider today's proceedings to be provisionally

2    sealed, the parties can then look at the transcript as soon

3    as we can get them printed and read, and then jointly

4    provide to the Court the report of any information that they

5    would want the Court to consider permanently kept redacted.

6              THE COURT:  Okay.  What does that mean for the

7    assembled public here?

8              MR. YUMKAS:  And as to the assembled public here,

9    the parties are okay with keeping in the courtroom all

10   parties in interest, to the extent the parties in interest

11   have not agreed yet to be bound by the confidentiality, we

12   would ask that they agree to that on the record, or be asked

13   to leave.

14             And other than those parties --

15             THE COURT:  Mr. Yumkas, I'm not going to have a

16   sealed courtroom.

17             MR. YUMKAS:  Okay.

18             THE COURT:  And I'm not persuaded that much of

19   this information is really that confidential or is even

20   needed in order for one side or the other to prevail in its

21   arguments.  And I'm, as I said before, inclined to let you

22   proceed, and then when you get to a point where you want to

23   actually rely on something you think needs to be sealed,

24   we'll deal with that at that time.

25             But I'm not going to go through taking roll of

Page 24

1    who's in the courtroom, interview all of them, figure out

2    whether they have an interest, whether they're willing to be

3    bound, no.  And I'm just not comfortable with --

4              MR. YUMKAS:  Very well, Your Honor.

5              THE COURT:  -- doing that.  And I'm not persuaded

6    that the cases that are cited to me say that.  And they do

7    say the Court's supposed to take the least restrictive

8    alternative.

9              So, for example, there's a document attached to

10   your omnibus response as Exhibit C or something like that

11   which wasn't uploaded in the public file, what relevance

12   this has I don't know, but an approach might be to offer it

13   as an exhibit under seal, and not otherwise discuss it or

14   just point the Court to it or some particular provision of

15   it so the Court can take whatever fact you're eluding to

16   into account.  It speaks for itself, for example.

17             I'm just -- I'm not comfortable that a bankruptcy

18   court should be in the business of conducting secret

19   proceedings, and I don't want to proceed that way.  We'll

20   spend all day litigating who out there is entitled to be

21   here for what.

22             MR. YUMKAS:  Very well, Your Honor, we'll make it

23   work.

24             THE COURT:  All right.

25             MR. YUMKAS:  Thank you.

1          THE COURT:  Thank you.

2          So let me make clear for the record, I'm

3    permitting the filing of the two redacted pleadings, but I'm

4    not making a determination as to confidential commercial

5    business information as to anything until such time as it's

6    submitted to the Court as evidence.

7          MR. YUMKAS:  Thank you, Your Honor.

8          THE COURT:  All right.  Thank you.

9          MR. BRODY:  Again for the record, Josh Brody from

10   Kramer and Levin on behalf of the debtor.

11         So, Your Honor, at this point, I think what I

12   would like to do is the following.  You know, the last

13   couple of days there's been a lot of activity and trying to

14   have discussions with both the committee and with the

15   stalking horse bidder, while trying to narrow the issues

16   that Your Honor needs to decide today.

17         And we think we have been successful, as I

18   mentioned, on the DIP credit agreements, and I'm going to

19   walk Your Honor through those changes.  I don't have yet for

20   Your Honor a red line of the DIP credit agreement and the

21   DIP order, because these changes were literally agreed to,

22   finalized this morning.  But I will walk Your Honor through

23   what they are.

24         They're not -- with respect to the DIP at least,

25   the changes are really not that significant.  The majority

1    of the changes that were more substantive I think relate to

2    the bidding procedures, and the red line that we filed

3    yesterday.

4              THE COURT:  So is it the case, because that was my

5    impression from what you said at the top, right, that the

6    objections to the debtor in possession financing motion have

7    been resolved by these changes?

8              MR. BRODY:  Yes, correct, Your Honor.

9              THE COURT:  So there shouldn't be any need for any

10   confidential information to persuade the Court that an

11   unobjected to financing motion --

12             MR. BRODY:  No.

13             THE COURT:  -- should be approved as long as I can

14   review the actual terms.

15             MR. BRODY:  Your Honor, that's totally fair.  And

16   frankly, you're correct and maybe this is more a sequencing

17   issue than in terms of addressing the sealing motion then --

18             THE COURT:  That's fine.  So tell me about the

19   financing terms that have been agreed to.

20             MR. BRODY:  So the changes that were made, Your

21   Honor, I think there are two what I would say most

22   significant ones that really went to the issue that the

23   committee objected to.  I think if Your Honor will recall

24   from the pleadings, one of the big concerns the committee

25   had was the presence of the DIP and any DIP draws prior to

1    the bid deadline how a bidder was going to address, you

2    know, make sure they have their deposit correct, and they

3    were putting the correct amount of money --

4            THE COURT:  Yes.

5            MR. BRODY:  -- up.  So we've essentially agreed to

6    with the committee, is that we will not make any draw to the

7    DIP facility until the sale hearing absent their consent.

8            So this way, all parties are paying attention,

9    it's a little bit of -- doing that way with the committee

10   consenting, it enables us if it becomes clear that there's

11   no problem with draws, in terms of its impact on the bid

12   procedures that we can make those draws, but essentially

13   this way, the committee feels that it may negatively impact

14   the bid process, there won't be any draws.

15           As a related point, the stalking horse bidder/DIP

16   lender has agreed that if there are no draws made, they will

17   not charge any fees on the DIP.  So essentially, if come to

18   the sale hearing, they're not the winning bidder, and

19   there's somebody else needs to come in and is going to

20   replace them, they won't be owed anything on the DIP,

21   assuming there had been no draws.  Which I think was a

22   fairly significant concession on their part.

23           The other changes that were made, and this is to

24   just the objection the committee raised about there being a

25   lack of a professional fee carve-out in the DIP is that

1    essentially the stalking horse has agreed, and I think

2    frankly this may have always been the case, just would

3    require a little bit of clarification, that once the DIP has

4    been -- as the DIP has been approved, then the committee has

5    either consented to a draw presale hearing or after the sale

6    hearing, that the debtor can draw on the entire amount of

7    the DIP and set it aside in a separate bank account, whether

8    it's to fund advance retainers to estate professionals, or

9    put in accounts it's away from the DIP lender's lien,

10   functionally accomplishes the same thing.  Which it

11   preserves the value of the DIP to pay professional fees the

12   same way a carve-out would.

13            The other changes, and I will try to make sure I

14   hit all of them, I think I would say, you know, more

15   clarifying in nature, and they're not what I would think --

16   I don't think of them as major substantive issues, but they

17   relate to modifying and clarifying the -- the DIP lender

18   would have to give five business days' notice before they

19   exercise any remedies other than I believe there was

20   charging default interest, or sending other types of -- or

21   sending default notices or refusing to make any additional

22   draws.

23            Clarify that, you know, that if there are any

24   asset sales, that the proceeds will be used to pay down the

25   loan, but only up to the amount of the DIP loan, just to

1    make that clear that obviously no payments will be made in

2    excess of the DIP loan, making it clear that the proceeds

3    are going to be limited to U.S. Trustee fees and

4    professional fees, which is again always the intent, just

5    clarifying it.

6         I'm sure Mr. Seligman can correct me if I'm

7    missing anything, but I think for the most part, that really

8    covers the changes to the DIP that resolved the committee

9    and the U.S. Trustee's objection.

10        THE COURT:  All right.  Thank you.  Mr. Seligman,

11   does that address the committee's concerns?

12        MR. SELIGMAN:  It does, Your Honor.  There's -- I

13   would just like to state that our principal objection,

14   obviously to the DIP was while we had no objection to a DIP

15   in concept, our concern was that we felt that this DIP was

16   infecting the bidding process and making it more difficult

17   for there to be bids.  And that was our main function or

18   objection to try and police that.

19        And I think that the changes that Mr. Brody has

20   outlined resolve it for us.  There's probably a couple of

21   other nits and nats, just clarifications in the document.  I

22   think there was one other one, Your Honor, oh, that was also

23   important to us, which was the original bidding procedures

24   required basically a replacement DIP.

25        Again, we thought that that was not appropriate in

1    the context of a bidder.  They should be focused on bidding

2    for the assets, rather than necessarily having to do a

3    replacement DIP.  So another modification to the procedures

4    was that a bidder could -- as part of the bid proposed or

5    replacement DIP or provide other satisfactory evidence or

6    information to the debtor to show that administrative fees

7    could be covered if they were the successful bidder and that

8    the stalking horse DIP was not available.

9              So with that and a couple of other minor

10   clarifications, that resolved it for us.  From our

11   perspective now it's pretty much a clean DIP, and allows

12   people to make bids or not make bids without consideration

13   of the more complex DIP issues.

14             THE COURT:  All right.  I see, thank you.

15             Mr. Goldberg, I believe you were objecting or the

16   United States Trustee was objecting to this financing.

17             MR. GOLDBERG:  Your Honor, the U.S. Trustee is

18   satisfied that the committee's satisfied, that's the main

19   concern.  We think that there have been actual negotiations

20   with give and take by the negotiating parties.  We think

21   that that's sufficient to satisfy our concerns.

22             THE COURT:  All right.  Does anyone else wish to

23   be heard on the debtor in possession financing motion?

24        (No response)

25             THE COURT:  No one has responded.  Anything

1    further, Mr. Brody?

2            MR. BRODY:  Not on the DIP, Your Honor.

3            THE COURT:  All right.  When do you think you

4    would have the actual agreement and order to the Court?

5            MR. BRODY:  If not today, it'll be shortly

6    thereafter.

7            THE COURT:  Okay.  You'll submit red line

8    versions?

9            MR. BRODY:  Correct, Your Honor.

10           THE COURT:  Okay.  I'm satisfied based upon what's

11   been said today on the record and my prior review of the

12   materials filed in support of the motion and considered at

13   an earlier hearing that this is an appropriate debtor in

14   possession financing arrangement, as modified on the record

15   here today.

16           I will obviously review the agreement and the

17   order when they are submitted in chambers, to make sure

18   they're consistent with what's been said.  But if they are,

19   it will be approved.

20           MR. BRODY:  Thank you, Your Honor.

21           I guess that would -- I would turn to the bidding

22   procedures themselves, and before we get into the actual

23   hearing, and which I'll get to in a second as to how I'd

24   like to proceed, I'd like to walk Your Honor through the

25   changes that were submitted yesterday evening to the bidding

1    procedures.

2         And I think the way I would characterize these

3    changes, Your Honor, is as I mentioned at the outset, I

4    don't think or I know that we have not settled all of the

5    committee's issues.  We really did our best to use the

6    committee's objections, which were provided to us in advance

7    of their actual filing their pleadings, because there's been

8    a fair amount of give and take over the last number of weeks

9    to try and see if we could not reach a full agreement, at

10   least narrow the issues.

11        I think we've done a fairly good job of trying to

12   narrow those issues.  I know that, and probably just to make

13   this simpler, I'm not going to tell -- going to take the --

14   tell Your Honor that whatever any particular change

15   specifically addresses or resolves an issue waived by the

16   committee, because that'll just cause too much back and

17   forth and cause Mr. Seligman to have to jump up here every

18   five minutes.

19        So instead I think I may walk Your Honor through

20   the changes, and then through the course of the hearing, I

21   think it'll be clear to Your Honor what issues really have

22   been, you know, if not resolved completely, but at least

23   somewhat addressed.  And, you know, I think that from my

24   perspective, and I know that I'd mentioned this to Your

25   Honor at the first day hearing when we were talking about,

Page 33

1    you know, date -- deadlines and dates for filing objections,

2    that we wanted to have as much time as possible to try to

3    reach a resolution.

4           And I certainly would say that, you know, from the

5    debtor's perspective, the committee and the stalking horse,

6    I think there has been, you know, a fair amount of movement.

7    I'd like to -- at the risk of sounding like I'm tooting my

8    own horn, I think that, you know, we used the opportunity of

9    the committee's objection to try to extract changes from the

10   stalking horse.

11          And, you know, Your Honor will obviously decide

12   whether or not they were meaningful enough, but I think it

13   was -- a fair amount of effort was put into it and we were

14   somewhat successful.

15          So I guess --

16          THE COURT:  Well, let me just say a couple of

17   things.  First of all, I assume you're referring me to this

18   updated version that was filed last night at Docket No. 118?

19          MR. BRODY:  Correct, Your Honor.

20          THE COURT:  Okay.  And what I'd like to do before

21   you start, you can make your presentation as you suggested,

22   but I think I'd like to hear from Mr. Seligman and anyone

23   else who's objecting to the bidding procedures as revised,

24   what the objections are, so before we go into the hearing

25   and I understand what's in dispute.

1          MR. BRODY:  Your Honor, that's certainly fine,

2    makes a lot of sense.  I guess the one thing I would say is,

3    you know, in part because we want to make sure we get

4    finished today, and you know, I discussed with Mr. Seligman

5    sort of the hearing procedure, and we had both sort of been

6    in agreement that we're not going to make any opening

7    statements, we're just going to go straight to the

8    evidentiary record.  Go through all the evidence and the

9    witnesses, close the record, and then closing arguments to

10   try to streamline it.

11         And I guess obviously Your Honor will hear from

12   Mr. Seligman now as to which issues are still open but --

13         THE COURT:  I want to know what we're having a

14   hearing about.

15         MR. BRODY:  No, fair enough.

16         THE COURT:  I'm not trying to get lengthy opening

17   statements or upset your agreement amongst counsel which

18   sounds fine to me on how to proceed.  I just want to

19   understand what I'm supposed to decide.

20         MR. BRODY:  No, understood.

21         THE COURT:  So tell me -- oh, I thought you were

22   going to go through the bidding procedures.

23         MR. BRODY:  Oh, I guess, Your Honor -- I wasn't

24   sure if Your Honor wanted me to walk through them or hear

25   first from Mr. Seligman as to what he thinks are still

1    issues he has objections to.

2            THE COURT:  Maybe it's easier just to hear what

3    the objections are and then let you put on your case --

4            MR. BRODY:  That's fine with me.

5            THE COURT:  -- to try to overcome those.

6            MR. SELIGMAN:  Your Honor, that was going to be my

7    suggestions too, rather than taking up the time of the Court

8    to walk through the changes that were made, and focus on

9    what --

10           THE COURT:  Fine.

11           MR. SELIGMAN:  -- is at issue.

12           Essentially, Your Honor, there -- and I'm not

13   going to argue, I just want to lay out the issues.

14   Essentially I think that there's three categories of

15   objections that remain.  The first one is the timeline.

16   There's the proposed date for a bid deadline of April 6th.

17   We have issues with proposed target closing dates in the

18   APA, the merger agreement of April 30th.  So I'll put that

19   one in category, timeline.

20           Second category is the more economic terms of the

21   bidding procedures, break-up fee, expense reimbursements.

22   Those are essentially it.  I think that there has been a

23   proposal in terms of a reduction in bid increments from 250

24   to 150, while we don't love it, we're willing to live with

25   that.

1           So I think it's principally the economics of the

2    break-up, and how you calculate it, and what's the right

3    market, and numerations and nominators.

4           Third point is there's a capitalization

5    requirement.  The stalking horse is obviously putting in

6    capital.  There's a requirement that the level of capital

7    that the stalking horse is putting in has to be essentially

8    matched, without getting into too much details right now,

9    and that's an issue that we have.

10           So I think that those are principally the three

11    categories of --

12           THE COURT:  When you say capitalization, we're

13    talking about the amount of money that the successful

14    purchaser will put into the bank to capitalize the bank,

15    correct?

16           MR. SELIGMAN:  For going forward, right.

17           THE COURT:  So the question is whether a competing

18    bidder should necessarily have to capitalize it exactly the

19    same way.

20           MR. SELIGMAN:  Exactly the same way.

21           THE COURT:  Okay.

22           MR. SELIGMAN:  Yeah.

23           THE COURT:  All right.  I understand.  That's

24    helpful, thank you.

25           MR. BRODY:  Your Honor, certainly I'm happy to

1    hear that that's the only issues that are still open.

2              I guess at this point, Your Honor, because again

3    without getting the specifics of the changes that were made,

4    unless if Your Honor wants me to, I'm happy to do so, but --

5              THE COURT:  No, let's focus on, we a limited

6    amount of time, let's focus on how to resolve these three.

7              MR. BRODY:  With that, Your Honor, I'm going to

8    turn the podium over to my partner, Mr. O'Neill, who's going

9    to be handling the evidentiary portion of the hearing.

10             THE COURT:  All right.  That's fine.  Mr. O'Neill.

11             MR. O'NEILL:  Good morning, Your Honor.

12             THE COURT:  Good morning.

13             MR. O'NEILL:  The debtor calls William Boyan.

14             THE COURT:  Sir, would you come forward.

15             MR. O'NEILL:  Your Honor, may I approach with an

16    exhibit binder?

17             THE COURT:  You may, I think --

18             MR. O'NEILL:  I believe Your Honor has -- oh,

19    there is one, Your Honor.

20             THE COURT:  Okay.  Sir, if you would stand in

21    front of the witness box, raise your right and take the oath

22    before you are seated, that would help.

23             WILLIAM LESTER BOYAN, III, WITNESS, SWORN

24             THE CLERK:  Please be seated.  Please state and

25    spell your full name and give your address for the record,

1    please?

2             THE WITNESS:  William Lester Boyan, III, B as in

3    boy, O-y-a-n.  Address, 8400 Comanche Court, Bethesda,

4    Maryland 20817.

5             THE CLERK:  Thank you.

6                       DIRECT EXAMINATION

7    BY MR. O'NEILL:

8    Q    Where do you work, Mr. Boyan?

9    A    Sandler O'Neill & Partners.

10   Q    What is Sandler O'Neill?

11   A    It's an investment banking firm.

12   Q    What focus, if any, does Sandler O'Neill's practice

13   have?

14   A    We focus on financial services and specifically about

15   85 percent of our business focuses on banking work.

16   Q    How many bank deals does Sandler O'Neill close annually

17   approximately?

18   A    From an M&A perspective, we close anywhere from 20 to

19   50 transactions a year.  Since 2005, we have completed 367

20   transactions for 113 billion in deal value.

21   Q    And where does Sandler O'Neill typically fall in the

22   deal ranking tables?

23   A    When we look at the transactions where we have been an

24   advisory on a buy side or sell side transaction versus our

25   competition, we annually rank as number one or number two in

1   terms of number deals completed annually.

2   Q    Broadly speaking, what services does Sandler O'Neill

3   provide to its clients?

4   A    We're a full service investment banking firm.  From an

5   investment banking perspective, we provide M&A advice, we

6   raise capital for banks, and provide other strategic advice.

7   Q    What is your position at Sandler O'Neill?

8   A    I'm a managing director in the investment banking

9   group.

10  Q    How long have you worked there?

11  A    Ten years.

12  Q    Where did you work before you were at Sandler O'Neill?

13  A    I was with Friedman Billings Ramsey, which is also an

14  investment banking firm, headquartered in Arlington,

15  Virginia.

16  Q    What did you do there?

17  A    I was a managing director in the investment banking

18  group focused on banks and thrifts.

19  Q    And how long did you work there?

20  A    Seven years.

21  Q    Before that, where did you work?

22  A    I was with Hubde Financial (ph), which is an M&A firm

23  that focuses on banks, and I was with them for five years.

24  Q    Okay.  Do you have any degrees?

25  A    I graduated from Georgetown University and their

1   business school, graduated in 1988.

2   Q    What kind of work do you do at Sandler O'Neill?

3   A    I am an investment banker, so I call on banks

4   particularly in Maryland, D.C., Virginia, and also other

5   parts of the country, and I work with banks to help them

6   with capital raising, M&A advisory services, and other

7   strategic advice.

8   Q    For how long have you been advising banks on M&A and

9   other transactions?

10  A    For 25 years.

11  Q    Approximately how many bank clients have you advised

12  over the course of your 25-year career?

13  A    Numerous, successful M&A transactions, probably

14  completed somewhere between 35 and 60 M&A transactions --

15  Q    How about branch --

16  A    -- as a lead, that would include branch transactions.

17  Branch transactions, probably about 25 branch transactions.

18  Q    And when you say you completed M&A transactions, are

19  those transactions on the sell side?

20  A    Both sell side and buy side M&A transactions.

21  Q    And approximately how many buy side clients have you

22  advised during the course of your career?

23  A    I'd say probably 25 percent of the time I'm on the buy

24  side, probably 75 percent on the sell side.

25  Q    Just by way of example, what bank and thrift M&A

Page 41

```
 1    transactions have you led in the past year or so?

 2    A    I represented Annapolis Bancorp in their sale to FNB

 3    Corporation.  That closed April 2012 I believe.  I

 4    represented Virginia Commerce in Arlington in their sale to

 5    United Bancshares, that closed January 31st of this year.  I

 6    closed the sale of United Financial Banking Company,

 7    headquartered in Vienna, Virginia to Cardinal Financial.

 8    That closed in January 15th of this year.

 9         I announced the sale of Prince George's Federal Savings

10    Bank in Upper Marlboro to Southern National Bancorp of

11    Virginia.  That was announced just recently, and last week

12    announced the sale of People's Service Company in Nixon,

13    Missouri to Southern Missouri Bancorp.  So that's just the

14    M&A transactions.

15    Q    I notice that a lot of those banks are from in and

16    around this area.  Do you specialize in any particular

17    region?

18    A    I -- as I mentioned earlier, I live in Bethesda, so I

19    spend a lot of time with banks and thrifts in D.C.,

20    Maryland, and Virginia.

21    Q    Just by way of example, could you describe what you did

22    in the Virginia Commerce transaction?

23    A    I developed a long term relationship with Virginia

24    Commerce.  I had a relationship with Virginia Commerce going

25    back to the mid-'90s, helped them raise capital along the
```

1    way.  They had some trouble with credit quality, sustained

2    some significant losses.  So ultimately, ended up selling

3    that institution where we advised the board on what their

4    opportunities might be if they decided to sell the company.

5         Conducted due diligence on the institution to make sure

6    we understood the status of the balance sheet and income

7    statement, and the viability of the franchise,

8    attractiveness of the franchise.

9         We put together what we call a confidential information

10   memorandum that describes the entire company from, you know,

11   all aspects of the company management team, operations and

12   otherwise.  We then established a list of potential buyers

13   that we would consider once we went out to market the

14   company.

15        Of course, keeping the board and management team

16   apprised and involved in the process all along the way, and

17   ultimately marketed that company to a number of banks that

18   operate within the greater region.  And ultimately, we sold

19   that company to United Bancshares, they were the high

20   bidder.  Took the United Bancshares through their full due

21   diligence, and then we helped the company conduct -- helped

22   Virginia Commerce conduct due diligence on United

23   Bancshares, to make sure the stock that we were receiving

24   had the prescribed value that we thought it did.

25        And then helped negotiate the definitive agreement

Page 43

1    between the parties with legal counsel, and then we

2    announced the transaction, and then closed January 31st of

3    2014.

4    Q    That was a sell side deal, what sorts of things do you

5    do when you represent a potential purchaser of a bank?

6    A    We tend to help board and management understand the

7    opportunity and the risks involved with any particular

8    transaction.  We conduct -- formulate a bid, typically.

9    Typically, you'll receive a confidential information

10   memorandum with the bidding procedures and instructions

11   involved, and we help develop a bid that complies with those

12   bidding procedures, and submit the offer on behalf of the

13   institution.

14        If selected to go to the next round, which is due

15   diligence, we assist the company in evaluating the company

16   in conducting due diligence.  And then often times, you

17   might have a rebid, we'll formulate that bid, and advise the

18   board prior to doing so.

19        And if successful, then we would help them negotiate

20   the definitive agreement and close the transaction.

21   Q    As a banker at Sandler O'Neill, have you run auctions

22   in which bank assets have been sold?

23   A    Frequently, yes.

24   Q    How many times roughly?

25   A    Well, at least in all the transactions that I

1    mentioned, plus all the ones that weren't successful, so the

2    -- you know, more than 50.

3    Q    Have you organized and managed due diligence on bank

4    assets, as part of M&A processes in the past?

5    A    Yes, numerous times.

6    Q    How many times?

7    A    A lot more than 50.

8    Q    Have you conducted due diligence and formulated bids

9    for bank assets on behalf of buy side clients in the past?

10   A    Yes.

11   Q    How many times?

12   A    Numerous times, I couldn't begin to count.

13   Q    What involvement, if any, has Sandler O'Neill had in

14   bank holding company bankruptcy cases?

15   A    This would be my first.

16   Q    What about Sandler O'Neill?

17   A    Sandler O'Neill has been involved with a number of --

18   there have only been a handful of -- I'd say less than ten

19   bankruptcy transactions involving banks.  The first one came

20   in the end of 2010 and Sandler O'Neill was involved in that

21   transaction, American West.  And then there was another

22   transaction, Premiere in Florida, which we were also

23   involved.

24   Q    And you said this is your first bank holding company

25   bankruptcy.  Do you feel qualified to run an auction in

1    bankruptcy even though you never have before?

2    A    Yes.  The process is ultimately identical to what we

3    would conduct when we're selling an institution outside of

4    bankruptcy.

5    Q    Have you ever had occasion to negotiate or consider

6    Section 363 auction procedures in the past?

7    A    I have not specifically in a 363 transaction, no.

8    Q    Do you believe your experience allows you to do that in

9    this case?

10   A    Yes.

11   Q    Why do you say that?

12   A    As I mentioned, I think that the auction procedures as

13   have been drawn-up by the lawyers in this case and

14   negotiated to some degree are not dissimilar from the

15   process that we would go by in a normal M&A transaction

16   outside of bankruptcy.

17   Q    Do you ever have occasion to give speeches at

18   professional conferences?

19   A    Frequently, yes.

20   Q    On what topics, generally?

21   A    Usually relating to mergers and acquisitions, capital

22   raisings, strategic issues.  Often times, talking about an

23   overview of what's happening in the banking industry, give

24   you know, either directors or accountants or lawyers or bank

25   management an idea of what Sandler O'Neill's view of what's

Page 46

1    happening in the banking industry at any given time.

2    Q    What are some of the organizations that which you have

3    spoken regularly?

4    A    Annually, I -- for -- at least for the last let's say

5    ten years, I always do an hour long speech at the Maryland

6    Banker's Convention.  That is held typically in May or June

7    of each year.

8              MR. O'NEILL:  Your Honor, we would offer Mr. Boyan

9    as an expert on bank mergers and acquisitions.

10             THE COURT:  Is there any objection to the

11   qualification of this witness as an expert?

12             MR. BROWN:  On bank mergers and acquisitions, on

13   that topic alone, Your Honor, there is no objection.

14             THE COURT:  All right.  He's admitted as an expert

15   to testify on that subject.

16   BY MR. O'NEILL:

17   Q    Mr. Boyan, what role has Sandler O'Neill had in these

18   cases?

19   A    In the First Mariner case?

20   Q    Yes.

21   A    We have acted as --

22   Q    This case, excuse me.

23   A    -- investment banker since November of 2009.

24   Q    Broadly speaking, what has Sandler O'Neill done for

25   First Mariner?

Page 47

1    A    Our initial task was to help the company develop a

2    capital plan to file with the regulatory authorities.  That

3    would be the primary regulators, the FDIC, the State of

4    Maryland, and the Federal Reserve to help the company comply

5    with minimum capital requirements in certain regulatory

6    orders that have been filed at First Mariner Bank and First

7    Mariner Bancorp.

8    Q    What role have you had personally in this matter?

9    A    I have been one of the two parties that have led the

10   team for Sandler O'Neill since that time.

11   Q    And what have you Sandler O'Neill done during the past

12   four years to familiarize yourself with the First Mariner's

13   finances and operations?

14   A    You know, we're very -- we are -- gone through their

15   financials, conducted our own due diligence, so we are very

16   aware of all the aspects of the institution.

17   Q    Do you have an understanding of why Sandler O'Neill was

18   hired in 2009?

19   A    The company received a cease and desist order from the

20   FDIC in the State of Maryland.  Among other things, they

21   were required to raise capital to get to 7 and a half

22   percent tier one leverage ratio, and a 11 percent total risk

23   base ratio.

24        The Fed also had a written agreement that required them

25   to be at a 4 percent tier one leverage ratio, and an 8

Page 48

1    percent total risk base ratio, but that was at the bank

2    holding company level.

3    Q    You mentioned the FDIC and the State of Maryland and

4    the Federal Reserve, what relationship did they have to

5    First Mariner?

6    A    Will you repeat the question, please?

7    Q    I said, you mentioned the FDIC, and the State of

8    Maryland, and the Federal Reserve, what relationship did

9    they have to First Mariner?

10   A    The FDIC and the State of Maryland are their primary

11   regulators.

12   Q    When it was hired, broadly speaking, what did First

13   Mariner ask Sandler O'Neill to do?

14   A    Well, as I mentioned, the first thing we did is help

15   develop a capital plan as to what the alternatives would be,

16   so that we, you know, presented that to the board, worked

17   with management on that plan, and then submitted that to the

18   appropriate regulatory authorities.

19   Q    And broadly speaking, without getting into great

20   detail, over the last four years, what types of transaction

21   -- transactions has Sandler O'Neill pursued on behalf of

22   First Mariner to meet its regulatory obligations?

23   A    We have pursued numerous transactions, and we tried to

24   sell the company, the holding company and the bank to

25   strategic buyers numerous times.  We tried to raise capital

1   numerous times, so there's a series of transactions that we

2   attempted throughout the years.

3   Q    Did Sandler O'Neill and First Mariner in any way

4   attempt to limit the types of transactions it was willing to

5   consider to achieve its regulatory goals?

6   A    No.  We never -- when we went out to talk to people,

7   always trying to achieve the highest possible value for the

8   stakeholders in the company, specifically the common -- the

9   stockholders, but as well as the trust preferred holders.

10  Q    And broadly speaking, what type of investors did

11  Sandler O'Neill market transactions to?

12  A    Specifically financial investors or strategic buyers.

13  Q    What are strategic buyers?

14  A    Other banks or bank holding companies that we deemed

15  would have interest in the -- in this company.

16  Q    And what is a financial investor?

17  A    A financial investor would be either a private equity

18  investor or a hedge fund or other such fund that has

19  interest in investing in banks, that doesn't operate a bank

20  itself.

21  Q    How did you identify candidates to market transactions

22  to, Mr. Boyan?

23  A    For strategic buyers, as I mentioned, we complete

24  numerous M&A transactions annually in the banking business,

25  so we have a very good feel for who the buyers are in any

Page 50

1    given market, and you know, we have about 350 people in our

2    company, and we spend a lot of time talking with all the

3    banks in the U.S. and abroad to understand what their

4    desires are if they want to buy banks in the U.S.

5    Q    Do you have an understanding -- oh, strike that.

6         How sophisticated are the financial and strategic

7    investors that Sandler identified?

8    A    All very sophisticated.  I guess what I didn't talk

9    about I guess is the financial investors.  You know, we're

10   also one of the leading capital raising institutions as

11   well, so we have a long roster of investors that we talk to

12   on a regular basis.

13        I mean, we're selling stock for equity or debt for a

14   particular institution, we have a lot of people that have

15   interest, so we have relationships all over the country and

16   parts of the world that have interest in investing in U.S.

17   financial institutions.

18   Q    Okay.  Now, how sophisticated are the financial and

19   strategic investors that you identified?

20   A    I would say very sophisticated.

21   Q    Do you have an understanding whether those financial

22   and strategic investors were familiar with the potential for

23   executing bank M&A transactions in bankruptcy?

24   A    Since the end of 2010, as I mentioned, America West

25   completed a bankruptcy, a 363 transaction at the end of

1    2010, and that became a very hot topic in the industry.

2    There are a lot of institutions in the same position as

3    First Mariner, and this became a tool or a structure I

4    should say that became a consideration for a number of

5    institutions, as a way to resolve their financial and

6    capital issues.

7    Q    Of the investors and potential acquirers that you

8    contact -- you've contacted over the past four years,

9    approximately what proportion, if any, raised the issue of a

10   bankruptcy transaction with you?

11   A    Well, we went through fairly significant marketing of a

12   recapitalization of the holding company specifically in

13   2011.  And the result or the reply we kept running into with

14   the various investors is that, you know, First Mariner

15   Bancorp should consider a 363 transaction, and then if they

16   did so, then they would have interest in pursuing an

17   investment.

18   Q    How many parties has Sandler O'Neill contacted in

19   connection with its various marketing processes?

20   A    I'd say approximately 135.

21   Q    And what's the division strategic versus financial?

22   A    Thirty-five strategic or so, a hundred would be

23   financial investors.

24   Q    Please describe briefly without going into great detail

25   the initial transactions that Sandler O'Neill undertook on

Page 52

1    behalf of the bank in 2009?

2    A    In 2009, the -- we talked about the various

3    alternatives in the capital plan that we presented to the

4    board and they wanted to pursue what we call a rights

5    offering.  A rights offering is an offer made to the

6    existing common stockholders to see if they would like to

7    buy their pro rata share of the stock.

8        We thought that probably would not have a whole lot of

9    success.  We were not an underwriter in that transaction,

10   but nonetheless, that's what the company they decided they

11   wanted to do.

12       They went out, they pursued a rights offering, had

13   limited success, then we decided we would open up that

14   offering to be more of a community offering, anyone in the

15   community who really wanted, or anyone in the country for

16   that matter, who wanted to invest could invest.  And the

17   result of that offering was that they raised 10.9 million.

18       In addition, another transaction we undertook at about

19   the same time, is we were able to get some of the board and

20   management of First Mariner to buy some of the trust

21   preferred that was out in the marketplace, and exchange it

22   for equity in the bank thereby reducing the debt load at the

23   holding company and increasing its equity capital.

24   Q    And did those transactions resolve First Mariner's

25   financial and regulatory problems?

```
 1   A     No.  Those transactions were not significant enough

 2   themselves or collectively to resolve the minimum -- meet

 3   the minimum regulatory capital requirements.

 4   Q     After you completed the rights offering and the TruPS

 5   exchange, did there come a time that Sandler O'Neill pursued

 6   a recapitalization of the holding company?

 7   A     We did.  Following, you know, the rights offering and

 8   debt buy back, we pursued a recapitalization of the holding

 9   company.

10   Q     Approximately when was that?

11   A     I think it probably would've started towards the end of

12   2010 through 2011.

13   Q     And why did the bank pursue this transaction first?

14   A     Well, we always, as I mentioned earlier, I always

15   focused on trying to maximize the value or limit the harm

16   done to the company stakeholders, the trust preferred

17   holders, or the common holders.  And by getting someone to

18   put capital into the holding company, that would greatly

19   increase their ability to -- they had been deferring on

20   their interest payments on their debt, then they would have

21   capital at the holding company that they could use to come

22   current on that debt.

23         The regulators would not allow capital to come from the

24   bank to the holding company.  That was a limitation put on

25   the company by the regulators.
```

1    Q    What type of investors did you solicit for

2    recapitalization of the holding company?

3    A    We went out to financial investors and, you know, over

4    a hundred were contacted.

5    Q    And what did you do to solicit those investors?

6    A    We again sat down, conducted our due diligence of the

7    company at that point in time, we developed a confidential

8    information memorandum that described the transaction we

9    were looking to undertake, described the finances and the

10   benefits of -- to an investor of investing in this

11   franchise.

12       We then organized a list of potential investors that we

13   would contact.  We contacted them and got them to sign non-

14   disclosure agreements, and then we would take the management

15   team out on the road to have meetings with each or as many

16   of those institutional or financial investors as we could.

17   Q    And how did the investors you contacted respond to the

18   solicitation?

19   A    There were numerous people who were interested and

20   wanted to take a look at the opportunity, but in their

21   analysis, as they started to peel the onion and look at, you

22   know, what First Mariner had to offer, they declined to

23   pursue the opportunity.

24   Q    And to what extent, well, you've already mentioned that

25   investors discussed with you the possibility of a bankruptcy

1    transaction.

2    A    Yes, the -- you know, there were numerous hurdles, were

3    obstacles that the investors saw.  The debt at the holding

4    company was significant in relation to the equity of the

5    holding company.  As of March 31st, 2011 the company went

6    from having positive equity to negative equity at the

7    holding company.

8         So any capital that someone would put in, if you put in

9    a dollar, it would not be worth a dollar in terms of value

10   of the company after that, because there's negative equity.

11        In addition, the company's loan portfolio was -- had a

12   significant number of non-performing assets, loans that were

13   not paying on their interest or principal.  And the balance

14   sheet also had shrunk to some degree where the operations of

15   the company were such that the assets were -- the yield on

16   the assets could not carry the expense of the company.

17        So you had four issues.  You had a lot of debt, no

18   equity, a lot of non-performing assets in a company that was

19   losing money on an operating basis.

20   Q    After that solicitation, did First Mariner receive a

21   proposal from financial investors?

22   A    We did, Priam Capital approached us in 2011, early

23   2011.  They had interest in making an investment in the

24   company, 36 million with the caveat that we had to go and

25   raise the rest of the capital, which was $160 million plus a

1    $15 million rights offering, so a total of 175 million.

2    Q    And did the company pursue that transaction?

3    A    Vigorously, yes.

4    Q    And why did it do so at that time?

5    A    We felt like, you know, having a good strong lead

6    investor like Priam Capital is a group that, you know,

7    Howard Feinglass who leads Priam Capital is a former partner

8    at Ozzie Partners, so he's a sophisticated investor.  He had

9    capital and access to capital.  We diligenced his -- who his

10   limited partners were, and the fact that they had capital,

11   but also Howard is from Baltimore, went to Gillman High

12   School, and had a real passion for Baltimore.

13        And he wanted to see First Mariner survive.  He wanted

14   to be involved.  And he brought that passion right from 2011

15   through on -- on throughout this process.

16   Q    And was the transaction ultimately consummated?

17   A    No.  We were not able to get other investors that had

18   the same level of conviction as Mr. Feinglass from Priam

19   Capital.

20   Q    As its solicited interest in recapitalization

21   transaction with Priam Capital or rather a recapitalization

22   transaction in 2011, did the debtor also solicit interest in

23   a transaction from strategic investors?

24   A    We did.  You know, going through the recapitalization

25   discussion, and hearing the feedback from the market, from

1    the financial investors that really they recommended that we

2    would complete a 363 transaction, we felt that, you know, in

3    a 363 transaction that is fairly dire for the stakeholders.

4    And essentially the common would get probably zero, and the

5    trust preferred holders would probably get pennies on the

6    dollar for their debt.

7        So that was not a transaction we wanted to pursue.  We

8    really vigorously trying to protect the value for the

9    stakeholders in the company.

10   Q    Okay.  And what did you do to market the holding

11   company to strategic buyers in late 2011?

12   A    Well, we decided that at that juncture after having an

13   unsuccessful recap, we felt like trying to sell the company

14   at that stage was the right thing to do.  So we went through

15   the process of developing another confidential information

16   memorandum.  We organized an on-line data room, and prepared

17   ourselves to contact prospective buyers.

18   Q    By the way, what benefits would a sale of the holding

19   company have had for the company stakeholders that a 363

20   sale did not provide?

21   A    Well, clearly the trust preferred, as I mentioned, was

22   one of the four major issues that this company had.  A bank

23   holding company could absorb that debt and assume the

24   obligation for that debt, and in my personal opinion, I

25   thought that the debt was relatively cheap capital, tier one

1    capital, which is important regulatory capital in the

2    industry.

3        So I thought it would be advantageous for a bank to be

4    able to buy the holding company and absorb that capital as

5    capital for the acquiring institution.

6    Q    I can't recall if you told me this, but how many

7    strategic buyers did you go out to?

8    A    We went out to approximately 35 strategic buyers at

9    that point.

10   Q    And how did they respond to your marketing effort?

11   A    We had I think it was four parties that wanted to

12   pursue some level of due diligence.  BD&T, TDBank, Bay

13   Bancorp as it's known today, and Northwest Bancshares.

14   Q    And what proposals, if any, did First Mariner

15   ultimately receive?

16   A    We did not receive any proposals to complete a

17   transaction.  There were some people that conducted due

18   diligence, and did not want to proceed after due diligence.

19   Q    After the termination of the recapitalization

20   transaction and the marketing efforts or strategics, did

21   there come a time when First Mariner and Sandler O'Neill

22   also solicited interest from financial investors in a

23   bankruptcy transaction?

24   A    We did.  You know, following, you know, that was the

25   strategic -- the pursuit of a sale to strategics was the

1    fall of 2011.  Following that, the next step in the process

2    we felt like as our options were even more limited at that

3    point in time, so we had interest from Priam Capital and

4    others to pursue a 363 transaction as suggested by the

5    investors that we had contacted in the recapitalization

6    effort.

7    Q    How did the decision to pursue a bankruptcy transaction

8    relate to the failure of the prior recapitalization and

9    sales effort?

10   A    It was really directly related because we went out and

11   talked to, as I mentioned, over a hundred potential

12   investors, and the drum beat was, you know, this is a

13   company that was made for a 363 transaction, and that's the

14   only structure at that time that they would have considered.

15   Q    What did Sandler O'Neill do to solicit interest in a

16   363 transaction?

17   A    We put together another confidential information

18   memorandum, refreshed our data room with new information.

19   We went out to some of the investors that we had contacted

20   in the recapitalization effort.  We had Priam as our lead

21   investor at that point in time, they had committed to take

22   up to 24.9 percent of that offering.  So we really only had

23   to raise 75 percent of the capital.  And then we contacted

24   some additional parties that we had not contacted initially.

25   Q    And did -- at this time, did Sandler O'Neill solicit

1    interest in purchases of less than a hundred percent

2    interest in the equity of the bank?

3    A    We would be happy if someone would've come along and

4    considered a hundred percent acquisition of the bank;

5    however, when you have a regulated entity like a bank, you

6    cannot just come in and decide that you want to buy a

7    hundred percent.

8        If you have regulatory approval from the federal

9    regulators, then yes, you can pursue an acquisition of a

10   hundred percent.  If you are an investor in a bank, and you

11   crossover a certain threshold, you will then be deemed a

12   bank holding company.  And most investors do not want to be

13   deemed a bank holding company because it comes with

14   regulation of that entity.

15       So if I am a PE fund and I go over say, 24.9 or over 33

16   percent, depending on how the transaction is structured,

17   then you'd be deemed a bank holding company and the PE fund

18   would then be subject to examination by the Federal Reserve

19   and the scrutiny that comes with it.

20       In addition if that institution were at a later date to

21   become distressed itself, that entity would be a source of

22   strength, where that entity would have to sell other assets

23   and push it down into the bank to protect the bank from

24   eventual failure.

25   Q    What impact, if any, did soliciting interest of 25

1   percent or less have on the range of potential investors?

2   A     Had no effect.  I mean, I think that potential

3   investors were happy that there was someone who was already

4   involved, had done a lot of due diligence, and had the

5   commitment to the project.

6         So, you know, as you can imagine, it's easier to raise

7   75 percent of the capital than a hundred percent of the

8   capital.

9   Q    How many financial investors are organized to invest a

10  hundred percent of the equity in the bank?

11  A     There are a handful of financial investors that had

12  previously applied to be a bank holding company, and I would

13  kind of consider those in the strategic side, strategic

14  buyers.  So outside of those handful, and those handful we

15  contacted in the -- in this sale process in 2011, other than

16  that, pretty much no one wants to become a bank holding

17  company.

18  Q    So there are many more financial investors who are

19  interested in minority stakes?

20  A     Multiples, more, yes.

21  Q    The committee has argued that the marketing process was

22  inadequate because you only solicited interest of 24.9

23  percent or less in the bank, do you agree with that?

24  A     I disagree.

25  Q     Why?

Page 62

1    A    I just stated it, as I said, it's easier to raise 75

2    percent of the capital than it is to raise a hundred percent

3    of the capital.  We had a committed investor, who was

4    passionate, who's from Baltimore, he had done a good job of

5    -- you know, part of his limited partnership consisted of

6    local businesses or local businessmen, I should say that are

7    knowledgeable and highly regarded people within this

8    community, who could also become customers of the bank

9    following the transaction.  So there were certainly benefits

10   to have Priam as a partner in this process.

11   Q    In your opinion, what would've been the impact on the

12   range of potential investors if Sandler O'Neill had only

13   marketed only a 100 percent interest in the bank?

14   A    Well, as I said, the only parties that would have

15   interest would be strategic buyers, and we had gone down

16   that road.  And that does include PE funds that have formed

17   entities solely to be a bank holding company.

18        There are some that, you know, they raised a billion

19   dollars, they had no bank, but it was a bank holding company

20   and we approached all of those parties as part of the

21   process.

22   Q    The committee has also suggested that the marketing

23   process was inadequate because you marketed a Section 363

24   transaction with a committed investor.  Do you agree with

25   that?

1   A    I don't.  As I said, I disagree, I think it was a

2   benefit to market with at least 25 percent of the capital

3   already in place.

4   Q    And what response did you receive from financial

5   investors to your marketing?

6   A    We had one very sophisticated bank investor called

7   Pinebrook Road Partners signed on to participate as a 24.9

8   percent investor.  So at that point then we had two sort of

9   co-leads I would call it, and we started to really get some

10   traction after that, and you know, things were going pretty

11   well through until about the middle of 2012 I guess.

12   Q    And what happened then?

13   A    At that point in time, we had to, you know, arrive at

14   the price at which the investor group would pay the holding

15   company for the hundred percent of the stock in the bank,

16   and we weren't able to agree on what that price was.

17   Q    After that transaction terminated, in August 2012, did

18   the bank -- did First Mariner again attempt to market the

19   assets to strategic investors?

20   A    Yes, it was like every fall when the leaves changed, we

21   marketed First Mariner Bank for sale, so the fall of 2011,

22   2012 and 2013, we marked the company for sale.

23   Q    And who did Sandler contact?

24   A    We went back to a subset of the 35 banks that we had

25   contacted a year before, and added some new names to that

Page 64

```
1    list, and so it was probably 20 or so institutions that we

2    talked to at that point in time.

3    Q    And what type of transaction did you solicit?

4    A    We were pretty open, let the -- we wanted to let the

5    buyers dictate to us what they wanted to pursue as a

6    transaction.  As I mentioned, you know, we knew that the 363

7    was an option, but it had detrimental or harmful effects to

8    the stakeholders, so we weren't going to pigeon hole the

9    institution in that way.  We were hoping that one bank

10   holding company would see the light and say, yes, that is

11   capital debt trust preferred, I'd like to have on my balance

12   sheet to fund my bank.

13   Q    And did the company -- did there come a time when the

14   company received a proposal from a strategic investor in the

15   fall of 2012?

16   A    We did.  It introduced a relatively new bank holding

17   company.  In 2009, there were only 300 million in assets and

18   they had grown rapidly to be 2 billion in assets at the time

19   that we engaged in dialogue in the latter part of 2012.

20   Q    And what type of transaction did that bank propose?

21   A    That bank submitted a term sheet that proposed a

22   prepackaged bankruptcy transaction that would provide

23   reasonable value to the common holders and the trust

24   preferred holders.

25   Q    And what negotiations occurred concerning that
```

1   proposal?

2   A    It was a heavily negotiated transaction.  So we

3   proceeded beyond the term sheet stage and into full due

4   diligence.

5   Q    And how did the parties' negotiations conclude?

6   A    The parties -- we did not conclude favorably.  We felt

7   like it was unlikely that this bank would receive regulatory

8   approval within a reasonable period of time.

9   Q    Why do you say that?

10  A    This company had a number of banks that it had already

11  announced transactions with.  They were public

12  announcements, and they were going through the regulatory

13  process.  And one of those transactions had been outstanding

14  for a significant period of time.

15       So we knew that there was a question in our mind as to

16  why that delay had been taking place.  So the counsel for

17  First Mariner had conversations with the various regulatory

18  authorities, and it became clear that -- you know, never are

19  communications with the regulators abundantly clear, but you

20  get a general sense of things.

21       And it was deemed that the approval process for a

22  transaction between this bank and First Mariner would take

23  an extended period of time and even over a year.

24  Q    After the termination of discussions concerning the

25  prepack proposed by the bank, did there come a time when

1    First Mariner and Sandler O'Neill received a proposal for a

2    second prepackaged plan of reorganization from financial

3    investors and the holders of certain -- of the trust?

4    A    Yes.  Going back to the middle of 2012 in the 363

5    transaction with Priam and Pinebrook, and as I mentioned, we

6    had a lot of dialogue regarding price, and we couldn't come

7    to an agreement on price.

8         Well, one of the things that we talked about is we

9    said, you know, one way to get value to the trust preferred

10   holders, let alone the common holders, is do a prepackaged

11   bankruptcy transaction instead of a 363 transaction.  And we

12   had a lot of dialogue with the trust preferred holders about

13   such a structure and they were in favor.

14        So after we shopped the company and this bank holding

15   company, the sale to this bank holding company didn't come

16   through, we re-engaged with Priam and Pinebrook and pursued

17   a prepackaged bankruptcy transaction with terms that were

18   much more favorable and palatable to the stakeholders of

19   First Mariner.

20   Q    By the way, who are a few of the TruPS holders who were

21   involved in that prepackaged transaction?

22   A    Well, there was one entity called Hold Co Advisors who

23   holds itself out there as an expert in dealing with trust

24   preferred.  And their clients are the trust preferred

25   holders themselves, and it may be some of the people in this

1    room frankly.

2         And so we had extensive dialogue with Hold Co advisors,

3    and we explained to them that it was our intention to try to

4    protect and preserve the value for the trust preferred

5    holders as best we could throughout the process, no matter

6    which transaction we were pursuing.

7    Q    And what role, if any, does Hold Co advisors have on

8    the official committee of unsecured creditors?

9    A    Say that again.

10   Q    Does Hold Co advisors have any rule in connection with

11   the official committee of unsecured creditors in this case?

12   A    I believe that he's -- they're a committee member.

13   Q    Okay.  After you received a proposal for a prepack,

14   what happened?

15   A    We pursued that vigorously.  Now again, when you have a

16   bank, clearly Priam and Pinebrook themselves had more than

17   enough capital to capitalize this institution on themselves,

18   but they did not want to become a bank holding company for

19   all the reasons we described earlier.

20        So you've got two 24-9 investors available, so we had

21   to raise the rest of the capital, the other 50 percent.  And

22   ultimately we were successful in getting all that capital

23   committed.

24   Q    And -- but was the transaction consummated?

25   A    The transaction was not consummated, you know, we had

1     again, this is -- people that had been looking at this

2     institution for a long period of time, and one of the

3     requirements in the cease and desist order from the FDIC and

4     the State of Maryland was that the company had to have a

5     tier one leverage ratio of seven and a half percent.

6          And through the course of our modeling and those models

7     were developed in conjunction and had input from the private

8     equity investors themselves, and they understood all

9     throughout the process what we were looking at in terms of

10    ultimate results and returns from that -- from the offering

11    and the structure of the transaction.

12         In the end, they felt like the tier one leverage ratio

13    was too low, and they refused to pursue the transaction

14    further, at least one of those parties I should say.

15    Q    After the termination of that proposed prepackaged plan

16    of reorganization, did there come a time when First Mariner

17    and Sandler O'Neill again marketed the company to

18    strategics?

19    A    We did.  And as I said earlier, in the fall of 2013,

20    guess it was August of 2013, we went out and we marketed the

21    company to strategic buyers once again.

22    Q    And what types of transactions -- what type of

23    transaction did Sander O'Neill inform strategics it was

24    interested in, if any?

25    A    Well, once again, we tried to hold out hope that one

1    bank holding company would see the real benefit of buying

2    the holding company of this institution, and reaping the

3    benefits of that relatively cheap capital.

4         And as I mentioned earlier, 2012, I concluded the sale

5    of Annapolis Bancorp to FNB Corporation.  They're a $14

6    billion institution out of western Pennsylvania, so this was

7    a new buyer in this market.  So we felt like there was real

8    opportunity.

9         Later we had sold Baltimore County Savings Bank to FNB

10   as well.  So it just turns out that First Mariner extends

11   from about where Baltimore County's franchise is all the way

12   down to Annapolis, where Annapolis Bancorp's franchise is,

13   so this was a perfect fit in between those.

14        So we felt like, you know, if anyone's going to buy

15   this, you know, it's going to be FNB because it really fits

16   strategically for them, and we were hoping that maybe some

17   of the improvements in the economy would've led them to say

18   that the loan credit quality had stabilized, and they now

19   had the ability to cut a lot of costs that would solve the

20   operating performance issues of the company.

21        So we thought there was a real chance we could sell the

22   holding company to FNB or someone else who might have

23   interest.

24   Q    At this time, did Sandler O'Neill solicit interest in

25   any particular type of transaction?

Page 70

1    A    We did not.

2    Q    Why not?

3    A    We were hoping for the silver bullet that would save

4    the trust preferred and the common and the holding company

5    all at once.

6    Q    The committee has argued that this marketing process

7    was inadequate because Sandler did not explicitly solicit

8    participation in a Section 363 transaction.  Do you agree

9    with that?

10   A    I do not.

11   Q    Why?

12   A    You know, we knew going into the marketing process that

13   we were going to get bids that said, we will only pursue

14   this company through a 363.  And as I mentioned, we'd been

15   marketing this bank formally three times, you know, '11, '12

16   and '13, informally through the whole process, we were

17   always having dialogue with various buyers for banks in this

18   market, always holding out hope that we would have someone

19   come forth and buy the institution.

20   Q    To what extent did strategic investors raise the

21   possibility of a 363 transaction?

22   A    We received one letter from FNB as we had hoped, that

23   did not use the word bankruptcy explicitly, but if you read

24   the transaction, the only way that transaction could be

25   accomplished would be through a bankruptcy transaction.

1          In addition, there was a bank, National Penn that we

2    have had extensive discussions with over the years about

3    their interest in coming from -- you know, their primary

4    market is, you know, the greater Philadelphia market, and we

5    were hoping that they would cross the border and come down

6    into Maryland and take advantage of this great opportunity

7    to build a franchise in Baltimore.

8          They looked at this closely, they came down to visit

9    and spent hours with management, going through the business,

10   and in the end said that they would pursue a 363, but would

11   not give us a letter, an offer.  So all we had to present to

12   the board was they have interest, but they have not yet come

13   to the table.

14         So we pursued National Penn from August through

15   November to try to convince them to make an offer for the

16   institution, and really engaged in the due diligence process

17   and negotiating process.

18   Q    And were you ever able to obtain an offer from them?

19   A    No.

20   Q    Okay.  And what happened with FNB?

21   A    FNB, they came in, they conducted full blown loan due

22   diligence, and we know that they are sticklers for credit,

23   and they looked at the loan portfolio and they said to

24   themselves, that they thought that the company was -- they

25   would not pursue a transaction with the company.

1    Q     Okay.  Did they ultimately make a proposal?

2    A     They did make a revised proposal which they only

3    offered to purchase six branches, 300 million in deposits,

4    and 75 to a hundred million of the company's best loans.

5    Q     And what was your view of that proposal?

6    A     We felt like it was -- we felt it was problematic,

7    because it was taking the best branches out of the -- it was

8    like buying the center of the donut and leaving all the

9    branches that were further afield, so reducing the franchise

10   value of the company.

11        Also, they were going to buy our best loans, which

12   reduced -- which increased the percentage of non-performing

13   loans as a percentage of performing loans, which makes you

14   look either furthermore like damaged goods.

15        And we thought that the FDIC would have a problem with

16   us selling branches in that magnitude at that stage in the

17   game.

18   Q     Other than First -- other than FNB and National Penn,

19   what interest did you receive as a result of your marketing

20   effort to strategics in 2013?

21   A     We had no other indications of anyone wanting to come

22   to the table.

23   Q     Did there come a time when First Mariner received a

24   term sheet from RKJS?

25   A     I believe it was November 8, 2013, we received a term

1    sheet from RKJS.

2    Q    What is RKJS?

3    A    It's an entity formed by two gentlemen, Rob Kunisch and

4    Jack Steil, so RKJS.  And those individuals were heavily

5    involved in some of the previous transactions we were

6    considering.

7    Q    Who are Mr. Steil and Mr. Kunisch?

8    A    They are people that grew up and live in the Baltimore

9    area.  They spent their -- pretty much their entire careers

10   here as bankers in Baltimore.  Probably -- most -- part of

11   their career they worked for Mercantile Bancshares which is

12   one of the preeminent banks that's ever operated in Maryland

13   or the Mid-Atlantic, let alone just Baltimore.

14   Q    And do they -- are there investors in RKJS?

15   A    Yes, they are investors in RKJS.

16   Q    And who and how many?

17   A    They are supported by Priam Capital, GCP Capital,

18   Patriot Financial, and the family office, and then they also

19   have a handful of successful business people from the

20   Baltimore community that are supporting their effort.

21   Q    What did the RKJS term sheet propose in the way of a

22   transaction?

23   A    They proposed a 363 transaction.

24   Q    And -- 363 transaction to purchase the shares of the

25   bank; is that right?

1    A    That's correct, to buy a hundred percent of the stock

2    of the bank from the holding company.

3    Q    And after the company received the term sheet, what did

4    it do?

5    A    The company considered its options once again.  We went

6    back to FNB and to National Penn with the hopes that they

7    would come forward and make a more attractive proposal, but

8    they both refused.

9    Q    What negotiations, if any, were there concerning the

10   RKJS term sheet after November?

11   A    You know, there were a lot of things in that term sheet

12   that were unpalatable.  We negotiated some of those items

13   and were successful in some regard and unsuccessful in

14   others.

15   Q    And did the parties -- what, if any, terms were you

16   successfully able to change?

17   A    The break-up fee was proposed at 3 percent, so you

18   know, they have a hundred million dollars raised, so that'll

19   be $3 million, we were able to negotiate that down to $1

20   million.  We were also able to increase the purchase price

21   from $4 million to 4 million 775.

22   Q    Did there come a time when the parties entered into a

23   binding a term sheet?

24   A    I believe it was on November 21st if my memory serves

25   me correctly that we -- that the board signed the term

Page 75

1    sheet.

2    Q    Now, you mentioned that you had spoken -- after

3    initially receiving the term sheet, you spoke with both FNB

4    and National Penn, what did you say to them?

5    A    We said that we had received a term sheet, proposing a

6    363 transaction, and that transaction requested exclusivity

7    for a period of time, and we wanted to see if National Penn

8    or FNB would change their mind and come to the table and

9    engage in dialogue and negotiations for a transaction

10   between one of those two companies and First Mariner.

11   Q    And what, if anything, did they do in response?

12   A    They said no, thank you, go ahead and sign the term

13   sheet, enter into your exclusivity, don't worry about us.

14   Q    Now, at your deposition a week or so ago, counsel to

15   the committee asked you whether you had quote shopped

16   unquote the RKJS term sheet between November 8 and November

17   21.  Do you recall that?

18   A    Yes.

19   Q    And you said no, is that right?

20   A    That's correct.

21   Q    Why did you say that?

22   A    When I think of the word shopped, I think about that

23   formal process that we talked about, putting together a

24   confidential information memorandum that explains their

25   transaction, putting together a formal model that you put in

Page 76

1    the book, so that people understand the transaction from a

2    financial perspective, put together a list of potential

3    parties that you'd go out and engage dialogue with, and then

4    going out and conducting that marketing process.  To me,

5    that's what shopping a transaction means.

6    Q    And did you do that in connection with the November 8

7    RKJS term sheet?

8    A    We did not.

9    Q    Okay.  After entering into the binding term sheet, did

10   the parties proceed to negotiate a definitive agreement?

11   A    They did.

12   Q    And I would ask you to turn to Exhibit 1 in your

13   binder, and that's Debtor's Exhibit 1, and tell me what that

14   is.

15   A    That looks like the merger agreement between First

16   Mariner Bancorp, First Mariner Bank and RKJS Bank.

17          MR. O'NEILL:  I'd offer it into evidence, I

18   believe the committee has stipulated.

19          MR. BROWN:  Yeah, no objection, Your Honor.

20          THE COURT:  Debtor's 1 is admitted.

21      (Debtor's Exhibit No. 1 received)

22   BY MR. O'NEILL:

23   Q    Very broadly speaking, what is the structure of the

24   transaction proposed in Exhibit 1?

25   A    RKJS would form a Maryland trust company that is a non-

1   FDIC insured company, they would capitalize that company

2   with a hundred million dollars.  They would then pay the

3   First Mariner Bancorp the purchase price of 4 million 775,

4   and then -- for a hundred percent of the stock of the bank,

5   and then they would merge that bank in with this interim

6   entity, the RKJS Bank.

7   Q    Do you believe the $4.775 million purchase price is

8   fair and reasonable consideration for the debtor's equity in

9   the bank?

10  A    I do.

11  Q    Why?

12  A    Because we had marketed the company for sale for the

13  last four and a half years, and this was the only group that

14  had any passion or desire to really pursue this opportunity

15  vigorously with all the issues it has, first and foremost.

16       Secondarily, when you look at the company -- the bank's

17  balance sheet, and we're specifically talking about the

18  bank, not the holding company, while there's equity at the

19  bank level, if you mark the balance sheet to market, there

20  can be made a case that the equity would be eroded quickly

21  and that there really isn't any equity in the company.

22  Q    In your view, would the $4.775 million purchase price

23  have been available to the debtor without the contribution

24  of the recapitalization amount?

25  A    No.  You can't take one without the other.  You have to

1    look at this problem as a two pieced problem.  You have to

2    resolve the bank in order to get or you have to resolve the

3    holding company's issues in order to get the bank, so you

4    have to look at the two pieces together.

5    Q    And why is that?

6    A    Because the bank is an under-capitalized institution,

7    and the regulators will not give you approval to complete a

8    transaction unless you capitalize that institution to the

9    extent that's acceptable to the regulators.

10   Q    Did you get comfortable that RKJS would receive

11   regulatory approval?

12   A    I felt like -- well, we engaged in dialogue with the

13   regulators, and didn't have any objection, but you know,

14   people like Rob Kunisch and Jack Steil, they're upstanding

15   members of the community, they have a long history of

16   banking in the Baltimore market.  They're exactly the type

17   of people that the FDIC hopes will come forward and lead

18   institutions in this country.

19   Q    Under the terms of the agreement that's Exhibit 1, can

20   the purchase price change?

21   A    It can, yes.

22   Q    How?

23   A    If at closing the bank's equity drops below 29 million,

24   the price can be reduced on a dollar-for-dollar basis.

25   Q    And did the boards -- did the debtor's board approve

1    the transaction that's embodied in Exhibit 1?

2    A    Yes.

3    Q    What, in your view, would be the consequences to the

4    bank if it did not enter into the M&A transaction?

5    A    This is the point where it gets pretty sensitive, Your

6    Honor, I'd like to -- this is --

7              MR. O'NEILL:  Why don't I hold the question, Your

8    Honor.

9              THE COURT:  All right, that's fine.

10   BY MR. O'NEILL:

11   Q    Are proposed alternate procedures an aspect of the

12   agreement that is Exhibit 1?

13   A    Say that again.  Sorry.

14   Q    The auction procedures are a term of the agreement to

15   Exhibit 1, right?

16   A    Yes.

17   Q    The parties agreed on -- meaning RKJS and the debtor

18   agreed on auction procedures as part of the (indiscernible)

19   deal; is that right?

20   A    Correct, they were presented in their term sheet.

21   Q    And we heard this morning that the procedures that were

22   originally agreed have been modified and presented to the

23   Court in modified form; is that right?

24   A    That's my understanding, yes.

25   Q    Would you take a look at what's been marked as Exhibit

Page 80

1    5 in the binder?

2    A    I would love to, but Exhibit 5 is not in my book.

3            MR. O'NEILL:  Do you have it then?

4            THE COURT:  I do.  Okay.  Well, I have something

5    that says -- behind the tab as Exhibit 5, yes.

6            MR. O'NEILL:  And is it a red line, Your Honor?

7            THE COURT:  Yes.

8            MR. O'NEILL:  Okay.

9    BY MR. O'NEILL:

10   Q    What is that?

11   A    That is a copy of the auction procedures as adjusted.

12           MR. O'NEILL:  I would offer that in evidence, Your

13   Honor.

14           THE COURT:  What is intended to be offered as

15   Exhibit 5 is the same thing as what is on file --

16           MR. O'NEILL:  Yes, Your Honor.

17           THE COURT:  -- as part of document 118?

18           MR. O'NEILL:  Yes, Your Honor.

19           THE COURT:  All right.  Is there any objection?

20           MR. BROWN:  No objection, Your Honor.

21           THE COURT:  Exhibit 5, Debtor's 5 is admitted.

22        (Debtor's Exhibit No. 5 received)

23   BY MR. O'NEILL:

24   Q    How were the auction procedures developed?

25   A    The original terms of the auction procedures were

1    presented in the term sheet that we received on November

2    8th.

3    Q    And were they negotiated?

4    A    Yes.

5    Q    By whom?

6    A    Legal counsel.

7    Q    And what role, if any, did you have in that process?

8    A    I did not really get involved with the negotiation of

9    the specific auction procedures.

10   Q    But you were familiar with the procedures?

11   A    Yes.

12   Q    Let's talk just in terms of categories.  I think first,

13   let's talk about the 30-day timeline.

14        What is the proposed bid deadline?

15   A    Thirty days following this hearing, which would make it

16   April 6th.

17   Q    You've run many M&A processes on behalf of banks and

18   purchase of bank assets, in your opinion, can an interested

19   party conduct due diligence and make a binding offer in this

20   case within the 30-day time limit?

21   A    Absolutely.

22   Q    Why do you say that?

23   A    Typical timeline for someone to conduct due diligence

24   when we are on the sell side is, we give people two to three

25   days.

1    Q    And parties are able to comply with that; is that

2    right?

3    A    Every time.

4    Q    What impact, if any, does the extensive prepetition

5    marketing process have on the ability of bidders to conduct

6    due diligence quickly?

7    A    I think that any potential interested party that is

8    sophisticated and has the capital to recapitalize the bank

9    will be able to move quickly enough to be in compliance with

10   the timeline.

11   Q    Okay.  Can you give me an example of -- strike that.

12        Are you aware of a party who has conducted due

13   diligence in this case and in this transaction within a

14   period of less than 30 days?

15   A    Well, we were going through the process on the initial

16   term sheet on November 8th, there was one party that was

17   listed as putting in $20 million as part of their group.

18   Q    This is an investor in RKJS?

19   A    That's correct.  And --

20   Q    What happened with that investor?

21   A    That investor decided to withdraw from the process, so

22   we had to go out and market the transaction to try to find a

23   replacement investor.

24   Q    And who did you market the transaction to?

25   A    We went to financial investors, and we were able to

1    secure Patriot Financial as a replacement.

2    Q    And how long did it take Patriot to conduct its due

3    diligence and commit to the transaction?

4    A    It was done very quickly.

5    Q    How quickly?

6    A    They were done in -- from the first time we talked to

7    them, to the time they said yes, was probably no longer than

8    three weeks.

9    Q    Have you seen other auction processes run effectively

10   in less than the 30-day time period?

11   A    Yes.

12   Q    How often?

13   A    Well, frequently, but you know, if you look at FDIC

14   assisted transactions, you know, distressed companies,

15   they're sold -- typically the government will let all the

16   prospective bidders know, they open up a data room, they

17   give them some materials, and expect bids within three

18   weeks, and then close that weekend.

19   Q    Are there any benefits to running an auction in March

20   and April?

21   A    Well, you don't have any, you know, big times for

22   vacations that you would in say like August or at the end of

23   December.  So, no, I think it's a good time to conduct a

24   process.

25   Q    And what efforts is Sandler O'Neill making to market

1    the company?

2    A    We have developed and -- our list of potential parties

3    that we're going to go to, we have put together a new

4    confidential information memorandum, we have put together

5    with the help of the company an updated data room, so we are

6    ready to go, and this week it was determined we have a no

7    shop provision, where we weren't allowed to go out and

8    contact anyone until after this hearing.  I guess it was

9    part of the discussions between the committee and First

10   Mariner, it was determined -- and RKJS, I should say, we

11   were allowed to begin that marketing process, so we did.

12        We had -- National Penn actually came to company

13   headquarters on Wednesday, and they spent three hours with

14   the entire senior management team going through all aspects

15   of the institution.

16        We have contacted others and already started to receive

17   -- send out non-disclosure agreements as requested by those

18   potential bidders.

19   Q    You said you had discussions with the committee.  To

20   what extent has the committee suggested entities to whom you

21   might market this transaction?

22   A    I received the list this morning about 6 a.m. of

23   additional parties that we should consider, both financial

24   buyers, and strategic buyers.

25   Q    And how many of those people had you not previously

1   contacted?

2   A    There are a handful that we hadn't previously contacted

3   on either list.

4   Q    In your opinion, would an extension of the 30-day

5   bidding period benefit or harm the estate?

6   A    I think it would be harmful to the estate to extend the

7   timeline.

8   Q    Why do you say that?

9   A    Because as we've gone through in our discussion here

10  today, you can see the numerous efforts and variations of

11  transactions we have been through, particularly with private

12  equity investors.  And they're a fickle bunch, and they walk

13  away from transactions pretty easily.

14       I mean, when we had the pre-pack and, you know, the

15  model showed we were going to be off by 20 basis points, and

16  they refused to proceed to closing.  I mean, after a

17  tremendous amount of time and effort.

18       So I worry every single day about, you know, investors

19  changing their mind.  It's not -- you're not dealing with

20  one entity, you're dealing with a whole group of people that

21  all have to be of like mind and thought at a given point in

22  time.

23  Q    And why, if at all, does the passage of time increase

24  the risk of an investor might walk?

25  A    As I mentioned earlier, this company, one of the most

Page 86

1    debilitating issues it has, is that the asset base does not

2    generate enough earnings to carry its expense base.  So

3    every day the doors are open, equity is dwindling and the

4    company is losing money.

5         In addition, you know, I'm not a credit expert, but I

6    do understand some of the loans that are in the loan

7    portfolio, there could be a loan that goes bad or suffers

8    losses at any point in time.

9    Q    Are there any other risks that might be -- that the

10   bank might incur if the bidding deadline is extended?

11   A    There are, but I'd prefer --

12   Q    To what extent might employees leave?

13   A    They're -- that's always a risk that you could lose

14   employees and customers.  I mean, as I mentioned, the

15   balance sheet is shrinking, loans are paying off, and you

16   know, employees may decide to leave also.

17             MR. O'NEILL:  There are some other risks, Your

18   Honor, that I won't ask about because of confidentiality.

19             THE COURT:  All right.

20   BY MR. O'NEILL:

21   Q    In your opinion, what impact might the extension of the

22   30-day marketing period have on the stalking horse bidder,

23   RKJS?

24   A    They may decide that they want to walk away.  There is

25   a -- in the definitive agreement there is a what we call a

1   drop dead date, a date at which either party can walk away

2   without any repercussions and that is April 30.

3   Q    Do you agree with the committee's assertion that the no

4   shop provision in the agreement that's Exhibit 1 is harmful

5   to the prepetition and post-petition marketing processes?

6   A    No, it's common language.  It's in all the definitive

7   agreements that we enter into on behalf of our clients, so

8   it's pretty common language.

9   Q    Has the no shop provision prevented Sandler O'Neill

10  from communicating with anyone who is interested in

11  participating in the marketing process?

12  A    No.  We have people that call from time to time, and of

13  course, when the transaction was announced, we did have a

14  number of calls, but most of those were parties just

15  interested in knowing what was going on.

16  Q    And National Penn, I guess, expressed interest, and it

17  took a day or two, but you got them into -- we got them into

18  the data room; is that right?

19  A    Correct.  They showed interest and we invited them to

20  come down to the company and specifically begin their due

21  diligence, together with the entire management team.  The

22  entire management team spent hours with National Penn trying

23  to refresh their memory as to what they already knew to be

24  true previously.

25  Q    What's the stalking horse bidder fee?

1    A    The stalking horse bidder fee consists of two parts.

2    One part is the break-up fee and the other part is the

3    expense reimbursement.

4    Q    And what are the amounts of those two components?

5    A    The break-up fee is a million dollars.  As I mentioned

6    earlier, we brought it down from 3 million to 1 million.

7    And the expense reimbursement is a million 775.

8    Q    Do you have experience in negotiating break-up fees and

9    expense reimbursements?

10   A    Yes.

11   Q    In your opinion, will the size of the stalking horse

12   bidder fee have any effect on the willingness of potential

13   investors to bid at auction?

14   A    No, no, I don't --

15   Q    Why is that?

16   A    -- think so.  I say that because you have to

17   recapitalize this institution, so when you look at the

18   financial commitment from a buyer or a strategic investor,

19   it is not, you know, 4.775 million, it's the 80 to 100

20   million dollars that you have to hold against those assets

21   or infuse into the company to capitalize the institution so

22   it may meet the minimum regulatory requirements as discussed

23   in the cease and desist order, and in the written agreement

24   with the Federal Reserve.

25   Q    The committee has argued that the size of the stalking

1    horse bidder fee should be judged in relation to the amount

2    of the purchase price flowing into the holding company.  Do

3    you agree with that?

4    A    I disagree.  I know that in other M&A deals, you look

5    at the purchase price in relation to the break-up fee.  In

6    this case, you have to include the recapitalization amount

7    when you're thinking about it, because that is the entire

8    financial commitment.

9    Q    In your view, is it -- strike that.

10        What is your understanding of whether the

11   recapitalization amount will be contributed at closing or

12   after closing?

13   A    The recapitalization amount has to be contributed --

14   well, with the RKJS are you asking or just --

15   Q    Yes --

16   A    -- anyone?

17   Q    -- in this transaction.

18   A    On this transaction, they will fund the RKJS Bank prior

19   to the closing of the transaction, then at closing, merge

20   that bank into First Mariner Bank.

21   Q    In your opinion, is the stalking horse bidder fee in

22   this case fair and reasonable?

23   A    Yes.

24   Q    Why?

25   A    As I mentioned, I think you have to look at this

1   holistically, you have to look at the recapitalization

2   amount with the purchase price, and that's the entire

3   financial commitment that one must make to be successful.  I

4   mean, you cannot show up at this auction and say I've got,

5   you know, 4 or $5 million and expect to win the day.  You

6   have to capitalize the institution.

7   Q    Let's talk a little bit about the expense

8   reimbursement.  The amount of that is -- it's capped at

9   $1.75 million; is that right?

10  A    Correct.

11  Q    And in your view, is that amount reasonable for an

12  expense reimbursement on this transaction?

13  A    Yes.

14  Q    Why?

15  A    This is a complex transaction, as you can see by the

16  amount of professionals that are in this room.  It's a --

17  it's not a process, as I said, there's been less than ten of

18  these transactions completed.  There are a lot of issues,

19  you have regulatory issues, you've got bankruptcy issues, I

20  mean, this is an evolved process.

21       So I think that, you know, while we tried to reduce

22  those amounts, I think that any expenses that they incur to

23  actually resolve this institution once and for all should be

24  reimbursed as part of the process.

25  Q    And we talked a little bit earlier about the fact that

Page 91

1    RKJS has multiple investors.  Do you recall that?

2    A    Yes.

3    Q    And to what extent have each of those investors

4    conducted due diligence?

5    A    The largest investors have conducted significant

6    amounts of due diligence, and the smaller investors have

7    conducted less so, but each of the parties has conducted

8    their own due diligence.

9    Q    And many of the investors had not previously conducted

10   due diligence; is that right?

11   A    Correct.

12   Q    What is the recapitalization requirement?

13   A    Any party that comes to purchase First Mariner Bank has

14   to commit to recapitalize the institution.

15   Q    In any particular amount?

16   A    In the amount of 85 to a hundred million dollars.

17   Q    The committee has asserted that the recapitalization

18   requirement is in a quote, arbitrary condition that serves

19   no meaningful purpose.  Do you agree with that?

20   A    I disagree.

21   Q    Why?

22   A    Because you -- if you go to the beginning of the story,

23   the federal regulators said we needed to have so much

24   capital to operate a financial institution in the US of A.

25   So someone has to come to the table and capitalize the

1    institution so that not only is it well capitalized at that

2    point in time, but also in the ensuing years after that

3    after the company continues to incur losses in its loan

4    portfolio, but also the company has to over time grow its

5    balance sheet, so that the operating earnings disappear.

6    And there's going to be a little bit of a carry a couple of

7    years maybe before that happens.

8    Q    What tier one leverage capital ratio is required by the

9    cease and desist order?

10   A    Seven and a half percent.

11   Q    And how was the recapitalization amount determined?

12   A    Based upon that requirement, plus the cushion, if you

13   will, for any expected losses that could come in the ensuing

14   years.

15   Q    Must every competing bid satisfy the recapitalization

16   requirement in cash?

17   A    No, I mean, you could be a bank holding company who

18   merges that bank into their own bank and, you know, some

19   people think that's not placing capital against those

20   assets, but you have to have free capital that they do

21   allocate to this balance sheet, so that the buyer meets

22   their minimum regulatory capital requirements following the

23   transaction; otherwise, they won't get approval from the

24   regulators of the transaction.

25            MR. O'NEILL:  That's all I have, Your Honor.

1            THE COURT:  Thank you.  Is there going to be

2    cross-examination of this witness?

3            MR. BROWN:  Yes, Your Honor.

4            THE COURT:  I think now would be a good time to

5    take a short recess before we take that up.  Sir, I would

6    remind you you're under oath, even though we're on recess,

7    which means you should not discuss your testimony with

8    anyone.  You are free to walk around, use the restroom.

9            THE WITNESS:  Okay.

10           THE CLERK:  All rise.  Court is in recess.

11       (Recessed at 11:59 a.m.; reconvened at 12:11 p.m.)

12       (Call to Court)

13           THE COURT:  Mr. Boyan, I remind you you're still

14    under oath and required to tell the truth.  Do you

15    understand?

16           THE WITNESS:  Yes, I understand.

17           THE COURT:  All right.  Before we begin let me say

18    for the sake of clarity, while attorneys are permitted to

19    use electronic devices like computers and laptops, I-Pads

20    and such in connection with their presentation of the case,

21    the use of any kind of electronic device in a courtroom, or

22    by those in the gallery for any purpose is not permitted

23    during this hearing, and I am expecting everyone who's in

24    the gallery to have their electronic devices in the power

25    off position.

1          If there's any use of electronic devices or any

2     disruption, I'll be asking the court security officer to

3     escort you out into the hallway, where you can deal with

4     whatever issue you have.  All right.

5               Cross-examination.

6               MR. BROWN:  Thank you, Your Honor.  For the

7     record, Judson Brown for the unsecured creditor's committee.

8                         CROSS-EXAMINATION

9     BY MR. BROWN:

10    Q    Mr. Boyan, I want to start with your background.  Your

11    experience is in providing M&A capital raise and strategic

12    advice to banks, correct?

13    A    Correct.

14    Q    You have never advised a bank with respect to a

15    potential bankruptcy before this case, right?

16    A    That is correct.

17    Q    Never been involved in a Chapter 11 bankruptcy

18    proceeding, right?

19    A    That is correct.

20    Q    Never testified in any bankruptcy proceeding, right?

21    A    No.

22    Q    You've never testified as an expert before in any case,

23    correct?

24    A    That is correct.

25    Q    Mr. Boyan, you have never been involved in a sale

Page 95

1    pursuant to Section 363 of the Bankruptcy Code, correct?

2    A    That is correct.

3    Q    You have never negotiated a sale pursuant to Section

4    363, correct?

5    A    Correct.

6    Q    This is the first time, right?

7    A    Yes.

8    Q    You've never run an auction with a stalking horse bid,

9    have you?

10   A    No.

11   Q    You've testified on direct about all the auctions

12   you've run, right?

13   A    That is correct.

14   Q    In not one of those did you have a stalking horse

15   bidder, correct?

16   A    That is correct.

17   Q    You've never offered an opinion on whether a stalking

18   horse bid provides fair and reasonable consideration for the

19   assets subject to the auction, correct?

20   A    Could you repeat your question, please?

21   Q    Yeah.  You've never offered an expert opinion on

22   whether a stalking horse bid provides fair and reasonable

23   consideration for the assets subject to an auction?

24   A    I have never provided such an opinion.

25   Q    You've never negotiated auction procedures for an

1    auction pursuant to Section 363, correct?

2    A    That is correct; however, auction procedures in the 363

3    process are very similar to the procedures we follow in any

4    auction that we conduct.

5    Q    Okay.  We'll get to that in a minute.  But just to be

6    clear, you have never negotiated an auction procedures for a

7    Section 363 sale or auction, right?

8    A    That's correct.

9    Q    Never offered an expert opinion on whether auction

10   procedures are fair and reasonable, right?

11   A    That's correct.

12   Q    For any auctions, subject to 363 or not, correct?

13   A    That is correct.

14   Q    You've never offered an expert opinion on whether

15   auction procedures are designed to attract the maximum

16   number of bidders at an auction, have you?

17   A    In the auctions that we generally pursue, they tend to

18   be more a confidential process where we would make -- deem a

19   limited auction.  We don't go out to the whole world,

20   there's 6,000 banks, we don't ask every bank every time.  We

21   ask the ones that in our professional opinions, the ones

22   that make sense to include in such a process.

23        So in this case, we actually have more freedom because

24   it is a public process, we're going to go out to a broader

25   audience than we otherwise would.

1    Q    Okay.  So I want to talk about that for just a second.

2    The auctions you conduct are limited auctions, right?

3    A    Right, we don't put it in the newspaper, it's

4    confidential.

5    Q    Right, it's confidential, right?

6    A    Correct.

7    Q    So there's a different process that you go through with

8    respect to potential bidders, right?

9    A    It's easier.

10   Q    So you've never offered an opinion on whether auction

11   procedures in any auction are designed to maximize -- to

12   attract the maximum number of bidders, right?

13   A    Generally, the more people that come to the party

14   should drive the highest price.

15   Q    I completely agree, and that's exactly my goal.  I want

16   to come back to my question one last time, Mr. Boyan.

17   A    Uh-huh.

18   Q    You have never offered an opinion on whether auction

19   procedures are designed to attract the maximum number of

20   bidders?

21   A    Never provided an opinion, no.

22   Q    Never provided an opinion on whether auction procedures

23   are structured to promote active bidding, have you?

24   A    I've never provided such an opinion, no.

25   Q    Now, I want to talk for a minute about the marketing

1    efforts that you described Sandler O'Neill took, undertook

2    from 2009 to this case was filed.

3         In 2009, you started with some smaller transactions

4    trying to develop a capital plan for the bank, right?

5    A    That's correct.

6    Q    In 2010, Sandler O'Neill was seeking to recapitalize

7    the bank, right?

8    A    Correct.

9    Q    And the holding company as well, right?

10   A    Correct.

11   Q    Just to be clear, Mr. Boyan, the debtor here is not the

12   bank.  The debtor is the holding company, right?

13   A    That is correct.

14   Q    That's the bank's parent, right?

15   A    Correct.

16   Q    Now, in 2010, you were marketing a potential

17   recapitalization of the bank and the holding company to

18   financial investors, right?

19   A    That is correct.

20   Q    And those financial investors told you at the time that

21   they'd be interested in doing a sale or acquisition pursuant

22   to Section 363 of the Bankruptcy Code, right?

23   A    That is correct.

24   Q    That was in 2010, right?

25   A    2010 and 2011.

Page 99

1   Q    At that time, those parties who indicated an interest

2   in a 363 transaction, they were financial investors, right?

3   A    That's correct.

4   Q    And when you're talking about financial investors,

5   you're talking about private equity funds, institutions with

6   money, right?

7   A    That is correct.

8   Q    That's different from a strategic buyer like another

9   bank, right?

10  A    That is correct.

11  Q    The financial investors raised the option of a 363 in

12  2010, 2011, Sandler O'Neill did not pursue that option at

13  that time, right?

14  A    We made recommendations to the board as to the variety

15  of options that were available and the board did not select

16  as an option.

17  Q    So Sandler O'Neill didn't market the bank or the debtor

18  pursuant to Section 363 in 2010, right?

19  A    That's correct.

20  Q    Didn't market the bank or the debtor in a Section 363

21  transaction in 2011, right?

22  A    Not until 2012.

23  Q    And the reason that Sandler O'Neill didn't do that is

24  Sandler O'Neill was trying to provide a return to the TruPS

25  and common equity holders, right?

1    A    That's correct.  We felt like the company had some

2    relative franchise value, given its branch structure, and

3    even its mortgage company, and being the largest in --

4    largest independent bank holding company headquartered in

5    Baltimore -- MSA, I should say not in Maryland, in Baltimore

6    MSA, we felt like there was an option where someone might

7    come along and see the value that we saw.

8    Q    And that is value that provides some return to the

9    TruPS holders and common equity holders, right?

10   A    That is correct.

11   Q    In 2011, Sandler O'Neill was pursuing a

12   recapitalization and it had found a lead primary financial

13   investor, right?

14   A    That's correct.

15   Q    That's Priam Capital, right?

16   A    That's correct.

17   Q    And you described earlier on direct examination Priam

18   Capital had been involved in a number of potential

19   transactions involving the holding company and the bank

20   here, right?

21   A    Yes, they are very loyal to the process and the

22   opportunity.

23   Q    They're passionate --

24   A    Yes.

25   Q    -- as you put it, right?

1    A     Yep.

2    Q     Loyal to this bank and the assets that are for sale

3    here, right?

4    A     Yes.

5    Q     That recapitalization transaction did not come to

6    fruition in 2011, right?

7    A     That is correct.

8    Q     So in 2012 Sandler O'Neill marketed the assets of the

9    bank through a Section 363 transaction, right?

10   A     State that again, please.

11   Q     In 2012, Sandler O'Neill marketed the assets here of

12   the bank in a Section 363 transaction, correct?

13   A     That is correct.

14   Q     When Sandler O'Neill went to the market, it had a

15   committed financial investor already, correct?

16   A     That is correct.

17   Q     And that again was Priam Capital, right?

18   A     Correct.

19   Q     When Sandler O'Neill went to the market in 2012 and

20   proposed a Section 363 transaction, it only marketed that

21   transaction to financial investors, right?

22   A     That is correct.

23   Q     In 2012, Sandler O'Neill did not market the bank or any

24   assets to strategic buyers through a Section 363

25   transaction, correct?

1    A    We did market the bank in the fall of 2012 to strategic

2    buyers, we just didn't try to limit what structure they

3    could pursue.  We left it open to the buyers, there is

4    nothing in the bidding instructions provided to the buyers

5    that they had to bid for a 363 structure or not, we left it

6    open, so as to protect the value of the stakeholders, the

7    trust preferred and the common holders.

8         We didn't feel like we needed to judge the situation,

9    we felt like we wanted the buyers to tell us what their

10   interests were.

11   Q    So we're going to get to that marketing in the fall of

12   2012 in a minute, I want to focus on the proposal -- the

13   proposed 363 transaction that was on the table the first

14   half of 2012, okay.  Do you understand that?

15   A    Yes.

16   Q    For that transaction, Sandler O'Neill only marketed

17   that Section 363 to financial investors and not strategic

18   buyers, right?

19   A    Yes.

20   Q    All right.  Now, in the fall of 2012, Sandler O'Neill

21   went back to the market to strategic buyers, correct?

22   A    Correct.

23   Q    At that point in time, Sandler O'Neill sought strategic

24   buyers' view of the value of the assets being sold, right?

25   A    Correct.

1    Q    Sandler O'Neill did not suggest any particular type of

2    transaction, correct?

3    A    We did not.

4    Q    You didn't suggest a recapitalization, a bankruptcy

5    prepack, or a Section 363 sale, did you?

6    A    We did not.

7    Q    And that's because you wanted the strategic buyer to

8    determine the transaction in the hopes of returning some or

9    providing some return to the TruPS and common equity

10   holders, right?

11   A    That's correct.

12   Q    As you put it on direct, you didn't want to pigeon hole

13   the institution, the holding company and the bank by

14   marketing a Section 363 to strategic investors at that point

15   in time in the fall of 2012, right?

16   A    That's correct.

17   Q    Sander O'Neill wasn't able to find a transaction from a

18   strategic investor in the fall of 2012, right?

19   A    We did have someone on the line who wanted to complete

20   the transaction and First Mariner wanted to complete the

21   transaction, we just didn't have that prominent third party

22   that we thought would approve the transaction.

23   Q    Well, I'm talking about the fall of 2012.

24   A    Yes.

25   Q    Right.  And Sandler O'Neill had identified a potential

1    prepack bankruptcy with a strategic buyer, right?

2    A    We did.

3    Q    And the reason that that fell apart is because Frist

4    Mariner terminated those discussions for fear that the

5    transaction wouldn't receive regulatory approval, right?

6    A    That's correct.  We were concerned that the regulatory

7    approval process would take a lengthy amount of time, which

8    could put the company in jeopardy ultimately.

9    Q    So now we're at the first half of 2013, and Sandler

10   O'Neill goes back to market to propose a transaction again

11   with Priam Capital as a committed financial investor, right?

12   A    That's correct.

13   Q    And this proposed transaction was a prepack bankruptcy,

14   right?

15   A    That is correct.

16   Q    And the proposal was only marketed to financial

17   investors at that point in time, right?

18   A    Correct.

19   Q    Now, that transaction was negotiated over the course of

20   a number of months in 2013, right?

21   A    That's correct.

22   Q    Basically the first half of 2013?

23   A    I would agree.

24   Q    The company, the debtor here and the bank, were subject

25   to an exclusivity provision with those financial investors

1    involved in that transaction, right?

2    A    Correct.

3    Q    The company and Sandler O'Neill abided by that

4    exclusivity agreement, right?

5    A    Yes.

6    Q    And that exclusivity agreement meant that the company

7    and Sandler couldn't market for a different or better

8    transaction than the one they were negotiating with those

9    financial investors, right?

10   A    I'm not certain that that is true.  We may have had a

11   carve-out for any buyer that comes in, then we could pursue

12   a transaction with a strategic buyer.

13   Q    If somebody came in and through a proposal in, Sandler

14   O'Neill or the company could negotiate over that proposal,

15   right?

16   A    Yes.

17   Q    But Sandler O'Neill and the company couldn't

18   affirmatively go out and seek a better proposal, right?

19   A    I don't know that that's entirely true, I'd have to go

20   back and look at the confidentiality agreement.  We had

21   numerous confidentiality agreements over the years with

22   various parties, and we were concerned about I think what is

23   your point, is being locked up with one investor or one

24   strategy for a lengthy period of time.

25         So I know that at one point in time, we did make sure

1    that we had the flexibility to pursue a strategic

2    transaction instead of the private equity process, because

3    we were I think at that stage in the overall effort,

4    somewhat jaded by the whole private equity effort.

5    Q    But you continued with this private equity effort for

6    the first half of 2013, right?

7    A    That's true, when you contact 135 potential parties and

8    only one or two stand up, you tend to stick with those.

9    Q    And so you negotiated with the financial investors in

10   2013, but that transaction fell apart as well, right?

11   A    It did.

12   Q    And the reason that that transaction fell apart is

13   because the buyers, the financial investors that included

14   Priam were concerned that the bank would not meet its tier

15   one leverage ratio at the close of the transaction, right?

16   A    Yes, but it was Pinebrook that had the problem, it was

17   not Priam.  I think Priam was okay with the way we were

18   situated.

19   Q    Okay.  So there were a number of financial investors,

20   Priam is one, Pinebrook is another, right?

21   A    Right.

22   Q    And one of those investors, Pinebrook, had a problem

23   with the fact that the bank may not hit its tier one

24   leverage ratio if the deal closed, right?

25   A    They used that as the excuse to get out of the

Page 107

1    transaction.

2    Q    That's what you were told, right?

3    A    Correct.

4    Q    And your understanding, as you said on direct was, the

5    financial investors thought that the bank was going to miss

6    its tier one leverage ratio by 20 basis points, right?

7    A    Correct.

8    Q    How much capital is that, Mr. Boyan?

9    A    That's not a lot.

10   Q    So this financial investor group walked away from a

11   deal over a difference of a small amount of capital, right?

12   A    They used that as their issue.  We think that they had

13   a broader concern about the company and hid behind the issue

14   of missing by 20 basis points.

15        If you look at the earnings of the company, they turned

16   pretty dire at that point.  The mortgage business from time

17   to time was really helping the company, and quickly went

18   from a benefit to a real negative at about the same time

19   they walked away from the 20 basis points, and they said,

20   well, we're walking away because of this issue.

21        We think that in reality, the issue that the company

22   could not make money on an operating basis was really the

23   real issue that they had.

24   Q    So I want to talk about that for a minute.  The company

25   was profitable from late 2011 over the course of 2012,

1   right?

2   A    The company was profitable only 2012, I believe.  And

3   that was a direct result of what we called the refi, the

4   refinance mortgage wave that led to significant earnings in

5   2012, and then I think the company made approximately 16

6   million in 2012, and then went on to lose 16 million in

7   2013.

8   Q    The company was profitable beginning in late 2011 and

9   continuing through 2012, right?

10  A    Okay.  If that's the facts, then you're right.

11  Q    Well, I want to make sure those are the facts, right?

12  A    If you show me the financials, I'll agree with you.

13           MR. BROWN:  Your Honor, may I approach?

14           THE COURT:  With what?

15           MR. BROWN:  To refresh his recollection with his

16  declaration, Your Honor.

17           THE COURT:  Yes, you may show him his declaration.

18           MR. BROWN:  Let the record reflect I'm handing Mr.

19  Boyan Committee Exhibit 6 --

20           THE COURT:  You need to be at the podium, we can't

21  hear you or record if you're standing there and speaking.

22           MR. BROWN:  Yes, Your Honor.

23           Your Honor, let the record reflect that I have

24  handed Mr. Boyan his declaration, Committee Exhibit 6

25  submitted in this matter.

1    BY MR. BROWN:

2    Q    Mr. Boyan, do you have Committee Exhibit 6, your

3    declaration in this matter?

4    A    I do.

5    Q    You recognize it to be the declaration that you signed

6    and was filed at the beginning of this bankruptcy on

7    February 10?

8    A    Yes.

9    Q    Let's turn to paragraph 23.

10   A    Okay.

11   Q    Are you there?

12   A    Yes.

13   Q    You say, "beginning in late 2011 and continuing through

14   2012, F Mar and the bank returned to profitability," right?

15   A    Okay.  Yes, it does say that.

16   Q    Now, after the transaction in the first half of 2013

17   failed, Sandler O'Neill went back to the market in August,

18   right?

19   A    Correct.

20   Q    August 2013, right?

21   A    That is correct.

22   Q    To approximately 24 strategic buyers, right?

23   A    Correct.

24   Q    That was the last widespread marketing effort before

25   this bankruptcy was filed, right?

Page 110

1    A      That is accurate.

2    Q      When Sandler O'Neill went back to those strategic

3    buyers in the fall in August of 2013, Sandler O'Neill was

4    still holding hope for selling the holding company, right?

5    A      Yes.

6    Q      It was hoping for, to use your words, a silver bullet

7    to save the trumps (sic) and the common equity holders,

8    right?

9    A      That's correct.

10   Q      As a result, Sandler O'Neill did not market the bank,

11   the holding company, or any of their assets for sale

12   pursuant to a Section 363 transaction, right?

13   A      As I mentioned earlier, the first 363 transaction took

14   place in December 2010.  Since that time, there'd been just

15   under ten I believe, just round numbers, of 363

16   transactions, so it's become quite a plethora of transaction

17   for -- to distressed companies.  And we know that this is a

18   very efficient market.  You've got an industry that is

19   homogeneous industry, on file call reports with the federal

20   regulators, public companies file a 10Q and a 10K with the

21   SEC.

22        So it's an industry where information travels and can

23   be sorted through very efficiently.  So, you know, going out

24   with a marketing process we wanted the buyers, since we're

25   always dictating to investors or buyers what the transaction

1   may be from time to time, we wanted them to tell us what

2   they thought was going to be the transaction that that

3   particular bank wanted to pursue.

4        In addition, we had new information at 2013 we just had

5   FNB buy Annapolis Bancorp, and then we just had FNB buy

6   Baltimore County Savings Bank.  Now, you've got a brand new

7   player of the market that bought two small community banks

8   on either side of Baltimore, and this bank sits squarely in

9   the middle of that.  We thought that that was a positive

10  development for a potential transaction.

11       Therefore, we were hopeful that FNB could come in, make

12  an offer for the company, keep the capital that the trust

13  preferred represented at the holding company, and then allow

14  them to cut costs to make the company profitable on an

15  earnings run rate basis.

16       So, yes, we were not going to pigeon hole the

17  institution.  We did have conversations.  The word

18  bankruptcy came up, the word 363 came up.  So what we

19  marketed in a typed written confidential memorandum, no way

20  limited the types of discussions we were having with the

21  potential suitors.

22  Q   In August 2013, Sandler O'Neill did not market the bank

23  or the holding company for sale to strategic buyers through

24  a Section 363 transaction, correct?

25  A   We did not put it in writing suggesting that that was

1    the transaction we were seeking.

2    Q    A Section 363 transaction would signal to the market

3    that the common equity holders and the trust preferreds at

4    the holding company would be effectively flushed, right?

5    A    That was a concern.  As I mentioned earlier, a 363

6    transaction can produce results for the stakeholders that is

7    less than optimal.

8    Q    And so Sandler O'Neill never went to the market and

9    inform strategic buyers that the company was considering or

10   would even be willing to entertain a transaction that

11   flushed, stripped the trust preferreds and the common equity

12   holders of any value, right?

13   A    I think your point is, did we have dialogue or were we

14   interested in having the dialogue with strategics that would

15   we entertain a 363 transaction; yes, we did have dialogue,

16   National Penn specifically suggested a 363.  FNB submitted a

17   letter that insinuated bankruptcy without using the words,

18   the only way you could have completed the transaction that

19   they laid out is only through a bankruptcy transaction.  And

20   I think they were just trying to be careful and not trying

21   to pigeon hole themselves in the type of bankruptcy

22   transaction they would otherwise want to pursue.

23        You remember, this is a competitive process, they're

24   submitting a bid at a bid deadline where they're trying not

25   to get eliminated by something that they may say.  So

1    they're not trying to pigeon hole themselves in how a

2    transaction might be executed.

3        So we were quite open to having a dialogue about 363.

4    We did have the dialogue about 363, we were just trying to

5    get people to go from talking to a transaction and getting

6    people to actually document an offer that we could take to

7    the board.

8    Q    In reality, Sandler O'Neill was always trying to get

9    potential investors or acquirers away from a 363

10   transaction, right?

11   A    No.

12   Q    That's not true?

13   A    Not trying to get people away in every instance.  We

14   are just merely soliciting people to present their thoughts

15   on paper.

16   Q    Do you recall being deposed in this matter, Mr. Boyan?

17   A    I did.

18   Q    That was just about a week ago, right?

19   A    That's right.

20   Q    It was by me, right?

21   A    Yes.

22   Q    You were under oath, right?

23   A    Correct.

24   Q    Sworn to tell the truth, right?

25   A    Correct.

1  Q    And you agreed to give -- and there was no reason you

2  couldn't give complete and accurate testimony, right?

3  A    Correct.

4           MR. BROWN:  Your Honor, may I approach with his

5  deposition?

6           THE COURT:  Well, for what --

7           MR. BROWN:  To impeach him.  I'm sorry, Your

8  Honor, to impeach.

9           THE COURT:  Well, why don't you ask him a -- I

10  mean, what are you going to do, show him his deposition?

11           MR. BROWN:  Sorry, Your Honor, I --

12           THE COURT:  You want to ask him about his

13  testimony at the deposition, I'm not following you?

14           MR. BROWN:  No, I'm sorry, Your Honor.  I already

15  asked him whether Sandler O'Neill was always trying to get

16  potential investors or buyers away from a 363.  I understood

17  his answer to be no.  I made sure that was his answer, and I

18  understood it to be no again, that's inconsistent with his

19  deposition, and so I wanted to clarify that or impeach him,

20  but --

21           THE WITNESS:  Could I address that, Your Honor?

22           THE COURT:  I mean, don't you have to ask him

23  about his deposition testimony before you confront him with

24  what is in the transcript?

25           MR. BROWN:  Your Honor, I was going to ask him the

1    question, confront him with his deposition testimony to

2    impeach, because what he said on the stand today is

3    different from what he said in his deposition.

4                THE COURT:  All right.  You may approach, show the

5    witness his deposition.  Has that been marked for

6    identification?

7                MR. BROWN:  It has not, Your Honor.  We'll mark it

8    as Committee Exhibit 13.

9    BY MR. BROWN:

10   Q    Mr. Boyan, this is a copy of your deposition.  Let's

11   turn to page 49.

12   A    Okay.

13   Q    Starting on line 9 through line 21.  I asked you,

14              "They suggested a 363.  You just tried to get them

15   to bring in value."

16        Your answer,

17              "We always tried to get people away from a 363 and

18   say, you know, the reason people wanted to do a 363 is not

19   to have to assume the obligation for the trust preferred,

20   and we never went there.  We said no, come through the front

21   door, buy the holding company, take the whole package, so

22   you, Mr. BB&T, you can take that debt, put it on your

23   balance sheet as tier one capital and that accrues to you as

24   a benefit.  That's not the way they saw it."

25        I asked that question, you gave that answer, correct?

```
 1              MR. O'NEILL:  I object, Your Honor.  This is
 2     improper impeachment.  The excerpt he's using refers to a
 3     particular transaction, and not -- and doesn't refer to his
 4     consistent attitude or approach to the marketing effort.
 5              THE COURT:  Overruled.  You can answer the
 6     question.
 7              THE WITNESS:  We, as investment banker for the
 8     company are always trying to make sure we do the best we can
 9     for the stakeholders.
10     BY MR. BROWN:
11     Q    Mr. Boyan, my simple question, I asked you that
12     question, you gave that answer at your deposition, correct?
13     A    I did give that answer in my deposition, but everything
14     has context, and you're trying to parse words and pigeon
15     hole me on one answer.  We don't -- you know, yes, were we
16     trying to get people not to do a 363, absolutely, right up
17     to the process in the 2013.
18         In our view, a bank holding company would benefit from
19     taking that trust preferred and putting it on its balance
20     sheet.  At that stage, we did not deter people from pursuing
21     a 363 or a prepackaged bankruptcy, and yes, we would've
22     accepted either answer.
23         Now, in the case of National Penn, National Penn
24     specifically stated that they would only have interest in
25     pursuing the opportunity in a 363 transaction.  We met with
```

1    them on August 29th of 2013, we brought them into the bank,

2    we spent hours of management's time to try to implore them

3    that this was a franchise worth their interest.

4        So we pursued National Penn.  We pursued them all

5    through the way through August through September, and they

6    said what, they only want to do a 363.  Why would we pursue

7    them if we weren't ready to do a 363?  We were.

8        We implored them to give us a letter, they continued to

9    refuse.  We went through October, we asked them for a

10   letter, they refused.  Got into November, we receive a

11   letter from RKJS, we asked them again, we get the letter,

12   and it says we're going to do a 363, we go to them, and say,

13   you would be our preferred buyer because you are a bank

14   holding company who has capital, and I can see that it would

15   be, you know, probably a better solution for us and maybe

16   we'd get more value if National Penn were to pursue this

17   opportunity in a 363.

18       So would we prefer that they did a prepack or bought

19   the holding company in a normal M&A transaction, absolutely.

20   Did we fight for our client and the value of their

21   stakeholders, absolutely to the end, because that's what we

22   do.

23       Now, we did open up the door for a 363 after we

24   received the November 8th term sheet from RKJS, and right

25   before signing it, we sent an e-mail to their advisors

1    requesting one more time, will you submit us a letter, and

2    they said no.

3    Q    So, Mr. Boyan --

4    A    Can I finish my answer?

5    Q    Mr. Boyan, my --

6         THE COURT:  You opened the door to this, I

7    overruled the objection, let him complete his answer.

8         THE WITNESS:  So they e-mailed back to us, no, go

9    ahead and sign the term sheet, we don't care about the

10   exclusivity, go on your way.

11   BY MR. BROWN:

12   Q    So that's exactly what I want to talk about, Mr. Boyan.

13   When the RKJS initial proposal comes over, that's November

14   8th, 2013, right?

15   A    Correct.

16   Q    Now, you do agree that Sandler O'Neill did not shop

17   that RKJS proposal in the market, right?

18   A    That's your term using shop, we did talk to FNB and

19   National Penn about doing a 363 after we received the

20   November 8th term sheet.

21   Q    We're going to talk about that in a minute.  You agree

22   in no uncertain terms that Sandler O'Neill did not shop the

23   RKJS proposal in the market, correct?

24   A    Explain what you mean by shop their term sheet.

25   Q    Well, Mr. Boyan, do you not understand what I mean when

1    I ask you whether Sandler O'Neill shopped the RKJS term

2    sheet in the market?

3    A    No, I do not know if you mean did I hand someone else's

4    term sheet to another potential buyer in violation of the

5    confidentiality agreement, no, we don't do that.

6    Q    Well, let's be clear about that, okay.  The company

7    gets a term sheet on November 8th, right?

8    A    Correct.

9    Q    The company is not subject to exclusivity provision

10   starting November 8, right?

11   A    We had an NDA with that party that precluded us from

12   sharing information about one another to third parties.

13   Q    Okay.  But the company and its advisors Sandler O'Neill

14   were not subject to an exclusivity provision with respect to

15   the November 8 term sheet that RKJS sent over, correct?

16   A    No, as I just said in my e-mail with this other party

17   saying we are about to enter into an exclusivity agreement

18   that will preclude us from talking to you, so speak now with

19   a letter, with an offer that we can take to our board, and

20   if you do so, it would be considered seriously by the board,

21   and we are encouraging you to do so.  And they replied, no

22   thank you, sign the term sheet with that other party, we

23   understand you're going to enter into exclusivity, and you

24   know, good riddance.

25   Q    So that exclusivity provision kicks in when the company

1    signs the term sheet on November 21, right?

2    A    Correct.

3    Q    During those two weeks, Sandler O'Neill never shopped

4    the RKJS proposal in the market to see if any other market

5    participant, financial investor, or strategic buyer could

6    provide better terms, correct?

7    A    Your term shop is different than my term shop.

8         So you're asking me forget about how you want to term

9    the question, let's talk about really what happened.  Did we

10   call parties to see if we could get a superior proposal from

11   another party prior to signing this term sheet?  Yes, we did

12   that.  If you want to call that shop, then yes, that's what

13   we did.

14        But when I think of shop, did we put together a big

15   book, write 363 on it, put together a model, send it out, go

16   out to 25, 35, a hundred parties financial and strategics,

17   no, we didn't do that.  We had just done that.

18   Q    Okay.

19   A    We did -- hold it.  We did that.  We went to every bank

20   we could find that would actually talk to us in the fall of

21   2013.  I mean, when you go back to people five times, they

22   start to say, are you in this business, because you've

23   called me five times and asked me that same question, I've

24   said no five times.

25        So asking someone a sixth time whether they want to buy

Page 121

1    First Mariner, whether it's a 363 or a prepack or anything

2    else, you just don't do it.  You go to the people who

3    actually have shown one ounce of interest.

4    Q    Now, the company and its buyers were subject to an

5    exclusivity provision starting November 21, right?

6    A    Yes.

7    Q    That exclusivity provision continued all the way

8    through the company signing the M&A agreement with the RKJS

9    group, right?

10   A    Correct.

11   Q    The RKJS -- excuse me, the M&A agreement with RKJS

12   includes a no shop provision, right?

13   A    Correct, as to every single merger agreement that we

14   sign in an M&A deal.

15   Q    So from November -- the M&A agreement was signed on

16   February 7, right?

17   A    Correct.

18   Q    From November 21 to February 7, the company and its

19   advisors were prohibited, pursuant to that exclusivity

20   provision, from affirmatively seeking a better offer, right?

21   A    You're in this room, because we already talked about we

22   just shopped the company from August to November with zero

23   takers.

24   Q    I just want an answer to my question.  The company was

25   subject to an exclusivity provision from November 21 to

1    February 7, and that meant that it could not seek a better

2    offer than the RKJS proposal, correct?

3    A    We did structure a fiduciary out into the definitive

4    agreement that allowed someone to come in at any point in

5    time in the process and make a superior proposal that could

6    be considered by the board.

7         So these are -- you enter into a contract, you have to

8    give them some assurance that you're going to adhere to that

9    contract, but as a fiduciary you have to think about what

10   you're giving up by entering into that agreement, and we

11   were cognizant of the fact that we might be limiting our

12   ability to go and talk to others, but we did not close the

13   door on that, and with able help from counsel in the room,

14   we were able to structure a fiduciary out that allowed

15   someone to come in at any point in time, make an offer that

16   we would then be able to consider.

17   Q    The company could consider an offer that came in the

18   door, but the company and its advisors could not

19   affirmatively go and seek a better proposal, correct?

20   A    As again, we went to over 135 parties repeatedly over

21   and over and over and over again, there is only one group,

22   one in four and a half years of attempting one transaction

23   or another that showed the passion, that saw the vision,

24   that saw the value of the franchise offered, and spent their

25   own hard earned money on lawyers, accountants, due

Page 123

1    diligence, time, effort, some of these guys quit their jobs

2    and went without pay to pursue this opportunity.

3         Now, in my world, when someone does that, you've got a

4    bona fide party in which you're dealing with.  And when,

5    after all that effort, there's only one party standing, it's

6    pretty easy to figure out, I mean, for me it is, I don't

7    know what you think, but I think one party is pretty easy to

8    figure out.

9              THE COURT:  All right.  Let me stop things here

10   for a moment.  Mr. Boyan, you're being asked questions -- I

11   understand your desire to answer more fully, but you're

12   being asked questions, you need to answer the question.

13   And, Counsel, I'd like you -- I understand the points that

14   you're making, we need to move on here, or we're going to

15   run out of time, and frankly I'm not sure what this cross-

16   examination is really accomplishing.

17             MR. BROWN:  Very well, Your Honor, I'll move on.

18             THE WITNESS:  Understood, Your Honor, I'll be more

19   to the point.

20   BY MR. BROWN:

21   Q    Now, Mr. Boyan, the proposed auction procedures here

22   require a bid deadline that is 30 days from today, right?

23   A    Correct.

24   Q    In your opinion, that's sufficient time for a potential

25   bidder to perform their due diligence, right?

1    A    It was what was required in the term sheet and we

2    acquiesced given the circumstances, and we do believe that

3    it is sufficient time for someone who's serious to come to

4    the table and make an offer, conduct their due diligence,

5    and all the rest.

6    Q    The 30 days of due diligence was required by the RKJS

7    group, right?

8    A    The 30-day period to -- in which to make a bid, yes.

9    Q    And in your view, that time is sufficient based on your

10   experience in M&A deals, right?

11   A    Yes.

12   Q    This, you will agree, is not a traditional M&A deal,

13   right?

14   A    It is definitely different, but the process is the

15   same.

16   Q    Now, in -- you testified on direct, or at least I

17   thought I heard you testify on direct that in M&A deals,

18   potential bidders can perform their due diligence in two to

19   three days; is that right?

20   A    That's correct.

21   Q    In those instances, how current was the loan review

22   from the bank that was subject to the auction?

23   A    For example, Virginia Commerce and United Bancshares,

24   that diligence took place Super Bowl weekend last year 2013.

25   They came in at Friday night at 7 o'clock after employees

1    left, stayed till midnight, reviewing loans, reviewing all

2    the files, financials of the company, regulatory exams,

3    board minutes, and then on Saturday they come back at 7

4    a.m., and they stay till 11 o'clock.  And then on Sunday,

5    they come in and do the same thing, but they leave at 2

6    o'clock, they feel like they've covered everything, and

7    everybody goes home and gets to watch the Super Bowl.

8         So essentially that was two days to do due diligence on

9    a $3 billion bank.  This -- and the loan portfolios, like

10   two and a half billion.  This loan portfolio is 550 million,

11   so in reality, people who understand banks would be able to

12   come in and conduct due diligence in two or three days

13   easily.

14   Q    The total loan portfolio of this bank is 550 million?

15   A    That's approximately it, yeah.

16   Q    Now, you've never offered an opinion on whether 30 days

17   is sufficient for potential bidders to do their due

18   diligence and submit a bit in a 363 auction, right?

19   A    I've never given an opinion.

20   Q    The proposed auction procedures also require a closing

21   deadline of April 30, right?

22   A    That's correct.

23   Q    Okay.  So let's walk through the deadline.  Bids are

24   due 30 days from today if the bid procedures order is

25   entered today, right?

1    A    That's correct.

2    Q    Bids are due April 7, right?

3    A    That is correct, April 6th actually.

4    Q    April 6th is a Sunday, so I think it's April 7, does

5    that sound right to you?

6    A    April 6th or 7th is fine.

7    Q    The auction is five days later, right?

8    A    Correct.

9    Q    April 11 is the auction?

10   A    That is correct.

11   Q    And the sale hearing is a couple of days after that,

12   right?

13   A    I believe the 14th.

14   Q    April 14th, right?

15   A    Assuming that there are over bidders.

16   Q    Right, if there's an auction, there's a sale hearing on

17   April 14, right?

18   A    Correct.

19   Q    And then the -- in order to be a qualifying bid, any

20   competing bidder must include a closing deadline of April 30

21   just 16 days after that sale hearing, right?

22   A    Okay.

23   Q    You agree, right?

24   A    Yes.

25   Q    All of the regulatory approvals must be obtained before

1    a transaction can close, right?

2    A    That's right.

3    Q    And the buyer, whether it's a strategic or a financial

4    investor is the one that has to obtain those regulatory

5    approvals, right?

6    A    That's correct.

7    Q    Now, your hope, Mr. Boyan, is that the regulators would

8    approve an application within 30 days from when it's

9    submitted, right?

10   A    We certainly hope so, yes.

11   Q    So a competing bidder who wins an auction on April 11

12   and then obtains the right to purchase this asset after a

13   sale hearing on April 14th, only has 16 days to obtain that

14   regulatory approval, right?

15   A    That's correct.

16   Q    And if winning bidder can't get that regulatory

17   approval and close on April 30th, the debtor can terminate

18   the agreement, right?

19   A    That's correct.

20   Q    Now, you agree that a closing deadline of April 30

21   restricts the number of potential bidders, right?

22   A    Well, we're not looking for moms and pops, we're

23   looking for sophisticated people who can put 80 to $100

24   million to work and know how to do that.

25   Q    In your view, there's no specific reason that the

1    closing deadline has to be April 30, as opposed to say 15

2    days later, right?

3    A    Well, the RKJS in their term sheet came to us, and they

4    said, this is hard and fast, we're not going to move that

5    deadline so it is April 30.

6    Q    So April 30 is imposed by the buyer group here?

7    A    That's correct.

8    Q    Now, you testified on direct, Mr. Boyan, that it would

9    be harmful to the estate here to extend this timeline,

10   either the timeline for bids to be submitted or the timeline

11   for closing; is that correct?

12   A    That's correct.

13   Q    And you said that one of the reasons is private equity

14   firms are fickle, they could walk away, right?

15   A    That's correct.

16   Q    But here we're talking about financial investors who

17   are committed and passionate and loyal to use your words,

18   right?

19   A    I would use that for -- to -- when I talk about Priam,

20   some of the others, I'm not certain.

21   Q    Well, some of the others in the RKJS group are Rob

22   Kunisch and Jack Steil, right?

23   A    Right.

24   Q    And they've been independent consultants to the company

25   for two years before putting this offer on the table, right?

1   A    They terminated their consulting arrangement with the

2   company I believe it was June or July 2013.

3   Q    And they were consultants with the company for two

4   years before that, right?

5   A    Approximately, yes.

6   Q    Now, the other reason you -- another reason you said

7   that extending the deadline would be harmful is because the

8   balance sheet is projected to decrease, right?

9   A    Correct.

10  Q    That's just a projection, right?

11  A    Right.

12  Q    Now, you also said employees or customers may leave,

13  right?

14  A    Correct.

15  Q    Have you spoken to any employees who are planning to

16  leave?

17  A    I've been in the M&A business in the banking sector for

18  25 years, so United Financial Banking Companies that I just

19  sold to Cardinal Financial closed -- it was announced

20  September 9th and closed in January.  By the time, right

21  after we announced the deal, the senior lender, the chief

22  lending officer left to go to a competitor.  It happens all

23  the time.  That in itself could've killed that transaction

24  and had the buyer walk away.

25  Q    Are you --

1    A    So that is a risk.  It is real and tangible, and I've

2    seen it time and time again where employees don't see the

3    opportunity with the other party, and they receive incoming

4    offers from others, and they leave.

5    Q    Okay.  But to confirm, you're not aware of any

6    employees who are planning to leave this debtor or this

7    bank, correct?

8    A    They have not shared that with me, no.  They don't

9    usually share those sorts of things with us, they just

10   leave.

11   Q    Now, you also testified on direct that the proposed

12   stalking horse bidder fee here is fair and reasonable in

13   your view, right?

14   A    Correct.

15   Q    But as you testified, the stalking horse bidder fee has

16   two components, a break-up fee and an expense reimbursement,

17   right?

18   A    Correct.

19   Q    Now, you've never negotiated a stalking horse bidder

20   fee before, correct?

21   A    No.  I have numerous times negotiated break-up fees,

22   though.

23   Q    But never for an auction or a 363 sale in a bankruptcy,

24   right?

25   A    Correct.

1    Q    You don't know what the market rate would be, for

2    example, for a break-up fee or an expense reimbursement for

3    a stalking horse bidder in a 363 sale, correct?

4    A    I have expertise in negotiating break-up fees in

5    transactions and have a tremendous amount of experience in

6    that frankly, and when you look at the grand total of what

7    someone's financial commitment is, the break-up fee, the

8    expense reimbursement are small in comparison to what the

9    overall commitment really is.

10    Q    But to come back to my question, you don't know what

11    the market rate is for a break-up fee or an expense

12    reimbursement provided to a stalking horse bidder pursuant

13    to a Section 363 sale, correct?

14    A    I feel confident that I -- that this one is reasonable.

15    Q    Now, I want to talk about the recapitalization amount.

16    That RKJS group proposes 85 to a hundred million dollars to

17    recapitalize the bank, right?

18    A    Correct.

19    Q    In order to be a qualifying bid, any competing bid must

20    commit to capitalize or recapitalize the bank in the same

21    amount, right?

22    A    They have to get regulatory approval to do so.

23    Q    That's the key, right?  All you're wanting here is a

24    bid that will obtain regulatory approval, right?

25    A    That's correct.

1    Q    So why not then get away with -- get away from and

2    eliminate the specific recapitalization amount and merely

3    require that a competing bidder provide evidence or

4    information that their bid will sufficiently capitalize the

5    bank in order to receive regulatory approval?

6    A    I believe in the past we've had some people coming at

7    First Mariner that proposed less in a dollar amount to

8    recapitalize the company, you may be familiar with some of

9    those parties, and we don't want to encourage parties that

10   really don't have the ability to either gain regulatory

11   approval or really don't have the money to come forth and

12   recapitalize this company.

13        I mean, you have to be a serious sophisticated party to

14   gain regulatory approval and complete the transaction.

15   Q    But the debtor with its advisors can evaluate a bid and

16   determine whether the competing bidder has the financial

17   wherewithal or the capital backing in order to obtain

18   regulatory approval, right?

19   A    Could you repeat the question please?

20   Q    Yeah.  The debtor, with its advisors, Sandler O'Neill

21   and yourself, can evaluate competing bidders to determine

22   whether those bidders have the financial wherewithal and the

23   capital backing to obtain regulatory approval, right?

24   A    This was just another term of the arrangements with

25   RKJS.  We don't think it's unreasonable, and you know,

Page 133

1    there's only so many things you can negotiate before someone

2    walks away from a transaction, and we were very concerned

3    about having this group walk away if we acted obstinate or

4    difficult in the negotiations.

5    Q    The 85 to a hundred million dollar recapitalization

6    requirement was imposed by the RKJS group?

7    A    Yes.

8             MR. BROWN:  Nothing further at this time, Your

9    Honor.

10            THE COURT:  Redirect?

11            MR. O'NEILL:  I just have a couple.

12                      REDIRECT EXAMINATION

13   BY MR. O'NEILL:

14   Q    First, Mr. Boyan, when Mr. Brown asked you a series of

15   questions about the outside date in the bidding procedures,

16   would you turn to Exhibit 6 -- Exhibit 5 in the exhibit

17   binder?  That's the bidding procedures.

18        Now, you recall that Mr. Brown suggested that the

19   outside date to receive regulatory approval was April 30,

20   2014; is that right?

21   A    Yeah.  Hold on one second.

22   Q    Would you --

23   A    Okay.  So 5?

24   Q    Exhibit 5, yes.  Would you flip to Section 6(d) on page

25   4?

Page 134

1    A    Yes.

2    Q    And read that out loud please.

3    A    "6(d) Closing deadline; the bid shall contain a

4    proposed closing date that is no later than April 30, 2014

5    or such later date as may be agreed by the debtor after

6    consultation with the committee and the over bidder the

7    closing deadline."

8    Q    How likely is it in your view that if the debtor

9    selects an over bidder as the winning bid it would not agree

10   to extend the closing deadline?

11   A    I think if the -- if we evaluate the terms and don't

12   see any undue risk in the structure of the transaction, I'm

13   sure that they would be flexible in extending that deadline.

14   Q    Mr. Brown just asked you some questions about the 85 to

15   hundred million dollar recapitalization amount.

16   A    Yes.

17   Q    Do you have any understanding as to how the 85 to a

18   hundred million dollar recapitalization number was

19   developed?

20   A    We looked at, you know, it's a billion dollar balance

21   sheet, so kind of simple math.  You need at least 75

22   million.  And with this balance sheet, you cannot just get

23   to the minimum.

24        As I mentioned before, you've got a loan portfolio that

25   has embedded losses in the loan portfolio.  You have a

1    balance sheet that is going to -- is not large enough to

2    carry the expense, so your profit potential is negative.  So

3    you're going to have a drain on that capital for some period

4    of time that could be, that could be years before they turn

5    the corner.

6         So you have to have a certain level of cushion to make

7    sure that you stay above that seven and a half percent

8    threshold, not just at the point of closing, but further out

9    into the future.

10             MR. O'NEILL:  I have no --

11   Q    And do you have any understanding, Mr. Boyan, as to

12   whether regulators require such a cushion?

13   A    A minimum is a minimum.  If a regulator is coming in

14   and conducting a regulatory exam and you're right at the

15   minimum, they're going to tell you to raise capital.

16             MR. O'NEILL:  I have no further questions, Your

17   Honor.

18             THE COURT:  Mr. Boyan, I have one question.  I'm a

19   little unclear about your testimony on direct.

20             THE WITNESS:  Okay.

21             THE COURT:  And I don't think this was cleared up

22   in any of the subsequent examination.

23             You indicated that -- I think you indicated that a

24   transaction was announced, I believe you were testifying

25   meaning the RKJS transaction was announced.  At what time

Page 136

1   was the RKJS transaction announced, and what was announced

2   to the public?

3            THE WITNESS:  Well, it wasn't announced publicly,

4   maybe I used the wrong terminology but it wasn't announced

5   publicly until February 7th, when it was -- when they signed

6   the agreement, the merger agreement.

7            THE COURT:  And --

8            THE WITNESS:  I believe that's accurate.

9            THE COURT:  And what was announced at that time?

10           THE WITNESS:  That RKJS would complete a 363

11   transaction subject to filing bankruptcy and completing the

12   transaction, the 363 process.

13           THE COURT:  Were the terms, the general terms of

14   the proposed transaction announced at that time?

15           THE WITNESS:  The merger agreement was filed

16   publicly, so yes, everyone would know the terms of the

17   agreement.

18           THE COURT:  I see, all right, thank you.

19           Do the parties have questions of the witness in

20   light of the Court's questions?

21           MR. BROWN:  No, Your Honor.

22           MR. O'NEILL:  No, Your Honor.

23           THE COURT:  I'm assuming since no one else has

24   approached, that no one wishes to examine the witness.  No

25   one else did.

1          Thank you for your testimony, sir, you may step

2     down.

3          THE WITNESS:  Thank you.

4          THE COURT:  I think we should take a lunch recess

5     at this point.  Are you planning to call more witnesses for

6     the debtor?

7          MR. BRODY:  Yes, Your Honor, so we have one more

8     witness we will be calling.  I understand that the committee

9     has a witness.  Your Honor, I just -- and I appreciate very

10    much Your Honor's flexibility in accommodating my needs, but

11    the way I'm thinking about it, to make sure we try to get

12    finished today, I think we'd like to be finished with the

13    evidentiary record by 4 o'clock at the latest.

14          So I would suggest if we can to -- if we're going

15    to take a lunch break to keep it relatively brief.

16          THE COURT:  All right.  We will take a recess at

17    this point and resume at 2 o'clock sharp.

18          THE CLERK:  All rise.  The Court is in recess

19    until 2 p.m.

20       (Recessed at 1:06 p.m.; reconvened at 2:02 p.m.)

21       (Call to Court)

22          THE COURT:  Yes, sir.

23          MR. SIEGEL:  Good afternoon, Your Honor, Craig

24    Siegel from Kramer Levin on behalf of the debtor.

25          THE COURT:  Yes.

Page 138

1          MR. SIEGEL:  And the debtor would like to call its

2     next witness, Mark Keidel.

3          THE COURT:  All right.  Please come forward, sir.

4     I need you to stand in front of the witness box, raise your

5     right hand, and take the oath before having a seat.

6               MARK KEIDEL, WITNESS, SWORN

7          THE CLERK:  Please be seated.  Please state your

8     full name and address for the record.

9          THE WITNESS:  My name is Mark Keidel.

10          THE CLERK:  I'm sorry, can you spell that, the

11     last name?

12          THE WITNESS:  K-E-I-D-E-L.

13          THE CLERK:  Thank you.

14          THE WITNESS:  And my address is 6313 Farmington

15     Lane, Woodbine, Maryland.

16          THE CLERK:  And your zip?

17          THE WITNESS:  21797.

18          THE CLERK:  Thank you.

19          THE COURT:  Counsel?

20               DIRECT EXAMINATION

21     BY MR. SIEGEL:

22     Q    Good afternoon, Mr. Keidel.

23     A    Good afternoon.

24     Q    Where do you work?

25     A    First Mariner Bank.

```
 1    Q     And how long have you lived in the area?

 2    A     I have lived in the Baltimore area since 1982, I was

 3    born and raised in Maryland -- western Maryland.

 4    Q     Do you hold any positions at the debtor?

 5    A     At the debtor I'm the interim chief executive officer.

 6    Q     And have you held any positions at the debtor prior to

 7    that?

 8    A     Yes, I was chief operating officer from 2009 to 2012,

 9    chief financial officer from 2000 to 2009.

10    Q     And have you held any positions at First Mariner Bank?

11    A     Yes, the same positions.

12    Q     Are you on the board of the debtor?

13    A     Yes, I am.

14    Q     How long have you been on the board?

15    A     Since 2009.

16    Q     Now prior to joining First Mariner in 2000 what

17    experience did you have working in the banking industry?

18    A     I started my career in 1982 here in Baltimore.  I

19    worked for a bank that was known at that time as the First

20    National Bank of Maryland, which is now part of the M&T

21    system.

22              In 1987 I joined Carroll County Bank & Trust

23    Company, which is about a $250 million bank located in

24    Westminster.  That bank formed a holding company in 1992, I

25    believe.  We took that bank public and I became the CFO in
```

1    1992.  It grew up to about a billion two.  We sold that bank

2    in 1999, and I joined First Mariner in 2000.

3    Q    Do you have any college degrees?

4    A    Yes, I do.

5    Q    What degrees?

6    A    I have a B.S. in accounting.

7    Q    From where?

8    A    Boswer State University.

9    Q    Okay.  What assets does the debtor have?

10   A    The primary asset at this some point the equity

11   interest it owns in the bank, First Mariner Bank.

12   Q    Does it have any other assets?

13   A    It has some.  A small cash account, small investment

14   account, and a receivable that's in escrow related to the

15   sale of its interest in Mariner Finance, which took place

16   several years ago.

17   Q    And what operations and employees does the debtor have?

18   A    The debtor really has no operations.  We have named

19   executive officers, myself included and board members, but

20   no operations.

21   Q    And what is the approximate value of the bank's assets

22   today?

23   A    The bank's assets are just under $1 billion.

24   Q    How would you describe the bank's current financial

25   condition generally?

1    A    The bank's condition is troubled.  It's current

2    capitalization category is undercapitalized.  In the past

3    we've been significantly undercapitalized, so one level

4    below that.  We're currently undercapitalized.  And the bank

5    has begun to experience operating losses again.  We lost

6    money in every quarter of 2013 and we lost more significant

7    amounts in the third and fourth quarter of 2013.  So we

8    continue to chip away at the equity of the bank.

9    Q    And just very generally how would you describe the

10   bank's expected financial performance in the near term?

11   A    Well, as was discussed, the bank runs a very

12   significant mortgage operation and that mortgage operation

13   can produce significant swings in revenue, but barring a

14   significant uptick in mortgage banking activities we would

15   expect losses to continue.

16   Q    And how does the bank's financial condition affect the

17   debtor's financial condition?

18   A    Well they're certainly in my mind one in the same as

19   the only operating asset to the degree there's deterioration

20   in the financial condition of the bank, it's going to

21   directly impact the ultimate value of the bank that would be

22   due to the debtor in a sale.

23   Q    How could the bank's current financial condition and

24   its expected future financial performance affect the

25   proposed sale process?

1    A    Well there is a trigger in the merger agreement that

2    does provide for a downward purchase price in the event that

3    tier one equity, as it's defined in the agreement, falls

4    below 29 million.  So any dollar below 29 million is a

5    dollar per dollar impact in the purchase price.

6    Q    And are there any other potential effects that the

7    bank's current and future financial condition could have on

8    the proposed sale process?

9    A    Well, I think any time you have a troubled bank you

10   have a variety of potential risks, including the loss of

11   customers over time, if the negative financial condition

12   deteriorates, loss of employees, perhaps some additional

13   regulatory intervention.  It's hard to say, and I wouldn't

14   want to speculate on that, but it is a possibility.  Again,

15   loss of employees and vendors.  Key vendors, our mortgage

16   vendors who buy our mortgages, we sell -- originate and sell

17   anywhere between 50 million and 200 million in mortgages a

18   month, so if those investors would become concerned they

19   could stop buying those mortgages and that would have a

20   significant impact on the mortgage banking line of business.

21   Q    Okay.  What are the principal elements of the debtor's

22   capital structure?

23   A    Primarily the trust preferred securities, which total

24   about 50.5 million in face amount.  I believe the accrued

25   interest is around 10 million that's currently on the books.

Page 143

1    In addition the company has about 19.7 million shares of

2    common stock outstanding.

3    Q    Now is the debtor currently paying interest in

4    connection with the debentures and the trust?

5    A    No, it is not.

6    Q    Why not?

7    A    In 2008 we elected to begin to defer payments on the

8    TruPS that was allowed under the agreement, it's not in the

9    event of default.  We also did receive a regulatory letter

10   from the Federal Reserve that prohibited us from making

11   payments, and that letter is still in force.

12   Q    When you say it was allowed under the agreement what

13   agreement are you referring to?

14   A    The agreements that govern the payments of interest on

15   the preferreds.  There are a lot of agreements, so I don't

16   remember the particular one.

17   Q    Okay.  And for how long has the debtor deferred paying

18   interest in connection with the debentures and the trust?

19   A    Began in December of 2008 and it has continued till

20   today.

21   Q    And what has been the effect of the debtor's decision

22   to defer these interest payments?

23   A    Well no cash payments were made, so cash -- any cash or

24   resources that were at the holding company remained at the

25   holding company or were ultimately downstream to the bank.

1  Q     And what was the effect of not paying that interest in

2  January of 2014?

3  A     Well the interest was due and payable at that point, my

4  recollection is we did have a cure period, so we did trigger

5  an event of default I believe around February 6th, and we

6  did -- we were sued I believe it was in New York Southern

7  District, there was lawsuit filed for demand payment.

8  Q     When you say the interest was due and payable in

9  January do you mean the accrued interest over the past five

10 years?

11 A     Accrued interest and principal at that point.

12 Q     Okay.  And you testified that a default occurred as a

13 result?

14 A     Yes.

15 Q     May I ask you to take a look at Debtor's Exhibit 4 in

16 the binder that's before you?

17 A     Yes, I have it.

18 Q     Do you recognize Exhibit 4?

19 A     I do.

20 Q     And what is Exhibit 4?

21 A     It is the complaint filed by one of the creditors.  It

22 was filed in New York Southern District.

23 Q     When you say one of the creditors you mean one of the

24 holders of trust?

25 A     Yes.

1    Q    Okay.  And who are the lawyers that filed that lawsuit?

2    A    Kirkland & Ellis.

3    Q    Okay.

4         MR. SIEGEL:  Your Honor, we'd like to move

5    Exhibit 4 into evidence.

6         THE COURT:  Any objection?

7         MR. BROWN:  No, Your Honor.

8         THE COURT:  Very well Debtor's 4 is admitted.

9    (Debtor's Exhibit No. 4 received)

10   BY MR. SIEGEL:

11   Q    You can put that exhibit away?

12   A    Okay.

13   Q    Mr. Keidel, very generally, what effect did the global

14   credit and financial crisis that began in 2007 affect the

15   bank and the debtor?

16   A    Very generally it was pretty broad, but clearly what we

17   experienced was significant distress in residential real

18   estate.  The bank was a significant -- always has been a

19   significant player in the mortgage banking space.  The

20   agreements we had with certain of our mortgage investors

21   required us to repurchase certain loans.  Those loans went

22   delinquent early in their -- early in their origination, so

23   we were required to repurchase a significant number of

24   loans.  Wound up those loans did not perform so we had to

25   take write downs where collateral had to be liquidated.  So

1    that was a significant impact.

2           We were a significant real estate investor on

3    residential real estate, an originator, so again, as

4    residential real estate customers began to default people's

5    equity got upside down, some customers walked away, some

6    just could not pay, nonetheless when we had to liquidate

7    collateral those were at lower values.

8           You then had the impact on land development

9    transactions that we had where land development transactions

10   started to go upside down.  Again, many borrowers could not

11   pay and the subsequent write downs on collateral were

12   significant.

13          And then ultimately it spilled over into the

14   consumer and commercial segments where just higher

15   unemployment, distress, and commercial business in general

16   affected customer's ability to pay on those types of loans

17   as well.

18   Q    And how would you describe generally the effect on the

19   debtor's financial -- the debtor's and the bank's financial

20   condition at the time?

21   A    Well it was significant.  We were one of the early

22   entrants into the problems, 2007 is when the real

23   residential real estate meltdown occurred, it caused

24   significantly higher levels of non-performing assets for the

25   bank and that precluded us, I believe, from getting any TARP

1    assistance, so that had a significant impact.  And then

2    subsequent to that of course the operating losses that were

3    triggered by declines in collateral values of bad assets

4    eroded capital, and then ultimately when you can't -- when

5    you can't prove that you're profitable for a period of time

6    you have to take valuations against your deferred tax

7    benefits.  So all of those things hurt the equity of the

8    bank.

9    Q    How did the bank's regulators respond to those

10   problems?

11   A    Well again, you know, one of the more significant

12   problems was we did not get TARP, and that was a significant

13   blow to the institution.  It's not an excuse, but it was a

14   significant event.

15           In addition, because of the higher level of non-

16   performing asset and the deteriorating capital, we did enter

17   into a cease and desist order in September 2009.  Primary

18   components of that agreement were to raise capital and

19   reduce non-performing assets.  Those were the two primary

20   provisions.

21   Q    Did the Federal Reserve board take any action in

22   response to --

23   A    They did.

24   Q    -- the problems you described?

25   A    They did.  November we signed a similar agreement with

Page 148

1   the Federal Reserve to increase capital levels and improve

2   operations.

3   Q    Now in response to the cease and desist order and the

4   agreement with the Federal Reserve board and the problems

5   you described the debtor hired Sandler O'Neill to help

6   recapitalize and market the company, right?

7   A    Correct.

8   Q    And Mr. Boyan testified about the marketing efforts,

9   the recapitalization efforts that the debtor and Sandler

10  O'Neill undertook?

11  A    Correct.

12  Q    All right.  Very generally, how would you describe the

13  recapitalization and marketing efforts that you, the bank,

14  the debtor, Sandler O'Neill, undertook over the past four

15  plus years?

16  A    I think they were pretty broad and extensive.  We began

17  that in 2009 with hiring Sandler O'Neill, we did complete

18  the sale of our finance company within a year of that, we

19  also completed the secondary offering.  Those two items

20  contributed about 21 million to the bank in additional

21  capital.

22         We also did a debt exchange where certain insiders

23  purchased debt.  Some exchanged for common equities.  So

24  that helped improve the capital structure at the holding

25  company.  And we had hoped that that would create a little

Page 149

1    better marketing opportunity in terms of marketing

2    particularly common stock in the bank.

3            I believe we also attempted a tender offer, I want

4    to say in 2011 on the trust preferred securities.

5            And then, you know, clearly we had about a four-

6    year period of a variety of transactions either intended to

7    increase capitalization at the holding company over the bank

8    or a sale of the bank.

9    Q    Was there ever a time since October 2009 when you were

10   not actively engaged in trying to market, sell, or

11   recapitalize the bank of the debtor?

12   A    No.  I believe there was maybe 60 days when we weren't

13   working on an active, written offer or proposal in four

14   years.

15   Q    And prior to the M&A agreement that's before the Court

16   now none of those efforts succeeded other than the small

17   capital raises you talked about?

18   A    Yeah.  Those efforts succeeded to some degree, but they

19   clearly were not enough to overcome the downdraft we had an

20   capital caused by the financial conditions at the time.

21   Q    Now as of the petition date does the bank meet the

22   regulator's minimum capital requirements?

23   A    No.

24   Q    Who's been the primary point person at the debtor and

25   the bank for communicating with the regulators?

```
1    A    I have been.

2    Q    And how frequently have you communicated with the

3    regulators?

4    A    Beginning with the cease and desist order back to

5    September 2009, we generally have weekly calls with all

6    three regulators, the (indiscernible - 00:16:11)

7    commissioner of financial regulation, the FDIC, and the

8    Federal Reserve Bank of Richmond.  There are periods of time

9    when we don't have those calls, but those are usually when

10   the regulators are on cite doing a regular safety and

11   (indiscernible - 00:16:24) examination, we'll suspend those

12   calls.  But generally there's either -- they're either on

13   site or we're communicating at least weekly.

14   Q    What could the regulators do if the bank continues to

15   fail to meet the minimum regulatory capital requirements?

16   A    Well in general the regulators have very broad powers.

17        Again, I wouldn't want to speculate on, you know,

18   what they will do, but they have very broad powers and can

19   intersee (sic) or trigger a receivership under a variety of

20   conditions.

21   Q    Now in November of 2013 the debtor received a proposal

22   from the stalking horse, correct?

23   A    Correct.

24   Q    And what did you and the board do in response to

25   receiving that proposal from the stalking horse bidder?
```

Page 151

1    A     Well we certainly received it.  I recall, you know,

2    certainly distributing the proposal to the full board, to

3    our advisors.  We had a fairly quick board meeting to

4    discuss it.  The board directed the advisors to continue to

5    pursue and further negotiate the term sheet.

6    Q    Was the term sheet executed?

7    A     It was negotiated, eventually a term sheet was executed

8    I believe November 21st.

9    Q    And what did you and the board do after the term sheet

10   was executed, generally?

11   A     Generally the board certainly directed me to support

12   diligence efforts, because there was some additional

13   diligence efforts that were required by some of the

14   investors, so we certainly wanted to support that.

15           In addition the board instructed its advisors to

16   further negotiate the definitive agreement as well as the

17   related bankruptcy provisions.  We primarily relied on our

18   advisors to take care of those negotiations.

19   Q    And when was a definitive agreement entered into by the

20   debtor?

21   A     I believe it was February 7th.

22   Q    Now on behalf of the debtor who directly participated

23   in the negotiations with the representatives of the stalking

24   horse bidder over the M&A agreement, the bid procedures, et

25   cetera?

1    A    It was primarily our corporate counsel, which

2    Kilpatrick Stock & Townsend (sic).  Certainly Kramer Levin

3    participated in terms of the bankruptcy process and

4    procedures, and Sandler O'Neill also participated.

5    Q    And did you directly participate in the negotiations

6    with the stalking horse bidder over any of the aspects of

7    the M&A agreement, including the bidding procedures?

8    A    Not directly.

9    Q    Okay.  And to what extent did your advisors report back

10   to you and the board about the negotiations with the

11   stalking horse bidder?

12   A    My recollection is there's a period of -- in that two-

13   month period there were several meetings, various calls to

14   discuss where we were on the transaction, it was clearly a

15   period of time where one of the investors in the original

16   proposal fell out so we were updating the board on the

17   substitute investor, talked about key provisions, where we

18   were in the process.

19          So there was a regular dialogue in communications

20   and updates both written and verbal that were presented to

21   the board.

22   Q    And based on what was reported to you how would you

23   describe the negotiations with the stalking horse bidder?

24   A    I'd characterize the feedback that came back to me as

25   spirited, lively, contentious some times, but I think

1    everybody shared a common goal of getting to a -- getting to

2    a deal and getting the bank recapitalized.

3    Q    Now with the proposed M&A agreement or transaction

4    resolve the bank's unmet capital requirements?

5    A    I believe it will.

6    Q    Do you believe that the contribution of the

7    recapitalization amount, which is provided for in the M&A

8    agreement, provides a benefit to the debtor and to the

9    estate?

10   A    The value of the recapitalization amount?

11   Q    Well, let me restate the question.

12   A    Okay.

13   Q    Do you believe that the contribution of the

14   recapitalization amount provides a benefit to the debtor and

15   to the estate?

16   A    It does.  One can't happen without the other.  If

17   there's no recapitalization then there's obviously no

18   purchase price to the debtor, so.

19   Q    Did the debtor's board approve the M&A agreement?

20   A    Yes.

21   Q    And when did the board do that?

22   A    We had a board call I believe on February 6th.  I think

23   the board gave authorization to its advisors to further

24   negotiate a few pieces and we signed the agreement on the

25   7th is my recollection.

```
 1    Q     May I ask you to look at Debtor's Exhibit 3, which is
 2    in the binder in front of you.
 3    A     I have it.
 4    Q     And what is -- do you recognize Debtor's Exhibit 3?
 5    A     I do.
 6    Q     And what is Debtor's Exhibit 3?
 7    A     These appear to be the resolutions that were provided
 8    to the board and that the board approved.
 9    Q     Okay.  Did you -- did you sign the resolution?
10    A     I did.
11    Q     Did all the other board members sign the resolution?
12    A     To my knowledge, yes.
13    Q     So it was adopted unanimously?
14    A     Yes.
15    Q     In deciding whether to approve the M&A agreement did
16    the board discuss the terms of the agreement?
17    A     There were discussions.  Again, the board received all
18    of the documents.  In addition the board received summaries
19    of the key points of the document.  At the board meeting on
20    the 6th those documents were discussed in more detail.  I do
21    recall, you know, some questions -- maybe not specifically
22    -- but some discussion around certain provisions.
23          So there was a -- there was significant review and
24    discussion of the materials and the provisions.
25    Q     And in deciding whether or not to approve entering into
```

```
 1    the M&A agreement did the -- did the board consider the M&A
 2    agreement as a whole and not just its individual terms?
 3    A    Yes.  You know, we've done a lot of different proposals
 4    and transactions, and our experience is that, you know, you
 5    never get everything you ask for, everything has to be
 6    negotiated.
 7              Were there points in the agreement that weren't
 8    ideal?  Sure, but at the same time I think the overriding
 9    desire and the lack of another transaction to get something
10    done was important to the board.  I think the
11    recapitalization was important.  The uncertainty surrounded
12    the deferral period extension was a significant concern for
13    the board and potential negative publicity.
14              So yes, the agreement was looked at as a whole.
15    Certain individual provisions were discussed from time to
16    time and I know were negotiated, but you have to look at
17    this I think as a whole.
18    Q    Are you a creditor of the debtor?
19    A    I am.
20    Q    What is your interest as a creditor of the debtor?
21    A    My face amount is 600,000.
22    Q    And are you aware whether other board members also own
23    TruPS?
24    A    Yes, I believe 8 of the 11 directors own trust
25    preferred securities.
```

1    Q    And in this resolution, which is Debtor's Exhibit 3,

2    does the resolution accurately describe the reasons why the

3    board decided to enter into the M&A agreement?

4    A    I believe so.

5            MR. SIEGEL:  No further questions at this time,

6    Your Honor.

7            THE COURT:  Cross-examination.

8            MR. SIEGEL:  Oh, I apologize, Your Honor, I forgot

9    to call to Debtor's Exhibit 3 into evidence.

10           THE COURT:  Is there any objection to 3?

11           MR. BROWN:  No, Your Honor.

12           THE COURT:  Very well, Debtor's 3 is admitted.

13       (Debtor's Exhibit No. 3 received)

14           THE COURT:  Cross-examination of this witness?

15           MR. BROWN:  Yes, Your Honor.

16       (Pause)

17           MR. BROWN:  Judson Brown for the creditors'

18    committee, Your Honor.

19                    CROSS-EXAMINATION

20    BY MR. BROWN:

21    Q    Good afternoon, Mr. Keidel.

22    A    How are you?  Good to see you again.

23    Q    I want to talk to you about the terms of the RKJS

24    proposal on the table, okay?

25    A    Okay.

1    Q    RKJS as agreed to pay a purchase price for the debtor's

2    equity interest in the bank, right?

3    A    Correct.

4    Q    That purchase price is 4.775 million, right?

5    A    I believe so.

6    Q    Now that price is subject to a potential reduction,

7    right?

8    A    Correct.

9    Q    It will reduce on a dollar for dollar basis for every

10   dollar that the bank's tier one equity amount drops below

11   29 million, right?

12   A    Right.

13   Q    The purchase price is not subject to an increase,

14   right?

15   A    That's correct.

16   Q    So if the bank's tier one equity amount goes up the

17   purchase price doesn't go it, right?

18   A    That's correct.

19   Q    But if the bank's tier one equity amount drops to

20   28 million, for example, the purchase price would drop by

21   $1 million, right?

22   A    That's correct.

23   Q    Now you said on direct that the debtor is projecting

24   that its equity is eroding and the tier one capital -- tier

25   one equity amount is dropping, right?

1    A    Correct.

2    Q    Those are projections, right?

3    A    Correct.

4    Q    Now the purchase price here, the ultimate purchase

5    price paid is only below the 4.775 million that RKJS has

6    proposed if there's no competing bid, right?

7    A    Correct.

8    Q    Now if the parties to an ultimate agreement -- an M&A

9    agreement, whether it's RKJS or another competing bidder who

10   wins at auction, if they're ready to close but regulators

11   have not granted approval for the transaction the deal

12   cannot close, right?

13   A    That's correct.

14   Q    But the purchase price is still subject to a reduction,

15   right?

16   A    Under the existing agreement, yes.

17   Q    There's no -- for example, Mr. Keidel, there's no

18   freeze on the downward adjustment in the purchase price if

19   the parties are ready to close they're just merely waiting

20   on the regulators, right?

21   A    That's right.

22   Q    So if the regulators take four months to approve a

23   transaction the purchase price may be zero, right?

24   A    That's possible.

25   Q    Through no fault of the debtor or the winning bidder,

1     right?

2     A     That's possible.

3     Q     And that was a term imposed by RKJS, right?

4     A     The purchase price adjustment, yes, that was introduced

5     later in the transaction is my recollection.

6     Q     Under the auction procedures here, Mr. Keidel,

7     potential bidders have 30 days to do their due diligence and

8     submit a bid, right?

9     A     That's right.

10    Q     So in those 30 days they've got to review the bank's

11    financial operations, right?

12    A     Yes.

13    Q     That would include reviewing the bank's loan portfolio,

14    right?

15    A     Correct.

16    Q     Were you in the courtroom earlier when Mr. Boyan said

17    that the bank's loan portfolio is about 550 million?

18    A     Yes.

19    Q     Is that correct?

20    A     It's 566- today.

21    Q     Pretty exact.  Thank you.

22          So of that 566- how much is the commercial loan

23    portfolio?

24    A     I don't have the exact number.  It's slightly under

25    300 million is my recollection.

1    Q    It's about 300 million?

2    A    Correct.

3    Q    A little more than half of the entire portfolio?

4    A    Yeah, it's about right.

5    Q    Okay.  The commercial loan portfolio was last reviewed

6    by a third party two years ago, right?

7    A    That was my recollection.  I believe it was February of

8    2012.

9    Q    So any competing bidder would certainly need to do

10   diligence and refresh that review of the commercial loan

11   portfolio, right?

12   A    I would think so.

13   Q    Now the RKJS group includes a number of financial

14   investors, right?

15   A    Yes.

16   Q    One of them is Prime Capital, right?

17   A    Yes.

18   Q    Prime Capital has considered and been involved in four

19   potential transactions involving the debtor here, the

20   holding company, and the bank, right?

21   A    Yes.

22   Q    Over the course of the past three plus years?

23   A    Four years.

24   Q    So Prime began doing its due diligence in 2011, right?

25   A    Yes, early 2011.

1    Q    At that time in early 2011 Prime did several months of

2    due diligence, right?

3    A    That's my recollection, yes.

4    Q    About three months or so, right?

5    A    Two to three months, yeah.

6    Q    And then in the next two transactions that Prime

7    Capital considered it did further due diligence, right?

8    A    It did.

9    Q    And then Prime Capital submits a proposal here and the

10   parties sign the term sheet on November 21, right?

11   A    Right.

12   Q    Prime does still more diligence, right?

13   A    Right.

14   Q    Mr. Keidel, if the RKJS group were willing to agree to

15   additional time for a competing bidder to perform due

16   diligence and submit a bid you'd be okay with that wouldn't

17   you?

18   A    It's possible if there's, you know, significant benefit

19   to that competing bid.

20         I would think in this case, given who might be

21   interested at this point, you know, it's likely to be a

22   sophisticated investment group or a strategic, generally

23   they can do diligence more quickly.

24   Q    So if the -- if the buyer group here were willing to

25   agree to 45 or 60 days for a potential bidder to perform

Page 162

1    their due diligence you wouldn't be okay with that?

2    A    I would think we would consider that, yes.

3    Q    The proposed auction procedures here also require a

4    closing deadline of April 30, right?

5    A    Correct.

6    Q    Now the debtor and the competing bidder can agree to a

7    later closing deadline, right?

8    A    Yes.

9    Q    But as currently constituted the auction procedures

10   require a competing bidder to include a closing deadline of

11   April 30 in order to submit a qualifying bid, right?

12   A    Yes, unless the closing date is extended -- can be

13   extended.

14   Q    Unless the debtor agrees to extend it, right?

15   A    Right.

16   Q    The debtor hasn't currently agreed to extend the

17   closing date has it?

18   A    No.

19   Q    So all of the regulatory approvals have to be obtained

20   before a closing can occur, right?

21   A    Yes.

22   Q    A competing bidder at an auction might not know it

23   actually wins the auction until April 14 at a sale hearing,

24   right?

25   A    That's correct.

1    Q    And so that competing bidder then only has 16 days to

2    obtain regulatory approval and close this transactions,

3    right?

4    A    Yes, unless that deadline is extended.

5    Q    Now based on your experience in the industry you

6    anticipate that here it could take 30 to 60 days to obtain

7    regulatory approval, right?

8    A    In what I would consider to be a traditional situation

9    where you have, you know, a healthy institution acquiring

10   another healthy institution, yes.

11   Q    Now, Mr. Keidel, there's no material difference between

12   a closing of -- a closing date of April 30 and May 10th, for

13   example, right?

14   A    No, that -- my understanding of the agreement is that

15   the issue would be, you know, potential further

16   deterioration of the company and the risk that that would

17   cause.  Anything that would result in the purchase price

18   reduction, which I think you would trigger the next month's

19   measurement I believe somewhere around May 15.  And then of

20   course there's always the risk that the stalking horse

21   bidder, you know, would pull out of the transaction.

22        But in terms of just the raw financial impact, no,

23   there wouldn't be a material difference until you triggered

24   a new measurement date for the purchase price.

25   Q    Which comes around May 15, right?

```
 1    A     That's my recollection.

 2    Q     Now the only material difference between a closing

 3    deadline of April 30 and May 30 is the potential financial

 4    impact on the purchase price, right?

 5    A     That's -- that's the primary.  There are other risks

 6    and they're similar to the risks I mentioned concerning the

 7    board's concern to move the transaction.  That's risk of the

 8    customer base and some other risks that, you know, loss of

 9    key employees.  So those are risks there.

10    Q     Okay.  So the risks that you identified separate and

11    apart from the downward price adjustment are the loss of

12    customers, vendors, and key employees, right?

13    A     Yes, and I guess you'd have to consider the possibility

14    that the stalking horse bidder would -- would leave the

15    transaction and then you have the risk of non-closure at

16    that point as well.

17    Q     With respect to the loss of customers and vendors do

18    you have any information or indication that any customer or

19    vendor would leave if the closing deadline were extended 30

20    days?

21    A     I don't have any specific evidence of that.  I can tell

22    you that the board and myself are always concerned that, you

23    know, with time there's the potential for an event and a PR

24    event that may trigger more activity in the deposit

25    withdrawal of the company.  You don't know what that is.
```

```
 1   Q    You just don't know do you?

 2   A    You don't.

 3   Q    And similarly you don't have any evidence or

 4   information that any key employees would leave if the

 5   closing deadline were extended 30 days?

 6   A    I don't have any direct information, but I have a

 7   concern.

 8   Q    Now, Mr. Keidel, you will agree with me that there's no

 9   material difference between a closing deadline of April 30

10   and June 15, right?

11   A    Again, other than the things that I've mentioned and

12   the concerns that we've mentioned, you know, the other

13   risks, you know, potential regulatory intervention and so

14   forth.  It's hard to say, you'd be speculating.  But your

15   real issue is the downward purchase price and the other

16   risks that I've talked about, and I do think the longer it

17   takes, my experience has been after four years, time to due

18   diligence can work in your favor, but generally investors

19   find more reasons not to do the deal or to find reasons to

20   back away from the deal.

21   Q    But even if the time to do due diligence is not

22   extended the bid deadline -- excuse me -- the bid deadline

23   remains 30 days from when the bid procedures order is

24   entered, the closing deadline could still be extended to

25   provide a potential competing bidder the knowledge that
```

1    they've got more time to obtain regulatory approval, right?

2    A     That would be true, yes.

3    Q     Now if the RKJS group was willing to extend the closing

4    deadline by 30 days, 45 days, would that be acceptable to

5    you?

6    A     I would think so, but I think we would -- we --

7    certainly if there were not a bid or an auction that took

8    place we would encourage and want to have the quickest

9    possible close we can have, really under any scenario.

10   Q     You want to close quickly but you want to find a -- the

11   highest and best value for the estate, right?

12   A     Correct.

13   Q     And so if extending the closing deadline by 30 or 45

14   days would maximize bidding activity and attract bidders you

15   would be okay with that, right?

16   A     We would, but we definitely would want to make sure

17   that the bidder was qualified, could receive regulatory

18   approval, and again, was not a threat to the stalking horse

19   walking away from the transaction.

20   Q     And you can evaluate whether a bidder has the financial

21   and regulatory capability to close a transaction based on

22   information they provide in a bid, right?

23   A     Generally, yes.  There's no certainty.  We would

24   certainly -- I would expect in this type of scenario that if

25   a regulator had concern about a group we'd hear about it.

Page 167

1    Q    You'd know pretty quick, right?

2    A    I believe so.

3    Q    Now the auction procedures also propose a stalking

4    horse bidder fee that has two components, right?  A break-up

5    fee and an expense reimbursement?

6    A    Yes.

7    Q    The stalking horse bidder here is entitled to both of

8    those components if it loses out to a competing bidder at an

9    auction, right?

10   A    That's correct.

11   Q    The break-up fee -- the proposed break-up fee is

12   $1 million, right?

13   A    That's correct.

14   Q    Now of that $1 million, 250,000 is paid by the estate,

15   right?

16   A    Yes.

17   Q    Seven hundred and fifty thousand is paid by the bank,

18   right?

19   A    Yes.

20   Q    But the 750,000 that's paid by the bank that still

21   decreases the value of the estate's equity interest in the

22   bank, right?

23         MR. SIEGEL:  Your Honor, we'd like to object to

24   this line of questioning.  I think it goes beyond the scope

25   of the direct.  It's really -- he testified he did not

Page 168

1    directly participate or have knowledge about the

2    negotiations and the discussions of this.  I just think it's

3    beyond the scope of the direct.

4              THE COURT:  Overruled.  You can ask the question.

5    You're using up your time to present evidence in support of

6    your own objection case, but go ahead.

7              MR. BROWN:  I -- believe me, Your Honor, I

8    understand.

9    BY MR. BROWN:

10   Q    Mr. Keidel, the 750,000 that the bank would pay would

11   still decrease the value of the estate's equity interest in

12   the bank, right?

13   A    It's not certain, but you could certainly conclude

14   that.

15   Q    The second component, the expense reimbursement, that's

16   capped at 1.75 million, right?

17   A    Yes.

18   Q    Now this stalking horse bidder fee in aggregate,

19   2.75 million, that's more than 50 percent of the purchase

20   price for the debtor's equity interest in the bank, right?

21   A    That -- that's correct.

22   Q    The stalking horse bidder fee it's not subject to

23   reduction, right?

24   A    No.

25   Q    Now the board approved this stalking horse bidder fee,

1    right?

2    A    Correct.

3    Q    The board didn't ask that Sandler O'Neill shop this

4    stalking horse bidder fee in the market did it?

5    A    I don't -- I don't recall a specific line of

6    questioning from the board about the stalking horse fee in

7    and of itself.  I do recall the board discussing a variety

8    of the bankruptcy provisions that probably included those,

9    certainly talked about maybe some of the bidding milestones,

10   but I don't remember a specific conversation.

11         Again, I think the board tried to look at the

12   agreement in totality, certainly listen to the counsel and

13   advice of its advisors, I think considered the amount of

14   negotiation that was done, and what was likely to happen if

15   we continued to prolong negotiations, which we probably

16   weren't going to get anywhere and more time would erode, we

17   could frustrate the bidders.  I think all those things were

18   considered.

19         So I don't know that each individual -- and I

20   can't remember whether the stalking horse bidder fee was a

21   particular issue -- but collectively many of those issues

22   were discussed.

23   Q    Now you would agree with me that a lower stalking horse

24   bidder fee would likely attract more bidders, right?

25   A    It couldn't hurt I wouldn't think.

1    Q     So if RKJS were to agree to a lower stalking horse

2    bidder fee here you'd certainly take that, right?

3    A     I would think so, I'm a creditor.

4    Q     Now the auction procedures here also require a minimum

5    recapitalization amount, right?

6    A     Yes.

7    Q     And the purpose of that so to obtain regulatory

8    approval, right?

9    A     Yes.

10   Q     Now if the buyer group here, RKJS, were willing to drop

11   the requirement for a minimum recapitalization amount and

12   simply require that a competing bidder provide information

13   that it could obtain regulatory approval you'd take that

14   wouldn't you?

15   A     Yeah, it's possible.  Again, I think you'd have to

16   consider the circumstances, but you would take that I

17   believe, but that set of circumstances is complex where

18   something less than 85 million would recapitalize the bank,

19   it would likely involve a structure that shrunk the bank or

20   something along those lines that would probably have some

21   additional contingencies.

22          So in and of itself would that provision maybe

23   benefit, yes, but again, I think we looked at this in

24   totality when we negotiated.

25   Q     Now you do agree with me, Mr. Keidel, it's possible

Page 171

1    that a strategic bidder, another bank here, could come in

2    and acquire First Mariner Bank, absorb First Mariner Bank,

3    and not have to infuse any capital directly into First

4    Mariner Bank, right?

5    A    That's my understanding.

6    Q    Now there's also an auction procedure requiring a

7    deposit by any competing bidder, right?

8    A    That's my understanding.

9    Q    And there's three components to that deposit, right?

10   The bid -- the overbid increment of $150,000, right?

11   A    Right.  Right.

12   Q    The stalking horse bidder fee of 2.75, right?

13   A    Yes.

14   Q    2.75 million, I'm sorry.  Right?

15   A    Right.

16   Q    And then the outstanding DIP obligations in the amount

17   that the debtor expects to draw on the DIP, right?

18   A    That's my understanding, yes.

19   Q    And the DIP is a $2.5 million DIP, correct?

20   A    Could be.

21   Q    So --

22   A    Depending on what's drawn.

23   Q    -- a competing bidder has to submit a deposit of almost

24   five and a half million dollars when you add those together,

25   right?

1    A    That's correct.

2    Q    That's more than the proposed purchase price for the

3    debtor's equity interest in the bank, right?

4    A    That is correct.

5    Q    The stalking horse here, the RKJS group, they have not

6    made a deposit, right?

7    A    Not to my knowledge.

8    Q    And they're not required under the M&A agreement or the

9    auction procedures to make a deposit, correct?

10   A    Not to my knowledge.

11            MR. BROWN:  Nothing further at this time, Your

12   Honor.

13            THE COURT:  Redirect?

14            MR. SIEGEL:  Yes, Your Honor.

15                        REDIRECT EXAMINATION

16   BY MR. SIEGEL:

17   Q    Mr. Keidel, did you hear the beginning of today's

18   proceedings the deal announced on the DIP that there would

19   be no draw on the DIP?

20   A    I believe -- I believe that was my understanding, yes.

21   Q    Okay.

22            MR. SIEGEL:  No further questions, Your Honor.

23            THE COURT:  I have no questions.

24            Thank you for your testimony, sir, you may step

25   down.

1              THE WITNESS:  Thank you.

2              THE COURT:  Any further evidence for the debtor?

3              MR. SIEGEL:  No, Your Honor.

4              THE COURT:  All right.  Committee, you're up.

5              MR. BROWN:  Thank you, Your Honor.

6              Your Honor, Judson Brown for the committee.  The

7       committee calls Christopher Wu to the stand.

8              THE COURT:  If you'd come forward, sir, I'd ask

9       you to stand, raise your right hand, take the oath before

10      you have a seat in the witness box.

11                   CHRISTOPHER K. WU, WITNESS, SWORN

12             THE CLERK:  Please be seated.

13             State your full name, spelling you last name, and

14      your address for the record, please.

15             THE WITNESS:  My name is Christopher K. Wu,

16      spelled W-U.  My address is 215 West 90th Street, Apartment

17      7-C, New York, New York 10024.

18             THE CLERK:  Thank you.

19                     DIRECT EXAMINATION

20      BY MR. BROWN:

21      Q    Mr. Wu, where are you employed?

22      A    The firm of Carl Marks Advisory Group.

23      Q    And what's your position with Carl Marks?

24      A    I'm a partner.

25      Q    What is Carl Marks and your role in this bankruptcy

1   case?

2   A    Carl Marks has been retained as financial advisor and

3   investment banker to the official unsecured creditors'

4   committee.

5   Q    Now, Mr. Wu, are you prepared to offer opinions today

6   regarding the debtor's proposed auction procedures and the

7   prepetition marketing efforts that occurred before this

8   bankruptcy?

9   A    I am.

10  Q    Before we get to those, Mr. Wu, I want to talk about

11  your background for a little bit.

12           When did you join Carl Marks?

13  A    In 2003.

14  Q    What is it that you have done for Carl Marks over the

15  last 10 or 11 years?

16  A    Primarily investment banking work, which I specialize

17  in, and particularly with respect to restructuring, working

18  with distressed companies.  I do M&A, but the majority of

19  the work is restructuring oriented.

20  Q    And what do you mean when you say restructuring

21  oriented?

22  A    Restructuring means dealing with companies that are

23  undergoing various stages of insolvency both out of court or

24  in bankruptcy.

25  Q    What percentage of your work is restructuring oriented,

1    Mr. Wu?

2    A    It depends on the year, but I would say probably three

3    quarters on average.

4    Q    Now how many restructuring and bankruptcy -- excuse me

5    -- bankruptcy proceedings have you been involved in?

6    A    Over 50.

7    Q    I'm sorry?

8    A    Over 50.

9    Q    Fifty?

10   A    Yes.

11   Q    And what sort of work have you done in the

12   restructuring and bankruptcy proceedings, Mr. Wu?

13   A    I've represented debtors, I've represented creditors'

14   committees, I've represented secured lenders, DIP lenders,

15   I've represented other parties in interest in various

16   bankruptcy insolvency proceedings.

17   Q    And what sort of matters have you been involved in in

18   working in, what sort of tasks, Mr. Wu?

19   A    I have assisted debtors go through a 363 sale process.

20   I have assisted debtors go through a plan of reorganization

21   process.  Bankruptcy is an arena where there's lots of

22   transactions and therefore a lot of the work is transaction

23   oriented.  I have helped and assisted creditors maximize

24   value through those proceedings.

25   Q    Mr. Wu, you said you've been involved in Section 363

1    transactions.  How many of those have you been involved in?

2    A    I've been involved in over two dozen Section 363

3    transactions.

4    Q    And what was your role in those more than two dozen 363

5    transactions?

6    A    A lot of it was representing debtors, but also

7    creditors' committees, secured lenders, and other parties in

8    interest.

9    Q    Have you ever been involved in negotiating auction

10   procedures for 363 transactions?

11   A    I have.

12   Q    How often?

13   A    I played a role that was integral in negotiating,

14   formulating, and structuring auction procedures in the

15   majority, if not all, of those two dozen Section 363 cases

16   that I've been involved in.

17   Q    Mr. Wu, have you ever testified as an expert?

18   A    Yes.

19   Q    How many times?

20   A    I have testified over 15 to 20 times in that range.

21   Q    Now, Mr. Wu, has your testimony ever been criticized

22   before?

23   A    Not in my opinion.

24   Q    Well has --

25              THE COURT:  I don't know what that question asks

1    or proves.  Let's -- let's stick to something -- is this

2    witness's qualification to testify as an expert questioned

3    by the debtor?

4              MR. SIEGEL:  It depends on the scope on which

5    they're seeking to qualify him, Your Honor.

6              THE COURT:  So offer up something and let's see if

7    there's an objection and let's move on.

8              MR. BROWN:  I will.  Your Honor, we would offer

9    Mr. Wu as an expert in auction procedures with experience in

10   auction procedures involving bank holding company

11   bankruptcies.

12             MR. SIEGEL:  I'm not sure quite what that means.

13   I think it's easier just to say what I'm going object to.

14             I think they're going to have Mr. Wu offer

15   opinions about matters relating to bank M&A, such as what's

16   required for purposes of conducting due diligence, how long

17   it's going to take, and how quickly regulators might act or

18   not act.  And I don't think you're going to hear any basis

19   to believe that he has expertise in those matters.  But --

20   and I can do a voir dire if you want or we can handle it on

21   the cross.  Probably easier to handle it on the cross,

22   that'll probably be what most of the cross is about.

23             THE COURT:  I'll admit him as an expert to testify

24   as offered, and I'll take the cross-examination as a way to

25   judge how much weight I ought to give his opinions.

```
 1              MR. BROWN:  Thank you, Your Honor.

 2   BY MR. BROWN:

 3   Q    Mr. Wu, do you have any experience in Section 363

 4   transactions involving bank holding companies?

 5   A    I do.

 6   Q    What is -- what is that experience?

 7   A    I previously represented the official creditors'

 8   committee in the Rogers Bancshare Chapter 11, which closed

 9   recently -- or actually it's still pending, but there's a

10   plan on file, and also in the North Texas Bancshares case,

11   which is a Chapter 11 of a bank holding company in the

12   District of Delaware.

13   Q    And what was your role in those two bank holding

14   company bankruptcy matters, Mr. Wu?

15   A    The same as in this matter, which is financial advisor

16   and investment banker to the creditors' committee.

17   Q    Did you testify in those matters, Mr. Wu?

18   A    I did.

19   Q    Did you testify in those matters with respect to

20   auction procedures?

21   A    That was the topic of my testimony in both cases.

22   Q    Now, Mr. Wu, I want to turn to what you did in this

23   case to form your opinions.  Can you briefly describe for

24   the Court what you did?

25   A    I have had the opportunity to speak with Sandler
```

1    O'Neill, I had the opportunity to speak with the debtor's

2    CEO, Mr. Keidel, I have reviewed information in the data

3    room, including prior board presentations, I've also heard

4    testimony in this courtroom earlier, and I've reviewed the

5    transcripts from the depositions of both Mr. Boyan and

6    Mr. Keidel.

7    Q    Now, Mr. Wu, you testified earlier that you formed some

8    opinions.  What are those?

9    A    My opinions are simply twofold.

10            Number one, that the prepetition marketing process

11   in my opinion was insufficient.

12            And number two, the bidding protections being

13   proposed here are onerous and in my opinion don't promote

14   bidding.

15   Q    Now I want to start with the first of those, the

16   prepetition marketing.  You've been in the courtroom and the

17   Court has heard a lot about that, the prepetition marketing

18   efforts here over a number of years.  How was the

19   prepetition marketing insufficient in your view?

20   A    Well certainly it was long and exhaustive, but the

21   period that I'm primarily concerned about is really the

22   three to four to five months leading up to the petition

23   date, and from that perspective I don't believe that the

24   bidders, based on the information that I have and heard,

25   ever marketed a Section 363 sale to both strategic and

1    financial bidders as a whole.

2    Q    Why is that important, Mr. Wu?

3    A    In my experience it's pretty critical at the point of

4    recognizing that a bankruptcy proceeding is eminent and a

5    possibility as a way to resolve the holding company's debt,

6    and therefore the two factors that are critical, in my view,

7    when the banker assisting the company educate the

8    marketplace specifically letting strategic and financial

9    bidders know that a 363 sale is contemplated, and there's

10   two elements that I think are critical in terms of

11   maximizing value in that particular transaction.

12            One is that bidders will then know that the bank,

13   after all this time, can be sold free and clear of the

14   TruPS.  In other words the board is prepared, management is

15   prepared to sell the stock in the bank holding company and

16   possibly impair the TruPS holders and seven pair equity, and

17   that's a very important signal to buyers who have been

18   presented with various types of transactions in the past,

19   all of which we're seeking, and again, there's no -- there's

20   really no fault in First Mariner's efforts to cover the

21   TruPS and the equity, but that -- that didn't intersect with

22   value and that didn't result in a transaction.  So buyers

23   need to understand, oh, I can buy this asset finally free

24   and clear.  That's number one.

25            The other critical point, in my opinion and

1    experience, is that bidders can then be incented to come to

2    the table with bid protections.

3    Q    And why is that important?

4    A    That's important because in a bankruptcy context a

5    stalking horse is then exposed as the floor, and so in

6    exchange for the time and energy to agree to serve as a

7    floor and a platform that encourages bidding stalking horses

8    are conveyed value through bidding protections.

9         And so those are important incentives to get

10   strategic bidders to the table, in particular certainly who

11   are not interested in participating in part of a club of a

12   recapitalization or a financially driven Section 363.  So

13   those are my opinions.

14   Q    Now, Mr. Wu, you heard that RKJS submitted a term

15   sheet, a proposed term sheet on November 8 and a term sheet

16   was executed on November 21.  Sandler O'Neill discussed the

17   proposed terms with two strategic buyers but did not shop

18   that proposal in the market.  Did you hear that testimony?

19   A    I did.

20   Q    In your view was that sufficient marketing of the RKJS

21   proposal?

22   A    Well the testimony I heard even from Mr. Boyan's

23   perspective, and I'm not here to characterize it, but I

24   don't think he felt that it was shopped either, in that he

25   had specifically reached out to two strategic buyers to see

1    if they were interested.

2            My view is that in order to appropriately shop at

3    the point of entering into an important transaction that

4    this bank has been seeking for over four years and wherein

5    they would be locked up with proposed bid procedures that

6    they need to make sure that this is the best stalking horse

7    transaction they can enter into that will promote bidding.

8            And in my mind going to two buyers is insufficient

9    and it's akin to, you know, letting a couple of bidders know

10   I'm going down the aisle even though, you know, they're on

11   the brink of a transaction.

12   Q    Now, Mr. Wu, you said you had a second opinion with

13   respect to the auction procedures that have been proposed

14   here; is that right?

15   A    Yes.

16   Q    What is that opinion?

17   A    That the bidding protection -- bidder protections as a

18   whole are onerous and don't promote overbidding.

19   Q    Are there any particular terms in your view that are

20   onerous and don't promote overbidding?

21   A    Specifically the expense reimbursement of 1.75 million

22   and the break-up fee of 1 million.

23   Q    Are there any other terms of the auction procedures

24   that would chill bidding in your view?

25   A    The recap requirement is certainly one, and also the

1    outside closing date is very short, as well as the bid

2    deadline.

3    Q    So you mention the break-up fee, the expense

4    reimbursement, the recapitalization amount, the bid

5    deadline, and the outside closing date.  I want to talk

6    about each of those, okay?  And let's start with the break-

7    up fee.

8              In your opinion, Mr. Wu, why is the break-up fee

9    not designed to maximize the number of bidders here?

10   A    In my opinion a break-up fee should (a), obviously

11   compensate a stalking horse for its desire to move forward

12   to capture some value that they're adding to the estate.

13   Really that encouraged bidder 1 million on 4.775 purchase

14   price is too high a percentage, it represents over 20

15   percent, and taken in and of itself is an extraordinarily

16   percentage of the purchase price, in my experience.

17   Q    What -- well, Mr. Wu, you are taking the break-up fee

18   as a percentage of the purchase price for the debtor's

19   equity and not considering the recapitalization amount

20   infused into the bank, right?

21   A    Yes.

22   Q    Why?

23   A    Because the estate and its creditors get no value and

24   there's no distribution to the creditors for any amount of

25   the recap amount whether it's 85 or 75 or a strategic comes

1    in and recapitalizes the bank's subsidiary.

2    Q    Now was there a break-up fee given to a stalking horse

3    bidder in either of the other two bank holding company

4    bankruptcies you've been involved in?

5    A    There was.

6    Q    And what -- in both or in just one?

7    A    In both Rogers and North Texas there was a break-up fee

8    in both.

9    Q    And how does the break-up fee in those bank holding

10   company cases compare to the break-up fee here?

11   A    The break-up fee in the Rogers Bancshare case was

12   4 percent of the purchase price, $640,000 on a $16 million

13   stalking horse price.

14         In the North Texas case the break-up fee was

15   $250,000 on a $7.35 million purchase price.

16   Q    Why is the break-up fee here -- the proposed break-up

17   fee, $1 million, why that problematic in your view?

18   A    It's a problem because over bidders are going to be --

19   and we're not even getting to the expense reimbursement yet

20   -- but over bidders are always going to be $1 million more,

21   they're going to have to pay $1 million more at every

22   successive round of bidding, assuming that we even get a

23   single overbid, and so when buyers look at taken together

24   the bidding protections there's a judgment there as to

25   whether, you know, they can really compete.

1  Q    Now in your opinion, Mr. Wu, what is an appropriate

2  break-up fee here to compensate the stalking horse but still

3  designed to maximize the number of bidders?

4  A    In my opinion the break-up fee should be approximately

5  $125,000.

6  Q    What do you base that on?

7  A    In any view a break-up fee should range in the two to

8  four percent range based on my experience, that's typically,

9  you know, where they are in 363's, and I think that would be

10  appropriate in this case.

11  Q    You also mentioned that you have a problem with the

12  proposed expense reimbursement; is that right?

13  A    Yes.

14  Q    What's the problem there, Mr. Wu?

15  A    Well the problem is 1.75 million again as a percentage

16  of the purchase price, 4.775, is extremely high, and I

17  believe it's over 35 percent and it functions in a similarly

18  bid chilling manner when they're so far above norms that we

19  see in other cases that taken together 35 percent and over

20  20 percent for the break-up fee you're looking at 56 or 57

21  percent of the purchase price as a hurdle, and therefore the

22  next over bidder has to bid 2.75 million plus another 150-

23  initial bid increment required and that will require almost

24  $8 million for the next over bidder to overbid the 4.775

25  floor set by RKJS.

1    Q    Mr. Wu, do you have a view on what an appropriate

2    expense reimbursement cap would be?

3    A    I do, it's 250,000.

4    Q    Mr. Wu, you said the -- the timeline here, the closing

5    deadline and the bid deadline do not maximize the number of

6    bidders here.  Why is that your opinion?

7    A    It's my opinion because there are a lot of things that

8    an over bidder needs to do upon the notice of bid procedures

9    where whatever is decided here today bidders can react to,

10   and we certainly are encouraged that the debtor, with our

11   input, opened up exclusivity late last week or -- yeah, two

12   days -- two, three business days ago, but -- but there still

13   needs to be a full vetting of the marketplace and just

14   signing confidentiality agreements, getting into the data

15   room, spending time with management, if management is tied

16   up with one party, you know, it obviously needs to multi-

17   stream many parties' interests hopefully.  So it's a pretty

18   rapid timeline.  Not to say that some extremely

19   sophisticated parties couldn't meet it, but it's -- it puts

20   more pressure, let's just put it that way, on an over

21   bidder.

22   Q    In your view what should the due diligence time period

23   be and thus the bid deadline?

24   A    I believe ideally it would be 30 days beyond what is

25   proposed to give a fulsome 60 days from what is, you know,

1    from the bid procedures hearing for the bid deadline.

2    Q    You also mentioned an issue with the closing deadline.

3    What's the problem with the proposed closing deadline,

4    Mr. Wu?

5    A    The proposed closing deadline effectively requires, as

6    we heard earlier today, that a bidder needs to achieve

7    regulatory approval 14 days after the sale hearing, and

8    that's yet another hurdle for an over bidder to submit its

9    bid, get approval, and really the issue is the signal to the

10   marketplace that a strategic bidder needs to obtain

11   regulatory approval effectively within 53 days, I believe,

12   which is much more rapid than the other cases that I've been

13   involved in.

14   Q    Well what -- what was the outside closing date in the

15   other -- the proposed outside closing date in the other bank

16   holding company bankruptcies you've been involved in,

17   Mr. Wu?

18   A    So in the Rogers case where the bid deadline was also

19   fairly expedited, but -- and I believe it was 33 days -- the

20   good news was that the outside closing date was

21   approximately, I believe, and I don't have the exact

22   numbers, but around 123 days.

23   Q    What about in North Texas?

24   A    In North Texas the -- the debtor filed its petition

25   similar to First Mariner with a stalking horse under an

1    exclusivity provision, which thankfully was lifted very soon

2    after the petition, six days.

3             So as a consequence, if you include the time from

4    when exclusivity was lifted, the debtors in that case were

5    able to market the assets for approximately a month before

6    the bid deadline, and therefore the bid deadline -- before

7    the bidding procedures hearing -- and therefore the bidding

8    -- bid deadline actually was pretty rapid, inside of I

9    believe it was December 9, 22, so around 17 days.  So I

10   would add approximately 30 days to that.  So around 44, 45

11   days was the time that over bidders could do their due

12   diligence and submit bids.  And from the time of the bid

13   procedures hearing until closing the outside closing date

14   was 70 days.

15   Q    Now you've been in the courtroom today, you've heard

16   testimony that the debtors can extend the closing deadline

17   beyond April 30.  Do you recall that testimony?

18   A    Yes.

19   Q    Is that sufficient in your mind, Mr. Wu, to alleviate

20   any concerns that an April 30 closing deadline will chill

21   bidding activity?

22   A    I think it's very helpful that there's flexibility that

23   a debtor can use its business judgment, and you know, extend

24   it, but that's certainly not in a bidder's control.  Bidders

25   obviously will look at timelines, its own resources, and

1    determine whether pursuing and participating in this auction

2    is worth their while.  And so that's just another factor

3    where they're going to have to use their judgment to say,

4    can we be influential or through no fault of our own we

5    really do all of our work and the debtor still closes, or

6    the stalking horse, which is a possibility, it just -- it

7    just doesn't know.  An over bidder has no way of knowing.

8    So it's a factor.

9    Q    Mr. Wu, you also mentioned an issue with the

10   recapitalization amount.  What's the problem with the

11   required recapitalization?

12   A    So the main issue is simply that a strategic can

13   allocate capital on its own balance sheet, a strategic with

14   a tier one capital ratio of 7 or 8 or 9 or whatever it may

15   be doesn't actually need to stroke that check of $85 million

16   in order to gain regulatory compliance.  You may need to

17   allocate a certain amount of money, you may not need to,

18   it's -- it's really up to the regulator.

19           So it goes to simply in my opinion what would

20   maximize value is a provision that's simply stated to not

21   have that requirement but to simply gain regulatory

22   approval.

23   Q    What is the impact in your opinion of including a

24   requirement that a competing bid itself include a

25   recapitalization amount?

Page 190

1    A    In my opinion that's just another factor for over

2    bidders evaluating the bidding procedures to determine

3    whether this is a process they can get involved in, and to

4    the extent that that capital is available for a strategic

5    bidder so that it could in fact advance it and maybe take it

6    back post-closing I'm not sure that every strategic bidder

7    can do that.

8            MR. BROWN:  Nothing further at this time, Your

9    Honor.

10           THE COURT:  Cross-examination?

11                  CROSS-EXAMINATION

12   BY MR. O'NEILL:

13   Q    Hello, Mr. Wu.

14   A    Hello.

15   Q    Mr. Wu, if I want to bid on this company I have to come

16   up with more than $8 million in cash that goes to the

17   holding company don't I?

18   A    It depends on cash.  I mean in you're a strategic

19   bidder, like I said, you can allocate value on your balance

20   sheet, you might not have to stroke that check.

21   Q    Well, if I'm a financial bidder I've got to come up not

22   just $8 million for the holding company, right?

23   A    Correct.

24   Q    I've got to come up with 85- to $100 million for the

25   bank, right?

```
 1    A     Yes, if you're a financial investor, yes.

 2    Q     So that's an aggregate commitment of $103 million,

 3    right?

 4    A     You're talking about 8 million plus 95- or --

 5    Q     Actually I take it back, maximum, let's say 85-, so

 6    let's say it's an aggregate commitment of 93 million; right?

 7    A     Yeah.  Yes.

 8    Q     And as a percentage of $93 million, $2.9 million is

 9    3 to 4 percent; is that right?

10    A     Something like that.

11    Q     Okay.  Now strategics, a bank, right, that has to --

12    doesn't allocate its capital willy-nilly, right?

13    A     Right.

14    Q     So if they have capital on their balance sheet they

15    can't just -- they don't faultlessly allocate it to one

16    project or another, right?

17    A     Sure, but a bank may have significant excess capital.

18    Q     But they're still allocating the capital aren't they?

19    A     We don't know exactly what kind of allocation.  It's

20    subjective.  It's all based on what a regulator will approve

21    or not approve.  But yes, capital needs to get allocated.

22    Q     Presumably the regulators are fairly careful to make

23    sure that capital is actually allocated aren't they?

24    A     Presumably, it depends on the merger structure.

25    Q     And even in that instance the combination of the cash
```

1    for the holding company plus an allocation of capital, let's

2    say lowest instance $85 million allocation, that's still

3    $93 million either paid and allocated isn't it?

4    A    If that numbers correct.  I think there's some

5    subjectivity to that number.

6    Q    Mr. Wu, you've run one bank M&A process in your career;

7    isn't that right?

8    A    Yes.

9    Q    Just one?

10   A    One M&A process with the insolvency overlay for a

11   community bank, yes.

12   Q    And you heard Mr. Boyan testify earlier, right?

13   A    Yes, I did.

14   Q    And he's -- he's closed more than 50 bank M&A

15   transactions, right?

16   A    I heard a range of 35 to 70.

17   Q    Okay.  But you've only run one?

18   A    Correct.

19   Q    And you did that last year, right?

20   A    Last year.

21   Q    For a community bank?

22   A    Yes.

23   Q    And they retained Carl Marks as an financial advisor?

24   A    Yes.

25   Q    And you provided advice to the board on strategic

1    alternatives?

2    A    I did.

3    Q    And they decided to go with a 363 sale, right?

4    A    That was the direction that we focused on ultimately.

5    Q    And you actually conducted -- you ran a 363 process for

6    that community bank, right?

7    A    Well, prepetition 363 process in order to select the

8    best stalking horse, yes.

9    Q    And you designed that 363 process, right?

10   A    Myself and my colleagues provided advice to the board

11   and the board approved it.

12   Q    And you went out with a 363, the way you've told us

13   should have been done here, you went out expressly seeking a

14   363, right?

15   A    Yes.

16   Q    Okay.  And you marketed it to over 125 investors?

17   A    Yep.

18   Q    Strategic and financial?

19   A    Yes.

20   Q    And you got two indications of interest, right?

21   A    Ultimately, yes.

22   Q    All right.  And then you -- then they got in and they

23   did some due diligence, right?

24   A    Yes.

25   Q    And what happened?

1    A    They were concerned about the bank's financial

2    situation, there weren't adequate reserves, there were

3    significant marks that a buyer would need to take, and they

4    ultimately disengaged for a variety of reasons after they

5    did their due diligence.

6    Q    So -- so neither party submitted a bid?

7    A    Right, and --

8    Q    So --

9    A    -- I think they ultimately had other projects to pursue

10   that were more attractive.

11   Q    So the sale process failed?

12   A    The sale -- we fulfilled our scope, the board asked us

13   to go out and find a stalking horse, and ultimately it was

14   concluded.  We certainly fulfilled the scope and we didn't

15   achieve the objective and the goals.  So I wouldn't say it

16   failed, we just weren't able to, through no fault of our

17   own, secure a stalking horse.

18   Q    So you didn't secure a stalking horse and after that

19   you and the community bank had a mutual parting of the ways?

20   A    Very mutual, and different community banks obviously

21   have different financial conditions, some worse than others.

22   Q    All right.  Okay.  And other than that unsuccessful

23   process for the community bank you've never run an M&A

24   process for a bank or a bank holding company?

25   A    No.

```
 1   Q    And other than that unsuccessful process for the
 2   community bank you've never organized a data room on behalf
 3   of a bank holding company?
 4   A    No, And it's going to be no to all of these question.
 5   The focus really is my experience as in bankruptcy in 363
 6   sales.
 7   Q    Maybe we should change seats.
 8        And other than your unsuccessful process with the
 9   community bank you've never communicated with potential
10   purchasers on behalf of a bank or bank holding company?
11   A    I've communicated them, but the protocol if I'm serving
12   as a financial advisor to the unsecured creditors' committee
13   is for the debtors to do that.
14   Q    Okay.
15   A    So I have communicated, but the sale process protocol
16   is the debtor's role.
17   Q    All right.  You've never represented a potential
18   purchaser of a bank or a bank holding company either, right?
19   A    No.
20   Q    And you've never assisted a potential purchaser of a
21   bank or bank holding company in conducting due diligence?
22   A    No.
23   Q    And you've never represented a potential purchaser of a
24   bank or bank holding company in formulating a bid?
25   A    Correct.
```

1   Q    You've never published any articles concerning banks or

2   bank holding companies?

3   A    I have not.

4   Q    And you don't belong to any bank or bank holding

5   company trade or professional organizations?

6   A    No.

7   Q    Now I think you said that other than your experience

8   with the community bank your experience in the area of bank

9   and bank holdings companies arises from the Rogers

10  Bancshares and North Texas cases; is that right?

11  A    Yes.

12  Q    And those were both bank holding company bankruptcies?

13  A    Correct.

14  Q    Right?  And you represented the unsecured creditors'

15  committee in those cases?

16  A    Yes.

17  Q    Rogers Bancshares was last summer, right?

18  A    Last summer, yes.

19  Q    In Arkansas; is that right?

20  A    Yes.

21  Q    And as FA for the committee there you didn't manage the

22  bank's due diligence process?

23  A    No.

24  Q    That's not typically the committees' role, right?

25  A    No.

1    Q    That's what you were saying before?

2    A    Correct.

3    Q    It's really the debtor's role?

4    A    Yes.

5    Q    So the FA for the committee doesn't really have much to

6    do with that; is that right?

7    A    No, but it's -- you know, we need to evaluate the data

8    room and ask for further information if we think more is

9    warranted or valid.

10   Q    Okay.  And you had some communications with bidders,

11   right?

12   A    Some, yeah.

13   Q    But the protocol that you guys had agreed to in that

14   case was that communications concerning the sale process

15   would run through the debtor's FA, right?

16   A    That's right.

17   Q    I mean that's just the way things are done, right?

18   A    Typically, yes.

19   Q    And you think that's appropriate, right?

20   A    Typically, yes.

21   Q    Okay.  And in -- as the FA for the committee and Rogers

22   Bancshares it wasn't your role to communicate with

23   regulators either, right?

24   A    No.

25   Q    Again, that's the role of the committee -- of the

Page 198

1    debtor, excuse me?

2    A    The role of the debtor, yes.

3    Q    And you were also the committee FA in North Texas,

4    right?

5    A    Yes.

6    Q    And if I asked you the same questions about North Texas

7    I'd get the same answers?

8    A    You'd get all the same answers, yes.

9    Q    In fact in your deposition we looked at some of your

10   time records from North Texas, right?

11   A    You did.

12   Q    Uh-huh.  And there were records from the filing from

13   your retention through the auction, right?

14   A    Yes.

15   Q    And you had recorded I think one hour of time talking

16   to a potential bidder; is that right?

17   A    Yes, and that was in the North Texas case, yes.

18   Q    And zero hours relating to due diligence?

19   A    Yes, but my colleagues were probably more involved in

20   that.

21   Q    Okay.  But you --

22   A    Not me, no.

23   Q    And -- and zero committee -- communicating with

24   regulators, right?

25   A    Zero, yes.

1    Q    Okay.  There are investment banking firms in the

2    country that are widely considered to be experts in the

3    field of banks and bank holding companies aren't there?

4    A    Yes.

5    Q    And Sandler O'Neill is one of them?

6    A    Yes, Sandler is one of them and their expertise is in

7    capital raising and healthy M&A.

8    Q    Okay.  And when you represented the community bank you

9    didn't deal with regulators, right?

10   A    No, that was really the CEO and the CFO's role.

11   Q    Okay.  But you didn't speak to them, the regulators?

12   A    I personally did not speak to the regulator.

13   Q    And you haven't ever worked for a bank regulator?

14   A    No.

15   Q    And you've never represented a potential purchaser of a

16   bank or bank holding company in obtaining regulatory

17   approval?

18   A    No.

19   Q    And so you have no personal experience in obtaining

20   regulatory approval for a purchaser of a bank or a bank

21   holding company?

22   A    I have not done that.

23   Q    And on direct you offered some opinions about the

24   potential timing of regulatory approval --

25   A    Yes.

1    Q    -- of a purchaser, right?

2    A    Yes.

3    Q    That was based on your experience only in Rogers and

4    North Texas?

5    A    Right, and so there's been ten cases approximately of

6    bank holding companies, and I participated in two of those,

7    which is significant, and I base my views having been an

8    active participant in those two cases.

9    Q    But you didn't talk to any regulators in Rogers and

10   North Texas?

11   A    No.

12   Q    And in fact your understanding of the regulatory

13   approval process and Rogers in North Texas was based on your

14   conversations with regulatory counsel; isn't that right?

15   A    Regulatory counsel, debtors, and our own counsel, who

16   is more knowledgeable.

17              So clearly, you know, I'm not a regulatory expert,

18   I have some exposure to it and have participated in M&A

19   processes where regulatory approval is needed.  So I have

20   some experience.

21              MR. O'NEILL:  And, Your Honor, I have some binders

22   with exhibits for cross, can I approach?

23              THE COURT:  Yes.

24   BY MR. O'NEILL:

25   Q    Would you take a look at tab 4 in the binder?  That's a

```
 1    copy of your declaration is it not?

 2    A    Yes.

 3    Q    Would you flip to paragraph 30?

 4    A    Yes.

 5    Q    In paragraph 30 you offer opinions about the amount of

 6    work that's required to -- for bidders to perform due

 7    diligence and prepare binding bids, right?

 8    A    Yes.

 9    Q    And then in paragraph 31 you state:

10         "Given the complex nature of bank transactions the

11    approximately 30-day time frame for competing bidders to

12    conduct due diligence and submit a bid is extraordinarily

13    truncated and likely will discourage bidders and chill

14    bidding."

15         Right?

16    A    Yes.

17    Q    And the experience on which you base these opinions is

18    your experience in the community bank case, right, and

19    Rogers and North Texas?

20    A    Yes.

21    Q    Okay.  There was no auction -- well, strike that.

22         And then turning to paragraph 3 --  33 rather it

23    says:

24         "In my experience and for the reasons stated above

25    an appropriate period for conducting due diligence and
```

1   preparing bid packages in connection with the transactions

2   involving stock and the bank should run at least 60 days

3   from approval of bid procedures to fall within a realistic

4   regulatory approval time frame."

5          Do you see that?

6   A    Yes.

7   Q    And the basis on which you assert that is again the two

8   community banking 363's in which on over bidder participated

9   in that auction, right?  That's Rogers and North Texas in

10  your view?

11  A    Yes.

12  Q    By the way, Rogers and North Texas were not the only

13  bank holding companies in which there was an auction; isn't

14  that right?

15  A    No.  I mean that's correct.  That's correct.

16  Q    There were in fact two others, right?

17  A    There were two others, yes.

18  Q    I think Big Sandy, right?

19  A    Yeah.

20  Q    And Mercantile?

21  A    Right.

22  Q    All right.  Let's talk about Rogers.  You testified

23  concerning the bid procedures in Rogers, right?

24  A    I did.

25  Q    And among the things you testified about was the length

Page 203

1    of the period between the bid procedures order and the bid

2    deadline, right?

3    A    Yes.  There's a lot of things that we -- that I

4    testified on, but among the things was timing.

5    Q    Okay.  But you thought that period was too short,

6    right?

7    A    I did.

8    Q    And the period was about 35 days; is that right?

9    A    Yes.

10   Q    Okay.  And you said it was too short because there's a

11   lot to do, right?

12   A    Yeah.

13   Q    You have to sign an NDA?

14   A    Right.

15   Q    Do your diligence?

16   A    Yes.

17   Q    Get internal approvals?

18   A    Yes.

19   Q    Hire consultants?

20   A    Yes.

21   Q    Meet with management.  Mark up a purchase agreement?

22   A    Yes.

23   Q    And get regulatory approval, right?

24   A    Yes.

25   Q    And you testified that a buyer couldn't reasonably do

1   that in 33 to 35 days, right?

2   A    Yes.

3   Q    And I think your words were that to the extent that I

4   was a third-party bidder and I saw that I had 33 to 35 days

5   to do this I wouldn't even bother; is that right?

6   A    I said that there was a key factor, which was that they

7   had been clearly working with a lot of strategics

8   extensively discussing 363's, but in any case there was a

9   bidder in the courtroom who was ready to go but for the bid

10   showing terms.  So those were positive factors which I

11   didn't know.

12   Q    All right.  But you thought a lot more time was

13   required, right?

14   A    I did.

15   Q    And you told the Court 120 days from the bid procedures

16   order to the bid deadline?

17   A    Yes.

18   Q    Right?  And then -- and you said that that was sort of

19   necessary for the post-petition process to be adequate,

20   right?

21   A    Ideal and adequate, yes.

22   Q    Well but you didn't use the word ideal, right, you used

23   the word adequate?

24   A    Adequate, yes.

25   Q    But you're not asking for 120 days here?

Page 205

```
 1    A    No.

 2    Q    And part of the reason for that is that you're

 3    concerned that First Mariner's tier one capital is

 4    declining, right?

 5    A    I mean there's a trade off in the Rogers case that the

 6    bank was certainly performing better, had tier one capital

 7    in the six percent range, and so this -- First Mariner's

 8    capital ratios are worse and so there's some consideration

 9    to that.

10    Q    But a declining tier one capital ratio justifies a

11    shorter bidder period doesn't it?

12    A    To some extent, yes.

13    Q    Now the court in Rogers didn't actually adopt your view

14    about a 120-day bidding period did it?

15    A    No.

16    Q    In fact it adopted the debtor's view, right?

17    A    Yes.

18    Q    Thirty-three days?

19    A    Yes.

20    Q    And during that -- notwithstanding the fact that there

21    was only 33 days a competing bidder was able to complete due

22    diligence, right?

23    A    Yes.

24    Q    And to submit a binding proposal?

25    A    No, two were, although we certainly hoped that two
```

1    others would have been able to perform, but there was

2    certainly a sense and understanding that management was

3    stressed in terms of managing due diligence for four

4    separate parties at the same time.  So you know, had it been

5    longer I think there was a strong possibility that there

6    could have been more bidders in Rogers.  But that being

7    said, management was able to support the process for two

8    significant over bidders.

9    Q    Nevertheless in 33 days two parties completed due

10   diligence and committed topping bids, right?

11   A    Yes.

12   Q    And there was an auction, right?

13   A    There was.

14   Q    And the purchase price went from 16- to over 50-,

15   right?

16   A    The closing price was 53.6 million, which was a 300 --

17   yeah, a 330 percent premium over the stalking horse price.

18   Thankfully, you know, we were able to reduce the bid

19   protections by over 80 percent, which was a key factor, in

20   my opinion, in promoting that auction.

21   Q    And by the way, there was a no shop in Rogers, right?

22   A    Yes.

23   Q    And it restricted both pre and post-petition marketing?

24   A    It did.

25   Q    And 33 days were still enough to get two competing

Page 207

1    bids, right?

2    A    In that particular case it was, yes.

3    Q    Let's talk about some of the other bank holding company

4    cases.

5         Under the bid order in Capital there were 23 days

6    between the bid procedures order and the bid deadline,

7    right?

8    A    Right, but in Capital Bank Corp., as I understand it,

9    there was no stalking horse.

10   Q    You understand that from counsel; is that right?

11   A    I know that much about that case.

12   Q    Okay.  Your counsel was also counsel in that case,

13   right?

14   A    Actually I never talked to Mr. Seligman about Capital

15   Bank Corp.

16   Q    Anyhow there were 23 days between the bid procedures

17   order and the bid deadline in Capital Bank Corp, right?

18   A    There was, and no over bidder showed up as I understand

19   it.

20   Q    And under the bid procedures order in Mercantile there

21   were 33 days between the entry of the bid procedures order

22   and the bid deadline?

23   A    I assume that's correct.

24   Q    Okay.  And there was an auction in Mercantile, right?

25   A    Yes.

```
 1    Q     There was an over bidder?

 2    A     Yes, as I understand it.

 3    Q     Even though there were only 33 days between the bid

 4    procedures order and the bid deadline?

 5    A     Right, there could have been more.

 6    Q     And in first place there were actually 13 days between

 7    the entry of the bid procedures order and the bid deadline,

 8    right?

 9    A     I assume that's correct.  But no over bidder showed up

10    in that process.

11    Q     Okay.  I mean at your deposition you actually looked at

12    the order, so -- and you agreed with me, right?

13    A     Yes, you showed that -- that to me.

14    Q     And under the bid procedures order in Big Sandy there

15    were 32 days between the entry of the bid procedures order

16    and the bid deadline, right?

17    A     I assume that's correct.

18    Q     And there was an over bidder in Big Sandy, right?

19    A     Yes.

20    Q     And under the bid procedures order in America West

21    there were 27 days between the entry of the bid procedures

22    order and the bid deadline, right?

23    A     I assume that's correct, even though no over bidder

24    showed up in that case.

25    Q     Turn to paragraph 34 of your declaration, and the
```

1    second sentence, please.  Do you see where it says, "Banks

2    are valued based on their capital"?

3    A    Yes.

4    Q    That's your view, right?

5    A    Yes.

6    Q    And what you mean by that is banks are based on the

7    book value of their -- of their equity, right?

8    A    Yes.

9    Q    And all things -- all other things being equal if the

10   bank's capital increases the value of its equity increases,

11   right?

12   A    All other things being equal, yes.

13   Q    Okay.  A recapitalization of the bank, whether through

14   capital infusion or a merger with a strategic acquirer, is a

15   necessary requirement to obtain regulatory approval for this

16   transaction, right?

17   A    I agree with that.

18   Q    So a recapitalization of the bank, whether through a

19   cash infusion or a merger with a strategic acquirer, is a

20   necessary predicate for this transaction, correct?

21   A    Yes.  Yes.

22   Q    On direct you testified that a strategic bidder might

23   be deterred by the April 30 closing deadline; is that right?

24   A    Yes.

25   Q    You thought that the gap between the auction and the

1   April 30 deadline was potentially too short for a strategic

2   to get regulatory approval, right?

3   A     Yes.

4   Q     Or to have comfort that it would get regulatory

5   approval, right?

6   A     Yes.

7   Q     But strategics are by definition other banks, right?

8   A     Yes.

9   Q     So they have lots of contact with the regulators,

10  right?

11  A     They should, yes.

12  Q     And they've already received regulatory approval for

13  their businesses haven't they?

14  A     For their existing business.  A merger is completely

15  different.

16  Q     All right.  I'd like to go back to where we started,

17  that community bank.  That community bank was a holding

18  company -- or had a holding company, right?

19  A     Yes.

20  Q     And the holding company had issued trusts -- TruPS?

21  A     Yes.

22  Q     And the holding company was not in good financial

23  condition was it?

24  A     No.

25  Q     It had negative equity?

1    A    Yes.

2    Q    And it had -- the bank had significant non-performing

3    assets, right?

4    A    Yes.

5    Q    And at the time you were marketing it it wasn't making

6    any money, correct?

7    A    Correct.

8    Q    It sounds kind of familiar doesn't it?

9    A    What's the -- what is the point?

10   Q    All right, never mind.

11            And the bank --

12   A    That bank is not this bank.  This is a different

13   circumstance.

14   Q    All right.  And the bank -- that bank considered a

15   variety of transactions, right?

16   A    Yes.

17   Q    And you tried as hard as you could to sell it, right?

18   A    Yes.

19   Q    You designed the process as best you could, right?

20   A    Sometimes the asset doesn't have the value.  In this

21   case we're very thankful that there's value.

22   Q    That's right.  So you designed a gold-plated 363

23   process in your mind, right?

24   A    No, I think that's the way it should be done.

25   Q    Right.  And you provided everybody with all the

1    information they're required?

2    A    Yes.

3    Q    And you still didn't get a bid, right?

4    A    That happens in M&A, you should ask Mr. Boyan as well.

5    Q    I think Mr. Boyan tried for four years and he finally

6    got a bid, right?

7    A    It really depends on the case.

8    Q    And rather than the bank having nothing it's better to

9    hang onto the deal we have; isn't it?

10    A    In that specific case, yes.  But the key is at the

11    point of going into bankruptcy did you -- did the debtor

12    look at -- did they market check that to make sure that

13    before being locked up under these bid protections did they

14    have the best stalking horse, did they have the right bid

15    protections?

16    Q    Having --

17    A    That's the key.

18    Q    Having spent over four years trying to find a

19    transaction and finally having a buyer --

20    A    In my --

21    Q    -- the last thing this bank should do is let the

22    stalking horse get away?

23    A    And my opinion is, and I agree, we don't want the

24    stalking horse to get away and they should stay in this room

25    and they have a binding agreement like all stalking horses

```
1    do, and if they breach that binding agreement it'll be like

2    any other Chapter 11 case.

3              My main concern is the -- not the first 44 months,

4    but the last 4, the last 3.

5              MR. O'NEILL:  I have no further questions, Your

6    Honor.

7              THE COURT:  Redirect?

8              MR. BROWN:  Briefly, Your Honor.

9                     REDIRECT EXAMINATION

10   BY MR. BROWN:

11   Q    Mr. Wu, you were asked on cross-examination a number of

12   questions about an engagement you had with another community

13   bank, rights?

14   A    Yes.

15   Q    Concerning a -- marketing a 363 transaction, right?

16   A    Yes.

17   Q    And you testified that the circumstances there were

18   different from the circumstances here, right?

19   A    They are.

20   Q    How so?

21   A    That bank did not ultimately have any value for the

22   TruPS, and if there was value the bidders had more

23   interesting better projects to devote its attention to.

24   That was my conclusion.

25   Q    Now, Mr. Wu, on cross-examination you also discussed
```

1   several other bank holding company bankruptcies cases

2   besides North Texas and Rogers, right?

3   A    Yes.

4   Q    In three of those, Capital, First Place, and America

5   West you said there was no over bidder; is that right?

6   A    Yes.

7   Q    Are the auction procedures in those cases informative

8   on what auction procedures should be used to attract the

9   maximum number of bidders?

10  A    Clearly, I mean the fact that no over bidders showed up

11  is unfortunate, and part of that may have something to do

12  with the bid procedures and auction procedures, but I'd have

13  to look at those cases more carefully.  All we can say is

14  that the result was there was no auction in those cases.

15  Q    And you also discussed two cases in which there were

16  auctions, Mercantile and Big Sandy, right?

17  A    Yes.

18  Q    Now in any of these five cases was the outside closing

19  deadline as short as the outside closing deadline proposed

20  in these auction procedures?

21  A    My understanding is that the auction outside closing

22  date in this case is more rapid than any of those other

23  cases.

24          MR. BROWN:  Nothing further, Your Honor.

25          MR. O'NEILL:  I have nothing, Your Honor.

Page 215

1            THE COURT:  I have no questions for the witness.

2            Sir, thank you for your testimony, you may step

3    down.

4            Any other evidence for the committee?

5            MR. BROWN:  Nothing further, Your Honor.

6            THE COURT:  All right.  Anyone else wishing to

7    present any evidence or be heard prior to closing argument?

8            MR. O'NEILL:  Your Honor, can we take a five-

9    minute break?

10           THE COURT:  That sounds like a good idea.  Five

11   minutes.

12           THE CLERK:  All rise.  This court is in recess.

13       (Recessed at 3:44 p.m.; reconvened at 3:53 p.m.)

14       (Call to Court)

15           THE COURT:  We're ready for closing argument?

16           MR. BRODY:  Yes, Your Honor.

17           THE COURT:  Mr. Brody.

18           MR. BRODY:  Thank you, Your Honor.  Again, for the

19   record, Josh Brody from Kramer Levin on behalf of the

20   debtor.

21           Your Honor, I think that when you sort of take a

22   step back and think about all the evidence that's been

23   presented today, you hear a pretty compelling story about

24   how much work and how long a process the debtor ran in order

25   to get where we are with the current deal we have signed up

1    with the stalking horse.

2            And I think I was going to try to weave through

3    some of the evidence without repeating it all obviously.

4    But I think and I'll obviously get to the Committee's

5    specific objections in a second, but I think that it's

6    important again -- and sometimes you can get lost when

7    you're looking at the details to take a step back and think

8    about a few important points overall with respect to the

9    relief that's being sought today.

10           First, at the risk of overstating the obvious, the

11   debtor did not arrive at a decision to sign up this deal

12   quickly.  This is the result of a four year marketing

13   process.  I mean, it's the kind of thing I feel like you

14   almost can't say it enough.  Four years, the debtor has been

15   marketing itself and the bank for a variety of types of

16   transactions.  There have been multiple fits and starts, but

17   this, out of 130 parties that have been contacted over the

18   years, there's one deal that ever got to signing -- one.  I

19   think again, it cannot be overstated.

20           And second of all, layered on top of that is that

21   the debtor has been in severe financial distress for quite

22   some time.  And it doesn't just necessarily start and end

23   with the C & D and the various regulatory orders that were

24   issued four years ago.  While there was some element of

25   time, as I think the evidence made pretty clear and is

1   undisputed that the debtor had started doing better or the

2   bank had started doing better, that trend is turned the

3   opposite way.

4        And so you have $60 million in (indiscernible)

5   coming due in January.  You have the regulators continuing

6   to push the bank to correct the financial condition over

7   again the four years.  So it became clear -- it sort of

8   again, stating the obvious, that the debtor needed to do

9   something.  And this deal was, again, and I apologize for

10   beating a dead horse.  It was the only deal available,

11   period.

12        I guess the other preliminary point I would make

13   is again I think this is something that everyone

14   acknowledges, the filing of the bankruptcy didn't stop the

15   clock on the issues that impact he bank, be it regulatory,

16   be it the value of the bank's assets or any other issues

17   they could -- it could impact value.  Filing of the

18   bankruptcy had no impact on that and that will continue.

19        There's of course the interesting thing I think

20   about the Committee's objection is I think they realize this

21   -- I think in fact, some of the comments that Mr. Wu made,

22   they recognize that right now this is the only deal the

23   Debtor has.  It's the only deal that's available.

24        And so I think in some of the positions that they

25   take that indicate the willingness essentially to blow up

1    the deal and have the stalking horse walk away, I think that

2    even the Committee in their heart of hearts recognizes they

3    don't want that.

4         And so, yes, they're pushing on a lot of the

5    points that they'd prefer that they were better.  Your

6    Honor, from the debtor's perspective and I think as the

7    redline that we filed to the bid procedures makes clear, we

8    would like nothing more than a better deal.  But this is

9    what we have, this is all we have.  I think it's very

10   important to keep that in context when we look at the

11   specific provisions that they're objecting to.

12        You know, interestingly, Your Honor, I think in

13   some respects this sort of carefulness with which the

14   Committee is putting forth their objection is actually

15   pretty clear, because some of the positions that they take,

16   I think are actually -- if you really look closely -- not so

17   consistent.  For example, the Committee is very concerned

18   the bid deadline is too soon.  Okay.  But on the other hand,

19   they recognize and their concern is only a downward purchase

20   price adjustment.

21        And their worried that tier 1 capital at closing

22   is going to go down, but extending that deadline -- if you

23   extend the bid deadline, that's only going to exacerbate the

24   problem of the tier 1 capital going down.  And the same

25   thing is true of the closing date, which I will get to in a

1    little more detail, Your Honor.

2              I think the same thing is true, Your Honor, with

3    respect to the Committee's objection to the stalking horse

4    bidder fee.  On the one hand they're saying, Your Honor,

5    don't look at what's going into the bank.  Only look at

6    what's coming into the debtor and that's the number you

7    should use.  But at the same time -- and this is true in

8    both the objections they filed and some of the questions

9    that were asked today.  They want to say that the $750,000

10   portion of the breakup fee attributable to the bank, well

11   that impacts the debtor too, so that part ultimately really

12   does matter even though it's coming out of the bank.

13             You can't have it both ways.  And I think that,

14   Your Honor, part of the thing I think the Committee

15   struggled with a little bit is again, they know that if we

16   lose this stalking horse bidder, it would be extremely

17   disastrous for the debtor.

18             I guess with that back drop in mind, Your Honor,

19   I'm going to turn to the specifics of the Committee's

20   objections.  And again, I think that for both brevity and

21   ease of -- because there are a lot of smaller issues out

22   there that I want to address, really the three issues that

23   Mr. Seligman mentioned at the outset of the hearing, which

24   were specifically the timeline, which is the bid deadline,

25   the closing dates, economic issues, breakup fee expense

1    reimbursement and then the (indiscernible) amount

2    requirement.

3              Obviously to the extent Your Honor has other

4    questions about other provisions, I'm obviously more than

5    happy to discuss them.  So it looks like a --

6              THE COURT:  Let me ask you this question.  Mr.

7    Brown I think in his cross-examination -- I puzzled over

8    this when it was happening -- seemed to suggest that there

9    was the prospect of additional concessions on these three

10   points from the stalking horse purchaser.  Are any changes

11   in these terms that are in dispute between the Committee and

12   the debtor actually in the offering before I make a ruling

13   here?

14             MR. BRODY:  So I think I would say the following.

15   I think that with respect to the issue regarding the recap

16   amount, that the language that we changed I think largely

17   addresses the Committee's issue.  Mr. Seligman may disagree,

18   but I think on that point, that's where we are.

19             With respect to the other two issues with the

20   extension of time and the breakup fee and expense

21   reimbursement, to be honest, Your Honor, on those two points

22   there's been very, very little discussion.  And, you know, I

23   can speculate as to why that's the case, but notwithstanding

24   there were a lot of discussions amongst the parties.  Those

25   two issues it was very, very -- I don't think any real

1    movement on it at all.  So I would not expect that there --

2    peace is going to suddenly break out before Your Honor

3    rules.

4              THE COURT:  All right.  Thank you.

5              MR. BRODY:  So, I guess, Your Honor, again, I

6    don't want to go through all the specifics of Mr. Boyan's

7    testimony, because I think that Your Honor it's kind of

8    puzzling to me.  I have never seen a debtor that was

9    marketed for so long prior to the petition date -- four

10   years, 135 or so parties by the acknowledged experts in the

11   space, in the industry when it comes to banks and bank

12   holding companies.  They called everyone they know.

13   They've been out there beating down doors.  Mr. Boyan

14   testified, you know, when you call somebody five times and

15   they keep saying no, at a certain point you have to stop

16   calling.

17             And Mr. Boyan made clear, you know, when you think

18   about it, for all the Committee's blustering about their

19   objection that they didn't like the process, really it comes

20   down to one thing and Mr. Wu said this.  It wasn't the last

21   four years.  They recognize, you know, that was okay.  It

22   was the last four months prior to petition date where they

23   say, you know, you should have been out there specifically

24   marketing with all the bells and whistles, this 363 deal.

25             And I think, Your Honor, first of all, I think

1    it's clear that Sandler O'Neill did try to make contact with

2    other potential bidders they had spoken to, to discuss

3    interest in the 363 deal, not to mention the fact that again

4    over the course of the entirety of the four years, they were

5    talking to people about any transaction.  Tell us what you

6    want to do, tell us what you're interested in and we are

7    more than happy to consider it and see if we can't get it

8    done.

9           At times was their focus on other transactions?

10   Yes, because the debtor -- and frankly this just makes sense

11   and I think the Committee would be upset if we had -- the

12   TruPS holders would be upset if we hadn't tried at various

13   points to focus on transactions that would maximize return

14   to the TruPS holders more so than a 363 sale.

15          And, you know, again, Your Honor, without running

16   through all the specifics of Mr. Boyan's testimony, because

17   I think the over --

18          THE COURT:  I don't think that's necessary.  Let

19   me ask you this question.  This is a question that -- and

20   certainly I'll let Mr. Seligman address it also.  But I look

21   at the bidding procedures that were proposed, the ones that

22   are -- I keep looking at the redline copy that's on file at

23   118.  I realize that's a slightly different document from

24   what you had in the exhibit book, but it's the same document

25   in substance.

1          As I understand the Committee's objection, it's

2     that -- on this point -- it's that somehow the April 30

3     deadline is an arbitrary impediment to the ability of a

4     competing bidder to make a qualifying competing bid because

5     it will take them longer to get regulatory approval and

6     nobody can start from standing start today and get to April

7     30th and close the deal.

8          So I'd like you to address that, but specifically

9     in the context of the bidding procedures, I don't read April

10    30th as a hard deadline.  It seems to me, as I read it, that

11    the professionals that represent the debtor; the debtor in

12    the exercise of its debtor in possession fiduciary duties is

13    free to engage in discussions with third parties and might

14    be topping bidders.  And if those parties come to you and

15    say, hey we're a mega bank, we have tons of capital, we're

16    willing to overbid this by $50 million, but we need a 45 day

17    extension, isn't the debtor free to, at that point, assuming

18    that they're exercising business judgment consistent with

19    their fiduciary duty, say, that is a qualifying bid, it tops

20    the stalking horse and let it go to auction?

21          MR. BRODY:  That's absolutely correct, Your Honor.

22    That is exactly why I think we were sitting here listening

23    to some of the questions kind of puzzling over the same

24    thing.

25          The April 30th deadline was a deadline that the

Page 224

1   stalking horse wanted from their own perspective because

2   they want to close as quickly as possible.  So the idea that

3   we're going to use the stalking horse's construct but give

4   us that exact flexibility that if -- to use Your Honor's

5   example, if Mega Bank comes in and wants to bid even

6   something slightly higher, but they say, but we think we're

7   going to need a little more time to close and get regulatory

8   approval, absolutely.

9          I mean, I think one thing that's important that

10  goes directly to this point but it's also a more overarching

11  point as well, is the regulatory overlay here is what it is.

12  And obviously from the debtor's perspective, in any auction,

13  a debtor has to look at closing risks, whether it's

14  regulatory or otherwise.  Here, because of the regulatory

15  overlay there is that specific risk that is one that we have

16  to deal with.  So, the idea that the April 30th date is

17  there, I think as Your Honor said, and I think frankly the

18  language is as clear as could be.

19          And to Your Honor's point, this is a provision

20  that's in the qualified bid requirements.  So if somebody

21  comes in and says well I see your April 30th date, but I'd

22  like you guys to agree that my bid can be later, so we can

23  do that.  I think Your Honor is absolutely correct as to how

24  this provision actually works.

25          THE COURT:  Is the competing bidder required to

1    include this downward adjustment in the purchase price in

2    their -- they're free to offer whatever they offer?

3              MR. BRODY:  That's exactly -- I'm glad Your Honor

4    asked that question, because it goes exactly to the point --

5    at one point Mr. Brown was asking questions of -- frankly at

6    this point I forget which witness.  I think it was Mr.

7    Keidel asking him specifically about, you know, can other --

8    what will happen if another bank is worried about capital

9    going down.  That's a purchase price issue.  And that's a

10   question of, is the -- if the bidder wants to come in and

11   say, I'll do 4.775, with no downward purchase price

12   adjustments.  So we'll have to figure out at that point what

13   do we think the downward purchase price adjustments are

14   going to be and figure out how much more, if anything, that

15   that bid is.

16             So that really is what I can call a stale issue.

17   And that's part of what the auction -- frankly, given the

18   downward purchase price adjustment; we've made it a little

19   bit easier for a bidder to come in.  All they have to do is

20   strike that provision and suddenly they've given a better

21   bid than the current bid that's on the table.

22             So, Your Honor, is absolutely correct, I think

23   from our perspective, where that impacts the dates is right

24   now.  This is the deal that we have and we're afraid that if

25   you start pushing out the dates of the bid deadline that

212-267-6868          www.veritext.com          516-608-2400

Page 226

1    even if the stalking horse agrees to stick around, which

2    frankly, Your Honor, I don't know that they would.  I think

3    in any club deal or group deal like this, you have to worry.

4    All it takes is one person to walk and things can unravel

5    very quickly.  But that aside, if you push the dates out, it

6    ultimately may mean that you have less consideration coming

7    into the debtor.

8            THE COURT:  I don't want to cut you short, but I

9    think it's time for me to hear from the Committee as to why

10   these concerns that they have remaining are a reason why the

11   Court should either not approve these bidding procedures or

12   do something other than what you're asking, which is for the

13   Court to approve the bidding procedures as proposed in

14   document number 118.

15           MR. BRODY:  Always happy to be cut off by Your

16   Honor.

17           THE COURT:  Mr. Seligman.

18           MR. SELIGMAN:  Good afternoon, Your Honor.  Your

19   Honor, I would -- there's one thing that -- I agree with Mr.

20   Brody on a lot of different things and various matters.  One

21   thing I --

22           THE COURT:  Let me ask you before you start, your

23   co-counsel I thought was implying in his examination of the

24   witnesses that there was forthcoming some concession on some

25   of these points by the stalking horse bidder that perhaps

Page 227

1    the Committee has in its pocket.  Is that true?

2              MR. SELIGMAN:  No.  I think the point of --

3              THE COURT:  But if it's not true, I mean you could

4    ask questions all afternoon.  Well, of course the debtor

5    would accept $100 million more than what's being proposed.

6              MR. SELIGMAN:  I think that was simply the point,

7    Your Honor, of a lot of these bidding procedures were

8    impositions from the stalking horse as opposed to

9    necessarily things the debtor was saying was important from

10   their perspective to maximize value.  I think that was the

11   point of those questions.  So, maybe I --

12             THE COURT:  So you don't have any rabbits to pull

13   out of your hat on new terms of conditions?

14             MR. SELIGMAN:  I have no --

15             THE COURT:  Okay.

16             MR. SELIGMAN:  I have no rabbits, h.

17             THE COURT:  All right.

18             MR. SELIGMAN:  Your Honor, stepping back just big

19   picture, I just want to remind Your Honor that the

20   Creditors' Committee consists of three members who are TruPS

21   holders.  These are instruments that are held in these

22   complex CDOs.  They are fairly passive investments.  This is

23   not a -- these are instruments that maybe you heard, they're

24   held by some of the board members.  Some people, you know,

25   individuals, moms and pops in the mid-Atlantic region,

1   insurance companies, other bank and financial institutions,

2   these are not hedge funds who are coming in and buying these

3   things at 3 cents on the dollar and now trying to hold

4   things up.  I mention that --

5            THE COURT:  Why does that matter?

6            MR. SELIGMAN:  Your Honor, I just want to mention

7   that because I --

8            THE COURT:  I mean, wouldn't it --

9            MR. SELIGMAN:  -- think there's been some

10  assertions here that we're trying to blow up deals and the

11  like.  And I just want to start off by saying, Your Honor,

12  that step --

13           THE COURT:  I don't think that your client, the

14  Creditors' Committee is here trying to blow up a deal in

15  violation of its fiduciary duty, so move on to your next

16  point.

17           MR. SELIGMAN:  That's fine, Your Honor.  I did

18  want to mention, Your Honor, we talked a lot about these

19  different -- these bank holding company cases and there's

20  been a number of them over the past several years.  And they

21  all are fairly -- they follow pretty much the same play book

22  in the sense that they're usually filings with a stalking

23  horse lined up.  There is a request for a very short period

24  of time for a bid procedures order for an auction and the

25  like.

1          Those are -- and there's the same assertions by

2     the company that there's risk here, regulatory action, that

3     the bank may be a melting ice cube and the like.  These are

4     typical things that are asked for and routinely in these

5     cases and again we represented Creditors' Committees in two

6     of these other ones.  Routinely, the job of the Creditors'

7     Committee is to come out and point out issues, Your Honor,

8     that we think don't maximize value or the chill bidding,

9     because again, the whole process is about maximizing value

10    here.

11         And invariably in all those cases and there's

12    various provision throughout, but invariably, all those

13    cases, the Court's accept some provisions but they push back

14    on others.  Routinely in all these cases, the debtor will

15    come in and say, Judge, it's the only thing I had and I

16    asked the stalking horse to change things and they said no.

17    And in all those cases, it's ultimately up to the Creditors'

18    Committee to try and be that stalwart to push back that

19    momentum and say here's what we think is in terms of what's

20    fair.

21         And it's ultimately the judge sometimes who says,

22    you know, hey stalking horse, are you going to tell me if

23    you're going to walk tomorrow, because I think that maybe

24    another week is appropriate or I believe that the breakup

25    fee should be reduced or the expense reimbursement should be

1   reduced.

2          So I understand the debtors did the best they

3   could in terms of negotiating these bid procedures.  I

4   understand that they felt that their hands were tied because

5   that's all they had.  But part of this process is not to

6   just accept that as given and to say the buyer is going to

7   walk, but it's to do what we think maximizes value and more

8   importantly, Your Honor, to paraphrase Leonard Hand (ph),

9   it's not just about doing what's right, but it's about the

10  appearance of what's doing right.

11         Your Honor this morning had concerns about sealing

12  the courtroom because bankruptcy is a transparent process.

13  Bankruptcy is an open process.  If people want to come into

14  the bankruptcy courts and implement a transaction, there is

15  a cost to it.  There's life in the fish bowl.  You've got to

16  be open.  You've got to be fair.  You have to have the

17  appearance of being fair.

18         And if it turns out here, Your Honor, that at the

19  end of the day there are no other bidders, we all have to

20  feel comfortable that the reason that there was no other

21  bidders because the market spoke as opposed to these bidding

22  procedures being chilling or prohibiting other people or

23  creating such an unlevel playing field that a lot of people

24  said, you know what I'm not even going to bother to make a

25  bid because it looks so stacked against me.  It's just not

1    worth my time, there are other opportunities out there.

2           I believe the process is important and that's the

3    role that we've played.  I think we've been constructive and

4    trying to resolve our concerns with the DIP.  Again, we were

5    not focused on other issues about the DIP.  We focused on

6    making sure that it did not implement or impact the bidding

7    procedure process.

8           We could have stood up here, Your Honor, and

9    talked about, hey this is a sub rosa plan, it should go

10   through voting.  We could have raised all those types of

11   issues, but we focused on -- we said, yes, okay.  Let's have

12   a sale.  We understand that, but let's have a process that

13   is appropriate.

14          We owned the legal standards here with respect to

15   what governs the various bidding procedure.  It obviously

16   has to not be collusion.  It has to encourage bidding and

17   not discourage bidding.  So I won't spend any time with

18   respect to that.

19          But I will make a point, Your Honor, that when you

20   have a -- when a debtor comes in on the first day with a

21   stalking horse bid in hand and comes in with a very short

22   time period -- and I don't think anybody will doubt that

23   this is a short, you know, 30 days is a short time period.

24   It's not three months.  But the point is, is that does the

25   debtor come with a stalking horse that they can really say

1    that they looked at and they got the best stalking horse

2    there and that that stalking horse was the product of

3    negotiation or in the formal bidding or whatever it may be,

4    that's important.  And when you have such a short process,

5    it is appropriate to look at the pre-petition process and to

6    say what was done there.  But there is a balance.

7            If somebody had said, you know, we had five or six

8    people that we all said to them, hey look we're going to

9    file for bankruptcy in two months, we need a stalking horse,

10   here are the terms, here is our indication of value, this is

11   the kind of stalking horse bidding procedure we can provide

12   for you.  That's what I see is fairly typical.  When you do

13   that and then you say, okay, now I can have a shorter or a

14   more -- a shorter, you know, second round -- sometimes that

15   makes sense.

16           But when you're coming in with a stalking horse

17   that wasn't the product of a 363 shop, it puts more pressure

18   and more tension on the round two.  Especially here, Your

19   Honor, where there has been a no shop provision since the

20   filing date until a couple of days ago.

21           And I think that's important.  Some of the other

22   cases I've been involved in, the day after the filing, the

23   debtor's financial advisor is going out with more marketing

24   materials and saying, okay here we are, here's my teaser.

25   But that's not what happened here.

1            As a matter of fact, Your Honor, the bidder that's

2    in there right now conducting diligence, they were initially

3    rebuffed.  They called up the debtor and they said, we'd

4    like to get in the data room.  The debtor said no.  The only

5    reason they're in the data room was because they called one

6    of the members of my committee who called me and I called

7    debtor's counsel.  And I said, I got somebody who was told

8    that they can't participate in the data room, they can't get

9    in there.  What's going on?  And then the person was allowed

10   to be in the data room.

11            Part of our comments to the bid procedures as

12   contained as an exhibit to our objection said that the

13   debtor should have an affirmative obligation to proactively

14   market.  They didn't do that and it's only about two days

15   ago where they decided, now, we're going to proactively

16   market conveniently right before this was filed.

17            So let me now turn with that background, Your

18   Honor, to the issues.  One timeline we believe it's too

19   short.  Again, because of the tension on the fact that --

20   the tension and focus you have to put on this round two

21   because of what we believe was the inadequacy of the round

22   one process.  Obviously they've been looking for four years.

23   There's no -- we're not taking --

24            THE COURT:  Why is there any reason to think that

25   anybody who is interested in this bank doesn't already know

1    about it?  I mean it's been shopped for four years.  They

2    made a public announcement.  The deal with the stalking

3    horse has been a matter of public record since the day it

4    was filed in this Court.  Well, yes it is what it is.  They

5    did the best that they can.  They're opening things up now.

6    We're about to run through a bidding procedure.  I mean,

7    what more were they supposed to do?

8             MR. SELIGMAN:  What more were they supposed to do,

9    is they weren't supposed to  then say as a result of that

10   process that they're going to put these kind of bid -- these

11   kind of break out fees and expense reimbursement in there.

12            We've talked about it's just a short period of

13   time, Your Honor, for somebody to get in there.  And, you

14   know, again it is true that they have been out there but

15   they've never been out there with a 363 shop process where

16   they've been saying here's what you can do.  We're now

17   talking about this level of indication of value.  We're now

18   talking about a transaction where you can take this thing

19   free and clear of the debt, free and clear of the equity.

20   It's a different type of transaction.

21            THE COURT:  So let's focus on the specifics.

22   What's wrong with the timeline?  Why doesn't the flexibility

23   that's built in here on the April 30 closing deadline as

24   discussed with counsel, why doesn't it address the concern

25   expressed by your own witness?

1           MR. SELIGMAN:  I think, h, with respect to that, I

2    think that I would make it simply say -- instead of putting

3    a date out there and having people think about oh well if

4    there's a sale hearing in mid-April I only have two weeks to

5    get regulatory approval.  Why not just take out that

6    provision?

7           Why not say that a bid -- any bid should list a

8    proposed closing deadline.  The debtors are free when they

9    are considering the highest and best offer, they are free to

10   consider the closing deadline that's proposed by the buyer,

11   the bidder as a relative date.  If somebody proposes April

12   17th, well then I would say -- they would probably say that

13   that's great.  If somebody proposed December 31st, well then

14   they would say that's too long.  But I think this sends a

15   signal that that's the kind of deadline and is somebody

16   going to then do a bunch of work when they know that they're

17   going to have to then see if the debtors is going to waive

18   it or not waive it?  There's no need for it.

19          Just say part -- one of the things that you have

20   to include in a bid is your proposed bid deadline.  And let

21   the debtor then decide what -- in terms of regulatory

22   approval and everything else, let them consider that as part

23   of the mix.  I think that would be appropriate and that

24   would resolve the issue with respect to that closing

25   deadline from the Committee's perspective.

1          Let me address if I can -- I want to come back to

2     the timing in a second, but want to move to the breakup fee

3     and the expense reimbursement and any other stalking horse

4     provisions.

5          Your Honor, at least in my experience, the rule of

6     thumb always for me was 1 to 3, 1 to 4 percent for breakup

7     fees and then some reasonable amount of expense

8     reimbursement.  I just feel, Your Honor, and I think that

9     whether you look at large 363 cases in general in Chapter 11

10    or whether you look specifically at the bank holding company

11    cases.  $2.75 million off of a $4.75 million transaction,

12    that's just way off market.  I mean, as we've said, it's

13    approximately 22 percent --

14          THE COURT:  But that's not the deal.

15          MR. SELIGMAN:  That is the deal.

16          THE COURT:  But the purchaser of this asset, of

17    this estate, has to capitalize the bank one way or the

18    other.

19          MR. SELIGMAN:  Your Honor, I think that argument,

20    number one it's been -- I don't think it's logical, number

21    one.  And I think it's been rejected by multiple cases.

22          I think the point of this debtor and this estate

23    is what value comes into this estate.

24          THE COURT:  So we restructure the transaction so

25    that the stalking horse purchaser pays an additional $80

1    million to the estate so that it can capitalize the bank

2    before the -- and that solves your problem?  Isn't that the

3    substance of what's happening here?  Why would that make it

4    any different in substance?

5                MR. SELIGMAN:  Because the $80 million is not

6    being distributed to creditors.  Your Honor, if that's --

7                THE COURT:  If there is no $80 million, there's

8    not going to be 4.775 or whatever the number is.

9                MR. SELIGMAN:  I understand.  But the question is,

10   Your Honor, is this is the debtor locking up a payment to a

11   stalking horse in case there's an over bidder.  It's also

12   additional amount that has to be bid by any competing over

13   bidder of multiple millions of dollars.  And the question is

14   what are they, you know, what are they getting for that.

15   And what they're getting for that is 4.75.  They're not

16   getting the 85 to 100 million.  It just doesn't matter.

17               Your Honor, I would say to you if you look at it

18   from the buyer's perspective, I think that has dangerous

19   precedent and that's going to get a slippery slope.  Because

20   in the next case, a buyer is going to say, well I know I'm

21   going to buy this asset, but you know what I'm going to

22   spend a bunch of money incorporating it.  I may run a new

23   marketing campaign.  There's a lot of fixed and some costs

24   that a buyer has to put into a transaction.

25               And by the way, Your Honor, the capital that

1    they're putting in, it's not for our -- it's for their

2    benefit.   It's you know the $80 to $100 million, whatever

3    the number is once they buy the bank it's their capital.

4    It's on their balance sheet.   It's just basically what

5    they're saying is, I'm going to write a check, I'm going to

6    give -- I'm going to have money in one hand and I'm just

7    going to put it in this other pocket, but it's on their

8    balance sheet.   It makes no difference to us.

9         I suppose, Your Honor, that if somebody -- to give

10   a hypothetical if somebody came in and said I'm going to pay

11   $10 million because I want the trade name of Fmar (ph) and I

12   don't really need the bank.   Why wouldn't we take that too?

13   That's the relevant amount -- I would say in that instance,

14   they're paying $10 million.   That's the benefit to the

15   estate.   It's not the $85 million and we have cited in our

16   brief, we've cited multiple cases that have rejected that

17   argument.   The big Sandy case.

18        I've got to tell Your Honor another example in the

19   first place a bank holding company case last year in front

20   of Judge Shannon.   In that case, the buyer had very what I

21   would consider onerous bidding procedures there too.   The

22   buyer actually upped their bid before the bid procedures and

23   agreed to pay the creditors in full.   And when the buyer is

24   paying you in full, the Creditors' Committee, who are we to

25   complain, right?   The buyer also made the same argument that

1    they were seeking -- I think it was $5 million off of a $45

2    million transaction.  So roughly, 10, 11, 12 percent and

3    they made the same argument to Judge Shannon.

4             And Judge Shannon turned to them and said, no I'm

5    only going to approve this amount. I'm only going to

6    approve, because I think the range is 1 to 3 percent, 1 to 4

7    percent and that -- and the breakup fee was cut by 40

8    percent.  Because Judge Shannon, said you tell me what you

9    want to do, but that's the level in which I feel

10   comfortable.

11            So I just believe that valuing it based upon what

12   the buyer is putting in doesn't make a different because in

13   every situation --

14            THE COURT:  Why does it matter what I feel

15   comfortable with?  That's not really the standard here,

16   right?  It's not how I would run this case if I was the

17   counsel for the Chapter 11 debtor or you and I were doing it

18   together.  Isn't the standard whether the debtor exercising

19   its fiduciary duties has properly exercised business

20   judgment to devise a process and do what it's done to get us

21   where we are today?

22            MR. SELIGMAN:  You're absolutely right Your Honor

23   that the test for bidding procedures is 363, it's debtor's

24   business judgment.  But I would submit to Your Honor that

25   there is a market for the appropriate bidding for breakup

Page 240

1    fees.  It's a market that's developed.  It's what people

2    expect and again 1 to 3 percent, 2 to 4 percent is the range

3    in which people are doing it.  And let's call a spade a

4    spade when we're talking about the 2.75 against 4.75.  It's

5    a 60 percent breakup fee based upon the value that's coming

6    to the estate.  And the question is, is based on those

7    economics, is that going to enhance bidding or is that going

8    to chill bidding?

9            Certainly stalking horses who come to the table

10   deserve to get some amount of a breakup fee for the fact

11   that they're coming to the table.  There's no question and

12   we're not quibbling with that concept.  But the question is,

13   should that level of breakup fee be appropriate and that I

14   would submit, Your Honor, is out of whack with all other

15   Chapter 11 cases and even all of these other bank holding

16   cases.  I just happen to have a note here that the ones of

17   most recent vintage, Texas Bank shares, 3.4 percent of the

18   cash, Mercantile, 3 percent, Rogers 4 percent.

19           THE COURT:  Was there capitalization requirements

20   in those cases?

21           MR. SELIGMAN:  In Mercantile the -- it wasn't part

22   of the bidding procedures, but yes the buyer was putting in

23   capital.  But it wasn't -- nobody even thought to add that

24   to the deal and try and justify the breakup fee.  They chose

25   a 3 percent based on cash post-closing, yes, they were going

Page 241

```
1    to have to work out with the regulators, working out putting

2    in some additional capital.  But that was on them to do.  It

3    had nothing to do with the estate and that's the way it

4    should be.

5           In the First Place case, yes, they were putting in

6    significant additional capital.  And again, in the First

7    Place, they argued to Judge Shannon, that's the denominator

8    that you should use.

9           And Judge Shannon said, I feel very uncomfortable

10   approving that bidding procedure because it should be based

11   upon the cash and it's way out of whack.  And Judge Shannon

12   said I'm not going to -- you go in the hallway and you tell

13   me what you want to do.  And so 3 seconds later, the

14   stalking horse came back and said we're going to cut our

15   breakup fee by 40 percent.  And the judge says, thank you

16   very much, with that I'll approve it.

17          So in both Judge Shannon in the First Place case

18   and Judge Kerry (ph) in the Mercantile case, they both did

19   not -- neither -- they recognized in the colloquy they said,

20   I know what goes on.  The buyer of course is going to impose

21   very tough, onerous bidding procedures.  And who can blame

22   them?

23          The buyer is going to ask for what they're going

24   to ask for because they don't want competition.  I don't

25   blame them for that. And the debtor may be in the middle and
```

Page 242

1    trying to do the best that they can.  But both Judge Kerry

2    and Judge Shannon said, I'm not going to be bullied by the

3    fact that somebody is going to walk.  You tell me if you're

4    going to walk if I'm going to change these procedures and

5    I'll know.  But the Courts said, let's do what's

6    appropriate.

7           We can't complete defer to the business judgment

8    on this one.  It's a matter of what's appropriate for

9    fostering competitive bidding and people push back, court's

10   push back.  Creditors' Committees push back to get what's

11   appropriate because again it's not just what's right, but

12   it's also the appearance of what's right.  So that we know

13   if we go through this process, we will feel comfortable that

14   the Chapter 11 supervised process was done fairly and if

15   there are no other bidders is because the market spoke as

16   opposed to any hooks.

17          I did also though want to point to another element

18   that makes the breakup fee an expense reimbursement even

19   more egregious.  And that's because this is not for a locked

20   in deal.  Even if Your Honor were to say, yeah I know these

21   things are high, but there's a locked in deal.  This is not

22   a locked in deal.

23          What do I mean by that?  Well, firs, there's the

24   tier one capital downward purchase price.  As we noted,

25   ironically the capital goes up, it's not a benefit to the

1    estate. It's only a one way ratcheting down.  If the bank --

2    if the capital goes down a couple of million dollars and

3    especially if the regulators take a couple of months before

4    this thing closes, if that's the scenario, we could end up

5    and Mr. Keidel acknowledge it.  It's a possibility that you

6    could end up that the purchase price in this case is zero.

7             So why should we put that level of breakup fee

8    expense reimbursement for this size deal, 2.75 off of a

9    $4.75 million deal when we don't -- that 4.75 that's not

10   even locked in.  And I would submit, Your Honor --

11            THE COURT:  But the breakup fee only comes into

12   play if you have a higher offer and presumably that offer is

13   going to be locked in if we have one.  We don't know what

14   that's going to be.

15            MR. SELIGMAN:  Right, but that's --

16            THE COURT:  You haven't lost anything.

17            MR. SELIGMAN:  What you have --

18            THE COURT:  You're ahead of the game if you're

19   paying a breakup fee.

20            MR. SELIGMAN:  No, you have lost because what

21   you're doing, Your Honor, is you're paying what we believe

22   is a disproportionate over market amount to lock in a deal

23   that's not really locked in.  There's a price at which you

24   pay to lock something in.  And to know that worst case, no

25   bids I get 4.75, but we don't know that.

Page 244

```
 1              And so to the extent that there are other bidders

 2    out there who would say, you know what if it was $250,000

 3    breakup fee I may participate, but a million, maybe I'm not.

 4    There's always a balance.

 5              There's always a balance on the breakup fee.  Are

 6    you sitting at -- you want to set it low because you want to

 7    encourage bidding, but at the same time you gotta get the

 8    fish you have and that's okay.  But at some point, Your

 9    Honor, you set the thing so high that some people don't come

10    to table.  And you know what, if you have a rock solid deal,

11    maybe in some situations, a higher breakup fee is

12    appropriate, but not here where it's not locked in, number

13    one and number two, if for whatever reason there's no

14    regulatory approval by April 30th, the stalking horse can

15    also walk from this deal.

16              So again, we're talking about a mid-April sale

17    hearing.  If the regulators come back and say, you know, I

18    need more information on this guy.  I need to run another

19    background search and it takes a little bit of time.  It's a

20    couple of weeks or whatever.  People are still waiting for

21    the regulators to make a decision.

22              THE COURT:  Isn't that factor to consider at the

23    sale hearing?

24              MR. SELIGMAN:  I would say no, Your Honor.

25    Because again, it's the price you're paying now to lock up
```

1    somebody.  Again, there's a price to pay to lock somebody

2    up.  But you better lock them up and you know if there's no

3    other bidder, you got something solid on the hook.  And

4    here, there's nothing solid on the hook because of those two

5    issues.  And we've asked.  And the answer has been no that

6    we're not going to give you on those points.

7              THE COURT:  I was asking a different question.

8              MR. SELIGMAN:  I'm sorry.

9              THE COURT:  As we get to the sale hearing and

10   there hasn't been any overbidding and we don't know what the

11   regulatory approval is going to be and we have this

12   ratcheting down of the purchase price.  Isn't that the time

13   for this objection to be made?

14             MR. SELIGMAN:  I don't think so, Your Honor,

15   because we're only going to run an auction once.  You're

16   right that that is an additional consideration and maybe if

17   that was the case, maybe I'd say, Your Honor, at this point

18   they should lock it in if they really want to (indiscernible

19   - 00:39:21), but at that point, the water is over the dam

20   because we only have one chance to run this auction process

21   and we better do it right.

22             And if we're going to -- you can bet, if it's

23   true, as Mr. Boyan said, that he's tired of people -- people

24   are tired of him calling five times.  If we do it one more

25   time, we're never going to get another chance.  And so

1    that's my point, Your Honor, is we're paying too much for a

2    deal that's not -- that's a femoral and that's going to

3    potentially cause other people not to bid and, you know,

4    there's leverage you pull with trying to find the right way.

5    What's the balance between encouraging people and

6    discouraging people.  But I just think without knowing these

7    -- without having the buyer locked in, what are we paying

8    for?  What are we paying for?

9              I also want to mention to Your Honor the point

10   about -- which I think came out when Mr. Brody was speaking,

11   this issue also about the size.  I don't know that it merits

12   much discussion but again, to the extent that the debtors

13   are arguing well, the breakup fee is only 250 because that's

14   all the debtor is paying.  That's not the case.

15             If you ask anybody, Your Honor, because the 750

16   from the bank matters.  This is not a -- the bank is not a

17   operating business where you value it based upon an EBITDA

18   multiple of earnings where the cash on hand doesn't change

19   the value.  No, this is a bank that is based upon the

20   capital.

21             If you ask anybody and it makes sense, if you ask

22   anybody, if the bank, you know, puts $750,000 and bet on the

23   lottery and lost it, would somebody pay $750,000 less for

24   the stock of the bank; of course, because they had 750 less

25   of capital.  So it's money that directly impacts the value

1    of the stock.

2           The final point, Your Honor, that I want to focus

3    on is the recapitalization requirement. And we've done a lot

4    of talking about this and frankly, Your Honor, I don't

5    understand what the problem is from the stalking horse is or

6    from the debtor's perspective on this point.

7           We have suggested multiple times, it is totally

8    appropriate for the debtor in considering who is the highest

9    and best bid and as Your Honor know, it's not the highest

10   bit, it's the highest or best.  It is completely appropriate

11   for the debtor to consider the likelihood of regulatory

12   approval. And it is completely approach for them to consider

13   how is the buyer structuring the transaction?  Are they

14   writing a check?  Are they allocating capital?  How much are

15   they allocating?  And that's totally appropriate and they

16   should consider that.

17          But the fact is we have some arbitrary

18   requirements that we heard testimony from the debtor's

19   advisors that it was not set by them.  It was basically

20   dictating by a stalking horse that the amount should be 85

21   to 100.  Where did they get that?  Well, they sort of backed

22   into 75 and they added some cushion, right?  Why do we need

23   that?  From our perspective, that is just going to another -

24   - amongst all the little hooks here, that's going to cause

25   potentially somebody not to bid.

Page 248

```
 1              If they -- because I can tell you this, Your
 2    Honor.  If Warren Buffet comes forward and says, I'll pay
 3    $50 million for this bank and I'm going to contribute
 4    capital up.  I actually -- he says I've spoken to the
 5    regulators and actually I think $80 million is the right
 6    number of capital and that's what I'm going to do, the
 7    debtor should be able to consider that.  They shouldn't
 8    knock out Warren Buffet at the bid stage and say it's not
 9    going to --
10              THE COURT:  What allows them to do that under
11    these bidding procedures?
12              MR. SELIGMAN:  Because the bidding procedure says
13    that a bid has to have a capitalization requirement equal to
14    the equity capitalization amount, which is defined as 85 to
15    `100.  We have suggested language on multiple occasions that
16    simply says that the -- in order to be considered, a bid
17    should get to --
18              THE COURT:  I'm looking at the document at 118 at
19    paragraph 9(a)(4) at the sentence, which was added, which
20    says in addition, such bid must result in recapitalization
21    of the bank of at least the recapitalization amount unless
22    the debtor determines after consultation with the Committee
23    that due to proposed transaction, the bank would be
24    nevertheless be capitalized to the same extent as the equity
25    contribution, meet regulatory requirements and otherwise
```

1    receive regulatory approval of a proposed transaction.  Why

2    doesn't that address completely what you just said?

3              MR. SELIGMAN:  Because -- and we talked about

4    this.  We told him because what it says is that unless the

5    debtor determines that to a proposed transaction, the bank

6    would nevertheless be capitalized to the same extent as the

7    equity contribution.  Equity contribution is $85 million.

8    And our point is if somebody comes forward and they can say,

9    you know what, we think that through our structure, that

10   we're going to capitalize this thing is supported the $80

11   million, $79 million.  I don't know what the right number

12   is.  They should be free to consider that.  They can talk to

13   their regulatory counsel.  They can talk to Samuel O'Neil.

14   They can talk to the regulators and say, is that

15   appropriate.

16             But to just arbitrarily say that it has to hit 85

17   because of a number imposed by the stalking horse, we

18   believe is inappropriate.  They should be free to factor

19   that in and we just believe that this is another example of

20   the stalking horse trying to tweak the procedures in a way

21   that's going to cause people to say, you know what this

22   thing is stacked.  I'm not going to even bother.

23             So that is how we would suggest that that would be

24   fixed.  I think it's a relatively simple fix and it

25   shouldn't affect anything.

1           If Your Honor would just give me 30 seconds to

2      make sure that I've addressed all my points --

3           THE COURT:  Sure.

4           MR. SELIGMAN:  -- and I appreciate that

5      indulgence.

6      (Pause)

7           MR. SELIGMAN:  Your Honor, so one more point.

8      It's the point about -- and this goes back to the question

9      of timing.  And let me start with that we've heard

10     references or assertions in various pleadings or in

11     testimony to the fact that this thing has to happen

12     immediately because maybe there is an inspector of

13     regulatory action or maybe there will be customer deposit,

14     withdrawals or the like.

15           I'd just like to put that issue, because that is

16     something that is raised in every one of these cases and in

17     every one of these cases, the debtor gets on the stand --

18     the debtor -- the CEO gets on the stand and says, I have

19     weekly calls with the regulators.  And as Judge Kerry and

20     Judge said in the Mercantile case, I'm not convinced that

21     there's imminent regulatory action.

22           There is a process by which a regulator before

23     they're going to seize a bank, there's a long -- there's

24     like a long ten step -- I always want to say twelve step --

25     ten steps that they have to go through before they can seize

Page 251

```
 1    the bank.  None of those have happened.  This bank has been

 2    under a cease and desist order for multiple years.  We don't

 3    think there's any risk in whether it's 30 days or whether

 4    it's 60 days and I think Mr. Keidel testified to it, that's

 5    not going to make a difference from a regulatory

 6    perspective.

 7              This -- with the bank holding company filing for

 8    bankruptcy, if there was any risk of a run on the bank, I

 9    think that would have happened and it clearly hasn't.  Part

10    of it -- and we've cited this in our brief, is there is such

11    a high percentage left of deposits that are insured by the

12    FDIC.  So again, Your Honor, just to call Your Honor's

13    concerns about that.  Whether it is 30 days, whether it is

14    60 days, from that perspective, we don't think it's going to

15    make a difference from a regulatory perspective.

16              THE COURT:  All right.  Thank you.  Mr. Brody?

17              I'm concerned about this last point that was

18    discussed.  Does or does not this bidding procedure require

19    a competing bidder to propose to capitalize the bank by at

20    least this amount, which perhaps its arbitrary, perhaps it's

21    arbitrarily high on the part of bidding -- I'm sorry, the

22    stalking horse bidder.  Does it really require what the

23    Committee says?

24              MR. BRODY:  I guess, Your Honor, I think to really

25    put the right point on it, I have to sort of consider who
```

1    we're talking about as a potential bidder.  In that --

2             THE COURT:  I'd like you to answer my question

3    first.  If you want to argue why --

4             MR. BRODY:  No, Your Honor.  I don't mean to --

5             THE COURT:  If you want to argue why there's some

6    reason to do something different, fine, but does this or

7    does this not require -- you're going to tell me there's a

8    good reason for that, but what my question is, does it or

9    does it not require it?

10            MR. BRODY:  Fair enough, Your Honor.  And I wasn't

11   trying to be evasive.  I just -- part of my understanding of

12   how this is expected to work is in part based on who we

13   expect to bid.  But the answer to Your Honor is, if for

14   example, a strategic bidder were to come in and buy the bank

15   and absorb it, the idea that they would be capitalized at

16   the same extent as the equity contribution is not -- they

17   would not need to put up $85 million in cash.  We'd need to

18   know that they would be well capitalized once they've

19   absorbed the bank onto their balance sheet.  So it's really

20   not quite the same thing.

21            THE COURT:  So why isn't it sufficient to say that

22   it's capitalized sufficient to get regulatory approval?

23            MR. BRODY:  Well, Your Honor, I think the part of

24   the reason for that is I'm not going to disagree with what

25   Mr. Seligman said, but the part of this was the stalking

1    horse's requirement.  But, I think even from our perspective

2    we look at it as, you know, the bank -- the $75- or $85

3    million, that number we view as the number that anyone is

4    going to have to hit.

5          So, if you don't have that requirement, the idea

6    that we're going to start spending time with potential

7    bidders who are going to come in and say, well, I just want

8    to put $25 million into the bank and pay you $25 million for

9    your stock when we know there's no way that gets regulatory

10   approval, it just will not happen.  So it made sense to

11   actually set some guidelines.

12         The reality is, Your Honor, and I think this goes

13   to some of the things that Mr. Boyan testified to, if you

14   don't set sometime set some guidelines on bidders, they may

15   take advantage.  They say, yeah, you know, I'm going to play

16   games a little bit and I'll put in a bid just to sort of

17   keep you guys on the hook even though I'm not really serious

18   about it.  We want to make sure that any bidder that comes

19   in is going to close.  Because it's -- that point cannot be

20   emphasized enough.

21         So the idea, we focused on that equity

22   contribution, again is it possible somebody wants to pay

23   less, I guess.  But from the debtor's business judgment,

24   without that equity contribution, you're not going to get

25   anywhere.

1          THE COURT:  All right.  Thank you.

2          MR. SELIGMAN:  Your Honor, I'm sorry, can I just

3     respond to that.  I think Your Honor the way you stated it

4     and the way I understand is right.  It is a minimum.  If

5     somebody wants to absorb, they still have to allocate the

6     capital.  If they want to take out as Your Honor said, it

7     should be a bid sufficient to obtain regulatory -- and if

8     they want to give guidance what they think is appropriate,

9     that's --

10          THE COURT:  I heard all the words and I agreed

11     with you, I think that's what he's saying.  He's saying

12     there's good reason for it.

13          MR. SELIGMAN:  And I guess my only point, Your

14     Honor, is that we think that it's arbitrary and it doesn't

15     need to be in there and they could equally give the guidance

16     orally and say this is the kind of target we're talking

17     about if you want to make a bid that we're going to

18     consider.

19          THE COURT:  All right.  Thank you.

20          I've considered carefully the arguments that were

21     made here in closing argument.  I've considered the papers

22     that were filed.  I'm not considering any of the evidence or

23     arguments that were made and redacted from the papers that

24     were filed.  And I've considered the testimony of the

25     witnesses.

1            I find Mr. Boyan's testimony very credible and I

2     give a lot of weight to it.  I think Mr. Wu is a credible

3     witness.  I don't quell that he already has some experience,

4     but based upon everything that's before me, I give little

5     weight to his testimony.

6            I believe that the bidding procedures as modified

7     at paper #118 and I have a few questions about the order

8     that's been submitted.  But subject to that, the bidding

9     procedures as modified at Docket #118 should be approved.

10           As far as I'm concerned from all of this evidence,

11    it's clear to me -- what's clear to me is as -- to use the

12    words of Mr. Seligman, in my view, this evidence shows the

13    market has spoken.  And this is the best the debtor can do

14    with the circumstances it faces.  And if there's somebody

15    out there who is prepared to act quickly under these

16    circumstances and make a significantly higher bid, taking

17    into account all of the factors and the reimbursement of the

18    expenses and the bidding -- the breakup fee, then fine.  If

19    not, then we should move on because this is a situation that

20    is challenging and difficult and the opportunity to sell the

21    bank may be totally lost.

22           So I'm convinced from the evidence and I find that

23    the debtor has exercised proper business judgment as a

24    fiduciary and debtor in possession in this case taking into

25    account all of the circumstances that are present about its

1    business and financial situation and that of the bank.

2            The bank has been marketed for more than three

3    years.  Exactly how long, I don't exactly recall, but it's

4    been quite a while by an expert financial advisor who is

5    experienced in bank transactions.

6            The timeline in my view is reasonable under the

7    circumstances particularly considering the condition of the

8    bank and the prior marketing that went on here.

9            I hear the Committee's concerns about the breakup

10   fee, but under the circumstances, I believe the breakup fee

11   is appropriate, because I think that as Mr. Boyan testified,

12   the bank -- in a transaction like this, the debtor and the

13   Court have to take into account the totality of the

14   financial commitment being undertaken by the purchaser here.

15   And when you compare this additional requirement to have the

16   capital available to capitalize the bank, the purchaser is

17   committing far more than just the actual cash consideration

18   purchase price that's flowing into the estate. And under

19   those circumstances, I believe that the breakup fee as

20   proposed and the expense reimbursement as opposed are

21   appropriate, reasonable and are not onerous under the

22   circumstances of this case.  I'm not saying I'm going to

23   approve them in the next case, but I don't find them to be

24   onerous in this case.

25            While I have some concern about the

1   recapitalization requirement that I expressed, I believe

2   that my concerns are addressed by the evidence and the

3   arguments being made by Mr. Brody.  This is a situation that

4   requires action and it requires it now.  The market has

5   spoken.  And we don't need -- I think it was Mr. Wu himself

6   who testified about the challenges of a debtor trying to run

7   a due diligence and an auction process when it has to deal

8   with too many prospective purchasers.  We don't need mere

9   meddlers here trying to make low ball offers and bog down

10  the process if they aren't really serious and they aren't

11  capable of getting regulatory approval.  So I find that

12  requirement under the circumstances of this case to be

13  appropriate.

14          I think that the bid deadline and the closing date

15  requirement of April 30th under the circumstances of this

16  case are appropriate, particularly whereas here I read the

17  bidding procedures to allow the debtor to solicit and

18  receive offers that call for an outside closing date that's

19  after April 30th.  It's simply a factor that the debtor

20  takes into account with his professionals after consulting

21  with the Committee and its professionals as to whether a

22  particular bill is higher and best.

23          So, my conclusion is after considering everything,

24  I find that these bidding procedures should be approved and

25  I will enter an order approving them.

Page 258

1          Mr. Brody, I looked at the -- I don't know whether
2     you're proposing a different order than the one that was
3     filed with the original motion, but --
4          MR. BRODY:  Well, Your Honor, I have to apologize.
5     Under the mountains of paper at the moment, I can't seem to
6     actually find a copy of the order, but I don't recall any
7     changes being made to the order itself.
8          MR. SELIGMAN:  Your Honor, I don't recall, but
9     perhaps I'm sure between Mr. Brody and myself we can take a
10    look at the order and just make sure the revisions to the
11    auction procedure, to the extent there's some inconsistency,
12    I'm sure we'll work that through and get Your Honor an
13    appropriate order.
14         THE COURT:  I'm sure you will.  So let me get to
15    my specific issues.
16         The order as proposed I think refers to the wrong
17    exhibit to the motion with respect to the M&A agreement.
18    Obviously it will need to be changed to reflect, because I'm
19    ruling and I'm approving the bidding procedures at 118, not
20    the ones that were attached to the motion.
21         Paragraph 5 -- and Mr. Brody, if you don't have
22    your order at hand, I think I saw someone in the back
23    waiving a copy that you might look at.
24         MR. BRODY:  Your Honor, I guess it's good we
25    didn't clear the courtroom.

1          THE COURT:  Paragraph 5, which begins on page 6

2     and carries over on page 7 of what I'm looking at.  The last

3     sentence there contains a provision about the waiving of

4     Rule 6004H and I'm fine with that under the circumstances.

5     Nobody is objecting to that.

6          It also contains something I've never seen before

7     and there are a lot of lawyers in the courtroom perhaps

8     smarter than I am, but I've never seen reference to this

9     Rule 62G.  I had to go read it to see what it is.  And I

10    don't believe it applies unless -- because 7062 was not made

11    applicable in a contested matter unless the Court otherwise

12    orders it.

13         If this is intended to make clear that the Court

14    is not otherwise ordering, fine, but the rule deals with

15    what can be done on appeal.  And I don't think this Court

16    has the authority to tell the district court, the circuit

17    court of appeals or the Supreme Court what jurisdiction they

18    have under rule 62 or some other rule of procedure.  So I'm

19    concerned about what the meaning of that is intended to be.

20         I don't think I can order if Mr. Seligman appeals

21    this, I don't think I can order the district court judge not

22    to do something under this rule.

23         MR. BRODY:  There's a first time for everything,

24    Your Honor.  Your Honor, and that's to the question, frankly

25    standing here right now it doesn't much -- I'll discuss it

Page 260

1    with Mr. Seligman and Mr. Wasserman.

2              THE COURT:  Okay.  Now, paragraph 8 is the only

3    other provision in which I stumbled.  Let me just say, as I

4    understand what you contemplate, you want to have a hearing

5    on April 10th if there is no auction.  And --

6              MR. BRODY:  I actually calculated as April 11th.

7              THE COURT:  I'm sorry, April 11th and you want to

8    have it on the following Monday if there is an auction,

9    correct?

10             MR. BRODY:  Correct.

11             THE COURT:  So that's the 14th.

12             Just a minute.

13        (Pause)

14             THE COURT:  All right.  She's checking on that.

15   My only other issue was with paragraph 8.  What -- this

16   order says that the bank is authorized and directed to pay

17   its share of the stalking horse bidder fee.  What

18   jurisdiction, authority, power, does the bankruptcy court

19   have to direct the bank to do anything?  I don't know what

20   contractual regulatory obligations the bank has that may

21   permit or deny it the ability to do this.  If it's a

22   question of approving that the debtor cause the bank to do

23   it, I'm fine with that, but do I have the authority to enter

24   an order on potentially, I guess, the pain of contempt that

25   the bank has to pay the $750,000 to the stalking horse?

Page 261

1              MR. BRODY:  Your Honor, this is a point that

2       frankly was discussed early on in the process with the

3       stalking horse counsel.  I think the intent -- you're

4       correct.  The intent is that Your Honor would be authorizing

5       the transaction that the debtor's perspective authorizing

6       the -- or directing -- it's --

7              THE COURT:  So the extent that some approval is

8       needed from this Court --

9              MR. BRODY:  Correct.

10             THE COURT:  -- it's given, but I'm not directing

11      on the pain of contempt that the bank must make the payment.

12             MR. BRODY:  Correct, Your Honor.  If Your Honor

13      would like us to soften that language somewhat.

14             THE COURT:  I don't think I have the authority to

15      order the bank to do anything.

16             MR. BRODY:  Okay.

17             THE COURT:  So, yes I would like you to revise

18      that to see if you can address that.

19             MR. BRODY:  Okay.

20             THE COURT:  All right.  So based upon the note

21      that I just received from the courtroom deputy, we can have

22      a hearing on Friday, April 11th at 10:00 a.m. in the

23      eventuality that there is no auction to consider approval of

24      the sale motion, which at that point we would be -- I don't

25      know what objections there would be, but we would be

Page 262

```
 1   considering just the stalking horse bidder's proposing as I
 2   understand what you're proposing.  And at 10:00 on the 14th,
 3   if there has been an auction and there is to be a hearing
 4   after an auction.
 5            So if you would adjust the time tables in here
 6   accordingly.
 7            UNIDENTIFIED SPEAKER:  Sure.
 8            THE COURT:  Anything else we need to do in the
 9   case today?  I think someone wants your attention.
10        (Pause)
11            MR. BRODY:  I guess Mr. Wasserman is raising the
12   question about if Your Honor has a particular issue with the
13   date we would pick for the auction.  I think our intent,
14   what the auction procedures provide for is that the auction
15   would be held, not here.  So I wasn't sure that Your Honor
16   necessarily needed to be aware of that.  I think as long as
17   we're fit within the procedures, I wouldn't think Your Honor
18   has any particularity about the specific date.
19            THE COURT:  Well, have you picked a date?  I mean,
20   I would like to see consistent -- despite the fact I said
21   what I said and I think the debtor has exercised its
22   business judgment, I'm not going to second guess it at this
23   point based on the evidence that I have.  I don't want there
24   to be some arbitrary shortening of this process.  It needs
25   to be as lengthy as it can possibly be to afford as much
```

1    possibility for a third parties to participate in the

2    process.

3              MR. BRODY:  Well, Your Honor, the way I think

4    about it, once the bid deadline of April 6th has been set,

5    which is what the procedures provide for, the days in

6    between from bid deadline to sale hearing almost is really

7    as much a function of making sure that the debtor can

8    appropriately deal with bids that come in.  So I wouldn't

9    expect that the auction would be on April 7th, for example,

10   the day after, because we need to evaluate bids that have

11   come in.  But it needs to give us --

12             THE COURT:  I guess I was assuming it was going to

13   be on the 11th.

14             MR. BRODY:  No, I think the --

15             THE COURT:  Because we don't need the hearing on

16   the 11th if you're having the auction.  It's going to be on

17   the 14th.  If there is no auction, then you can be here on

18   the 11th.

19             MR. BRODY:  No, I think that's right.  I think the

20   expectation was there was going to be some number of days

21   between the bid deadline to the auction.

22             THE COURT:  But that's Monday of this particular

23   week, right?

24             MR. BRODY:  Right, correct, Your Honor.  I think

25   I'm probably going to be -- I'm guessing the 9th or the 10th

Page 264

1    would be the auction.  I think.  I don't know if Mr. Boyan's

2    will --

3              THE COURT:  This is an important date.  I think it

4    needs to be ironed out.  I'm going to take a short recess

5    while you figure out that.

6              THE CLERK:  All rise.  Court is in recess.

7         (Recessed and reconvened)

8              THE COURT:  So do we have a date for the auction?

9              MR. BRODY:  We do, Your Honor.

10             THE COURT:  Excellent.

11             MR. BRODY:  So just to be clear, to set the dates

12   out.  So the bid deadline, which in the redline that was

13   filed said April 6th, which is a Sunday, so we're going to

14   move that to April 7th.  The auction will be April 10th.

15   The sale hearing, again assuming there's no auction will be

16   the 11th.  If there is an auction, it will be the 14th.

17             THE COURT:  Okay.

18             MR. BRODY:  The objection deadline we had in here

19   as March 28th.  I told Mr. Seligman that obviously we were

20   happy to work with the Committee if that date needs to be

21   extended for them, we'll work that out.

22             THE COURT:  I'm sure that whatever the two of you

23   work out will be fine with us.  If you make it too close to

24   the hearing, then it may delay a ruling in the matter,

25   but --

1           MR. BRODY:  I will keep that in mind, Your Honor.

2           THE COURT:  -- you guys are experienced.  I'm sure

3    you will come up with something that's reasonable under the

4    circumstances. Anything else we need to do?

5           MR. BRODY:   I don't believe so, Your Honor.

6           THE COURT:  All right.  Let me just say one last

7    thing.  I noticed that someone -- I don't know who it was --

8    in this case earlier at the last hearing, ordered a

9    transcript.  And I looked at the transcript and I was a

10   little alarmed because one of the attorneys for the debtor

11   was quoted by the Court reporter as saying that the

12   indebtedness to the TruPS was $160 million, when I was sure

13   I had heard 60.  And of course that's consistent with the

14   evidence that I heard today.  We went back and listened to

15   the tape and in fact, the attorney said 60, not 160.  So

16   whoever ordered that transcript, you need to talk with the

17   transcriber, because we need to make sure we're using a

18   transcription service that's getting the job done and

19   getting it done right.  And if somebody ordered that

20   transcript, then I just wanted to point out that we were

21   aware of that error and it's a material error in this case.

22   All right.  Thank you.

23          THE CLERK:  All rise.  This Court is adjourned.

24   (Proceedings concluded at 5:04 PM)

25                        * * * * *

Page 266

1                    I N D E X

2

3              W I T N E S S E S

4    WITNESS              BY                PAGE

5    WILLIAM LESTER

6       BOYAN, III        MR. O'NEILL       38

7                         MR. BROWN         94

8                         MR. O'NEILL       133

9    MARK KEIDEL          MR. SIEGEL        138

10                        MR. BROWN         156

11                        MR. SIEGEL        172

12   CHRISTOPHER K. WU     MR. BROWN         173

13                        MR. O'NEILL       190

14                        MR. BROWN         213

15   CLOSING ARGUMENT     MR. BRODY         215

16   CLOSING ARGUMENT     MR. SELIGMAN      226

17   REBUTTAL ARGUMENT    MR. BRODY         251

18   REBUTTAL ARGUMENT    MR. SELIGMAN      254

19

20

21

22

23

24

25

1                          I N D E X

2

3                        E X H I B I T S

4    NO.                  IDENTIFICATION              RECEIVED

5    Debtor's:

6    1              Merger agreement                      76

7    5              Auction procedures                    80

8    4              Complaint                            145

9    3              Resolution                           156

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                           I N D E X

2

3                        R U L I N G S

4    IDENTIFICATION                              PAGE

5    (6) Motion of the Debtor for the entry of      13

6    interim and final orders establishing

7    notification and hearing procedures for

8    transfers of certain equity securities, and

9    granting related relief filed by First Mariner

10   Bancorp

11

12   (9) Motion for authority to obtain credit       31

13   under Section 364(b), Rule 4001(c) or (d)

14   (filed under Section 364(c), NOT Section

15   364(b)) filed by First Mariner Bancorp

16

17   (43) Application to employ Sandler O'Neill &    14

18   Partners LP as independent financial advisors

19   and verified statement of proposed party filed

20   by First Mariner Bancorp

21

22

23

24

25

1                    I N D E X

2

3                  R U L I N G S, CONTD.

4  IDENTIFICATION                                    PAGE

5  (114) Motion to seal debtor's omnibus reply       23

6  in support of its motions for (I) An order

7  approving, among other things, bidding and

8  auction procedures with respect to the sale of

9  certain assets and bidding protections for the

10  stalking horse bidder filed by First Mariner

11  Bancorp

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    I N D E X

 2

 3               R U L I N G S, CONTD.

 4   IDENTIFICATION                              PAGE

 5   (15) Motion for sale of property under       254

 6   Section 363(b) for (I) An order (A) Approving

 7   bidding and auction procedures with respect to

 8   the sale of certain assets, (B) Approving bidding

 9   protections for the stalking horse bidder,

10   (C) Approving procedures related to the

11   assumption and assignment of certain executory

12   contracts and unexpired leases, (D) Approving

13   the form and manner of notices related to the

14   auction and sale, and (E) Scheduling the sale

15   hearing, and (II) An Order (A) Approving such

16   sale free and clear of liens, claims,

17   encumbrances and other interests and (B)

18   Granting related relief filed by First Mariner

19   Bancorp

20

21

22

23

24

25
```

1

CERTIFICATION

2          I, Sheila G. Orms, Dawn South and Melissa Looney

3    certify that the foregoing is a correct transcript from the

4    official electronic sound recording of the proceedings in

5    the above-entitled matter.

6    Dated:  March 11, 2014

7

8    Sheila Orms
       Digitally signed by Sheila Orms
       DN: cn=Sheila Orms, o, ou,
       email=digital1@veritext.com,
9      c=US
       Date: 2014.03.12 11:54:58 -04'00'

10   Signature of Approved Transcriber

11

12   Dawn
       Digitally signed by Dawn South
       DN: cn=Dawn South, o, ou,
       email=digital1@veritext.com,
13   South
       c=US
       Date: 2014.03.12 11:55:40 -04'00'

14

AAERT Certified Electronic Transcriber CET**D-408

15

16   Melissa Looney
       Digitally signed by Melissa
       Looney
       DN: cn=Melissa Looney, o, ou,
       email=digital1@veritext.com,
17     c=US
       Date: 2014.03.12 11:56:22 -04'00'
     _____

18

MELISSA LOONEY

19

AAERT Certified Electronic Transcriber CET**D - 607

20

Veritext

21

330 Old Country Road

22

Suite 300

23

Mineola, NY 11501

24

25