1   UNITED STATES BANKRUPTCY COURT

2   DISTRICT OF MARYLAND

3   CASE NO. 14-11952-DER

4   - - - - - - - - - - - - - - - - - - x

5   In the Matter of:

6

7   FIRST MARINER BANCORP,

8

9            Debtors.

10  - - - - - - - - - - - - - - - - - - x

11

12                      U.S. Bankruptcy Court

13                      101 West Lombard Street

14                      Baltimore, Maryland

15

16                      April 14, 2014

17                      10:02 AM

18

19  B E F O R E :

20  HON. DAVID E. RICE

21  U.S. BANKRUPTCY JUDGE

22

23

24

25  ECRO - SANDY FRANK

```
1    HEARING Re (15) Motion for sale of Property under Sections

2    363(b) and (I) an Order (A) Approving Bidding and Auction

3    Procedures with Respect to the Sale of Certain Assets, (B)

4    Approving bidding protections for the stalking horse bidder,

5    (C) Approving procedures related to the assumption and

6    assignment of certain executory contracts and unexpired

7    leases, (D) Approving the form and manner of notices related

8    to the auction and sale, and (E) Scheduling the Sale

9    Hearing, and (II) an Order (A) Approving such sale free and

10   clear of liens, claims, encumbrances and other interests and

11   (B) Granting Related relief, Notice Served on 2/10/14, filed

12   by First Mariner Bancorp.

13

14   HEARING Re (118) Line submitting replacement Exhibit D on

15   behalf of First Mariner Bancorp filed by Lawrence Joseph

16   Yumkas (related document(s)(15) Motion for sale of property

17   under Section 363(b) and Notice of motion filed by Debtor

18   First Mariner Bancorp).

19

20   HEARING Re (162) Objection on behalf of RKJS Bank filed by

21   Richard Wasserman

22

23   HEARING Re (163) Motion to Continue Hearing on April 14,

24   2014, filed by RKJS Bank

25   Transcribed by:  Sheila Orms and Sherri Breach
```

Page 3

1    A P P E A R A N C E S :

2

3    KRAMER LEVIN NAFTALIS & FRANKEL, LLP

4         Attorneys for the Debtor

5         1177 Avenue of the Americas

6         New York, NY  10036

7

8    BY:  P. BRADLEY O'NEILL, ESQ.

9         ROBERT T. SCHMIDT, ESQ.

10

11   YUMKAS, VIDMAR & SWEENEY, LLC

12        Attorneys for Debtors

13        2530 Riva Road

14        Suite 400

15        Annapolis, MD  21401

16

17   BY:  LAWRENCE JOSEPH YUMKAS, ESQ.

18

19   KIRKLAND & ELLIS, LLP

20        Attorneys for Official Committee of Unsecured

21        Creditors

22        300 North LaSalle

23        Chicago, IL  60654

24

25   BY:  JEFFREY GETTLEMAN, ESQ.

```
 1   VENABLE LLP

 2         Attorneys for RKJS Bank

 3         750 East Pratt Street

 4         Suite 900

 5         Baltimore, MD  21202

 6

 7   BY:  RICHARD WASSERMAN, ESQ.

 8         MICHAEL SCHIFFER, ESQ.

 9         CHRISTOPHER R. MELLOTT, ESQ.

10

11   REED SMITH LLP

12         Attorneys for National Penn Bank

13         1301 K Street, N.W.

14         Suite 1100, East Tower

15         Washington, D.C.  20005

16

17   BY:  CLAUDIA Z. SPRINGER, ESQ.

18

19

20

21

22

23

24

25
```

Page 5

```
 1              P R O C E E D I N G S

 2        (Call to Court)

 3              THE CLERK:  On the 10 o'clock docket, calling the

 4    case of First Mariner Bancorp, Case No. 14-11952.  Counsel,

 5    please identify yourself and the clients for the record.

 6              MR. YUMKAS:  Good morning, Your Honor, Lawrence

 7    Yumkas, Robert Schmidt, Bradley O'Neill on behalf of the

 8    debtor.  Also with us today is the debtor's internal CEO,

 9    Mr. Mark Keidel.

10              THE COURT:  Good morning.

11              MR. WASSERMAN:  Good morning, Your Honor, Richard

12    Wasserman from Venable LLP, on behalf of RKJS Bank.  With me

13    today is our other Venable partners, Christopher Mellott,

14    John Beatty, Michael Schiffer and I also wanted to introduce

15    to the Court, the President of RKJS Bank, Robert Kunich,

16    Jr., Rob Kunich.

17              THE COURT:  Good morning to all of you.

18              MR. GETTLEMAN:  Good morning, Your Honor, Jeffrey

19    Gettleman from Kirkland & Ellis representing the committee.

20              THE COURT:  And good morning to you.  Anyone else?

21              MS. SPRINGER:  Good morning, Your Honor, Claudia

22    Springer from Reed Smith representing National Penn Bank.

23    And in the courtroom we have a number of people.  Lawrence

24    Able is with me and Paul Jascott from my firm, and Scott

25    Baynor (ph) is President of National Penn Bank.  He's in the
```

1    courtroom as well, as is Mike Hughes, who's the Chief

2    Financial Officer for National Penn Bank.

3            THE COURT:  I know that there were motions for

4    admission pro hoc vitae filed --

5            MS. SPRINGER:  Yes, Your Honor, Saturday.

6            THE COURT:  Yes.  I haven't had a chance to review

7    them.  I don't know whether the fee's been paid, but for

8    purposes of today's hearing, I'm fine with everyone

9    proceeding as if those motions have been granted.

10            MS. SPRINGER:  Thank you, Your Honor, I appreciate

11   that.

12            THE COURT:  Anyone else?

13       (No response)

14            THE COURT:  Very well.  We're here today for a

15   hearing in this case on the proposed sale of assets by the

16   Debtor, First Mariner Bancorp was essentially its most

17   important assets, its stock in First Mariner Bank.  Bidding

18   procedures were approved by the Court.

19            I understand from the record that the auction was

20   conducted.  I have an objection from RKJS, and a motion to

21   continue.  Before I turn the proceedings over to the debtor,

22   Mr. Yumkas, let me say this, for purposes of today's

23   hearing, I would like to make clear that the use of

24   electronic devices by anyone who's in the courtroom and

25   behind the bar, which separates the attorneys from the

1    public is not going to be permitted.

2            If you're using electronic devices out there, you

3    should turn them off.  The attorneys who are inside the bar

4    when you are participating in the conduct of the case may

5    use electronic devices consistent with the rules of the

6    Court.  But we do not permit any recording or photography,

7    but if you're using electronic devices, cell phones, lap

8    tops or whatever for purposes of conducting the case that's

9    okay.

10           If members of the public who are in the gallery

11   wish to use electronic devices, they can leave the courtroom

12   and do so, so as long as they're doing it elsewhere in the

13   courthouse consistent with the rules of court.

14           Mr. Yumkas.

15           MR. YUMKAS:  Thank you, Your Honor, Lawrence

16   Yumkas on behalf of the debtors.

17           Your Honor, as the Court has acknowledged late

18   last night and early this morning, an objection was filed by

19   the stalking horse bidders, which is also accompanied by

20   what can be fairly characterized as a higher offer than that

21   received at the provisional close of the auction on Thursday

22   evening.

23           And given the hour that it arrived, what the

24   debtors would like to do before taking a position is have a

25   chance to meet with both the creditor's committee and then

1    the debtor's own board of directors, in order to get clear

2    direction as to how best to respond.

3             And what we're hoping the Court could consider is

4    postponing this hearing and putting it off until 2 o'clock

5    this afternoon, or at any time this afternoon that would

6    work for the Court's convenience.  We just need some time to

7    talk these issues through.

8             THE COURT:  I see.  Well, let me hear a statement

9    of position from all the other parties in the courtroom who

10   wish to be heard.

11            MR. GETTLEMAN:  Good morning, Your Honor, Jeffrey

12   Gettleman on behalf of the committee.  I mean the papers

13   that came in last night did come in very late, and we've

14   been trying to catch up, and we managed to talk to at least

15   one member of our committee this morning.  But we would also

16   appreciate and support a -- at least a short postponement of

17   the hearing so we can confer with our client and with the

18   other parties.

19            THE COURT:  All right.

20            MR. WASSERMAN:  Richard Wasserman on behalf of

21   RKJS Bank.  We have no objection, Your Honor.

22            THE COURT:  All right.  What about --

23            MS. SPRINGER:  Good morning, Your Honor, Claudia

24   Springer on behalf of National Penn Bank.  While we have no

25   objection to a very brief continuance, we understand the

1    logistics here, and that these papers were filed late last

2    night, and I believe very early in the morning hours.

3              We would oppose any further continuance that is to

4    another day of the sale hearing.  We're here today to

5    proceed with a sale hearing, and today is the day that we

6    would like to proceed.

7              THE COURT:  So you're opposing the request to

8    continue this till 2 o'clock, or are you just -- you're just

9    stressing the idea --

10             MS. SPRINGER:  No, we are not --

11             THE COURT:  -- that we -- you want to have it

12   resolved today.

13             MS. SPRINGER:  Right.  And if it can before 2, we

14   would appreciate that as well.  We don't know why it should

15   take four hours, but if 2 o'clock is the designated time,

16   then we will be here at 2.

17             THE COURT:  All right.  I see.  Mr. Yumkas.  So

18   what is it to be accomplished?  I recognize that the papers

19   were filed at 1:45 this morning, but I was up at 6 o'clock,

20   I read them.  And obviously there's two sides to every

21   story, but reading what RKJS says, it doesn't seem to me

22   that what they're saying is a surprise to the debtor this

23   morning.

24             So, I mean, why -- what's to be accomplished by

25   this postponement if it's at 2 o'clock or some other time

1   today?

2           MR. YUMKAS:  Well, Your Honor, the -- there is an

3   offer contained in the objection, and the papers filed with

4   it that is -- it's an offer that moves the needle in this

5   case, and the board of the debtors think it would be prudent

6   to at least consider it, and of course, weigh in with

7   respect to whether it can be considered, given the auction

8   procedures.

9           THE COURT:  All right.  Does anybody else wish to

10  be heard on the issue of this request for a short

11  postponement?

12      (No response)

13          THE COURT:  I'm going to take a short recess.

14          THE CLERK:  All rise.

15      (Recessed at 10:10 a.m.; reconvened at 10:12 a.m.)

16      (Call to Court)

17          THE COURT:  Through the recess, I considered the

18  request for a short continuance of this hearing, and I think

19  given the development since the auction, I'll use the word

20  concluded without being conclusory, when the bidding

21  stopped, there had been no developments, and the debtor

22  wishes to have an opportunity to consult with everyone and

23  the committee about what to do in light of the current state

24  of play, I think it is appropriate to grant that request.

25  We will continue this hearing until 1:00 p.m. this

1    afternoon.

2            THE CLERK:  All rise.

3        (Recessed at 10:12 a.m.; reconvened at 1:03 p.m.)

4        (Call to Court)

5            THE CLERK:  On the 1 o'clock docket, calling the

6    case of First Mariner Bancorp, Case No. 14-11952.  Counsel,

7    please identify yourselves and your clients for the record.

8            MR. SCHMIDT:  Good afternoon, Your Honor.  For

9    First Mariner Bancorp, the Debtor, Robert Schmidt from

10   Kramer Levin Naftalis & Frankel, accompanied by my partner

11   Bradley O'Neill and Larry Imkus (ph).

12           THE COURT:  Good afternoon.

13           MR. GETTLEMAN:  Good morning, Your Honor or

14   afternoon, Your Honor, Jeffrey Gettleman from Kirkland &

15   Ellis representing the committee.

16           THE COURT:  Good afternoon to you.

17           MR. WASSERMAN:  Good afternoon, Your Honor,

18   Richard Wasserman, Venable LLP, with me is Christopher

19   Mellott, John Beatty and Michael Schiffer is on his way, on

20   behalf of RKJS Bank.

21           THE COURT:  Good afternoon to all of you.

22           MS. SPRINGER:  Good afternoon, Your Honor, Claudia

23   Springer from Reed Smith with Paul Sascot and Lawrence Able

24   (ph) for National Penn Bank.

25           THE COURT:  Good afternoon to you.

Page 12

1              UNIDENTIFIED:  Good afternoon.

2              THE COURT:  We're here for a continuation of this

3     hearing.  Does the debtor have a report on the status of

4     affairs?

5              MR. SCHMIDT:  Thank you, Your Honor, and thank you

6     for the accommodation of the additional time.  A lot of

7     activity has occurred over the last couple of hours.  I

8     can't say that we've reached closure on anything at this

9     point in time, not for lack of trying on the part of all

10    parties.

11             So I guess the report would be that it would be

12    our intent to go forward with the sale approval hearing.  I

13    know there are -- Mr. Wasserman's motion is also on or

14    Venable's motion for the continuance is also on.  We can,

15    you know, proceed however Your Honor would like to, just in

16    terms of sequencing.

17             THE COURT:  What I'd like to do is hear maybe a

18    ten minute statement of position from each of the parties on

19    the status the sale, and the approval of the proposed

20    sale, and the request by RKJS that this hearing be

21    continued.

22             UNIDENTIFIED:  Who would you like to go first,

23    Your Honor, on --

24             THE COURT:  I'd like to hear from the debtors,

25    it's the debtor's motion.

1           MR. SCHMIDT:  Thank you, Your Honor.  Again, for

2    the record, Robert Schmidt from Kramer Levin.

3           Your Honor, as the Court noted earlier this

4    morning when we first came on the record briefly, on March

5    8th, this Court approved an order approving the bid

6    procedures governing the auction and sale process, and that

7    was at Docket No. 122.

8           After that order was entered, notice of the sale

9    motion and auction procedures was served on all parties, and

10   publication was made in the Baltimore Sun in accordance with

11   the Court's order.  In connection therewith, the debtor's

12   investment banker, Sandler O'Neill proceeded to remarket the

13   bank shares by contacting 50 some odd potential strategic

14   buyers, and you know, a variety of other parties who have

15   expressed interest in these assets over the last several

16   months if not years.

17          The one bank -- the one party that showed up that

18   expressed the strong interest and conducted extensive due

19   diligence as National Cam Bancshares.  They signed a NDA,

20   they started diligence, and the good news is that on the

21   March 7th bid deadline, they submitted a bid which was

22   accompanied by a proposed merger agreement, and a deposit of

23   $2.9 million, which was the requirement under the bid

24   procedures.

25          At that point, the debtor and its advisors

1    promptly analyzed the bid, and in consultation with the

2    committee, determined that it was a qualified bid under the

3    bid procedures.  We also with Sandler O'Neill and the

4    company conducted reverse due diligence on National Penn to

5    ensure that, you know, we felt that they would be able to

6    close the transaction in a timely manner.

7            Prior to our determination that Nat Penn was

8    qualified, we received a fairly detailed letter from counsel

9    for RKJS, it's referenced in their objection, in which they

10   raised a number of questions as to the bid qualifications of

11   Nat Penn.  We closely analyzed that letter response.  We

12   consulted extensively with the committee, and ultimately

13   concluded that the issues raised in that letter were not

14   meritorious, and we continued to view Nat Penn as a

15   qualified bidder.

16           Pursuant to the auction procedures order on April

17   10th, we held an auction for the debtor's equity interest.

18   That auction was held I guess across the way at the office

19   of Miles Stockbridge.  It was a very spirited auction, there

20   were multiple rounds of bidding, and it went well late into

21   the evening.  I think we concluded at around 10:30 or

22   thereabouts.

23           As -- we were fortunate in that we had

24   sophisticated and capable bidders represented by experienced

25   bankruptcy and corporate counsel, which certainly made the

1   auction proceeding a little bit more easier to deal with.

2   We were quickly -- relatively quickly harmonize the

3   documents, so that to the greatest extent possible, had

4   bidding on an apples-to-apples basis.  Although when we get

5   into some testimony a little later on in this, Mr. Boyan

6   will describe in much more detail the way in which the

7   bidding was actually conducted.

8           Your Honor, at the conclusion of the auction, the

9   amounts bid in our view were virtually identical.  The RKJS

10  bid on a face basis was slightly higher.  By the way, the

11  whole total increase from the initial stalking horse bid was

12  I think roughly about 500 percent.  The net to First

13  Mariner's estate increased by approximately 11 million,

14  based on a final net bid by National Penn of 13729025.

15          That number, when I say net bid, they obviously

16  had -- from their total bid, had to back out the break-up

17  fee and expense reimbursement, and a potential purchase

18  price adjustment that was contained in their contract.

19          Your Honor, during the course of the auction

20  proceedings that night, we extensively consulted with the

21  creditor's committee.  We had a special subcommittee of the

22  board of directors that was involved.  We had a chair of

23  that subcommittee was present for the entirety of the

24  auction, and there were -- if you look at the auction

25  transcript, there are many hours of deliberations, you know,

1    pretty much non-stop throughout the day.  Unfortunately, we

2    didn't have dinner, so we kept on going.

3           So -- but after those deliberations, the -- you

4    know, the debtor determined that the bid to National Penn

5    was the best bid, primarily because, you know, we read the

6    economic differences as pretty de minimus, but we did feel

7    after extensive conversations with regulatory counsel, with

8    special committee, the creditor's committee and others, that

9    the Nat Penn bid was the better bid because of the certainty

10   of closing.  Nat Penn is a large institution that's an

11   incredibly well capitalized institution, and based on our

12   diligence, we had no qualms that they would be able to

13   close.

14          THE COURT:  When was any of that concern

15   communicated in the auction?  Because I -- remember, all I

16   had was the objection and the transcript, but if that's a

17   concern that was a factor, it seems like it's come

18   completely out of the blue.

19          MR. SCHMIDT:  No, I don't think that's correct,

20   Your Honor.  There were discussions throughout the auction

21   process with representatives of RKJS.  We did have a concern

22   that as the bidding got higher, and truthfully, the bidding

23   went higher than we had a realistic expectation.  But

24   because the RKJS bid is what we'll call a club deal, where

25   there are many, many different investors in the group, there

1   was a concern that as the numbers got higher, that the

2   regulatory issues took on -- potential regulatory issues

3   took on more prominence.

4          THE COURT:  Wasn't the process, I mean, I don't

5   want to cut you off, but again, all I've done is read what

6   is in the objection.  It seems like there was a fairly

7   organized process, a spreadsheet and model had been

8   developed, and in looking at what I can see so far, it seems

9   like the implication of the debtor's process was that if the

10  next bid was made, it was necessarily higher.

11         And so I have a hard time from the record

12  understanding how the debtor concluded that these other

13  factors, which were never discussed on the record, somehow

14  had greater economic value than what was being implied by

15  the process that was being employed.

16         MR. SCHMIDT:  Understood, Your Honor.  It was --

17  you know, throughout the process, the regulatory overlay was

18  an important feature that was discussed frequently

19  throughout the day and prior to that.

20         It's hard to -- selling a bank is a lot different

21  than selling a manufacturing company or a retailer or

22  different types of business that us bankruptcy practitioners

23  often do.  The regulatory overlay, you know, creates a level

24  of uncertainty and a level of subjectivity that, you know,

25  we had to grapple with, which is, you know, why we had

1    experienced regulatory counsel, each of the parties has

2    experienced regulatory counsel who are very actively

3    involved in the deliberative process.

4              THE COURT:  Is the debtor contending that RKJS is

5    not capable of closing the deal that it's proposing in its

6    more recent, modified, amplified purchase price?

7              MR. SCHMIDT:  No, we're not suggesting that at

8    all, Your Honor.  You know, we're suggesting that based on,

9    you know, everything that we know, and all the diligence

10   that we have done on each of the parties, that the National

11   Penn has a higher likelihood of getting approval sooner and

12   in a more timely manner.

13             The fact of the matter is, RKJS --

14             THE COURT:  Why does that matter?

15             MR. SCHMIDT:  Well, it matters in --

16             THE COURT:  RKJS eliminated its downside purchase

17   adjustment -- price adjustment, which was a concern to me

18   frankly because it implied the price could go to zero.  If

19   that's been eliminated, then why does it matter whether one

20   or two weeks or a month or whatever --

21             MR. SCHMIDT:  Because they have -- because one,

22   just because of the way -- I mean, their initial deal came

23   to be, they don't have a deposit at risk.  And two, they

24   have a walkaway right when you get to --

25             UNIDENTIFIED:  April 30th.

1            MR. SCHMIDT:  April 30th.  So if they don't have

2    regulatory on April 30th, they can walk and, you know, we'd

3    be left with nobody.  So, you know, the timing is quite

4    critical.

5            The only other comment I had to add is that, and

6    it's in RKJS's objection, a few hours after the conclusion

7    of the auction at about -- I think about 4 a.m. in the

8    morning, they did submit a revised proposal upping the bid

9    by an additional million dollars.

10           We immediately early the next morning had our

11   deliberations amongst our folks, the committee, and we

12   determined that even with that additional million, we still

13   felt that the Nat Penn bid was the better bid.

14           THE COURT:  So the debtor is saying to the Court

15   that something about the likelihood of -- not so much the

16   ability to close the loan, but to obtain regulatory approval

17   promptly was a factor, was the factor that decided the

18   auction?

19           MR. SCHMIDT:  That was ultimately among the

20   tenable factors, yes, Your Honor.

21           THE COURT:  And what's the evidence going to show

22   the Court that would support the debtor's exercise of its

23   judgment on that?

24           MR. SCHMIDT:  Sure.  In addition, we would propose

25   in addition to the testimony of Mr. Boyan, who will go

1   through more of the auction mechanics and those types of

2   issues so the Court is aware how things were played out,

3   we'll also hear testimony from Mr. Keidel, the interim CEO

4   who will testify as to the deliberative process, the board

5   process, and how we consulted with the committee and came to

6   the ultimate conclusion.

7              THE COURT:  So this is all going to be -- I

8   hesitate to use the word off record, so that -- because

9   that's kind of unfair in characterizing what takes place in

10  these sort of proceedings.  But there's going to be a lot of

11  testimony about matters that were not discussed on the

12  record of the transcript of the auction, but went on in

13  these discussions that were outside of the bidding room, and

14  during the various breaks when there was consultation and

15  discussion?

16             MR. SCHMIDT:  That's correct, Your Honor.  For the

17  most part, the only thing that really was on the record was

18  the actual bidding itself, not any of the deliberative

19  process.

20             THE COURT:  All right.

21             MR. SCHMIDT:  So unless the Court had any further

22  questions, you know, we're prepared to turn to the testimony

23  either by proffer or by live testimony, whichever the Court

24  would prefer.

25             THE COURT:  Well, before we turn to the testimony,

Page 21

1    I thank you for your statement of the position the debtor is

2    taking what the evidence is going to show.  But I'm going to

3    take up and make a ruling on the RKJS motion that's asking

4    for this hearing to be postponed, and in effect, we don't

5    begin with your case because they say they need the

6    opportunity to take discovery about why the other bid was

7    selected as best.

8              MR. SCHMIDT:  Fair enough, Your Honor.  The only

9    -- well, I guess we'll have a chance to respond after Mr.

10   Gettleman presents his argument.

11             THE COURT:  Yes, sure.

12             MR. SCHMIDT:  Thank you.

13             THE COURT:  All right.  I'd like to hear next from

14   National Penn.

15             MS. SPRINGER:  Good afternoon, Your Honor, Claudia

16   Springer from National Penn Bank.  Should I direct my

17   statements only to the motion that's been made for the

18   continuance of the hearing or --

19             THE COURT:  You can do -- I asked for oral

20   statement of position, and I indicated --

21             MS. SPRINGER:  Sure.

22             THE COURT:  -- I'm taking up the motion to

23   postpone, so --

24             MS. SPRINGER:  Okay.

25             THE COURT:  -- however you want to use your time.

1          MS. SPRINGER:  So, Your Honor, thank you.  We're

2     here today to hopefully have the motion of the debtor to

3     sell the assets of the estate approved to National Penn

4     Bank.  We're prepared to go forward with our final bid that

5     was submitted on Thursday evening, that's why we came here

6     today.  You know, we were certainly somewhat surprised by

7     the papers that were filed last night by the other bidder.

8          Having said that, we're aware that they would like

9     to continue this hearing.  We're not prepared to have the

10    hearing continued.  We're a public company, we have earnings

11    reports that are coming out.  There is reason that we need

12    this to be decided today, and that's why we're all here

13    today.  And so if this is continued, I don't believe that

14    National Penn would be part of the bidding process.

15         THE COURT:  All right.  I have no questions.  You

16    stated your position, thank you.

17         MS. SPRINGER:  Thank you, Your Honor.

18         THE COURT:  I'd like to hear from the creditor's

19    committee, what's the committee's -- well, before you begin,

20    let me ask you, I was a little puzzled by the transcript

21    because it did not appear that anyone from the committee

22    attended the bidding session, other than perhaps your

23    financial advisor.

24         MR. GETTLEMAN:  And that must be a mistake.  Both

25    Mr. Seligman and I were both present during the whole

Page 23

1      bidding -- the auction process.

2              THE COURT:  Good, okay, I'm glad we clarified that

3      then.  So what's the committee's position on what the Court

4      should do today both on the proposed sale and the motion

5      from RKJS?

6              MR. GETTLEMAN:  So briefly, Your Honor, without

7      rehashing anything that the debtor has said, the committee,

8      first of all, believes that the auction process went off

9      according to its rules, and was concluded according to its

10     rules.  I mean, the -- we, as Mr. Schmidt said, we consulted

11     with the debtor throughout the process, and I mean, our view

12     is, just you know, looking at the simple kind of situation,

13     the debtor's counsel outlined some ground rules at the

14     beginning of the hearing, which I'm sure you've seen in the

15     transcript.  And the idea was that the bidding would proceed

16     sequentially with each party having a bid, and then after

17     time when the party, the last party said they were done

18     bidding, then that was the end of the auction.  And that's

19     basically what happened.

20              And so our view is that the auction followed the

21     rules.  So the -- as far as the -- you know, we also

22     consulted with the debtor about the -- this was prior to the

23     auction about the RKJS's concerns about Nat Penn being a

24     qualified bidder, and we also consulted with our regulatory

25     and corporate attorneys, and we came to the same conclusion

1   as the debtor, that the committee believed that Nat Penn's

2   bid was -- or sorry, Nat Penn was a qualified bidder.

3          As far as the outcome of the auction, again, you

4   know, we've considered the bidding carefully ourselves, and

5   also consulted with the debtor.  From the committee's

6   perspective, of course, we're most interested in what funds

7   are going to ultimately come into the estate.  And if you

8   look at the numbers, just the numbers of the money that's

9   coming into the estate, the Nat Penn bid actually higher by

10  I think our number is like $561,000.

11         Now, it is true that there were some adjustments

12  made during the bidding process.  There were some credits

13  given to RKJS, but those are just credits for purposes of

14  bidding the way we look at it.  And so they weren't like

15  money coming into the estate.  So from the creditor's

16  committee's perspective, the Nat Penn bid was monetarily

17  economically superior.

18         And then finally, we also discussed with our own

19  regulatory counsel, and basing it on our own experience and

20  other bank situations, regarding the --

21         THE COURT:  What was the point in conducting

22  bidding if you off record, as a committee, had concluded

23  that there was some secret aspect of it, that affected the

24  dollar value of the purchase price being made by one of the

25  -- proposed by one of the parties?  I don't understand that.

1             MR. GETTLEMAN:  Well, I think it was more of a --

2    I think the -- well, first of all, it isn't our decision,

3    it's the debtor's decision.

4             THE COURT:  But when you represent the committee,

5    I'm asking you now as the representative of the committee,

6    what is the committee's position today.  I'm not interested

7    in justifications, rationalizations for what took place, in

8    terms of what I'm asking you.  What does the committee want

9    the Court to do today about the situation as it exists right

10   now at 1:25 p.m. on Monday?

11            MR. GETTLEMAN:  Well, that's easy.  We want you to

12   approve the sale based on the auction results.

13            THE COURT:  So disregard the subsequent much

14   higher offers being made by RKJS?

15            MR. GETTLEMAN:  Well, we -- yes, that's correct,

16   Your Honor.

17            THE COURT:  Why?

18            MR. GETTLEMAN:  Well, again, I mean, I think the

19   -- there's two aspects to this.  One is the straight

20   economics of the bid that was approved at the conclusion of

21   the auction.  But the other part of it is, though, Your

22   Honor, that -- and this relates to I think the business

23   judgment of the debtor and accepting -- you know, deciding

24   which bid was superior is that, you know, I -- I mean, we

25   have seen, and I've seen myself, you know, regulators in

Page 26

1     these situations do things that are unexpected.  I mean the

2     bank regulators are basically a blank box, they don't tell

3     you what they're thinking or doing.

4             I mean, even in the letter today that -- or sorry,

5     yes, maybe it was late last night, RKJS submitted with their

6     new bid, it said something to the effect that, they had --

7     because of their increased bid, they had to submit a revised

8     application to the regulators.  And the regulators, I think

9     what they said was, we hadn't -- they hadn't heard anything

10    from the regulators to indicate that the regulators weren't

11    pleased with it, or something like that.  But that's really

12    not the point.  I mean, the regulators don't have any

13    obligation to tell RKJS or anybody else anything about their

14    position.

15            THE COURT:  Well, why does it -- I mean, why is

16    that really a factor?  I mean, the bidding went way higher

17    than anybody expected.  The regulators haven't passed on the

18    bid by Nat Penn, have they?  So, I mean, yes, it's a factor,

19    but why is that so critical?

20            MR. GETTLEMAN:  Well, it's a factor because

21    ultimately, and again, I'm basing this on my own personal

22    experience as well as seeing other, you know, our

23    consultation with our own regulatory counsel is, you know,

24    regulators in a lot of situations, and I'm not saying this

25    is necessarily this situation, but of course, we don't know

1      what the regulators are saying, so we have to go with our

2      own experience to form our judgments.  And, you know, the

3      judgment is that the regulators, in our experience, have

4      seemed to favor offers to buy banks like this from other

5      banks or bank holding companies, as opposed to investor

6      groups.

7              Now, that's not true universally, but it does

8      involve to us sitting out, you know, looking in at the

9      regulatory process, to us, it's a risk.  And so therefore,

10     we would rather go with the institution that we think has

11     more probability of closing at the end of the day.

12             THE COURT:  All right.  So you would say -- what

13     are you saying with respect to the motion that RKJS has made

14     to --

15             MR. GETTLEMAN:  Well --

16             THE COURT:  -- continue the proceeding because

17     they say discovery is needed.

18             MR. GETTLEMAN:  I -- so my understanding of the

19     way that the auction procedures read is that Nat Penn's bid

20     is irrevocable until the sale hearing, I think is the way it

21     reads.

22             So if this hearing is continued, I mean, I think

23     and Nat Penn said that they, you know, say that they have to

24     have it decided today, and they're going to withdraw from

25     the process, then you know --

```
 1              THE COURT:  Well, they can say what they wish,

 2     that doesn't make it so.

 3              MR. GETTLEMAN:  No, no, no, I'm not saying that

 4     they will.  But I'm just saying to the extent that Nat Penn

 5     intends to, you know, withdraw from the process, the

 6     committee would obviously rather see the bird in the hand.

 7              THE COURT:  What part of the bidding procedures

 8     are you referring to?

 9              MR. GETTLEMAN:  Your Honor, I'm sorry, I do not

10     have that in front of me.  I read it this morning.  It is

11     Section 6(e) on page 4 at the bottom of the page.

12              THE COURT:  All right.  I see what that says.

13              MR. GETTLEMAN:  I think that's all I have to say

14     unless the Court has further questions.

15              THE COURT:  No, thank you.

16              MR. GETTLEMAN:  Thank you, Your Honor.

17              THE COURT:  Mr. Wasserman.  We had the auction,

18     somebody else was determined to be the highest bidder, why

19     should the Court a) upset that; and b) why should we delay

20     these proceedings by a week, which is what I understand you

21     to be asking, given all the concerns that are being raised?

22              MR. WASSERMAN:  Thank you, Your Honor.  I'll

23     address the motion for the short continuance that we

24     requested in just a moment.

25              I think there are a number of points I want to
```

1    respond to in the various arguments presented by counsel.

2    It's incredibly indicative of the frustration that we'd

3    faced throughout, and why we think this auction was

4    hopefully tainted the way -- particularly the way it ended,

5    Your Honor, and I'll come back to that in a moment.  Because

6    my client was clearly prepared to make a higher bid and was

7    never given the opportunity to do that, I'll come back to

8    that in a moment.

9              I think very telling, Your Honor, in Mr. Schmidt's

10   argument, in talking about the regulatory approval issue

11   that Your Honor was addressing.  A big concern -- let me

12   just preface this by saying, until the statements that Your

13   Honor just heard, that we all have heard today in court, we

14   have never been told what the reasons were that the higher

15   bid of RKJS was passed over, and the lower bid of Nat Penn

16   was taken, without giving us an opportunity to come back and

17   increase our bid if it was a result of economics or

18   something that -- we heard from Mr. Schmidt.  While the big

19   concern, so we just heard it today finally, was that there

20   was a walk away right at April 30th, that RKJS had in its

21   contract.

22             At the beginning of the auction, and I think this

23   would probably be reflected in the transcript, if I could

24   find a few minutes finding it, there is no question, Your

25   Honor, that in fact, we agreed right at the beginning, may

1   have been our first opening, Your Honor, to add the same

2   extension to May 31st that is contained in the Nat Penn

3   contract.

4           THE COURT:  I think that's important.  I'm going

5   to take a short recess while you locate that.

6           THE CLERK:  All rise.  Court is in recess.

7       (Recessed at 1:30 p.m.; reconvened at 1:33 p.m.)

8       (Call to Court)

9           THE COURT:  All right.  We left off, Mr.

10  Wasserman, you were going to look for that reference to May

11  30th, I think it was.

12          MR. WASSERMAN:  Yes, Your Honor.  Thank Your Honor

13  for letting me do that.

14          If Your Honor would turn to page 29 of the auction

15  transcript, what place this is in the auction, this is, in

16  fact, the beginning of the auction.  This is our first bid.

17  And Mr. Schiffer, Michael Schiffer from Venable was

18  presenting our bid.

19          If you begin on line 22, on page 29, I'll read it

20  for the record, Your Honor.  "So four parts to our bid that

21  will be revisions to the current RKJS merger agreement, the

22  first, as has been requested by the debtor, we are willing

23  to extend the deadline for the drop date dead date on being

24  able to terminate the merger agreement in the event that

25  regulatory approval has not been received to May 31."

1          So the language would be much like the language in

2     the Nat Penn agreement, and if you look at their merger

3     agreement, they have similar language, and we indicated we'd

4     do the same, or essentially the same.  But May 31 was

5     clearly the date.

6          So that if all other conditions were satisfied,

7     other than regulatory approval, then the April 30 deadline

8     would automatically be extended to May 31.  This was an

9     order to equalize the two for bidding purposes, Your Honor,

10    we did this in our first bid on the record.

11         And again, this is just illustrative of what went

12    on through this whole process.  Okay.

13    `    Also a comment from creditor's committee counsel,

14    Your Honor, we heard for the first time here in court today

15    that there was a new factor that went into the determination

16    of which was the best bid, I suppose.  Although I guess this

17    would say it was a higher bid.  For the first time, the

18    creditor's committee had a completely different

19    interpretation of the bidding, and said that well, they

20    evaluated Nat Penn as the higher bid.  Well, that's totally

21    inconsistent with the entire auction.

22         We attach the last bid sheet that was going on

23    throughout the auction after each round, it went through at

24    least ten rounds, I think it shows, we were the higher

25    bidder by our last bid, it was clearly so.  And now we hear

1    for the first time something never discussed, never

2    mentioned in the record, or anything like that, oh, they

3    didn't think we were the higher bidder.  They didn't tell

4    this.

5              So you can't run an auction based on factors,

6    inconsistent with what the debtor was doing, or at least

7    what the debtor said it was doing.  We don't know what they

8    were really doing.  That's one of the things I'll come to in

9    a moment.  That's why we need discovery, if we have to go

10   forward on this.

11             In any event, this is amazing that now there's a

12   new thing that they thought in their minds that Nat Penn's

13   bid was the higher bid.  Just as I say, totally inconsistent

14   with the entire proceeding in the auction itself.

15             Okay.  Your Honor, what I'm going to -- would like

16   to do is just make my argument on this motion for the short

17   continuance.

18             THE COURT:  That's fine.

19             MR. WASSERMAN:  If I might.  So, Your Honor, RKJS

20   objects strenuously to what happened at the auction held on

21   April 10.  Details are provided in our objection to sale,

22   including our position that the auction should not have been

23   held, and that's the issue of the qualified bid, Your Honor.

24   And under the auction procedures, RKJS was the highest

25   bidder, and therefore was the successful bidder.

1          Your Honor, in our judgment, the auction was a

2     travesty, as we set forth in some detail in our objection,

3     it was seriously flawed and tainted.  The premature and

4     totally arbitrary end of the auction was contrary to the

5     auction procedures, and resulted in the debtor's estate not

6     getting the highest and best bid for its assets.

7          The premature end to the auction cut off any

8     further bids, notwithstanding that RKJS was prepared to make

9     a substantially higher bid at the auction after it was

10    announced that the debtor had chosen someone else

11    notwithstanding we had the higher bid.

12          To re-emphasize the point, the debtor cut off the

13    bidding before RKJS was finished bidding, and would not let

14    us bid further.  RKJS never said that we were finished

15    bidding.  Remember the last thing that happened was Nat Penn

16    said, it had no further bid.  We had a bid outstanding,

17    which was the highest bid at the time.  No one came back to

18    us.

19          Indeed RKJS had already -- has already, excuse me,

20    Your Honor, there was -- we had more money to bid, this is

21    evidenced by the fact that we've already proposed offers for

22    an additional $4 million.  Yes, an additional $4 million

23    we're prepared to add to the final number that we had on the

24    table at the auction.  And we've communicated this to the

25    debtor, the committee, other parties.

1          We were prepared to present higher bids at the

2     auction.  The auction needs to be a fair and transparent

3     process, which it certainly was not.  It is undisputed that

4     RKJS had the highest bid at the end of the auction.  I'll

5     footnote that now, Your Honor.  We heard something new from

6     creditor's committee counsel that we never knew until we

7     walked into this room, notwithstanding this fact, and we

8     still contend, Your Honor, it's still undisputed because if

9     you look at the debtor's own sheets, we were the highest

10    bid.

11         Notwithstanding this fact, debtor's counsel

12    announced without prior warning, and without any explanation

13    whatsoever, that the debtor had made the decision subject to

14    board approval to accept the lower bid of Nat Penn without

15    giving RKJS an opportunity to respond or further increase

16    its bid.

17         Debtor's counsel said the auction was over, and

18    directed the court reporter to cut off the record.  RKJS's

19    counsel asked to respond, and was told, no, the auction is

20    over.  Debtor's counsel --

21         THE COURT:  Mr. Wasserman, I'm sorry, we're going

22    to have to take a short recess.

23         THE CLERK:  All rise.

24      (Recessed at 1:40 p.m.; reconvened at 1:55 p.m.)

25      (Call to Court)

1          THE COURT:  Mr. Wasserman, I apologize for the

2     interruption, but I think we're ready to resume.

3          MR. WASSERMAN:  Thank you, Your Honor.

4          Let me just pick up where we left off.  We were

5     talking about, and I really want to paint the picture of

6     what happened at the end of this auction because it was

7     quite appalling.

8          So after a two and a half hour break, debtor's

9     counsel comes back in, announces the result, the preliminary

10    result.  Debtor's counsel then says, the auction's over,

11    directed the court reporter to cut off the record.  RKJS's

12    counsel requested an opportunity to respond, and was told,

13    no, the auction was over.

14          Debtor's counsel, the debtor, its financial

15    advisors, the committee's counsel and financial advisors,

16    Nat Penn and its advisors all packed their bags and walked

17    out of the auction room.  RKJS had no opportunity to try to

18    discuss the auction procedures, or present a higher offer,

19    which would've provided additional value to the debtor's

20    bankruptcy estate.

21          We've heard a little bit from counsel, as to what

22    their -- what the debtor assigned as reasons.  Until we

23    heard it today, we had no reason at all given to us as to

24    why the debtor made the decision that it did.

25          We're entitled to know why and explore the

1    reasons, and what went into that decision.  For example,

2    were there any understandings not on the record reached with

3    Nat Penn.  We have no idea.  We're requesting in our motion

4    a short continuance to take discovery because of the

5    importance of the Section 363 sale in this case, the Court

6    should have a full record before it when it makes its

7    decision.

8         We submit that if RKJS is not declared by this

9    Court to be the winning bidder, as we believe is correct

10   under the auction procedures, the auction should be reopened

11   to allow for further bids, so that the estate can maximize

12   the value of its assets.

13        RKJS advised the debtors several hours after the

14   auction ended that it was prepared to increase its already

15   higher bid by an additional $1 million.  That was at 4 in

16   the morning.  The auction ended at 10:30.

17        Indeed, last evening, RKJS further upped its offer

18   to the debtor by another $3 million, to a now total of $4

19   million, better than what was the highest bid at the

20   auction.  That is a premium over 30 percent above the value

21   to the estate of Nat Penn's bid.

22        It is in the best interests of all parties to

23   pursue the auction in this case to a fair conclusion, to

24   achieve the best price for the debtor's assets.  RKJS has

25   spent countless hours and millions of dollars in its efforts

1    to save First Mariner Bank as a local Maryland banking

2    institution, serving the people of the State of Maryland,

3    and the City of Baltimore.

4           To see this effort go up in smoke, poof, by a

5    flawed and tainted auction process is not right, it's not

6    fair, it's not in the public interests.  We're asking for a

7    short continuance to do needed discovery, so that we can

8    present a full record to this Court.  No one will be

9    prejudiced by a brief delay for a week or so.

10          I'll come back to the issue raised by Nat Penn's

11    counsel in just a moment.  There are far too many unknowns

12    here, including the reasons for the debtor's decision to

13    select Nat Penn.  They need to be explored through

14    discovery, so that this proposed sale to the lower bidder at

15    the auction is not rushed through the court.  Due process

16    requires no less.

17          Let me come back to just a couple of points raised

18    by other counsel as to regulatory approval.  Your Honor

19    needs to understand that RKJS has been at this process for

20    months.  We have communicated regularly with the regulators,

21    debtor's counsel has been on many of the calls, I think

22    there's a weekly call that includes both debtor's counsel,

23    as well as RKJS's counsel.

24          Mr. John Beatty from our office has been leading

25    that initiative, he's regulatory counsel for RKJS.  All of

1    the papers that the regulators have requested have been

2    submitted to the regulators.

3              By contrast, as of the time of the auction, Nat

4    Penn hadn't even begun its regulatory approval.  So we're

5    there with all of our papers submitted, and they hadn't even

6    begun the process, Your Honor.

7              Your Honor, we also had this question or the issue

8    raised by Nat Penn's counsel that "If this hearing is

9    continued, Nat Penn will not be part of the bidding

10   process."

11             Well, that's pretty indicative of the other party

12   to the contract that is being asked to be approved as to how

13   fickle they are, and what the risk of closing that

14   transaction is going to be.  Seems they cited by Mr.

15   Gettleman flies directly in the face of the auction

16   procedures, Section 6(e).

17             So I think that needs to be taken into

18   consideration as well.

19             Finally, Your Honor, let me just conclude, I want

20   to commend to the Court's reading a case cited in our

21   objection, which is the case of In Re Sunland on page 15 of

22   our memo.  It's a case decided from the District of New --

23   the Bankruptcy Court for the District of New Mexico, on

24   March 25th of this year, a couple of weeks ago.  It's by

25   Bankruptcy Judge David Thuma, I don't know --

1              THE COURT:  I have it.  I have it.

2              MR. WASSERMAN:  You have it, okay.

3              THE COURT:  I have a copy here.

4              MR. WASSERMAN:  Yeah, I think it's an excellent

5    case.  It sets out the circuit court authority for the -- if

6    Your Honor doesn't rule that RKJS is just the winner, which

7    I believe is consistent with the auction procedures, it's

8    addressed in our objection, then this provides the

9    rationale, the support, the underpinnings for reopening the

10   auction in this case.

11             Our bid is over now with the $4 million over 30

12   percent higher than the other bid.  The auction process was

13   flawed, and we submit the auction should be reopened as our

14   alternative relief that we're asking for, Your Honor.

15             Let me pause here and see if the Court has any

16   questions for me.  Our main relief is if this is going

17   forward, we do think we're entitled to -- we tried to keep

18   our request very short, to try to expedite discovery, and it

19   obviously requires cooperation of all parties.  So we're not

20   trying to delay this and we are trying to get to the bottom

21   of this so the Court can have a full record if the Court

22   hasn't already, you know.  If the Court has any questions, I

23   am happy to answer those.

24             THE COURT:  Thank you.  I -- yes, I do have a

25   question.  I take from what you ended with here, that among

1   the positions your client is asserting is the idea that the

2   Court should reopen the bidding.  And I suppose on the

3   premise that the process seemed, at the very least to imply,

4   that the last bid that your client made was highest and

5   best.  And then for the first time you learned in these

6   events at the very end of the hearing, that someone was

7   declaring that this bid from Nat Penn was actually highest,

8   and therefore, your client never really had a fair

9   opportunity to make a higher and better bid because of these

10  undisclosed factors that --

11          MR. WASSERMAN:  And the early termination of the

12  auction.

13          THE COURT:  I think there needs to be a very clear

14  record, and I'm assuming from what you're saying that your

15  client is proposing that -- you have other arguments, but if

16  we get to this one, your client is proposing that we reopen

17  the bidding with this enhanced offer that has been made by

18  your client, the one that includes the additional $4

19  million.  Is that -- if that's correct, I'd like to have a

20  very clear record in this proceeding today that your client

21  is contractually bound to whatever agreement its proposing,

22  not ruling that that was timely, legitimate, should be

23  considered by the Court, but there's an indication from your

24  side that a binding -- an offer of a binding contract is

25  being made by RKJS at this higher price.  And if the Court's

Page 41

1    going to take off on any course that the parties are asking

2    for, I want to know what contract it is that RKJS says it's

3    bound to today, because if Nat Penn walks, we want to know

4    that your buyer is here and under contract.

5            MR. WASSERMAN:  Okay.  Thank you.  Let me just

6    consult with my client for just one moment.

7            THE COURT:  Let me take a recess so we can make

8    sure that --

9            MR. WASSERMAN:  Certainly, Your Honor.

10           THE COURT:  -- and I recognize that some of these

11   papers are not in the record, other than as an attachment,

12   but I want to make sure that what you're proposing is clear

13   on the record as to what your client is bound to.  Thank

14   you.

15           MR. WASSERMAN:  Thank you, Your Honor.

16           THE CLERK:  All rise.  Court is in recess.

17       (Recessed at 2:05 p.m.; reconvened at 2:10 p.m.)

18       (Call to Court)

19           MR. WASSERMAN:  Thank you, Your Honor, Richard

20   Wasserman on behalf of RKJS.

21           Your Honor, attached as Exhibit 5 to our objection

22   is the new proposal that we made last night.  We are

23   prepared to state on the record that yes, RKJS will be bound

24   to that proposal.  That is the proposal, in fact, it's a

25   marked up merger agreement attached as part of it.

Page 42

```
 1              THE COURT:  Who is in the courtroom today with
 2   authority to make that binding commitment on behalf of RKJS?
 3              MR. KUNICH:  I am, Your Honor.
 4              THE COURT:  And who are you, sir?  Identify
 5   yourself.
 6              MR. KUNICH:  Robert D. Kunich, Jr.
 7              THE COURT:  And what's your relationship to RKJS?
 8              MR. KUNICH:  I'm the President.
 9              THE COURT:  All right.  Thank you, sir.
10         Well, I think that clears that up.  Anything else?
11              MR. WASSERMAN:  Not unless Your Honor has any
12   further questions.
13              THE COURT:  No.  That answers my question, thank
14   you.
15              MR. WASSERMAN:  Thank you.
16              THE COURT:  I'll hear from the debtor.  I'm going
17   to assume, unless I hear otherwise from National Penn that
18   they stand by their bid, which was the one selected by the
19   debtor at the auction.
20              MS. SPRINGER:  Yes, Your Honor, we stand by that
21   today, and we would like to respond to some of the
22   statements made by Mr. Wasserman.  So would you like to hear
23   from the debtor first?
24              THE COURT:  Yes.
25              MS. SPRINGER:  Okay.
```

1           THE COURT:  Well, let's hear what you have to say.

2    I'd rather hear from the debtor last.

3           MS. SPRINGER:  Okay.  Your Honor, first of all,

4    Mr. Wasserman was wrong that National Penn Bank did not

5    previously file its application with the OCC or discuss this

6    matter with the OCC.  They've been doing that for the past

7    several weeks.  So that's absolutely incorrect.

8           And let's face it, they're the stalking horse.

9    They had a head start here, but notwithstanding the fact

10   that they've been talking to the OCC for months, or I think

11   he said they've been at it for months, they still don't have

12   their regulatory approval.

13          Secondly, I think it's -- the Court should take

14   notice of the fact that unlike other 363 sales, where there

15   are back-up bidders, there is no back-up bidder in this

16   case.  This is an all or nothing proposition.  If these

17   folks are wrong and they don't -- and they are deemed to be

18   the successful bidder and they don't get their approvals,

19   there is nothing in this estate for anybody.

20          So that's a very important factor that the Court

21   should weigh in determining who should be the successful

22   bidder here.

23          Thirdly, it seems that Mr. Wasserman wants to pick

24   and choose those auction procedures that he wants

25   implemented or given effect by the Court.  The auction

1    procedures clearly state that if the sale hearing, which is

2    a defined term, does not take place, then -- today, then the

3    offer is a revocable offer.

4         The -- I point out to Your Honor in paragraph 10,

5    or Section 10(a), it states that if an auction is held, the

6    sale hearing, which is a defined term, is April 14th, at 10

7    a.m.  And then if you go back to the section that Mr.

8    Wasserman pointed out which is Section 6(e), it states, "the

9    bid shall remain binding and irrevocable until the sale

10   hearing."

11        So our reading of those provisions combined is --

12        THE COURT:  I appreciate your reading them, thank

13   you for your argument.  I've read this.  There is no auction

14   conclusion until the Court approves the last bid made as the

15   highest and best bid.  And there's no sale hearing until the

16   hearing is concluded.  And take whatever position you want

17   about these auction procedures, but that's the way I read

18   them.  Until the Court says, that the last bid accepted is,

19   in fact, the highest and best bid, and it approves the sale,

20   and until the sale hearing is concluded, which it hasn't

21   been, whenever it is, that's when the sale hearing is over.

22        So you can make your arguments, but that's the way

23   I read and I interpret the --

24        MS. SPRINGER:  Understood, Your Honor.

25        THE COURT:  -- bidding procedures.

Page 45

1              MS. SPRINGER:  But we relied upon the sale hearing

2    being today when we made our offer.  And when -- and we were

3    prepared for a sale hearing occurring today.  And I would

4    question the -- you know, the -- certainly the motives of

5    Mr. Wasserman's client in filing at 1 o'clock this morning a

6    motion for a continuance in this case, when he knew, I'm

7    sure all the while, that that is what they were going to ask

8    for.

9              Why didn't he pick up the phone on Friday or over

10   the weekend and say, I want to continue this hearing for the

11   following reasons.  No such courtesies were extended.  And

12   yet he stands here and is concerned about the lack of

13   courtesy that he says was shown to he and his client by the

14   debtor and the creditor's committee.  That just doesn't fly,

15   it works both ways.  Thank you, Your Honor.

16             THE COURT:  All right.  What does the debtor have

17   to say?

18             MR. SCHMIDT:  I'll be brief, Your Honor, just in

19   response to a few of the points raised by Mr. Wasserman.

20             First, Your Honor, I don't want the Court to think

21   we're crazy.  The debtor here would love to be able to --

22             THE COURT:  Well, first of all, you were mistaken

23   or somebody was mistaken when they told me that this bid by

24   RKJS had a drop dead date of --

25             MR. SCHMIDT:  I was going to get to it, Your

1    Honor, and it was my mistake for which I apologize.

2              THE COURT:  Well, that's a pretty big mistake,

3    isn't it?  I mean --

4              MR. SCHMIDT:  Well, Your Honor --

5              THE COURT:  -- you suggested to the Court there

6    was a major feature of why this bid was considered not

7    highest and best, didn't you?

8              MR. SCHMIDT:  Well, it really goes to the

9    certainty of closing and not just the timing.  The

10   concern --

11             THE COURT:  But that's offered up as essentially

12   the reason why this auction is decided one way or the other.

13             MR. SCHMIDT:  Well, there are several reasons,

14   Your Honor.  What -- you know, while we would've liked the

15   opportunity to take more money as of 1 o'clock this morning,

16   substantially more money, there's still the fact that, you

17   know, we are fiduciaries, we have an obligation to pick the

18   bid that we think has the highest likelihood of closing as

19   the best bid.  That was an important consideration, it was

20   an important consideration to the creditor's committee who

21   -- they are the economic party in interest.

22             There's nothing -- the debtor, other than our

23   desire to, you know, have a sale that preserves this bank,

24   you know, we don't really have any skin in the game in terms

25   of the financial outcome.  The committee is the sole

1    financial beneficiary here.  There's really -- even at the

2    higher levels that were risen to during the bid process,

3    there's no hope that equity will receive anything in this

4    situation.

5         So, you know, that's really the key part of the

6    consideration, the key part of the analysis is certainty of

7    closing.  Nat Penn, a very well capitalized national banking

8    institution versus a -- you know, and I don't mean this

9    pejoratively versus a club deal which was RKJS comprised of

10   20 to 25 -- 21 investors.

11        THE COURT:  Well, we'll have to see what the

12   evidence is.

13        MR. SCHMIDT:  Exactly, Your Honor, and I was going

14   to go there.  The -- we don't think there's a need for

15   discovery.  The people who have all the answers we're

16   prepared to put on the stand, and they can be, you know,

17   cross-examined and, you know, they'll tell the story of

18   exactly what happened and what went into the process.

19        THE COURT:  Are you taking the position that --

20   what is the debtor's position when, if ever it is, that

21   National Penn can walk from its contract, its offer?

22        MR. SCHMIDT:  Your Honor, there are a couple of

23   elements of that.  There's a DIP element, which as I

24   understand the agreements, that can expire as soon as

25   tomorrow, which would be severely prejudicial to the estate.

Page 48

1    You know, in terms of their ability to walk, you know, April

2    17th is the date that's in the contract.

3           Now, I appreciate that there are some competing

4    interpretations of the bid procedures and how they work.  We

5    agree with Your Honor's analysis on that front in terms of,

6    you know, when the sale hearing concludes or when the sale

7    hearing happens, for lack of a better word.

8           THE COURT:  I had one question.  I looked at the

9    transcript, and it seems to me what happened here is exactly

10   what was worrying both bidders at the outset of the auction.

11   On page 11, Mr. Tashman asks about what would happen if

12   something like this happened, and Mr. Brady (ph) responds as

13   -- I'm just sort of paraphrasing it here, but -- well, Mr.

14   Tashman says at line 16 on page 11, "I'm assuming that if

15   you were to finish the bidding and my client having made the

16   last bid, that we're not going to subsequently hear that

17   having had more time to think about it, the debtor and the

18   committee has closed the auction and gone with not the last

19   bid."  Exactly the circumstance that happened here.

20          And Mr. Brady sort of equivocates on that and

21   says, "We'll take it under advisement."  And then Mr.

22   Wasserman raises the same concern on behalf of his client,

23   and there's the same sort of non-responsive, we'll take it

24   under advisement statement made by Mr. Brady.  Was there

25   ever anything done to address those concerns?  Why would the

1    parties be led to believe that there would be some sort of

2    subsequent advisement or discussion about this issue before

3    the bidding closed?

4            MR. SCHMIDT:  Well, Your Honor, in each of those

5    statements by Mr. Brody, he does go on to say that the

6    debtor will deliberate, they'll consult with the committee,

7    which is exactly what we did every step of the way through

8    the proceedings.

9            There was, you know, a constant stream of

10   deliberations after virtually every series of bids.  And the

11   regulatory issue was a prominent issue.  For RKJS to express

12   surprise that regulatory is all of a sudden an issue I think

13   is a little bit misleading.  They've been involved with the

14   regulatory --

15           THE COURT:  And why wasn't the party who

16   ostensibly had the high bid under the process that the

17   debtor and the debtor's financial advisors set up, not

18   entitled to make another bid after it was advised for the

19   first time that it's what -- what is -- seems to be

20   characterized in the exhibits that I have as the high bid,

21   was it really the high bid, and therefore, was outbid by

22   some other bid.  I mean, I don't understand.

23           MR. SCHMIDT:  Well, the logic behind it, Your

24   Honor, was after the deliberations between the debtor's

25   advisors, the committee and its advisors, and the board's

1    special committee, that the fact that where RKJS was -- had

2    evolved to at that point in time after a fairly rapid fire

3    set of bids, you know, how gotten to the break point in

4    terms of where we had a high degree of discomfort with their

5    regulatory -- the potential for regulatory approval on a

6    timely basis.

7            The regulators had been working with one set of

8    numbers, and a bid that started off at a dramatically lower

9    number during the course of that evening, the bids evolved,

10   you know, past where any of us thought they were likely to

11   go.  And that's what gave us the pause, that's what led to

12   breaking the action and the deliberations.

13           And the reason that RKJS was not given an

14   opportunity to up the bid, because it really didn't matter,

15   because the higher bid was not going to make the situation

16   any better.  Indeed, a higher bid could arguably make the

17   situation worse.  So that was the rationale.

18           THE COURT:  Explain that one to me again.

19           MR. SCHMIDT:  Well, because --

20           THE COURT:  Maybe my mind wandered.

21           MR. SCHMIDT:  No --

22           THE COURT:  But how does the higher bid ever make

23   the situation worse?

24           MR. SCHMIDT:  Because we had already reached a

25   point where based on where the auction had evolved to on

Page 51

1    that evening, that the debtor and its professionals, and the

2    committee and its professionals, regulatory and corporate --

3              THE COURT:  So seriously you're suggesting that if

4    they had offered an additional $4 million, you wouldn't have

5    stopped to think about whether they had the potential to

6    carry through on that, and whether that was enough to

7    outweigh some of your other concerns and to continue the

8    auction or do more due diligence or something?  Seriously?

9              MR. SCHMIDT:  You know, Your Honor, at that point

10   in time, that was the reason of the decision of the boards

11   of the committee, the committee, and the others involved in

12   the process that more money -- a bigger increase was, you

13   know, reducing the likelihood of regulatory approval.

14             THE COURT:  All right.

15             MR. SCHMIDT:  Thank you.

16             THE COURT:  I understand, thank you.  Anyone else

17   wish to be heard?  Does the creditor's committee have

18   anything more they wish to say?

19             MR. GETTLEMAN:  Your Honor, just only one thing,

20   and that is I understand that we're all trying to, you know,

21   paint a particular picture of what happened at the auction,

22   spin comes to mind, but you know, I guess what I would say

23   is that, you know, from our point of view, and my experience

24   in other auctions, I think the debtor was actually quite

25   careful in trying to not tell all, either bidder what they

Page 52

1    should do to make, you know, to increase or enhance the

2    possibility that theirs would be chosen.  I mean, you know,

3    we as a spectator, and even when we are as a debtor, running

4    an auction, you know, we hear the bids, and the bidding goes

5    on, and at the end of the auction, we use our business

6    judgment to choose who is the right person.

7            And so, you know, I'm not sure that -- you know, I

8    don't think there was anything sinister going on here.  And

9    also I don't think that -- I don't think there should have

10   been any explanation about what was either right or wrong

11   with any bid.  I mean, the bids are the bids.  That's really

12   all I have to say, Your Honor, thank you.

13           MR. SCHMIDT:  Your Honor, could I just make one

14   point of clarification on this issue of, you know, why

15   higher is not better?

16           THE COURT:  All right.

17           MR. SCHMIDT:  The -- as the Court may recall from

18   the bid procedures hearing, there was a high degree of focus

19   on the amount of regulatory capital that RKJS was going to

20   be putting into the new entity, the new bank.

21           The way they were bidding was basically they were

22   step-by-step reducing that amount of regulatory capital that

23   was going on.  So arguably if they started at 100 million or

24   90 million and every bid they put in was taking away from

25   the capital that was going into New Co, which was, you know,

1      again really a reason why there was -- the concern that the

2      regulators would not view that favorably.

3             The regulators, quite frankly, I don't think, you

4      know, care very much about how much money comes into the

5      Hold Co bankruptcy estate to pay creditors.  They're focused

6      on the capitalization of --

7             THE COURT:  But that's not what we're worrying

8      about.

9             MR. SCHMIDT:  Well, I understand that, Your Honor,

10     but to the extent that they view the decrease in regulatory

11     capital as material, there's a greater likelihood that

12     they'll either take longer to approve the regulatory

13     applications or not approve them at all.  Thank you.

14            THE COURT:  All right.  Thank you.  Mr. Wasserman,

15     I'm going to give you the last word.

16            MR. WASSERMAN:  This regulatory point has just not

17     been fairly presented to the Court, and if necessary, I have

18     Mr. Beatty here who can address it if the Court wants to

19     hear by -- from a regulatory lawyer.

20            But you will see in the Exhibit 5 that was

21     submitted last night, the additional proposal, and this was

22     said to -- the debtor knows about this in discussions we've

23     had with them, that the RKJS has already filed with the

24     regulators a business plan and other documents at a lower

25     capitalization, no objection has been raised to that, but no

1    positive response either, and the point that we don't have

2    positive response, they're not going to respond until -- the

3    regulators aren't going to respond until it's known who's

4    going to be the winning bidder.  So no one's going to get a

5    sign-off, a final sign-off, until they know you're dealing

6    with the final deal.

7            So that doesn't make sense that there's no sign-

8    off by the regulators.  Moreover, we've included in that

9    additional capital availability of at least another $15

10   million.  So if the regulators do need additional capital,

11   it is available in this new proposal.  We made sure we

12   covered that, it's committed, you'll see there are signed

13   documents to do that.  That's part of our proposal, Your

14   Honor, if necessary, that additional funding is there.

15           THE COURT:  Thank you.  I've considered the motion

16   to postpone the hearing, and I've considered all the

17   arguments that are being made.  And while some of the issues

18   are troubling, I don't believe and I do not find that the

19   motion to continue the hearing should be granted.  I'm going

20   to deny it.  I believe that we're here under the bidding

21   procedures process the order that the Court entered,

22   everybody knew that we were going to have a hearing today on

23   the proposed sale and the results of the auction.  That's

24   going to take whatever course it takes.  My guess is it's

25   going to be well beyond the Court's time for hearing that we

1   have available today, and we'll continue from day to day

2   until we reach a conclusion.

3          I think that's exactly the process that the

4   bidding procedures contemplated, and exactly what the

5   parties knew and expected.  And that may result in a number

6   of orders, all of which are exactly what any party knew and

7   expected could be the outcome of this hearing.

8          So I'm going to deny the motion to continue

9   today's hearing, and we will start with the debtor's case in

10  support of the proposed sale.  I'll take a short recess so

11  that the parties can get organized for that.

12         THE CLERK:  All rise.  Court is in recess.

13     (Recessed at 2:29 p.m.; reconvened at 2:36 p.m.)

14     (Call to Court)

15         THE COURT:  Before we begin, let me just say for

16  the information of the parties, the Court has a regularly

17  scheduled docket later this afternoon, and I would propose

18  that we call those cases at or around 3:20, we should be

19  handle to them in fairly short order, and then resume in

20  this case some time hopefully at or before 4 o'clock.

21         MR. SCHMIDT:  Thank you for that guidance, Your

22  Honor.  One request that people have asked for me to make,

23  is to get a sense for how late the Court thinks it may go

24  this afternoon in light of the fact that there are a number

25  of folks who are eager to get home for Passover.

1          THE COURT:  I am typically sensitive and concerned

2     to the various obligations in religious observances that any

3     party or attorney feels are appropriate to accommodate.  But

4     this is a hearing that the parties set up and served up to

5     the Court with their agreement on scheduling for today,

6     knowing exactly what the calendar says.  And I have a

7     prospective bidder in court suggesting that it's not bound

8     and it's going to walk away if this matter is not concluded,

9     giving them the benefit of the doubt, as soon as absolutely

10    possible, if not by 12 midnight tonight.

11         So I am intend to proceed with this matter as late

12    as I reasonably can, and continue it from day to day, to

13    hear it at every opportunity that I have, tomorrow, the next

14    day, and the day after where I can take up this case.

15         When we get to 3:20, the Court can take a recess

16    because -- in this hearing, to consider these other cases.

17    Perhaps the parties can discuss in the hallway what they

18    want to do about the scheduling.  If the parties are in

19    agreement, it will not be a problem with the Court to try to

20    continue things in a way that accommodates these concerns

21    and this request.  But the desire of counsel to get a recess

22    for religious observance reasons, can't prejudice the

23    estate's desire to move forward with the proposed sale.  We

24    have a billion dollars, in round numbers, financial

25    institution whose fate is hanging in the balance.  A

1   substantial amount of money involved in this case, and so

2   I'm not going to without careful consideration do anything

3   about scheduling until I've had an opportunity to think

4   about it further, in light of whatever the parties might

5   agree to.

6           MR. SCHMIDT:  Thank you, Your Honor.  We certainly

7   agree with those concerns, which is why Mr. O'Neill and I

8   are here, and Mr. Brody is not.  Certainly we're prepared to

9   go as late as it takes, but we appreciate the Court's

10  consideration.

11          THE COURT:  All right.  Well, it's your case.

12          MR. SCHMIDT:  With that, Your Honor, I'll turn the

13  podium over to Mr. O'Neill.

14          THE COURT:  All right, fine.  Mr. O'Neill.

15          MR. O'NEILL:  Good afternoon, Your Honor.

16          THE COURT:  Good afternoon.

17          MR. O'NEILL:  We are prepared to proceed either by

18  proffer or to put on testimony directly depending on the

19  Court's preference.  A proffer obviously would make things

20  move more expeditiously.

21          MR. MELLOTT:  Your Honor, Chris Mellott on behalf

22  of RKJS, and it would be our position that we would like to

23  hear the live testimony.  We haven't heard any of this

24  before, and so we want to hear these witnesses.

25          THE COURT:  Very well, call your witness.

1              MR. O'NEILL:  Okay.  Your Honor, the debtor calls

2     William Boyan.

3              THE COURT:  If you would come forward, sir, you'll

4     need to stand and raise your right hand and be sworn in

5     before you take a seat in the witness box.

6                    WILLIAM BOYAN, WITNESS, SWORN

7              THE CLERK:  Please be seated.  Excuse me, please

8     state your full name and address for the record.

9              THE WITNESS:  William L. Boyan, III.

10             THE CLERK:  Can you spell your last name?

11             THE WITNESS:  B as in boy, o-y-a-n.

12             THE CLERK:  Thank you.

13             THE WITNESS:  Address, 8400 Comanche Court,

14    Bethesda, Maryland 20817.

15             THE CLERK:  Thank you.

16                    DIRECT EXAMINATION

17    BY MR. O'NEILL:

18    Q    Where do you work, Mr. Boyan?

19    A    Sandler O'Neill & Partners.

20    Q    And what role does Sandler O'Neill have in this case?

21    A    We're the financial advisor for the Debtor, First

22    Mariner Bancorp.

23    Q    What is your position at Sandler O'Neill?

24    A    Managing director in the investment banking group.

25    Q    And you've testified previously in this case; is that

1    right?

2    A     Yes, I have.

3    Q     And you were qualified as an expert in bank M&A

4    transactions; is that right?

5    A     Yes.

6    Q     Did you attend the auction last Thursday on April 10th?

7    A     I did.

8    Q     And what role, if any, did you have in that auction?

9    A     I assisted in managing the auction with Josh Brody.

10   Q     And broadly speaking, what tasks did you perform in

11   managing the auction?

12   A     We developed a short spreadsheet that tracked all the

13   bidding for each of the bids, and tried to assess which bid

14   was highest or best.

15   Q     You mentioned the spreadsheet or model; is that right?

16   A     Yes.

17   Q     Would you explain briefly what that model was intended

18   to do?

19   A     To calculate the bids expressed by both parties.

20         MR. O'NEILL:  May I approach, Your Honor?

21         THE COURT:  Do you have an exhibit?

22         MR. O'NEILL:  I have an exhibit.

23         THE COURT:  Is it marked?

24         MR. O'NEILL:  It is not marked.

25      (Pause)

1   BY MR. O'NEILL:

2   Q    Mr. Boyan, you're looking at what's been marked as

3   Debtor's Exhibit 1.  What is that?

4   A    It's the model that we used to track the bids and

5   calculate the bids.

6   Q    And it's the model that Sandler O'Neill prepared to

7   track the bids at the auction --

8   A    Correct.

9           MR. O'NEILL:  I would offer the document into

10  evidence, Your Honor.

11          MR. MELLOTT:  No objection.

12          THE COURT:  Debtor's Exhibit 1 is admitted.

13      (Debtor's Exhibit No. 1 received)

14  BY MR. O'NEILL:

15  Q    Could you take us through just by way of example one of

16  the bids to explain the nature of the bids and the

17  adjustments that were made to the bids, in order to compare

18  them at the auction?

19  A    Sure, certainly.  Why don't we start at the left-hand

20  side of the page where it says "original bids."  RKJS

21  stalking horse bid was 4 million 775, and from that, they

22  deducted the amount of the estimated March 31st, 2013 Tier 1

23  capital, and that dropped it below 29 million.  When RKJS

24  initially made their bid, they said that any bid that they

25  make would be adjusted for the amount of Tier 1 capital that

Page 61

1    drops below 29 million, which is shown there as $2,590,773.

2    So the net bid from RKJS was $2,184,227.  So that was the

3    initial bid made by RKJS, the stalking horse bid.

4        Then if you go on to Nat Penn, when we arrived at the

5    auction, Nat Penn made an initial offer of $8 million, which

6    is on that next line below the yellow box.  They also

7    offered up an additional amount of consideration which was a

8    receivable, that was a subsidiary of the bank, that they

9    would then dividend to the holding company and First Mariner

10   Bancorp would get the benefit of that receivable.

11       So that's 8 and a half million in total, but they also

12   followed the same formula that RKJS was following, and they

13   also deducted the estimated amount of the equity that

14   dropped below 29 million, again 2,590,773.  So their bid was

15   5,909,227 taking into account that difference in the equity.

16       But as the over bidder had the obligation to pay the

17   break-up fee, which consisted of 250,000 from the holding

18   company, 750,000 from the bank, and then a $1,750,000 of

19   expenses.  So after deducting those economics, the bid

20   really amounted to $3,159,227.

21       So at that point, they were 975,000 over the $2,184,227

22   offered by RKJS.  Now --

23   Q    Did you then make adjustments to some of those numbers?

24   A    Yes.  We --

25   Q    What were those?

1    A    The receivable, the tax planning associated with up

2    front National Penn's bid required that the receivable could

3    not be paid off quickly, that it had to get paid off over

4    close.  And what we were led to -- in our due diligence

5    found is that over the first six months 450,000 would get

6    paid out of that receivable, but that the remaining amounts

7    would be paid out over the next year and a half, so it'd

8    take two years for that receivable to pay off.

9         So we applied time value of money type of discount to

10   that receivable, and added some administrative costs in that

11   that would be a liquidating trust that we added $25,000 of

12   additional expenses to manage that fund over the next two

13   years.

14        So the amount of credit that we were giving to that bid

15   was $453,126.

16        Nat Penn's bid also for tax planning purposes had to

17   contain at least 40 percent stock and the remainder being

18   allocated in cash, and that would also allow them to retain

19   certain tax benefits associated with their bid.

20        So if you continue down the page, the truly cash

21   portion of their bid, outside some of the cash payments that

22   I've already mentioned would be $295,536 in cash, stock of

23   $2,363,691.

24        Now, that stock is not (indiscernible) we would've had

25   the -- or I should say, First Mariner would not had the

Page 63

1   ability to sell immediately after closing.  If they did, it

2   would blow the tax treatment again a concern from National

3   Penn.

4       So we were allowed to sell the stock at a minimum would

5   be five days following the closing, the year-end date, which

6   -- in which the month of closing, but it could be up to 35

7   days if, for example, let's say the closing took place on

8   May 1, the year-end date, according to the definitive

9   agreement would be the end of that month, May 31st.  And the

10  first date you'd be able to sell that stock would be five

11  days following that, so it'd be June 5th.

12      So the debtor would have to hold that stock for

13  potentially five to 35 days, at which point in time, there'd

14  be market risks in that stock potentially.  We came up with

15  some strategies to hedge that risk, found through our

16  diligence that some of those strategies or all of those

17  strategies effectively would've blown the tax treatment, and

18  there needs to be risk on the behalf of the recipient of

19  that stock, in order to -- if the -- if you negate the risk,

20  I should say, then it blows the tax treatment.

21      So in the end, we thought about an appropriate discount

22  for that stock, and we applied initially a 10 percent

23  discount after some negotiations with National Penn, we

24  agreed to reduce that discount to 7 and a half percent.  So

25  that's represented there as the $177,277.

Page 64

1      So the stock value given to the Nat Penn bid was

2   $2,186,414 which was a net bid to the estate of First

3   Mariner after all discounts of two million nine hundred and

4   thirty-five dollars and 76 cents -- 76 dollars.  That means

5   that the difference after these discounts would be $750,849.

6      So that is how we calculated the bids.  Clearly the

7   minimum over bid was $150,000, so clearly the Nat Penn

8   initial over bid was in excess of that $150,000 threshold.

9   So we opened the bid and the auction with RKJS making

10  another bid.

11  Q    Just a couple of minor points of clarification for the

12  Court's benefit.  To what extent does the stock of Nat Penn

13  publicly traded?

14  A    It's publicly traded stock, and fairly liquid with

15  about a billion and a half dollar market cap.

16  Q    And you mentioned a few limitations on the estates, if

17  the estate were to accept this currency, limitations on its

18  ability to dispose of that stock.  What was the source of

19  those limitations?

20  A    It was all tax driven, and clearly part of Nat Penn's

21  bid was associated with the tax benefits that they saw

22  coming out of the transaction.  And without those benefits,

23  we weren't sure that they would proceed with their bid or

24  bid as highly as they otherwise might.

25  Q    So those limitations were a condition of Nat Penn's

1    bid; is that right?

2    A    Yes, they were.

3    Q    Okay.  How many rounds of bidding were there at the

4    auction last Thursday?

5    A    Ten and a half.

6    Q    And are each of those rounds of bidding reflected on

7    Exhibit 1?

8    A    Yes.

9    Q    And what was the value of the final bid submitted by

10   RKJS at the auction last Thursday?

11   A    They submitted a bid and they ultimately, RKJS bid and

12   dividend, was willing to dividend that same receivable.  So

13   we gave them the same value of that receivable, the

14   $453,126.

15       So with that and the $13,225,949 that they bid in cash,

16   amounted to $13,679,075.  Although in the process of the

17   bidding, if you look along the line that says, amount below

18   29 million, you'll see that it's negative 2.6 million

19   essentially until you get to the sixth round, it goes from a

20   negative 2.6 million to a positive 200,000.

21       And as part of their bid, RKJS was willing to do away

22   with that safety net that they were building in for

23   themselves, and eliminating any discount to their bid for

24   the losses associated with the March financials.

25       But they wanted to secure for themselves some sort of

1   premium for providing that benefit to the debtor.  Initially

2   we didn't think that made any sense, but we saw a real

3   benefit and trying to protect the purchase price for the

4   debtor, so we were originally offered up $150,000 credit.

5   They wanted more, so we offered to give them 200,000.

6        And we explained the situation to Nat Penn following

7   the acceptance of that bid, and Nat Penn then considered

8   whether or not they wanted to follow suit and ultimately

9   decided not to.

10        But if you continue to follow across that to the tenth

11   round, you'll see that $200,000 was still in place in the

12   tenth round, so the value of the net -- the RKJS bid is

13   $13,879,075.

14   Q    And just so the Court's following along, that's all the

15   way over on the right hand -- on the right-hand side in the

16   last column.

17   A    Highlighted in yellow.

18   Q    Okay.  And what was the value of the final submitted by

19   Nat Penn at the auction last Thursday?

20   A    Well, if you go under the ninth round bids and go down

21   where it says NBC -- NPDC bid before discounts, you'll see

22   it's $19,627,834.  The stock and cash was $19,127,834.  Then

23   the 500,000 for the receivable, less the $2.6 million of the

24   potential loss, that left them with $17 million.  Then they

25   had the $250,000 pay out for the break-up fee, plus the

1   $750,000 portion of the break-up fee from the bank, the

2   million 750 from the expense reimbursement, left them with a

3   bid of $14,287,061.  That is continuing down then after you

4   look after the discounts all the way down to the green box,

5   you get to $13,729,075.

6   Q    And what is the difference between the value of the two

7   final bids submitted at the auction?

8   A    Well, that could be looked at in --

9   Q    The dollar value.

10  A    Well, there was a $150,000 difference between the final

11  RKJS bid and the final Nat Penn bid.

12  Q    Did there come a time at the auction on Thursday when

13  Nat Penn indicated that it would not bid any further?

14  A    No.  I mean you're saying right at the auction?

15  Q    No.

16  A    At the auction concluded, following RKJS's bid, Nat

17  Penn said that they refused to continue, and the -- and at

18  that point in time, we took a recess.

19  Q    And after that occurred, did there come a time when the

20  special committee of the board of directors undertook to

21  determine which of the final bids was higher and better?

22  A    That evening we did have a discussion about the bids,

23  and frankly, when it got to that dollar amount and the

24  difference being $150,000, the economics were really not a

25  factor at all in the decision-making process.

Page 68

```
 1    Q     Before we get to that, did you participate in the

 2    consideration of the special committee which bid was higher

 3    and better?

 4    A     Yes.

 5    Q     Who else participated in that?

 6    A     Mr. Kaddo (ph), Kilpatrick & Townsend, the counsel from

 7    their firm, Kramer Levin people, and we had Barry Bondroff

 8    (ph) who was a member of the board of directors who was part

 9    of the special committee.

10    Q     And did you advise the debtor and the special committee

11    of the debtor's board as to which bid you believed was

12    higher and better?

13    A     We did not really address higher, but we addressed the

14    regulatory standing of one bidder versus the other, and felt

15    like that was the real difference maker in the bids.

16    Q     Would you explain to the Judge what your advice was on

17    that score?

18    A     Judge, we realized that the dollars and cents were

19    important, but in the end, if you don't get regulatory

20    approval you can't close the transaction.  And we felt like

21    National Penn being a bank holding company, they have

22    substantial capital, they -- we conducted due diligence on

23    their regulatory position, and found that they had very

24    strong footings in the regulatory environment.

25          The CRA, or the Committee of Reinvestment Act rating is
```

Page 69

```
1    -- can be a very troublesome portion of the regulations, and

2    we really dug into that and it's a public record, but found

3    that they had outstanding CRA ratings, which made a big

4    difference in our thought process.

5         So not that RKJS could not get regulatory approval,

6    it's just somewhat more uncertain than the National Penn

7    potential for getting -- achieving regulatory approval.

8    Q    What impact, if any, did you advise the special

9    committee that the structure of the RKJS deal as a club deal

10   might have on the likelihood of regulatory approval?

11   A    Well, clearly having a bank holding company that is

12   approved by the federal regulators already, has been through

13   numerous examinations by various regulatory bodies, we felt

14   that they had a better chance of getting regulatory approval

15   than an entity that is a new entity that is less known to

16   the regulators.

17   Q    And did -- and what was the outcome of the special

18   committee's consideration?

19   A    The outcome was they were all unanimously in favor of

20   the National Penn bid.  Really mostly based on the fact that

21   they felt like they could get regulatory approval, that it

22   was more certain, not the timing necessarily, but the

23   certainty of the regulatory approval was important to them.

24   Q    And were there any reasons why the special committee

25   reached that conclusion?
```

1   A    The creditor's committee played a significant role in

2   the decision-making process, and they also even though are

3   motivated by the dollars and cents, understand the

4   regulatory framework and the considerations and were fully

5   in favor of the Nat Penn bid.

6   Q    What was the amount of the increase in value of the

7   estate from the stalking horse bid to the final Nat Penn bid

8   that the special committee was determined highest and best?

9   A    Can you repeat the question, please?

10   Q    What was the amount of the increase in value to the

11   estate from the initial RKJS stalking horse bid to the Nat

12   Penn bid that -- the final Nat Penn bid that the special

13   committee determined was highest and best?

14         MR. MELLOTT:  Objection, Your Honor, I don't

15   believe there's any testimony it was highest.

16   BY MR. O'NEILL:

17   Q    The special committee determined -- well.

18         THE COURT:  I'll sustain the objection, rephrase

19   your question.

20   Q    All right.  What was the amount of the increase in

21   value to the estate from the stalking horse bid submitted by

22   RKJS to the Nat Penn bid approved by the special committee

23   following the auction?

24   A    It looks like it's about 11 and a half million dollars.

25         MR. O'NEILL:  I have nothing else, Your Honor.

1          THE COURT:  Cross-examination.

2                    CROSS-EXAMINATION

3     BY MR. MELLOTT:

4     Q    Thank you, Your Honor.  Good afternoon, Mr. Boyan.  My

5     name is Chris Mellott.  I represent RKJS Bank, I'm an

6     attorney with the Venable Law Firm.

7          You referenced in your direct testimony the special

8     committee members at the auction.  Who is on the special

9     committee?

10    A    Barry Bondroff, John Brown, Jake -- what's Jake's last

11    name --

12    Q    That's all right, if you don't know.

13             THE COURT:  Answer the question yourself, sir, you

14    can't --

15             THE WITNESS:  All right.

16             THE COURT:  -- seek help by anyone in the

17    audience.  If you don't know, you don't know.

18    BY MR. MELLOTT:

19    Q    And who was there from the special committee?

20    A    Just Barry Bondroff, everyone else was patched in by

21    telephone.

22    Q    So there was actually a phone hook-up at the auction?

23    A    After -- in the evening prior to the decision, prior to

24    the conclusion of the auction, we did hold a conference call

25    with members of the special committee and the chairman of

1   the board to fill them in on the details of the auction and

2   the decision that needed to be made.

3              MR. MELLOTT:  If I may, Your Honor, I'm going

4   to --

5              THE COURT:  Yes.

6              MR. MELLOTT:  -- grab some exhibits

7   (indiscernible).

8              May I approach the witness, Your Honor?

9              THE COURT:  You've got an exhibit book?  Do you

10  have one for the Court?

11             MR. MELLOTT:  I do.

12             THE COURT:  All right.

13             MR. MELLOTT:  Yes, Your Honor.  And, Your Honor,

14  for counsel and for the Court, this is just an exhibit --

15             THE COURT:  You need to address the Court from the

16  podium.

17             MR. MELLOTT:  Thank you, Your Honor.  These are

18  the exhibits in the order and as numbered that were attached

19  to the objection filed yesterday.

20             THE COURT:  All right.  I understand.  So do we

21  have a set of these exhibits for the Court?

22             MR. MELLOTT:  Yes, Your Honor.

23             THE COURT:  Okay.  Thank you.

24             MR. MELLOTT:  So the first -- what I believe are

25  the first six exhibits are those that were attached to the

1    objection, and these are other exhibits we may utilize, but

2    I just want to be able to direct the witness, the portions

3    of the exhibit book.

4    BY MR. MELLOTT:

5    Q    Let me ask you first of all to direct your attention to

6    Exhibit 1.  Do you recognize that to be the transcript from

7    the auction procedure, I mean, the order from the auction

8    procedures that were to be followed for the auction that

9    occurred on August -- April 10th?

10   A    It appears to be so.

11           MR. MELLOTT:  Your Honor, I would move that into

12   admission.

13           MR. O'NEILL:  No objection.

14           THE COURT:  So RKJS Exhibit 1 is admitted.

15       (RKJS's Exhibit No. 1 received)

16   BY MR. O'NEILL:

17   Q    Then I would ask you to look at Exhibit 2, Mr. Boyan.

18   Do you recognize that to be the transcript that was provided

19   by the court reporter for the auction on April 10th?

20   A    It appears to be so.

21           MR. MELLOTT:  I would also --

22           THE WITNESS:  It's the first time I've seen it,

23   so.

24           MR. MELLOTT:  Well, I would move that into

25   evidence, is there any objection?

Page 74

1              MR. O'NEILL:  Your Honor, I object if he hasn't

2       seen it before.  We don't have --

3              MR. MELLOTT:  You're not going to stipulate to

4       this transcript?

5              MR. O'NEILL:  The transcript is --

6              THE COURT:  That's enough.  I'm going to take a

7       recess, and the witness can examine the document and make a

8       decision on whether he can recognize it or not.

9              UNIDENTIFIED:  Your Honor, you don't need to take

10      a recess.

11             THE CLERK:  All rise, court is in recess.

12          (Recessed at 3:04 p.m.; reconvened at 3:09 p.m.)

13          (Call to Court)

14             THE COURT:  Before we begin, Counsel, let me

15      remind you that counsel are to conduct themselves in a way

16      that involves addressing the Court, and not getting into

17      debates and discussions amongst themselves while the hearing

18      is in process.

19             The one time that I was gaveled by Chief Judge

20      Keir in this court I remember very vividly, it involved

21      exactly the sort of behavior that just took place.  I'm sure

22      it won't happen again, I'd ask you to proceed, Mr. Mellott.

23             MR. MELLOTT:  Thank you, Your Honor.

24             The RKJS Bank party would move the admission of

25      Exhibits 1, 2, 3, 7, 8, 9, 10 and 11.

1          THE COURT:  1, 2, 3, 7, 8, 9, 10 and 11, did I get

2     that right?

3          MR. MELLOTT:  That's correct, Your Honor.

4          THE COURT:  We already admitted 1, so it's really

5     2, 3, 7, 8, 9, 10 and 11.

6          MR. O'NEILL:  Yeah, 3's in too, but no objection,

7     Your Honor.

8          THE COURT:  All right.  Then RJ -- I'm sorry, RKJS

9     Exhibits 2, 3, 7, 8, 9, 10 and 11 are admitted and I think

10    we've admitted 1, but if we haven't, 1 is admitted also.

11         (RKJS Exhibit Nos. 2-3, 7-11 received)

12         MR. MELLOTT:  Thank you, Your Honor.

13         THE COURT:  Next question.

14    BY MR. MELLOTT:

15    Q    Mr. Boyan, at the April 10th auction, you discussed

16    with the parties the methodology and process by which the

17    bids would be valued, correct?

18    A    Yes.

19    Q    And prior to going on the record, there was a

20    discussion in which you and Mr. Josh Brody and

21    representatives of RKJS Bank participated and there was a

22    conversation about what would have economic value, correct?

23    A    Yes.

24    Q    And that discussion included that there would be

25    economic value for the cash, for the receivable, for

1    consideration of the stock, for the purchase price, and for

2    what the outside date was, correct?

3    A    Correct.

4    Q    And there was no discussion about having economic value

5    for any of the other items, correct?

6    A    I didn't know what any of the items --

7    Q    Well, there was no discussion about putting an economic

8    value on regulatory approval, correct?

9    A    Anybody who knows anything about bank M&A would know

10   regulatory approval is paramount.

11   Q    But you assigned no economic value to regulatory

12   approval in your spreadsheets, did you?

13   A    We -- at some point in time we were hoping that one

14   bidder or the other would separate themselves materially

15   from the other that would outweigh that regulatory risk may

16   be involved in the process.

17   Q    And when did you convey that to RKJS Bank?

18   A    Anyone who knows anything about bank M&A would know

19   that bank regulatory approval is paramount.

20   Q    So you didn't convey that to RKJS?

21   A    No, it was discussed, they were trying to get to

22   regulatory approval the day prior to the hearing, so that

23   they could have approval going into the hearing.

24   Q    Well, certainly they want to get approval as soon as

25   they could, wouldn't they?

1    A    They conveyed that to us quite frequently.

2    Q    But you set forth the whole process by which you would

3    identify qualified bids based on the economics, correct?

4    A    No.

5    Q    No?

6    A    No.  The bidding process was very important to the

7    economics, but it was equally and even more heavily weighted

8    towards the approval of the regulatory process.

9    Q    So did you ever say to RKJS Bank, now we don't think

10   you're going to be as likely to be approved, and therefore,

11   you need to factor that in in the amount of your bid?

12   A    We had numerous decisions, daily, hourly basis leading

13   up to the hearing or the option.  They knew full well that

14   was incredibly an important component, and we can go into

15   all those discussions if you'd like.

16   Q    Well, let's just start with what happened at the

17   auction.

18              THE COURT:  Could I just -- I know it's -- this is

19   going to go a long time, I think that was an important

20   question.  I don't think the witness answered it.  And

21   rather than forget it and have to bring it up myself, I'd

22   like you to ask that again and see if you can get the

23   witness to answer your question.

24   BY MR. MELLOTT:

25   Q    I want to understand when, when if ever, because I want

Page 78

1    you to testify when you indicated to and to whom at RKJS

2    Bank that there was going to be a valuation placed on the

3    regulatory approval risk?

4    A    We had numerous discussions with both RKJS, leading up

5    to the auction, and they knew it was going to be an

6    important component of the auction process and our decision-

7    making when evaluating bids.

8    Q    Well, Mr. --

9    A    And that took place specifically in the days leading up

10   to the auction.

11   Q    So are you telling me what you said to RKJS is,

12   regulatory approval is also important --

13   A    Right.

14   Q    Okay.  And it's important for both bidders, correct?

15   A    Correct.

16   Q    But when you went through the list of what you had to

17   value to determine what was the next highest bid to qualify,

18   there was no value put on the regulatory approval, correct?

19   A    When we got to the final -- after the tenth round

20   bidding on Exhibit 1, we sat down and evaluated the dollars

21   and cents, and also evaluated the regulatory approval

22   process, in the likelihood that one might receive regulatory

23   approval over the other.

24   Q    You evaluated that in your discussions among the bank

25   and the creditor's committee?

1    A    Creditor's committee, the special committee of the

2    debtor with counsel, yes, we discussed it extensively.

3    Q    And did you come back to RKJS at any point after that

4    tenth bid and say, all right, we think there's a higher

5    regulatory risk with you guys, you need to factor that in in

6    your mind and give us a better bid?  Did you ever say that?

7    A    Yes.

8    Q    You said that?

9    A    We --

10   Q    No, I said, did you -- listen, please, Mr. Boyan, it'll

11   go a lot faster.  Did you after the tenth bid say to RKJS,

12   okay, we have met, it's 7:30, you put your bid on, we have

13   met, and we now are starting to think that we need to also

14   consider the regulatory risk of your getting approved versus

15   Nat Penn getting approved, and we want you to know that we

16   think that means you've got to increase your bid?  Did you

17   ever said that?

18   A    We repeatedly discussed that fact leading up to the

19   auction.  It was a known fact.

20          THE COURT:  Mr. Mellott, I think you can stop this

21   line of questioning, the witness' answer is effectively no.

22          MR. MELLOTT:  Thank you, Your Honor.

23   BY MR. MELLOTT:

24   Q    Mr. Boyan, let me look -- have you look at your

25   spreadsheet which is Debtor's Exhibit 1, and let me start

1   with the amount below 29 million evaluation.  Now, the

2   number that was selected by you and by Sandler O'Neill was

3   $2,590,773, correct?

4   A    It was not selected by us.  It was calculated with

5   input from the company and shared with the creditor

6   committee, National Penn, and RKJS prior to bids being

7   submitted.

8   Q    And that was an estimate, correct?

9   A    Correct.

10  Q    That was a number that you plugged in because there was

11  not yet final confirmation as to what the amount of equity

12  of or below 29 million was going to be as of March 31,

13  correct?

14  A    Correct.

15  Q    So that number could've been 2.59, it could've been

16  2.7, it could've been 2.9, didn't know yet, correct?

17  A    Correct.

18  Q    And so when you got to the sixth round, and RKJS said,

19  okay, we're not going to reduce the purchase price by the

20  amount below 29 million that the final March 31 numbers come

21  out at, the debtor agreed to provide because of that flex in

22  the number, a $200,000 credit towards the price that RKJS

23  was bidding, correct?

24  A    Correct.

25  Q    Now, you also did an adjustment for the forgiveness of

1    the receivable, or the basically the bank subsidiary's

2    forgiveness of the receivable if acquired by the bidder, and

3    you reduced that on sort of a present value administrative

4    cost basis, correct?

5    A    Correct.

6    Q    And you also adjusted the stalk aspect of the Nat Penn

7    bid, and you said, you know, this we can't sell immediately,

8    it might be, as your testimony was, five days, it might be

9    in 35 days, we're going to reduce that initially by 10

10   percent, and then after discussions with Nat Penn you

11   decided to reduce that by 7 and a half percent, correct?

12   A    Correct.

13   Q    All right.  So you put a discount number on what the

14   actual equity is going to be above or below 29 million, you

15   put a discount number on the stock, and you calculated out

16   the specifics of what it was going to be credited in the way

17   of a $500,000 receivable that's coming back as 500,000 but

18   not until over two years, even though 450,000 were coming

19   back in six months, correct?

20   A    Correct.

21   Q    And then you go through this process for nine rounds of

22   taking bids.  And so in the second round, you've got -- Mr.

23   O'Neill walked you through the first round, let's just go

24   one more round.  You've got a number of minimum overbid at

25   the bottom of the first column before the yellow line saying

1    qualified bid of 5,675,849, correct?

2    A    Correct.

3    Q    Now, that's the number that the debtor is telling RKJS

4    they need to overbid in the next round in order to meet at

5    least the minimum $150,000 increment, correct?

6    A    That is correct.

7    Q    Okay.  And RKJS comes back and actually bids $8

8    million, correct?

9    A    Correct.

10   Q    And after you calculate that all out, you conclude,

11   with all the different reductions because at that point

12   we're still taking out the 2.59 million for the equity, you

13   calculate that all out, and you make a conclusion, and I

14   think you actually stated in the transcript, you make the

15   conclusion, okay, that's going to reflect a bid change of

16   3.6 million in change, and you concluded that in order for

17   Nat Penn then to submit a qualified bid, it needed to go to

18   6,012,353.  Do you recall that?

19   A    I guess we probably had that plugged into the

20   spreadsheet at the point in time, and it's been replaced by

21   the 12 million that they actually bid, so --

22   Q    Well, if you turn to --

23   A    -- I assume that that's accurate.

24   Q    Okay.  And then you get a bid of actually 12 million

25   from Nat Penn which equates to an actual increase to

1    6,815,000 and change, correct, after you do all your

2    adjustments.

3    A    Correct.

4    Q    So in order for RKJS to make another qualifying bid,

5    they've got to go to 9,102,000 and change, correct?

6    A    I understand.

7    Q    But you agree?

8    A    Yes.  I mean, where are we going, are we --

9    Q    I'm just trying to --

10   A    Okay.

11   Q    -- go through the steps.

12   A    Okay.

13   Q    So you are adjusting and telling RKJS at each of these

14   rounds what they have to bid to qualify for their next bid,

15   correct?

16   A    Yes.

17   Q    And that went all the way through their bid of

18   13,225,949 in the tenth round that increased their bid the

19   over $150,000 over Nat Penn's last bid, correct?

20   A    Could you repeat the question, please?

21   Q    The 13,225,949 that's reflected at the bottom of the

22   ninth round --

23   A    Okay.

24   Q    -- that is what the debtors are saying RKJS has to bid

25   in the next round --

1    A    Correct.

2    Q    -- in order to qualify, correct?

3    A    Correct.

4    Q    And they submit that qualifying bid.

5    A    That is accurate.

6    Q    Now, you made all these adjustments discounting

7    economically what it would be that you'd have to factor in

8    to equate the stock and equate the receivable, where is --

9    where on this spreadsheet is the factor you've got to put in

10   to equate your bid, RKJS, with Nat Penn's bid for regulatory

11   risk?  It's no where on here, is it?

12   A    It's not listed because it's not the analysis that we

13   were focused on at that point.  This is the numeric

14   analysis, and the other analysis is regulatory analysis.

15   Q    Mr. Boyan, you agree that based on the bidding that you

16   conducted, and you basically ran this auction, correct?

17   A    The (indiscernible) yes.

18   Q    That based on what went back and forth, the highest bid

19   that came in was RKJS', correct?

20   A    If you include all the premium and discounts, RKJS is

21   the highest bid.  If you eliminate all the premium and

22   discounts, Nat Penn is the highest bid.

23   Q    But the process that you set forth for the debtor, and

24   that the debtor proposed to the bidders included all those

25   premiums and discounts, correct?

1    A    It did up until that point, and at that point in time,

2    the economics then gave way to the concerns over the

3    regulatory process.  As RKJS's bid increased, we became

4    increasingly concerned of the 100 million pie that they had,

5    they were pushing more to the debtor, which is great for the

6    debtor, but it creates even more and more regulatory concern

7    that they'll actually get approval.

8        Now, that's great for the debtor, and would help drive

9    the economics for the debtor, but if they don't get

10   regulatory approval then the debtor gets zero.  So we were

11   evaluating that risk throughout the process.

12   Q    So the response to the question, which was that these

13   discounts and premiums were applied throughout this auction

14   in the procedure you set up, is it your testimony right now,

15   that that was then changed by you?

16   A    No, it was not changed.

17   Q    Oh, okay.

18   A    It was all part of the process of evaluating the

19   economics.

20   Q    So that process continued, and the highest bid with the

21   process you set up was RKJS's, correct?

22   A    This bid -- this process is not like any other

23   regulatory or bankruptcy process.  I'm sorry that the

24   numbers -- the dollars and cents are the critical part of

25   this.  I mean, they are to a degree.  And we took it through

1   the auction.  We did not know where the auction was going to

2   go.  We always hoped that through the process, that someone

3   would differentiate themselves, and each party, Nat Penn and

4   RKJS had ten chances to really differentiate their bid, and

5   we were hoping that we would have something that we could

6   hang our analysis on in totality.

7        You cannot separate the economic from the regulatory

8   stuff.  Now, we got to a point, and we (indiscernible) might

9   get to this point, where we have $150,000 more to RKJS

10  including all the premiums and discounts, and I'll give you

11  that.  But in the end $150,000 was not enough to change the

12  minds of those from the decision-making body to overweigh

13  the -- or outweigh the risk on the regulatory side.

14  Q    So when you say there is 150,000, you are agreeing that

15  the highest bid value-wise, as you valued it, the debtor

16  valued it was RKJS's, correct?

17  A    Sir, I have explained myself, and you continue to try

18  to put words in my mouth, and I have explained it to you,

19  you can look at it two ways, and if you're not going to

20  accept that, I appreciate that, but don't try to keep

21  putting words in my -- you ask me a question, I'll answer

22  it.

23  Q    The process that you've described in which you had a

24  bid that you then turn to Nat Penn to ask for a next bid,

25  you actually calculated the amount that was to be provided

Page 87

1    by Nat Penn, correct?

2    A    We always gave each party the minimum bid that they

3    would have to bid.

4    Q    And they indicated not only that they were not going to

5    increase their bid, that they would make no further bids,

6    correct?

7    A    That is correct.

8    Q    And then you went into a two and a half hour session in

9    which you started to factor in something other than this

10   pricing, correct?

11   A    There are significant other factors than just pricing.

12   I'm sorry that you can't accept that.

13            THE COURT:  It sounded like a yes or no answer to

14   me, sir.

15            THE WITNESS:  Okay.

16            THE COURT:  You're not particularly helping the

17   Court understand your testimony if you just don't answer the

18   question.

19            THE WITNESS:  I am, but he's trying to imply a

20   meaning --

21            THE COURT:  Well, it doesn't sound like an answer

22   to me.  Next question.

23   BY MR. MELLOTT:

24   Q    During that two and a half hours, you considered

25   factors other than what you had told the parties was going

```
 1   to be the pricing factors for accepting qualified bids,
 2   correct?
 3   A    Yes, we considered the economics and we considered the
 4   regulatory.
 5   Q    Mr. Boyan, the last bid from RKJS according to the
 6   transcript came in around 7:19, 7:20, correct?
 7   A    I suppose so, yes.
 8   Q    And about a ten minute caucus by Nat Penn, and then
 9   they said no further bid about 7:30, correct?
10   A    That sounds about right.
11   Q    And you confirmed to Mr. Stein of your office by e-mail
12   at about that same time, on the day of the auction, that
13   RKJS was the winning bidder, didn't you?
14   A    I don't recall.
15   Q    You don't recall sending that e-mail?
16   A    No.
17   Q    Do you have your Blackberry with you?
18   A    I do.
19   Q    Would you like to look to see if you sent any e-mails
20   to Mr. Stein on April 10th at around 7:30 p.m.?
21           THE COURT:  Are you saying you're prepared to
22   look, sir?
23           THE WITNESS:  I don't recall --
24           MR. O'NEILL:  I mean, is there a request for
25   production of documents, Your Honor?
```

Page 89

1            THE COURT:  The witness is on the stand with his

2     Blackberry, apparently there's a belief that an e-mail was

3     sent, and he can check.  We're going to take a recess in

4     this case, we need to take our 3 o'clock and 3:30 dockets,

5     and during the recess, the witness can check to see what his

6     records show.

7            Sir, while we're on the recess, you're still on

8     the witness stand, which means you're not allowed to discuss

9     with anyone the substance of your testimony.  You may

10    certainly feel free to walk around or go --

11           THE WITNESS:  I'll stay right here.

12           THE COURT:  Well, if you need to go to the

13    restroom, you can do that too.  You can't stay there because

14    we're going to have a hearing in other cases.

15           THE WITNESS:  Oh.

16           THE COURT:  So you'll need to get down.

17           MR. O'NEILL:  Your Honor, I know I can't talk to

18    him about his testimony, may I review the contents of his

19    Blackberry with him?

20           THE COURT:  No, let's let the witness answer the

21    question and then we'll see where that goes.

22           THE CLERK:  All rise.  Court is in recess.

23        (Recessed at 3:30 p.m.; reconvened at 3:55 p.m.)

24        (Call to Court)

25           MR. SCHMIDT:  Good afternoon, Your Honor.  Robert

Page 90

```
 1    Schmidt, Kramer Levin.  Before proceeding with the witness,

 2    I just thought I would like to give the Court a report on --

 3              THE COURT:  All right.

 4              MR. SCHMIDT:  -- the discussions on scheduling.

 5              I believe the parties are in agreement that we can

 6    conclude this evening at 5:30 and pick it up tomorrow at the

 7    Court's convenience.  The one issue was an issue that we

 8    mentioned briefly earlier.  My statement and my comments

 9    about the DIP being proposed under the Nat Penn deal having

10    a trigger date of tomorrow close of business or their

11    obligation to provide a DIP.  And I believe the Nat Penn

12    folks have agreed to push that date out to make it

13    coterminous with other trigger dates in their documents to

14    April 17th.  I would just ask Ms. Springer to confirm that

15    on the record.

16              THE COURT:  All right.  Very well.

17              Ms. Springer.

18              MS. SPRINGER:  Two points of clarification, Your

19    Honor.  If we are going to conclude before the hearing ends

20    this evening, which is my understanding, I would prefer it

21    if it was earlier than 5:30 so that some of us who are out

22    of towners can possibly get home in time for the holiday,

23    since we're going over to tomorrow anyway.

24              My second request is that, yes, that is correct on

25    the DIP, but it is our understanding that the debtor is in
```

Page 91

1      agreement that it is not going to draw down on the DIP until

2      it is known the identity of the successful bidder because

3      the successful bidder will be the party that is providing

4      the DIP, as I understand it.

5              But, you know, as far as we're concerned the 17th

6      in making that -- by the -- that determination will be made

7      by the 17th.

8              THE COURT:  All right.  Does that address your

9      concerns, Mr. Schmidt?

10             MR. SCHMIDT:  Yes, it does, Your Honor.  We just

11     didn't want to have an inadvertent trigger if we don't

12     include everything tomorrow or an order is not entered at

13     some point tomorrow.  The only other caveat or concern is

14     that with respect to ending earlier than 5:30, I don't know

15     how much longer RKJS is going to have Mr. Boyan on the stand

16     on cross.  I just don't think it makes sense to have that

17     carry over.

18             THE COURT:  Well, we can't control that.  I think

19     we'll go until 5:30 and, you know, we'll do the best we can.

20     Maybe if there's a reason to break earlier, then we can if

21     his testimony is concluded.

22             MR. SCHMIDT:  That's fair, Your Honor.  Thank you.

23             THE COURT:  All right.

24             Now there was a question before this witness, Mr.

25     Mellott, so you can pick up from there.

1          MR. MELLOTT:  Thank you, Your Honor.

2                    CROSS-EXAMINATION, CONTD.

3     BY MR. MELLOTT:

4     Q    I believe I had asked, Mr. Boyan, whether you could

5     check your Blackberry to see whether -- or your iPhone to

6     see whether you had an email to Mr. Stein at around 7:30 on

7     April 10th?

8     A    I did check my Blackberry and I had no such

9     communication regarding the outcome of the bidding.

10    Q    What about any text messages?

11    A    And I checked that as well and I had no text messages

12    with Mr. Stein.  I had one email to him on a different

13    subject, never mentioned RKJS or Nat Penn or the bidding. I

14    had a conversation with him late that night at about 11:00

15    after we had all left the auction.

16    Q    And at no point during the period from RKJS's last bid

17    until the end of the auction did you convey to Mr. Stein in

18    any form a conclusion that RKJS was the winning bidder?

19    A    I did not have any communications with Mr. Stein.  He

20    was at the Masters and I was pretty involved with what I was

21    up to, so I -- on the ride home at 10:30 at night I did have

22    a conversation with him.

23    Q    Did you have any discussions with any of the attorneys

24    for the debtor or board of the debtor during the break?

25    A    You mean today?

1    Q    Today.

2    A    No.  I did not.  Someone said hello to me and that was

3    it, but there was no discussions of my testimony or anything

4    else.

5    Q    Who was that?

6    A    I said hello to Gary Braunstein (ph), but that was it.

7    Q    Mr. Boyan, was there any value placed on the bids based

8    on whether First Mariner would remain a local Maryland

9    banking institution?

10   A    I think there was some emotions, but it did not factor

11   into the decision-making process one bit.

12   Q    Have there been any changes to the merger and

13   acquisition agreement with Nat Penn that was appended to the

14   notice of successful bidder that you're aware of?

15   A    The attorneys did work with Nat Penn following that

16   they were deemed to be the successful bidder in preparation

17   for -- I guess that might have been filed Friday night.

18   Q    But any changes since that filing that you're aware of

19   other --

20   A    No.  I didn't --

21   Q    -- than what Ms. Springer just announced?

22   A    I don't -- right.  I don't believe there have been any

23   since that filing, not that I have been made aware of.

24           MR. MELLOTT:  One second, Your Honor.

25   Q    Have there been any discussions about extending the

1    closing deadline with Nat Penn until June 30th?

2    A    There were numerous discussions about that subject and

3    I believe that in the decision of agreement they have agreed

4    under circumstances to extend to June 30.

5    Q    Mr. Boyan, at the time that you appeared on March 7th

6    at this court and testified the regarding upcoming auction

7    procedures -- you recall that?

8    A    Yes.

9    Q    Do you recall stating that there had been a period of

10   time in which Nat Penn had been a potential buyer for First

11   Mariner back in the fall of 2013?

12   A    Yes.

13   Q    And you recall also stating that you spoke again with

14   Nat Penn and I think it was also FMB after the RKJS term

15   sheet was submitted and signed, correct?

16   A    Correct.

17   Q    And then I think you also indicated that the Wednesday

18   before the March 7th hearing, Nat Penn had actually come

19   into -- you said the offices.  I'm not sure whether that's

20   the bank's offices or Sandler O'Neill's offices and had a

21   three-hour meeting with senior management.  Do you remember

22   that?

23   A    Yes.  It was at the headquarters of First Mariner.

24   Q    So when the auction procedures were being proposed, Nat

25   Penn had resurfaced as a potential interested bidder?

Page 95

1    A    That is correct.

2    Q    Now Sandler serves as a financial advisor to Nat Penn,

3    correct?

4    A    In certain circumstances, yes.

5    Q    In fact, you closed the -- Sandler O'Neill closed the

6    deal for Nat Penn to repurchase stock in January of this

7    year, correct?

8    A    That's correct.

9    Q    I have in the notebook Exhibits 10 and 11.  Was there

10   any disclosure of Nat Penn in the application for employment

11   of Sandler & O'Neill?

12   A    I don't understand the question.

13   Q    Was there any indication to this Court and to the

14   debtors that Sandler O'Neill was also a financial advisor to

15   Nat Penn?

16   A    I don't know that there was or was not.  I don't know

17   that the question was asked.

18   Q    Well, there's an application process in which you apply

19   to the Court and are supposed to list potential conflicts.

20   And I'm asking you -- and you have Exhibit 10 in front of

21   you.  Your --

22   A    I would have to review it.  It's been a while since I

23   looked at that document.

24   Q    Well, you're welcome to review it, but I believe you'll

25   find that there's no disclosure of Nat Penn in there.

```
 1   A    Okay.  At that --

 2              THE COURT:  Well, let's --

 3              THE WITNESS:  -- point in time --

 4              THE COURT:  Hold on a second.  Let's direct -- I

 5   think you're directing the witness to your Exhibit 11.  Is

 6   that right?

 7              MR. MELLOTT:  I believe Exhibit 11 is the order,

 8   Your Honor, but maybe I --

 9              THE COURT:  Well, I have a book in which Exhibit

10   11 is the application and Exhibit 12 is the order.

11              MR. MELLOTT:  I'm sorry.  Exhibit 11.  Thank you,

12   Your Honor.

13              THE COURT:  All right.  Now the witness -- I think

14   -- you directed him to the exhibit.  You -- he's expressed

15   some lack of familiarity with it.  Let's let the witness

16   look at it and then let's ask a question.

17              MR. MELLOTT:  Thank you, Your Honor.

18        (Pause)

19              THE WITNESS:  Okay.  I'm ready to proceed with

20   your question.  Maybe you can ask a --

21              MR. MELLOTT:  All right.  Well --

22              THE WITNESS:  -- specific question.

23   BY MR. MELLOTT:

24   Q    Are you familiar with the doc -- have you --

25   A    Yes.
```

1   Q   -- seen this document before?

2   A   Yes.

3   Q   Is there any indication in this document that Nat Penn

4   was a company that Sandler O'Neill was representing as a

5   financial consultant?

6   A   We represent people from time to time in various

7   transactions.  I think there was a transaction in January

8   and at that point in time that transaction had concluded.

9   So at that point in time we were not a financial advisor to

10  Nat Penn.

11  Q   So it's your position that when this was filed in

12  February you did not consider yourselves to be financial

13  advisors to Nat Penn?

14  A   That's correct.

15  Q   And when they resurfaced in March, did you indicate to

16  the debtors that you had been the financial advisor for Nat

17  Penn?

18  A   I don't know that the subject came up.

19  Q   So you don't recall any such conversation?

20  A   No.

21          MR. MELLOTT:  One second, Your Honor.

22      (Pause)

23          MR. MELLOTT:  That's all I have.  Thank you,  Your

24  Honor.

25          THE COURT:  Redirect.

1                MR. O'NEILL:  No redirect, Your Honor.

2                THE COURT:  I have some questions.

3                THE WITNESS:  Okay.

4                THE COURT:  So, Mr. Boyan, I'm confused.  During

5     what time periods did you act -- you or your firm act as a

6     financial advisor for Nat Penn?

7                THE WITNESS:  I believe it was a transaction where

8     they repurchased some stock in -- and I guess it was

9     January.  It was not a transaction I was involved with or

10    really had any knowledge of the transaction whatsoever until

11    we got to the point where we were talking about Nat Penn

12    being a viable opportunity here.

13               THE COURT:  Did you know about it at that point?

14               THE WITNESS:  At that point I suppose, yes, that I

15    knew that we had had some involvement with them.  And it was

16    --

17               THE COURT:  Was --

18               THE WITNESS:  -- nothing more than a stock

19    repurchase.

20               THE COURT:  But it was never disclosed?

21               THE WITNESS:  Not disclosed nor discussed.

22               THE COURT:  And was there some other prior

23    engagement that your firm had on behalf of Nat Penn?

24               THE WITNESS:  Not that I'm aware of.  There -- we

25    -- Your Honor, we represent numerous financial institutions

```
 1    across the country and from time to time we may have been
 2    involved with Nat Penn in the past.  But I have never had
 3    any involvement with Nat Penn in any transaction up until
 4    now.
 5              THE COURT:  Okay.  I understand.
 6              I understand your testimony to be -- so I want you
 7    to correct me if my understanding is wrong -- that from the
 8    time that the auction commenced to the time that you or
 9    whoever it was came out at that late hour and declared that
10    the debtor was going to go with Nat Penn, that you never
11    discussed on or off the record with any of the bidders the
12    need for them to try to strengthen or differentiate their
13    bids based upon the fact that ability to close or regulatory
14    approval was becoming an increasingly important factor in
15    the debtor's mind in the auction?
16              THE WITNESS:  I would say not from the time that
17    the auction commenced, but as I mentioned, it was -- it was
18    a significant discussion beforehand.
19              THE COURT:  Mr. Boyan, you were -- you do this
20    repeatedly and you're asked a direct question.  The answer
21    is either yes or no, and I'm taking your answer to be that
22    you confirm that from the time the auction commenced until a
23    winner was declared, if you will, it wasn't discussed.
24              THE WITNESS:  That's correct.
25              THE COURT:  So no party that was involved in the
```

1    auction process knew that that was being a factor that was

2    also considered when this financial analysis was being

3    presented that's Debtor's Exhibit 1?

4              MR. O'NEILL:  Your Honor, you mean no party

5    meaning no bidder because, obviously --

6              THE COURT:  Yes.  The bidders.

7              THE WITNESS:  Your Honor, I understand your

8    question, but I think you're trying to guide me to an answer

9    that I don't really agree with and that's what I'm trying to

10   convey to everyone is everyone knows this is part of the

11   process.  It was discussed extensively prior to the -- so

12   the fact -- it's not like people were going to forget that

13   when they get to the bidding.

14             And so the direct answer to your question is it

15   was not discussed from the time the -- that the auction

16   commenced, but it was discussed extensively prior to that so

17   much so that the -- that RKJS was trying to secure their

18   financial -- their regulatory approval prior to the auction

19   commencing, which we were encouraging them to do so.

20             THE COURT:  At the outset of the auction both

21   parties expressed concern that the bidding might stop

22   without -- and I'm sort of characterizing what the

23   transcript says.  You're free to look at it if you wish.

24   But that the bidding might stop and something like what we

25   have happened here would happen.  And they wanted an

1    opportunity to understand what was causing the decision to

2    be made and a chance to improve their position before the

3    auction was concluded, right?

4              THE WITNESS:  That's correct.

5              THE COURT:  And both parties inquiries', Mr. Brody

6    responded that the debtor was taking it under advisement?

7              THE WITNESS:  That's correct.

8              THE COURT:  Was there ever any discussion with any

9    of the parties about what under advisement meant or any kind

10   of response to this concern before the auction was

11   concluded?

12             THE WITNESS:  Periodically through the day we did

13   have conversations, particularly with RKJS, about where they

14   really stood financially.  We took the numbers of their team

15   aside and said, we really need to know the specifics of your

16   commitments and the pro forma financial ratios because if

17   they don't hit certain ratios they are never going to get

18   regulatory approval.  And we talked through that with them

19   and requested that they give us information that would help

20   enhance their bid and their standing in the eyes of the

21   regulators.

22             And as I mentioned earlier, you know, there's two

23   pieces of the pie.  They raised a hundred million.  If they

24   keep giving more to the holding company, that hurts their

25   chances at the bank level.  And we did have communications

1    through the day with counsel and -- involved where those

2    were pretty extensive discussions.

3              THE COURT:  And why not disclose at the conclusion

4    what the debtors' evaluation was of the merits of the two

5    bids and invite some opportunity for one party or the other

6    to enhance their bid to address the issue?

7              THE WITNESS:  Well, we -- as I mentioned, we were

8    trying to encourage more disclosure through the day from

9    RKJS.  And at the end it was our fear that they would try to

10   overextend in a way that, yes, they might have a higher

11   numerical bid, but the underlying result of that would be no

12   regulatory approval.

13             THE COURT:  But why is that a problem?  I mean,

14   because if they came in and said, we're going to increase

15   our bid to 100,000 -- $100 million, then wouldn't the debtor

16   have a sound business basis for rejecting the bid?

17             THE WITNESS:  The regulators would not approve the

18   transaction and we would end up with nothing.

19             THE COURT:  But that's why -- I don't understand

20   why you wouldn't ask.  That's the point I don't -- the

21   question I don't understand.  If they were doomed to failure

22   how could you conclude that without hearing from them first?

23   That's what I don't understand.

24             THE WITNESS:  Well, we did ask for pro forma

25   ballot sheets to confirm their ratios.  We said, okay, where

1    are you.  You know, we were trying to measure where they

2    were.  I mean, we didn't know how -- you know, we didn't

3    anticipate that the bidding would get so lofty.  And then

4    when it did, periodically we pulled out our models and said,

5    okay.  So if everybody -- if they have $100 million and

6    they're going to pay us X dollars, what are the ratios and

7    what do we think the regulator is going to say about that.

8           THE COURT:  But the point of the cross-examination

9    was you never disclosed any of that to RKJS, right?

10          THE WITNESS:  We had conversations with them, but

11   we never said, hey, your bid is not going to be -- you know,

12   if you come within a certain dollar amount we never said to

13   them, you're not going to be chosen.  It's -- you know, the

14   -- in the definitive agreement or in the auction procedures

15   it says highest or best, and we were really looking for

16   best.  And I think people are hanging on highest a little

17   bit, but we did have a lot of discussion about making sure

18   that we gave them the opportunity to present financials to

19   us and to make their case as to why they have a stable bid.

20   And we didn't want to end up in a situation where RKJS was

21   the highest bid, but a non-approvable bid and then we would

22   lose Nat Penn at the same time.

23          THE COURT:  But that's -- you're saying that's the

24   situation you're in now.  That's what you want the Court to

25   believe, isn't it?

1                THE WITNESS:  I'm just -- I think the discussion

2      that we're having here today is about what took place at the

3      auction.  Now I guess there's still an open item of what you

4      do now since there's been a new bid.  I mean, I kind of feel

5      like people are criticizing the auction process and I --

6                THE COURT:  No.  No.  No.  You don't understand.

7      Forget the new bid for a moment.

8                THE WITNESS:  Okay.

9                THE COURT:  You're criticizing the bid for being

10     what it was.  I don't understand.  Why you could -- what was

11     the problem with ask -- telling them that they needed to do

12     something to strengthen their bid to address this issue?  If

13     it was so clearly going to fail because of regulatory

14     approval, why not see what else they would do?

15               THE WITNESS:  We did.  We said give us financials

16     and give us more information to show us that you can do

17     better.  We requested financials more than once throughout

18     the day.

19               THE COURT:  Were you involved in the decision to

20     conclude the auction -- I'm not finding that this is the way

21     it happened, but RKJS would say sort of in a perfunctory

22     hasty way and that all the other parties simply, you know,

23     packed up and left?

24               THE WITNESS:  I was not involved in that decision.

25     No.

1          THE COURT:  Do you know why that was decided to be

2     done?

3          THE WITNESS:  I don't.  I was not involved in that

4     discussion.

5          THE COURT:  Okay.  Do either or any of the parties

6     have any questions of the witness in light of the Court's

7     questions?

8          MR. O'NEILL:  I do not, Your Honor.

9          MS. SPRINGER:  Your Honor, just one question.

10                    CROSS EXAMINATION

11     BY MS. SPRINGER:

12     Q    Mr. Boyan.

13     A    Hi.

14     Q    I just want to clarify.  At any time during the

15     proceeding did you --

16     A    By proceeding you mean the auction, right?

17     Q    The auction.

18     A    Okay.

19     Q    Exactly.  Or after Nat Penn became involved as a bidder

20     did you or your firm represent National Penn Bank in this

21     transaction?

22     A    No.

23     Q    Okay.  As far as you know was National Penn represented

24     by another investment banking firm?

25     A    They were represented by Jefferies which is an

1    investment banking firm.

2    Q    And in connection with your representation of the

3    debtor, did you have conversations with Jefferies as

4    representative of National Penn Bank?

5    A    Yes.  We talked quite extensively with Jefferies.

6    Q    And did Jefferies negotiate on behalf of National Penn

7    Bank?

8    A    They did and one of the early touch points was that the

9    creditors' committee wanted to have Nat Penn receive access

10   to the data room, due diligence materials ahead of the

11   hearing that we had on whatever that day was that we were

12   here last, and we said, no, we cannot do that.  We're not

13   going to get ahead of the judge.  And we continued to come

14   under pressure from the creditors' committee, so we thought

15   it out and said, okay.  Well, this would help -- you know,

16   one of the criticisms is there wasn't enough time.  So we

17   let Nat Penn in and let them get started ahead of the

18   hearing that we had.

19   Q    And do you feel that the auction process in your mind

20   was -- do you feel that both bidders were treated in a fair

21   manner?

22   A    Yes, I do.  And I think each party was given nine to

23   ten shots to make their case, and we listened, recorded

24   everything,  let people know exactly where they stood in the

25   auction process as it related to the numeric's.  And I felt

1    like each side had their opportunity to speak their mind and

2    make their bids.

3    Q    Okay.  Thank you.

4         MS. SPRINGER:  No further questions.

5         THE WITNESS:  Thank you.

6                   RECROSS-EXAMINATION

7    BY MR. MELLOTT:

8    Q    Mr. Boyan, is it your testimony that Sandler O'Neill

9    has no hope to continue to represent Nat Penn in the future?

10   A    They're not a client of mine typically, so it's not

11   something that I considered.

12   Q    But the closing on that deal in which Nat Penn was the

13   financial advisor was in January of 2014, wasn't it?

14   A    I wouldn't call it a deal.  It was a stock repurchase

15   which is a very small transaction and, frankly, I wouldn't

16   call it a transaction.

17   Q    But that was January of 2014?

18   A    I believe so.  I just took that from your statement.

19   Q    Well --

20        (Pause)

21        MR. MELLOTT:  May I approach, Your Honor, with an

22   exhibit?

23        THE COURT:  Yes.

24        MR. MELLOTT:  I would like to have that marked as

25   the next exhibit.

1           THE COURT:  13.

2           MR. MELLOTT:  Thank you, Your Honor.  Exhibit 13.

3    BY MR. MELLOTT:

4    Q    I'll show you, Mr. Boyan, what's been marked as RKJS

5    Exhibit 13 and ask you if that's a Sandler O'Neill press

6    release dated January 28, 2014 announcing the stock

7    repurchase that we've been discussing?

8    A    Yes.

9    Q    Okay.

10          MR. MELLOTT:  I would move that into evidence,

11   Your Honor.

12          MR. O'NEILL:  No objection, Your Honor.

13          THE COURT:  RKJS 13 is admitted.

14      (RKJS Exhibit No. 13 received)

15   BY MR. MELLOTT:

16   Q    I would like you to go back to Debtor Exhibit 1, the

17   spreadsheet that His Honor was asking you about.

18      Now as I understand it you had asked for a specific bid

19   from Nat Penn in response to the tenth bid shown in that

20   sheet, thirteen-million-two from RKJS, correct?

21   A    Can you repeat the question, please?

22   Q    You had stated to Nat Penn what their bid would have to

23   be to qualify to outbid the tenth bid from RKJS, correct?

24   A    Correct.

25   Q    And if they had given you that bid, you then would have

1    asked for -- calculated the next bid for RKJS, correct?

2    A    Yes.  Actually, this spreadsheet initially went to nine

3    rounds and as the bidding went on we added ten, eleven,

4    twelve, thirteen, fourteen, and those did not materialize so

5    we deleted the columns that were not necessary.

6    Q    And it was your intent to proceed until one of the

7    bidders stopped?

8    A    That's correct.

9    Q    Even though by the end of the bid from RKJS in the

10   tenth round you then made the determination that whatever

11   bid Nat Penn had that was lower was going to qualify and be

12   the better bid and you were willing to let that keep

13   increasing for Nat Penn regardless of your conclusion

14   already that you were at a regulatory risk for RKJS that is

15   making that bid not worth more than the previous bid from

16   Nat Penn, correct?

17   A    The conclusion was not made until after we talked with

18   the directors after the tenth bid -- after RKJS bid in the

19   tenth round.

20   Q    So is it your testimony that the bid that RKJS gave as

21   its ninth bid, that previous bid from RKJS, if no response

22   had been given from Nat Penn, that that would have been a

23   qualified highest bid?

24   A    We would have evaluated that at that point in time.

25   Q    And if your evaluation was done the same way, then the

1    effect of having not made that evaluation until the tenth

2    bid by Nat Penn -- I mean, from RKJS with no response from

3    Nat Penn was just to get another bump from Nat Penn,

4    correct?

5    A    I think the -- if Nat Penn had shown up to bid in the

6    tenth round we would have accepted that bid as the highest

7    bid and we would have put it back to RKJS for another bid.

8    Q    The request for pro formas from RKJS that you referred

9    to earlier, those were made and provided to you at the day

10   of the auction, correct?

11   A    We requested the information and the response we got

12   from your firm was we will only provide that information if

13   we're deemed to be the winning bidder.  So there was no

14   disclosure of information at that point in time.

15   Q    So it's your testimony that that information was not

16   provided to you during the break after the last bid before

17   Mr. Brody's announcement.  Is that your testimony?

18   A    My testimony is that we asked for it earlier in the

19   day.  I cannot remember between which rounds.  But it became

20   something that we were focused on.  We pulled everyone into

21   the room.  There were probably 15 people standing around,

22   most of whom were representing RKJS.  We had extensive

23   conversation about our concerns.  We asked for financials.

24   We asked for a list of all those who were involved as

25   participants in the group.  And we were told by, I believe

1    it was Mr. Schiffer that we would only receive that

2    information at the conclusion of the bidding.

3    Q    So it's your testimony you did not receive that

4    information?

5    A    You're asking me a question that is -- actually, the

6    question was asked twice.  So the first time we did not

7    receive it.  The second time it was requested.  I did not

8    see -- I did not see it at the end of the day, at the

9    conclusion of bidding.

10   Q    So it's your testimony the debtor did not receive that

11   information?

12   A    I didn't say that.  I did not see it at the conclusion

13   of the bidding.

14   Q    Before Mr. Brody announced that Nat Penn had been

15   selected as the best -- for approval of the board, was there

16   any indication from the time that the last RKJS bid was

17   given until that announcement, any indication given by you

18   or anyone that you knew of on the debtors' side to RKJS that

19   the decision had been made to announce that Nat Penn would

20   be the highest bid -- would be the best bid?

21   A    No.

22         MR. MELLOTT:  Nothing further.  Thank you, Your

23   Honor.

24         THE COURT:  Mr. Boyan, could you look at debtor --

25   I'm sorry -- RKJS Exhibit 11 again at page -- if you look at

1    the top there's a legend that says document number, and if

2    you keep going it comes to Document Number 43-1, page 1 of

3    9.

4              THE WITNESS:  Excuse me.  You said 11?

5              THE COURT:  Correct.  It's RKJ -- it's in the RKJS

6    binder behind Tab 11, at least in my book.

7              THE WITNESS:  Yeah.  I -- okay.  I have one of 15.

8              THE COURT:  Okay.  That's the beginning and then

9    you keep going.

10             THE WITNESS:  Oh, okay.  Okay.  Got it.

11             THE COURT:  You see a verified statement?

12             THE WITNESS:  Yeah.

13             THE COURT:  And that says that you were the person

14   who signed this statement, right?

15             THE WITNESS:  Yes.

16             THE COURT:  How was this verified statement

17   prepared?

18             THE WITNESS:  The lawyers prepared it.  Initially,

19   I read through it, looked at it and approved it.

20             THE COURT:  Did you do any independent checking of

21   any kind of conflict system or client representation system?

22             THE WITNESS:  We did.  We have an internal group

23   that took care of all of that for us.  We have a compliance

24   department that heralded that.

25             THE COURT:  And you physically signed an affidavit

1    like this, blue ink on white paper?

2              THE WITNESS:  I believe -- yes.

3              THE COURT:  And you executed it on February 13th?

4              THE WITNESS:  Yes.

5              THE COURT:  At -- how does that -- I'm confused.

6    How does that relate in time -- it's after this stock

7    offering transaction or deal that you discussed.  I

8    understand that.  But there was testimony about National

9    Penn arriving at the offices of First Mariner for the sit

10   down with management.  I'm confused about when that meeting

11   took place.  This is when they sort of came back to be

12   interested.

13             THE WITNESS:  What was the date of our hearing

14   last?  It was Friday, March 7th, I believe.

15             THE COURT:  I think that's right.  The order

16   appears to have been entered on March 8th.

17             THE WITNESS:  So it would have been that

18   Wednesday, the 5th.

19             THE COURT:  So sometime in March after you --

20             THE WITNESS:  Correct.

21             THE COURT:  -- signed your affidavit.  And have

22   you gone back to reconsider anything that you've said in

23   this affidavit in light of subsequent developments?

24             THE WITNESS:  Clearly, we should have maybe let

25   people know that we have represented Nat Penn in the past,

1   but, you know, I really don't see it as a conflict today and

2   apparently did not at the time I signed the affidavit.

3          THE COURT:  I see.  All right.  I have no further

4   questions.

5          Any more questions of this witness in light of

6   that inquiry?

7          MR. MELLOTT:  No, Your Honor.

8          MR. O'NEILL:  No, Your Honor.

9          THE COURT:  All right.  Thank you for your

10  testimony, sir.  You may step down.

11         THE WITNESS:  Thank you.

12         THE COURT:  Is there some other witness the debtor

13  wishes to call today?

14         MR. O'NEILL:  Yes, Your Honor.  The Debtor calls

15  Mark Keidel.

16         THE COURT:  All right, sir. If you would come

17  forward.  Would you please stand and raise your right hand

18  in front of the witness box and be sworn in before taking a

19  seat.

20              MARK KEIDEL, WITNESS, SWORN

21         THE CLERK:  Please be seated.

22         Please state your full name and address for the

23  record.

24         THE WITNESS:  It's Mark Alan Keidel.  My address

25  is 6313 Arlington Lane, Woodvine, Maryland, zip code is

1    21797.

2            THE CLERK:  Thank you.

3                        DIRECT EXAMINATION

4    BY MR. O'NEILL:

5    Q    Mr. Keidel, where do you work?

6    A    First Mariner Bancorp and First Mariner Bank.

7    Q    What is your position at those two institutions?

8    A    Currently the interim CEO.

9    Q    Okay.  Are you also a member of the board of directors?

10   A    Yes, I am.

11   Q    For how long have you been a member of the board of

12   directors?

13   A    Since 2009.

14   Q    And how long have you worked in the banking industry?

15   A    Just over 30 years.

16   Q    And are you generally familiar with the marketing and

17   sale of First Mariner Bank, what's the subject of this

18   proceeding?

19   A    Yes, I am.

20   Q    Formerly speaking, what involvement did you have in the

21   prepetition efforts to market the bank and the selection of

22   RKJS as the stalking horse?

23   A    I believe it was in November.  We were approached by

24   the RKJS group, negotiated a term sheet, assisted with some

25   diligence in their efforts, certainly guided other bank

1    management in diligence and their efforts, was involved to

2    some degree with negotiations of some of the other

3    documents, the bankruptcy documents.

4    Q    And what involvement did you have in the post-petition

5    efforts to market the bank?

6    A    Primarily, the interaction with Nat Penn.  They did

7    come forward shortly after the hearing, if not before the

8    hearing on March 7th, to my recollection.  So we spent an

9    extensive amount of time with Nat Penn, both answering their

10   questions and satisfying their diligence needs as well as

11   visiting Nat Penn and satisfying our needs in terms of our

12   diligence.

13   Q    What -- were you involved in the auction that occurred

14   last Thursday?

15   A    Yes, I was.

16   Q    And what was your role in all of that?

17   A    I was, you know, representing the company as an

18   executive officer and a board member.  However, the board

19   directed Barry Bondruff to be the chairman of the special

20   committee.  I was not a member of the special committee.

21   Q    You mentioned the special committee.  How was the

22   special committee formed?

23   A    It was a sub-committee formed that the board approved

24   selected by the chairman of the board, Mike Watson.  Mike

25   wanted to be certain that the committee included both

1    creditors because there are some board members who are

2    creditors and some who are not.  So I believe we had two

3    board members who were not creditors on that committee.

4    Q    And what was the purpose of the special committee?

5    A    To, you know, certainly hear input from the advisors in

6    terms of the auction and to provide approval of a

7    preliminary or a provisional bidder to --

8    Q    And --

9    A    -- to recommend to the full board.

10   Q    Well, you mentioned Mr. Bondruff.  It was -- he was

11   never on the special committee and the board?

12   A    That's correct.

13   Q    And what role, if any, did he have at the auction?

14   A    He was there throughout all the bidding, was certainly

15   involved in various conversations, some of the deliberations

16   of the professionals, and he was there for the full duration

17   of the auction.

18   Q    The last time you were here you testified about the

19   auction procedures; is that right?

20   A    Correct.

21   Q    And those procedures approved a stalking horse bidder,

22   isn't that right?

23   A    That's correct.

24   Q    And who was that?

25   A    RKJS.

1    Q    And to what extend did the auction procedures establish

2    a deadline for the submission of competing bids?

3    A    I believe it was April 7th.

4    Q    And what, if any, competing bids were received by that

5    deadline?

6    A    We did receive a bid from National Penn Bank, National

7    Penn Bank shares.

8    Q    And what is National Penn?

9    A    National Penn is about a $9 billion bank holding

10   company headquartered in Allentown, Pennsylvania,

11   approximately a billion dollars in capital and a billion-

12   five in market cap.

13   Q    To what extent are you familiar with Nat Penn?

14   A    Certainly, back in the fall when we had some

15   preliminary discussions, reviewed their financials, learned

16   a little bit more about them at some of the management.

17   After they reemerged in the process, certainly did a little

18   more work, read their public filings, their most recent

19   public filings, spent an entire day in Allentown reviewing

20   the most recent financials, reviewing both their current

21   capital ratios as well as expected capital ratios post-

22   transaction, reviewed the status of their regulatory

23   situation, saw presentations regarding the regulatory

24   situation that were provided to them by their regulators.

25   Our counsel also reviewed regulatory filings when we were

1    there.

2    Q    And all of those activities that you were just

3    describing, when did they occur in relation to the auction

4    or this -- the auction process?

5    A    Our process was conducted on April 1st.

6    Q    So following the initial -- the initiation of the

7    marketing process, but before the submission of the

8    competing bids?

9    A    Yes.

10   Q    What are the -- well, strike that.

11        You -- to what extent -- or what involvement did you

12   have in the determination of whether competing bids were

13   qualified?

14   A    Certainly, when we received the bid we forwarded the

15   bid, and I do believe most of the counsel was copied on the

16   bid.  But we wanted to make sure and confirm that everybody

17   had received it.  We asked a variety of experts to review

18   the bid.  I know there were conversations between our

19   advisors and Nat Penn to clarify any points where we were

20   concerned that maybe it needed to be changed to be

21   qualified.  I believe those changes were made.

22        Our internal counsel, board counsel, regulatory

23   counsel, bankruptcy counsel, and Sandler O'Neill, I believe,

24   all participated in staying the bid to confirm that it was

25   qualifying and then also reviewed certain items that were

```
1    challenged by the RKJS counsel, spent an extensive amount of
2    time with the experts there.  It's a very legal process, so
3    I clearly relied on lawyers to instruct me and direct me in
4    terms of what I was looking at, received a summary from
5    Kilpatrick Townsend that kind of put forth the case that the
6    bid was qualified.  And I do believe we forwarded the
7    objections to the board and informed the board that based on
8    our review a qualified bid had been received.
9    Q    Okay.  And just -- I think you brought this up, but I
10   want to make sure it's clear.  From whom did you get the
11   authority to determine whether the bid was qualified?
12   A    The board.
13   Q    So the board delegated determination of whether the bid
14   was qualified to you; is that --
15   A    Correct.
16   Q    To what extent did the debtor consult with the
17   creditors' committee before determining whether the Nat Penn
18   bid was a qualified bid?
19   A    My understanding was that there were conversations
20   between the professionals and the advisors.
21   Q    And what was the outcome of those conversations?
22   A    Their conclusion also was that the National Penn bid
23   was a qualified bid.
24   Q    Did there come a time when the debtor held an auction
25   for the stock of the bank?
```

1    A    Yes.

2    Q    When was -- when and where was that?

3    A    I believe it was last Thursday.

4    Q    Here in Baltimore?

5    A    Correct.

6    Q    Did you attend that auction?

7    A    I did.

8    Q    How long did it last?

9    A    Well, I think there were some procedural things that

10   started around 10:00.  I believe the actual auction started

11   around noon or a little after.

12   Q    And how -- you attended for the full duration of the

13   auction?

14   A    I did.

15   Q    And how long was Mr. Bondruff present at the auction?

16   A    Full duration.

17   Q    You mentioned the special sub-committee of the board.

18   How, if at all, was it kept abreast of proceedings at the

19   auction?

20   A    You know, we had had this committee on standby.  Of

21   course, nobody knew how long this would work.  So I

22   regularly emailed either my administrative assistant or the

23   chairman just to let them know that, you know, we were

24   working through the process, couldn't give them an estimate

25   as to when we may have a call.  I didn't want to put

1    anything in electronic form that, you know, conveyed where

2    the bidding was per se.  I wanted to be careful about

3    confidentiality.  And that was it.  So we were really just

4    trying to keep them around and let them know when a call for

5    a final determination and more deliberation might be needed.

6    Q    Okay.  And which of the debtors' professionals attended

7    the auction?

8    A    Sandler O'Neill, Kilpatrick Townsend, bankruptcy

9    counsel, the board's counsel, and the company's general

10   counsel.

11   Q    To what extent did the committee or its representatives

12   attend the auction?

13   A    The committee members?

14   Q    Yes.  The creditors' committee.

15   A    The creditors' committee.  They were represented by

16   their financial advisor, Karl Marx, as well as Kirkland

17   Ellis, their legal counsel.

18   Q    How many rounds of bidding were there at the auction?

19   A    I believe there were ten.

20   Q    How did the bidding conclude?

21   A    The bidding concluded, I believe the RKJS group made a

22   bid and subsequent to that, I can't remember whether there

23   was a break or not, and the Nat Penn group elected not to

24   continue or increase their bid.

25   Q    And what, if anything, did the debtor do after Nat Penn

1    passed to evaluate the two final bids at the auction?

2    A    Well, there was a great deal of discussion amongst

3    individuals, amongst professionals, consultation with the

4    committee.  I believe the duration was in the several hour

5    range that we debated the -- basically the two bids that

6    were left at the end.

7    Q    And was Mr. Bondruff involved in those discussions?

8    A    Yes, very much.

9    Q    And was the special committee involved in those

10   discussions?

11   A    The special committee was informed and we did have a --

12   I can't remember the length of the call, but we had a fairly

13   lengthy call updating them on the proceedings, advising them

14   what all the different advisors thought, shared with them

15   the views of the creditors' committee and the like.

16   Q    And the debtors' advisors participated in those

17   discussions as well?

18   A    Yes.

19   Q    And what, if any, conclusion resulted from those

20   discussions?

21   A    Well, I think we did recognize that from a financial

22   standpoint the bids were very close, and by the way we

23   measured it the RKJS bid was the higher bid.  We then had to

24   move to was it the best bid or I think otherwise best bid.

25   I never thought I would recognize that term as much as I do,

1    but I do now.  And so there was a lot of discussion, you

2    know, more on qualitative factors.  You know, we certainly

3    expected and knew that those types of discussions were part

4    of this.

5         And as was testified to before, I think it came to the

6    point where the RKJS bid became higher than we would have

7    expected and we began to get concerned about the

8    reallocation of dollars to the estate and away from the

9    bank, and what implications that may have on regulatory

10   approval.

11        And also just in the nature of a club transaction,

12   there are a lot of other investors who are there, you know,

13   we really weren't sure of who had authority in terms of

14   those other investors if the deal terms changed

15   significantly, whether there was a break point or not.

16        So those types of concerns started to come in.  The

17   advisors were unanimous.  Every advisor that advised the

18   board as well as the credit -- creditors' committee voiced a

19   pretty strong recommendation for the Nat Penn bid, you know,

20   just given the certainty to close.  No one was saying that

21   RKJS would not get regulatory approval.  I think there was a

22   level of confidence there.  But I think given the changes in

23   the transaction, the length of time that that might take, if

24   there needed to be more capital put in or the business plan

25   needed to change, that might have a material impact on the

1    length of time that it would take to get regulatory

2    approval.  And our experience and since I've been CEO is

3    time has not been our friend in terms of the financial

4    health of the company.

5    Q    Okay.  How, if at all, did the structure of the RKJS

6    proposal as a club deal affect your appraisal of the

7    likelihood of regulatory approval?

8    A    Well, certainly when you have multiple investors and if

9    there are material changes, you know, you do get concerned

10   that do all have to approve, do some.  If there's changes in

11   the capital structure, you know, what requirements are

12   needed.  You know, generally, if one of the larger investors

13   would pull out, it collapses the capital deck, if you will.

14   And it becomes a very -- you know, a challenging situation.

15   So there's just more moving pieces with a club deal.

16   Q    And how, if at all, would changes in the percentage

17   interests of members of the club affect your appraisal of

18   the likelihood of regulatory approval?

19   A    Well, you know, I'm not an expert there and I don't

20   think we -- I don't think we tried to characterize that.

21   But I think you do get concerned if more preferred equity is

22   put into a transaction, you know, that you can dilute other

23   investors.  So there were those kinds of uncertainties.

24        (Pause)

25   Q    To what extent, if any, did counterparty risk factor

1    into your appraisal of which bid was higher or which bidder

2    -- which bid was best?

3    A    Well --

4            MR. MELLOTT:  Your Honor, I'm not sure there's

5    been any testimony about counterparty risk.

6            MR. O'NEILL:  I said --

7            THE COURT:  Yes.

8            MR. O'NEILL:  I said to what extent, if any.  I

9    mean, that's a foundational objection.  So --

10           THE COURT:  Overruled.  You can ask the question.

11           THE WITNESS:  It's an element of a variety of

12   factors.  You have to consider it.

13   BY MR. O'NEILL:

14   Q    And how would you consider it?

15   A    Well, again, the risk of a counterparty certainly to

16   close either collectively or individually, you would

17   evaluate, you know, the prospects and what can go wrong.

18   Q    What, if any -- what was your appraisal of the

19   counterparty risk of the RKJS?

20   A    Well, again, I don't think there was, you know, a

21   negative view of the RKJS bid in terms of the probability to

22   close or the -- not the probability to close, but the

23   regulatory approval.  But there was concern that given the

24   changes that it could delay the approval, more time could go

25   by.  It might allow for investors in the group to become

1    concerned if the company continued to lose money, the

2    regulatory process drug on.  You know, it's -- it becomes a

3    less attractive investment and with multiple investors,

4    again, it only takes one for that process to start to

5    unwind.  We experienced that in the beginning of the

6    transaction.  When one investor pulled out it took a

7    considerable amount of time to backfill another investor.

8              I had had a conversation with our regulators and

9    we asked the question just prior to the auction, you know,

10   what would happen if there was a material change in the

11   transaction and one of the regulators -- there wasn't a

12   general discouragement, but one of the regulators said it

13   wouldn't be helpful.

14   Q    Okay.  Now did there come a time after the auction when

15   RKJS sought to increase the amount of its bid?

16   A    Yes.

17   Q    And when was that?

18   A    I believe the day or -- yeah, the day following.

19   Q    And what did RKJS propose at that time?

20   A    My recollection was that it was an increase of a

21   million dollars and I think they kept the rest of the terms

22   the same.

23   Q    And what, if anything, did you do after you received

24   that proposal?

25   A    I certainly looked at that in conjunction, talked about

1   that with the professionals first, spoke a little bit more

2   about it with both our chairman and Barry Bondruff who was

3   chairman of the special committee, again, waited to hear the

4   input from the creditors' committee.  So we had all of that

5   input prior to the full board approval that took place on

6   Friday afternoon.

7   Q    And what, if anything, did you conclude about the

8   increase in the RKJS bid as a result of this --

9   A    Well, again, you know, I think you were back to some of

10  the same points that were raised earlier and it's hard to

11  say where there's a tipping point, but we felt like we were

12  at a tipping point where increasing the bid, you know, in

13  some ways almost put more risk in it.  Again, I do believe

14  -- my recollection was within that offer was a commitment to

15  increase the capital.  So I think, you know, that's helpful.

16  But, again, to diligence that to make sure there weren't

17  things in the other agreements that the common stockholders

18  had that might have prevented preferred from coming in over

19  top of them and diluting it, we just didn't know and there

20  just wasn't time to diligence that.

21  Q    And you said you shared the proposal with the

22  creditors' committee.  To what extent did you share the

23  result -- your views about the revised proposal with the

24  creditors' committee?

25  A    The conversations -- I didn't have direct conversations

1    with the creditors' committee.  The feedback I got from our

2    professionals was they considered it and I believe there was

3    an email communication from creditors' committee counsel

4    that said it -- the increase and the amount would not change

5    their selection of Nat Penn as the best bid.

6    Q    And to what extend did the debtor communicate with

7    regulators after the close of the auction concerning the

8    likelihood of RKJS receiving regulatory approval?

9    A    I'm sorry.  Can you repeat that?

10   Q    To what extent did the debtor communicate with

11   regulators following the closure of the auction concerning

12   the likelihood of RKJS receiving regulatory approval?

13   A    I don't recall that I had any conversations.  I believe

14   counsel may have had some.

15   Q    Do you recall how those communications came about?

16   A    I --

17             MR. MELLOTT:  Objection, Your Honor.  Now we

18   really are into hearsay.

19             THE COURT:  Overruled.

20             THE WITNESS:  I'm sorry.  Repeat the question.

21             THE COURT:  The question was, do you recall how

22   those communications came about.  I don't see how that's

23   hearsay.  So you can answer that.

24             THE WITNESS:  My recollection was I believe that

25   our regulatory counsel did have a conversation with certain

1    regulators.

2    BY MR. O'NEILL:

3    Q    Do you have an understanding as to how that

4    communication came about?

5    A    No, I do not.

6    Q    Did there come a time when Nat Penn indicated that it

7    would enhance the final bid it submitted at the auction?

8    A    My recollection is yes.

9    Q    And when was that?

10   A    I don't recall.  It's been quite busy over the last

11   couple of days, but I believe it was in the last two days.

12   Q    And what was the nature of that enhancement?

13   A    My understanding is that they would agree to push the

14   time frame out for regulatory approval to June 30.

15   Q    Meaning the drop dead for regulatory --

16   A    Correct.

17   Q    -- approval would be moved from May 31 to June 30?

18   A    Correct.

19   Q    And what impact would that change have on the purchase

20   price and adjustment feature of the bid?

21   A    It -- well, I -- the -- any loss that would be incurred

22   during the month of June would be a reduction from the

23   purchase price.  So if there were to be an operating loss,

24   that would be a reduction to the purchase price.

25   Q    And what did you do to evaluate this enhancement?

1    A    Again, we discussed it.  There were clearly pros and

2    cons.  You know, the extra time, you know, is helpful in

3    case there is any problem.  We didn't expect one, but it was

4    helpful to have that insurance.  And both the company and

5    the creditors' committee viewed the cost or the potential

6    cost of that insurance, if you will, which might be one

7    month's earnings to be a fair tradeoff and we accepted that.

8    Q    Did there come a time when the full board of directors

9    of the debtor met to consider the Nat Penn bid and RKJS bid?

10   A    Yes.

11   Q    When was that?

12   A    Friday afternoon.

13   Q    And what information was -- Friday afternoon, April

14   11th; is that right?

15   A    Correct.

16   Q    The day after the auction?

17   A    Correct.

18   Q    What information was provided to the board at that

19   meeting concerning the auction and the bids?

20   A    My recollection was the spreadsheet that was, I

21   believe, the first exhibit today as well as the bid that

22   came in after the auction were both provided to the board.

23   Q    To what extent was the board informed at that meeting

24   about the changes that RKJS had proposed to its bid

25   following the close of the auction?

```
1    A    It was discussed.  I believe -- actually, somebody, I
2    believe, read it and then it was -- and it was also
3    distributed so there was full consideration of it.
4    Q    Which of the debtors' financial and legal advisors
5    attended the April 11th bid meeting?
6    A    Again, I believe internal counsel, Kirkland Ellis, the
7    board's counsel, Kramer Levin as well as representatives of
8    Sandler O'Neill.
9    Q    What discussion was there amongst members of the board
10   concerning the auction and then final bids?
11   A    You know, there was extensive discussion around the
12   bids themselves.  You know, clearly they had different
13   elements.  There were discounts taken.  There were stock
14   components in the Nat Penn bid.  So a fair amount of time
15   was spent by Bill going over the -- you know, the financial
16   aspects of the bid.  We obviously moved towards some of the
17   qualitative factors and the risk of certainty to close.  And
18   I can't remember the duration of the call.  It was fairly
19   lengthy.  You know, the board -- I believe every board
20   member spoke.  My recollection is, you know, there were
21   questions surrounding the impact on employees, things of
22   that nature that were answered.
23        And, again, a lot of questions about would the
24   transaction from RKJS require additional capital, where
25   would that come from, you know, is -- could the money be
```

1    secured, those types of questions.

2    Q    And what, if anything, did the debtors' advisors

3    recommend to the board?

4    A    Again, much like the special committee, unanimous and

5    fairly firm advice to the board to accept the Nat Penn

6    proposal.

7    Q    What, if any, conclusion did the board come to

8    concerning which bid was highest and best?

9    A    Well, certainly the board recognized that, you know,

10   the way we measured the bid, the RKJS bid was the highest

11   bid.  So it moved to otherwise best and the board,

12   considering all the factors and the advice of its advisors

13   as well as the creditors' committee used -- viewed the Nat

14   Penn bid as the best bid.

15              MR. O'NEILL:  I have nothing else, Your Honor.

16              THE COURT:  Cross-examination.

17              MR. MELLOTT:  Thank you, Your Honor.

18                        CROSS-EXAMINATION

19   BY MR. MELLOTT:

20   Q    Good afternoon, Mr. Keidel.  My name is Chris Mellott.

21   I represent RKJS Bank.

22   A    How are you?

23   Q    How are you, sir?

24   A    Good.

25   Q    I want to start, if you would, turn to the exhibit

1    notebook and I would like you to look at Exhibit 6.  Do you

2    recognize this April 8th letter --

3    A    Yes, I do.

4    Q    -- from counsel for RKJS?

5    A    Yes.

6    Q    And you've reviewed this letter?

7    A    Yes, I did.

8    Q    And this is the document you described earlier in your

9    testimony as RKJS's positions taken with the debtor about

10   the status of Nat Penn's bid submitted on April 7th and

11   whether it qualified, correct?

12   A    Correct.

13   Q    Now let me direct your attention to Section 1 that's

14   talking about capitalization and recapitalization of the

15   bank.  Do you see that section?

16   A    Yes.

17   Q    Did the debtor set a dollar value on Nat Penn's "well

18   capitalized" proposal in its merger and acquisition

19   agreement?

20   A    I don't recall in the merger and acquisition agreement.

21   What I believe we reviewed here was in the context of the

22   merger and the pro forma financial since it was -- this was

23   going to be a merger of First Mariner Bank into National

24   Penn Bank, that First Mariner Bank would not exist that, you

25   know, we looked at it globally, does the -- is the

1    capitalization level sufficient and is it going to be a

2    detriment or a difficulty for Nat Penn getting regulatory

3    approval.

4    Q    Now you are familiar with the auction procedures,

5    correct, Mr. Keidel?

6    A    To some degree, yes.

7    Q    And you recall the provision that's cited here, Section

8    6(c), that indicates that even if there's not an amount then

9    the recapitalization has to be to the same extent as the

10   equity contribution.  Do you remember that language in the

11   auction procedure?

12   A    Yes, I do.

13   Q    So was there a dollar value placed on the Nat Penn

14   offer to, you know, we'll bring you into the fold and we'll

15   make you part of this Pennsylvania Bank?  Was there a dollar

16   value set on that by you or the board?

17   A    No.  What we looked at was, you know, Nat Penn Bank

18   shows capital in the one-billion-dollar range and I believe

19   at the bank level close to 800 million.  So in terms of

20   financial strength and capacity, there was no question in

21   our mind that Nat Penn was extraordinarily well positioned

22   from a capital standpoint to absorb the merger of the bank.

23   Q    So for these branches that were coming in to be --

24   capitalizing this new entity being brought in to Nat Penn

25   you didn't put a value on that, did you?

1   A    No.  We looked at it collectively for, you know, would

2   it cause a capitalization problem and was the combined

3   entity capital sufficient because there was no dollars

4   coming into First Mariner, if you would.  The structure of

5   the agreement was that First Mariner would be merged with

6   and into Nat Penn Bank.

7   Q    Well, did you look at the tier one leverage and total

8   risk percentages that was going to result from this merged

9   entity?

10  A    Yes.

11  Q    And you concluded that that was in, what, the five

12  percent for the tier one leverage and the ten percent for

13  total risk, correct?

14  A    My recollection is it was well in excess of that.

15  Q    Was that -- was that documented?  Does the board have

16  documentation as to what they assess the capitalization to

17  be?

18  A    I received a document.  I believe it was requested in

19  our diligence showing the pro forma capital ratios.  I also

20  did my own independent calculations to see if the -- if the

21  calculations we were given seemed reasonable as did, I

22  believe, Mr. Boyan, who confirmed that he got to pretty much

23  the same numbers that Nat Penn provided.

24  Q    But what the proposal is is to well capitalize and

25  that's a defined term, right?

1    A    Yes.  These numbers would be hundreds of millions of

2    dollars higher than the minimums needed for well

3    capitalized.

4    Q    But that's not what's being proposed here.  What was

5    proposed here was to be well capitalized.  That's what's in

6    the merger and acquisition --

7    A    Well, once you're beyond well capitalized you're well

8    capitalized.  So there's no super well capitalized.  There

9    -- once you're well capitalized, it's the matter of degrees

10   that you exceed that.  And, again, these -- the level of

11   excess capital that Nat Penn would have had beyond the well

12   capitalized, the minimums required for well capitalized was

13   significant.

14   Q    Did you discuss point two in this letter about -- at

15   your board meeting, and this is what -- we want to be clear.

16   You're on the board of the holding company, the debtor,

17   correct?

18   A    That's correct and concurrently with the bank.

19           THE COURT:  So when you say point two, Mr.

20   Mellott, where are you directing the witness?

21           MR. MELLOTT:  On page 2 at the bottom, Numeral 2.

22           THE COURT:  Okay.

23           MR. MELLOTT:  I appreciate that.  Thank you for

24   that clarification, Your Honor.

25   BY MR. MELLOTT:

1   Q    In that section there's a discussion of this reverse

2   merger that's being proposed.  Was there a discussion that

3   the board had about the additional aspect that that imposes

4   for regulatory approval?

5   A    Our understanding of the reverse mortgage is -- or

6   reverse mortgage, flipping back into my banking mode --

7   reversed merger would be that, you know, it basically would

8   require OCC approval and OCC approval only that was the view

9   of our regulatory counsel.  So actually only one regulator

10  would need to approve it.

11  Q    So you did not -- did you evaluate the risk, though, of

12  that -- of the sanctions potential under that reverse

13  mortgage -- I mean, reverse --

14  A    Ah, you actually said it.

15  Q    I mean, reverse merger.

16  A    In what sense?

17  Q    Well, what discussions did you have about that?  Did

18  you talk through the potential sanctions under these

19  sections --

20  A    I did.  I had general conversations and, certainly,

21  relied on counsel's view.  You know, these are fairly

22  extensive provisions, regulatory provisions that while I'm

23  familiar with them, you know, certainly others within my

24  organization and advisors are even more familiar with.  The

25  general sense of all these provisions when I received the

1    review and the written review from counsel was that these

2    conditions either in their mind didn't imply or didn't rise

3    to a threshold of materiality to disqualify the bid.

4    Q    What about the aspect of the bid purchase price being

5    taken into account, the fact that it's got to cover the --

6    and this is the Nat Penn price -- has got to cover the one

7    million dollars that is the breakup fee and then the 1.75

8    million that's got to be reimbursed for expenses.  Isn't

9    that going to reduce the price that's being bid?

10   A    Yes, it would.

11   Q    And then if the deposit that Nat Penn is providing is

12   required to be returned because they terminate, they don't

13   get approval, then you're in a position where the bank is

14   stuck with that 2.75 million.

15   A    Well, my understanding is the deposit's made so the

16   2.75, I guess, would be paid and I think the view of this

17   was there would be a small amount that might be over and

18   above that that would hit the estate, but in the minds of

19   the advisors it wasn't material.

20   Q    So if that deposit has to go back to Nat Penn, the

21   debtor's the one that's going to have to pay it out of the

22   estate or reduce what's available to the creditors, correct?

23   A    Well, if the deposit went back our understanding was

24   that the deposit would go back.  I thought the concern was

25   that if the 2.75 was paid and the remaining deposit went

Page 140

1    back, it would be a slight hit to the estate.  That was my

2    recollection of this discussion.  And, again, that was the

3    view of our advisors.

4            MR. MELLOTT:  I would move into evidence Exhibit

5    6.

6            MR. O'NEILL:  No objection.

7            THE COURT:  All right.  Then RKJS Exhibit 6 is

8    admitted.

9        (RKJS Exhibit No. 6 received)

10   BY MR. MELLOTT:

11   Q    Now Mr. Boyan testified that the bid process followed

12   through the ten bids.  You verified there were ten bids.

13   Was there any point in time after that tenth bid from RKJS

14   in which the debtor indicated before the announcement on the

15   record that it was going to preliminarily conclude that the

16   best bid was Nat Penn's?  Any discussion that you had or

17   anyone you know are for the debtor in which they told that

18   to RKJS?

19   A    Not that I'm aware of.

20   Q    And you never asked RKJS during that two-and-a-half-

21   hour period to consider increasing their bid because you

22   were now thinking about regulatory issues, correct?

23   A    That's correct.  I -- you know, my interactions with

24   either side were extraordinarily limited.  I had a brief

25   conversation to clarify one of the rep and warranty issues

1    with representatives of Nat Penn.  And I did not have any

2    interaction with the other group.  You know, having not been

3    through one of these, you know, I wanted to let the

4    professionals and the advisors direct the types of

5    negotiations and the things that were instructed.  But I

6    think that went both ways.  I don't think there was any

7    communications with Nat Penn either in terms of, I guess

8    what I would look at as coaching.

9            So, you know, I think we all felt like regulatory

10   approval and certainly to close were issues that were so

11   obvious that, you know, I think none of us felt like they

12   needed to be put on the table.  That was all of the

13   advisors.

14   Q    Well, as a member of the board of the debtor were you

15   -- you were interested, correct, in obtaining the most

16   amount of money for the holding company as you could in this

17   bid process, right?

18   A    I'm a creditor, so I was certainly aware of that.  But

19   in my view bankers say sometimes your return of principal is

20   better than return on principal, and certainty of getting

21   the dollars became a more significant issue than a slightly

22   higher amount of dollars.

23   Q    But the slightly higher amount was because you didn't

24   go back and talk to RKJS about the ability to increase their

25   bid, did you?  So when you say slightly you're talking about

1    the 150,000, correct?

2    A     Correct.  And --

3    Q     Okay.  So the next thing that happens is everybody

4    leaves the auction, correct?

5    A     Are you referring to after the closing of the auction?

6    Q     I'm talking about Mr. Brody announces that the auction

7    is over and everything is going off the record.  You were

8    gone.  You didn't stand around and talk to anybody, correct?

9    A     I went back to -- we were in a conference room.  I went

10   back, got my information and, you know, left.  I think a lot

11   of people left.  Let's face it.  It's a very contentious

12   situation.  It's emotional.  People were emotional.  I think

13   most people, you know, felt like they needed some distance.

14   Q     Let me ask you to turn to Exhibit 9, Mr. Keidel, and in

15   particular first turn to the first page.  This is the notice

16   of -- this is the Exhibit A to the notice of selection of

17   successful bidder.  This is the redline that was submitted

18   on Friday of the Nat Penn merger and acquisition agreement.

19   Do you see that?

20   A     Yes, sir.

21   Q     If you would turn to Section 9.01, which is on page, at

22   the top, 71 of 248.

23         (Pause)

24   A     I'm sorry.  71?

25   Q     71.

1    A    Ah, now I'm with you.  Okay.

2    Q    This is Section 9.01 that I want to direct your

3    attention to, Mr. Keidel, at the bottom of that page.  This

4    talks about the termination of this agreement and there's an

5    initial provision that talks about closing having not

6    occurred on April 30, but then the potential for an

7    automatic extension to May 31, 2014.  Are you familiar with

8    that provision?

9    A    Yes.

10   Q    Now is this the provision that you said has now been

11   modified to June 30?

12   A    That was our discussions.  Yes.

13   Q    So has that been actually offered by Nat Penn and

14   accepted by the debtor?

15   A    That's my understanding.

16   Q    But this agreement that was filed on Friday doesn't

17   reflect that?

18   A    Our -- correct.  Our conversations took place much like

19   other conversations with the other bidder invariably

20   conversations, you know, to clarify things, bring out points

21   of weakness (sic) continue to happen.  So we were having

22   conversations along those lines.

23   Q    And was there any price adjustment associated with that

24   extension?

25   A    Yes.  My understanding is that the potential price

1   adjustment, not certain, but should there be operating

2   losses during the month of June, those losses would be

3   deducted from the purchase price.

4   Q    So in other words, the adjustment is downward, correct?

5   A    Potentially, but could be.  Yes.

6   Q    And has a new merger and acquisition agreement been

7   signed accepting that change?

8   A    I don't believe so.

9   Q    But the board's approved that?

10  A    Conceptually, yes.  We talked with the board I believe

11  actually this morning about that.

12  Q    So from the perspective of the bank as the asset being

13  sold by the debtor, that process in which you're evaluating

14  these terms and adjusting a reduced price and the June 30

15  date is something that has now occurred post-April 10th,

16  correct?

17  A    That's correct.

18  Q    Mr. Keidel, has there been any discussion or

19  understanding that you have as to your position with Nat

20  Penn going forward?

21  A    No.

22  Q    None at all, huh?

23  A    I've signed the same agreement or I will sign the same

24  agreement that I signed for the RKJS proposal.

25  Q    And no discussions about anything other than that?

1    A    A very high level of no assurances at all.

2    Q    And when you say a very high level, what do you mean?

3    A    Talk about different roles within Nat Penn,

4    particularly within the region and, you know, the regional

5    structure is different and somebody with my skill set

6    probably doesn't fit.

7    Q    And who have you had those discussions with?

8    A    Mr. Fainer (ph) and Mr. Hughes.

9    Q    And when were those discussions?

10   A    About a week ago.

11   Q    So --

12   A    Ten days ago.

13   Q    This is Monday, the 14th.  So --

14   A    It was April 1st, actually.

15   Q    So prior to the submission of the bid on April 7th?

16   A    Yes.  You know, we were all very aware, you know, that

17   the employment agreements and all, best -- you know, the

18   disturbance of those, they needed to remain in place.

19   Q    And what positions do those individuals have at Nat

20   Penn?

21   A    The two I mentioned?

22   Q    Yes.

23   A    Mr. Fainer is the CEO and Mr. Hughes is the CFO.

24        MR. MELLOTT:  One second, Your Honor.

25        (Pause)

1    Q    Did the -- those two gentlemen, the CEO and CFO, who I

2    believe were introduced, actually, as being here today, did

3    they attend the auction?

4    A    Yes.

5            MR. MELLOTT:  Nothing further, Your Honor.  Thank

6    you.

7            THE COURT:  Redirect.

8                    REDIRECT EXAMINATION

9    BY MR. O'NEILL:

10   Q    Just to clarify, Mr. Keidel, to the extent you have an

11   agreement with Nat Penn for a post-transaction employment,

12   that's identical to the agreement you have with RKJS, if

13   they're the prevailing bidder; is that right?

14   A    That's correct.

15   Q    And you said that in your high level discussions with

16   Mr. Fainer and his colleague, they informed you that you're

17   -- someone with your skill set probably didn't fit in the

18   organization?

19   A    Well, no.  I wouldn't say that.

20           THE COURT:  That's not what he said, I don't

21   think.

22           THE WITNESS:  No.

23           THE COURT:  But you can continue on.

24           THE WITNESS:  I said when I look at the situation

25   and typically in these -- in regional type structures, you

1    know, I'm a CFO by trade, which is typically more of an

2    administrative or corporate role.  So, you know, the

3    likelihood of me staying is limited.  There are limited

4    roles.  I'm a Baltimore guy.  I'm not relocating.  And, you

5    know, we had that discussion.  So, you know, there was

6    nothing beyond that.  And, also, in my agreement I did agree

7    to waive change of control benefits that would -- could have

8    been triggered in this transaction the way it was

9    structured, and I agreed to waive those.

10              MR. O'NEILL:  I have nothing else.

11              THE COURT:  Mr. Keidel, when did you first learn

12    that the debtors' financial advisors had worked for National

13    Penn?

14              THE WITNESS:  I guess I was looking at some press

15    releases because I think it was in my review probably in

16    early April.  I did see the stock repurchase and I do -- I

17    think I saw that Sandler O'Neill represented Nat Penn in

18    that transaction.

19              THE COURT:  And yet it wasn't called to anyone's

20    attention until today?

21              THE WITNESS:  Not that I recall.  You know,

22    Sandler O'Neill represents a lot of banks.  So, you know,

23    from time to time they probably represented a vast -- a

24    substantial number of banks in the country.  So I didn't

25    consider the fact that they represented Nat Penn in a

1    transaction unusual.

2           THE COURT:  And what's your position with the

3    debtor?

4           THE WITNESS:  I'm the CE -- interim CEO.

5           THE COURT:  I see.  Now I gather from your

6    testimony that there was concern about, I guess, both on the

7    ability to close and get regulatory approval front that

8    what's being proposed as RKJS is going to be financed

9    through a club deal I think was the terminology, right?

10          THE WITNESS:  Correct.

11          THE COURT:  Now there's no security deposit posted

12   by RKJS, right?

13          THE WITNESS:  That's my recollection.  Yes.

14          THE COURT:  Was there ever any discussion about

15   addressing it -- the skin in the game if you will of RKJS by

16   requesting that they post a security deposit during any of

17   this process of the auction?

18          THE WITNESS:  Not -- I believe there were a lot of

19   those discussions when the original merger agreement were --

20   was drafted, but there were none to my knowledge subsequent

21   to that because, again, there was an interim bank, but there

22   wasn't an entity at that time.

23          THE COURT:  But if there -- the fragility of their

24   commitment was a big issue in the mind of the debtor and the

25   debtors' professional, why wasn't there some consideration

```
 1   given to requesting that they address that by a security

 2   deposit?

 3            THE WITNESS:  Well, again, you know, I'm looking

 4   towards my advisors to help me with that.  You know, it's an

 5   auction process.  The rules of that process are not well

 6   known to me.  And we didn't -- I didn't view the situation

 7   to get into those negotiations.  I allowed, you know, the

 8   professionals to do those.

 9            THE COURT:  So saying it another way, it wasn't

10   considered and never proposed to RKJS?

11            THE WITNESS:  Not to my knowledge.

12            THE COURT:  And it wasn't offered.  I think I

13   understood your testimony to be that after the auction --

14   the debtor contends that the auction concluded with the

15   announcement by Mr. Brody, that the debtor has purported to

16   enter into a new binding contract as yet undisclosed that

17   involves extension of the outside closing date to June 30th

18   with some downside adjustment in the purchase price.  Did I

19   hear that correctly?

20            THE WITNESS:  Yes.

21            THE COURT:  And what do we have about the terms --

22   what do we know about the terms of that?  Where has that

23   been disclosed before today?

24            THE WITNESS:  Again, those have been discussions

25   to help alleviate any of the further concerns.  They were
```

```
1    discussed somewhat, I believe, the night of the auction and

2    those discussions have continued to occur amongst the

3    professionals since.

4              THE COURT:  All right.  That answers my questions.

5              Do any of the parties have any questions of this

6    witness in light of the Court's questions?

7              UNIDENTIFIED SPEAKER:  Your Honor, may I, but I

8    will defer to debtor because the --

9              THE COURT:  Mr. O'Neill, we'll let you go first if

10   you have questions.

11             MR. O'NEILL:  Thank you, Your Honor.

12                    FURTHER REDIRECT EXAMINATION

13   BY MR. O'NEILL:

14   Q    The judge asked you a couple of questions about

15   security deposits and whether the debtor had attempted to

16   obtain a security deposit from RKJS in connection with the

17   renegotiation of the stalking horse agreement and

18   thereafter.  What leverage did the debtor have to obtain a

19   security deposit during the negotiation of the stalking

20   horse agreement?

21   A    Well, you know, it's probably more limited in that

22   situation.

23   Q    But did -- to what extent did the debtor seek such a

24   deposit?

25   A    My recollection was that it was sought.
```

1    Q     But it wasn't obtained?

2    A     That is correct.

3    Q     And has -- at any time following the auction has the

4    debtor sought a deposit?

5    A     Repeat the question.

6    Q     At any time since the conclusion of the auction has the

7    debtor sought a deposit from RKJS?

8    A     It's been discussed.  You know, I'm unaware of who

9    initiated the conversation, but I know it's been discussed.

10   Q     But no agreement has been reached; is that right?

11   A     That is correct.

12             MR. O'NEILL:  Nothing else, Your Honor.

13                       RECROSS-EXAMINATION

14   BY MR. MELLOTT:

15   Q     Mr. Keidel, in connection with the questions you were

16   just asked about the deposit, there have -- it's your

17   testimony that there have been discussions about a deposit.

18   Are you referring to recent discussions about some type of

19   security deposit?

20   A     Yes.

21   Q     And following the bid that was provided by Nat Penn

22   that the debtor decided was qualified, you were back into a

23   bidding process with both bidders.  Did you put anything on

24   the spreadsheet to indicate that there was going to be some

25   value to one of the parties putting forth a security deposit

1    that wasn't going to be refundable under certain

2    circumstances?

3    A    No.  We did not, but we didn't have any commitment or

4    any figures to decide upon.  We did last minute.

5    Q    And His Honor was asking you about considering those

6    types of things at the board meeting.  You did have at the

7    board meeting the pro formas that had been provided by RKJS.

8    Did the board actually go through those pro formas?

9    A    Pro formas for?

10   Q    For how this was going to work with the funding from

11   the capitalization --

12   A    I believe all we had was the capitalization table.

13   Q    So it's your testimony that the board did not review

14   the pro formas from RKJS?

15   A    The revised pro formas?

16   Q    Yes.  The revised.

17   A    That's correct.

18   Q    So when you met on April 11th you didn't review those?

19   A    No, we did not.  I -- to my knowledge we didn't have

20   them.

21   Q    But you did review the capitalization tables?

22   A    We did look at the capitalization tables.  Yes.

23   Q    Did you review the subscription agreements for the

24   investors?

25   A    Counsel reviewed those.

1    Q    But did the board actually address those and discuss

2    those at that board meeting?

3    A    On the 11th I believe so.  But they, you know, again,

4    recognized that there was a commitment, but, again, the

5    level of diligence we're not sure would need to be required

6    to assure that, you know, the funding was there and that

7    there weren't any conflicting issues with other agreements

8    of other investors.

9    Q    Now, Mr. Keidel, you testified at this evaluation on

10   April 11th, the board -- I just want to be clear.  The board

11   concluded as you had concluded the highest economic bid was

12   RKJS, correct?

13   A    Yes.  You know, there was clearly discussion that, you

14   know, even some amongst the creditors' committee given the

15   subjectivity of some of the factors in Nat Penn, you know,

16   it was -- it could have been considered that the other bid

17   was higher, but nobody was trying to recharacterize the

18   methodology that was used in the auction.

19   Q    And the discussion about the deposits that you're

20   having with RKJS, that -- those were discussions today,

21   aren't they?

22   A    Correct.

23          MR. MELLOTT:  That's all.  Thank you, Your Honor.

24          THE COURT:  I have no further questions of the

25   witness.  Thank you for your testimony, sir.  You may step

Page 154

1    down.

2            Any other evidence for the debtor?

3            MR. O'NEILL:  No, Your Honor.

4            THE COURT:  So the debtor rests?

5            MR. O'NEILL:  Yes, Your Honor.

6            THE COURT:  I see.  All right.

7            Any other evidence going to be presented in

8    support of the proposed sale transaction?

9            MS. SPRINGER:  Yes, Your Honor.  Claudia Springer

10   for National Penn Bank.  We will have a witness in support

11   of the sale transaction to National Penn Bank.

12           THE COURT:  All right.

13           What about the committee?

14           MR. GETTLEMAN:  Your Honor, the committee does not

15   intend to present any witnesses.

16           THE COURT:  All right.  We will resume tomorrow

17   morning at 10 a.m.

18           THE CLERK:  All rise.  This Court is adjourned.

19   (Whereupon, these proceedings concluded at 5:25 p.m.)

20                        * * * * *

21

22

23

24

25

Page 155

1                            I N D E X

2

3                         W I T N E S S E S

4    WITNESS                  BY                    PAGE

5    WILLIAM BOYAN         MR. O'NEILL             58

6                          MR. MELLOTT             71

7                          MS. SPRINGER           105

8                          MR. MELLOTT            107

9    MARK KEIDEL           MR. O'NEILL            115

10                         MR. MELLOTT            133

11                         MR. O'NEILL            146

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 156

1                          I N D E X

2

3                        E X H I B I T S

4    NO.                  IDENTIFICATION              RECEIVED

5    Debtor's:

6    1                 Auction spreadsheet              60

7

8    RKJS's:

9    1                 Auction procedures               73

10   2-3, 7-11         Documents                        75

11   13                Press release                   108

12   6                 Letter                          140

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 157

1                            I N D E X

2

3                          R U L I N G S

4    IDENTIFICATION                                    PAGE

5    (163) Motion to Continue Hearing on April 14,      54

6    2014, filed by RKJS Bank

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 158

CERTIFICATION

I, Sheila G. Orms, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

Dated:  April 16, 2014

Sheila
Orms

Digitally signed by Sheila Orms
DN: cn=Sheila Orms, o, ou,
email=digital1@veritext.com,
c=US
Date: 2014.04.16 15:50:22 -04'00'

Signature of Approved Transcriber

I, Sherri L. Breach, CERT*D-397, certified that the

foregoing transcript is a true and accurate record of the

proceedings.  Sherri L
Breach

Digitally signed by Sherri L Breach
DN: cn=Sherri L Breach, o, ou,
email=digital1@veritext.com,
c=US
Date: 2014.04.16 15:50:57 -04'00'

SHERRI L. BREACH

AAERT Certified Electronic Reporter & Transcriber

CERT*D-397

Veritext

330 Old Country Road

Suite 300

Mineola, New York 11501

Date: April 16, 2014