Entered: April 21, 2014
Signed: April 21, 2014

**SO ORDERED**



DAVID E. RICE
U.S. BANKRUPTCY JUDGE

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
(Baltimore Division)

In re:                                             *

FIRST MARINER BANCORP                  *          Case No: 14-11952 DER
                                                              (Chapter 11)
Debtor                                       *

*       *       *       *       *       *       *       *       *       *       *       *       *

ORDER (A) AUTHORIZING THE DEBTOR TO TRANSFER AND SELL CERTAIN
ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND OTHER
INTERESTS, (B) AUTHORIZING THE DEBTOR TO TRANSFER AND SELL SUCH
ASSETS AND TO CONSUMMATE OTHER TRANSACTIONS IN ACCORDANCE WITH
THAT CERTAIN MERGER AND ACQUISITION AGREEMENT,
AND (C) GRANTING RELATED RELIEF

Upon the motion, dated February 10, 2014 [Docket No. 15] (the "Motion"),[1] of First

Mariner Bancorp ("FMAR" or the "Debtor"), debtor and debtor-in-possession, filed in the above-

captioned chapter 11 case (the "Bankruptcy Case"), for entry of (i) the Auction Procedures Order

and (ii) this order (the "Sale Order") approving the transfer and sale of the Purchased Assets, free

and clear of all liens, claims, encumbrances, and other interests; and the Court having entered an

Auction Procedures Order on March 8, 2014 [Docket No. 122]; and an Auction having been held

on April 10 and April 15, 2014, in accordance with the Auction Procedures and the Auction

Procedures Order and as required by the Court at the Sale Hearing on April 15, 2014; and the

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

Debtor (in consultation with the Committee) having determined at the conclusion of the Auction that the bid from the Stalking Horse Bidder, RKJS Bank ("RKJS" or the "Purchaser"), was the highest and best bid for the Purchased Assets (the "Successful Bid"); and this Bankruptcy Court having conducted the Sale Hearing on April 14 and 15, 2014 (the "Sale Hearing") to consider the transfer and sale of the Purchased Assets and the other transactions contemplated by the Amended and Restated Merger and Acquisition Agreement dated as of April 15, 2014, by and among the Debtor, the Bank and RKJS, a copy of which is attached hereto as <u>Exhibit A</u> (together with all schedules and exhibits thereto, the "M&A Agreement") (the transactions including the merger thereunder, collectively, the "M&A Transaction"); and upon the record of the hearing to approve the Auction Procedures Order and the Sale Hearing, and the full record in this Bankruptcy Case; and the Court having determined that the relief sought in the Motion is in the best interests of the Debtor, its estate, creditors and parties-in-interest, and that the legal and factual bases set forth in the Motion and presented at the Sale Hearing establish just cause for the relief granted herein; and all objections to the Motion, if any, having been resolved; and after due deliberation and sufficient good cause appearing therefor,

### THE COURT HEREBY FINDS AND CONCLUDES THAT:[2]

A.    <u>Jurisdiction and Venue</u>.  The Court has jurisdiction to hear and determine the Motion pursuant to 28 U.S.C.§§ 157(b)(1) and 1334(a). This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper in this District and in the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

B.    <u>Statutory Predicates</u>.  The statutory bases for the relief requested in the Motion are (i) sections 105(a), 363(b), (f), and (m), 365, 503, and 507 of title 11 of the United States

---

[2] The findings of fact and conclusions of law set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to these proceedings by Bankruptcy Rule 9014. To the extent any of the following findings constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

Code (the "Bankruptcy Code"); (ii) Rules 2002(a)(2), 6004(a), (b), (c), (e), (f), and (h), 6006(a) and (c), 9007, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"); and (iii) Rules 2002-1, 2002-2, 6004-1 and 6006-1 of the Local Bankruptcy Rules for the District of Maryland (the "Local Bankruptcy Rules").

   C. <u>Notice</u>. The Debtor has provided good and sufficient notice with respect to the following:  (i) the Motion and the relief sought therein, including the entry of this Sale Order and the transfer and sale of the Purchased Assets and consummation of the other transactions contemplated under the M&A Transaction, (ii) the Auction and the Sale Hearing, and (iii) the assumption and assignment of leases and contracts and cure amount (if any); and no further notice of the Motion, the relief requested therein or the Sale Hearing is required.  A reasonable opportunity to object and to be heard regarding the relief provided herein has been afforded to parties-in-interest.

   D. <u>Compliance with the Auction Procedures</u>. The marketing and auction procedures as set forth or described in the Motion, the Auction Procedures Order, and the Auction Procedures were fair, proper, and reasonably calculated to result in the best value received for the Purchased Assets. The Auction process set forth in the Auction Procedures afforded a full, fair, and reasonable opportunity for any party-in-interest to become a Qualified Bidder and to submit a Qualified Bid and participate in the Auction. As demonstrated by (i) the testimony and other evidence proffered and adduced at the Sale Hearing and (ii) the representations of counsel made on the record at the Sale Hearing, the Debtor has conducted the bidding process (including the selection of the Successful Bid), the Auction (including the proceedings held on April 15, 2014 with respect to the reopened Auction), and the sale process, in good faith, without collusion and in accordance with

the Auction Procedures, the Auction Procedures Order and this Court's ruling to reopen the Auction made on the record at the Sale Hearing on April 15, 2014.

      E.      <u>Highest or Otherwise Best</u>.  The M&A Agreement constitutes the highest and best offer for the Bank Shares and Other Purchased Assets, and will provide a greater recovery for the Debtor's estate than would be provided by any other available alternative, including any other Qualified Bids. The Debtor's determination that the M&A Agreement constitutes the highest and best offer for the Bank Shares and Other Purchased Assets constitutes a reasonable, valid and sound exercise of the Debtor's business judgment, and is in the best interests of the Debtor, its estate and its creditors.  The consideration to be paid by the Purchaser for the Purchased Assets is fair and reasonable, is the highest and best offer therefor, and constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code, the Uniform Fraudulent Conveyance Act, the Uniform Fraudulent Transfer Act, and the laws of the United States, any state, territory or possession thereof, the District of Columbia or any other applicable law.

      F.      <u>Arm's Length Transaction</u>. The M&A Agreement and other documents and instruments related to and connected with the M&A Transaction and the consummation thereof, as each may have been amended through the date hereof (the "Transaction Documents") were negotiated, proposed and entered into by the Debtor and the Purchaser without collusion, in good faith and through an arm's length bargaining process. Neither the Purchaser nor any of its affiliates or representatives is an "insider" of the Debtor, as that term is defined in section 101(31) of the Bankruptcy Code. None of the Debtor, the Purchaser, or their respective representatives engaged in any conduct that would cause or permit the M&A Agreement, any of the other Transaction Documents or the transactions contemplated therein to be avoided under section 363(n) of the

Bankruptcy Code, or has acted in any improper or collusive manner with any Person. The terms and conditions of the M&A Agreement and the other Transaction Documents, including, without limitation, the consideration provided in respect thereof, are fair and reasonable, and the M&A Transaction, including the transfer and sale of the Bank Shares and Other Purchased Assets is not avoidable and shall not be avoided, and no damages may be assessed against the Purchaser or any other party, under section 363(n) of the Bankruptcy Code.

H.    Good Faith Purchaser. The Purchaser has proceeded in good faith and without collusion in all respects in connection with the sale process, in that: (i) the Purchaser, in proposing and proceeding with the M&A Transaction in accordance with the M&A Agreement, recognized that the Debtor was free to deal with other interested parties; (ii) the Purchaser agreed to provisions in the M&A Agreement that would enable the Debtor to accept a higher and better offer; (iii) the Purchaser complied with all of the provisions in the Auction Procedures and the Auction Procedures Order applicable to the Purchaser; (iv) all payments to be made by the Purchaser and other agreements entered into or to be entered into between the Purchaser and the Debtor in connection with the M&A Transaction have been disclosed; (v) the negotiation and execution of the M&A Agreement and related agreements were conducted in good faith and constituted an arm's length transaction; (vi) the disclosure requirements required by the applicable Bankruptcy Rules and Local Bankruptcy Rules have been satisfied; and (vii) the M&A Agreement was not entered into, and the M&A Transaction being consummated pursuant to and in accordance with the M&A Agreement, is not being consummated, for the purpose of hindering, delaying or defrauding creditors of the Debtor.  The Purchaser is therefore entitled to all of the benefits and protections provided to a good-faith purchaser under section 363(m) of the Bankruptcy Code. Accordingly, the reversal or modification on appeal of the authorization provided herein to

consummate the M&A Transaction shall not affect the validity of such transaction or the Purchaser's status as a "good faith" purchaser.

I.      Corporate Authority.  Subject to the entry of this Sale Order, the Debtor has (i) full corporate power and authority to enter into and perform all of its obligations under the Transaction Documents, and the Debtor's prior execution and delivery of, and performance of obligations under, the Transaction Documents is hereby ratified; (ii) all of the corporate power and authority necessary to consummate the M&A Transaction including the transfer and sale of the Bank Shares and Other Purchased Assets as set forth in the M&A Agreement; and (iii) taken all corporate action necessary to authorize and approve the Transaction Documents. Further, except as otherwise expressly provided in the M&A Agreement, no consents or approvals are required for the Debtor to consummate the M&A Transaction including the transfer and sale of the Bank Shares and Other Purchased Assets other than the consent and approval of this Bankruptcy Court.

J.      Justification for Relief.  Good and sufficient reasons for approval of the M&A Agreement and the other Transaction Documents and the M&A Transaction including the transfer and sale of the Bank Shares and Other Purchased Assets have been articulated to the Court in the Motion and at the Sale Hearing, and the relief requested in the Motion and set forth in this Sale Order is in the best interests of the Debtor, its estate, creditors and other parties-in-interest in the Bankruptcy Case.  The Debtor has demonstrated through the Motion and other evidence and arguments at the Sale Hearing both (i) good, sufficient and sound business purpose and justification and (ii) compelling circumstances for the transfer and sale of the Bank Shares and Other Purchased Assets to the Purchaser as provided in the M&A Agreement outside the ordinary course of business, and before, and outside of, a plan of reorganization, and such action is an appropriate exercise of the Debtor's business judgment and in the best interests of the Debtor, its estate and its creditors.

K.    <u>Property of the Estate</u>.  The Bank Shares and Other Purchased Assets constitute property of the Debtor's estate and title thereto is vested in the Debtor's estate within the meaning of section 541(a) of the Bankruptcy Code. Accordingly, the Debtor has or will have as of the date of Closing all right, title and interest to and in the Bank Shares and Other Purchased Assets that may be required to implement and effectuate the M&A Transaction in the manner contemplated by the M&A Agreement and the other Transaction Documents.

L.    <u>Free and Clear</u>.  In accordance with sections 363(b) and 363(f) of the Bankruptcy Code, the consummation of the M&A Transaction pursuant to the Transaction Documents will be a legal, valid, and effective transfer and sale of the Bank Shares outstanding prior to the M&A Transaction and the Other Purchased Assets and will vest (i) in the Investors, through the consummation of the M&A Transaction, all of the Debtor's right, title, and interest in and to the Bank Shares outstanding after the M&A Transaction, and (ii) in the Bank, through the consummation of the M&A Transaction, all of the Debtor's right, title and interest in and to the Other Purchased Assets, in each case, free and clear of all liens, claims, encumbrances, and other interests of any kind or nature whatsoever, including, but not limited to, all encumbrances, security interests, pledges, hypothecations, obligations, liabilities, demands, guarantees, charges, options, rights, restrictions, contractual commitments, rights of first refusal, rights of setoff, and interests of any kind or nature that have been, are or could be asserted against the Debtor, whether known or unknown, legal or equitable, matured or unmatured, contingent or noncontingent, liquidated or unliquidated, asserted or unasserted, whether arising prior to or subsequent to the commencement of the Bankruptcy Case, whether known or unknown, whether imposed by agreement, understanding, law, equity or otherwise, and all rights and claims under any bulk transfer statutes and related laws, whether arising by agreement, statute, or otherwise, and whether arising before or after commencement of the Bankruptcy Case,

including liens, claims, and other interests of any of the creditors, vendors, employers, employees, suppliers, or lessors of the Debtor or any other third party (collectively, the "Encumbrances"). The Debtor has demonstrated that one or more of the standards set forth in section 363(f)(1) - (5) of the Bankruptcy Code have been satisfied. All holders of Encumbrances in the Bank Shares and Other Purchased Assets are adequately protected by having their respective Encumbrances attach to the net Purchase Price proceeds attributable to the Bank Shares and Other Purchased Assets (excluding, for the avoidance of doubt, the Recapitalization Amount) to the extent any such Encumbrances existed as of the Petition Date and subject to the terms of such Encumbrances with the same validity, force and effect, and in the same order of priority, which such Encumbrances had against the Bank Shares and/or Other Purchased Assets as of the Petition Date, subject to any rights, claims and defenses the Debtor or its estate may possess with respect thereto.

M.     Condition of the M&A Transaction. The Purchaser would not have entered into the M&A Agreement and would not consummate the transactions contemplated thereby if the M&A Transaction including the transfer and sale of the Bank Shares and Other Purchased Assets as provided therein were not free and clear of all Encumbrances, or if the Purchaser, the Investors or the Bank would, or in the future could, be liable for any of such Encumbrances.

N.     Prompt Consummation. The Debtor has demonstrated good and sufficient cause to waive the stay requirement under Bankruptcy Rules 6004(h) and 6006(d). Time is of the essence in consummating the M&A Transaction including the transfer and sale of the Bank Shares and Other Purchased Assets as provided in the M&A Agreement and the other transactions contemplated by the M&A Agreement and the other Transaction Documents, and it is in the best interests of the Debtor and its estate to consummate such transaction within the timeline set forth in the Motion and the M&A Agreement.

**NOW THEREFORE, IT IS HEREBY ORDERED THAT:**

1.     The relief requested in the Motion is GRANTED and APPROVED in all respects to the extent provided herein.

2.     All objections with regard to the relief sought in the Motion that have not been withdrawn, waived, settled, or otherwise dealt with as expressly provided herein and in the Auction Procedures Order, and all reservation of rights included in such objections, are overruled on the merits with prejudice.

3.     Pursuant to sections 105(a), 363(b), 363(f), and 365 of the Bankruptcy Code, the M&A Transaction with RKJS, including without limitation the transfer and sale of the Bank Shares and Other Purchased Assets on the terms set forth in the M&A Agreement attached hereto as Exhibit A, is approved, and the Debtor is authorized and directed to consummate the M&A Transaction in accordance with the M&A Agreement including without limitation by executing all documents (including without limitation the Transaction Documents) and taking all actions necessary and appropriate to effectuate and consummate the M&A Transaction including without limitation the transfer and sale of the Bank Shares and Other Purchased Assets in consideration of the Purchase Price and the Equity Contribution to be made to the Bank (through the Merger) upon the terms set forth in the M&A Agreement, the transactions contemplated in Exhibit D to the M&A Agreement or any alternative thereto as provided in Section 2.02(b) of the M&A Agreement and changing the name of the Debtor in accordance with section 5.27 of the M&A Agreement.  The releases set forth in section 5.11 of the M&A Agreement are authorized and approved.

4.     No later than one (1) business day following the date of entry of this Order, the Purchaser shall make the Deposit as provided in and subject to the terms of section 2.02(c) of the M&A Agreement.  The Deposit shall only be disbursed (a) pursuant to a written agreement

between FMAR and FMIB directing to whom to make the distribution; (b) by Order of the Bankruptcy Court directing to whom to make the distribution; or (c) to apply the Deposit to the Purchase Price at Closing.

5.      As of the closing of the M&A Transaction in accordance with the M&A Agreement (the "Closing"), (i) the transactions set forth in the M&A Agreement shall effect a legal, valid, enforceable and effective transfer and sale of the Bank Shares (through the merger as set forth therein) to the Investors and sale of the Other Purchased Assets to the Bank free and clear of all Encumbrances, as further set forth in the M&A Agreement and this Order, including without limitation paragraphs L and 8 hereof; and (ii) the M&A Agreement, and the other Transaction Documents, and the transactions related thereto and the consummation of such transactions including without limitation the M&A Transaction, shall be enforceable against and binding upon, and not subject to rejection or avoidance by, the Debtor, any successor thereto including a trustee or estate representative appointed in the Bankruptcy Case, and all other persons and entities.

6.      Subject to the fulfillment of the terms and conditions of the M&A Agreement, this Sale Order shall, as of the Closing, be considered and constitute for all purposes a full and complete general assignment, conveyance, and transfer of the Bank Shares and Other Purchased Assets and/or a bill of sale transferring all of the Debtor's rights, title and interest in and to the Bank Shares and Other Purchased Assets. Consistent with, but not in limitation of the foregoing, each and every federal, state, and local governmental agency or department is hereby authorized and directed to accept all documents and instruments necessary and appropriate to consummate the transactions contemplated by the M&A Agreement and approved in this Order.

7.      Any person or entity that is currently, or on the Closing Date may be, in possession of some or all of the Bank Shares and Other Purchased Assets are hereby directed to

surrender possession of such Bank Shares and Other Purchased Assets either to (a) the Debtor before the Closing or (b) to Purchaser or its designee upon the Closing.

8.      The transfer of the Bank Shares and Other Purchased Assets pursuant to the Transaction Documents is a legal, valid, and effective transfer and shall, in accordance with sections 105(a) and 363(f) of the Bankruptcy Code, and upon consummation of the M&A Transaction, including, without limitation, payment of the Purchase Price to the Debtor and the making of the Equity Contribution to the Bank, vest RKJS, the Investors and the Bank (as the surviving entity in the M&A Transaction) (collectively, the "Acquiring Parties") with all right, title, and interest in the Bank Shares and Other Purchased Assets, free and clear of all Encumbrances.

9.      Following the Closing, no holder of any liens, claims, and other interests against the Debtor, the Bank Shares or the Other Purchased Assets shall interfere with the Acquiring Parties' respective rights in, title to or use and enjoyment of the Bank Shares and Other Purchased Assets.  All valid and perfected Encumbrances in the Bank Shares and/or Other Purchased Assets shall attach to the net Purchase Price proceeds attributable to the Bank Shares and Other Purchased Assets (except, for the avoidance of doubt, the Recapitalization Amount) immediately upon receipt of such Purchase Price proceeds by the Debtor in the order of priority, and with the same validity, force and effect, which such Encumbrances had against such Bank Shares and/or Other Purchased Assets as of the filing of the Bankruptcy Case, subject to any rights, claims and defenses the Debtor, its estate or any trustee for the Debtor, as applicable, may possess with respect thereto and any limitations on the use of such proceeds pursuant to any provision of the M&A Agreement or this Sale Order.

10.      The Acquiring Parties shall not be deemed, as a result of any action taken in connection with, or as a result of the M&A Transaction including the transfer and sale of the

Bank Shares and Other Purchased Assets, to: (i) be a successor (or other such similarly situated party) to the Debtor (except as otherwise specified in the M&A Agreement); or (ii) have, *de facto* or otherwise, merged with or into the Debtor. The Purchaser is not acquiring or assuming any liens, claims, and other interests, including, without limitation, any liability arising from any of the following: (i) any employment or labor agreements, consulting agreements, severance agreements, change in control agreements or other similar agreements to which the Debtor is or was a party; (ii) any pension, welfare, compensation or other employee benefit plans, agreements, practices, and programs, including without limitation, any pension plan of the Debtor; (iii) the cessation of the Debtor's operations, dismissal of employees, or termination of employment or labor agreements or pension, welfare, compensation or other employee benefit plans, agreements, practices and programs and any obligations with respect thereto that arise from the Employee Retirement Income Security Act of 1974 ("ERISA"), the Fair Labor Standard Act, Title VII of the Civil Rights Act of 1964, the Age Discrimination and Employment Act of 1967, the Federal Rehabilitation Act of 1973, the National Labor Relations Act, the Consolidated Omnibus Budget Reconciliation Act of 1985 or the Worker Adjustment and Retraining Notification Act (the "WARN Act"); (iv) workmen's compensation, occupational disease or unemployment or temporary disability insurance claims; (v) environment liabilities, debts, claims or obligations which may be asserted on any basis, including, without limitation, under the Comprehensive Environmental Response, Compensation and Liability Act or any other environmental, health and safety requirements; (vi) any bulk sales or similar law, (vii) any litigation by or against the Debtor; and (viii) the laws of the United States, any state, territory or possession thereof, or the District of Columbia, based, in whole or in part, directly or indirectly, in any theory of law or equity, including without limitation, any theory of antitrust or successor or transferee liability. None of the Acquiring Parties nor any of their respective employees, members,

directors, advisors, lenders, affiliates, owners, successors and assigns shall have any successor or vicarious liabilities with respect to the Debtor, the Bank Shares, the Other Purchased Assets or any liens, claims, and other interests of any kind or character.

11.     Except for the holders of any assumed liabilities (and then only as and to the extent expressly permitted by the M&A Agreement), all persons and/or entities asserting liens, claims, and other interests against the Debtor, or its interest in the Bank Shares and Other Purchased Assets, are hereby forever estopped, permanently enjoined, and precluded from (i) pursuing such liens, claims, and other interests against the Bank Shares and Other Purchased Assets, other than against the net Purchase Price proceeds as provided herein; (ii) asserting, commencing or continuing in any manner any action against the Acquiring Parties or against any of their respective assets or properties (including, without limitation, the Bank Shares and Other Purchased Assets) on account of such liens, claims, and other interests; (iii) the enforcement, attachment, collection or recovery, by any manner or means, of any judgment, award or decree of order against the Acquiring Parties or any of their respective assets or properties (including, without limitation, the Bank Shares and Other Purchased Assets) on account of such liens, claims, and other interests; (iv) creating, perfecting or enforcing any Encumbrance of any kind against the Acquiring Parties or any of their respective properties or assets (including, without limitation, the Bank Shares and Other Purchased Assets) on account of such liens, claims, and other interests; (v) asserting any set off, right of subrogation or recoupment or other affirmative defense of any kind against any obligations due to the any of the Acquiring Parties on account of such liens, claims, and other interests; (vi) taking any action, in any manner, in any place whatsoever, that does not conform to or comply with the provisions of this Sale Order or the M&A Agreement; and (vii) asserting with respect to the Debtor that any of the Acquiring Parties is a successor, successor-in-interest, or otherwise

liable for the liens, claims, and other interests pursuant to any other statutory or legal or equitable theory, including, without limitation, worker's compensation, occupational disease, pension and employee benefits, labor and employment, bulk sales or tax laws or obligations.

12.     This Sale Order (i) shall be effective as a determination that, on Closing, all liens, claims, and other interests of any kind or nature whatsoever existing as to the Bank Shares and Other Purchased Assets before the Closing, have been unconditionally released, discharged and terminated, and that the transfers and conveyances described herein have been effected, and (ii) shall be binding upon and shall govern the acts of all persons and entities. On Closing, the Debtor, and persons holding any liens, claims, and other interests in the Bank Shares and Other Purchased Assets as of the Closing, are authorized and directed to execute such documents and take all other actions as may be reasonably necessary to release their liens, claims, and other interests in the Bank Shares and Other Purchased Assets, if any, as such liens, claims, and other interests may have been recorded or may otherwise exist. If any person or entity that has filed financing statements or other documents or agreements evidencing any liens, claims, and other interests in the Bank Shares and Other Purchased Assets shall not have delivered to the Debtor before the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of all liens, claims, and other interests which the person or entity has with respect to the Bank Shares and Other Purchased Assets, then the Purchaser, Bank and/or the Debtor are hereby authorized to execute and file such statements, instruments, releases and other documents on behalf of the person or entity with respect to such Bank Shares and Other Purchased Assets.

13.     The Debtor shall apply the net Purchase Price in accordance with the applicable orders of this Bankruptcy Court in the Bankruptcy Case.  Any Encumbrances encumbering the

Bank Shares and Other Purchased Assets shall be released and attach to the net Purchase Price proceeds as provided for in this Sale Order.

14.     The Debtor is hereby authorized and empowered, in connection with the Closing, to change its corporate name and the caption of this Bankruptcy Case, consistent with section 5.27 of the M&A Agreement and applicable law.  The Debtor shall file a notice of change of case caption within five days after the Closing, and the change of case caption for this Bankruptcy Case shall be deemed effective as of such date.

15.     This Sale Order shall be binding upon and shall govern the acts of all Persons, including without limitation all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of the Bank Shares or Other Purchased Assets. The terms and provisions of the M&A Agreement and all other Transaction Documents, the M&A Transaction including the transfer and the sale of the Bank Shares and Other Purchased Assets, and this Sale Order shall be binding in all respects upon the Debtor, its estate, all creditors of (whether known or unknown) and holders of equity interests in the Debtor, any successor to the Debtor including any liquidating trust or trustee, the Acquiring Parties and their respective affiliates, successors and assigns, and all third parties, notwithstanding the subsequent appointment of any trustee of the Debtor under any chapter of the Bankruptcy Code, as to which trustee(s) such terms and provisions likewise shall be binding. The provisions of this Sale Order and any actions taken pursuant hereto shall survive any conversion or dismissal of the Bankruptcy Case and the entry of any other order that may be entered in the Bankruptcy Case, including any order (i)

confirming any plan of reorganization; (ii) converting the Bankruptcy Case from chapter 11 to chapter 7; (iii) appointing a trustee or examiner in the Bankruptcy Case; or (iv) dismissing the Bankruptcy Case. The terms and provisions of this Sale Order, as well as the rights granted under the Transaction Documents, shall continue in full force and effect and are binding upon any reorganized debtor, successor to the debtor or chapter 7 or chapter 11 trustee applicable to the Debtor, notwithstanding any such conversion, dismissal or order entry.  Nothing contained in any chapter 11 plan confirmed in this bankruptcy case or in an order confirming such plan, nor any order dismissing this case or converting it to a case under chapter 7 of the Bankruptcy Code, shall conflict with or derogate from the provisions of the M&A Agreement, any documents or instruments executed in connection therewith, or the terms of this Sale Order.

16.    The transactions contemplated by the M&A Agreement and other Transaction Documents are undertaken by the Acquiring Parties without collusion and in "good faith," as that term is defined in section 363(m) of the Bankruptcy Code. The Acquiring Parties are good faith purchasers within the meaning of section 363(m) of the Bankruptcy Code and, as such, are entitled to the full protections of section 363(m) of the Bankruptcy Code.

17.    The failure specifically to include any particular provision of the M&A Agreement or the other Transaction Documents in this Sale Order shall not diminish or impair the effectiveness of such provisions, it being the intent of the Court that the M&A Agreement and the other Transaction Documents be authorized and approved in their entirety. Likewise, all of the provisions of this Sale Order are non-severable and mutually dependent.

18.    Notwithstanding Bankruptcy Rules 6004, 6006(d), 7062, or 9014, if applicable, or any other Local Bankruptcy Rule or otherwise, this Sale Order shall not be stayed for 14-days after the entry hereof, but shall be effective and enforceable immediately upon entry pursuant to Bankruptcy Rule 6004(h). Time is of the essence in approving the M&A Transaction including the

transfer and sale of the Bank Shares and Other Purchased Assets and the transactions related thereto, and the Debtor and the Acquiring Parties intend to close the sale of the Bank Shares and Other Purchased Assets and related transactions as soon as practicable.

19.    The automatic stay pursuant to section 362 is hereby lifted with respect to the Debtor to the extent necessary, without further order of this Bankruptcy Court, to (i) allow the Purchaser to deliver any notice provided for in the M&A Agreement and Transaction Documents and (ii) allow the Acquiring Parties to take any and all actions permitted under the M&A Agreement and Transaction Documents in accordance with the terms and conditions thereof.

20.    Nothing in this Sale Order shall modify or waive any closing conditions or termination rights in the M&A Agreement, and all such conditions and rights shall remain in full force and effect in accordance with their terms.

21.    Unless otherwise provided in this Sale Order, to the extent any inconsistency exists between the provisions of the M&A Agreement and this Sale Order, the provisions contained in this Sale Order shall govern.

22.    The Court shall retain jurisdiction to interpret, construe, and enforce the provisions of the M&A Agreement and this Sale Order in all respects, and further, to hear and determine all disputes between the Debtor and/or the Purchaser, as the case may be, and any other non-debtor party relating to the M&A Agreement, the other Transaction Documents, the M&A Transaction or this Sale Order and any dispute between any of the Acquiring Parties and the Debtor as to their respective obligations with respect to any asset, liability, or claim arising hereunder.

23.    For the avoidance of doubt, the *Order (A) Authorizing and Approving Debtor-In-Possession Financing and Granting Security Interests and a Superpriority Administrative Claim*

*In Connection Therewith, (B) Approving the Terms And Conditions of That Certain Superpriority Debtor-In-Possession Credit Agreement and Related Documents, and (C) Modifying The Automatic Stay to the Extent Necessary to Enter Into the Debtor-In-Possession Financing and Effectuate the Terms Thereof*, entered by the Bankruptcy Court on March 12, 2014 [Dkt. No. 133], (the "DIP Order") and the Superpriority Debtor-in-Possession Credit Agreement, dated February 7, 2014, by and between the Debtor and the Purchaser as lender (the "DIP Credit Agreement"), that was approved by the DIP Order, a copy of which is attached as Exhibit B to FMAR's motion to obtain postpetition credit under section 364 of the Bankruptcy Code [Dkt. No. 9], as modified by submission dated March 11, 2014 [Dkt. No. 130] shall remain in full force and effect and the Debtor is authorized, upon entry of this Order, to (i) draw up to $2,5000,000 in accordance with the DIP Credit Agreement and (ii) deposit such funds into a segregated account to pay for fees and expenses contemplated under the DIP Credit Agreement and the DIP Order.

24.     Nothing in this Sale Order, the M&A Agreement, or any other related document with any other party shall relieve or excuse the Debtor, the Purchaser or any other party from complying with any and all applicable federal securities laws, rules, and regulations with respect to the offer, sale, purchase or distribution of securities or otherwise.

**END OF ORDER**

**Exhibit A**

**Successful Bidder's M&A Agreement**

# AMENDED AND RESTATED MERGER AND ACQUISITION AGREEMENT

by and among

## FIRST MARINER BANCORP,
a Maryland corporation,

## FIRST MARINER BANK,
a Maryland chartered trust company,

and

## RKJS BANK,
a Maryland chartered trust company

April 15, 2014

**Table of Contents**

|  |  | Page |
|---|---|---|

Section 2.04.        Chapter 11 Bankruptcy Case ....................................................................... 13

**ARTICLE III.        REPRESENTATIONS AND WARRANTIES OF THE COMPANIES** ........... 13
Section 3.01.        Organization and Qualification ................................................................ 13
Section 3.02.        Authority; Approvals .............................................................................. 14
Section 3.03.        No Conflict With Other Instruments ........................................................ 15
Section 3.04.        Capitalization; Title to Other Purchased Assets ...................................... 15
Section 3.05.        Compliance with Laws, Permits and Instruments .................................... 16
Section 3.06.        Financial Statements ............................................................................... 16
Section 3.07.        Undisclosed Liabilities ........................................................................... 17
Section 3.08.        Litigation ................................................................................................ 17
Section 3.09.        Consents and Approvals .......................................................................... 17
Section 3.10.        Title to FMBank Assets ........................................................................... 18
Section 3.11.        Absence of Certain Changes or Events .................................................... 18
Section 3.12.        Taxes ...................................................................................................... 19
Section 3.13.        Insurance ................................................................................................ 21
Section 3.14.        Proprietary Rights ................................................................................... 21
Section 3.15.        Transactions with Certain Persons and Entities ....................................... 22
Section 3.16.        Evidences of Indebtedness ...................................................................... 22
Section 3.17.        Certain Loans and Related Matters .......................................................... 23
Section 3.18.        Environmental Compliance ..................................................................... 23
Section 3.19.        Regulatory Compliance ........................................................................... 24
Section 3.20.        Deposits .................................................................................................. 24
Section 3.21.        Interest Rate Risk Management Instruments ............................................ 24
Section 3.22.        Community Reinvestment Act .................................................................. 25
Section 3.23.        Fair Housing Act, Home Mortgage Disclosure Act and Equal Credit
                     Opportunity Act ...................................................................................... 25
Section 3.24.        Consumer Compliance Laws .................................................................... 25
Section 3.25.        Bank Secrecy Act, Foreign Corrupt Practices Act and U.S.A. Patriot Act ........... 25
Section 3.26.        Loans Secured by FMAR Capital Stock ................................................... 26
Section 3.27.        Absence of Certain Business Practices ..................................................... 26
Section 3.28.        Books and Records .................................................................................. 26
Section 3.29.        Internal Controls ..................................................................................... 26
Section 3.30.        Fiduciary Responsibilities ....................................................................... 26
Section 3.31.        Guaranties ............................................................................................... 27
Section 3.32.        Employee Relationships .......................................................................... 27
Section 3.33.        Benefit Plans ........................................................................................... 27
Section 3.34.        Obligations to Employees ........................................................................ 30
Section 3.35.        Contracts and Commitments .................................................................... 30
Section 3.36.        Brokers and Finders ................................................................................ 32

**ARTICLE IV.        REPRESENTATIONS AND WARRANTIES OF FMIB** ................................ 32
Section 4.01.        Organization and Qualification ................................................................ 32
Section 4.02.        Authority; Approvals .............................................................................. 32
Section 4.03.        No Conflict With Other Instruments ........................................................ 33
Section 4.04.        Litigation ................................................................................................ 33

i

Section 4.05.    Consents and Approvals................................................................. 33
Section 4.06.    Available Funds............................................................................. 34
Section 4.07.    Brokers and Finders...................................................................... 34

**ARTICLE V.**    **COVENANTS OF THE PARTIES**......................................... 34
Section 5.01.    Commercially Reasonable Efforts................................................. 34
Section 5.02.    Consents and Approvals................................................................. 34
Section 5.03.    Required Acts................................................................................ 35
Section 5.04.    Prohibited Acts.............................................................................. 36
Section 5.05.    Certain Company Contracts .......................................................... 39
Section 5.06.    Confidential Information................................................................ 40
Section 5.07.    Access; Pre-Closing Investigation................................................ 41
Section 5.08.    Attendance at Directors' and Committee Meetings ..................... 41
Section 5.09.    Additional Financial Statements................................................... 42
Section 5.10.    Notice of Certain Events .............................................................. 42
Section 5.11.    Indemnification and D&O Insurance; Releases ........................... 43
Section 5.12.    Notice of Sale ............................................................................... 45
Section 5.13.    Resignations.................................................................................. 45
Section 5.14.    Operating Functions ..................................................................... 45
Section 5.15.     DIP Financing.............................................................................. 46
Section 5.16.    Payment of the Brokers Fee ......................................................... 46
Section 5.18.    Debtor-in-Possession.................................................................... 47
Section 5.21.    Bankruptcy Efforts ....................................................................... 47
Section 5.22.    Non-Solicitation of Competing Bids ............................................ 47
Section 5.23.    Bankruptcy Filings ....................................................................... 47
Section 5.24.    Plan ............................................................................................... 47
Section 5.25.    Appeal .......................................................................................... 47
Section 5.26.    Update of Representations............................................................ 47
Section 5.27.    Name Change ............................................................................... 48
Section 5.28.    Employee Transition ..................................................................... 48

**ARTICLE VI.**    **CONDITIONS TO CLOSING** ............................................... 48
Section 6.01.    Conditions to the Obligations of All Parties................................. 48
Section 6.02.    Conditions to the Obligations of FMIB ....................................... 49
Section 6.03.    Conditions to the Obligations of the Companies.......................... 50

**ARTICLE VII.**    **CLOSING** ............................................................................... 51
Section 7.01.    Actions to be Taken at the Closing by the Companies.................. 51
Section 7.02.    Actions to be Taken at the Closing by FMIB ............................... 52
Section 7.03.    Concurrent Delivery ..................................................................... 53
Section 7.04.    Assignment and Transfer of Other Purchased Assets; Merger.... 53
Section 7.05.    Time and Place of the Closing and Closing Date ......................... 53

**ARTICLE VIII.**    **TERMINATION**....................................................................... 54
Section 8.01.    Termination ................................................................................... 54
Section 8.02.    Effect of Termination ................................................................... 55

**ARTICLE IX.**    **SURVIVAL OF REPRESENTATIONS AND WARRANTIES; TAX**
                 **MATTERS** ................................................................................ 56
Section 9.01.    Survival of Representations, Warranties and Covenants.............. 56
Section 9.02.    Transfer Taxes .............................................................................. 56

| | | |
|---|---|---|
| Section 9.03. | Prorations | 56 |
| Section 9.04. | Tax Returns | 56 |
| Section 9.05. | Cooperation | 57 |
| Section 9.06. | Carrybacks | 57 |
| Section 9.07. | Amended Tax Returns of FMBank; Settlement of Audit | 58 |
| Section 9.08. | Tax Sharing Agreements | 58 |
| Section 9.09. | Tax Covenant Involving FMBank | 58 |
| Section 9.10. | Additional Tax Covenants | 58 |
| **ARTICLE X.** | **MISCELLANEOUS** | 59 |
| Section 10.01. | Expenses | 59 |
| Section 10.02. | Entire Agreement | 59 |
| Section 10.03. | Binding Effect; Assignment | 60 |
| Section 10.04. | Further Cooperation | 60 |
| Section 10.05. | Severability | 60 |
| Section 10.06. | Notices | 60 |
| Section 10.07. | Waiver of Jury Trial | 62 |
| Section 10.08. | Jurisdiction | 62 |
| Section 10.09. | Multiple Counterparts | 62 |
| Section 10.10. | Specific Performance | 62 |
| Section 10.11. | Attorneys' Fees and Costs | 62 |
| Section 10.12. | Rules of Construction | 63 |
| Section 10.13. | Articles, Sections, Exhibits and Schedules | 63 |
| Section 10.14. | Public Disclosure | 63 |
| Section 10.15. | Extension; Waiver | 63 |
| Section 10.16. | Amendments | 63 |
| Section 10.17. | Automatic Extension of Deadlines and Dates | 64 |
| Section 10.17. | Automatic Extension of Deadlines and Dates | 64 |
| Section 10.17. | Automatic Extension of Deadlines and Dates | 64 |

| | |
|---|---|
| <u>Exhibit A</u> | DIP Loan Agreement and Documentation |
| <u>Exhibit B</u> | Form of Sale Order |
| <u>Exhibit C</u> | Form of Articles of Merger |
| <u>Exhibit D</u> | Additional Closing Deliverables |

### MERGER AND ACQUISITION AGREEMENT

**THIS AMENDED AND RESTATED MERGER AND ACQUISITION AGREEMENT** (this "Agreement") is dated as of April 15, 2014 and effective only as of the entry of the Sale Order (as defined herein), by and among **FIRST MARINER BANCORP**, a Maryland corporation with its principal offices in Baltimore, Maryland ("FMAR"), **FIRST MARINER BANK**, a Maryland chartered trust company and wholly-owned subsidiary of FMAR, with its principal offices in Baltimore, Maryland ("FMBank," and together with FMAR, the "Companies"), and **RKJS BANK**, a Maryland chartered trust company ("FMIB"). FMAR, FMBank and FMIB are sometimes referred to herein individually as a "Party," and collectively as the "Parties."

### RECITALS

**WHEREAS**, FMAR owns all of the issued and outstanding shares of FMBank;

**WHEREAS**, FMIB has received aggregate capital commitments of $100,000,000 and, if requested by regulators, commitments to result in aggregate capital commitments of $114,943,900 from the investors identified on that certain list of investors provided to FMAR on the date hereof, each of whom is an "accredited investor" within the meaning of Regulation D under the Securities Act of 1933, as amended (each such Person identified on such list, as such list may be updated from time to time by FMIB, is referred to herein as an "Investor," and collectively, as the "Investors"), for the purpose of acquiring and recapitalizing the Bank;

**WHEREAS**, all of the issued and outstanding shares of capital stock of FMIB will, upon completion of the Equity Contribution (as defined herein), be owned by the Investors;

**WHEREAS**, FMAR desires to sell, and FMIB and the Investors desire to acquire, all of the issued and outstanding shares of FMBank (the "FMBank Shares") held by FMAR and the Other Purchased Assets (as hereinafter defined), free and clear of all Encumbrances, as defined herein (the "Acquisition"), which Acquisition shall be (i) structured as a merger of FMIB with and into FMBank, with FMBank being the surviving Person, as defined herein (the "Merger"), and (ii) effectuated pursuant to the Sale Order (as hereinafter defined);

**WHEREAS**, concurrently with Closing (as defined herein), immediately prior to the effective time of the Merger, the Investors shall make the Equity Contribution to FMIB, on and subject to the terms of this Agreement;

**WHEREAS**, on February 7, 2014, FMIB and the Companies entered into a Merger and Acquisition Agreement (the "Original Merger Agreement") to set out the terms pursuant to which FMIB agreed to act as the "stalking horse" bidder with respect to the FMBank Shares and the Other Purchased Assets;

**WHEREAS**, on February 10, 2014 ("Petition Date"), FMAR filed a voluntary bankruptcy petition (the "Bankruptcy Case") under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code") in the United States Bankruptcy Court

for the District of Maryland (the "<u>Bankruptcy Court</u>") and, contemporaneously therewith, filed the Sale Motion (as defined herein);

WHEREAS, on March 8 and 12, 2014 (respectively), the Bankruptcy Court entered the Auction Procedures Order (as defined herein) and the DIP Order (as defined herein);

WHEREAS, on April 10, 2014, pursuant to the Auction Procedures Order, the Debtor held an auction with respect to the FMBank Shares and the Other Purchased Assets, which was reopened on April 15, 2014 by the Bankruptcy Court;

WHEREAS, at the conclusion of the Auction, FMIB was selected as the successful bidder with respect to the FMBank Shares and the Other Purchased Assets;

WHEREAS, on April 15, 2014, the Bankruptcy Court held a hearing (the "<u>Sale Hearing</u>") during which it (a) approved FMIB as the successful bidder with respect to the FMBank Shares and the Other Purchased Assets and (b) authorized FMAR to enter and consummate the Acquisition and the other Contemplated Transactions in accordance with this Agreement;

WHEREAS, FMIB has agreed to deliver to FMAR no later than one (1) business day following the entry of the Sale Order, by wire transfer of immediately available funds, an amount of cash equal to Three Million Dollars ($3,000,000) (the "<u>Deposit</u>"), which shall be disbursed only in accordance with this Agreement and the Sale Order; and

WHEREAS, this Agreement amends, restates and supersedes the Original Merger Agreement;

NOW, THEREFORE, for and in consideration of the foregoing and of the mutual representations, warranties, covenants and agreements contained in this Agreement, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and subject to the conditions set forth below, the Parties, intending to be legally bound, undertake, promise, covenant and agree with each other as follows:

ARTICLE I.
INTERPRETATION

Section 1.01. <u>Definitions</u>. In this Agreement, unless the context otherwise requires or unless otherwise specifically provided herein:

"<u>Accounting Period Change</u>" is defined in <u>Section 9.10(b)</u>.

"<u>Acquisition</u>" is defined in the Recitals of this Agreement.

"<u>Affiliate</u>" means, with respect to any Person, any Person that, directly or indirectly, controls, is controlled by, or is under common control with, such Person. For the purposes of this definition, "control" (including, with correlative meaning, the terms "controlled by" and

2

"under common control with") as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities or by contract or otherwise.

"Affiliated Group" means any affiliated group within the meaning of Section 1504(a) of the Code.

"Agreement" is defined in the Preamble of this Agreement.

"Alternative Transaction" means any plan, agreement or arrangement, other than this Agreement, or agreement to support or propose to the Bankruptcy Court any plan, agreement or arrangement, other than this Agreement, the effect and/or results of which involve the recapitalization or acquisition of FMBank and/or FMAR by any Person other than the Investors through FMIB.

"Articles of Merger" is defined in Section 2.01.

"Assumed Bank Related Contracts" is defined in Section 5.05.

"Auction Procedures" means the Auction Procedures annexed as Exhibit A to the Auction Procedures Order.

"Auction Procedures Order" means the *Order (A) Approving Bidding And Auction Procedures With Respect To The Transfer And Sale Of Certain Assets, (B) Approving Bidding Protections For The Stalking Horse Bidder, (C) Approving Procedures Related To The Assumption And Assignment Of Certain Executory Contracts And Unexpired Leases, (D) Approving The Form And Manner Of Notices Related To The Auction And Sale, (E) Scheduling The Sale Hearing, And (F) Granting Other Related Relief*, entered by the Bankruptcy Court on March 8, 2014 [Dkt. No. 122].

"Bank D&O Policies" is defined in Section 5.11(b).

"Bank D&O Tail Policy" is defined in Section 5.11(b).

"Bank Related Contracts" is defined in Section 2.01.

"Bank Subsidiaries" is defined in Section 3.01(c).

"Bankruptcy Case" is defined in the Recitals to this Agreement.

"Bankruptcy Code" is defined in the Recitals of this Agreement.

"Bankruptcy Court" is defined in the Recitals to this Agreement.

"Bankruptcy Exception" means, in respect of any agreement, contract, commitment or obligation, any limitation thereon imposed by any bankruptcy, insolvency, fraudulent conveyance, reorganization, receivership, moratorium or similar law affecting creditors' rights

3

and remedies generally and, with respect to the enforceability of any agreement, contract, commitment or obligation, by general principles of equity, including principles of commercial reasonableness, good faith and fair dealing, regardless of whether enforcement is sought in a proceeding at law or in equity.

"Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure.

"BHCA" means Bank Holding Company Act of 1956, as amended.

"Broker" means Sandler O'Neill & Partners, L.P.

"Broker Fees" means the fees payable by FMAR to the Broker upon closing of the Contemplated Transactions in an aggregate amount equal to the amount set forth on *Disclosure Schedule 3.36*.

"Burdensome Condition" means any restraint, limitation, term, requirement, provision or condition that would (i) materially impair any of the benefits to FMIB or any Investor of the Contemplated Transactions; (ii) require any Person (including any Investor) other than FMIB to guaranty, support or maintain the capital of FMBank; (iii) require a material modification of, or impose a material limitation, restriction or condition on, the activities, governance, legal structure, or compensation of FMIB or any of its Affiliates or, following the Closing, FMBank, any Investor or any of their respective Affiliates; *provided, however,* that the following shall not be deemed to be a "Burdensome Condition":  (y) those restraints, limitations, terms, requirements, provisions or conditions specifically applicable to FMBank or Bank Subsidiaries by reason of their condition as of the date hereof and specifically disclosed in *Disclosure Schedule 3.19*; and (z) any restraint, limitation, term, requirement, provision or condition that applies generally to bank holding companies and banks as provided by statute, regulation, or written and publicly available supervisory guidance of general applicability, in each case, as in effect on the date hereof.

"Business Day" means a day that FMBank is open to the public for the conduct of banking business.

"Call Reports" is defined in Section 3.06.

"Claim" and "Claims" are defined in Section 5.11(c).

"Closing" is defined in Section 7.05.

"Closing Date" is defined in Section 7.05.

"Code" means the Internal Revenue Code of 1986, as amended.

"Companies" is defined in the Preamble to this Agreement.

"Company Required Approvals" is defined in Section 3.09.

"Constituent Documents" means articles or certificate of incorporation, bylaws and any other constituted document of a corporate entity.

"Contemplated Transactions" means all of the transactions between the Companies and FMIB contemplated by this Agreement.

"Contracts" is defined in Section 3.35.

"CRA" is defined in Section 3.22.

"Deposit" is defined in the Recitals to this Agreement.

"DIP Loan" is defined in Section 5.15.

"DIP Loan Agreement" means that certain Super-Priority Debtor-in-Possession Credit Agreement, dated February 10, 2014, between FMIB as lender and FMAR as borrower, attached as Exhibit B to FMAR's motion to obtain credit under section 364 of the Bankruptcy Code [Dkt. No. 9], as modified by submission dated March 11, 2014 [Dkt. No. 130], as modified from time to time in accordance therewith.

"DIP Order" means the *Order (A) Authorizing and Approving Debtor-In-Possession Financing and Granting Security Interests and a Superpriority Administrative Claim In Connection Therewith, (B) Approving the Terms And Conditions Of That Certain Superpriority Debtor-In-Possession Credit Agreement and Related Documents, and (C) Modifying The Automatic Stay to the Extent Necessary to Enter Into the Debtor-In-Possession Financing and Effectuate the Terms Thereof*, entered by the Bankruptcy Court on March 12, 2014 [Dkt. No. 133].

"Disclosure Schedules" is defined in ARTICLE III.

"Employee Plans" is defined in Section 3.33(a).

"Encumbrance," with respect to any asset, means, whether or not registered or registrable or recorded or recordable, and regardless of how created or arising:  (i) a Lien, Liability, encumbrance, adverse claim, charge, covenant, restriction, execution, security interest, pledge against such asset, or a subordination to any right or claim of others in respect thereof; (ii) a claim or interest in, to, or against such asset; (iii) an option or other right to acquire, or to acquire any interest in, such asset; (iv) an interest of a vendor or lessor under any conditional sale agreement, capital lease or other title retention agreement relating to such asset; and (v) any other encumbrance of whatsoever nature and kind in, to, or against such asset.

"Environmental Laws" means the Legal Requirements relating to pollution or protection of public or employee health or safety or the environment, including laws relating to (i) emissions, discharges, releases or threatened releases of Hazardous Materials, into the environment (including ambient air, indoor air, surface water, ground water, land surface or

subsurface strata), (ii) the manufacture, processing, distribution, use, generation, treatment, storage, disposal, transport or handling of Hazardous Materials, and (iii) underground and above ground storage tanks containing Hazardous Materials, and related piping, and emissions, discharges, releases or threatened releases therefrom.

"Equity Contribution" is defined in Section 2.03.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" means, with respect to a Person, any other Person bearing a relationship to the first Person described in Sections 414 (b), (c), (m) or (o) of the Code, or Section 4001(b) of ERISA, or any regulations or guidance issued thereunder.

"Executive Officer" is defined in Section 3.08.

"Expense Reimbursement" is defined in Section 5.17.

"FDIA" means Federal Deposit Insurance Act, as amended.

"FDIC" means the Federal Deposit Insurance Corporation or any successor thereto.

"Final Order" means any order or judgment entered by the Bankruptcy Court or other court having jurisdiction over any matter; *provided, that* such order or judgment has not been reversed, stayed, or vacated pursuant to applicable law or by an order of the Bankruptcy Court or other court of competent jurisdiction.

"FM Counsel is defined in Section 2.01(c).

"FM Group" means FMAR and the members of its Affiliated Group.

"FM Group Member" means each member of the FM Group.

"FMAR" is defined in the Preamble of this Agreement.

"FMAR Releasee" is defined in Section 5.11(d).

"FMAR Releasor" is defined in Section 5.11(c).

"FMAR Subsidiaries" is defined in Section 3.01(a).

"FMB Holdings Receivable" is the $500,000 receivable that will be payable by FMBank to FMB Holdings, Inc. as contemplated by Exhibit D.

"FMBank" is defined in the Preamble of this Agreement.

"FMBank Closing Equity" shall mean the "Tier 1 Capital" of FMBank calculated in accordance with the regulations of the FDIC as of (a) the close of business on the last Business

6

Day of the month immediately prior to the Closing Date if the Closing Date is after the tenth Business Day of a month, or (b) the close of business on the last Business Day of the second month immediately prior to the Closing Date if the Closing Date is on or before the tenth Business Day of a month; provided that any amounts paid or to be paid by FMBank for the Bank D&O Tail Policy shall be deducted as additional liabilities from the calculation of FMBank Closing Equity, regardless of whether such amounts are required by FDIC regulations to be included as a liability in calculating Tier 1 Capital.

"FMBank Releasee" is defined in Section 5.11(c).

"FMBank Releasor" is defined in Section 5.11(d).

"FMBank Shares" is defined in the recitals to this Agreement.

"FMIB" is defined in the Preamble of this Agreement.

"FMIB Required Approvals" is defined in Section 4.05.

"Former Related Person" is defined in Section 3.08.

"GAAP" means generally accepted accounting principles in effect in the United States.

"Governmental Authority" means any federal, state, municipal, county or regional government or governmental or regulatory authority, domestic or foreign, and includes any department, commission, bureau, board, administrative agency or regulatory body of any of the foregoing or any non-governmental regulatory body that provides standards for certification.

"Hazardous Material" means any pollutant, contaminant or toxic or hazardous substance, constituent, material or waste regulated under Environmental Laws, including petroleum, crude oil or any fraction thereof or any petroleum product, but does not include nominal quantities of any chemical used in the ordinary course of business as office or cleaning supplies.

"Indemnified Parties" is defined in Section 5.11.

"Information" is defined in Section 5.06.

"Investor" is defined in the Recitals to this Agreement.

"IRS" is defined in Section 3.12(c).

A Person has "Knowledge" of, or acts "Knowingly" with respect to, a particular fact or other matter if any individual who is presently serving as a director or Executive Officer of that Person is actually aware of such fact or other matter, after due inquiry.

"Leased Properties" is defined in Section 3.10.

"Legal Requirement" means any federal, state, local, municipal, foreign, international, multinational or other constitution, law, ordinance, principle of common law, code, regulation, statute or treaty.

"Liability" means any liability or obligation of any kind, character or description, whether known or unknown, absolute or contingent, whether or not accrued, disputed or undisputed, liquidated or unliquidated, secured or unsecured, joint or several, due or to become due, vested or unvested, executory, determined, determinable or otherwise, including, without limitation, any "Claim" as defined in Section 101(5) of the Bankruptcy Code.

"Lien" means any lien, pledge, mortgage, deed of trust, interest, security interest, claim, lease, charge, option, right of first refusal, levy, right of first offer, easement, servitude, transfer restriction under any shareholder or similar agreement, Tax (including foreign, federal, state and local Tax), order of any Governmental Authority, encumbrance or any other restriction or limitation whatsoever of any kind or nature, whether secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, contingent or non-contingent, material or non-material, known or unknown.

"Material Adverse Change" means any fact, circumstance, event, effect, development, occurrence or change that (1) has had, or would be reasonably likely to have, a material and adverse effect on the business, results of operations, financial condition, assets, properties, employees, liabilities (absolute, accrued, contingent or otherwise) or reserves of FMBank, excluding any change with respect to, or effect on, FMBank resulting from (i) changes in Legal Requirements, GAAP or regulatory accounting requirements, as such would apply to banks, (ii) changes after the date of this Agreement in national or regional political conditions or general economic or market conditions (including changes in prevailing interest rates, credit availability and liquidity) generally affecting banks and bank holding companies, except to the extent that such change has a disproportionately adverse effect on FMBank as compared to similarly situated banks, (iii) any actions or omissions expressly required by this Agreement or that are taken at the written request of or with the prior informed written consent of FMIB in contemplation of the Contemplated Transactions, and (iv) any pre-Closing restriction or conditions imposed on FMBank as a result of regulatory agreements to which FMBank is a party as of the date of this Agreement, or (2) prevents or materially impairs the ability of either or both of the Companies to timely consummate the Contemplated Transactions. For purposes of determining whether a Material Adverse Change has occurred based on an increase in FMBank's classified loans or other real estate owned, such determination shall be made from the date of this Agreement. The conditions resulting in the filing of the Bankruptcy Case will not be deemed to be a Material Adverse Change.

"Maturity Date" is defined in the DIP Loan Agreement attached as Exhibit A.

"MDB" means the Office of the Commissioner of Financial Regulation of the Maryland Department of Labor, Licensing and Regulation, or any successor thereto.

"Merger" is defined in the recitals to this Agreement.

"Original Merger Agreement" is defined in the Recitals of this Agreement.

8

"Other Bank Related Contracts" is defined in Section 5.05.

"Other Purchased Assets" is defined in Section 2.01.

"Owned Properties" is defined in Section 3.10.

"Outside Date" is defined in Section 8.01(a).

"Parties" is defined in the Preamble of this Agreement.

"Permitted Liens" is defined in Section 3.10.

"Person" means an individual, legal personal representative, corporation, limited liability company, partnership, firm, trust, trustee, syndicate, joint venture, unincorporated organization, Governmental Authority or other entity of whatever nature.

"Petition Date" is defined in in the Recitals to this Agreement.

"Privileged Property" is defined in Section 2.01(c).

"Properties" is defined in Section 3.10.

"Purchase Price" is defined in Section 2.02.

"Real Estate" is defined in Section 3.10.

"Recapitalization Amount" is defined in Section 2.03.

"Rev. Proc. 2006-45" is defined in Section 3.12(o).

"Sale" means the transfer and sale of the FMBank Shares and the Other Purchased Assets pursuant to this Agreement and the Sale Order.

"Sale Hearing" is defined in the Recitals.

"Sale Motion" means the *Motion Of The Debtor For (I) An Order (A) Approving Bidding And Auction Procedures With Respect To The Sale Of Certain Assets, (B) Approving Bidding Protections For The Stalking Horse Bidder, (C) Approving Procedures Related To The Assumption And Assignment Of Certain Executory Contracts And Unexpired Leases, (D) Approving The Form And Manner Of Notices Related To The Auction And Sale, And (E) Scheduling The Sale Hearing, (A) (II) An Order Approving Such Sale Free And Clear Of Liens, Claims, Encumbrances And Other Interests And (B) Granting Related Relief,* filed by FMAR with the Bankruptcy Court on February 10, 2014 [Dkt. No. 15].

"Sale Order" means an order of the Bankruptcy Court in substance in the form of Exhibit B hereto (unless otherwise agreed to by FMIB).

9

"Straddle Period" means any Tax period beginning before and ending after the Closing Date.

"Straddle Return" has the meaning set forth in Section 9.04(b).

"Subsidiary" means, when used with reference to an entity, any corporation, a majority of the outstanding voting securities of which are owned directly or indirectly by such entity or any partnership, joint venture or other enterprise in which any entity has, directly or indirectly, a majority equity interest.

"Tax" or "Taxes" means any federal, state, local, or foreign income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental (including taxes under Code §59A), customs, duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, including any interest, penalty, or addition thereto, whether disputed or not.

"Tax Return" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"Year-End Date" is defined in Section 9.10(b).

**Section 1.02. Governing Law.** This Agreement and the agreements contemplated hereby shall be construed and interpreted, and the rights of the Parties shall be determined, in accordance with the Bankruptcy Code and the substantive laws of the State of Maryland, in each case without regard to the conflict of laws principles thereof or of any other jurisdiction.

## ARTICLE II.
## ASSIGNMENTS AND TRANSFER; MERGER

**Section 2.01. Assignments and Transfer; Merger.**

(a)    Subject to the terms and conditions set forth herein, and subject to entry of the Sale Order, at Closing, (i) FMAR shall sell, assign and transfer to FMBank, free and clear of all Encumbrances, (A) all of the contracts of FMAR and the FMAR Subsidiaries (other than FMBank and the Bank Subsidiaries) that relate to the business of FMBank, all of which shall be identified by FMIB hereafter in accordance with Section 5.05 (collectively, the "Bank Related Contracts"), which FMIB has identified in accordance with Section 5.05 as either an Assumed Bank Related Contract or an Other Bank Related Contract, (B) all right, title and interest of FMAR and the FMAR Subsidiaries to any proceeds received or to be received after the Closing Date related to any Assumed Bank Related Contracts and/or Other Bank Related Contracts, including any such proceeds from any insurance claims to the extent related to FMBank or any Bank Subsidiary or the business of FMBank or any Bank Subsidiary, and (C) all of the assets set forth on *Schedule 2.01* (the assets identified in clauses (A), (B) and (C), collectively, the "Other

Purchased Assets"); and, thereafter, (ii) FMIB shall be merged with and into FMBank, with FMBank being the surviving Person; thereupon, (A) FMBank shall possess any and all purposes and powers of FMIB, (B) all property rights, privileges and powers of whatever nature and description of FMIB shall be transferred to, vested in, and devolved upon FMBank, without further act or deed, (C) all of the Liabilities of FMIB shall become the Liabilities of FMBank, (D) the FMBank Shares outstanding prior to the Merger shall have been transferred free and clear of all Encumbrances, and (E) the Investors shall have acquired all FMBank Shares in the Merger free and clear of all Encumbrances.

(b)    In connection with the Merger, which shall be effective in accordance with those certain Articles of Merger, in substantially the same form as Exhibit C (the "Articles of Merger"), (i) each of the FMBank Shares issued and outstanding immediately prior to the effective time of the Merger automatically shall be cancelled and retired and shall cease to exist, and FMAR, as sole holder thereof, shall be entitled to receive, in exchange therefor, the Purchase Price as full consideration for such FMBank Shares, and (ii) (A) each share of Common Stock of FMIB issued and outstanding immediately prior to the effective time of the Merger automatically shall be cancelled and retired and shall cease to exist, and each Investor, as a holder thereof, shall be entitled to receive, in exchange therefor, as full consideration for each such share of Common Stock, one share of Common Stock of FMBank and (B) each share of Series A Preferred Stock of FMIB issued and outstanding immediately prior to the effective time of the Merger automatically shall be cancelled and retired and shall cease to exist, and each Investor, as a holder thereof, shall be entitled to receive, in exchange therefor, as full consideration for each such share of Series A Preferred Stock, one share of Series A Preferred Stock of FMBank.

(c)    FMIB and FMBank hereby agree that pre-Merger attorney-client communications and attorney work-product documentation between FMBank and any of Kilpatrick Townsend & Stockton, LLP, Kramer, Levin, Naftalis & Frankel LLP, Gordon Feinblatt LLC, and Yumkas, Vidmar & Sweeney, LLC (collectively, "FM Counsel"), that specifically relate to this Agreement, the transactions contemplated by this Agreement, or the analysis, solicitation and/or negotiation of any other potential strategic transaction involving FMAR or FMBank ("Privileged Property"), will not remain with FMBank, as the surviving corporation in the Merger, but will pass to FMAR and become FMAR's Privileged Property upon consummation of the Merger, and FMBank, as the surviving entity in the Merger, waives any right to assert the attorney-client privilege with respect to the Privileged Property. Privileged Property inadvertently retained by FMBank as the surviving corporation in the Merger will be the Privileged Property of FMAR, and FMBank, as the surviving corporation in the Merger, agrees to immediately return such property to FMAR. FMBank, as the surviving entity in the Merger, hereby consents to FM Counsel's representation of FMAR in connection with any dispute with FMBank or FMIB with respect to this Agreement and the transactions contemplated hereby and waives any conflict of interest related thereto.

Section 2.02.  **Purchase Price; Deposit**.

(a)    The aggregate purchase price payable to FMAR for its FMBank Shares and the Other Purchased Assets shall be Seventeen Million Seven Hundred Twenty-Five Thousand Nine Hundred and Forty-Nine Dollars ($17,725,949), which includes the amount of

the FMB Holdings Receivable (the "Purchase Price"); *provided, that* the Purchase Price shall be increased by $1,000,000 if the FMIB Required Approvals contemplated by Section 6.01(a) are not obtained by FMIB by April 30, 2014 (for the avoidance of doubt, this is a one-time additional Purchase Price increase even if the Outside Date is further extended pursuant to Section 8.01(a)).

(b)    The Purchase Price (other than the FMB Holdings Receivable) shall, subject to the terms and conditions of this Agreement, be payable by wire transfer of immediately available funds (from the Equity Contribution) to an account designated in writing in advance by FMAR on the Closing Date. Notwithstanding the foregoing, FMIB shall have the right to pay a portion of the Purchase Price: (i) by offsetting and reducing the amount due to FMIB under the DIP Loan Agreement and (ii) by authorizing FMAR to apply the Deposit toward the Purchase Price. The FMB Holdings Receivable shall be payable in accordance with Exhibit D hereto; *provided, however* upon request of FMIB, the Companies will permit FMIB to provide an alternative structure from that in Exhibit D or to make revisions to Exhibit D, so long as the value received by FMAR is at least equal to $500,000 and, if payments to the Debtor or any of its Subsidiaries under such alternative structure are made over time, such payments shall end no later than 24 months after the Year-End Date. The Parties agree that they, without further consideration, will do, perform, execute, acknowledge and deliver all such further documents and instruments as may be reasonably required in order to effect such alternative structure of FMB Holdings Receivable.

(c)    No later than one (1) business day following the entry of the Sale Order, FMIB shall, by wire transfer of immediately available funds to an account designated by FMAR, send the Deposit to an account designated by FMAR, which shall be applied in accordance with Section 2.02(b); *provided, however* that the Deposit shall be indefeasibly forfeited by FMIB to FMAR upon termination of this Agreement for any reason other than termination by FMIB, in accordance with Section 8.01(b) hereof, on account of (i) a breach of this Agreement by either FMAR or FMBank or (ii) a Material Adverse Change as defined in Section 1.01 of this Agreement. If termination occurs on account of circumstances described in subsections (i) or (ii) of the foregoing sentence, FMAR shall return the Deposit by depositing it into an account specified by FMIB within two (2) Business Days of such termination. The Deposit shall be held in a separate and segregated bank account of FMAR at Branch Banking and Trust Company, a North Carolina banking corporation, and will be titled, and designated on the records of FMAR, as a special deposit account pursuant and subject to this Agreement and the Sale Order. No funds may be disbursed from such account except: (a) pursuant to a written agreement between FMAR and FMIB directing to whom to make the distribution; (b) by Order of the Bankruptcy Court directing to whom to make the distribution; or (c) to apply the Deposit to the Purchase Price at Closing.

**Section 2.03. Equity Contribution**. Concurrently with Closing, immediately prior to the effective time of the Merger, the Investors shall make an equity contribution (the "Equity Contribution") to FMIB in an amount necessary to obtain the FMIB Required Approvals, which Equity Contribution shall be no less than Eighty-Five Million Dollars ($85,000,000) and no more than One Hundred Fourteen Million Nine Hundred Forty-Three Thousand Nine Hundred Dollars ($114,943,900) in cash. The amount of the Equity Contribution, less the Purchase Price shall, as

12

a result of the Merger, be cash available to recapitalize FMBank (the "Recapitalization Amount").

Section 2.04.  **Chapter 11 Bankruptcy Case**.

Subject to the terms and conditions of this Agreement, the obligations of the Parties under this Agreement and the Contemplated Transactions are subject to and contingent upon the entry of the Sale Order.  The Parties agree to cooperate and coordinate FMAR's continuation of the Bankruptcy Case and to seek, among other things, entry of the Sale Order in substantially the same form as Exhibit B as a Final Order, or in such other form and manner as may be acceptable to FMIB:  (A) finding that notice of Sale Hearing was given in accordance with the Bankruptcy Code and Bankruptcy Rules, and constitutes such notice as is appropriate under the particular circumstances; (B) finding that FMIB is a "good faith" purchaser entitled to the protections afforded by §363(m) of the Bankruptcy Code; (C) finding that the Other Purchased Assets are assigned and transferred to FMBank free and clear of all Encumbrances, and that the Investors are acquiring all FMBank Shares free and clear of all Encumbrances pursuant to the Merger; and (D) approving the transactions proposed by this Agreement, including, without limitation, the Merger, the sale, assignment and transfer of the Other Purchased Assets, and the sale, assumption and assignment of the Assumed Bank Related Contracts pursuant to Section 365 of the Bankruptcy Code as contemplated in the Sale Motion.

# ARTICLE III.
# REPRESENTATIONS AND WARRANTIES OF THE COMPANIES

The Companies hereby, jointly and severally, make the following representations and warranties to FMIB as of the date of this Agreement; *provided, that* those representations and warranties which address matters only as of a particular date shall have been true and correct only on such date. On or prior to the date of this Agreement, the Companies have delivered to FMIB that certain document entitled Disclosure Schedules (the "Disclosure Schedules") containing the schedules referred to in this ARTICLE III.

Section 3.01.  **Organization and Qualification**.

(a)     FMAR is a Maryland corporation and bank holding company registered under the BHCA.  FMAR and each of its Subsidiaries (the "FMAR Subsidiaries") are duly organized, validly existing and in good standing under all laws of the state of their incorporation. FMAR has all requisite corporate power and authority (including, without limitation, all material licenses, franchises, permits and other governmental authorizations as are required under all applicable Legal Requirements) to own, lease and operate its properties and assets as now owned, leased or operated, and to carry on its  businesses as presently conducted.  True and complete copies of the Constituent Documents of FMAR, each as amended to date, have been made available or delivered to FMIB.

(b)     FMBank is a Maryland chartered trust company, duly organized, validly existing and in good standing under the laws of the State of Maryland.  FMBank has all requisite corporate power and authority (including, without limitation, all material licenses, franchises,

permits and other governmental authorizations as are required under all applicable Legal Requirements), to own, lease and operate its properties and assets as now owned, leased or operated, and to carry on its business as presently conducted. True and complete copies of the Constituent Documents of FMBank, as amended to date, have been delivered to FMIB. FMBank is an insured bank as defined in the FDIA and is not a member of the Federal Reserve System. The FDIC has not been appointed receiver of FMBank.

        (c)    Except as set forth on *Disclosure Schedule 3.01(c)*, (i) FMBank does not own or control any Affiliate or Subsidiary, (ii) FMBank has no equity interest, direct or indirect, in any other bank or corporation or in any partnership, joint venture or other business enterprise or entity, except as acquired through settlement of indebtedness, foreclosure, the exercise of creditors' remedies or in a fiduciary capacity, and (iii) the business carried on by FMBank has not been conducted by or through any other direct or indirect Subsidiary or Affiliate of FMBank. The Subsidiaries of FMBank (the "Bank Subsidiaries") have all requisite corporate power and authority including, without limitation, all material licenses, franchises, permits and other governmental authorizations as are required under all applicable Legal Requirements, to own, lease and operate their respective properties and assets as now owned, leased or operated, and to carry on their respective businesses as presently conducted. True and complete copies of the Constituent Documents of all Bank Subsidiaries, as amended to date, have been made available or delivered to FMIB.

        (d)    The Companies' mortgage business and operations have been conducted as a division of FMBank under the tradename "First Mariner Mortgage." First Mariner Mortgage Corporation, a Maryland corporation, does not own any of the assets of the Companies' mortgage business and operations or conduct any of the Companies' mortgage business and operations.

        **Section 3.02. Authority; Approvals.** (i) *Except as set forth on Disclosure Schedule 3.02*, the Companies have full legal right, corporate power and authority to enter into this Agreement and to carry out their respective obligations hereunder in accordance with the Sale Order; (ii) FMAR has full legal right, corporate power and authority to enter into the DIP Loan Agreement and to carry out its obligations thereunder; and (iii) the execution and delivery of this Agreement, the DIP Loan Agreement and all documents, instruments and agreements required to be executed and delivered by the Companies pursuant to this Agreement and the DIP Loan Agreement, and the consummation of the Contemplated Transactions, have been duly and validly authorized by all necessary corporate action on the part of the Companies. This Agreement, the DIP Loan Agreement and all documents, instruments and agreements required to be executed and delivered by the Companies pursuant to this Agreement and the DIP Loan Agreement have been duly executed and delivered by the Companies and (assuming due authorization, execution and delivery by FMIB), constitute legal, valid and binding obligations of the Companies, enforceable against the Companies in accordance with their respective terms, subject to the Bankruptcy Exception. No other corporate proceedings, including any shareholder approvals, are necessary for the execution and delivery by the Companies of this Agreement or by FMAR of the DIP Loan Agreement, the performance by them of their respective obligations hereunder or thereunder, or the consummation by them of the Contemplated Transactions.

**Section 3.03.  No Conflict With Other Instruments.**  None of the execution and delivery of this Agreement or the DIP Loan Agreement or the consummation of the Contemplated Transactions (in accordance with the Sale Order), or compliance by the Companies with any of the provisions hereof or thereof, will (i) materially violate, materially conflict with, or result in a material breach of any provision of, or constitute a material default (or an event which, with notice or lapse of time or both, would constitute a material default) under, or result in the termination of, or result in the loss of any benefit or creation of any material right on the part of any third party under, or accelerate the performance required by, or result in a right of termination or acceleration of, or result in the creation of any material Encumbrance upon any of the material properties or assets of FMAR, FMBank or any other FMAR Subsidiary or any Bank Subsidiary under any of the terms, conditions or provisions of (A) the Constituent Documents of FMAR, FMBank or any other FMAR Subsidiary or any Bank Subsidiary, or (B) except as set forth on *Disclosure Schedule 3.03*, any material note, bond, mortgage, indenture, franchise, license, permit, agreement or other instrument or obligation to which FMAR, FMBank or any other FMAR Subsidiary or any Bank Subsidiary is a party or by which such Person may be bound, or to which FMAR, FMBank or any other FMAR Subsidiary or Bank Subsidiary or any of the properties or assets of FMAR, FMBank or any other FMAR Subsidiary or any Bank Subsidiary may be subject, or (ii) assuming the Company Required Approvals and the FMIB Required Approvals are duly obtained, violate in any material respect any Legal Requirement or any judgment, ruling, order, writ, injunction or decree applicable to FMAR, FMBank or any other FMAR Subsidiary or Bank Subsidiary or any of their respective properties or assets.

**Section 3.04.  Capitalization; Title to Other Purchased Assets.**

(a)    The authorized shares of FMBank consists of 152,300 shares of common stock, par value $10.00 per share, of which 152,300 shares are issued and outstanding.  All of such FMBank Shares have been duly authorized, validly issued, and are fully paid and nonassessable, and have not been issued in violation of any preemptive or other rights of any Person. All securities of FMBank have been issued in compliance with the securities laws of the United States and the State of Maryland.  Except as contemplated herein and as set forth on *Disclosure Schedule 3.04(a)*, FMAR is, and as of the Closing Date (immediately prior to the effective time of the Merger) will be, the lawful record and beneficial owner of all of the FMBank Shares, free and clear of all Encumbrances (other than transfer restrictions imposed by applicable federal and state securities laws).

(b)    Except as set forth on *Disclosure Schedule 3.04(b)*, there are no: (i) outstanding preemptive rights, subscriptions, options, calls, units, warrants or other rights of any kind or nature to acquire or which relate to any securities of FMBank or any Bank Subsidiary; (ii) outstanding securities, instruments or obligations that are or may become convertible into or exchangeable or exercisable for any securities of FMBank or any Bank Subsidiary; (iii) Contracts under which FMAR or any FMAR Subsidiary, or FMBank or any Bank Subsidiary, are or may become obligated to sell, issue or otherwise dispose of or redeem, purchase or otherwise acquire any securities of FMBank or any Bank Subsidiary; (iv) shareholder agreements, voting trusts or other agreements, arrangements or understandings to which FMAR or any FMAR Subsidiary, or FMBank or any Bank Subsidiary, is a party or of which the

15

Companies are aware, that may affect the exercise of voting or any other rights with respect to the capital stock of FMBank or any Bank Subsidiary; or (v) outstanding bonds, debentures, notes or other indebtedness having the right to vote on any matters on which the shareholders of FMBank or any Bank Subsidiary may vote.

(c)    All of the outstanding shares (or other equity interests as applicable) of each Bank Subsidiary are directly and beneficially owned and held by FMBank or any Bank Subsidiary and have been duly authorized and validly issued, are fully paid and nonassessable, have been issued in full compliance with all federal and state securities laws and other Legal Requirements, were not issued in violation of or subject to any preemptive rights or other rights to subscribe for or purchase securities, and are free and clear of all Encumbrances.

(d)    Neither FMAR nor any FMAR Subsidiaries (other than FMBank and the Bank Subsidiaries) (i) owns or has any right to use any asset or property (whether real, personal, tangible, intangible or otherwise) used in or held for use in, or related to, the business of FMBank or the Bank Subsidiaries or (ii) other than Bank Related Contracts, is a party to any Contract relating to the business of FMBank or Bank Subsidiaries.

(e)    At the Closing, FMAR will transfer and deliver good and marketable title to the Other Purchased Assets to FMBank, in each case, free and clear of any Encumbrances (other than Encumbrances created in favor of FMIB as collateral for the DIP Loan, which Encumbrance is intended to be terminated and released as of the consummation of transfer of the Other Purchased Assets to FMBank pursuant to this Agreement).

Section 3.05.  **Compliance with Laws, Permits and Instruments**.  Except as set forth on *Disclosure Schedule 3.05*, at all times since January 1, 2013, FMBank and each Bank Subsidiary have in all material respects performed and abided by all material obligations required to be performed by it, and has complied with, and is in compliance with in all material respects, and is not in default (and with the giving of notice or the passage of time will not be in default) under, or in violation of (i) any provision of FMBank's or any Bank Subsidiary's Constituent Documents, (ii) any material provision of any mortgage, indenture, lease, contract, agreement or other instrument applicable to FMBank or its assets, operations, properties or businesses or the assets, operations, properties or businesses of any Bank Subsidiary, (iii) any material Legal Requirement or any material judgment, writ, injunction, order, decree, award, applicable to FMBank or its assets, operations, properties or businesses or the assets, operations, properties or businesses of any Bank Subsidiary (including, without limitation, that certain Order to Cease and Desist issued by the FDIC to FMBank on September 18, 2009).

Section 3.06.  **Financial Statements**.  FMAR has furnished or made available to FMIB true and complete copies of the Reports of Condition and Income of FMBank for the periods ending December 31, 2012, December 31, 2011 and September 30, 2013 (the "Call Reports"). The Call Reports (i) fairly present, in all material respects, the financial position of FMBank and the Bank Subsidiaries as of the respective dates and the results of their respective operations for the periods indicated in that Call Report in conformity with the instructions to the Call Report, and (ii) do not contain any items of special or nonrecurring income or any other income not earned in the ordinary course of business except as expressly specified therein.  The allowance

for loan losses shown on the Call Reports was, and the allowance for loan losses to be shown on any Call Reports of FMBank and the Bank Subsidiaries as of any date subsequent to the execution of this Agreement will be, calculated in accordance with GAAP in all material respects as applied to banking institutions and all applicable rules and regulations, and in the reasonable opinion of management, are, and will be, adequate in all respects to provide for all possible losses, net of recoveries relating to loans previously charged off, on loans outstanding (including accrued interest receivable) of FMBank and Bank Subsidiaries and other extensions of credit (including letters of credit or commitments to make loans or extend credit); *provided, however,* that no representation or warranty is made as to the sufficiency of collateral securing or the collectability of such loans.

**Section 3.07.  Undisclosed Liabilities.**  FMBank and the Bank Subsidiaries have no Liability that is not reflected in or disclosed in the appropriate Call Reports, except (a) Liabilities incurred in the ordinary course of business and consistent with prudent business practices since the date of the applicable Call Reports, (b) Liabilities that, individually or in the aggregate, are not material, (c) Liabilities arising from the Contemplated Transactions, and (d) Liabilities set forth on *Disclosure Schedule 3.07*.

**Section 3.08.  Litigation.**  Except as set forth on *Disclosure Schedule 3.08*, and except for the Bankruptcy Case and matters therein, there are no actions, claims, suits, investigations or other legal or administrative proceedings of any kind or nature at law or in equity, or by or before any federal, state or municipal court or other Governmental Authority pending or, to the Knowledge of the Companies, threatened, against FMBank or any Bank Subsidiary or against any of their directors or "executive officers," as such term is defined under 12 C.F.R. Section §215.2(e)(1) of Regulation O promulgated by the Board of Governors of the Federal Reserve System (an "Executive Officer"), or any Person serving in any such capacity at any time on or after January 1, 2009 (each, a "Former Related Person"), relating to the performance of their duties in such capacities, that in any manner involve FMBank or any of its properties or capital stock or any of the properties or capital stock of any Bank Subsidiary. Except as set forth on *Disclosure Schedule 3.08*, to the Knowledge of the Companies, no legal action, suit or proceeding or judicial, administrative or governmental investigation is pending or, to the Knowledge of the Companies, threatened against FMAR, FMBank or any FMAR Subsidiary or any Bank Subsidiary that would reasonably be expected to have a material adverse effect on the validity of this Agreement or the agreements contemplated hereby, or any actions taken or to be taken by FMAR, FMBank or any FMAR Subsidiary or any Bank Subsidiary pursuant hereto or thereto, or seeks to enjoin or otherwise restrain the transactions contemplated hereby or thereby.

**Section 3.09.  Consents and Approvals.**  Except as set forth on *Disclosure Schedule 3.09* (the "Company Required Approvals"), no consent or approval of, notice to or filing with any Governmental Authority having jurisdiction over any aspect of the business or assets of the Companies or their Affiliates and no consent or approval of or notice to any other Person, is required in connection with Companies' execution, delivery or performance of this Agreement or the agreements contemplated hereby or the completion by the Companies of the transactions contemplated hereby or thereby.

**Section 3.10.   Title to FMBank Assets**.  Except as set forth in *Disclosure Schedule 3.10*, FMBank and/or one or more of the Bank Subsidiaries: (a) has good, valid and marketable title to all the properties and assets reflected in the September 30, 2013, Call Report or acquired after the date thereof (except properties sold or otherwise disposed of since the date thereof in the ordinary course of business) (the "Owned Properties"), free and clear from any Encumbrances other than Encumbrances that, (i) (A) would not, and would not reasonably be expected to, individually or in the aggregate, affect the value thereof or interfere with the use made or to be made thereof by FMBank or any Bank Subsidiaries in any material respect or otherwise be material, (B) do not secure indebtedness for borrowed money and (C) arose only in the ordinary course of business, and (ii) in the case of Owned Properties consisting of Real Estate, (A) statutory liens for amounts not yet delinquent, and (B) those liens related to real property taxes, local improvement district assessments, easements, covenants, restrictions and other matters of record which do not individually or in the aggregate materially adversely affect the use and enjoyment of the relevant real property ("Permitted Liens"); (b) is the lessee of all leasehold estates reflected in the September 30, 2013, Call Report or acquired after the date thereof (except for leases that have expired by their terms since the date thereof) (the "Leased Properties" and, collectively with the Owned Properties, the "Properties"; and any Property consisting of real estate or buildings or improvements thereon ("Real Estate")), free and clear from Encumbrances other than Encumbrances that, (i) (A) would not, and would not reasonably be expected to, individually or in the aggregate, affect the value thereof or interfere with the use made or to be made thereof by FMBank or any Bank Subsidiary in any material respect or otherwise be material, (B) do not secure indebtedness for borrowed money and (C) arose only in the ordinary course of business, and (ii) in the case of Leased Properties consisting of Real Estate, Permitted Liens, and each such lease is valid without default thereunder by the lessee or, to the Knowledge of the Companies, the lessor; and (c) owns or leases all properties and assets as are used by FMBank or any Bank Subsidiary in their business.  The Real Estate is in material compliance with all applicable private agreements, zoning requirements and other Legal Requirements relating thereto, and there are no condemnation proceedings pending or, to the Knowledge of the Companies, threatened with respect to any such properties.  True and complete copies of all deeds and leases for, or other documentation evidencing ownership of or a leasehold interest in, the properties referred to in *Disclosure Schedule 3.10*, title insurance policies for the real property owned referred to in *Disclosure Schedule 3.10* (to the extent available) and all mortgages, deeds of trust and security agreements to which such property is subject have been made available to FMIB.  Except as set forth on *Disclosure Schedule 3.10*, all tangible assets used by FMBank and/or Bank Subsidiaries are in good operating condition, ordinary wear and tear excepted, and materially conform with all applicable Legal Requirements.  None of FMBank's or any Bank Subsidiary's premises or equipment is in need of maintenance or repairs other than ordinary routine maintenance and repairs.

**Section 3.11.   Absence of Certain Changes or Events**.  Except as disclosed in the Call Reports or as disclosed on *Disclosure Schedule 3.11*, since January 1, 2013, (a) FMBank and the Bank Subsidiaries have conducted their business only in the ordinary course consistent with past practice (except as otherwise required by this Agreement and the incurrence of expenses related to this Agreement and the Contemplated Transactions) and (b) no event has occurred or circumstance arisen, that individually or in the aggregate, has had or could reasonably be expected to result in a Material Adverse Change to FMBank or any Bank Subsidiary.

**Section 3.12.  Taxes**.

(a)     Each FM Group Member has duly and timely filed all material Tax Returns that it was required to file under applicable Legal Requirements with the appropriate Federal, state, local or foreign governmental agencies. All such Tax Returns were correct and complete in all material respects and have been prepared in substantial compliance with all applicable Legal Requirements. All Taxes due and owing by each FM Group Member (whether or not shown on any Tax Return) have been paid.  Since January 1, 2011, no claim has been made by any Governmental Authority in a jurisdiction where the FM Group Members do not file Tax Returns that any FM Group Member may be subject to taxation by that jurisdiction. There are no Liens for Taxes (other than material Taxes not yet due and payable) upon any of the assets or properties of any of the FM Group Members.

(b)     Each FM Group Member has withheld and paid all Taxes required to have been withheld and paid in connection with any amounts paid or owing to any employee, independent contractor, creditor, shareholder, or other third party, and all Forms W-2 and 1099 required with respect thereto have been properly completed and timely filed.

(c)     There is no dispute or claim concerning any Tax Liability of any FM Group Member either (i) claimed or raised by any Governmental Authority in writing or (ii) as to which any officer responsible for Tax matters of the Companies has Knowledge. Within the past three (3) years, the Internal Revenue Service (the "IRS") has not challenged the interest deduction on any FM Group Member's debt on the basis that such debt constitutes equity for federal income Tax purposes.

(d)     *Disclosure Schedule 3.12(d)*: (i) lists all Tax Returns filed with respect to the FM Group and each FM Group Member for taxable periods ended on or after December 31, 2010; (ii) indicates Tax Returns that have been audited; and (iii) indicates Tax Returns that currently are the subject of audit. True and complete copies of the Federal income Tax Returns of the FM Group, as filed with the IRS for the years ended December 31, 2010, 2011 and 2012, have been delivered or made available to FMIB. No FM Group Member has waived any statute of limitations in respect of Taxes or agreed to any extension of time with respect to a Tax assessment or deficiency.

(e)     No FM Group Member has been a United States real property holding corporation within the meaning of the Section 897(c)(2) of the Code, during the applicable period specified in Code Section 897(c)(1)(A)(ii).

(f)     Each FM Group Member has at all times of its existence been a member of the FM Group.  The FM Group has consistently filed a consolidated federal income Tax Return the common parent of which was and is FMAR. No FM Group Member has been a member of any other group filing a consolidated Tax Return and none have any Liability for the Taxes of any Person other than the Companies under Treasury Regulation § 1.1502-6 (or any similar Legal Requirement), as a transferee or successor, by contract or otherwise. Except as set forth on *Disclosure Schedule 3.12(f)*, no FM Group Member is a party to or bound by any Tax allocation or sharing agreement.

19

(g)    The unpaid taxes of the FM Group (i) did not exceed the provisions for current or deferred Taxes on the FM Group's consolidated balance sheet dated as of December 31, 2013 (excluding any reserve for deferred Taxes established to reflect timing differences between book and Tax income), and (ii) will not exceed such provisions for current or deferred Taxes as adjusted for the passage of time through the of the Closing Date (excluding any reserve for deferred Taxes established to reflect timing differences between book and Tax income). The FM Group, and each FM Group Member, is in compliance with the requirements of FIN 48, and their Tax accrual work papers explain and support all amounts provided and positions taken by them with respect to FIN 48.

(h)    No FM Group Member is required to include any item of income in, or exclude any item of deduction from, taxable income for any taxable period (or portion thereof) ending after the Closing Date as a result of any: (i) change in method of accounting for a taxable period ending on or before the Closing Date; (ii) "closing agreement" as described in Code §7121 (or any corresponding or similar provision of state, local, or foreign Tax law) executed on or before the Closing Date; (iii) intercompany transactions or any excess loss account described in Treasury Regulations under Code §1502 (or any corresponding or similar provision of state, local, or foreign Tax law); (iv) installment sale or open transaction disposition made on or before the Closing Date; (v) prepaid amount received on or before the Closing Date; or (vi) election under Code §108(i).

(i)    No FM Group Member has been a party to any "reportable transaction" or "listed transaction" as such terms are defined in Code §6707A(c) and Treasury Regulation §1.6011-4(b)(2) through (6).

(j)    No FM Group Member has distributed stock of another Person or has had its stock distributed by another Person, in a transaction that was purported or intended to be governed in whole or in part by Code §355 or §361.

(k)    No FM Group Member has ever made a valid election to be taxed for federal income Tax purposes as an S corporation or a qualified S corporation subsidiary (within the meaning of Code §§1361, 1362 and 1361(b)(3)).

(l)    The FM Group has disclosed on its federal income Tax Returns all positions taken therein that could give rise to a substantial understatement of federal income Tax within the meaning of Code § 6662.

(m)    *Disclosure Schedule 3.12(m)* lists and contains an accurate and complete description as to the United States Federal net operating loss carryforwards ("NOLs") and capital loss carryforwards of the FM Group and FMBank (including, without limitation, any limitations of such net operating or capital loss carry forwards under Code Sections 382, 383 or 384 or the Treasury Regulations) as of December 31, 2013, and the expiration dates thereof. No FM Group Member has undergone an "ownership change" (as such term is defined in Code Section 382(g)) with respect to any NOLs.

(n)    *Disclosure Schedule 3.12(n)* contains a materially accurate and complete list of FMBank's adjusted Tax basis in each of its assets as of December 31, 2013.

(o)    Each entity that will be an FM Group Member on the Year-End Date will meet the requirements under Revenue Procedure 2006-45, 2006-2 C.B. 851 ("Rev. Proc. 2006-45"), to obtain automatic approval from the Commissioner of Internal Revenue to change the accounting period of the FM Group under Code Section 442 and Treasury Regulation Section 1.442-1(b).

**Section 3.13.  Insurance**. *Disclosure Schedule 3.13* sets forth an accurate and complete list of all policies of insurance, including fidelity and bond insurance, relating to FMBank and the Bank Subsidiaries. All such policies, with regard to FMBank and the Bank Subsidiaries, (a) are valid, outstanding and enforceable according to their terms, subject to the Bankruptcy Exception, and (b) are in full force and effect and will remain in effect to the end of their policy periods, and (c) to the extent this Agreement is executed after the end of their policy periods, will be renewed, subject to normal renewal policies and procedures, including the payment of premiums.  With respect to the Bank D&O Policies, all such policies are valid, outstanding, and enforceable in accordance with their respective terms, notwithstanding the Bankruptcy Exception, provided the bankruptcy of any named insured is one in which the party filing the same is a debtor-in-possession and no bankruptcy trustee is appointed. No notice has been received of the cancellation, or to the Knowledge of the Companies, threatened or proposed cancellation, of any such policy and there are no unpaid premiums due thereon. Neither FMAR, FMBank nor any Bank Subsidiary is in material default with respect to any such policy, and neither FMAR, FMBank nor any Bank Subsidiary has failed to give any notice or present any material claim thereunder in a due and timely fashion. Except as set forth on *Disclosure Schedule 3.13*, FMBank and each Bank Subsidiary has not been refused any insurance with respect to its assets or operations, nor has its insurance been limited by any insurance carrier to which FMBank and each Bank Subsidiary has applied for any such insurance within the last two (2) years. Each property of FMBank and each Bank Subsidiary is insured in amounts deemed adequate by FMBank's management against risks customarily insured against. There have been no claims under any fidelity bonds of FMBank and/or any Bank Subsidiary within the last three (3) years, and the Companies have no Knowledge of any facts that would form the basis of a claim under such bonds. Except as set forth on *Disclosure Schedule 3.13*, FMBank and each Bank Subsidiary shall, immediately after the Closing until the end of the policy periods, or beyond as specified in Section 5.11 herein, continue to have coverage under such policies and bonds with respect to events occurring prior to the Closing.

**Section 3.14.  Proprietary Rights**.  *Disclosure Schedule 3.14* lists all copyrights, trademarks, service marks, trade names, trade dress, logos, internet domain names, patents, other proprietary rights, interests, and protections, all other intellectual property, and all rights therein, in each case, registered or unregistered, and any and all applications with respect thereto (collectively, "Intellectual Property"), owned or used by FMBank and/or the Bank Subsidiaries (collectively, "FMBank Intellectual Property").  Except as set forth on *Disclosure Schedule 3.14*, FMBank and/or the Bank Subsidiaries owns, possesses, and has good, valid and marketable title to, and the unrestricted right to use, all FMBank Intellectual Property, free and clear of Encumbrances, and such FMBank Intellectual Property constitutes all Intellectual Property necessary to conduct the respective businesses of FMBank and the Bank Subsidiaries. To the Knowledge of the Companies, neither FMBank nor any Bank Subsidiary is infringing on or otherwise acting adversely to the Intellectual Property or other rights of any Person. There is no

21

claim pending or, to the Knowledge of the Companies, threatened, against FMBank or any Bank Subsidiary with respect to any Intellectual Property or other such rights.

**Section 3.15.  Transactions with Certain Persons and Entities**. Except as disclosed in *Disclosure Schedule 3.15* and excluding deposit liabilities, there are no outstanding amounts payable to or receivable from, or advances by FMBank or any Bank Subsidiary to, and FMBank and the Bank Subsidiaries are not otherwise creditors of, any director, Executive Officer, Former Related Person, or other Affiliate of FMAR or FMBank,  nor is FMBank or any Bank Subsidiary a debtor to any such Person, other than as part of the normal and customary terms of such Person's employment or service as a director for FMAR and/or FMBank. Except as set forth on *Disclosure Schedule 3.15*, to the Knowledge of the Companies, neither FMBank nor any Bank Subsidiary uses any asset owned by any shareholder owning five percent (5%) or more of the issued and outstanding common stock of FMAR, or any director, officer, Former Related Person, or other Affiliate of FMAR or FMBank, in the operations (other than personal belongings of such officers and directors located in FMBank's premises, the removal of which would not result in a Material Adverse Change). Except as disclosed in *Disclosure Schedule 3.15*, neither FMBank nor any Bank Subsidiary is a party to any material transaction, contract or agreement with any director, Executive Officer, Former Related Person, or other Affiliate of FMAR or FMBank, other than credit and consumer banking transactions in the ordinary course of business.

**Section 3.16.  Evidences of Indebtedness**.

(a)     All evidences of indebtedness and leases that are reflected as assets of FMBank are the legal, valid and binding obligations of the respective obligors thereof, enforceable in accordance with their respective terms, subject to the Bankruptcy Exception. No claim or defense has been asserted, and to the Companies' Knowledge, there are no acts or omissions that would give rise to any claim or right of rescission, set off, counterclaim or defense that may be asserted against FMBank. The credit files of FMBank contain all material information known to FMAR or FMBank that is reasonably required to evaluate in accordance with generally prevailing practices in the banking industry the collectability of the loan portfolio of FMBank (including loans that will be outstanding if any of them advances funds they are obligated to advance).

(b)     To the Knowledge of the Companies, there are no, nor have the Companies received notice of, any past or present conditions, events, activities, practices or incidents that may result in a material violation of any Environmental Law with respect to any real property securing any indebtedness reflected as an asset of FMBank.

(c)     With respect to any loan or other evidence of indebtedness, all or a portion of which has been sold to or guaranteed by any Governmental Authority, including the Small Business Administration, each of such loans was made in compliance and conformity with all applicable Legal Requirements such that such Governmental Authority's guaranty of such loan is effective during the term of such loan in all material respects.

(d)      No representation or warranty is being made in this <u>Section 3.16</u> or in this Agreement as to the sufficiency of collateral securing or collectability of the loans reflected as an asset of FMBank.

**Section 3.17.   <u>Certain Loans and Related Matters</u>.**

(a)      Except as set forth on *Disclosure Schedule 3.17(a)*, as of the date of this Agreement (with respect to the matters set forth in clauses (iii), (iv) and (v) of this <u>Section 3.17(a)</u> below) and as of December 31, 2013 (with respect to the matters set forth in clauses (i) and (ii) of this <u>Section 3.17(a)</u> below), FMBank is not a party to any written or oral (i) loan agreement, note or borrowing arrangement, under the terms of which the obligor is sixty (60) days or more delinquent in payment of principal or interest or in default of any other material provisions as of the date of this Agreement or on non-accrual status; (ii) loan agreement, note or borrowing arrangement which has been classified or, in the exercise of reasonable diligence by FMBank or any regulatory agency with supervisory jurisdiction over FMBank, should have been classified as "substandard", "doubtful", "loss", "other loans especially mentioned", or any comparable classifications by such Persons; (iii) loan agreement, note or borrowing arrangement including any loan guaranty, with any director, Executive Officer or Former Related Person of FMBank, or any ten percent (10%) or more shareholder of FMAR, or any Person controlling, controlled by, or under common control with any of the foregoing Persons; (iv) loan agreement, note or borrowing arrangement in violation of any Legal Requirement applicable to FMBank, which violation could result in a Material Adverse Change with respect to FMBank; or (v) loan agreement, note or borrowing arrangement which, at the time it was entered into, constituted a violation of FMBank's legal lending limit and which remains on FMBank's books.

*(b)*      *Disclosure Schedule 3.17(b)* contains the "watch list of loans" of FMBank as of September 30, 2013, and the Companies shall update such schedule prior to the Closing such that it contains the "watch list of loans" of FMBank as of the date no earlier than thirty (30) days prior to the Closing Date. Except as set forth in *Disclosure Schedule 3.17(b)*, to the Knowledge of the Companies, there is no loan agreement, note or borrowing arrangement which should be included on a watch list in accordance with FMBank's ordinary course of business and with prudent banking principles, which is not included on such list.

**Section 3.18.   <u>Environmental Compliance</u>.**

(a)      To the Knowledge of the Companies, FMBank and each of the Bank Subsidiaries, their operations and their respective Properties are in material compliance with all Environmental Laws. The Companies do not have Knowledge of, and neither FMAR nor FMBank have received, notice of, any past, present, or future conditions, events, activities, practices or incidents that may interfere with or prevent the material compliance of FMBank or Bank Subsidiaries with all Environmental Laws.

(b)      FMBank and each of the Bank Subsidiaries has obtained all material permits, licenses and authorizations that are required by it under all Environmental Laws.

23

(c)    To the Knowledge of the Companies, no Hazardous Materials exist on, about or within any of the Properties, nor to the Knowledge of FMAR and FMBank have any Hazardous Materials previously existed on, about or within or been used, generated, stored, transported, disposed of, on or released from any of the Properties, except as set forth on *Disclosure Schedule 3.18(c)*. The use that FMBank or the Bank Subsidiaries make and intend to make of the Properties will not result in the use, generation, storage, transportation, accumulation, disposal or release of any Hazardous Material on, in or from any of the Properties.

(d)    There is no action, suit, proceeding, investigation, or inquiry before any Governmental Authority pending or to Companies' Knowledge threatened against FMBank or the Bank Subsidiaries relating in any way to any Environmental Law. To the Knowledge of the Companies, neither FMBank nor any Bank Subsidiary has any Liability for remedial action under any Environmental Law. Neither FMBank nor any Bank Subsidiary has received any request for information by any Governmental Authority with respect to the environmental condition of any of the Properties, nor has FMBank or any Bank Subsidiary received any notice of any kind from any Governmental Authority or other Person with respect to any violation of or claimed or potential Liability of any kind under any Environmental Law.

**Section 3.19.  Regulatory Compliance**. All reports, records, registrations, statements, notices and other documents or information required to be filed by FMBank with any federal or state regulatory authority, including, without limitation, the MDB and the FDIC, have been duly and timely filed and all information and data contained in such reports, records or other documents as of their respective dates (or, if amended prior to the date hereof, as of the date of such amendment) were true, accurate, correct and complete in all material respects. Except as set forth on *Disclosure Schedule 3.19*, (a) neither FMAR nor FMBank is, and has not within the last five (5) years been, subject to any commitment letter, memorandum of understanding, cease and desist order, written agreement or other formal or informal administrative action with any federal or state regulatory bodies, and FMAR and FMBank are in full compliance with the requirements of any such commitment letter, memorandum of understanding, cease and desist order, written agreement or other formal or informal administrative action, and (b) there are no actions or proceedings pending or, to the Knowledge of the Companies, threatened against FMBank by or before any such regulatory bodies or any other Governmental Authority. Without limiting the foregoing, FMBank is in material compliance with, and since January 1, 2011 has complied in all material respects with, Sections 23A and 23B of the Federal Reserve Act, its implementing regulations, and the Federal Reserve's Regulation O.

**Section 3.20.  Deposits**. No deposit of FMBank is a "brokered" deposit (as such term is defined in 12 C.F.R. § 337.6(a)(2)) or, to the Knowledge of the Companies, is subject to any Encumbrance, legal restraint or other legal process (other than garnishments, pledges, set off rights, escrow limitations and similar actions taken in the ordinary course of business).

**Section 3.21.  Interest Rate Risk Management Instruments**. To the Knowledge of the Companies, all interest rate swaps, caps, floors and option agreements and other interest rate risk management arrangements, whether entered into for the account of FMBank or for the account of a customer of FMBank, were entered into in the ordinary course of business and (a) are consistent with prudent banking practice, (b) are in accordance with applicable Legal Requirements, and (c) with counterparties believed to be financially responsible at the time; and

24

each of them constitutes the legal, valid and binding obligation of FMBank, enforceable according to their terms, subject to the Bankruptcy Exception. FMBank has duly performed in all material respects all of its material obligations thereunder to the extent that such obligations to perform have accrued; and, to the Companies' Knowledge, there are no material breaches, violations or defaults or allegations or assertions of such by any party thereunder.

**Section 3.22.    Community Reinvestment Act.** FMBank is in compliance in all material respects with the Community Reinvestment Act (12 U.S.C. §2901 et seq.) (the "CRA") and all regulations issued thereunder, and FMBank has made available to FMIB copies of FMBank's current CRA statement, all support papers therefor, all letters and written comments received by FMBank since January 1, 2010, pertaining thereto and any responses by FMBank to those letters and comments. FMBank has a rating of not less than "satisfactory" as of its most recent CRA compliance examination, and the Companies have no Knowledge of any reason why FMBank would not receive a rating of "satisfactory" or better in its next CRA compliance examination or why the FDIC or any other governmental entity may seek to restrain, delay or prohibit the Contemplated Transactions as a result of any act or omission of FMBank under the CRA.

**Section 3.23.    Fair Housing Act, Home Mortgage Disclosure Act and Equal Credit Opportunity Act.** Except as set forth in *Disclosure Schedule 3.23*, FMBank is in material compliance with the Fair Housing Act (42 U.S.C. §3601 et seq.), the Home Mortgage Disclosure Act (12 U.S.C. §2801 et seq.) and the Equal Credit Opportunity Act (15 U.S.C. §1691 et seq.) and all regulations issued thereunder. FMBank has not received any notice of any violation of those acts or any of the regulations issued thereunder, and FMBank has not received any notice of, nor do the Companies have Knowledge of, any threatened administrative inquiry, proceeding or investigation with respect to FMBank's non-compliance with such acts.

**Section 3.24.    Consumer Compliance Laws.** Except as set forth in *Disclosure Schedule 3.24*, all loans of FMBank have been made in material compliance with all applicable statutes and regulatory requirements at the time of such loan or any renewal thereof, including, without limitation, Regulation Z (12 C.F.R. §226 et seq.), the Federal Consumer Credit Protection Act (15 U.S.C. §1601 et seq.), and all statutes governing the operation of Maryland trust companies.

**Section 3.25.    Bank Secrecy Act, Foreign Corrupt Practices Act and U.S.A. Patriot Act.** FMBank is in material compliance with the Bank Secrecy Act (12 U.S.C. §§1730(d) and 1829(b)), the United States Foreign Corrupt Practices Act and the International Money Laundering Abatement and Anti-Terrorist Financing Act, otherwise known as the U.S.A. Patriot Act, and all regulations issued thereunder, and FMBank has properly certified all foreign deposit accounts on all of its deposit accounts; furthermore, FMBank has timely and properly filed and maintained all requisite Currency Transaction Reports and other related forms, including any requisite Custom Reports required by any agency of the United States Treasury Department, including the IRS. To the Companies' Knowledge, FMBank has timely filed all Suspicious Activity Reports with the Financial Crimes Enforcement Network, a bureau of the U.S. Department of the Treasury, required to be filed by it under the laws and regulations referenced in this Section.

**Section 3.26.  Loans Secured by FMAR Capital Stock**. Except as set forth on *Disclosure Schedule 3.26*, no borrower of FMBank was required to purchase capital stock of FMAR in order to obtain a loan or other form of credit from FMBank.

**Section 3.27.  Absence of Certain Business Practices**. To the Knowledge of the Companies, neither FMBank or any Bank Subsidiary, nor any director, officer, employee, Former Related Person, or agent of FMBank or any Bank Subsidiary, or any other Person acting on their behalf, has, directly or indirectly, within the past six (6) years, given or agreed to give any gift or similar benefit to any customer, supplier, governmental employee or other Person who is or may be in a position to help or hinder the business of FMBank or any Bank Subsidiary (or assist FMBank or any Bank Subsidiary in connection with any actual or proposed transaction) that (a) might be reasonably likely to subject FMBank or any Bank Subsidiary to any damage or penalty in any civil, criminal or governmental litigation or proceeding, (b) if not given in the past, might reasonably have resulted in a Material Adverse Change or (c) if not continued in the future might reasonably result in a Material Adverse Change or might reasonably subject FMBank or any Bank Subsidiary to suit or penalty in any civil, criminal or governmental litigation or proceeding.

**Section 3.28.  Books and Records**. The minute books, stock certificate books and stock transfer ledgers of FMBank and each Bank Subsidiary (a) have been kept accurately in the ordinary course of business, (b) are complete and correct in all material respects, and (c) the transactions entered therein represent bona fide transactions. Neither FMBank nor any Bank Subsidiary has sold or disposed of, or otherwise divested itself of the ownership, possession, custody or control, of any corporate books or records of any nature that, in accordance with sound business practice, normally are retained for a period of time after their use, creation or receipt, except at the end of the normal retention period.

**Section 3.29.  Internal Controls**. FMBank and each Bank Subsidiary maintains accurate books and records reflecting its assets and liabilities and maintains proper and adequate internal accounting controls that provide assurance that (a) transactions are executed with the authorization of management and/or FMBank's (or Bank Subsidiary's) Board of Directors; (b) transactions are recorded as necessary to permit preparation of the consolidated financial statements of FMBank and to maintain accountability for FMBank's (or Bank Subsidiary's) assets; (c) access to FMBank's (or Bank Subsidiary's) assets is permitted only in accordance with the authorization of management and/or FMBank's (or Bank Subsidiary's) Board of Directors; (d) the reporting of FMBank's (and each Bank Subsidiary's) assets is compared with existing assets at regular intervals; and (e) extensions of credit and other receivables are recorded accurately, and proper and adequate procedures are implemented to effect the collection thereof on a current and timely basis.

**Section 3.30.  Fiduciary Responsibilities**. To the Companies' Knowledge, FMBank and each Bank Subsidiary has performed in all material respects all of its duties as a trustee, custodian, guardian or as an escrow agent in a manner that complies in all material respects with all applicable Legal Requirements.

**Section 3.31.** **Guaranties**. Except as set forth on *Disclosure Schedule 3.31*, none of the Liabilities of FMBank or any Bank Subsidiary are guaranteed by any other Person, and neither FMBank nor any Bank Subsidiary has guaranteed the Liabilities of any other Person.

**Section 3.32.** **Employee Relationships**. Except as set forth on *Disclosure Schedule 3.32*, neither FMBank nor any Bank Subsidiary is a party to any collective bargaining agreement or to any conciliation agreement with the United States Department of Labor, the United States Equal Employment Opportunity Commission, or any federal, state or local agency that requires equal employment opportunities or affirmative action in employment beyond the generally applicable Legal Requirements. There are no unfair labor practice complaints pending against FMBank or any Bank Subsidiary before the National Labor Relations Board and no similar claims pending before any similar state or local or foreign agency. To the Knowledge of the Companies, there is no activity or proceeding of any labor organization (or representative thereof) or employee group to organize any employees of FMBank or any Bank Subsidiary, nor of any strikes, slowdowns, work stoppages, lockouts or threats thereof, by or with respect to any such employees. FMBank and each Bank Subsidiary is in compliance in all material respects with all applicable Legal Requirements respecting employment and employment practices, terms and conditions of employment and wages and hours, and neither FMBank nor any Bank Subsidiary is engaged in any unfair labor practice.

**Section 3.33.** **Benefit Plans**.

(a)    Set forth on *Disclosure Schedule 3.33(a)* is a complete and accurate list of all "employee benefit plans" (as defined in Section 3(3) of ERISA), all "multiemployer plans" (as defined in Section 3(37) of ERISA) and "multiple employer plans" (as defined in Section 413(c) of the Code), all specified fringe benefit plans as defined in Code Section 6039D, and all other employment, bonus, incentive, compensation, deferred compensation, profit sharing, stock option, phantom stock, stock appreciation right, stock bonus, stock purchase, employee stock ownership, savings, severance, supplemental unemployment, layoff, salary continuation, retirement, pension, health, life insurance, disability, group insurance, vacation, holiday, sick leave, fringe benefit or welfare plan or any other similar plan, agreement, policy or understanding (qualified or nonqualified), and any trust, escrow or other agreement related thereto, which (i) are sponsored, maintained or contributed to by FMBank or any of its ERISA Affiliates, or with respect to which FMBank or any of its ERISA Affiliates has any Liability, and (ii) provide benefits, or describe policies or procedures applicable to, or for the welfare of, any officer, director, independent contractor, employee, service provider, former officer, director or employee of FMBank or any of its ERISA Affiliates, or the dependents, spouses or beneficiaries of any such Person, regardless of whether funded (the "Employee Plans"). True, accurate and complete copies of the documents comprising each Employee Plan, including each trust, funding arrangements (including all annuity contracts, insurance contracts, and other funding instruments), summary plan descriptions and summaries of material modifications, the most current determination letter issued by the Internal Revenue Service, Form 5500 Annual Reports and nondiscrimination test results for the three most recent plan years, and material documents, records, policies, procedures or other materials related thereto, have been delivered or made available to FMIB. No unwritten amendment exists with respect to any Employee Plan.

(b)    There have been no prohibited transactions (as defined in Code Section 4975(c)(1)), breaches of fiduciary duty or any other breaches or violations of any Legal Requirement applicable to the Employee Plans that would subject FMBank or any of its ERISA Affiliates or any Employee Plan to any Taxes, penalties, or other liabilities (including Liability arising through indemnification). Each Employee Plan that is represented to be qualified under Code Section 401(a) has a favorable determination letter or opinion letter that covers all existing amendments and has no obligation to adopt any amendments for which the remedial amendment period under Code Section 401(b) has expired, and neither of the Companies is aware of any circumstances likely to result in revocation of any such favorable determination letter or opinion letter. To the Knowledge of the Companies, each such Employee Plan is so qualified and has been operated in compliance with applicable Legal Requirements and its terms, any related trust is exempt from federal income Tax under Code Section 501(a) and no event has occurred that will or reasonably could result in the loss of such Tax exemption or to Liability for any Tax under Code Section 511. There are no pending claims, lawsuits or actions relating to any Employee Plan (other than ordinary course claims for benefits) and, to the Companies' Knowledge, none are threatened. Neither FM Bank nor any of its ERISA Affiliates provides welfare benefits to any service provider or dependent of such service provider after the termination of the service relationship other than as disclosed in this Agreement or any schedule hereto or as required by applicable Legal Requirements. Except as set forth on *Disclosure Schedule 3.33(b)*, no written or oral representations have been made to any employee or former employee of FMBank or any of its ERISA Affiliates promising or guaranteeing any employer payment or funding for the continuation of medical, dental, life or disability coverage or any other welfare benefit (as defined in ERISA Section 3(1)) for any period of time beyond the employee's termination of employment with FMBank or any of its ERISA Affiliates (except to the extent of coverage required under Code Section 4980B or applicable state law). Compliance with FAS 106 would not create any material change to the Call Reports. Except as set forth on *Disclosure Schedule 3.33(b)*, the completion of the Contemplated Transactions will not cause a termination or partial termination, or otherwise accelerate the time of payment, exercise, or vesting, or increase the amount of compensation due to any employee, officer, former employee or former officer of FMAR or FMBank or any of their ERISA Affiliates under any Employee Plan except (i) as contemplated by this Agreement, or (ii) as identified on *Disclosure Schedule 3.33(b)*. There are no surrender charges, penalties, or other costs or fees that would be imposed by any Person against FMBank or any of its ERISA Affiliates, an Employee Plan, or any other Person, including an Employee Plan participant or beneficiary, as a result of the hypothetical liquidation as of the Closing Date of any insurance, annuity, or investment contracts or any other similar investment held by any Employee Plan. No amount due under any Employee Plan is or will be subject to the excise tax of Section 4999 of the Code.

(c)    Since January 1, 2011, no participant or beneficiary or non-participating employee has been denied any benefit due or to become due under any Employee Plan, and neither FMBank nor any of its ERISA Affiliates has willfully misled any Person as to his or her rights under any Employee Plan, or since January 1, 2011, failed to disclose any information or provide any documents required to be disclosed or provided. All obligations required to be performed by FMBank and its ERISA Affiliates under any Employee Plan have been performed in all material respects, and neither FMBank nor any of its ERISA Affiliates is in default under or in violation of any provision of any Employee Plan, which defaults or violations, in the

aggregate, would be expected to result in a Material Adverse Change. To the Knowledge of the Companies, no event has occurred that would constitute grounds for an enforcement action by any party against FMBank or any of its ERISA Affiliates under Title 1 of ERISA under any Employee Plan.

        (d)      With respect to each Employee Plan:

        (i)      All Employee Plans that are "group health plans" (as defined in Code §5000(b)(1) and ERISA §733(a)) have been operated up to the Closing in a manner so as to not subject FMBank or any ERISA Affiliates thereof to any Liability under Code §4980B or §4980D or any provision of the Patient Protection and Affordable Care Act of 2010 (as amended);

        (ii)      No Employee Plan is subject to Title IV of ERISA or the minimum funding requirements of Section 412 of the Code or Section 302 of ERISA;

        (iii)      neither FMBank nor any of its ERISA Affiliates has ever maintained, contributed to, or had any direct or indirect obligation with respect to any "multiemployer plan" (as defined in Section 3(37) of ERISA) or "multiple employer plan" (as defined in Section 413(c) of the Code).

        (e)      Except as set forth on *Disclosure Schedule 3.33(e)*, all Employee Plan documents, annual reports or returns, audited or unaudited financial statements, actuarial valuations, summary annual reports, and summary plan descriptions issued with respect to the Employee Plans are correct, complete, and current in all material respects, and have been timely filed and/or distributed to participants to the extent required.

        (f)      No Employee Plan is invested in or provides the opportunity for the purchase of any employer security (within the meaning of ERISA §407(d)).

        (g)      Except as set forth on *Disclosure Schedule 3.33(g)*, neither FMAR nor FMBank nor any ERISA Affiliate thereof maintains any Employee Plan that is a "nonqualified deferred compensation plan" within the meaning of Code §409A(d)(I) of the Code. All Employee Plans listed on *Disclosure Schedule 3.33(g)* comply with Code §409A and the regulations thereunder in form and operation.

(h)      FMBank may withdraw at any time from any Employee Plan to which it contributes (but does not sponsor or maintain), including any such plan sponsored or maintained by FMAR, without incurring Liability except for unpaid premiums or contributions due for the pay period that includes the date of withdrawal or termination.

        (i)      With respect to the Employee Plan that is a self-funded health plan: (i) such plan was fully insured until June 30, 2013, and became self-funded as of July 1, 2013; (ii) a complete and accurate summary of claims incurred and reported for the period commencing on July 1, 2013, and continuing through December 31, 2013, has been delivered or made available to FMIB; (iii) the Companies have timely paid all claims incurred and reported; (iv) the

Companies' financial statements accurately reflect any liability associated with such plan; and (v) stop loss insurance is in force with respect to such plan, and all premiums therefor have been timely paid.

**Section 3.34. Obligations to Employees**. All accrued obligations and liabilities of and all payments by FMBank and the Bank Subsidiaries, and all Employee Plans, whether arising by operation of law, by contract or by past custom, for payments to trusts or other funds, to any government agency or authority or to any present or former director, officer, employee or agent (or his or her heirs, legatees or legal representatives) have been and are being paid to the extent required by applicable Legal Requirements or by the plan, trust, contract or past custom or practice, and adequate actuarial accruals and reserves for such payments have been and are being made by FMBank and the Bank Subsidiaries according to GAAP and applicable Legal Requirements applied on a consistent basis and actuarial methods with respect to: (a) withholding taxes, unemployment compensation or social security benefits; and (b) all Employee Plans. All obligations and liabilities of FMBank and the Bank Subsidiaries for all other forms of compensation that are or may be payable to their current or former directors, officers, employees or agents, or pursuant to any Employee Plan, have been and are being paid to the extent required by applicable Legal Requirements or by the plan or contract, and adequate actuarial accruals and reserves for payment therefor have been and are being made by FMBank and the Bank Subsidiaries according to GAAP and generally accepted actuarial principles applied on a consistent basis. All accruals and reserves referred to in this Section are correctly and accurately reflected and accounted for in all material respects in the Call Reports and the books, statements and records of FMBank and the Bank Subsidiaries.

**Section 3.35. Contracts and Commitments**.

(a)    Except as set forth in *Disclosure Schedule 3.35*, neither FMBank nor any Bank Subsidiary is a party to or bound by any of the following (whether written or oral, expressed or implied) (such agreements listed on the schedule being referred to herein as the "Contracts"):

(i)    employment contracts, change-in-control agreements, retention agreements, severance agreements, other than FMBank's standard at-will offer letter;

(ii)    bonus, stock option, deferred compensation, pension, retirement or other employee benefit arrangement;

(iii)    any lease or license with respect to any property, real or personal, whether as landlord, tenant, licensor or licensee involving an annual expenditure in excess of $10,000;

(iv)    any participation, loan purchase or similar agreement pursuant to which FMBank or any Bank Subsidiary has (A) acquired an interest in the indebtedness of any third party or (B) sold an interest in the indebtedness of any third party;

(v)    contract or commitment for capital expenditures in excess of $10,000 for any one project;

(vi)    contract or commitment made in the ordinary course of business for the purchase of materials or supplies or for the performance of services over a period of more than ninety (90) days from the date of this Agreement involving an annual expenditure in excess of $25,000;

(vii)    contract or option to purchase or sell any real or personal property other than in the ordinary course of business;

(viii)    contract, agreement or letter with respect to the management or operations of FMBank or any Bank Subsidiary imposed by any Governmental Authority having supervisory jurisdiction over FMBank or any Bank Subsidiary;

(ix)    agreement, contract or indenture related to the borrowing by FMBank or any Bank Subsidiary of money other than those entered into in the ordinary course of business;

(x)    guaranty of, or joint or several obligation with respect to, any Liability of FMAR, any FMAR Subsidiary, or any other Person;

(xi)    agreement with or extension of credit to any Executive Officer or director of FMAR, any FMAR Subsidiary, FMBank, any Bank Subsidiary, any Former Related Person, or holder of more than ten percent (10%) of the issued and outstanding stock of FMAR, or any Affiliate of such Person;

(xii)    contracts other than the foregoing, with payments aggregating $25,000 or more not made in the ordinary course of business and not otherwise disclosed in this Agreement and the Disclosure Schedules;

(xiii)    any agreement containing covenants that limit the ability of FMBank or any Bank Subsidiary to compete in any line of business or with any Person, or that involve any restriction on the geographic area in which, or method by which, FMBank or any Bank Subsidiary may carry on its business (other than as required by any Legal Requirement);

(xiv)    any data processing services agreement or contract which may not be terminated without payment or penalty upon notice of thirty (30) days or less;

(xv)    any agreement, contract or indenture pursuant to which FMBank or any Bank Subsidiary may become obligated to invest in or contribute capital to any Person;

(xvi)    any agreement, contract or indenture involving payments based on the profits of FMBank or any Bank Subsidiary; or

(xvii) any agreement, contract or indenture that requires the consent or approval of any third party for the Acquisition to be consummated.

(b)    Each Contract (i) is valid and binding on FMBank and, to the Companies' Knowledge, each other party thereto, and is in full force and effect; (ii) FMBank is in all material respects in compliance with and has in all material respects performed all obligations required to be performed by it under each such Contract; (iii) FMBank has not received any notice to terminate, in whole or in part, or notice of any material violation or default (or any condition which with the passage of time or the giving of notice or both would cause such a violation or default) by any party under any such Contract; and (iv) no other party to any such Contract is, to the Knowledge of the Companies, in default or violation in any respect thereunder.

(c)    Copies of each Contract identified in *Disclosure Schedule 3.35* have been delivered or made available to FMIB.

(d)    Neither FMAR nor any FMAR Subsidiary is a party to, or bound by, any license or license agreement with respect to any property necessary to conduct the respective businesses of FMBank and the Bank Subsidiaries.

**Section 3.36.  Brokers and Finders**. Except as set forth on *Disclosure Schedule 3.36*, FMAR, FMBank and the Bank Subsidiaries, and their officers, directors or employees, have not employed any broker, finder, financial advisor or investment banker or incurred any Liability for any brokerage, financial advisory, investment banking or other similar fees or commissions in connection with this Agreement and the transactions contemplated hereby.

## ARTICLE IV.
## REPRESENTATIONS AND WARRANTIES OF FMIB

FMIB hereby makes the following representations and warranties to the Companies as of the date hereof; *provided, that* those representations and warranties which address matters only as of a particular date shall have been true and correct only on such date:

**Section 4.01.  Organization and Qualification**. FMIB is a Maryland chartered trust company, duly organized, validly existing and in good standing under the laws of the State of Maryland and was formed solely for the purpose of engaging in the transactions contemplated hereby and has engaged in no business or activities other than in connection with the transactions contemplated by this Agreement. FMIB has all requisite corporate power and authority (including, without limitation, all material licenses, franchises, permits and other governmental authorizations as are required under all applicable Legal Requirements) to own, lease and operate its properties and assets as now owned, leased or operated, and to carry on its business as presently conducted.  True and complete copies of the Constituent Documents of FMIB have been delivered to the Companies.

**Section 4.02.  Authority; Approvals**. FMIB has full legal right, corporate power and authority to enter into and deliver this Agreement and the DIP Loan Agreement and, subject to

32

the Sale Order, to carry out its obligations hereunder and thereunder; and the execution and delivery of this Agreement, the DIP Loan Agreement and all documents, instruments and agreements required to be executed and delivered by FMIB pursuant to this Agreement and the DIP Loan Agreement and, subject to the Sale Order, the consummation of the Contemplated Transactions have been duly and validly authorized by all necessary corporate action on the part of FMIB. This Agreement, the DIP Loan Agreement and all documents, instruments and agreements required to be executed and delivered by FMIB pursuant to this Agreement and the DIP Loan Agreement have been duly executed and delivered by FMIB and (assuming due authorization, execution and delivery by the Companies), constitute a legal, valid and binding obligation of FMIB, enforceable against FMIB in accordance with their respective terms, subject to the Bankruptcy Exception. No other corporate proceedings, including any shareholder approvals, are necessary for the execution and delivery by FMIB of this Agreement or the DIP Loan Agreement, the performance by FMIB of its obligations hereunder or thereunder or the consummation by FMIB of the Contemplated Transactions.

Section 4.03.  **No Conflict With Other Instruments**. Neither the execution and delivery of this Agreement or the DIP Loan Agreement, nor, subject to the Sale Order, the consummation of the Contemplated Transactions, nor compliance by FMIB with any of the provisions hereof or thereof, will (i) materially violate, materially conflict with, or result in a material breach of any provision of, or constitute a material default (or an event which, with notice or lapse of time or both, would constitute a material default) under, or result in the termination of, or result in the loss of any benefit or creation of any material right on the part of any third party under, or accelerate the performance required by, or result in a right of termination or acceleration of, or result in the creation of any material Encumbrance upon any of the material properties or assets of FMIB under any of the terms, conditions or provisions of (A) the Constituent Documents of FMIB, or (B) any material note, bond, mortgage, indenture, franchise, license, permit, agreement or other instrument or obligation to which FMIB is a party or by which it may be bound, or to which FMIB or any of the properties or assets of FMIB may be subject, or (ii) assuming the Company Required Approvals and the FMIB Required Approvals are duly obtained, violate in any material respect any Legal Requirement or any judgment, ruling, order, writ, injunction or decree applicable to FMIB or any of its properties or assets.

Section 4.04.  **Litigation**. No legal action, suit or proceeding or judicial, administrative or governmental investigation is pending or, to FMIB's Knowledge, threatened against FMIB that would reasonably be expected to have a material adverse effect on the validity of this Agreement or the agreements contemplated hereby or any actions taken or to be taken by FMIB pursuant hereto or thereto, or seeks to enjoin or otherwise restrain the transactions contemplated hereby or thereby.

Section 4.05.  **Consents and Approvals**. Subject to entry of the Sale Order, except as set forth on *Schedule 4.05* (the "FMIB Required Approvals"), no consent or approval of, notice to or filing with any Governmental Authority having jurisdiction over any aspect of the business or assets of FMIB or its Affiliates, and no consent or approval of or notice to any other Person, is required in connection with FMIB's execution, delivery or performance of this Agreement or the agreements contemplated hereby or the completion by FMIB of the transactions contemplated hereby or thereby. As of the date of this Agreement, FMIB knows of no reason why any of the

33

FMIB Required Approvals should not be granted or that any of the Company Required Approvals will not be granted without imposition of a Burdensome Condition.

**Section 4.06.    Available Funds**.

(a)    FMIB has available or committed sources of funds sufficient to fund the full DIP Loan amount as required by the DIP Loan Agreement.

(b)    FMIB has committed sources of funds to provide, and as of the Closing Date, FMIB will have in hand (or in escrow) the Equity Contribution, including the Purchase Price.

(c)    FMIB has entered into Subscription Agreements (the "Subscription Agreements"), pursuant to which each investor who is a party thereto has committed, subject to the terms thereof, to invest in FMIB the cash amounts set forth therein, which represent in the aggregate at least Eighty-Five Million Dollars ($85,000,000) and no more than One Hundred Fourteen Million Nine Hundred Forty-Three Thousand Nine Hundred Dollars ($114,943,900). FMIB has provided to FMAR a complete and accurate form of the execution version of the Subscription Agreements.  The Subscription Agreements are in full force and effect and constitute legal, valid and binding obligations of FMIB and, to the knowledge of FMIB, the other parties thereto..

**Section 4.07.    Brokers and Finders**. Neither FMIB nor any of its officers, directors or employees have employed any broker, finder, financial advisor or investment banker or incurred any Liability for any brokerage, financial advisory, investment banking or other similar fees or commissions in connection with this Agreement and the transactions contemplated hereby.

**ARTICLE V.**
**COVENANTS OF THE PARTIES**

**Section 5.01.    Commercially Reasonable Efforts**. The Companies and FMIB will use commercially reasonable efforts to perform and fulfill all conditions and obligations to be performed or fulfilled by them related to the preparation for and submission of the bankruptcy filing under this Agreement. The Companies and FMIB will use commercially reasonable efforts to furnish to the Bankruptcy Court evidence of adequate assurance by FMIB of its future performance under this Agreement and evidence that FMIB has the financial wherewithal to timely close the Contemplated Transactions. The Companies and FMIB will use commercially reasonable efforts to obtain the approval of the the Sale Order. Subject to the approval of the Bankruptcy Court, the Companies and FMIB will use commercially reasonable efforts to perform and fulfill all conditions and obligations on their part to be performed or fulfilled under this Agreement and to cause the completion of the Contemplated Transactions in accordance with this Agreement.

**Section 5.02.    Consents and Approvals**.

(a)     FMIB and the Companies shall use commercially reasonable efforts to obtain all FMIB Required Approvals and Company Required Approvals, and to take or cause to be taken all actions to do, or cause to be done, all things proper and advisable under any applicable Legal Requirement to consummate the Contemplated Transactions.

(b)     The Parties shall cooperate and coordinate the filings to obtain the FMIB Required Approvals and Company Required Approvals. As soon as practicable following the filing of the Bankruptcy Case, but in no event later than five (5) Business Days thereafter, the Parties will cooperate to cause to be published all required notices and prepare and file all necessary filings in order to obtain the FMIB Required Approvals and the Company Required Approvals; *provided, that* nothing shall require FMIB to provide to the Companies copies of materials in advance for which confidential treatment will be requested from the Governmental Authority to which the application will be submitted. FMIB will promptly furnish the Companies with advance copies of all such regulatory filings and all correspondence for which confidential treatment has not been requested.

(c)     To the extent permitted by applicable Legal Requirements, FMIB and the Companies will promptly, but not later than five (5) Business Days after receipt of a written request by the other Parties, furnish to the other Party all information, data and documents responding to such request, including financial statements, required to be included in any application, notice, petition or statement to be made by or filed by FMAR, FMBank and/or FMIB with any Governmental Authority in connection with the Contemplated Transactions while this Agreement is pending, and the Companies and FMIB represent and warrant that all information so furnished for such applications, petitions and statements will not omit any material fact required to be stated therein or necessary to make the statements made, in light of the circumstances under which they were made, not misleading. FMIB and the Companies will otherwise fully cooperate in the filing of any applications or other documents necessary to complete the Contemplated Transactions.

**Section 5.03.    Required Acts.** Except as otherwise provided in this Agreement or as may be otherwise required by any Governmental Authority having jurisdiction over the Companies or by the Bankruptcy Code or Bankruptcy Court having jurisdiction over FMAR, between the date of this Agreement and the Closing, unless otherwise permitted in writing by FMIB, which consent will not be unreasonably withheld, conditioned or delayed, FMBank shall, and FMAR shall cause FMBank to:

(a)     Operate in all material respects only in the ordinary course of business and  consistent with prudent banking practices;

(b)     Use commercially reasonable efforts to maintain and preserve its business organization and business relationships with its customers, depositors and employees, and to maintain all properties and assets owned, leased or used by it (whether under its control or the control of others), in good operating condition and repair, ordinary wear and tear excepted;

(c)      Perform all of its material obligations under contracts, leases and documents relating to or affecting its assets, properties and business, except such obligations as FMBank may in good faith reasonably dispute; and

(d)      Maintain in full force and effect all insurance policies now in effect or renewals thereof and give all notices and present all claims under all insurance policies in due and timely fashion.

**Section 5.04. <u>Prohibited Acts</u>.** Except as otherwise provided in this Agreement or as may be otherwise required by any Governmental Authority having jurisdiction over the Companies, or by the Bankruptcy Code or Bankruptcy Court having jurisdiction over FMAR, between the date of this Agreement and the Closing, unless otherwise permitted in writing by FMIB, which consent will not be unreasonably withheld, conditioned or delayed, FMBank shall not, and FMAR shall cause FMBank not to:

(a)      Intentionally take or fail to take any action that would be reasonably expected to cause the representations and warranties made in ARTICLE III to be inaccurate at the time of the Closing or preclude the Companies from making such representations and warranties at the time of the Closing;

(b)      Except as otherwise provided herein or in the ordinary course of business, consistent with past practices, merge into, consolidate with or sell its assets and properties to any other Person, or amend FMBank's Constituent Documents;

(c)      Except as explicitly permitted hereunder, Knowingly engage in any transaction with any Affiliate of FMAR or FMBank, or any Former Related Person or Affiliate thereof, or allow such Persons to acquire any assets from FMBank, except (i) in the form of wages, salaries, fees for services, reimbursement of expenses and benefits already granted or accrued under the Employee Plans, (ii) any deposit (in any amount) made by an officer, director or employee or (iii) Loans made in accordance with Regulation O promulgated by the Federal Reserve;

(d)      Discharge or satisfy any Encumbrance or pay any Liability, except in the ordinary course of business consistent with past practices and except for liabilities incurred in connection with the Contemplated Transactions;

(e)      Incur or guarantee any additional debt obligation or other obligation for borrowed money (other than indebtedness, including deposit liabilities, Federal Home Loan Bank advances and advances from the Federal Reserve discount window, of FMBank incurred in the ordinary course of business consistent with past practices);

(f)      Issue, reserve for issuance, grant, sell or authorize the issuance of any shares or other equity interest of FMBank or any capital stock or other equity interest of any Bank Subsidiaries, or other securities or subscriptions, options, warrants, calls, rights or commitments of any kind relating to the issuance thereto;

(g)     Repurchase, redeem, or otherwise acquire or exchange (other than in accordance with the terms of this Agreement), directly or indirectly, any shares, or any securities convertible into or exchangeable or exercisable for any shares, of the capital stock of FMBank or any Bank Subsidiaries, or make, declare, pay or set aside for payment any dividend, or set any record date for, or declare or make, any other distribution in respect of the capital stock or other equity interests of FMBank or any Bank Subsidiaries;

(h)     Accelerate the vesting of pension or other benefits in favor of employees of FMBank and/or any Bank Subsidiary, except according to the Employee Plans or as otherwise contemplated by this Agreement;

(i)     Acquire any capital stock or other equity securities or acquire any equity or ownership interest in any bank, corporation, partnership or other entity (except (i) through settlement of indebtedness, foreclosure, or the exercise of creditors' remedies or (ii) in a fiduciary capacity, the ownership of which does not expose FMBank to any Liability from the business, operations or liabilities of such Person);

(j)     Subject to any Encumbrance any of its property, business or assets, tangible or intangible except (i) statutory liens not yet delinquent, (ii) consensual landlord liens, (iii) minor defects and irregularities in title and encumbrances that do not materially impair the use thereof for the purpose for which they are held, and (iv) pledges of assets to secure public funds deposits;

(k)     Except as set forth on *Schedule 5.04(k)*, sell, transfer, lease to  others or otherwise dispose of any of its assets (except any sales of securities with a value of less than Five Hundred Thousand Dollars ($500,000) or sales of loans or sales of "other real estate owned" with a value of less than Two Hundred Fifty Thousand Dollars ($250,000) in the ordinary course of business consistent with past practices) or cancel or compromise any debt or claim, or waive or release any right or claim of a value in excess of Fifty Thousand Dollars ($50,000);

(l)     Make any material change in the rate or timing of payment of compensation, commission, bonus or other direct or indirect remuneration payable, or pay or agree or orally promise to pay, conditionally or otherwise, any bonus, extra compensation, pension or severance or vacation pay, to or for the benefit of any of its shareholders, directors, officers, employees or agents, or Former Related Persons, other than periodic increases in compensation consistent with past practices, and bonuses, commissions, and incentives consistent with past and normal FMBank practices to FMBank and/or Bank Subsidiary employees and officers;

(m)     Enter into any Employee Plan or collective bargaining agreement;

(n)     Except (i) as otherwise provided herein and (ii) for payments or distributions for which FMBank is contractually obligated as of the date of this Agreement, make payments or distributions related to management incentive plans, including, but not limited to, stock option plans and employment contracts, applicable to FMBank and/or Bank Subsidiary employees;

(o)    Except as set forth on *Schedule 5.04(o)*, make any capital expenditures or capital additions or betterments in excess of an aggregate of Fifty Thousand Dollars ($50,000), except that FMBank may make such expenditures reasonably necessary to maintain existing assets in good repair and expenditures with a total aggregate cost of not more than Two Hundred Fifty Thousand Dollars ($250,000) for improvements or betterments relating to Properties;

(p)    Hire or employ any Person as a replacement for an existing executive position with an annual salary greater than the salary paid to the former executive employee at the time of termination or hire or employ any Person for any newly created officer or executive position;

(q)    Make any, or acquiesce with any, change in any (i) credit underwriting standards or practices, including loan loss reserves, (ii) asset liability management techniques, or (iii) accounting methods, principles or material practices, except as required by changes in GAAP as concurred with by the Companies' independent auditors, or as required by any applicable regulatory authority;

(r)    Sell (but payment at maturity is not a sale) or purchase any investment securities, other than sales or purchases of less than Twenty-Five Million Dollars ($25,000,000) during any one-month period of obligations in which FMBank is permitted to invest under its investment policy in effect as of the date of this Agreement and with a duration of four (4) years or less;

(s)    Except as set forth on *Schedule 5.04(s)*, make or acquire any extension of credit or participation therein or issue a commitment (including a letter of credit) or renew or extend an existing commitment for any extension of credit or participation therein, or amend or modify in any material respect any extension of credit or participation therein (including in any manner that would result in any additional extension of credit, principal forgiveness, or effect any uncompensated release of collateral, i.e., at a value below the fair market value thereof as determined by FMBank), except (i) new extensions of credits or participations therein not in excess of $1,000,000, (ii) extensions of credits or participations therein or commitments therefor that have previously been approved by FMBank prior to the date of this Agreement not in excess of $1,000,000, (iii) with respect to amendments or modifications that have previously been approved by FMBank prior to the date hereof, amendments or modifications of any existing extension of credit or participation therein rated "special mention" or worse by FMBank, with total credit exposure not in excess of $1,500,000, or (iv) with respect to any such actions that have previously been approved by FMBank prior to the date hereof, amendments or modifications (in any material respect) of any extension of credit or participation therein in a manner that would result in any additional extension of credit, principal forgiveness, or effect any uncompensated release of collateral, i.e., at a value below the fair market value thereof as determined by FMBank, in each case not in excess of $1,000,000;

(t)    Make any change in any Tax or accounting principles, practices or methods or systems or internal accounting controls, except as may be required to conform to changes in Tax laws or regulatory accounting requirements or GAAP;

(u)    Commence any action, legal or regulatory proceeding, lawsuit, litigation or other claim, other than in the ordinary course of business, or settle, waive or release or agree or consent to the issuance of any judgment or order in connection with any legal proceeding (i) involving any Liability of FMBank or any Bank Subsidiary for money damages in excess of Fifty Thousand Dollars ($50,000), except as set forth on *Schedule 5.04(u)*, or (ii) arising out of or relating to the transactions contemplated hereby;

(v)    Except as set forth on *Schedule 5.04(v)*, (i) Enter into, renew, extend, modify, amend or terminate any (A) Contract that calls for aggregate annual payments of Fifty Thousand Dollars ($50,000) or more, except in the ordinary course of business consistent with past practices, (B) Contract referenced in Section 3.36 (or any other Contract with any broker or finder in connection with the Merger or any of the Contemplated Transactions), or (C) Contract, plan, arrangement or other understanding with any Affiliate of FMAR or FMBank, or any Former Related Person or Affiliate thereof (other than, in the case of sub-clause (A), Contracts that can be terminated on less than 30 days' notice with no prepayment Liability or other obligation); (ii) make any material amendment or modification to any Contract described in clause (i), other than in the ordinary course of business consistent with past practices; or (iii) waive, release, compromise or assign any material rights or claims under any Contract described in clause (i);

(w)    Enter into any new line of business or change in any material respect its lending, investment, risk and asset-liability management, interest rate, fee pricing or other material banking or operating policies except as required by applicable Legal Requirements;

(x)    Alter materially its interest rate or fee pricing policies with respect to depository accounts of FMBank or waive any material fees with respect thereto;

(y)    Enter into any securitizations of any loans or extensions of credit or create any special purpose funding or variable interest entity other than on behalf of clients;

(z)    Foreclose upon or take a deed or title to any commercial real estate without first conducting a Phase I environmental assessment (except where such an assessment has been conducted in the preceding twelve months) of the property or foreclose upon any commercial real estate if such environmental assessment indicates the presence of Hazardous Material at, on or below the property;

(aa)    Enter into any acquisitions or leases of real property, including new leases and lease extensions; and

(bb)    Add, amend or modify in any respect the duties or obligations of indemnification by FMBank or any Bank Subsidiary with respect to their respective directors, officers, employees, Former Related Persons, agents or other Persons.

**Section 5.05.  Certain Company Contracts**. The Companies shall, at the Closing, pursuant to Section 365 of the Bankruptcy Code, assume (and take all actions reasonably requested by FMIB, including the payment of, or escrowing an amount to cover, cure costs, to effect assumption) assign and sell to FMBank those Bank Related Contracts as identified by

FMIB by written notice given to the Companies no later than three (3) Business Days after entry of the Auction Procedures Order (such Bank Related Contracts, the "Assumed Bank Related Contracts"). In addition, FMAR shall cause the FMAR Subsidiaries (other than FMBank and the Bank Subsidiaries), at or prior to the Closing, to assign to FMBank those Bank Related Contracts of such FMAR Subsidiaries as identified by FMIB by written notice given to the Companies contemporaneously with the notice given by FMIB in accordance with the preceding sentence (such Bank Related Contracts, the "Other Bank Related Contracts"). To the extent that, under any applicable non-bankruptcy Legal Requirement, any Assumed Bank Related Contract or Other Bank Related Contract may not be assigned to FMBank by FMAR (or any FMAR Subsidiary, as the case may be) absent the waiver or consent of, or notice to, one or more Persons, the Companies and FMIB shall use their commercially reasonable best efforts to obtain all such waivers or consents and to make all such notices prior to the Closing and shall cooperate in all respects with respect thereto. Notwithstanding anything in this Agreement to the contrary, the only liabilities or obligations that will be assigned to or assumed by FMBank with respect to the Assumed Bank Related Contracts and Other Bank Related Contracts will be those liabilities and obligations that first arise after Closing and not any liabilities or obligations for breaches or defaults occurring on or before Closing.

### Section 5.06.  Confidential Information.

(a)    The Parties acknowledge the confidential and proprietary nature of the "Information" (as herein defined) which has heretofore been exchanged or otherwise received, and which will be exchanged or otherwise received, from each other hereunder (including, without limitation, Information of FMBank received by FMAR and/or FMIB or its respective employees or agents), and agree to hold and keep the same confidential. Such Information will include, without limitation, any and all financial, technical, commercial, marketing, customer or other information concerning the business, operations and affairs of a Party that may be provided to any other Party, irrespective of the form of the communications, by such Party's employees or agents. Such Information shall not include information which is or becomes generally available to the public other than as a result of a disclosure by a Party or its employees or agents in violation of this Agreement. The Parties agree that the Information will be used solely for the purposes contemplated by this Agreement and that such Information will not be disclosed to any Person other than employees and agents of a Party who are directly involved in implementing the Contemplated Transactions, who shall be informed of the confidential nature of the Information and directed individually to abide by the restrictions set forth in this Section 5.06. The Information shall not be used in any way detrimental to a Party, including use directly or indirectly in the conduct of any Party's business or any business or enterprise in which such Party may have an interest, now or in the future, and whether or not now in competition with any Party.

(b)    If (x) this Agreement is terminated prior to consummation of the Merger, or (y) Closing occurs, each Party shall, upon the written request of any Party, at its election return to such Party or destroy (such destruction to be confirmed in writing to such Party upon further written request) all materials, documentation, data, records and other papers and copies thereof (whether on paper or in electronic, magnetic, photographic, mechanical or optical storage) relating to FMIB or its Affiliates or to FMAR, FMBank, the Bank Subsidiaries, the

FMBank Shares, or the businesses of FMBank and the Bank Subsidiaries, which are confidential and which are in the possession of such Party, and maintain the confidentiality of all such Information, and not use any such Information for any purpose whatsoever; *provided that* a Party may maintain such Information to the extent that such information would be commercially impracticable to return or destroy or as required by applicable Legal Requirements or such Party's bona fide document retention policies (including any practice or requirement to retain e-mail on an automated e-mail archival system) or relating to the safeguarding or backup storage of electronic data or in connection with a dispute with any Party.

(c)    From and after Closing, any and all Information of FMBank shall be, and be deemed to be, confidential and proprietary Information of FMBank and its Affiliates (but not FMAR and its Affiliates).

(d)    The obligations of each Party set forth in this Section 5.06 shall survive Closing or termination of this Agreement (as the case may be).

**Section 5.07.   Access; Pre-Closing Investigation.** Subject to the provisions of Section 5.06 and upon reasonable notice to the Companies, FMAR will, and will cause FMBank to, afford the respective officers, directors, employees, attorneys, accountants, investment bankers and authorized representatives of FMIB and the Investors reasonable access, to the extent legally permissible, to the properties, books, contracts and records of the Companies, permit FMIB to make such inspections as it may require and furnish to FMIB, to the extent legally permissible, during such period all such Information concerning the Companies and their Affiliates and their affairs as FMIB or any of the Investors may reasonably request, in order that FMIB and the Investors may have full opportunity to make such reasonable investigation as any of them desires to make of the affairs of the Companies and their Affiliates, including, without limitation, access sufficient to verify the value of the assets and the liabilities of the Companies and their Affiliates and the satisfaction of the conditions precedent to FMIB's obligations described in ARTICLE VI of this Agreement. FMIB will use its commercially reasonable efforts not to disrupt the normal business operations of FMAR and FMBank. The Companies agree at any time, and from time to time, to furnish to FMIB and the Investors as soon as reasonably practicable, any additional Information that FMIB or any Investor may reasonably request. All inspections by FMIB or any Investor under this Section 5.07 will be at the expense of FMIB or the Investor, as applicable, and shall be reasonably related to the Contemplated Transactions.   Notwithstanding the foregoing, no Party shall be required to provide access to or to disclose Information where such access or disclosure relates to matters involving the Agreement, would violate the rights of such entity's customers, jeopardize the attorney-client privilege of the entity in possession or control of such information, or contravene any law, rule, regulation, order, judgment, decree or binding agreement entered into prior to the date of this Agreement.   The Parties hereto will make appropriate substitute disclosure arrangements under circumstances in which the restrictions of the previous sentence apply.

**Section 5.08.   [Reserved]**

**Section 5.09.  Additional Financial Statements**. The Companies will cause FMBank to promptly furnish FMIB with true and complete copies of each Call Report of FMBank prepared after the date of this Agreement promptly after such reports are made available to the FDIC.

**Section 5.10.  Notice of Certain Events**.

(a)    The Companies will promptly notify FMIB in writing:

(i)    of the institution of any litigation against the Companies or the threat of any claim, controversy or contingent Liability that might reasonably be expected to become the subject of litigation involving the Companies or affecting any of their properties or assets that, if pending on the date hereof, would have been required to have been disclosed pursuant to Section 3.08 or that might reasonably be expected to result in a Material Adverse Change to FMBank,

(ii)    of any legal action, suit or proceeding or judicial, administrative or governmental investigation commenced or, to the Knowledge of the Companies, threatened against the Companies that would reasonably be expected to have a material adverse effect on the validity of this Agreement or the agreements contemplated hereby or any actions taken or to be taken by the Companies pursuant hereto or thereto, or seeks to enjoin or otherwise restrain the transactions contemplated hereby or thereby, and

(iii)    if any change or development has occurred or, to the Knowledge of the Companies, been threatened (or any development has occurred or been threatened involving a prospective change) that (A) is reasonably likely to have, individually or in the aggregate, a Material Adverse Change on FMBank, (B) would be reasonably likely to adversely affect, prevent or delay the obtaining of any regulatory approval for the completion of the Contemplated Transactions, or (C) would be reasonably likely to cause the conditions in Section 6.01 or Section 6.02 not to be met.

(b)    FMIB will promptly notify the Companies in writing if:

(i)    any legal action, suit or proceeding or judicial, administrative or governmental investigation, pending or, to the Knowledge of FMIB, threatened that would reasonably be expected to have a material adverse effect on the validity of this Agreement or the agreements contemplated hereby or any actions taken or to be taken by FMIB pursuant hereto or thereto or seeks to enjoin or otherwise restrain the transactions contemplated hereby or thereby, and

(ii)    if any change or development has occurred or, to the Knowledge of FMIB, been threatened (or any development has occurred or been threatened involving a prospective change) that (A) would be reasonably likely to adversely affect, prevent or delay the obtaining of any regulatory approval for the completion of the Contemplated Transactions, or (B) would be reasonably likely to cause the conditions in Section 6.01 or Section 6.03 not to be met.

42

(c)    Any notice provided by the Parties pursuant to this <u>Section 5.10</u> shall not alter or diminish the right of the other Parties to terminate this Agreement pursuant to <u>ARTICLE VIII</u> hereof.

**Section 5.11.    <u>Indemnification and D&O Insurance; Releases</u>.**

(a)    From and for a period of six (6) years after the Closing, FMBank shall not, and shall not permit or cause its Affiliates or any other Person to, amend, repeal or otherwise modify any exculpation, indemnification and limitation of liability provisions of the Constituent Documents of FMBank in effect as of the date hereof in any manner that would adversely affect the rights of any Person entitled to indemnification thereunder (the "<u>Indemnified Parties</u>").  All provisions for exculpation, indemnification and limitation of liability now existing in favor of the Indemnified Parties as provided by any applicable Legal Requirement or in the Constituent Documents of FMBank in effect as of the date hereof shall survive the Closing for a period of six (6) years and shall continue in full force and effect (with respect to acts or omissions occurring prior to the Closing that were committed by such Indemnified Parties in their capacity as officers, directors or employees of FMBank) for such six (6) year period, or, in the case of matters occurring prior to the Closing that have been raised but have not been finally resolved prior to the sixth (6th) anniversary of the Closing, until such matters are finally resolved.

(b)    FMBank shall purchase and obtain, as soon as is reasonably possible and in any event, no later than effective at the time of the Merger, a six-year "tail" policy (the "Bank D&O Tail Policy") under the directors' and officers' liability insurance policies currently maintained by FMAR on behalf of itself, FMBank and their respective Affiliates, and any directors' and officers' liability insurance policies maintained directly by FMBank (collectively, the "<u>Bank D&O Policies</u>") that provides equivalent primary and excess coverage to the existing coverage under the Bank D&O Policies. FMBank shall fully pay the premiums for the D&O Tail Policy, and upon such purchase and payment in full prior to the filing of the Bankruptcy Case, evidence of the same shall be provided by FMBank or FMAR to FMIB.

(c)    Effective as of the Closing, FMAR, for itself and its Affiliates (other than FMBank and the Bank Subsidiaries, and Mariner Capital Trusts II through VII and each of their trustees, if any of the Trusts or their trustees are Affiliates) (each, an "FMAR Releasor"), hereby irrevocably and unconditionally, knowingly and voluntarily, releases, acquits, remises, exonerates and forever discharges (a) each of the Investors, and each of its and their past, present and future officers, directors and/or other Affiliates, and each of its and their past, present and future officers, directors, partners, managers, trustees, stockholders, members, employees, successors, assigns, heirs, executors, attorneys, agents and representatives, each in their capacity as such, and (b) each of FMBank, and the Bank Subsidiaries, and each of its past, present and future partners, managers, trustees, stockholders, members, successors, assigns, heirs, executors, attorneys, agents and representatives, each in their capacity as such (each of the releasees in (a) and (b) above, an "FMBank Releasee"), of and from, and forever waives and relinquishes, any and all claims, demands, liabilities, defenses, affirmative defenses, setoffs, counterclaims, actions, causes of action, suits, debts, sums of money, accounts, demands, grievances, allegations, covenants, contracts, controversies, promises, agreements, damages, costs, expenses, attorney's fees, judgments and obligations, of whatever kind or nature, whether known or

43

unknown, fixed or contingent, now existing or which may develop in the future, in law or in equity or otherwise (each, a "Claim," and collectively, "Claims"), which any FMAR Releasor (directly, or through FMAR or any Affiliate of FMAR) ever had, now has, or can, shall or may have in the future, against the FMBank Releasees (or any of them), from the beginning of time through the Closing, except for (i) Claims arising under, or in connection with, this Agreement or any of the Contemplated Transactions (including, without limitation, the FMB Holdings Receivable owed by FMBank to FMB Holdings, Inc. in the amount of $500,000; by way of further clarification, any additional or greater intercompany receivable claims against FMB Holdings, Inc. by FMBank are released), (ii) Claims arising under, or in connection with, deposits or other accounts of the FMAR Releasors (or any of them) at FMBank and/or any of the Bank Subsidiaries, and (iii) Claims arising under, or in connection with, willful misconduct, willful malfeasance, and/or any criminal activity, and from and after Closing, FMAR shall refrain from, directly or indirectly, asserting any Claim or commencing, instituting or maintaining, or causing to be commenced, instituted or maintained, any legal or arbitral proceeding of any kind against any FMBank Releasee with respect to any matter released pursuant to this Section 5.11(c); provided that if any FMAR Releasor asserts any such Claim or takes any such action with respect to any such Claim, such FMAR Releasor, automatically, and without any further action by any FMBank Releasee, shall not be, or be deemed to be, an "FMAR Releasee," as defined in Section 5.11(d) hereof. This is a general release. For clarity, and notwithstanding anything to the contrary contained in this Agreement, including without limitation provisions of this Section 5.11(c), this Agreement does not release any Claims that the FMAR Releasors have or might have against the past, present or future directors or officers of FMBank and/or the Bank Subsidiaries; provided, however, that the FMAR Releasors shall limit any recoveries on account of Claims to insurance proceeds that cover the Claims, and the FMAR Releasors shall forgo bringing or maintaining Claims against the past, present or future officers, directors and employees of FMBank and/or Bank Subsidiaries for Claims that (i) are not covered by insurance (including any defense costs and expenses) and (ii) are indemnified by FMBank and/or the Bank Subsidiaries. The execution of this Agreement shall not constitute an acknowledgment of, or an admission by, any FMAR Releasor or FMBank Releasee of the existence of any Claims for any matter or precedent upon which any Claims may be asserted.

(d)    Effective as of the Closing, FMBank, as the surviving entity in the Merger, for itself and the Bank Subsidiaries (each, an "FMBank Releasor"), hereby irrevocably and unconditionally, knowingly and voluntarily, releases, acquits, remises, exonerates and forever discharges each of FMAR, each of the FMAR Subsidiaries (other than FMBank and those Bank Subsidiaries other than FMB Holdings, Inc.), and each of its and their past, present and future officers, directors and/or other Affiliates (other than FMBank and the Bank Subsidiaries, and, if any of the following are Affiliates, Mariner Capital Trusts II through VII and each of their trustees)), and each of its and their past, present and future officers, directors, partners, managers, trustees, stockholders, members, employees, successors, assigns, heirs, executors, attorneys, agents and representatives (each, an "FMAR Releasee"), of and from, and forever waives and relinquishes, any and all Claims which any FMBank Releasor (directly, or through FMBank or any Affiliate of FMBank) ever had, now has, or can, shall or may have in the future, against the FMAR Releasees (or any of them), from the beginning of time through the Closing, except (i) Claims arising under, or in connection with, this Agreement or any of the Contemplated Transactions,  (ii) Claims arising under, or in connection with, deposits or other

44

accounts of the FMAR Releasees (or any of them) at FMBank and/or any of the Bank Subsidiaries, and (iii) Claims arising under, or in connection with, willful misconduct, willful malfeasance, and/or any criminal activity. From and after the Closing, FMBank, as the surviving entity in the Merger, shall, and shall cause each FMBank Releasor to, refrain from, directly or indirectly, asserting any Claim or commencing, instituting or maintaining, or causing to be commenced, instituted or maintained, any legal or arbitral proceeding of any kind against any FMAR Releasee with respect to any matter released pursuant to this Section 5.11(d); *provided, that* if any FMAR Releasee asserts any Claim, or commences, institutes or maintains, or causes to be commenced, instituted or maintained, any legal or arbitral proceeding of any kind against any FMBank Releasee with respect to any matter released pursuant to Section 5.11(c) hereof, such FMAR Releasee, automatically, and without any further action by any FMBank Releasor, shall not be, or be deemed to be, an FMAR Releasee. This is a general release. The execution of this Agreement shall not constitute an acknowledgment of, or an admission by, any FMBank Releasor or FMAR Releasee of the existence of any Claims for any matter or precedent upon which any Claims may be asserted.

**Section 5.12. <u>Notice of Sale</u>.** Notice of this Agreement and the Sale Order and the hearings therefor shall be duly and properly given by FMAR by notice to all appropriate creditors and the appropriate parties in interest in the Bankruptcy Case.

**Section 5.13. <u>Resignations; Agreement Terminations</u>.** The Companies shall deliver to FMIB, with respect to each member of the Board of Directors of FMBank, a written resignation effective as of the Closing Date. In addition, (i) with respect to each individual identified on *Disclosure Schedule 3.33(a)* as being a party to an Employment Agreement listed under the heading "Employment Agreements" on such *Disclosure Schedule 3.33(a)*, the Companies shall deliver to FMIB (contemporaneously with the execution and delivery of this Agreement, which delivery is acknowledged to by FMIB) a fully-executed Employment Agreement (in form and substance approved by FMIB as of the date of this Agreement), dated as of the date of this Agreement but effective as of the Closing Date, which replaces the respective current Employment Agreement to which such individual is a party, and (ii) with respect to each individual identified on *Disclosure Schedule 3.33(a)* as being a party to a Retention and Success Bonus Agreement listed under the heading "Retention Agreements" on such *Disclosure Schedule 3.33(a)*, the Companies shall deliver to FMIB (contemporaneously with the execution and delivery of this Agreement, which delivery is acknowledged to by FMIB) a fully-executed First Amendment to Retention and Success Bonus Agreement (in form and substance approved by FMIB as of the date of this Agreement), dated as of the date of this Agreement but effective as of the Closing Date, which amends the respective current Retention and Success Bonus Agreement to which such individual is a party.

**Section 5.14. <u>Operating Functions</u>.** FMAR, FMBank and the Bank Subsidiaries shall cooperate with FMIB in connection with planning for the efficient and orderly combination of FMBank and FMIB and the operation of FMBank after the Merger. Without limiting the foregoing, FMBank shall provide office space and support services (and other reasonably requested support and assistance) in connection with the foregoing, and senior officers of FMAR, FMBank and FMIB shall meet from time to time as FMIB may reasonably request to review the financial and operational affairs of FMBank, and FMBank shall give due

consideration to FMIB's input on such matters, with the understanding that, notwithstanding any other provision contained in this Agreement, (a) FMIB shall not under any circumstance have any right, or be permitted, to exercise control of FMBank or any Bank Subsidiaries prior to the consummation of the Merger, (b) neither FMAR nor FMBank shall be under any obligation to act in a manner that could reasonably be deemed to constitute anti-competitive behavior under federal or state antitrust Legal Requirements, and (c) neither FMAR nor FMBank shall be required to agree to any material obligation that is not contingent upon the consummation of the Merger.

**Section 5.15.   DIP Financing.**

(a)   The parties entered into the DIP Loan Agreement pursuant to which FMIB will, subject to the terms and conditions set forth therein, provide to FMAR up to Two Million Five Hundred Thousand Dollars ($2,500,000) as Debtor in Possession financing (the "DIP Loan") in order to permit FMAR to pay the reasonable and documented out-of-pocket third party fees and expenses actually incurred in connection with the Contemplated Transactions and the Bankruptcy Case.

(b)   The DIP Loan Agreement became effective upon entry of the DIP Order. All amounts outstanding under the DIP Loan Agreement will become due and payable on the Maturity Date.

(c)   The obligations of FMAR under the DIP Loan Agreement will be secured by a lien on substantially all of the assets of FMAR, including, without limitation, a pledge of the FMBank Shares and Other Purchased Assets.  In addition, the obligations of FMAR under the DIP Loan Agreement will be entitled to super-priority administrative claim status pursuant to Section 364(c)(1) of the Bankruptcy Code.

(d)   To the extent that any provision of this Section 5.15 is inconsistent with the amendments to the DIP Loan Agreement agreed to by the parties and approved by the Bankruptcy Court, the DIP Loan Agreement attached to the order of the Bankruptcy Court shall control and the terms of this Section 5.15 are modified to match such DIP Loan Agreement.

**Section 5.16.   Payment of the Broker Fees.** At the Closing (immediately after the effective time of the Merger), subject to the receipt of customary release letters from the Broker in favor of the Parties in form and substance reasonably satisfactory to the Parties, FMBank shall pay to the Broker the Broker Fees in the amount of Two Million Dollars ($2,000,000) in full satisfaction of all obligations of FM Bank or any Bank Subsidiary in connection with any engagement letters or other agreements of FMBank or any Bank Subsidiary with the Broker, including any agreement to which FMAR and FM Bank are both parties, and FMAR will cause the Broker to deliver to FMBank, the Bank Subsidiaries and FMIB a "pay off letter" in respect thereof in form and substance reasonably satisfactory to FMIB.

**Section 5.17.   [RESERVED]**.

46

**Section 5.18.  Debtor-in-Possession.**   During the pendency of the Bankruptcy Case, FMAR shall continue to operate its business as debtor-in-possession pursuant to the Bankruptcy Code.

**Section 5.19.  [RESERVED].**

**Section 5.20.  [RESERVED].**

**Section 5.21.  Bankruptcy Efforts**.  FMIB and the Companies shall use their commercially reasonable best efforts to cause the Bankruptcy Court to enter the Sale Order.

**Section 5.22.  Non-Solicitation of Competing Bids**. The Companies shall not, and shall cause their Affiliates and representatives not to, (a) solicit or negotiate with any Person (and to cease immediately any such ongoing activity), or enter into any agreement or understanding with respect to, or approve or recommend, any direct or indirect sale of any equity interest in, or any material portion of the assets of, FMAR or FMBank or any extraordinary corporate transaction directly or indirectly involving FMAR or FMBank or (b) provide any Person (other than FMIB and its Affiliates, agents and representatives) with access to the books, records, operating data, contracts, documents or other information relating to FMBank. The Companies shall promptly notify FMIB of any proposals or offers from any third party to acquire, directly or indirectly, all or any substantial portion of the assets, properties, rights and interests of FMAR or FMBank received by the Companies, and the Companies shall promptly communicate to FMIB the material terms of such offer or bid.

**Section 5.23.  Bankruptcy Filings**. From and after the date of this Agreement until the Closing, each party to this Agreement shall use its reasonable best efforts to provide the other parties with a copy of such papers or pleadings as soon as practicable before filing any papers or pleadings in the Bankruptcy Case that relate in any way to this Agreement, the Sale, the Proposed Transaction, the Companies or FMIB.

**Section 5.24.  Plan**. The Companies covenant and agree that if the Sale Order is entered, the terms of any plan of reorganization or liquidation submitted, supported or sponsored by FMAR for confirmation shall not conflict with, supersede, abrogate, nullify, modify or restrict the terms of this Agreement and the rights of FMIB hereunder, or in any way prevent or interfere with the consummation or performance of the transactions contemplated by this Agreement, including any transaction that is approved pursuant to the Sale Order.

**Section 5.25.  Appeal**. If the Sale Order is appealed by any Person, or petition for certiorari or motion for rehearing, reconsideration or rehearing is filed with respect thereto, the Companies agree to take all action as may be reasonably necessary to defend against and oppose such appeal, petition or motion.

**Section 5.26.  Update of Representations**. If between the date of this Agreement and the Closing Date, any event occurs (which, for the avoidance of doubt shall include the Companies first obtaining Knowledge of an event occurring prior to the date of this Agreement) which would make any representation or warranty of the Companies in ARTICLE III hereof untrue or inaccurate in all respects (in the case of any representation or warranty qualified by

47

materiality or Material Adverse Change ) or in all material respects (in the case of any representation or warranty not qualified by materiality or Material Adverse Change ), then the Companies shall promptly notify FMIB of such events in writing (together with all material information relating thereto).  If between the date of this Agreement and the Closing Date, any event occurs (which, for the avoidance of doubt shall include FMIB first obtaining Knowledge of an event occurring prior to the date of this Agreement) which would make any representation or warranty of FMIB in ARTICLE IV hereof untrue or inaccurate, then FMIB shall promptly notify the Companies of such events in writing (together with all material information relating thereto).

**Section 5.27.  Name Change.**  Prior to or reasonably contemporaneously with Closing, FMAR shall change its name to a name that no longer has any variation of "First Mariner" or "1st Mariner," or any words that would be associated with such words.

**Section 5.28.  Employee Transition.**  The Parties shall use reasonable efforts to address issues related to employee transition, if necessary.

## ARTICLE VI.
## CONDITIONS TO CLOSING

**Section 6.01.  Conditions to the Obligations of All Parties.**  The obligations of each Party to consummate the Contemplated Transactions shall be subject to the fulfillment, at or prior to Closing, of each of the following conditions:

(a)  Government and Other Approvals.  FMIB shall have received all of the FMIB Required Approvals, and the Companies shall have received all of the Company Required Approvals, which approvals shall not impose any Burdensome Condition in the reasonable opinion of FMIB, and all applicable waiting periods having expired. Further, the approvals and the Contemplated Transactions shall not have been contested or threatened to be contested by any Governmental Authority.

(b)  Bankruptcy Court Approvals.  The Bankruptcy Court shall have entered the Sale Order in substantially the same form as Exhibit B as a Final Order, or in such other form and manner as may be reasonably acceptable to FMIB, which order shall include, among other provisions acceptable to FMIB, provisions (i) finding that notice of Sale Hearing was given in accordance with the Bankruptcy Code and constitutes such notice as is appropriate under the particular circumstances, (ii) finding that FMIB is a "good faith" purchaser entitled to the protections afforded by §363(m) of the Bankruptcy Code, (iii) finding that FMIB's acquisition of the FMBank Shares and Other Purchased Assets pursuant to this Agreement shall be free and clear of all Encumbrances, and (iv) approving the transactions proposed by this Agreement.

(c)  No Litigation.  No action shall have been taken, and no statute, rule, regulation or order has been promulgated, enacted, entered, enforced or deemed applicable to the Agreement by any Governmental Authority or by any court, including the entry of a preliminary or permanent injunction, that would (i) make this Agreement or any other agreement contemplated hereby, or the transactions contemplated hereby or thereby illegal, invalid or unenforceable, (ii) prohibit, restrict, make illegal or impose material limits on the ability of any Party to this Agreement to perform its obligations and agreements under this Agreement or any

48

other agreement contemplated hereby, or consummate the transactions contemplated hereby or thereby, or (iii) if this Agreement or any other agreement contemplated hereby, or the transactions contemplated hereby or thereby are completed, subject FMBank or any officer, director, shareholder or employee of FMBank to criminal or civil Liability. Further, no action or proceeding before any court or Governmental Authority or by any other Person shall have been threatened, instituted or pending that would reasonably be expected to result in any of the consequences referenced in clauses (i) through (iii) above.

**Section 6.02.  Conditions to the Obligations of FMIB**. The obligations of FMIB to consummate the Contemplated Transactions are subject to the satisfaction, at or prior to Closing, of each of the following conditions, which may be waived in whole or in part by FMIB:

(a)    Representations and Warranties. All representations and warranties made by the Companies in this Agreement or in any document or schedule delivered to FMIB in connection with this Agreement shall be true and correct in all respects (in the case of any representation or warranty qualified by materiality or Material Adverse Change) or in all material respects (in the case of any representation or warranty not qualified by materiality or Material Adverse Change) as of the date of this Agreement and as of the Closing with the same force and effect as if such representations and warranties were made as of the Closing, except with respect to those representations and warranties specifically made as of an earlier date (in which case such representations and warranties must have been true as of such earlier date).

(b)    Performance of Obligations. The Companies shall have duly performed and complied in all material respects with all agreements, covenants and conditions required by this Agreement to be performed by or complied with by the Companies at or before the Closing; *provided, that*, with respect to agreements, covenants and conditions that are qualified by materiality, the Companies shall have performed such agreements, covenants and conditions, as so qualified, in all respects.

(c)    No Material Adverse Change. From the date of this Agreement, there shall not have occurred any Material Adverse Change, nor shall any event or events have occurred that, individually or in the aggregate, with or without the lapse of time, could reasonably be expected to result in a Material Adverse Change.

(d)    Deliverables. The Companies shall have provided, or caused to be provided, to FMIB the documents required to be delivered by the Companies as set forth in Section 7.01.

(e)    KPMG Opinion. FM Bank shall have received an opinion from KPMG (dated as of the Closing Date), reasonably satisfactory to FMIB, to the effect that, (i) based on the most current information available prior to the Closing as provided by FMAR and FMBank to KPMG, it is more likely than not that Section 382(l)(6) of the Code will apply to the Contemplated Transactions such that the "value" of FMBank (within the meaning of Section 382(e) of the Code) for purposes of calculating the "section 382 limitation" (within the meaning of Section 382(b) of the Code) shall include any and all capital contributed by FMIB to FMBank pursuant to, and in connection with, the Contemplated Transactions, and (ii) an "ownership

49

change" (within the meaning of Section 382 of the Code) has not occurred in the three (3) years prior to the Closing.

(f)     Regulatory Orders. From the date of this Agreement until the Closing Date, (i) FMBank shall not have been subject to any new commitment letter, memorandum of understanding, cease and desist order, written agreement or other formal or informal administrative action with any Governmental Authority, and, except with respect to any requirement to meet specified capital requirements, FMBank shall have been in material compliance with the requirements of any commitment letter, memorandum of understanding, cease and desist order, written agreement or other formal or informal administrative action in existence as of the date of this Agreement, and (ii) there shall not have been any, and there are no, actions or proceedings pending or, to the Knowledge of the Companies, threatened against FMBank by or before any such Governmental Authority.

(g)     Bank D&O Policies. FMBank shall have purchased and obtained, and shall have fully paid the premiums for, the Bank D&O Tail Policy in accordance with Section 5.11(b) hereof.

(h)     Delivery of Resignations and/or Termination Evidence.  FMIB shall have received from the Companies the items required by Section 5.13.

**Section 6.03.  Conditions to the Obligations of the Companies**. The obligations of the Companies to consummate the Contemplated Transactions under this Agreement are subject to the satisfaction, at or prior to Closing, of each of the following conditions, which may be waived in whole or in part by the Companies:

(a)     Representations and Warranties. All representations and warranties made by FMIB in this Agreement or in any document or schedule delivered to the Companies in connection with this Agreement shall be true and correct in all respects (in the case of any representation or warranty qualified by materiality or Material Adverse Change) or in all material respects (in the case of any representation or warranty not qualified by materiality or Material Adverse Change) as of the date of this Agreement and as of the Closing with the same force and effect as if such representations and warranties were made as of the Closing, except with respect to those representations and warranties specifically made as of an earlier date (in which case such representations and warranties must have been true as of such earlier date).

(b)     Performance of Obligations. FMIB shall have duly performed and complied in all material respects with all agreements, covenants and conditions required by this Agreement to be performed by or complied with by FMIB at or before the Closing; *provided, that*, with respect to agreements, covenants and conditions that are qualified by materiality, FMIB shall have performed such agreements, covenants and conditions, as so qualified, in all respects.

(c)     Deliverables. FMIB shall have provided, or caused to be provided, to the Companies the documents required to be delivered by FMIB as set forth in Section 7.02.

**ARTICLE VII.**

50

## CLOSING

**Section 7.01.  <u>Actions to be Taken at the Closing by the Companies</u>**. At the Closing, the Companies will deliver to FMIB such documents and certificates contemplated to be delivered pursuant to this Agreement or reasonably necessary to carry out the terms of this Agreement and to evidence the Contemplated Transactions, including the following (all of such actions constituting conditions precedent to FMIB's obligations to close hereunder):

(a)    The Articles of Merger, duly executed by FMBank, and one or more certificates evidencing and representing the FMBank Shares, duly endorsed by FMAR in blank or accompanied by stock powers signed by FMAR in blank, and/or an affidavit of lost certificate, in form and substance reasonably satisfactory to FMIB, with respect to any certificate representing FMBank Shares that has been lost;

(b)    All conveyance, transfers, assignments, instruments or other documents which are necessary to assign and transfer the Other Purchased Assets (including the sale, assignment and assumption of the Assumed Bank Related Contracts, if any, and the assignment and assumption of the Other Bank Related Contracts, if any) to FMBank, in either case, as contemplated by this Agreement, in such form and content as FMIB may require, acting reasonably;

(c)    True, correct and complete copies of FMBank's Constituent Documents and all amendments thereto, duly certified (as applicable) as of a recent date by the MDB;

(d)    True, correct and complete copies of the Constituent Documents of each of the Bank Subsidiaries, certified as of a recent date by the applicable Governmental Authority of the state of their incorporation;

(e)    Good standing and existence certificates for FMBank and each of the Bank Subsidiaries, dated as of a recent date, issued by the appropriate state officials, duly certifying as to the existence and good standing of FMBank in Maryland;

(f)    A certificate, dated as of a recent date, issued by the FDIC, duly certifying that the deposits of FMBank are insured by the FDIC pursuant to the FDIA;

(g)    A certificate, dated as of the Closing Date, signed by the Secretary or an Assistant Secretary of FMAR, pursuant to which FMAR will certify: (i) the due adoption by its Board of Directors of corporate resolutions attached to such certificate authorizing the execution and delivery of this Agreement and the other agreements and documents contemplated hereby and the taking of all actions contemplated hereby and thereby; (ii) the incumbency and true signatures of those officers of FMAR duly authorized to act on its behalf in connection with the Contemplated Transactions and to execute and deliver this Agreement and other agreements and documents contemplated hereby and the taking of all actions contemplated hereby and thereby on behalf of FMAR; and (iii) that the copy of the Bylaws of FMAR attached to such certificate is true and correct and such Bylaws have not been amended except as reflected in such copy;

(h)    A certificate duly signed by the Secretary of FMBank, acting solely in his or her capacity as an officer of FMBank, pursuant to which FMBank will certify that the copy of FMBank's Bylaws attached to such certificate is true and correct and such Bylaws have not been amended except as reflected in such copy;

(i)    A certificate, dated as of the Closing Date, signed by the chief executive officer of FMAR, acting solely in his or her capacity as an officer of FMAR, as applicable, pursuant to which FMAR will certify that: (i) the conditions set forth in Sections 6.02(a) and (b) have been satisfied; and (ii) there has been no Material Adverse Change since September 30, 2013.

(j)    A filed copy of the Sale Order;

(k)    All consents required from third parties to complete the Contemplated Transactions, including those listed on *Disclosure Schedule 3.09 and Schedule 4.05*;

(l)    Endorsements on terms reasonably satisfactory to FMIB with respect to any insurance policies included in the Other Purchased Assets that, among other things, confirm the assignment of such policies, and provide that FMBank and each Bank Subsidiary will have the right to give notice with respect to, control and receive the proceeds of any claims under such policies relating to FMBank and any Bank Subsidiary;

(m)    Evidence of mutual termination of all existing incentives sponsored by or to which FMAR or FMBank is a party that are applicable to senior management officials of FMBank, including, but not limited to, stock option plans and employment contracts, shall be provided to FMIB. All such existing senior management incentives shall have been terminated by FMAR or FMBank and each applicable senior management official of FMBank;

(n)    Except as otherwise agreed by the FMIB in writing, the written resignation letters of all of the officers and directors of FMBank, which resignations shall be effective as of the Closing Date;

(o)    The payoff letter in the form and substance reasonably satisfactory to FMIB and the Companies from the Broker as set forth in Section 5.16;

(p)    A completed IRS Form 1128 (Application to Adopt, Change, or Retain a Tax Year), duly executed by FMAR; and

(q)    All other documents required to be delivered to FMIB by the Companies under this Agreement, including those set forth on Exhibit D, and all other documents, certificates and instruments as are reasonably requested by FMIB or its counsel.

**Section 7.02.    Actions to be Taken at the Closing by FMIB**. At the Closing, FMIB will deliver to the Companies such documents and certificates necessary to carry out the terms and provisions of this Agreement and to evidence the Contemplated Transactions, including the following (all of such actions constituting conditions precedent to the Companies' obligations to close hereunder):

      (a)    The Articles of Merger, duly executed by FMIB, and one or more wire transfers to an account designated by FMAR in the amount of the Purchase Price (less the FMB Holdings Receivable);

      (b)    True, correct and complete copies of FMIB's Constituent Documents and all amendments thereto, duly certified (as applicable) as of a recent date by the MDB;

      (c)    Good standing and existence certificates for FMIB, dated as of a recent date, issued by the appropriate state officials, duly certifying as to the existence and good standing of FMIB in Maryland;

      (d)    A certificate, dated as of the Closing Date, signed by the Secretary of FMIB pursuant to which FMIB will certify (i) the due adoption by the Board of Directors of FMIB of corporate resolutions attached to such certificate authorizing the execution and delivery of this Agreement and the other agreements and documents contemplated hereby and the taking of all actions contemplated hereby and thereby; (ii) the incumbency and true signatures of those officers of FMIB duly authorized to act on its behalf in connection with the Contemplated Transactions and to execute and deliver this Agreement and other agreements and documents contemplated hereby and the taking of all actions contemplated hereby and thereby on behalf of FMIB; and (iii) that the copy of the Bylaws of FMIB attached to such certificate is true and correct and such Bylaws have not been amended except as reflected in such copy;

      (e)    A certificate, dated as of the Closing Date, signed by a duly authorized officer of FMIB, pursuant to which FMIB will certify that the conditions set forth in Sections 6.03(a) and (b) have been satisfied; and

      (f)    All other documents required to be delivered to the Companies by FMIB under this Agreement.

    **Section 7.03.  Concurrent Delivery**. It shall be a condition of the Closing that all matters of payment and execution and delivery of documents, in each case, at the Closing by any Party to the other, pursuant to the terms of this Agreement, shall be concurrent requirements and that nothing will be complete at the Closing until everything required as a condition precedent to the Closing shall have been paid, executed and delivered, as the case may be.

    **Section 7.04.  Sale, Assignment and Transfer of Other Purchased Assets; Merger**. Subject to the terms and conditions set forth in this Agreement, and subject to the entry of a Sale Order, the sale, assignment and transfer of the Other Purchased Assets (including the sale, assignment and assumption of the Assumed Bank Related Contracts, if any, and the assignment and assumption of the Other Bank Related Contracts, if any) to FMBank, and the Merger, shall be deemed to take effect on the Closing Date.

    **Section 7.05.  Time and Place of the Closing and Closing Date**. On a date mutually acceptable to FMIB and FMAR that is the later of (a) within five (5) Business Days of the receipt of all necessary regulatory, corporate, and other approvals and the expiration of any mandatory waiting periods, or (b) within five (5) Business Days of the entry of the Sale Order by the

Bankruptcy Court as a Final Order (such later date, the "Closing Date"), a meeting (the "Closing") will take place at which the Parties to this Agreement will exchange certificates, letters and other documents in order to determine whether all of the conditions set forth in ARTICLE VI have been satisfied or waived or whether any condition exists that would permit a Party to this Agreement to terminate this Agreement. If none of the foregoing conditions then exists or if no Party elects to exercise any right it may have to terminate this Agreement, then the Parties will execute such documents and instruments as may be necessary or appropriate in order to effect the Contemplated Transactions. The Closing will take place at the offices of Venable LLP, 750 East Pratt Street, Baltimore, Maryland 21202 at 10:00 a.m., or at such other time and place to which the Parties may agree.

## ARTICLE VIII.
## TERMINATION

**Section 8.01.    Termination.**

(a)    In the event that the Closing has not occurred on or before April 30, 2014, or such later date as may be agreed in writing by the Parties (the "Outside Date"), either FMIB or the Companies may terminate this Agreement, in which event the Parties will be released from all obligations under this Agreement; *provided, however*, that the right to terminate this Agreement pursuant to this Section 8.01(a) shall not be available to any party whose failure to perform (including, in the case of the right of FMAR, FMBank's failure to perform) any obligation under this Agreement shall have been the cause of, or shall have resulted in, the failure of the Closing to occur on or prior to such date; *provided, further* (i) that if (1) the Closing has not occurred by April 30, 2014, May 31, 2014 or June 30, 2014, as applicable, by reason of non-satisfaction of the condition set forth in Section 6.01(a); and (2) all other conditions set forth in Article VI have heretofore been satisfied or waived or are capable of being satisfied, then (in addition to the increase in the Purchase Price contemplated by Section 2.02(a)) such date shall automatically be extended to (i) May 31, 2014, if the condition set forth in Section 6.01(a) is not satisfied by April 30, 2014, (ii) June 30, 2014, if the condition set forth in Section 6.01(a) is not satisfied by May 31, 2014, and (iii) July 31, 2014, if the condition set forth in Section 6.01(a) is not satisfied by June 30, 2014 (which applicable date shall thereafter be the Outside Date, subject to any further agreement in writing by the Parties to select a later date).  In all events, the DIP Loan shall be repaid in accordance with the DIP Loan Agreement as contemplated in Section 5.15 hereof.

(b)    This Agreement may also be terminated prior to the Closing:

(i)    by the mutual consent of FMIB and the Companies, duly authorized by the Board of Directors of each of FMIB and the Companies;

(ii)    by either FMIB or the Companies, if FMIB or any of its Affiliates received written notice by a Governmental Authority that it will not grant (or intends to rescind or revoke if previously approved) any of the FMIB Required Approvals or Company Required Approvals, or receives written notice from or is otherwise advised by such Governmental Authority that it will not grant any such FMIB Required Approval or Company Required

Approval on the terms contemplated by this Agreement without imposing any Burdensome Condition;

(iii)   by FMIB (solely in the event any portion of the DIP Loan has been advanced and is outstanding), if the DIP Loan Agreement has been terminated or the outstanding loans thereunder have been accelerated in accordance with the terms thereof, except if (a) payment in full of all obligations thereunder has been made, or (b) such termination of the DIP Loan Agreement is due to FMIB's material breach of its obligations thereunder;

(iv)   by the Companies, if FMIB fails to fund a properly made request for a DIP Loan under Section 2.2 of the DIP Loan Agreement within seven (7) Business Days of such request (provided that FMAR is not in "Default" of the DIP Loan Agreement);

(v)   by FMIB, upon written notice to the Companies, if FMIB is not in material breach of any of the terms of this Agreement, and there has been a breach of any representation, warranty, covenant or agreement made by FMAR or FMBank in this Agreement, or any such representation and warranty shall have become untrue after the date of this Agreement, such that the condition set forth in Section 6.02(a) or Section 6.02(b) would not be satisfied and such breach is not curable or, if curable, is not cured within thirty (30) days after written notice thereof is given by FMIB to the Companies;

(vi)   by the Companies, upon written notice to FMIB, if the Companies are not in material breach of any of the terms of this Agreement, and there has been a breach of any representation, warranty, covenant or agreement made by FMIB in this Agreement, or any such representation and warranty shall have become untrue after the date of this Agreement, such that the condition set forth in Section 6.03(a) or Section 6.03(b) would not be satisfied and such breach is not curable or, if curable, is not cured within thirty (30) days after written notice thereof is given by the Companies to FMIB;

(vii)   by FMIB, upon written notice to the Companies, if any condition to the obligation of FMIB to consummate the Closing set forth in Section 6.01 or Section 6.02 shall have become incapable of fulfillment other than as a result of a breach by FMIB of any covenant or agreement contained in this Agreement;

(viii)   by FMIB in the event that FMAR or FMBank has breached the terms of Section 5.22 in any respect adverse to FMIB;

(ix)   by the Companies, upon written notice to FMIB, if any condition to the obligation of the Companies to consummate the Closing set forth in Section 6.01 or Section 6.03 shall have become incapable of fulfillment other than as a result of a breach by the Companies of any covenant or agreement contained in this Agreement;

**Section 8.02.  Effect of Termination.**  In the event of the termination of this Agreement pursuant to Section 8.01, this Agreement shall become void and have no effect, except that (i) the provisions of Section 5.06, Section 8.01, this Section 8.02 and ARTICLE X shall survive any such termination, and (ii) no such termination shall relieve the breaching Party from Liability resulting from any breach by that Party of this Agreement.

# ARTICLE IX.
# SURVIVAL OF REPRESENTATIONS AND WARRANTIES; TAX MATTERS

**Section 9.01. <u>Survival of Representations, Warranties and Covenants</u>**. All representations, warranties, covenants and agreements of the Parties contained in this Agreement, or in any instrument delivered pursuant to this Agreement, shall terminate at the Closing Date other than those covenants and agreements of the Parties which by their terms apply in whole or in part after Closing.

**Section 9.02. <u>Transfer Taxes</u>**. The payment of any transfer, documentary, sales, use, stamp, registration and other such Taxes and fees (including any penalties and interest) incurred in connection with the consummation of the Contemplated Transactions will be borne fifty percent (50%) each by FMAR, on the one hand, and FMIB, on the other hand. Each Party shall, as required by applicable Legal Requirements, cooperate, and cause its Affiliates to cooperate, as necessary in the execution and filing of any Tax Returns and other documentation required to be filed with respect to all such transfer, documentary, sales, use, stamp, registration and other Taxes and fees.

**Section 9.03. <u>Prorations</u>**. Except as otherwise provided in this Agreement, FMAR shall be responsible for all Taxes payable by FMBank and the Bank Subsidiaries for periods ending on or prior to the Closing Date, regardless of whether such Taxes are due prior to or after the Closing Date. FMIB shall be responsible for all Taxes payable by FMBank and the Bank Subsidiaries attributable to periods beginning after the Closing Date. Taxes measured or based on income, sales, use or similar income-based, revenue-based, or transactional Taxes with respect to a Straddle Period shall be allocated as if the relevant Tax year of FMBank terminated as of the end of the Closing Date on an interim closing of the books basis. All other Taxes not described in the prior sentence for a Straddle Period allocated to the period ending on the Closing Date shall be the product of (x) the amount of such Taxes due for the entire Straddle Period and (y) a fraction with the numerator equal to the number of days in the Straddle Period up to and including the Closing Date and the denominator equal to the number of days in the entire Straddle Period. FMAR or FMIB, as applicable, shall invoice the other Party for the amount of Taxes that the other party is responsible for pursuant to this <u>Section 9.03</u> but were paid by FMIB or FMAR, as applicable, and such amount shall be paid within twenty (20) days of receipt of such invoice, but in no case shall such payment be required to be made more than five (5) days prior to the due date of the Tax Return to which such Taxes relate.

**Section 9.04. <u>Tax Returns</u>**.

(a)    Except as otherwise provided in <u>Section 9.02</u> hereof, FMAR shall prepare or cause to be prepared, and file or cause to be filed, at FMAR's sole expense, and on a basis reasonably consistent with past practice (to the extent permissible by applicable Legal Requirements), all Tax Returns for FMAR, FMBank and the Bank Subsidiaries for all periods ending on or before the Closing Date that are filed after the Closing Date (each, a "<u>Prior Period Return</u>"). FMAR will permit a representative of FMIB to review each Prior Period Return at least ten (10) days prior to the due date for the filing of such Prior Period Return (taking into account extensions). Pursuant to such review, if FMIB in good faith determines that a position

56

taken on such Prior Period Return would result in an increase in the Tax obligations of FMBank or a Bank Subsidiary in a taxable period commencing after the Closing Date, FMIB will be allowed to comment on such Prior Period Return and FMAR shall incorporate the comments that are reasonably requested by FMIB on each Prior Period Return.

(b)    Except as otherwise provided in Section 9.02 hereof, FMIB shall prepare or cause to be prepared, and file or cause to be filed, at FMIB's sole expense, all Tax Returns for FMBank and the Bank Subsidiaries other than the Prior Period Returns and the Consolidated Returns (as defined in Section 9.04(c) hereof); *provided, however, that* with respect to any Tax Return due after the Closing Date for a Straddle Period (each, a "Straddle Return"), FMIB shall provide FMAR with a copy of such Straddle Return for its review and consent, at least ten (10) days prior to the due date for the filing of such Straddle Return (taking into account extensions), which consent shall not be unreasonably withheld, conditioned or delayed.

(c)    FMAR shall include the income, if any, of FMBank and the Bank Subsidiaries (including any deferred items triggered into income by Treasury Regulation Section 1.1502-13 and any excess loss account taken into income under Treasury Regulation Section 1.1502-19, and determined by closing the books of FMBank and the Bank Subsidiaries as of the Closing Date) on its consolidated federal, and, as applicable, state and local, income Tax Returns ("Consolidated Returns") for all periods through the Closing Date, and FMAR shall pay any federal, and, as applicable, state and local, income Taxes attributable to such income. For all taxable periods ending on or before the Closing Date, FMAR shall cause FMBank and the Bank Subsidiaries to be included in the Consolidated Returns. FMAR shall prepare and file all Consolidated Returns on a basis reasonably consistent with past practice (to the extent permissible by applicable Legal Requirements).

**Section 9.05.  Cooperation**. FMIB and FMAR will (and FMAR will cause each of the FMAR Subsidiaries and Bank Subsidiaries to) cooperate fully, as and to the extent reasonably requested by any Party, in connection with the filing of Tax Returns and any audit, litigation or other proceeding with respect to Taxes. Such cooperation shall include the retention and (upon such Party's request) the provision of records and information reasonably relevant to any such audit, litigation, or other proceeding. Following the Closing Date, FMIB and FMAR shall cooperate, as to the extent reasonably requested by the other Party, in connection with the Bankruptcy Case including the provision of records and information reasonably relevant to the activities of the Companies and the Bankruptcy Case.

**Section 9.06.  Carrybacks**. FMAR shall pay to FMIB any Tax refund (or reduction in Tax Liability) resulting from a carryback of a post-acquisition Tax attribute of FMBank or a Bank Subsidiary into a Consolidated Return no later than ten (10) days after such refund (or reduction) is realized by the FM Group. At FMIB's request, FMAR shall use commercially reasonable efforts to cooperate with FMBank or a Bank Subsidiary in obtaining such refund (or reduction), including through the filing of amended Tax Returns or refund claims, and FMIB shall reimburse FMAR for all reasonable out of pocket expenses incurred by the FM Group in such cooperation.

**Section 9.07.   Amended Tax Returns of FMBank; Settlement of Audit**.

(a)    Unless required by applicable Legal Requirements, neither FMAR nor FMIB shall file or cause to be filed any amended Tax Returns for FMBank or any Bank Subsidiary covering, or adjusting any Taxes for, (i) any Tax period ending on or before the Closing Date or (ii) a Straddle Period, in each case with respect to the preceding clauses "(i)" and "(ii)," without the prior written consent of the other Party, which consent shall not be unreasonably withheld, delayed or conditioned.

(b)    Notwithstanding anything herein to the contrary, FMAR shall not (i) compromise, resolve, or settle any audit of a Consolidated Return that would have the effect of increasing the Tax Liability of FMBank or any Bank Subsidiary for any period ending after the Closing Date or decreasing any Tax attribute of any of FMBank or any Bank Subsidiary existing on the Closing Date, or (ii) file any amended Consolidated Return that would have the effect of increasing the Tax Liability of FMBank or any Bank Subsidiary for any period ending after the Closing Date or decreasing any Tax attribute of any of FMBank or any Bank Subsidiary existing on the Closing Date, in each case with respect to the preceding clauses "(i)" and "(ii)", without the prior written consent of FMIB, which consent shall not be unreasonably withheld, conditioned or delayed.

**Section 9.08.  Tax Sharing Agreements**. All Tax-sharing agreements or similar agreements with respect to or involving FMBank or any Bank Subsidiary shall be terminated as of the Closing Date with respect to FMBank and each Bank Subsidiary, and, after the Closing Date, neither FMBank nor any Bank Subsidiary shall be bound thereby or have any Liability thereunder.

**Section 9.09.  Tax Covenant Involving FMBank**. Without the prior written consent of FMIB, FMAR shall not (and shall cause the FM Group and each FM Group Member not to) make or change any election, change an annual accounting period, adopt or change any accounting method, file an amended Tax Return, enter into any closing agreement, settle any Tax Claim or assessment relating to FMAR or FMBank, surrender any right to claim a refund of Taxes, consent to any extension or waiver of the limitation period applicable to any Tax Claim or assessment relating to FMAR or FMBank, or take any other similar action relating to the filing of any Tax Return or the payment of any Tax, if such election, adoption, change, amendment, agreement, settlement, surrender, consent or other action would have the effect of increasing the Tax Liability of FMBank or any Bank Subsidiary for any period ending after the Closing Date or decreasing any Tax attribute of any of FMBank or any Bank Subsidiary existing on the Closing Date.

**Section 9.10.  Additional Tax Covenants** .

(a)    FMIB and FMAR agree that FMBank shall cease to be a member of the FM Group as of the end of business on the Closing Date pursuant to Treas. Reg. §1.1502-76(b)(1)(ii).  On its consolidated federal income Tax Return for the taxable year in which the Closing Date occurs, FMAR shall elect under Treas. Reg. §1.1502-36(d) to reduce FMAR's adjusted Tax basis in its FMBank Shares to the extent necessary to prevent any reduction of

FMBank's Tax attributes. All Tax Returns filed by the FM Group, each FM Group Member, FMBank and the Bank Subsidiaries shall be consistent with this provision. In addition, each FM Group Member agrees to take any other action reasonably requested by FMIB or FMBank to preserve FMBank's Tax attributes. At FMIB's discretion, FMAR shall make, or shall forego making (and shall cause the FMAR Subsidiaries to make or forego making), the election under Section 108(b)(5) of the Code on FM Group's consolidated federal income Tax Return for the taxable year in which the Closing Date occurs. Upon request by FMIB, FMAR shall deliver to FMIB its preliminary calculation of how FMAR would apply the provisions of Section 108 of the Code to any excluded cancellation of debt income, and within thirty (30) days of receipt thereof, FMIB shall provide direction to FMAR on making or not making the election. FMAR shall not make an election under Section 336(e) of the Code with respect to the acquisition of the FMBank Shares pursuant to this Agreement.

(b)    FMAR shall cause each entity that will be an FM Group Member on the last day of the month of the Closing Date (the "Year-End Date") to meet the requirements under Rev. Proc. 2006-45 to obtain automatic approval from the Commissioner of Internal Revenue to change the accounting period of the FM Group under Code Section 442 and Treasury Regulation Section 1.442-1(b) to a taxable year ending on the Year-End Date (the "Accounting Period Change"). In addition, FMAR agrees to effect such Accounting Period Change. To facilitate such Accounting Period Change, FMAR shall cause each entity that will be an FM Group Member on the Year-End Date to (i) take all actions necessary to comply with the requirements of Rev. Proc. 2006-45 to obtain automatic approval from the Commissioner of Internal Revenue to effect such Accounting Period Change (including, without limitation, the timely filing of IRS Form 1128, Application to Adopt, Change, or Retain a Tax Year), and (ii) refrain from taking any action that could cause any such entity to fail to meet the requirements of Rev. Proc. 2006-45.

## ARTICLE X.
## MISCELLANEOUS

**Section 10.01. Expenses**. Except as otherwise provided in this Agreement, each of the Parties is obligated to pay all of its expenses and costs (including all counsel fees and expenses and brokerage fees and commissions) incurred in connection with this Agreement and the consummation of the Contemplated Transactions.

**Section 10.02. Entire Agreement**. This Agreement and the other agreements, documents, schedules and instruments signed and delivered by the Parties to each other at the Closing are the full understanding of the Parties, a complete allocation of risks between them and a complete and exclusive statement of the terms and conditions of their agreement relating to the subject matter hereof and supersede any and all prior agreements, whether written or oral, that may exist between the Parties with respect thereto, including, without limitation, (i) that certain Summary of Terms, dated November 21, 2013 and amended on December 23, 2013, by and among FMAR, FMBank and FMIB, and (ii) all non-disclosure and/or standstill agreements among the Investors and FMAR and/or FMBank. Except as otherwise specifically provided in this Agreement, no conditions, usage of trade, course of dealing or performance, understanding or agreement purporting to modify, vary, explain or supplement the terms or conditions of this Agreement is binding unless hereafter made in writing and signed by the Party to be bound, and

no modification will be effected by the acknowledgment or acceptance of documents containing terms or conditions at variance with or in addition to those set forth in this Agreement.

**Section 10.03. Binding Effect; Assignment**. Subject to Bankruptcy Court approval, all of the terms, covenants, representations, warranties and conditions of this Agreement are binding upon, and inure to the benefit of and are enforceable by, the Parties and their respective successors, representatives and permitted assigns. Nothing expressed or referred to herein is intended or is to be construed to give any Person other than the Parties hereto any legal or equitable right, remedy or claim under or in respect of this Agreement, it being the intent of the Parties that this Agreement, and the terms hereof are for the sole benefit of the Parties to this Agreement and not for the benefit of any other Person, except that (i) the current directors and officers of FMBank included in the term "Indemnified Parties" shall be deemed to be third-party beneficiaries of the provisions of Section 5.11(a); and (ii) the Investors shall be deemed to be third-party beneficiaries with respect to the Companies' obligations under this Agreement. No Party to this Agreement may assign this Agreement, by operation of law or otherwise, in whole or in part, without the prior written consent of the other Parties, and any assignment made or attempted in violation of this Section is void and of no effect.

**Section 10.04. Further Cooperation**. The Parties agree that they will, at any time and from time to time after the Closing, upon request by the other and without further consideration, do, perform, execute, acknowledge and deliver all such further acts, deeds, assignments, assumptions, transfers, conveyances, powers of attorney, certificates and assurances as may be reasonably required in order to complete the Contemplated Transactions or to carry out and perform any undertaking made by the Parties hereunder.

**Section 10.05. Severability**. If any provision of this Agreement is held to be illegal, invalid or unenforceable under present or future Legal Requirements, then (a) this Agreement is to be construed and enforced as if such illegal, invalid or unenforceable provision were not a part hereof; (b) the remaining provisions of this Agreement will remain in full force and effect and will not be affected by such illegal, invalid or unenforceable provision or by its severance from this Agreement; and (c) there will be added automatically as a part of this Agreement a provision mutually agreed to which is similar in terms to such illegal, invalid or unenforceable provision as may be possible and still be legal, valid and enforceable.

**Section 10.06. Notices**. Any and all payments (other than payments at the Closing), notices, requests, instructions and other communications required or permitted to be given under this Agreement after the date of this Agreement by any Party hereto to any other Party may be delivered personally or by nationally recognized overnight courier service or sent by mail or (except in the case of payments) by facsimile transmission or electronic mail, at the respective addresses or transmission numbers set forth below and is deemed delivered (a) in the case of personal delivery, facsimile transmission or electronic mail, when received; (b) in the case of mail, upon the earlier of actual receipt or five (5) Business Days after deposit in the United States Postal Service, first class certified or registered mail, postage prepaid, return receipt requested; and (c) in the case of an overnight courier service, one (1) Business Day after delivery to such courier service with and instructions for overnight delivery. The parties may change their

respective addresses and transmission numbers by written notice to all other parties, sent as provided in this Section. All communications must be in writing and addressed as follows:

If to FMIB or (after Closing) FMBank:

> Robert D. Kunisch, Jr.
> President
> RKJS Bank
> 12997 Jerome Jay Dr.
> Telephone: 410-241-0839
> Facsimile: _____
> Electronic Mail:  kunisch@comcast.net

With a copy to:

> Michael D. Schiffer, Esq.
> Venable LLP
> 750 East Pratt Street
> Baltimore, Maryland 21202
> Telephone: 410-244-7546
> Facsimile: 410-244-7742
> Electronic Mail:  mschiffer@venable.com

If to FMAR or (prior to Closing) FMBank:

> First Mariner Bancorp
> First Mariner Bank
> 1601 South Clinton
> Baltimore, Maryland  21224
> Attn:  Mark A. Keidel
> Telephone: 410-558-4281
> Facsimile: 443-573-4912
> Electronic Mail:  mkeidel@1stmarinerbank.com

With a copy to:

> Gary Bronstein, Esq.
> Kilpatrick Townsend & Stockton LLP
> Suite 900
> 607 14th Street, NW
> Washington, DC 20005-2018
> Telephone: 202-508-5893
> Facsimile: 202-204-5616
> Electronic Mail:  gbronstein@kilpatricktownsend.com

**Section 10.07. <u>Waiver of Jury Trial</u>.** EACH OF THE PARTIES HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

**Section 10.08. <u>Jurisdiction</u>.** Each of the Parties agrees that any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby shall be brought in the United States Bankruptcy Court for the District of Maryland, so long as such court shall have subject matter jurisdiction over such suit, action or proceeding (provided, that if such Bankruptcy Court does not have jurisdiction over any matter, or if it has jurisdiction but does not exercise such jurisdiction for any reason, then such suit, action or proceeding shall be brought in any Maryland state court or Federal court of the United States sitting in Baltimore Maryland), and that any cause of action arising out of this Agreement shall be deemed to have arisen from a transaction of business in the State of Maryland, and each of FMIB and the Companies hereby irrevocably consents to the jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in such courts or that any such suit, action or proceeding brought in such courts has been brought in an inconvenient forum. Process in any such suit, action or proceeding may be served on any Party anywhere in the world, whether within or without the jurisdiction of such courts. Without limiting the foregoing, each Party agrees that service of process on such Party as provided in <u>Section 10.06</u> shall be deemed effective service of process on such Party.

**Section 10.09. <u>Multiple Counterparts</u>.** For the convenience of the Parties hereto, this Agreement may be signed in multiple counterparts, each of which will be deemed an original, and all counterparts hereof so signed by the Parties hereto, whether or not such counterpart will bear the execution of each of the Parties hereto, will be deemed to be, and is to be construed as, one and the same Agreement. Electronic or facsimile transmission of a signed counterpart of this Agreement will be sufficient to bind the Party or Parties whose signature(s) appear thereon.

**Section 10.10. <u>Specific Performance</u>.** Each of the Parties hereto acknowledges that the other Parties would be irreparably damaged and would not have an adequate remedy at law for money damages if any of the covenants contained in this Agreement were not performed in accordance with its terms or otherwise were materially breached. Each of the Parties hereto therefore agrees that, without the necessity of proving actual damages or posting bond or other security, the other Party may be entitled to seek temporary and/or permanent injunction or injunctions which a court of competent jurisdiction concludes is justified to prevent breaches of such performance and to specific enforcement of such covenants in addition to any other remedy to which they may be entitled, at law or in equity.

**Section 10.11. <u>Attorneys' Fees and Costs</u>.** If attorneys' fees or other costs are incurred to secure performance of any of the obligations herein provided for, or to establish damages for the breach thereof, or to obtain any other appropriate relief, the prevailing Party is entitled to

recover reasonable attorneys' fees and costs incurred therein and determined by the court to be justified.

**Section 10.12.  Rules of Construction**. The descriptive headings in this Agreement are inserted for convenience of reference only and are not intended to be part of or to affect the meaning or interpretation of this Agreement. Each use herein of the masculine, neuter or feminine gender is deemed to include the other genders. Each use herein of the plural will include the singular and vice versa, in each case as the context requires or as it is otherwise appropriate. The word "or" is used in the inclusive sense. No Party shall be required to take any action under this Agreement to the extent that such action would require the Party to violate any applicable Legal Requirement.

**Section 10.13.  Articles, Sections, Exhibits and Schedules**. All articles and sections referred to herein are articles and sections, respectively, of this Agreement and all exhibits and schedules referred to herein are exhibits and schedules, respectively, attached to this Agreement. Any and all schedules, exhibits, certificates or other documents or instruments referred to herein or attached hereto are and will be incorporated herein by reference hereto as though fully set forth herein.

**Section 10.14.  Public Disclosure**. None of the Parties shall make any announcement, statement, press release, acknowledgment or other public disclosure of the existence of, or reveal the terms, conditions or the status of, this Agreement or the Contemplated Transactions without the prior written consent of the other Parties to this Agreement; but any Party is permitted to make any public disclosures or governmental filings as legal counsel may deem necessary to maintain compliance with or to prevent violations of any Legal Requirement or that may be necessary to obtain regulatory approval for the Contemplated Transactions and such disclosure required by Section 5.12 of this Agreement, in which case the Party required to make the release or disclosure shall use its reasonable best efforts to allow the other Party reasonable time to comment on such release or disclosure in advance of the issuance thereof.  The Parties have agreed upon the form of a joint press release announcing the execution of this Agreement.

**Section 10.15.  Extension; Waiver**. No failure to exercise, nor any delay in exercising any right, power or privilege hereunder (including, without limitation, the right to terminate this Agreement in accordance with Article VIII hereof) by any Party hereto will operate as a waiver thereof. No single or partial exercise of any right, power or privilege hereunder will preclude any other or further exercise thereof or the exercise of any other right, power or privilege. A waiver of any Party of any right or remedy on any one occasion will not be construed as a bar to any right or remedy that such Party would otherwise have on any future occasion or to any right or remedy that any other Party may have hereunder. Any Party may unilaterally waive a right which is solely applicable to it.

**Section 10.16.  Amendments**. To the extent permitted by applicable law, this Agreement may be amended, modified or supplemented only by an instrument in writing signed by the Party against which enforcement of the amendment, modification or supplement is sought.

**Section 10.17. <u>Automatic Extension of Deadlines and Dates</u>**. In the event the Bankruptcy Court is not fully operational on a Business Day(s) due to a cessation of the operations of the U.S. Federal government, partial or otherwise, then all required deadlines and actions required to be completed by certain dates as may be set forth set forth herein or in the Exhibits hereto, that are directly or indirectly impacted such that the actions to be completed by those deadlines or dates cannot be reasonably completed, shall be automatically extended by the number of days that the Bankruptcy Court is not fully operational or as may otherwise be agreed by the Parties. The automatic extensions provided in this <u>Section 10.17</u> shall not exceed thirty (30) Business Days and such automatic extensions shall not extend the Outside Date set forth in <u>Section 8.01(a)</u>.

**Section 10.18. <u>FMAR Maintenance of Books and Records</u>**. After the Closing, FMAR shall maintain its books and records not transferred to FMIB in accordance with its past ordinary course practice and will transfer such books and records, as requested, to any liquidating trustee or similar representative appointed in the Bankruptcy Case.

**Section 10.19. <u>Amendment and Restatement</u>**. The Original Merger Agreement is amended and restated in its entirety by this Agreement.

*[SIGNATURE PAGE FOLLOWS]*

**IN WITNESS WHEREOF,** FMAR, FMBank and FMIB have caused this Agreement to be signed by their duly authorized officers as of the date first above written.

**FIRST MARINER BANCORP**

By: _Mak A. Keidel_ (SEAL)
Name: Mark A. Keidel
Title: Interim CEO

**FIRST MARINER BANK**

By: _Mak A. Keidel_ (SEAL)
Name: Mark A. Keidel
Title: Interim CEO

**RKJS BANK**

By: _____ (SEAL)
Name:
Title:

*[Signature Page to Merger and Acquisition Agreement]*

**IN WITNESS WHEREOF**, FMAR, FMBank and FMIB have caused this Agreement to be signed by their duly authorized officers as of the date first above written.

**FIRST MARINER BANCORP**

By:_____(SEAL)
Name:
Title:

**FIRST MARINER BANK**

By:_____(SEAL)
Name:
Title:

**RKJS BANK**

By:_____(SEAL)
Name:  Robert D. Kunisch, Jr.
Title:  President

*[Signature Page to Merger and Acquisition Agreement]*

65

## **MERGER AND ACQUISITION AGREEMENT**

### **EXHIBITS**

Exhibit A        DIP Loan Agreement and Documentation

Exhibit B        Form of Sale Order

Exhibit C        Form of Articles of Merger

Exhibit D        Additional Closing Deliverables

**EXHIBIT A**

**DIP LOAN AGREEMENT AND DOCUMENTATION**

## SUPERPRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT

THIS SUPERPRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT (this "Agreement"), dated as of February 10, 2014, is made by and between FIRST MARINER BANCORP, a Maryland corporation and a debtor and debtor in possession in a case pending under Chapter 11 of the Bankruptcy Code (the "Borrower"), and RKJS Bank, a Maryland corporation, as lender (together with its successors and assigns, the "Lender").

## PRELIMINARY STATEMENTS

1.        The Borrower intends to file a voluntary petition with the Bankruptcy Court on or after the date this Agreement is executed (the date of such filing being referred to herein as the "Petition Date") initiating the Case and has continued in the possession of its assets and in the management of its business pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

2.        The Borrower has requested that the Lender provide a delayed-draw term loan facility to the Borrower in an aggregate principal amount not to exceed the Commitment (as defined herein).

3.        The proceeds of the Loans (as defined herein) will be used solely in the manner set forth in Section 5.2 hereof.

4.        To provide security for the repayment of all obligations of the Borrower hereunder and under the other Loan Documents (as defined herein), the Borrower will provide to the Lender the following (all as more fully described herein):

(a)        pursuant to Section 364 (c)(1) of the Bankruptcy Code and the Order, as applicable, a Superpriority Claim in the Case having priority over any administrative claims of any entity, including, without limitation, any claims specified in or ordered pursuant to Sections 105, 326, 330, 331, 503(b), 506(c), 507, 726, 1113, 1114 or any other provisions of the Bankruptcy Code,

(b)        pursuant to Section 364(c)(2) of the Bankruptcy Code and the Order, a perfected first priority Lien on all unencumbered property and assets of the Borrower of any kind (other than Avoidance Actions and the proceeds therefrom), and

(c)        pursuant to Section 364(c)(3) of the Bankruptcy Code, a perfected Lien on the property of the Borrower as more fully described herein subject to (i) Liens for taxes not yet due and payable, and (ii) any validly attached and properly perfected unavoidable prepetition Liens on property of the Borrower (the Liens described in clauses (i) and (ii), the "Permitted Liens").

The parties hereto hereby agree as follows:

## SECTION 1.  DEFINITIONS

1.1        Defined Terms. As used in this Agreement (including the recitals hereof), the terms listed in this Section 1.1 shall have the respective meanings set forth in this Section 1.1.

"Acquisition Agreement": the Merger and Acquisition Agreement, dated as of February 7, 2014, by and among the Lender, the Borrower and FMBank relating to the acquisition by the Lender of all the issued and outstanding shares of FMBank and certain other assets of the Borrower and its Subsidiaries, which acquisition shall be structured as a merger of the Lender with and into FMBank, and the other transactions contemplated thereby.

"Acquisition Closing": as defined in this Section 1.1 in the definition of Maturity Date.

"Affiliate":  with respect to any Person, any Person that, directly or indirectly, controls, is controlled by, or is under common control with, such Person.  For the purposes of this definition, "control" (including, with correlative meaning, the terms "controlled by" and "under common control with") as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities or by contract or otherwise.

"Agreement": as defined in the preamble hereto.

"Alternative Transaction": any plan, agreement or arrangement, other than the Acquisition Agreement, or agreement to support or propose to the Bankruptcy Court any plan, agreement or arrangement, other than the Acquisition Agreement, the effect and/or results of which involve the recapitalization or acquisition of FMBank and/or Borrower by any Person other than the "Investors" (as defined in the Acquisition Agreement) through Lender.

"Alternative Transaction Order":  as defined in this Section 1.1 in the definition of "Maturity Date."

"Applicable Rate": six percent (6.00%) per annum.

"Assignee": as defined in Section 8.7.

"Avoidance Actions":  claims and causes of action arising under sections 502(d), 544, 545, 547, 548, 550 or 551 of the Bankruptcy Code.

"Bank Subsidiaries":  the Subsidiaries of FMBank.

"Bankruptcy Code":  Title 11 of the United States Code entitled "Bankruptcy", as now and hereafter in effect, or any successor statute.

"Bankruptcy Court":  the United States Bankruptcy Court (or, as applicable, the District Court) for the District of Maryland.

"Board":  the Board of Governors of the Federal Reserve System of the United States (or any successor).

"Borrower": as defined in the preamble hereto.

"Business":  the business currently carried on by the Borrower and its Subsidiaries.

2

"Business Day": a day that FMBank is open to the public for the conduct of banking business.

"Capital Lease Obligations": as to any Person, the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such Person under GAAP and, for the purposes of this Agreement, the amount of such obligations at any time shall be the capitalized amount thereof at such time determined in accordance with GAAP.

"Capital Stock": any and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership interests in a Person (other than a corporation), including member interests, partnership interests and joint venture interests, and any and all warrants, rights or options to purchase (or convertible into, or exchangeable for) any of the foregoing.

"Case": the case of the Borrower to be filed (or, currently pending, as the case may be) under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court.

"Cash Collateral": "cash collateral" as such term is defined in Section 363(a) of the Bankruptcy Code, or any successor provision.

"Code": the Internal Revenue Code of 1986, as amended from time to time.

"Collateral": all of the "Collateral" referred to in the Order or the other Security Documents and all of the other property and assets that are or are intended under the terms of the Order or the other Security Documents to be subject to Liens in favor of the Lender.

"Commitment": the obligation of the Lender to make Loans to the Borrower in an aggregate principal amount at any time outstanding of up to $2,500,000.00, as such amount may be reduced from time to time in accordance with the terms of this Agreement.

"Commonly Controlled Entity": an entity, whether or not incorporated, that is under common control with the Borrower within the meaning of Section 4001 of ERISA or is part of a group that includes the Borrower and that is treated as a single employer under Section 414 of the Code or the regulations thereunder.

"Contemplated Transactions": all of the transactions among the Borrower, FMBank and the Lender contemplated by the Acquisition Agreement.

"Contractual Obligation": as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"Creditors' Committee": any official committee of unsecured creditors appointed in the Case.

"Debtor Relief Laws": the Bankruptcy Code of the United States, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief laws of the United States or

3

other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"Default":  any of the events specified in Section 7, whether or not any requirement for the giving of notice, the lapse of time, or both, has been satisfied.

"Disposition" or "Dispose":  (a) the sale, transfer, license, lease or other disposition (including any sale and leaseback transaction) of any property of the Borrower or any of its Subsidiaries (other than FMBank) (or the granting of any option or other right to do any of the foregoing), including any sale, assignment, transfer or other disposal, with or without recourse, of any Capital Stock owned by the Borrower or any of its Subsidiaries (other than FMBank), or any notes or accounts receivable or any rights and claims associated therewith, and (b) the issuance of Capital Stock by the Borrower or any of its Subsidiaries to any Person (in the case of any such Subsidiary, other than the Borrower or any of its Subsidiaries).

"Dollars" and "$":  dollars in lawful currency of the United States.

"Effective Date":  as defined in Section 4.1(a).

"Environmental Laws":  the Legal Requirements relating to pollution or protection of public or employee health or safety or the environment, including laws relating to (i) emissions, discharges, releases or threatened releases of Hazardous Materials, into the environment (including ambient air, indoor air, surface water, ground water, land surface or subsurface strata), (ii) the manufacture, processing, distribution, use, generation, treatment, storage, disposal, transport or handling of Hazardous Materials, and (iii) underground and above ground storage tanks containing Hazardous Materials, and related piping, and emissions, discharges, releases or threatened releases therefrom.

"ERISA":  the Employee Retirement Income Security Act of 1974, as amended from time to time.

"Event of Default":  any of the events specified in Section 7, provided that any requirement for the giving of notice, the lapse of time, or both, has been satisfied.

"Facility":  the Commitment and the Loans made hereunder.

"First Day Orders":  as defined in Section 4.1(d).

"FMBank": First Mariner Bank, a Maryland chartered trust company.

"GAAP":  generally accepted accounting principles in the United States as in effect from time to time.

"Governmental Approval":  any consent, authorization, approval, order, license, franchise, permit, certificate, accreditation, registration, filing or notice, of, issued by, from or to, or other act by or in respect of, any Governmental Authority.

4

"Governmental Authority":  any federal, state, municipal, county or regional government or governmental or regulatory authority, domestic or foreign, and includes any department, commission, bureau, board, administrative agency or regulatory body of any of the foregoing or any non-governmental regulatory body that provides standards for certification.

"Guarantee Obligation":  as to any Person (the "guaranteeing person"), any obligation, including a reimbursement, counterindemnity or similar obligation, of the guaranteeing person that guarantees or in effect guarantees, any Indebtedness, leases, dividends or other obligations (the "primary obligations") of any other third Person (the "primary obligor") in any manner, whether directly or indirectly, including any obligation of the guaranteeing person, whether or not contingent, (i) to purchase any such primary obligation or any property constituting direct or indirect security therefor, (ii) to advance or supply funds (1) for the purchase or payment of any such primary obligation or (2) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (iii) to purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation or (iv) otherwise to assure or hold harmless the owner of any such primary obligation against loss in respect thereof; *provided, however,* that the term Guarantee Obligation shall not include endorsements of instruments for deposit or collection in the Ordinary Course of Business. The amount of any Guarantee Obligation of any guaranteeing person shall be deemed to be the lower of (a) an amount equal to the stated or determinable amount of the primary obligation in respect of which such Guarantee Obligation is made and (b) the maximum amount for which such guaranteeing person may be liable pursuant to the terms of the instrument embodying such Guarantee Obligation, unless such primary obligation and the maximum amount for which such guaranteeing person may be liable are not stated or determinable, in which case the amount of such Guarantee Obligation shall be such guaranteeing person's maximum reasonably anticipated liability in respect thereof as determined by the Borrower in good faith.

"Hazardous Material":  any pollutant, contaminant or toxic or hazardous substance, constituent, material or waste regulated under Environmental Laws, including petroleum, crude oil or any fraction thereof or any petroleum product, but does not include nominal quantities of any chemical used in the ordinary course of business as office or cleaning supplies.

"Indebtedness":  of any Person at any date, without duplication, (a) all indebtedness of such Person for borrowed money, (b) all obligations of such Person for the deferred purchase price of property or services (other than current trade payables incurred in the ordinary course of such Person's business), (c) all obligations of such Person evidenced by notes, bonds, debentures or other similar instruments, (d) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property), (e) all Capital Lease Obligations of such Person, (f) all obligations of such Person, contingent or otherwise, as an account party or applicant under or in respect of acceptances, letters of credit, surety bonds or similar arrangements, (g) the liquidation value of all redeemable preferred Capital Stock of such Person, (h) all Guarantee Obligations of such Person in respect of obligations of the kind referred to in clauses (a) through (g) above, and (i) all obligations of the kind referred to in clauses (a) through (h) above secured by (or for which the holder of such obligation has an existing right, contingent

5

or otherwise, to be secured by) any Lien on property (including accounts and contract rights) owned by such Person, whether or not such Person has assumed or become liable for the payment of such obligation. The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness expressly provide that such Person is not liable therefor.

"Investment": as to any Person, any direct or indirect acquisition or investment by such Person, whether by means of (a) the purchase or other acquisition of Capital Stock or debt of another Person, (b) a loan, advance or capital contribution to, Guarantee Obligation or assumption of debt of, or purchase or other acquisition of any other debt or equity participation or interest in, another Person, including any partnership or joint venture interest in such other Person and any arrangement pursuant to which the investor incurs debt of the type referred to in clause (h) of the definition of "Indebtedness" set forth in this Section 1.1 in respect of such Person, or (c) the purchase or other acquisition (in one transaction or a series of transactions) of assets of another Person that constitute a business unit of, or all of a substantial part of the business being conducted by, such Person.

"Legal Requirement": any federal, state, local, municipal, foreign, international, multinational or other constitution, law, ordinance, principle of common law, code, regulation, statute or treaty.

"Lender": as defined in the preamble hereto.

"Lien": means any lien, pledge, mortgage, deed of trust, hypothecation, interest, security interest, claim, lease, charge, option, right of first refusal, levy, right of first offer, easement, servitude, transfer restriction under any shareholder or similar agreement, tax (including foreign, federal, state and local tax), order of any Governmental Authority, encumbrance or any other restriction or limitation whatsoever of any kind or nature, whether secured or unsecured, choate or inchoate, filed or unfiled, perfected or unperfected, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, contingent or non-contingent, material or non-material, known or unknown.

"Loan(s)": an extension of credit by the Lender to the Borrower pursuant to Section 2.1.

"Loan Documents": this Agreement, the Security Documents, the Note, and any other agreement, instrument, certificate, report and other document executed and delivered pursuant hereto or thereto or otherwise evidencing or securing any Loan or any other Obligation and any amendment, waiver, supplement or other modification to any of the foregoing.

"Material Adverse Change": any fact, circumstance, event, effect, development, occurrence or change that (1) has had, or would be reasonably likely to have, a material and adverse effect on the business, results of operations, financial condition, assets, properties, employees, liabilities (absolute, accrued, contingent or otherwise) or reserves of FMBank, excluding any change with respect to, or effect on, FMBank resulting from (i) changes in Legal Requirements, GAAP or regulatory accounting requirements, as such would apply to banks, (ii) changes after the date of this Agreement in national or regional political conditions or general economic or market

6

conditions (including changes in prevailing interest rates, credit availability and liquidity) generally affecting banks and bank holding companies, except to the extent that such change has a disproportionately adverse effect on FMBank as compared to similarly situated banks, (iii) any actions or omissions expressly required by this Agreement or that are taken at the written request of or with the prior informed written consent of FMIB in contemplation of the Contemplated Transactions, and (iv) any pre-Closing restriction or conditions imposed on FMBank as a result of regulatory agreements to which FMBank is a party as of the date of this Agreement, or (2) prevents or materially impairs the ability of either or both of the Companies to timely consummate the Contemplated Transactions.  For purposes of determining whether a Material Adverse Change has occurred based on an increase in FMBank's classified loans or other real estate owned, such determination shall be made from the date of this Agreement.  The conditions resulting in and from the filing of the Bankruptcy Case will not be deemed to be a Material Adverse Change.

"Maturity Date":  the date which is the earliest of (a) the date that is four (4) months from the date of the first Loan under this Agreement, provided, that, if the Lender is the winning bidder in the Sale Hearing, but there is a delay in closing the Contemplated Transactions due to the need for Governmental Approval(s), such date shall automatically be extended to the earlier of (i) the "Closing" (as defined in the Acquisition Agreement) of the Contemplated Transactions (the "Acquisition Closing"), (ii) if under the Acquisition Agreement the Lender has the ability to terminate due to a failure or inability of Lender to obtain government approvals, 30 days after the date of termination of the Acquisition Agreement by the Lender under section 8.01(b)(ii) and (iii) if under the Acquisition Agreement the Lender has the ability to terminate due to a failure or inability of Borrower to obtain government approvals, the date of termination of the Acquisition Agreement by the Lender under section 8.01(b)(ii), (b) the Acquisition Closing, (c) the first Business Day following entry by the Bankruptcy Court of an order approving an Alternative Transaction (an "Alternative Transaction Order"), (d) the effective date as of which the Acquisition Agreement terminates in accordance with its terms (so long as such termination is not due to a breach thereof by the Lender), (e) the earlier of the effective date or the substantial consummation (as defined in Section 1101(2) of the Bankruptcy Code) of a Plan of Reorganization that has been confirmed by an order of the Bankruptcy Court, (f) such earlier date on which all Loans and other Obligations for the payment of money shall become due and payable in accordance with the terms of this Agreement and the other Loan Documents, including Section 7 hereof, and (g) the date that the Federal Deposit Insurance Corporation (or any successor thereto) is appointed receiver or conservator of FMBank.

"Multiemployer Plan":  a Plan that is a multiemployer plan as defined in Section 4001(a)(3) of ERISA.

"Net Cash Proceeds":  with respect to any Disposition by the Borrower or any of its Subsidiaries (other than FMBank), the aggregate amount of cash received (directly or indirectly) from time to time (whether as initial consideration or through the payment or disposition of deferred consideration) by or on behalf of the Borrower of such Subsidiary, in connection therewith after deducting therefrom only (i) the amount of any Indebtedness secured by any Permitted Lien on any asset (other than Indebtedness assumed by the purchaser of such asset) which is required to be, and is, repaid in connection with such Disposition (other than Indebtedness under this Agreement), (ii) reasonable expenses related thereto incurred by the Borrower or such Subsidiary

in connection therewith (including, without limitation, attorneys' fees and accountants' fees), (iii) transfer taxes paid to any taxing authorities by the Borrower or such Subsidiary in connection therewith, and (iv) income and franchise taxes to be paid in connection with such Disposition (after taking into account any tax credits or deductions and any tax sharing arrangements); in each case, to the extent, but only to the extent, that the amounts so deducted are (x) actually paid or required to be paid (and reserved for such purpose) to a Person that, except in the case of reasonable out-of-pocket expenses, is not an Affiliate of the Borrower or any of its Subsidiaries and (y) properly attributable to such transaction or to the asset that is the subject thereof

"Non-Excluded Taxes": as defined in Section 2.7.

"Note": a Promissory Note in form and substance reasonably satisfactory to the Lender.

"Notice of Borrowing": a notice of a borrowing substantially in the form of Exhibit A.

"Obligations": the unpaid principal of and interest on (including interest accruing after the maturity of the Loans) the Loans, and all other obligations and liabilities of the Borrower to the Lender, whether direct or indirect, absolute or contingent, due or to become due, or now existing or hereafter incurred, which may arise under, out of, or in connection with, this Agreement, any other Loan Document or any other document made, delivered or given in connection herewith or therewith, whether on account of principal, interest, reimbursement obligations, fees, indemnities, costs, expenses, or otherwise.

"Order": an order of the Bankruptcy Court in the Case in substantially the form attached hereto as Exhibit B authorizing and approving this Credit Agreement and the other Loan Documents, which order has not been reversed, stayed, or vacated pursuant to applicable law or by an order of the Bankruptcy Court or other court of competent jurisdiction.

"Ordinary Course of Business" or "in the Ordinary Course": the conduct of the Business in substantially the same manner as the Business was operated on the date of this Agreement, including operations in conformance with FMBank's practices and procedures as of such date.

"Other Taxes": any and all present or future stamp or documentary taxes or any other excise taxes, charges or similar levies arising from any payment made hereunder or from the execution, delivery or enforcement of, or otherwise with respect to, this Agreement or any other Loan Document.

"Patriot Act": the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT ACT) Act of 2001, Title III of Pub. L. 107-56, signed into law October 26, 2001.

"PBGC": the Pension Benefit Guaranty Corporation established pursuant to Subtitle A of Title IV of ERISA (or any successor).

"Permitted Liens": as defined in the preliminary statements hereto.

"Permitted Uses" as defined in Section 5.2.

8

"Person":  means an individual, legal personal representative, corporation, limited liability company, partnership, firm, trust, trustee, syndicate, joint venture, unincorporated organization or Governmental Authority or other entity of whatever nature.

"Petition Date":  as defined in the preliminary statements hereto.

"Plan":  at a particular time, any employee benefit plan that is covered by ERISA and in respect of which the Borrower or a Commonly Controlled Entity (i) is (or, if such plan were terminated at such time, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA, (ii) is a sponsor, (iii) is obligated to contribute thereto, or (iv) otherwise has any liability with respect thereto.

"Plan of Reorganization":  a plan or plans of reorganization with respect to the Case.

"Properties":  the facilities and properties owned, leased or operated by the Borrower.

"Regulation U":  Regulation U of the Board as in effect from time to time.

"Reorganization":  with respect to any Multiemployer Plan, the condition that such plan is in reorganization within the meaning of Section 4241 of ERISA.

"Reportable Event":  any of the events set forth in Section 4043(c) of ERISA, other than those events as to which the thirty day notice period is waived under of PBGC Reg. § 4043.

"Requirement of Law":  as to any Person, the Bylaws and Certificate of Incorporation or other organizational or governing documents of such Person, and any Legal Requirement, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"Responsible Officer":  the chief executive officer, president, chief financial officer, treasurer or assistant treasurer of the Borrower or any of the other individuals designated in writing to the Lender by an existing Responsible Officer of the Borrower as an authorized signatory of any certificate or other document to be delivered hereunder.

"Sale Hearing":  a sale hearing conducted by the Bankruptcy Court to consider the approval of the Contemplated Transactions.

"Sale Milestones":  the following milestones with respect to the Contemplated Transactions, in each case, in a manner satisfactory to the Lender in its sole and absolute discretion:

(a)      the Petition Date shall have occurred no later than one Business Day after the date of the Acquisition Agreement;

(b)      the Borrower shall file a motion in form and substance satisfactory to the Lender in its sole and absolute discretion seeking approval of procedures for an auction (the "Auction") with respect to the sale contemplated by the Acquisition Agreement (the "Auction Procedures Motion") on the Petition Date;

(c)      a hearing of the Bankruptcy Court to approve the Auction Procedures Motion shall be held and entry of the Auction Procedures Order (as such term is defined in the Acquisition Agreement) shall occur not later than 25 days after the Petition Date;

(d)      the deadline for submission of qualified bids for the Auction shall occur not later than 30 days after the hearing to approve the Auction Procedures Motion is held (the "Bid Deadline");

(e)      the Auction shall be held not later than 5 days after the Bid Deadline; and

(f)      a hearing of the Bankruptcy Court to approve the successful bid in the Auction shall be held not later than 2 Business Days after the Auction, or if there are no Qualified Bidders (as defined in the Acquisition Agreement), no later than 5 days following the Bid Deadline.

"SEC":  the Securities and Exchange Commission, any successor thereto and any analogous Governmental Authority.

"Secured Obligations":  as defined in the Security Agreement.

"Securities Act":  the Securities Act of 1933, as amended from time to time and any successor statute.

"Security Agreement":  that certain Superpriority Debtor-In-Possession Security Agreement dated of even date herewith by the Borrower to and for the benefit of Lender, as it may be amended, supplemented or otherwise modified from time to time.

"Security Documents":  the collective reference to the Security Agreement, the Order, any guaranty, and all other security documents hereafter delivered to the Lender granting a Lien on any property of any Person to secure the Obligations.

"Single Employer Plan":  any Plan that is covered by Title IV of ERISA, but that is not a Multiemployer Plan.

"Subsidiary":  when used with reference to an entity, any corporation, a majority of the outstanding voting securities of which are owned directly or indirectly by such entity or any partnership, joint venture or other enterprise in which any entity has, directly or indirectly, a majority equity interest.

"Superpriority Claim":  a claim under Section 364(c)(1) of the Bankruptcy Code against the Borrower in the Case which is an administrative expense claim having priority over any or all administrative expenses, including, without limitation, administrative expenses of the kind specified in Sections 503(b), 506(c) or 507(b) of the Bankruptcy Code.

"Uniform Commercial Code" or "UCC":  the Uniform Commercial Code (or any similar or equivalent legislation) as in effect from time to time in the State of Maryland or any other applicable jurisdiction.

"United States":  the United States of America.

10

"UST":  the Office of the United States Trustee.

    1.2    Other Definitional Provisions.

        (a)    Unless otherwise specified therein, all terms defined in this Agreement shall have the meanings set forth herein when such terms are used in the other Loan Documents or any certificate or other document made or delivered pursuant hereto or thereto.

        (b)    As used herein and in the other Loan Documents, and any certificate or other document made or delivered pursuant hereto or thereto, (i) the words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation", (ii) the word "incur" shall be construed to mean incur, create, issue, assume, become liable in respect of or suffer to exist (and the words "incurred" and "incurrence" shall have correlative meanings), (iii) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, Capital Stock, securities, revenues, accounts, leasehold interests and contract rights and (iv) references to agreements or other Contractual Obligations shall, unless otherwise specified, be deemed to refer to such agreements or Contractual Obligations as amended, supplemented, restated or otherwise modified from time to time.

        (c)    The words "hereof", "herein" and "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and Section, Schedule and Exhibit references are to this Agreement unless otherwise specified.

        (d)    The meanings given to terms defined herein shall be equally applicable to both the singular and plural forms of such terms.

## SECTION 2.  AMOUNT AND TERMS OF COMMITMENT

    2.1    Commitment.

        (a)    Subject to the terms and conditions and relying upon the representations and warranties herein set forth, the Lender agrees to make Loans to the Borrower at any time and from time to time from the Effective Date to the Maturity Date, or until the earlier reduction of its Commitment to zero in accordance with the terms hereof, in an aggregate principal amount of Loans at any time outstanding not to exceed the amount of the Commitment.

        (b)    Notwithstanding the foregoing:

            (i)    The aggregate principal amount of Loans outstanding at any time to the Borrower shall not exceed the Commitment in effect at such time.

            (ii)    The Commitment shall automatically and permanently be reduced to zero on the Maturity Date.  Within the limits set forth herein, the Borrower may borrow, prepay and repay Loans, on or after the Effective Date and prior to the Maturity Date, subject to the terms, provisions and limitations set forth herein; provided, however, that amounts repaid or prepaid may not be reborrowed.

11

2.2    <u>Making the Loans</u>.

(a)    The Borrower shall give the Lender prior telephonic notice (immediately confirmed in writing by e-mail, in substantially the form of <u>Exhibit A</u> hereto (a "<u>Notice of Borrowing</u>")), not later than 12:00 noon (Maryland time) on the date which is three (3) Business Days prior to the date of the proposed Loan (or such shorter period as the Lender is willing to accommodate from time to time, but in no event later than 12:00 noon (Maryland time) on the borrowing date of the proposed Loan). Such Notice of Borrowing shall be irrevocable and shall specify (i) the aggregate principal amount of the proposed Loan and line-item amounts for each of the proposed uses of the proposed Loan, (ii) the use(s) of the proposed Loan, in reasonable detail (which use(s) must be Permitted Uses) and (iii) the proposed borrowing date, which must be a Business Day. The Lender may act without liability upon the basis of written, electronic, telecopied, or telephonic notice believed by the Lender in good faith to be from the Borrower (or from any Responsible Officer thereof designated in writing purportedly from the Borrower to the Lender). The Borrower hereby waives the right to dispute the Lender's record of the terms of any such telephonic Notice of Borrowing. The Lender shall be entitled to rely conclusively on any Responsible Officer's authority to request a Loan on behalf of the Borrower until the Lender receives written notice to the contrary. The Lender shall have no duty to verify the authenticity of the signature appearing on any written Notice of Borrowing.

(b)    Each Loan shall be made in a minimum amount of $100,000.

2.3    <u>Repayment of the Loans</u>. The Loans shall mature on the Maturity Date and shall be indefeasibly repaid in full in immediately available funds (subject to Sections 2.02 and 5.20(n) of the Acquisition Agreement) on the Maturity Date. Unless otherwise provided under this Agreement, all payments (including prepayments) to be made by the Borrower hereunder, whether on account of principal, interest, fees or otherwise, shall be made without setoff or counterclaim and shall be made prior to 12:00 noon (Maryland time) on the due date thereof to the Lender at the office of the Lender specified in <u>Section 8.2</u> (or such other office as may be specified from time to time by the Lender by written notice to the Borrower), in Dollars and in immediately available funds. If any payment hereunder becomes due and payable on a day other than a Business Day, such payment shall be extended to the next succeeding Business Day. In the case of any extension of any payment of principal pursuant to the preceding sentence, interest thereon shall be payable at the then applicable rate during such extension.

2.4    <u>Reduction of Commitment; Prepayments</u>.

(a)    <u>Termination; Reduction of Commitment</u>.

(i)    The Commitment shall terminate on the Maturity Date.

(ii)    The Borrower may, without premium or penalty, reduce the Commitment to an amount (which may be zero) not less than the sum of (A) the aggregate unpaid principal amount of all Loans then outstanding and (B) the aggregate principal amount of all Loans not yet made as to which a Notice of Borrowing has been given by the Borrower under <u>Section 2.2</u>. Each such reduction (1) shall be in an amount which is an integral multiple of $100,000 (unless the Commitment in effect immediately prior to such reduction is less than

12

$100,000), (2) shall be made by providing not less than three (3) Business Days' prior written notice to the Lender and (3) shall be irrevocable.

(iii)    The Commitment shall automatically be reduced to the "Maximum DIP Loan Amount" (as such term is defined in the Acquisition Agreement) in accordance with the terms of the Acquisition Agreement; provided, however that if the Lender is approved at the Sale Hearing as the winning bidder with respect to the Contemplated Transaction, the Commitment shall be automatically, upon the entry of the Sale Order, increased to $2.500,000.

(iv)    Except as provided in Section 2.4(a)(iii), once reduced, the Commitment may not be increased.

(b)    Optional Prepayment.  The Borrower may at any time and from time to time prepay the principal of any Loan, in whole or in part without penalty or premium.

(c)    Mandatory Prepayment.

(i)    If at any time the aggregate principal amount of all Loans exceeds the Commitment, the Borrower shall immediately prepay the Loans to the full extent of any such excess.

(ii)    Immediately upon any Disposition by the Borrower or any of its Subsidiaries (other than FMBank), the Borrower shall prepay the outstanding principal amount of the Loans in an amount equal to 100% of the Net Cash Proceeds received by such Person in connection with such Disposition, or the actual amount of the Loans, whichever is less.  Nothing contained in this subsection (ii) shall permit the Borrower or any of its Subsidiaries (other than FMBank) to make a Disposition of any property other than in accordance with Section 6.5.

2.5    Interest Rates and Payment Dates.  Each Loan shall bear interest at a rate per annum equal to the Applicable Rate. All computations of interest shall be made on the basis of a 360- day year and actual days elapsed.

(a)    (i) On or prior to the Maturity Date, if any Event of Default shall occur, the Loans (whether or not overdue) shall bear interest at a rate per annum equal to the rate that would otherwise be applicable thereto pursuant to the foregoing provisions of this Section plus 2%, (ii) after the Maturity Date, the Loans shall bear interest at a rate per annum equal to the rate then applicable to the Loans under the Facility plus 2% and (iii) if all or a portion of any interest payable on any Loan or any other amount payable hereunder shall not be paid when due (whether at the stated maturity, by acceleration or otherwise), such overdue amount shall bear interest at a rate per annum equal to the rate then applicable to the Loans under the Facility plus 2%, in each case, with respect to clauses (i), (ii) and (iii) above, from the date of such non-payment until such amount is indefeasibly paid in full in immediately available funds (as well after as before judgment).

(b)    Interest shall accrue and be payable on the Maturity Date, provided that interest accruing pursuant to paragraph (a) of this Section shall be payable from time to time on demand.

13

(c)      Notwithstanding the foregoing, if the Lender is the winning bidder in the Sale Hearing, and subject to the occurrence of the Acquisition Closing, any interest or fees that have accrued shall be forgiven by the Lender and the Borrower shall have no obligation to make any interest payments hereunder. For the avoidance of doubt, however, interest or fees that have accrued shall not be forgiven by the Lender, and the Borrower shall have an obligation to make all interest payments hereunder in accordance with the terms hereof, including with respect to all interest and fees accrued prior to the Sale Hearing, if the Lender is not the winning bidder in the Sale Hearing or if the Lender is the winning bidder in the Sale Hearing but the Acquisition Agreement is terminated prior to the Acquisition Closing for any reason other than pursuant to Section 8.01(b)(ix) of the Acquisition Agreement.

2.6      [Reserved].

2.7      Taxes.

(a)      All payments made by the Borrower under this Agreement shall be made free and clear of, and without deduction or withholding for or on account of, any present or future income, stamp or other taxes, levies, imposts, duties, charges, fees, deductions or withholdings, now or hereafter imposed, levied, collected, withheld or assessed by any Governmental Authority, excluding:  (i) taxes imposed on or measured by net income and franchise taxes (imposed in lieu of net income taxes) imposed on the Lender as a result of (x) such Lender being organized under the laws of, or having its principal office located in, the jurisdiction imposing such tax or (y) such Lender having a present or former connection between the Lender and the jurisdiction of the Governmental Authority imposing such tax or any political subdivision or taxing authority thereof or therein (other than any such connection arising solely from the Lender having executed, delivered or performed its obligations or received a payment under, or enforced, this Agreement or any other Loan Document), (ii) U.S. withholding taxes imposed on any amount payable to a Lender pursuant to a law in effect on the date such Lender becomes a party to this Agreement, (iii) taxes that are attributable to the Lender's failure to comply with the requirements of Section 2.7(d) of this Agreement, and (iv) taxes that are attributable to the gross negligence of Lender. If any taxes that are not described in clauses (i) through (iv) of the prior sentence (such taxes, the "Non-Excluded Taxes") or Other Taxes are required to be deducted or withheld from any amounts payable to the Lender hereunder, the amounts so payable to the Lender shall by way of additional interest be increased to the extent necessary to pay to the Lender (after payment of all Non-Excluded Taxes and Other Taxes) a sum equal to the amount such Lender would have received had no such deduction of withholding been required.

(b)      In addition, the Borrower shall pay any Other Taxes to the relevant Governmental Authority in accordance with applicable law.

(c)      Whenever any Non-Excluded Taxes or Other Taxes are payable by the Borrower, as promptly as possible thereafter the Borrower shall send to the Lender for its own account a certified copy of an original official receipt received by the Borrower showing payment thereof. If the Borrower fails to pay any Non-Excluded Taxes or Other Taxes when due to the appropriate taxing authority or fails to remit to the Lender the required receipts or other

14

required documentary evidence, the Borrower shall indemnify the Lender for any incremental taxes, interest or penalties that may become payable by the Lender as a result of any such failure.

(d)    Each Lender that is organized under the laws of: (i) the United States shall execute and deliver to the Borrower two of more completed originals of IRS form W-9 on or prior to the Effective Date and (ii) the laws of a jurisdiction other than the United States shall execute and deliver to the Borrower two or more (as the Borrower may request) completed originals of IRS form W-8ECI, W-8BEN, or W-8IMY (and any supporting documentation requested by the Borrower), as applicable, or other applicable form, certificate or document prescribed by the United States IRS certifying as to such Lender's entitlement to exemption from U.S. withholding taxes on or prior to becoming a Lender under this Agreement.

(e)    The agreements in this Section shall survive the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

2.8    <u>Evidence of Indebtedness</u>.  The Lender shall maintain an account or accounts evidencing the Obligations of the Borrower to the Lender resulting from each Loan made by the Lender, including the amounts of principal and interest payable and paid to the Lender from time to time hereunder.  The entries made in such accounts. to the extent permitted by applicable law, shall be prima facie evidence of the existence and amounts of the obligations recorded therein, absent manifest error; provided, that the failure of the Lender to maintain such accounts or any error therein shall not in any manner affect the obligation of the Borrower to repay the Loans in accordance with the terms of this Agreement and the other Loan Documents.  The Lender may request that the Loans be evidenced by a Note and, in such event, the Borrower shall promptly execute and deliver a Note to the Lender.

2.9    <u>Priority and Liens</u>.

(a)    <u>Superpriority Claims and Liens</u>.   The Borrower hereby covenants, represents and warrants that, upon entry of the Order, the Obligations of the Borrower to the Lender under the Loan Documents:

(i)    pursuant to Section 364(c)(1) of the Bankruptcy Code, shall at all times constitute an allowed Superpriority Claim of the Lender;

(ii)    pursuant to Section 364(c)(2) of the Bankruptcy Code, shall at all times be secured by a perfected first priority Lien on all tangible and intangible property of the Borrower that is not subject to Permitted Liens (other than Avoidance Actions and the proceeds therefrom); and

(iii)    pursuant to Section 364(c)(3) of the Bankruptcy Code, shall be secured by a perfected Lien upon all tangible and intangible property of the Borrower that is subject to Permitted Liens.

(b)    <u>Real Property</u>. Subject in all respects to the terms of the Order, and the priorities set forth in <u>Section 2.9(a)</u> above, the Borrower grants to the Lender a security interest in, and mortgage on, all of the right, title and interest of the Borrower in all real property owned by the Borrower (including leasehold interests), including the real property described on

15

Exhibit C attached hereto, together with all of the right, title and interest of the Borrower in and to all buildings, improvements, and fixtures related thereto (the "Real Property"), all general intangibles relating thereto and all proceeds thereof, to secure repayment of the Obligations. The Borrower acknowledges that, pursuant to the Order, the Liens in favor of the Lender on the Real Property shall be perfected without the recordation of any instruments of mortgage or assignment. The Borrower agrees that (i) upon the reasonable request of the Lender, the Borrower shall promptly enter into separate mortgages on all Real Property having a value (together with improvements thereof) of at least $250,000 in recordable form with respect to such properties on terms reasonably satisfactory to the Lender, and (ii) the Borrower shall pay any and all transfer, documentary, stamp, registration and other such taxes and fees (including any penalties and interest) incurred in connection with the filing and/or recordation of any and all instruments of mortgage or assignment with respect to the Loans. The Borrower hereby assents to the passage of a decree for the sale of the Real Property upon the occurrence and continuation of an Event of Default.

(c)     Set-Off. Subject to Section 7 hereof, upon the occurrence and during the continuance of any Event of Default, the Lender is hereby authorized at any time and from time to time, to the fullest extent permitted by applicable Legal Requirements and without further order of or application to the Bankruptcy Court, to set off and apply any and all deposits (general or special, time or demand, provisional or final, other than payroll, trust, withholding and tax accounts) at any time held by, or on behalf of, Lender, and other indebtedness at any time owing by the Lender to or for the credit or the account of the Borrower against any and all of the obligations of the Borrower under the Loan Documents, whether or not such obligations are then due. The Lender shall notify the Borrower of such setoff and application, provided that the failure to give such notice shall not affect the validity of such setoff and application. The rights of the Lender under this Section 2.9(c) are in addition to other rights and remedies which it may have on the Maturity Date or upon the occurrence and during the continuance of any Event of Default under the Loan Documents or the Order.

(d)     Discharge. The Borrower agrees that (i) its obligations hereunder shall not be discharged by the entry of an order confirming a Plan of Reorganization (and the Borrower, pursuant to Section 1141(d)(4) of the Bankruptcy Code, hereby waives any such discharge) and (ii) the Superpriority Claim granted to the Lender pursuant to the Order, and described in Section 2.9(a) and the Liens granted to the Lender pursuant to the Order, and the Security Documents shall not be affected in any manner by the entry of an order confirming a Plan of Reorganization.

2.10   Security. Upon entry of the Order, as security for the prompt payment and performance of all Secured Obligations of the Borrower, the Borrower has granted, in accordance with the provisions hereof, the Security Documents applicable to the Borrower and the Order, to the Lender a security interest in all of its right, title and interest in and to all of the Collateral.

## SECTION 3. REPRESENTATIONS AND WARRANTIES

To induce the Lender to enter into this Agreement and to make the Loans, the Borrower hereby represents and warrants to the Lender that:

3.1    Continued Compliance with the Acquisition Agreement.    Each of the representations and warranties made by the Borrower and FMBank in or pursuant to the Acquisition Agreement is true and correct in all respects (in the case of any representation or warranty that is subject to a materiality or Material Adverse Change qualifier) or in all material respects (in the case of any representation or warranty that is not subject to a materiality or Material Adverse Change qualifier), and Borrower and FMBank have performed and complied with all of their obligations and agreements under the Acquisition Agreement in all respects (in the case of any representation or warranty that is subject to a materiality or Material Adverse Change qualifier) or in all material respects (in the case of any representation or warranty that is not subject to a materiality or Material Adverse Change qualifier).

3.2    No Legal Bar. Subject to the entry of the Order (which shall have occurred prior to the making of the Loan), the execution, delivery and performance of this Agreement and the other Loan Documents, the borrowings hereunder and the use of the proceeds thereof will not violate in any material respect any Requirement of Law or any Contractual Obligation of the Borrower and will not result in, or require, the creation or imposition of any Lien on any of its properties or revenues pursuant to any Requirement of Law or any such Contractual Obligation (other than the Liens created by the Security Documents).

3.3    No Default. The Borrower is not in default under or with respect to any of its Contractual Obligations in any respect that could reasonably be expected to result in a Material Adverse Change, except as set forth on Schedule 3.3.

3.4    Federal Regulations. No part of the proceeds of the Loans, and no other extensions of credit hereunder, will be used (a) for "buying" or "carrying" any "margin stock" within the respective meanings of each of the quoted terms under Regulation U as now and from time to time hereafter in effect for any purpose that violates the provisions of the Regulations of the Board or (b) for any purpose that violates the provisions of the Regulations of the Board. If requested by the Lender, the Borrower will furnish to the Lender a statement to the foregoing effect in conformity with the requirements of FR Form G-3 or FR Form U-1, as applicable, referred to in Regulation U.

3.5    Investment Company Act; Other Regulations. The Borrower is not an "investment company", or a company "controlled" by an "investment company", within the meaning of the Investment Company Act of 1940, as amended. The Borrower is not subject to regulation under any Requirement of Law (other than Regulation X of the Board) that limits its ability to incur Indebtedness, except for any such limitations that are otherwise generally applicable to bank holding companies.

3.6    Accuracy of Information, etc. No statement or information contained in this Agreement, any other Loan Document or any other document, certificate or statement furnished by or on behalf of the Borrower to the Lender for use in connection with the transactions contemplated by this Agreement or the other Loan Documents, contained as of the date such statement, information, document or certificate was so furnished, any untrue statement of a material fact or omitted to state a material fact necessary to make the statements contained herein or therein not misleading.

17

3.7    <u>Financial Statements; No Material Adverse Change</u>.

(a)    The Borrower has furnished or made available to the Lender true and complete copies of the consolidated financial statements of the Borrower and its Subsidiaries for the periods ending December 31, 2012, December 31, 2011 and September 30, 2013 (the "<u>Financial Statements</u>").  The Financial Statements (i) fairly present, in all material respects, the financial position of the Borrower and its Subsidiaries as of the respective dates and the results of their respective operations for the periods indicated in such Financial Statements in conformity with GAAP applied on a consistent basis, and (ii) do not contain any items of special or nonrecurring income or any other income not earned in the Ordinary Course of Business except as expressly specified therein.

(b)    There is no fact known to the Borrower that could reasonably be expected to result in a Material Adverse Change that has not been expressly disclosed in the Acquisition Agreement, in this Agreement, in the other Loan Documents or in any other documents, certificates and statements furnished to the Lender for use in connection with the transactions contemplated hereby and by the other Loan Documents.

3.8    <u>Ownership Of Property; Liens; Investments</u>.

(a)    The Borrower has good record and marketable title in fee simple to, or valid leasehold interests in, all real property necessary or used in the Ordinary Course of Business, except for such defects in title as could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Change.

(b)    The property of the Borrower is not subject to any Liens, other than Liens permitted by <u>Section 6.1</u>.

3.9    <u>Secured Superpriority Obligations.</u> On and after the Effective Date and the entry of the Order, the Order and the Loan Documents are sufficient to provide the Superpriority Claims and Liens described in, and with the priority provided in, <u>Section 2.9</u> of this Agreement and the Order.  From and after entry of the Order, the Order shall be in full force and effect and shall not have been vacated, reversed, modified, amended, rescinded or stayed without the prior written consent of the Lender.

**SECTION 4.  CONDITIONS PRECEDENT**

4.1    <u>Conditions to Effective Date</u>.  This Agreement shall become effective as of the Business Day (the "<u>Effective Date</u>") when each of the following conditions precedent shall have been satisfied or waived in a manner satisfactory to the Lender in its sole and absolute discretion:

(a)    The Lender shall have received each of the following, each of which shall be originals or telecopies (followed promptly by originals), each dated on or prior to the Effective Date (or, in the case of certificates of governmental officials, a recent date before the Effective Date) each in form and substance satisfactory to the Lender and in such number of copies as may be requested by the Lender:

(i)    duly executed counterparts of this Agreement;

18

(ii)    the Security Agreement, duly executed by the Borrower;

(iii)    such duly executed certificates of resolutions or consents, incumbency certificates and/or other duly executed certificates of Responsible Officers of the Borrower as the Lender may reasonably require evidencing the identity, authority and capacity of each Responsible Officer thereof authorized to act as a Responsible Officer in connection with this Agreement and the other Loan Documents;

(iv)    such documents and duly executed certifications as the Lender may reasonably require to evidence that the Borrower is duly organized or formed, and that the Borrower is validly existing and in good standing in the jurisdiction where it is formed;

(v)    a certificate signed by a Responsible Officer of the Borrower certifying, as of the Effective Date, that since the Petition Date there has been no change, event, circumstance or development that, individually or in the aggregate, has resulted in, or would reasonably be expected to result in, a Material Adverse Change.

(b)    All Governmental Approvals and all third party consents and approvals necessary in connection with the transactions contemplated hereby shall have been obtained (without the imposition of any conditions that are not reasonably acceptable to the Lender) and shall remain in effect; all applicable governmental filings shall have been made and all applicable waiting periods in connection with the transactions contemplated hereby shall have expired without, in either case, any action being taken by any Governmental Authority, and no law or regulation shall be applicable in the reasonable judgment of the Lender that restrains, prevents or imposes materially adverse conditions upon the transactions contemplated hereby.

(c)    The Order shall have been entered by the Bankruptcy Court, shall be in full force and effect and shall not have been amended, modified, stayed or reversed without the prior written consent of the Lender.

(d)    All of the "first day motions" and related orders submitted on or about the date of the commencement of the Case shall be in form and substance reasonably satisfactory to the Lender and the Borrower and, as entered, shall not deviate from the form thereof approved by the Lender in any material respect which is adverse to the interests of the Lender (such orders hereinafter being referred to as "First Day Orders"; it being understood and agreed that notwithstanding anything herein to the contrary, the relief sought in all such First Day Orders approved by the Lender shall be permitted herein and the consent of the Lender to such relief therein shall be deemed to have been obtained).

(e)    The Sale Motion (as defined in the Acquisition Agreement) and the related exhibits (including the Sale Order, as defined in the Acquisition Agreement) shall be in form and substance acceptable to the Lender in its sole discretion.

(f)    The Lender shall have received, at least one Business Day prior to the Effective Date, all documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including without limitation the Patriot Act.

(g)  Each of the representations and warranties made by the Borrower in or pursuant to the Loan Documents shall be true and correct in all respects (subject to any qualification provided therein) or in all material respects (in the case of any representation or warranty not otherwise qualified) on and as of such date as if made on and as of such date.

(h)  No Default or Event of Default shall have occurred and be continuing on such date or after giving effect to the extensions of credit requested to be made on such date.

(i)  All proceedings in connection with the making of such Loan and the other transactions contemplated by this Agreement and the other Loan Documents, and all documents incidental hereto and thereto, shall be satisfactory to the Lender, and the Lender shall have received all such agreements, instruments, approvals, opinions, and other documents, each in form and substance satisfactory to the Lender, as the Lender may reasonably request.

4.2  Conditions Precedent to All Loans.  The obligation of the Lender to make any Loan on or after the Effective Date is subject to the fulfillment of each of the following conditions precedent:

(a)  The Order shall have been entered by the Bankruptcy Court, shall be in full force and effect and shall not have been amended, modified, stayed or reversed without the prior written consent of the Lender.

(b)  Each of the representations and warranties made by the Borrower in or pursuant to the Loan Documents shall be true and correct in all respects (subject to any qualification provided therein) or in all material respects (in the case of any representation or warranty not otherwise qualified) on and as of such date as if made on and as of such date.

(c)  No Default or Event of Default shall have occurred and be continuing on such date or after giving effect to the extensions of credit requested to be made on such date.

(d)  The Lender shall have received a Notice of Borrowing pursuant to Section 2.2 hereof.

## SECTION 5.  AFFIRMATIVE COVENANTS

The Borrower hereby agrees that, so long as the Commitment remains in effect or any Loan or Obligations or other amounts are owing to the Lender hereunder or under the other Loan Documents, the Borrower shall:

5.1  Further Assurances.  At any time or from time to time upon the request of the Lender, at the expense of the Borrower, promptly execute, acknowledge and deliver such additional instruments, certificates or documents, and do all such other acts and things as the Lender may reasonably request for purposes of implementing or effectuating the provisions of this Agreement and the other Loan Documents, of providing for payment of the Obligations in accordance with the terms of this Agreement, the Notes and the other Loan Documents, or of more fully perfecting or renewing the rights of the Lender with respect to the Collateral (or with respect to any additions thereto or replacements or proceeds or products thereof or with respect to any other property or assets hereafter acquired by the Borrower which may be deemed to be

20

part of the Collateral) pursuant hereto or thereto. Upon the exercise by the Lender of any power, right, privilege or remedy pursuant to this Agreement or the other Loan Documents which requires any consent, approval, recording, qualification or authorization of any Governmental Authority, the Borrower shall execute and deliver, or will cause the execution and delivery of, all applications, certifications, instruments and other documents and papers that the Lender may be required to obtain from the Borrower for such governmental consent, approval, recording, qualification or authorization (to the extent the Borrower is permitted by applicable law to do so). The Borrower shall fully preserve or cause to be fully preserved the Liens granted by the Security Documents.

5.2    Use Of Proceeds. Use the proceeds of the Loans to pay the Borrower's reasonable and documented out-of-pocket third party fees and expenses actually incurred in connection with the Contemplated Transactions and the Case limited to professional fees and expenses of court-approved professionals in the Chapter 11 Case    (as may be subject to approval by the Bankruptcy Court), and fees and expenses of the United States Trustee pursuant to 28 U.S.C. § 1930(a)(6) (collectively, the "Permitted Uses").

5.3    Preservation Of Existence; Business, Etc. (a) Preserve, renew and maintain in full force and effect its legal existence and good standing under the laws of the jurisdiction of its organization; (b) take all reasonable action to maintain all rights, privileges, permits, licenses and franchises necessary in the normal conduct of its business; (c) preserve or renew all of its material registered patents, trademarks, trade names and service marks; and (d) maintain and operate its business in substantially the manner in which it is presently conducted and operated, and in compliance with all covenants of the Borrower set forth in the Acquisition Agreement.

5.4    Financial Information; Default Notices.    Deliver to the Lender, in form satisfactory to the Lender:

(a)    as soon as reasonably practicable after request by the Lender, such consolidated balance sheets of the Borrower and its Subsidiaries, related consolidated statements of income or operations, shareholders' equity, and cash flows, cash balance reports, Reports of Condition and Income of FMBank and its Subsidiaries, or any other financial reports as reasonably requested by the Lender; and

(b)    promptly (and in any event within two Business Days) provide written notice to the Lender of the occurrence of any Default or Event of Default, describing the nature of such Default or Event of Default and any remedial actions being taken with respect thereto.

5.5    Sale Milestones.    The Borrower and its Subsidiaries shall comply with and achieve the Sale Milestones.

## SECTION 6. NEGATIVE COVENANTS

The Borrower hereby agrees that, so long as the Commitment remains in effect or any Loan or other Obligations or other amounts are owing to the Lender hereunder or under any other Loan Document, the Borrower shall not, directly or indirectly:

6.1    Liens. Create, incur, assume or suffer to exist any Lien upon any of its property, assets or revenues, whether now owned or hereafter acquired, or sign or file or suffer to exist under the Uniform Commercial Code of any jurisdiction a financing statement that names the Borrower as debtor, or sign or suffer to exist any security agreement authorizing any secured party thereunder to file such financing statement, or assign any accounts or other right to receive income, other than the following:

(a)    Liens pursuant to any Loan Document and the Order;

(b)    Permitted Liens, provided that in the case of taxes not yet due and payable, only if such taxes are being contested in good faith and by appropriate proceedings diligently conducted, and only if adequate reserves with respect thereto are maintained on the books of the applicable Person in accordance with GAAP;

(c)    pledges or deposits in the Ordinary Course of Business in connection with workers' compensation, unemployment insurance and other social security legislation, other than any Lien imposed by ERISA; and

(d)    deposits to secure the performance of bids, trade contracts and leases (other than Indebtedness), statutory obligations, surety bonds (other than bonds related to judgments or litigation), performance bonds and other obligations of a like nature incurred or arising in the Ordinary Course of Business.

6.2    Indebtedness. Create, incur, assume or suffer to exist any Indebtedness, except:

(a)    Indebtedness under the Loan Documents; and

(b)    Indebtedness outstanding on the date hereof and listed on Schedule 6.2.

6.3    Investments. Make or hold any Investments, except:

(a)    Investments held by the Borrower in the form of cash or cash equivalents;

(b)    Investments consisting of extensions of credit in the nature of accounts receivable or notes receivable arising from the grant of trade credit in the Ordinary Course of Business, and Investments received in satisfaction or partial satisfaction thereof from financially troubled account debtors to the extent reasonably necessary in order to prevent or limit loss; and

(c)    Investments existing on the date hereof.

6.4    Fundamental Changes.    Merge, dissolve, liquidate, consolidate with or into another Person, or Dispose of (whether in one transaction or in a series of transactions) all or

22

substantially all of its assets (whether now owned or hereafter acquired) to or in favor of any Person, other than the Contemplated Transactions.

      6.5    <u>Dispositions</u>.  Make any Disposition or enter into any agreement to make any Disposition, except:

      (a)    Dispositions of obsolete or worn out property or property no longer used or useful in the Business of the Borrower, whether now or hereafter owned or leased, in the Ordinary Course of Business of such Person;

      (b)    Dispositions of inventory in the Ordinary Course of Business;

      (c)    Dispositions of equipment, software or real property to the extent that (i) such property is exchanged for credit against the purchase price of similar replacement property or (ii) the proceeds of such Disposition are reasonably promptly applied to the purchase price of such replacement property; and

      (d)    the marketing for sale and the sale of the capital stock of FMBank in accordance with the Acquisition Agreement, the Auction Procedures Order, and the transactions contemplated thereby.

      6.6    <u>Change In Nature Of Business</u>.  Engage in any line of business different from those lines of business conducted by the Borrower on the date hereof.

      6.7    <u>Transactions With Affiliates</u>.  Enter into any transaction of any kind with any Affiliate of the Borrower, whether or not in the Ordinary Course of Business, other than on fair and reasonable terms substantially as favorable to the Borrower as would be obtainable by the Borrower at the time in a comparable arm's length transaction with a Person other than an Affiliate; <u>provided that</u> the foregoing restriction shall not apply to transactions, arrangements, fees reimbursements and indemnities specifically and expressly permitted between or among such parties under this Agreement.

      6.8    <u>Accounting Changes</u>.  Make any change in (i) accounting policies or reporting practices in a manner that could materially affect the results of computation of any financial ratio or data for a given reporting period, except (x) as required by generally accepted accounting principles, (y) as required for compliance with the Sarbanes-Oxley Act or (z) as pre-approved by the Lender, or (ii) fiscal year.

      6.9    <u>Partnerships, Etc</u>.  Become a general partner in any general or limited partnership or joint venture.

      6.10    <u>Speculative Transactions</u>.  Engage in any transaction involving any interest rate protection agreement, foreign currency exchange agreement, commodity price protection agreement or other interest or currency exchange rate or commodity price hedging arrangement (including caps and collars with respect to interest rates, currency exchange rates or commodity prices) or futures contracts for speculative purposes or any similar speculative transactions, which are, in any case, inconsistent with prior practice and not otherwise made in the Ordinary Course of Business.

6.11    Formation Of Subsidiaries. Organize or invest in any new Subsidiary.

6.12    Administrative Priority; Lien Priority; Payment.

(a)    At any time, suffer to exist a priority for any administrative expense, secured claim or unsecured claim against the Borrower (now existing or hereafter arising of any kind or nature whatsoever), including without limitation any administrative expense of the kind specified in, or arising or ordered under, Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c) 726 or 1114 of the Bankruptcy Code equal or superior to the priority of the Lender in respect of the Obligations.

(b)    At any time, suffer to exist any Lien on the Collateral having a priority equal or superior to the Lien in favor of the Lender in respect of the Collateral, except for Permitted Liens.

(c)    Prior to the date on which the Obligations have been paid in full in cash, pay any administrative expense claims except (i) Obligations due and payable hereunder, and (ii) other administrative expense and professional claims incurred in the ordinary course of the business of the Borrower or the Case.

## SECTION 7.  EVENTS OF DEFAULT

7.1    Events of Default. If any of the following events shall occur and be continuing:

(a)    the Borrower shall fail to pay any principal of any Loan when due in accordance with the terms hereof; or the Borrower shall fail to pay any interest on any Loan or any other amount payable hereunder or under any other Loan Document, within two Business Days after any such interest or other amount becomes due in accordance with the terms hereof, or the Borrower shall use the proceeds of any Loan for purposes other than as described in the corresponding Notice of Borrowing; or

(b)    any representation or warranty made or deemed made by the Borrower herein or in any other Loan Document or that is contained in any certificate, document or financial or other statement furnished by it at any time under or in connection with this Agreement or any such other Loan Document shall prove to have been inaccurate in any respect (subject to any qualification provided therein) or in any material respect (in the case of any representation or warranty not otherwise qualified) on or as of the date made or deemed made; or

(c)    the Borrower fails to perform or observe any term, covenant or agreement contained in any of Sections 2.9 or 2.10, Section 5 or Section 6; or

(d)    the Borrower shall Default in the observance or performance of any other provision contained in this Agreement or any other Loan Document (other than as provided in paragraphs (a) through (c) of this Section), and such Default shall continue unremedied for a period of three (3) Business Days after notice to the Borrower from the Lender; or

(e)    (i) any Person shall engage in any "prohibited transaction" (as defined in Section 406 of ERISA or Section 4975 of the Code) involving any Plan, (ii) any "accumulated

24

funding deficiency" (as defined in Section 302 of ERISA), whether or not waived, shall exist with respect to any Plan or any Lien in favor of the PBGC or a Plan shall arise on the assets of the Borrower or any Commonly Controlled Entity, (iii) a Reportable Event shall occur with respect to, or proceedings shall commence to have a trustee appointed, or a trustee shall be appointed, to administer or to terminate, any Single Employer Plan, which Reportable Event or commencement of proceedings or appointment of a trustee is, in the reasonable opinion of the Lender, likely to result in the termination of such Plan for purposes of Title IV of ERISA, (iv) any Single Employer Plan shall terminate for purposes of Title IV of ERISA, (v) the Borrower or any Commonly Controlled Entity shall, or in the reasonable opinion of the Lender is likely to, incur any liability in connection with a withdrawal from, or the Insolvency or Reorganization of, a Multiemployer Plan or (vi) any other event or condition shall occur or exist with respect to a Plan; and in each case in clauses (i) through (vi) above, such event or condition, together with all other such events or conditions, if any, could, in the sole judgment of the Lender, reasonably be expected to result in a Material Adverse Change; or

(f)      one or more judgments or decrees shall be entered against the Borrower involving in the aggregate a liability (not paid or fully covered by insurance as to which the relevant insurance company has acknowledged coverage) of $250,000 or more, and all such judgments or decrees shall not have been vacated, discharged, stayed or bonded pending appeal within five (5) Business Days from the entry thereof; or

(g)      any of the Security Documents shall cease, for any reason, to be in full force and effect, or the Borrower or any Affiliate of the Borrower shall file a proceeding or take any other action to revoke or invalidate the Security Documents without the express written consent of the Lender, or any Lien created by any of the Security Documents shall cease to be enforceable and of the same effect and priority purported to be created thereby; or

(h)      an order (which has not been stayed) with respect to the Case shall be entered by the Bankruptcy Court appointing, or the Borrower shall file an application for an order with respect to the Case seeking the appointment of, (i) a trustee under Section 1104 of the Bankruptcy Code, or (ii) an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code; or

(i)      an order with respect to the Case shall be entered by the Bankruptcy Court converting the Case to a Chapter 7 case or the Borrower shall file a motion or not oppose a motion seeking such relief, unless such motion is consented to by the Lender; or

(j)      the Bankruptcy Court shall enter an order or orders granting relief from the automatic stay applicable under Section 362 of the Bankruptcy Code to the holder or holders of any security interest to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any Collateral of the Borrower which has a value in excess of $100,000 in the aggregate or permits any third party to commence or continue any litigation against the Borrower involving a potential liability not covered by insurance in excess of $100,000 in the aggregate; or

(k)    an order shall be entered by any court, tribunal, or governmental authority or agency, or the Borrower shall apply for authority, to revoke, reverse, stay, modify, supplement or amend the Order without the express prior written consent of the Lender; or

(l)    an order with respect to the Case shall be entered by the Bankruptcy Court without the express prior written consent of the Lender (i) to permit any administrative expense or any claim (now existing or hereafter arising, of any kind or nature whatsoever) to have administrative priority as to the Borrower equal or superior to the priority of the Lender in respect of the Obligations, except for allowed administrative expenses to the extent set forth in the Order, or (ii) to grant or permit the grant of a Lien on the Collateral, other than a Permitted Lien or any Lien in favor of the Lender; or

(m)    the Borrower shall make any payment of principal or interest or otherwise on account of any prepetition Indebtedness or trade payable (excluding payments effected by a setoff of obligations as permitted by Section 553 of the Bankruptcy Code) in excess of $10,000 without the express prior written consent of the Lender and the approval of the Bankruptcy Court other than as provided for in any First Day Orders; or

(n)    the Borrower shall file a motion in the Case (i) to use Cash Collateral of the Lender under Section 363(c) of the Bankruptcy Code without the express prior written consent of the Lender (it being understood and agreed that the Lender consents to the proposed use of Cash Collateral on the terms and conditions set forth in the form of Order attached hereto), (ii) to recover from any portions of the Collateral any costs or expenses of preserving or disposing of such Collateral under Section 506(c) of the Bankruptcy Code, to cut off rights in the Collateral under Section 552(b) of the Bankruptcy Code, or (iii) to take any other action or actions materially adverse to the Lender or its rights and remedies hereunder or under any of the other Loan Documents or the Lender's interest (as lender under the Loan Documents) in any of the Collateral; or

(o)    an order shall be entered by the Bankruptcy Court dismissing the Case which does not contain a provision for termination of the Commitment, and payment in full in cash of all Obligations of the Borrower hereunder and under the other Loan Documents upon entry thereof;

(p)    the Borrower shall fail to comply with the Order in any respect;

(q)    the Acquisition Agreement shall have terminated in accordance with its terms (other than as a result of a breach by the Lender); or

(r)    by not later than the first Business Day following entry by the Bankruptcy Court of an Alternative Transaction Order, the Borrower shall fail to indefeasibly pay in full to Lender all Obligations, including, without limitation, the outstanding principal, interest, and other obligations of the Borrower under this Agreement;

then, (i) in the case of an Event of Default under any of Sections 7.1(b) through 7.1(q) hereof, Lender may, by five (5) Business Days' prior written notice to the Borrower (with a copy to counsel for the Borrower, counsel for the Creditors' Committee, the UST and the Bankruptcy Court), declare the Loans (with accrued interest thereon) and all other amounts owing under this

26

Agreement and the other Loan Documents to be due and payable forthwith, whereupon the same shall immediately become due and payable in full and the Commitment terminated, and (ii) in the case of an Event of Default under Section 7.1(a) or (r) hereof, the Loans (with accrued interest thereon) and all other amounts owing under this Agreement and the other Loan Documents, shall immediately become due and payable in full without need for notice or demand and the Commitment shall terminate. Without limiting the foregoing, immediately upon the earlier of entry of an Alternative Transaction Order or any termination of the Acquisition Agreement, the Commitment shall terminate. Notwithstanding anything in this Agreement or the other Loan Documents to the contrary, the Lender shall not foreclose on Collateral consisting of Capital Stock of FMBank without the prior consent of the Board of Governors of the Federal Reserve System.

Except as expressly provided above in this Section, presentment, demand, protest and all other notices of any kind are hereby expressly waived by the Borrower. Notwithstanding the foregoing, any Event of Default under clause (m) above may be cured through the return to the Borrower, within five days following notice from the Lender of such Event of Default, of all sums paid which constitute or caused an Event of Default under clause (m) above. Upon the return of all such sums, the Borrower shall provide notice thereof to the Lender, along with such other evidence the Lender may reasonably require to confirm that such payment has been made to the Borrower, and upon delivery of such items such Event of Default shall then be cured and cease to be in effect or continuing.

7.2    Application of Proceeds.  If an Event of Default shall have occurred and be continuing, the Lender may at any time apply (a) all payments received by the Lender under the Loan Documents, whether from the Borrower or otherwise and (b) all or any part of proceeds constituting Collateral received by the Lender, in payment of the Obligations in the following order:

(a)    *first,* to the payment of all costs and expenses of such sale, collection or other realization, all other expenses, liabilities and advances made or incurred by the Lender in connection therewith, and all amounts for which the Lender is entitled to compensation, reimbursement and indemnification under any Loan Document and all advances made by the Lender thereunder for the account of the Borrower, and to the payment of all costs and expenses paid or incurred by the Lender in connection with the Loan Documents, all in accordance with Section 8.5 and the other terms of this Agreement and the Loan Documents;

(b)    *second,* thereafter, to the payment of all other Obligations; and

(c)    *third,* thereafter, to the payment to or upon the order of the Borrower or to whosoever may be lawfully entitled to receive the same or as a court of competent jurisdiction may direct.

## SECTION 8. MISCELLANEOUS

8.1    Amendments and Waivers.  No amendment, supplement, modification or waiver of any of the provisions of this Agreement or any other Loan Document shall be deemed to be made unless the same shall be in writing signed on behalf of the Borrower and the Lender and

each waiver, if any, shall be a waiver only with respect to the specific instance involved and shall in no way impair the rights of the parties making such waiver or the obligations of the other parties to such party in any other respect or at any other time. Any such waiver and any such amendment, supplement or modification shall be binding upon the Borrower, the Lender and all future holders of the Loan. In the case of any waiver, each of the Borrower and the Lender shall be restored to their former position and rights hereunder and under the other Loan Documents, and any Default or Event of Default waived shall be deemed to be cured and not continuing; but no such waiver shall extend to any subsequent or other Default or Event of Default, or impair any right consequent thereon.

8.2    Notices.  Any and all notices, requests, instructions and other communications required or permitted to be given under this Agreement after the date of this Agreement by any party hereto to any other party may be delivered personally or by nationally recognized overnight courier service or sent by mail or (except in the case of payments) by facsimile transmission or electronic mail, at the respective addresses or transmission numbers set forth below and is deemed delivered (a) in the case of personal delivery, facsimile transmission or electronic mail, when received; (b) in the case of mail, upon the earlier of actual receipt or five (5) Business Days after deposit in the United States Postal Service, first class certified or registered mail, postage prepaid, return receipt requested; and (c) in the case of an overnight courier service, one (1) Business Day after delivery to such courier service with and instructions for overnight delivery. The parties may change their respective addresses and transmission numbers by written notice to all other parties, sent as provided in this Section. All communications must be in writing and addressed as follows:

Borrower:          First Mariner Bancorp
1501 S. Clinton Street,
Baltimore, MD 21224
Attention:  Mark A. Keidel
                  Joseph Howard
Telephone:  410-558-4281
Facsimile:  443-573-4912
Electronic Mail:  MKEIDEL@1stMarinerBank.com
                  JHOWARD@1stMarinerBank.com

With a copy to:

Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, NY 10036
Attention:  Robert T. Schmidt
                  Joshua K. Brody
Telephone: 212-715-9100
Facsimile: 212-715-8100
Electronic Mail:  rschmidt@kramerlevin.com
                  jbrody@kramerlevin.com

Lender:          RKJS Bank

28

12997 Jerome Jay Drive
Cockeysville, MD 21030
Attention: Robert D. Kunisch, Jr.
Telephone: 410-241-0839
Electronic Mail: kunisch@comcast.net

With a copy to:

Venable LLP
750 E. Pratt Street. Suite 900
Baltimore, MD 21202
Attention: Michael D. Schiffer, Esq.
Telephone: 410-244-7546
Facsimile: 410-244-7742
Electronic Mail: mschiffer@venable.com

provided that any notice, request or demand to or upon the Lender shall not be effective until received. Notices and other communications to the Lender hereunder may be delivered or furnished by electronic communications pursuant to procedures approved by the Lender.

       8.3     No Waiver; Cumulative Remedies. No failure to exercise and no delay in exercising, on the part of the Lender, any right, remedy, power or privilege hereunder or under the other Loan Documents shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges herein provided are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.

       8.4     Survival of Representations and Warranties. All representations and warranties made hereunder, in the other Loan Documents and in any document, certificate or statement delivered pursuant hereto or in connection herewith shall survive the execution and delivery of this Agreement and the making of the Loans and other extensions of credit hereunder.

       8.5     Payment of Fees and Expenses; and Indemnification.

          (a)     In the event that an Alternative Transaction is consummated or this Bankruptcy Court enters an Alternative Transaction Order, on the Maturity Date, the Borrower shall reimburse the Lender for its reasonable documented costs, fees (including reasonable attorneys' fees), charges, and expenses incurred in connection with the Loans, whether incurred prepetition or postpetition (collectively, the "Fees and Expenses"); provided, however, that if no Loans are made under the Facility, Borrower shall not be obligated to reimburse the Lender for such Fees and Expenses. The obligation to pay the Fees and Expenses shall not reduce or otherwise affect the amount of the Commitment available to the Borrower. In connection with the Fees and Expenses, no later than seven (7) calendar prior to the hearing to approve the Alternative Transaction Order (the "Sale Hearing"), the Lender shall transmit (subject to confidentiality and applicable claims of privilege) summary invoices of the Fees and Expenses to

29

the Borrower, the counsel to any Committee and the United States Trustee, each of whom shall have four (4) calendar days from receipt thereof to review and object to such invoices. In the event of an objection, the parties shall confer with one another and attempt to reach agreement regarding the payment to be made. If agreement cannot be reached between the parties, the objecting party shall reasonably promptly submit to the Bankruptcy Court a written objection setting forth the precise nature of the objection and the monetary amount at issue, which objection shall be heard and determined by the Bankruptcy Court at the Sale Hearing. Absent a written objection to any summary invoice, the Lender's Fees and Expenses reflected in the applicable invoice shall not be subject to Bankruptcy Court approval and shall be paid in the amount reflected on such invoices. If there is a timely objection, the Lender will get paid such Fees and Expenses that are agreed to by the parties or are approved by the Bankruptcy Court. The Lender shall not be required to file any interim or final fee application(s) with the Bankruptcy Court, provided, that the Bankruptcy Court shall have jurisdiction to determine any disputes concerning the Lender's summary invoices. Notwithstanding anything to the contrary contained herein, in the event that closing of the Contemplated Transactions occurs, including the merger as set forth in the Acquisition Agreement, the Borrower shall have no obligation to reimburse the Lender for the Fees and Expenses.

       (b)     In the event it is necessary for Lender to file a motion or adversary proceeding to seek the enforcement or preservation of any rights under this Agreement, the other Loan Documents and any such other documents, or defend any challenge to Lender's claims or Liens, the Borrower will (i) pay or reimburse the Lender for all its reasonable documented costs and expenses incurred in connection with such motion or adversary proceeding, including the reasonable fees and disbursements of counsel to the Lender and (ii) pay, indemnify, and hold the Lender, and the officers, directors, trustees, employees, agents, advisors and Affiliates of the Lender and its officers, directors, employees, affiliates, agents and controlling persons (each, an "Indemnitee") harmless from and against any and all other liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever with respect to the enforcement of this Agreement, the other Loan Documents and any such other documents (regardless of whether any Indemnitee is a party hereto and regardless of whether any such matter is initiated by a third party, the Borrower or any other Person), including any of the foregoing relating to the use of proceeds of the Loan or the violation of, noncompliance with or liability under, any Environmental Law applicable to the operations of the Borrower or any of the Properties and the reasonable fees and expenses of legal counsel in connection with claims, actions or proceedings by any Indemnitee against the Borrower under any Loan Document (all the foregoing in this clause (b), collectively, the "Indemnified Liabilities"), provided, that the Borrower shall have no obligation hereunder to any Indemnitee with respect to Indemnified Liabilities to the extent such Indemnified Liabilities are found by a final and nonappealable decision of a court of competent jurisdiction to have resulted from the gross negligence or willful misconduct of such Indemnitee. Without limiting the foregoing, and to the extent permitted by applicable law, the Borrower agrees not to assert and to cause its Subsidiaries not to assert, and hereby waives and agrees to cause its Subsidiaries to waive, all rights for contribution or any other rights of recovery with respect to all claims, demands, penalties, fines, liabilities, settlements, damages, costs and expenses of whatever kind or nature, under or related to Environmental Laws, that any of them might have by statute or otherwise against any Indemnitee. All amounts due under this Section 8.5 shall be payable not later than 10 days after written demand therefor. Statements payable by the Borrower pursuant to

30

this Section 8.5 shall be submitted to the address of the Borrower set forth in Section 8.2, or to such other Person or address as may be hereafter designated by the Borrower in a written notice to the Lender. The agreements in this Section 8.5 shall survive repayment of the Loan and all other amounts payable hereunder.

8.6    Payments Set Aside.  To the extent that any payment by or on behalf of the Borrower is made to the Lender, or the Lender exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by the Lender in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Law or otherwise, or otherwise avoided and recovered by the Borrower, then to the extent of such recovery, the obligation or part thereof originally intended to be satisfied, and any Lien corresponding thereto, shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred.

8.7    Successors and Assigns; Assignments.  The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that (i) the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder (x) without the prior written consent of the Lender (and any attempted assignment or transfer by the Borrower without such consent shall be null and void) or (y) to any Person that is not a "United States person" as defined in Section 7701(a)(30) of the Code and (ii) the Lender may assign to one or more assignees (each, an "Assignee") all or a portion of its rights and obligations under this Agreement with notice to the Borrower. The Borrower shall maintain a register containing the name and address of each Lender and Assignee under this Agreement and its interest in the Loans and the amounts of the Obligations of the Borrower owing to such Person.

8.8    Set-off.  In addition to any rights and remedies of the Lender provided by applicable Legal Requirements and/or the Acquisition Agreement, the Lender and its Affiliates shall have the right, without prior notice to the Borrower, any such notice being expressly waived by the Borrower to the extent permitted by applicable Legal Requirements, upon any amount becoming due and payable by the Borrower hereunder (whether at the Maturity Date or otherwise), to set off and appropriate and apply against such amount any and all deposits (general or special, time or demand, provisional or final), in any currency, and any other credits, indebtedness or claims, in each case, whether direct or indirect, absolute or contingent, matured or unmatured, at any time held or owing by, or on behalf of, the Lender or any Affiliate of the Lender to or for the credit or the account of the Borrower, as the case may be. The Lender agrees promptly to notify the Borrower after any such setoff and application made by the Lender or any Affiliate, provided that the failure to give such notice shall not affect the validity of such setoff and application.

8.9    Conflicts Between this Agreement and the Order. To the extent any term or provision of this Agreement conflicts or is inconsistent with any term of the Order, the terms of the Order shall control and govern.

31

8.10    Counterparts. This Agreement may be executed by one or more of the parties to this Agreement on any number of separate counterparts, and all of said counterparts taken together shall be deemed to constitute one and the same instrument. Delivery of an executed signature page of this Agreement by facsimile transmission shall be effective as delivery of a manually executed counterpart hereof. A set of the copies of this Agreement signed by all the parties shall be lodged with the Borrower and the Lender.

8.11    Severability. If any provision of this Agreement is held to be illegal, invalid or unenforceable under present or future Legal Requirements, then (a) this Agreement is to be construed and enforced as if such illegal, invalid or unenforceable provision were not a part hereof; (b) the remaining provisions of this Agreement will remain in full force and effect and will not be affected by such illegal, invalid or unenforceable provision or by its severance from this Agreement; and (c) there will be added automatically as a part of this Agreement a provision mutually agreed to which is similar in terms to such illegal, invalid or unenforceable provision as may be possible and still be legal, valid and enforceable.

8.12    Integration. This Agreement and the other Loan Documents represent the entire agreement of the Borrower and the Lender with respect to the subject matter hereof and thereof, and there are no promises, undertakings, representations or warranties by the Lender relative to the subject matter hereof not expressly set forth or referred to herein or in the other Loan Documents.

8.13    GOVERNING LAW.    THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDER THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF MARYLAND, AND TO THE EXTENT APPLICABLE, THE BANKRUPTCY CODE.

8.14    Submission To Jurisdiction; Waivers.

(a)    SUBMISSION TO JURISDICTION.    THE BORROWER HEREBY IRREVOCABLY AND UNCONDITIONALLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE BANKRUPTCY COURT, OR IN THE EVENT THAT THE BANKRUPTCY COURT DOES NOT HAVE JURISDICTION OVER ANY MATTER OR IF IT HAS JURISDICTION BUT DOES NOT EXERCISE SUCH JURISDICTION FOR ANY REASON, THEN TO THE NONEXCLUSIVE JURISDICTION OF ANY MARYLAND STATE COURT OR FEDERAL COURT OF THE UNITED STATES OF AMERICA SITTING IN BALTIMORE, MARYLAND, AND ANY APPELLATE COURT FROM ANY THEREOF, IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS TO WHICH IT IS A PARTY, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT, AND EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN THE BANKRUPTCY COURT, ANY SUCH MARYLAND STATE COURT OR, TO THE FULLEST EXTENT PERMITTED BY LAW, IN SUCH FEDERAL COURT. EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND

32

MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW. NOTHING IN THIS AGREEMENT SHALL AFFECT ANY RIGHT THAT THE LENDER MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS IN THE COURTS OF ANY JURISDICTION.

(b)    WAIVER OF VENUE. THE BORROWER HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT IT MAY LEGALLY AND EFFECTIVELY DO SO, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS TO WHICH IT IS A PARTY IN ANY MARYLAND STATE OR FEDERAL COURT. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.

(c)    SERVICE OF PROCESS.    THE BORROWER IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SECTION 8.2. NOTHING IN THIS AGREEMENT WILL AFFECT THE RIGHT OF THE LENDER TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAW.

8.15    Acknowledgements.  The Borrower hereby acknowledges that:

(a)    it has been advised by counsel in the negotiation, execution and delivery of this Agreement and the other Loan Documents;

(b)    the Lender does not have a fiduciary relationship with or duty to the Borrower arising out of or in connection with this Agreement or any of the other Loan Documents, and the relationship between the Lender, on one hand, and the Borrower, on the other hand, in connection herewith or therewith is solely that of debtor and creditor; and

(c)    no joint venture is created hereby or by the other Loan Documents or otherwise exists by virtue of the transactions contemplated hereby among the Borrower and the Lender.

8.16    Releases of Liens.  At such time as the Loans and the other Obligations under the Loan Documents shall have been indefeasibly paid in full in immediately available funds and the Commitment has been terminated, the Collateral shall be released from the Liens created by the Security Documents and the Order, and the Security Documents and all obligations (other than those expressly stated to survive such termination) of the Lender and the Borrower under the Security Documents shall terminate, all without delivery of any instrument or performance of any act by any Person.

8.17    WAIVERS OF JURY TRIAL.    EACH OF THE PARTIES HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES TRIAL BY JURY IN ANY LEGAL

33

ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AND FOR ANY COUNTERCLAIM THEREIN.

    8.18    <u>Regulatory</u>.  The Borrower will, and will cause each of its Subsidiaries to, provide, to the extent commercially reasonable or required by any Requirement of Law, such information and take such actions as are reasonably requested by the Lender to assist the Lender in maintaining compliance with applicable Legal Requirements.

[Signature page Follows]

**IN WITNESS WHEREOF**, Borrower and Lender have caused this Agreement to be signed by their duly authorized officers as of the date first above written.

**BORROWER:**

**FIRST MARINER BANCORP,**
a Maryland corporation

By: _Mark Keidel_ (SEAL)
Name: Mark A. Keidel
Title: Interim Chief Executive Officer

ACKNOWLEDGMENT

STATE OF MARYLAND            )
                             ) ss:
CITY/COUNTY OF Baltimore     )

I HEREBY CERTIFY that on this _____ day of February, 2014, before me, the undersigned, a Notary Public in and for the State aforesaid, personally appeared _Mark Keidel_ , who is known to me (or satisfactorily proven) to be the person whose name is subscribed to the within instrument, who acknowledged himself/herself to be _Interim CEO_ of _First Mariner Bancorp_ , and who being authorized so to do signed the same in my presence and acknowledged that s/he executed the same for the purposes therein contained.

        WITNESS my hand and official seal.

_Helen M. Giordano_
Notary Public
My commission expires: _April 18, 2017_

LENDER:

RKJS BANK,
a Maryland corporation

By: ~~Robert D. Kunisch, Jr.~~ _(SEAL)_
Name: Robert D. Kunisch, Jr.
Title: President, Chief Operating Officer and Secretary

ACKNOWLEDGMENT

STATE OF MARYLAND
                                                    } ss:
CITY/COUNTY OF _Baltimore_

I HEREBY CERTIFY that on this _6th_ day of February, 2014, before me, the undersigned, a
Notary Public in and for the State aforesaid, personally appeared _Robert D. Kunisch, Jr._
who is known to me (or satisfactorily proven) to be the person whose name is subscribed to the
within instrument, who acknowledged himself/herself to be _Pres. & COO & Sec'y_
_RKJS Bank_, and who being authorized so to do signed the same in my presence and
acknowledged that s/he executed the same for the purposes therein contained.

WITNESS my hand and official seal.

_Deborah H. Scott_
Notary Public
My commission expires: _6-5-2016_

**EXHIBIT A**

Notice of Borrowing

[_____], 2014

RKJS Bank, as the
Lender party to the Credit Agreement referred to below
12997 Jerome Jay Drive
Cockeysville, MD  21030
Attention:  Robert D. Kunish, Jr.
E-mail:  kunisch@comcast.net

With a copy to:

Venable LLP
750 E. Pratt Street, Suite 900
Baltimore, MD  21202
Attention:  Michael D. Schiffer, Esq.
E-mail:  mschiffer@venable.com

Ladies and Gentlemen:

The undersigned, First Mariner Bancorp, a Maryland corporation, a debtor and debtor in possession in a case pending under Chapter 11 of the Bankruptcy Code (the "Borrower"), refers to the Superpriority Debtor-in-Possession Credit Agreement, dated as of February 10, 2014 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Credit Agreement"; the capitalized terms defined therein being used herein as therein defined), between the Borrower and RKJS Bank, as lender (the "Lender"), and hereby gives you notice, irrevocably, pursuant to Section 2.2 of the Credit Agreement, that the undersigned hereby requests a borrowing under the Credit Agreement, and in that connection sets forth below the information relating to such borrowing of the requested Loan (the "Proposed Loan") as required by Section 2.2 of the Credit Agreement:

1. The Business Day of the Proposed Loan is:  [_____], 20[__]
2. The aggregate amount of the Proposed Loan is:  $_____
3. The proceeds of the Proposed Loan are to be used for:

    [Describe with specificity the uses of the Proposed Loan (which uses must be Permitted Uses) on a per expenditure basis with a dollar amount corresponding to each expenditure.]

4. The proceeds of the Loan are to be disbursed to the following account:

Bank:  [_____]
Account No.:  [_____]

The Borrower hereby certifies that:

(A) each of the representations and warranties made by the Borrower in or pursuant to the Loan Documents is true and correct on and as of the date hereof as if made on and as of the date hereof; and

(B) no Default or Event of Default has occurred and is continuing on the date hereof or after giving effect to the Credit Event requested to be made on the date specified above.

Very truly yours,

First Mariner Bancorp

By:_____
Name:
Title:

**EXHIBIT B**

DIP Order

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
(Baltimore Division)

| | | |
|---|---|---|
| In re: | * | |
| | | |
| FIRST MARINER BANCORP | * | Case No: 14-11952-DER_____ |
| | | (Chapter 11) |
| Debtor | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

ORDER (A) AUTHORIZING AND APPROVING DEBTOR-IN-POSSESSION FINANCING
AND GRANTING SECURITY INTERESTS AND A SUPERPRIORITY ADMINISTRATIVE
CLAIM IN CONNECTION THEREWITH, (B) APPROVING THE TERMS AND
CONDITIONS OF THAT CERTAIN SUPERPRIORITY DEBTOR-IN-POSSESSION CREDIT
AGREEMENT AND RELATED DOCUMENTS, AND (C) MODIFYING THE AUTOMATIC
STAY TO THE EXTENT NECESSARY TO ENTER INTO THE DEBTOR-IN-POSSESSION
FINANCING AND EFFECTUATE THE TERMS THEREOF

Upon consideration of the Motion (the "Motion") filed by First Mariner Bancorp (the

"Debtor"), seeking, inter alia, (a) authority pursuant to sections 105 and 364(c)(1), (c)(2) and

(c)(3) of title 11 of the United States Code (the "Bankruptcy Code") and Rules 4001 and 9014 of

the Federal Rules of Bankruptcy Procedure, for the Debtor to obtain post-petition loans,

advances and other credit accommodations from RKJS Bank ("RKJS" or, in its capacity as

lender, the "Lender") under that certain Superpriority Debtor-in-Possession Credit Agreement by

and between the Lender and the Debtor, attached as **Exhibit B** to the Motion and a modified

version of which was filed at Dkt. No. 130 (as modified, the "DIP Credit Agreement"), and that

certain Superpriority Debtor-in-Possession Security Agreement between the Lender and the Debtor, attached to the Motion as **Exhibit C** (the "DIP Security Agreement," and together with the DIP Credit Agreement and any other documents required to be executed in connection therewith, collectively, the "DIP Loan Documents"), pursuant to which the Lender will be granted (i) a superpriority administrative claim pursuant to 11 U.S.C. § 364(c)(1); (ii) first priority security interests in and liens upon substantially all unencumbered property of the Debtor's estate pursuant to 11 U.S.C. § 364(c)(2); and (iii) junior security interests in and liens upon property of the Debtor's estate that is subject to an unavoidable lien pursuant to 11 U.S.C. § 364(c)(3); (b) approval of the terms and conditions of the DIP Loan Documents;[1] and (c) modification of the automatic stay solely to the extent necessary to enter into the proposed financing and effectuate the terms thereof; this Court having conducted a hearing on the Motion on March 7, 2014; and the Lender and Debtor having agreed and stipulated as follows, which stipulations this Court hereby approves and adopts:[2]

    A.    <u>Filing of Petition</u>.  On February 10, 2014 (the "Petition Date"), the Debtor filed a voluntary chapter 11 petition under the Bankruptcy Code thereby commencing the above-captioned bankruptcy case (the "Chapter 11 Case").  Pursuant to sections 1107 and 1108 of the Bankruptcy Code, the Debtor is authorized to operate its business as debtor in possession.

    B.    <u>Jurisdiction: Core Proceeding</u>.  Consideration of the Motion constitutes a "core proceeding" as defined in 28 U.S.C. § 157(b)(2)(A), (D), (G), (K), (M) and (0).  This Court has jurisdiction over this proceeding and the parties and property affected hereby pursuant to 28

---

[1] Unless otherwise defined herein, capitalized terms as used herein have the meanings ascribed thereto in the DIP Credit Agreement.

[2] Each of the following findings by the Court will be deemed a finding of fact if and to the full extent that it makes and contains factual findings and a conclusion of law if and to the full extent that it makes and contains legal conclusions.

U.S.C. §§ 157 and 1334.  Venue is proper in this District.

        C.     <u>Need for Funding</u>.  The relief sought in the Motion is necessary and in the best interests of the Debtor, its estate and creditors.  Without the proposed financing, the Debtor does not have the funds necessary to pay the costs and expenses in connection with (a) the Debtor's administration of this Chapter 11 Case, including, without limitation, the fees and expenses of estate professionals, (b) consummation of the transfer and sale of the Debtor's assets in order to maximize recoveries for the Debtor's creditors, (c) payments required to be made under the M&A Agreement (as defined below), and (d) management and preservation of the Debtor's assets.  The Debtor has requested that Lender make loans and advances to Debtor in order to provide funds to pay such costs and expenses. The Lender is willing to make post-petition loans and advances and provide such other credit accommodations pursuant to section 364(c) of the Bankruptcy Code.  Among other things, entry of this Order will preserve and maintain the assets of the Debtor's estate, will avoid harm to, and is in the best interests of, the Debtor, its creditors, and its estate.

        E.     <u>Unavailability of Alternative Financing</u>.  The Debtor is unable to procure unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense pursuant to section 364(b) of the Bankruptcy Code.

        F.     <u>Notice</u>.  The Debtor has provided due and sufficient notice of the Motion and the relief requested to (i) the United States Trustee, (ii) all creditors known to the Debtor who may have liens against the Debtor's assets, (iii) any applicable taxing authority, (iv) counsel for the official committee of unsecured creditors (the "Committee"), (v) the twenty (20) largest unsecured creditors of the Debtor, and (vi) all other creditors and parties in interest requesting notice under Bankruptcy Rule 2002(i).

G.    <u>Business Judgment and Good Faith under Section 364(e) of the Bankruptcy Code</u>. The terms of the DIP Credit Agreement, the other DIP Loan Documents and this Order have been negotiated in good faith and at arms-length within the meaning of section 364(e) of the Bankruptcy Code, are in the best interests of the Debtor, its creditors and the estate, are fair and equitable under the circumstances, and are enforceable pursuant to their terms.  The terms of the DIP Credit Agreement are (i) fair and reasonable and are well within the range of market terms for debtor-in-possession financing; (ii) reflect prudent exercise of business judgment by the Debtor, consistent with its fiduciary duties; (iii) constitute reasonably equivalent value and fair consideration; and (iv) are essential and appropriate for the continued operation and management of the Debtor's business and the preservation of its assets and properties.  This Order is subject to, and Lender is entitled to the benefits of, the provisions of section 364(e) of the Bankruptcy Code.

**THEREFORE, IT IS HEREBY ORDERED THAT:**

1.    <u>Authorization to Incur Indebtedness and Enter Into DIP Loan Documents</u>.  The Motion is hereby granted and approved as set forth herein on a final basis.  Pursuant to section 364(c) of the Bankruptcy Code, the Debtor is hereby authorized and empowered to borrow up to the amount of $2,500,000 from the Lender, pursuant to the terms of this Order and the terms and conditions set forth in the DIP Credit Agreement and the other DIP Loan Documents.  The Debtor is authorized and directed to execute, deliver, perform and comply with the terms and covenants of the DIP Loan Documents and this Order.  The terms and conditions of the DIP Loan Documents are ratified and approved, and, together with this Order, shall be sufficient and conclusive evidence of the borrowing arrangements between the Debtor and Lender and of the terms and conditions of the DIP Loan Documents, for all purposes.  No such

4

borrowings shall be made by the Debtor prior to the Sale Hearing without the consent of the Committee.

2.      <u>Use of Advances Made Under this Order and the DIP Credit Agreement</u>.  The Debtor is hereby authorized to use the proceeds of the Loans and advances made, and other credit accommodations provided, by Lender under the DIP Credit Agreement to pay the Debtor's reasonable and documented out-of-pocket third party fees and expenses actually incurred in connection with the M&A Transaction and the Chapter 11 Case but limited to professional fees and expenses of court-approved professionals in the Chapter 11 Case (as may be subject to approval by the Court), and fees and expenses of the United States Trustee pursuant to 28 U.S.C. § 1930(a)(6).  The proceeds and advances of such Loans shall be deposited into an escrow account at an institution other than First Mariner Bank, the terms of such escrow account to be mutually agreed upon among the Debtor and the Committee.

3.      <u>Grant of Liens and Superpriority Administrative Claim</u>.  Effective on and after the date of this Order, to secure the prompt payment and performance of any and all Obligations, Liens, liabilities and indebtedness (the "<u>DIP Facility Obligations</u>") of the Debtor to Lender of whatever kind or nature or description arising under the DIP Credit Agreement or other DIP Loan Documents, Lender shall have and is hereby granted: (i) a superpriority administrative claim pursuant to section 364(c)(1) of Bankruptcy Code, having priority over any and all administrative expenses including, without limitation, administrative expenses or claims of the kind specified in sections 105, 326, 330, 331, 503(b), 506(c), 507(a), 507(b), and 726 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other consensual or non-consensual lien, levy or attachment; (ii) valid and perfected security interests and liens, senior to all other creditors of the estate of the Debtor, in and upon all

5

of the issued and outstanding shares of First Mariner Bank and all other now existing and hereafter acquired personal and real property and fixtures of the Debtor and its bankruptcy estate, and the proceeds thereof, of whatever kind or nature, whether acquired prior to or subsequent to the Petition Date (other than the Avoidance Actions), that is not subject to an existing properly perfected and unavoidable lien; and (iii) valid and perfected junior security interests and liens in and upon all now existing and hereafter acquired personal and real property and fixtures of the Debtor and its bankruptcy estate, and the proceeds thereof, of whatever kind or nature, whether acquired prior to or subsequent to the Petition Date that is subject to an existing properly perfected and unavoidable lien pursuant to section 364(c)(3) of the Bankruptcy Code (collectively, clauses (i), (ii), and (iii) referred to as the "DIP Facility Superpriority Claims and DIP Facility Liens").

4.    No Surcharge of Collateral.  No costs or expenses of administration which have been or may be incurred by the Debtor or any creditor of the Debtor in connection with the Debtor's bankruptcy case, whether proceeding under chapter 11 or chapter 7 of the Bankruptcy Code, are or will be prior to or on a parity with the DIP Facility Superpriority Claims and DIP Facility Liens; and no such costs or expenses shall be imposed or charged against the Lender or the Collateral pursuant to section 506(c) of the Bankruptcy Code.

5.    Limitations on Use of Funds.  Notwithstanding the foregoing, no funds shall be paid or made available from the Loans for any fees, disbursements or expenses of any party, including the Debtor or the Committee, or any professional employed by any party, in connection with (i) the initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation against the Lender, including, without limitation, challenging the amount, validity, extent, perfection, priority, or enforceability of, or asserting any defense, counterclaim,

or offset to the DIP Facility Obligations, the DIP Facility Superpriority Claims and DIP Facility Liens; or (ii) any claims or actions to hinder or delay the Lender's assertion, enforcement or realization on the Collateral in accordance with the DIP Loan Documents or this Order; provided, however that notwithstanding anything to the contrary set forth in this Order, the Debtor may use funds from the Loans to take any action to enforce rights and remedies under this Order, the DIP Loan Documents, and/or that certain Merger and Acquisition Agreement, dated as of February 7, 2014, by and among RKJS, First Mariner Bank and the Debtor (the "M&A Agreement").

6.    Fees and Expenses of the Lender.  In the event that an Alternative Transaction is consummated or this Court enters an Alternative Transaction Order, on the Maturity Date, the Debtor shall reimburse the Lender for its reasonable documented costs, fees (including reasonable attorneys' fees), charges, and expenses incurred in connection with the Loans, whether incurred prepetition or postpetition (collectively, the "Fees and Expenses"); provided, however, that if no Loans are made under the Facility, Borrower shall not be obligated to reimburse the Lender for such Fees and Expenses.  The obligation to pay the Fees and Expenses shall not reduce or otherwise affect the amount of the Commitment available to the Debtor.  In connection with the Fees and Expenses, no later than seven (7) calendar days prior to the Sale Hearing, the Lender shall transmit (subject to confidentiality and applicable claims of privilege) summary invoices of the Fees and Expense to the Debtor, the counsel to any Committee and the United States Trustee, each of whom shall have four (4) calendar days from receipt thereof to review and object to such invoices.  In the event of an objection, the parties shall confer with one another and attempt to reach agreement regarding the payment to be made.  If agreement cannot be reached between the parties, the objecting party shall reasonably promptly submit to the Court

a written objection setting forth the precise nature of the objection and the monetary amount at issue, which objection shall be heard and determined by the Court at the Sale Hearing. Absent a written objection to any summary invoice, the Lender's Fees and Expenses reflected in the applicable invoice shall not be subject to Bankruptcy Court approval and shall be paid in the amount reflected on such invoices. If there is a timely objection, the Lender will get paid such Fees and Expenses that are agreed to by the parties or are approved by the Bankruptcy Court. The Lender shall not be required to file any interim or final fee application(s) with the Court, provided, that the Court shall have jurisdiction to determine any disputes concerning the Lender's summary invoices. Notwithstanding anything to the contrary contained herein, in the event that closing of the Contemplated Transactions occurs, including the merger as set forth in the M&A Agreement, the Debtor shall have no obligation to reimburse the Lender for the Fees and Expenses.

7.    <u>Automatic Perfection</u>.  With respect to the debt incurred by Debtor under the DIP Credit Agreement, this Order shall be sufficient and conclusive evidence of the priority, perfection and validity of all of the security interests in and liens upon the property of the estate of Debtor granted to Lender as set forth herein, without the necessity of filing, recording or serving any financing statements, or other documents which may otherwise be required under federal or state law in any jurisdiction or the taking of any other action, including, without limitation, taking possession of or exercising control over any Collateral, to validate or perfect the security interests and liens granted to Lender in this Order and the DIP Loan Documents. If Lender shall, in its discretion, elect for any reason to file any such financing statements or other documents with respect to such security interests and liens, the Debtor is authorized and directed to execute, or cause to be executed, all such financing statements or other documents upon

8

Lender's reasonable request and the filing, recording or service (as the case may be) of such financing statements or similar documents shall be deemed to have been made at the time of and on the Petition Date. Lender may, in its discretion, file a certified copy of this Order in any filing or recording office in any county or other jurisdiction in which the Debtor has real or personal property and, in such event, the subject filing or recording officer is authorized and directed to file or record such certified copy of this Order.

8.    Preservation of Pre-Petition Liens.    Notwithstanding anything to the contrary contained herein, any pre-petition secured lender's unavoidable liens and security interests in and against any assets of the Debtor shall continue in full force and effect to the extent existing on the date of the entry of this Order, subject to all rights and defenses of the Debtor, its estate and the Committee with respect thereto, and shall be and are unaffected by the DIP Credit Agreement and this Order. The property that is encumbered by any such lien or security interest that is avoided shall become subject to Lender's first priority lien; the Debtor and its estate waiving the benefits of section 551 of the Bankruptcy Code.

9.    Further Acts by Debtor.    Debtor is hereby authorized and directed to perform all acts, and execute and comply with the terms of such other documents, instruments, and agreements (in addition to the DIP Loan Documents) as Lender may reasonably require and as evidence of and for the protection of the Obligations and the Collateral or which may be otherwise deemed necessary by Lender to effectuate the terms and conditions of this Order and the DIP Loan Documents.

10.    No Control of the Debtor.    In determining to make any extensions of credit under the DIP Credit Agreement and in negotiating and consummating the transactions authorized by this Order and the DIP Loan Documents, the Lender shall not be deemed to have been or to be in

9

control of the operation of the Debtor.  In determining to make any Loan under the DIP Credit

Agreement, or in exercising any rights or remedies as and when permitted pursuant to this Order,

or the DIP Loan Documents, Lender shall not be deemed to be in control of the operations of the

Debtor or to be acting as a "responsible person" or "owner or operator" with respect to the

operation or management of the Debtor (as such terms, or any similar terms, are used in the

United States Comprehensive Environmental Response, Compensation and Liability Act, 29

U.S.C. §§ 9601 *et seq.* as amended, or any similar federal or state statute).  Furthermore, nothing

in this Order or the DIP Loan Documents shall in any way be construed or interpreted to impose

or allow the imposition upon Lender of any liability for any claims arising from the post-petition

activities of the Debtor.

     11.    <u>Limited Modification of Automatic Stay</u>.  The automatic stay provisions of

section 362 of the Bankruptcy Code are vacated and modified solely to implement the DIP Loan

Documents and to the extent necessary to permit Lender to exercise, upon the occurrence and

during the continuance of any Event of Default, any or all rights and remedies provided for in the

DIP Loan Documents; <u>provided, however,</u> that prior to the exercise of remedies under the DIP

Loan Documents (other than the right to charge interest at the default rate and to deny making

any Loan under the DIP Loan Documents), the Lender shall be required to give five Business

Days written notice to the Debtor, its bankruptcy counsel, the Committee's counsel and the U.S.

Trustee.  Notwithstanding the occurrence of an Event of Default or the Maturity Date, all of the

rights, remedies, benefits, and protections provided to the Lender under the DIP Loan

Documents and this Order shall survive the Maturity Date.

     12.    <u>Access to the Debtor</u>.  Without limiting the rights of access and information

afforded the Lender under the DIP Loan Documents, the Debtor shall permit representatives,

agents and/or employees of the Lender to have reasonable access to its knowledgeable personnel, premises and records during normal business hours (without unreasonable interference with the proper operation of the Debtor's business) and shall cooperate, consult with, and provide to such representatives, agents and/or employees all such non-privileged information as they may reasonably request.

13.    Insurance Policies.  Upon entry of this Order, the Lender shall be, and shall be deemed to be, without any further action or notice, named as an additional insured and loss payee on each insurance policy maintained by the Debtor which in any way relates to the Collateral. The Debtor is authorized and directed to take any action necessary to have the Lender added as an additional insured and loss payee on each insurance policy.

14.    Replacement DIP Financing.[3]  In the event that a bidder other than the Lender is the Successful Bidder for the Debtor's Purchased Assets, subject to Court approval at the Sale Hearing, the Debtor is authorized to enter into a replacement debtor-in-possession financing facility (the "Replacement DIP Facility") with such Successful Bidder on terms that are substantially the same (and at least as favorable to the Debtor) as those embodied in the DIP Loan Documents and this Order, subject to final approval at the Sale Hearing.  In such event, the Auction Results Notice will contain notice of such Replacement DIP Facility, together with a summary of any material differences between such Replacement DIP Facility and the terms of the DIP Loan Documents and this Order, and no other or further notice or motion will be required with respect thereto.  If the Court approves the Replacement DIP Facility, but subject to RKJS being paid in full, on the Maturity Date, all Obligations owing to it under the DIP Loan Documents, each of the terms of this Order shall apply in all respects to the Replacement DIP

---

[3] Terms used in this paragraph but not defined elsewhere in this Order have the meanings ascribed to them in the Motion.

Facility and all references in this Order to the Lender shall in all regards be understood to refer to the lender under the Replacement DIP Facility, and all references in this Order to the DIP Credit Agreement or the other DIP Loan Documents shall in all regards be understood to refer to the loan documents governing the Replacement DIP Facility; provided, however the Debtor may request non-material changes to this Order to be made to conform to the specific terms of the Replacement DIP Facility.

15.    <u>Survival of Provisions</u>.    The provisions of this Order and any actions taken pursuant hereto shall survive entry of any order which may be entered dismissing the Chapter 11 Case, converting Debtor's Chapter 11 case to a Chapter 7 case, or any order which may be entered confirming or consummating any Chapter 11 plan, and the terms and provisions of this Order as well as the priorities in payment, liens, and security interests granted pursuant to this Order and the DIP Credit Agreement shall continue in this or any superseding case under the Bankruptcy Code, and such priorities in payment, liens and security interests shall maintain their priority as provided by this Order until all Obligations are indefeasibly satisfied and discharged; provided, that, at such time, all obligations and duties of the Lender to provide any loans and advances under this Order or the DIP Credit Agreement shall terminate immediately upon the earlier of the date of any Event of Default, the Maturity Date or the date that the Plan of Reorganization becomes effective unless Lender has given its express prior written consent thereto.  For the avoidance of doubt, such consent shall not be implied from any other action, inaction or acquiescence by Lender.

16.    <u>Resolution of Any Conflicting Terms</u>.    To the extent the terms and conditions of the DIP Loan Documents are in conflict with the terms and conditions of this Order, the terms and conditions of this Order shall control.

17.     <u>Order Binding on Successors</u>.  The provisions of this Order shall be binding upon and inure to the benefit of the Lender, the Debtor, and their respective successors and assigns (including any trustee or other estate representative appointed or elected as a representative of the Debtor's estate, whether the bankruptcy case is a proceeding under chapter 11 or chapter 7 of the Bankruptcy Code, or of any estate in any successor case).  Except as otherwise explicitly set forth in this Order, no third parties are intended to be or shall be deemed to be third party beneficiaries of this Order or the DIP Credit Agreement.

18.     <u>Subsequent Reversal</u>.  If any or all of the provisions of this Order or the DIP Credit Agreement are hereafter modified, vacated, amended, or stayed by subsequent order of this Court or any other court without the consent of the Lender: (i) such modification, vacatur, amendment, or stay shall not affect the validity of any Obligation to the Lender that is or was incurred prior to the effective date of such modification, vacatur, amendment, or stay (the "Modification Date"), or the DIP Facility Superpriority Claims and DIP Facility Liens authorized or created by this Order and the DIP Loan Documents; (ii) the Obligations that were incurred by the Debtor prior to the Modification Date shall be governed in all respects by the original provisions of this Order and the DIP Loan Documents, and (iii) the validity of any Obligations and the DIP Facility Superpriority Claims and DIP Facility Liens is and shall be protected by sections 364(e) of the Bankruptcy Code.

19.     <u>Objections Overruled</u>.  All objections to the entry of this Order not otherwise resolved are hereby overruled.

20.    <u>Order Effective Immediately</u>.  This Order shall be effective immediately upon entry by the Court, and any stay of the effectiveness of this Order is hereby waived.  This Court has and will retain jurisdiction to enforce any terms of, and resolve any issues and disputes raised with respect to, this Order.

21.    <u>Notice Sufficient</u>.  The Debtor has provided notice of the Motion to all parties required under section 4001(c) of the Bankruptcy Rules and such notice complies with the requirements of Local Bankruptcy Rule 4001-4.

END OF ORDER

## **EXHIBIT C**

Real Property

None.

## SUPERPRIORITY DEBTOR-IN-POSSESSION SECURITY AGREEMENT

THIS **SUPERPRIORITY DEBTOR-IN-POSSESSION SECURITY AGREEMENT** (this "Agreement") dated February 10, 2014 is made by and between FIRST MARINER BANCORP, a Maryland corporation and a debtor and debtor in possession in a case pending under Chapter 11 of the Bankruptcy Code (the "Grantor"), and RKJS Bank, a Maryland corporation (together with its successors and assigns, the "Lender").

PRELIMINARY STATEMENTS.

(1)    The Grantor and the Lender have entered into a Superpriority Debtor-in-Possession Credit Agreement dated of even date herewith (said Credit Agreement, as it may hereafter be amended, amended and restated, supplemented or otherwise modified from time to time, being the "Credit Agreement"; capitalized terms not otherwise defined herein shall have the meanings set forth in the Credit Agreement), pursuant to which Lender will make the Loans available to Borrower.

(2)    It is a condition precedent to the Loans that the Grantor shall have granted the assignment and security interest and made the pledge and assignment contemplated by this Agreement.

NOW, THEREFORE, in consideration of the premises and in order to induce the Lender to make the Loans under the Credit Agreement, the Grantor hereby agrees with the Lender as follows:

**Section 1.  Grant of Security.**  Subject to the Permitted Liens, the Grantor hereby grants to the Lender a security interest in the Grantor's right, title and interest in and to all assets and property interests of the Grantor, including, without limitation, the following, in each case, as to each type of property described below, whether now owned or hereafter acquired by the Grantor, wherever located, by whomsoever held or controlled and whether now or hereafter existing or arising, and the proceeds thereof, as security for the Secured Obligations (as defined below) (collectively, the "Collateral"):

(a)    all equipment (any and all such property being the "Equipment");

(b)    all inventory (any and all such property being the "Inventory");

(c)    all accounts, chattel paper (including, without limitation, tangible chattel paper and electronic chattel paper), commercial tort claims identified on Schedule V hereto, documents,   instruments (including, without limitation, promissory notes), deposit accounts, letter-of-credit rights, general intangibles (including, without limitation, payment intangibles) and other obligations of any kind, whether or not arising out of or in connection with the sale or lease of goods or the rendering of services and whether or not earned by performance, and all rights now or hereafter existing in and to all supporting obligations and in and to all security agreements, mortgages, Liens, leases, letters of credit and other contracts securing or otherwise relating to the foregoing property (any and all of such accounts, chattel paper, commercial tort claims, documents, instruments, deposit accounts, letter-of-credit rights, general intangibles and other obligations, to the extent not referred to in clause (d), (e), or (f) below, being the

7460991-v10

"Receivables", and any and all such supporting obligations, security agreements, mortgages, Liens, leases, letters of credit and other contracts being the "Related Contracts");

(d)      the following (the "Security Collateral"):

(i)      the shares of Capital Stock (the "Initial Pledged Interests") set forth opposite the Grantor's name on and as otherwise described in Schedule I hereto and issued by the Persons named therein and the certificates, if any, representing the Initial Pledged Interests, and all dividends, distributions, return of capital, cash, instruments and other property from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of the Initial Pledged Interests and all subscription warrants, rights or options issued thereon or with respect thereto;

(ii)      all other shares of stock and other Capital Stock from time to time acquired by or owned by the Grantor in any manner (such shares and other Capital Stock, together with the Initial Pledged Interests, being the "Pledged Interests"), and the certificates, if any, representing such additional shares or other Capital Stock, and all dividends, distributions, return of capital, cash, instruments and other property from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such shares or other Capital Stock and all subscription warrants, rights or options issued thereon or with respect thereto;

(iii)      all indebtedness from time to time owed to the Grantor (such indebtedness being the "Pledged Debt") and the instruments, if any, evidencing such indebtedness, and all interest, cash, instruments and other property from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such indebtedness; and

(iv)      all other investment property (including, without limitation, all (A) securities, whether certificated or uncertificated, (B) security entitlements, (C) securities accounts, (D) commodity contracts and (E) commodity accounts) in which the Grantor has now, or acquires from time to time hereafter, any right, title or interest in any manner, and the certificates or instruments, if any, representing or evidencing such investment property, and all dividends, distributions, return of capital, interest, distributions, value, cash, instruments and other property from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such investment property and all subscription warrants, rights or options issued thereon or with respect thereto;

(e)      the following (collectively, the "Account Collateral"):

(i)      the deposit accounts as described in Schedule II hereto (the "Deposit Accounts") and all funds and financial assets from time to time credited thereto (including, without limitation, all cash equivalents), all interest, dividends, distributions, cash, instruments and other property from time to time received,

receivable or otherwise distributed in respect of or in exchange for any or all of such funds and financial assets, and all certificates and instruments, if any, from time to time representing or evidencing the Deposit Accounts;

(ii)    all promissory notes, certificates of deposit, deposit accounts, checks and other instruments from time to time delivered to or otherwise possessed by the Lender for or on behalf of the Grantor, including, without limitation, those delivered or possessed in substitution for or in addition to any or all of the then existing Account Collateral; and

(iii)    all interest, dividends, distributions, cash, instruments and other property from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of the then existing Account Collateral;

(f)    the following (collectively, the "Intellectual Property Collateral"):

(i)    all patents, patent applications and inventions claimed or disclosed therein and all improvements thereto ("Patents");

(ii)    all trademarks, service marks, domain names, trade dress, logos, designs, slogans, trade names, business names, corporate names and other source identifiers, whether registered or unregistered (provided that no security interest shall be granted in United States intent-to-use trademark applications to the extent that, and solely during the period in which, the grant of a security interest therein would impair the validity or enforceability of such intent-to-use trademark applications under applicable law), together, in each case, with the goodwill symbolized thereby ("Trademarks");

(iii)    all copyrights, including, without limitation, copyrights in Computer Software (as hereinafter defined), Internet web sites and the content thereof, whether registered or unregistered ("Copyrights");

(iv)    all computer software, programs and databases (including, without limitation, source code, object code and all related applications and data files), firmware and documentation and materials relating thereto, and any substitutions, replacements, improvements, error corrections, updates and new versions of any of the foregoing ("Computer Software");

(v)    all confidential and proprietary information, including, without limitation, know-how, trade secrets, manufacturing and production processes and techniques, inventions, research and development information, databases and data, including, without limitation, technical data, financial, marketing and business data, pricing and cost information, business and marketing plans and customer and supplier lists and information (collectively, "Trade Secrets"), and all other intellectual, industrial and intangible property of any type;

(vi)    all registrations and applications for registration for any of the foregoing, including, without limitation, those registrations and applications for

3

registration set forth in <u>Schedule III</u> hereto (as such <u>Schedule III</u> may be supplemented from time to time by any Intellectual Property Security Agreement executed by the Grantor and the Lender from time to time), together with, as applicable, all reissues, divisions, continuations, continuations-in-part, extensions, renewals and reexaminations thereof;

(vii)    all tangible embodiments of the foregoing, all rights in the foregoing provided by international treaties or conventions, all rights corresponding thereto throughout the world and all other rights of any kind whatsoever of the Grantor accruing thereunder or pertaining thereto;

(viii)    all agreements, permits, consents, orders and franchises relating to the license, development, use or disclosure of any of the foregoing to which the Grantor, now or hereafter, is a party or a beneficiary ("<u>IP Agreements</u>"); and

(ix)    any and all claims for damages and injunctive relief for past, present and future infringement, dilution, misappropriation, violation, misuse or breach with respect to any of the foregoing, with the right, but not the obligation, to sue for and collect, or otherwise recover, such damages;

(g)    all books and records (including, without limitation, all data, formula, programs, licenses relating thereto, customer lists, credit files, printouts and other computer output materials and records) of the Grantor pertaining to any of the Collateral;

(h)    all general intangibles, including, without limitation, payment intangibles, contract rights, rights to payment, rights arising under common law, statutes, or regulations, choses or things in action, goodwill, purchase orders, customer lists, monies due or recoverable from pension funds, route lists, rights to payment and other rights under any royalty or licensing agreements, including Intellectual Property Licenses, infringement claims, pension plan refunds, pension plan refund claims, insurance premium rebates, tax refunds, and tax refund claims, and interests in a partnership or limited liability company which do not constitute a security under Article 8 of the UCC;

(i)    the Commercial Tort Claims specified on <u>Schedule V</u> hereto; and

(j)    all proceeds (in whatever form received, existing or arising) of, collateral for, income, royalties and other payments now or hereafter due and payable with respect to, and supporting obligations relating to, any and all of the Collateral (including, without limitation, proceeds, collateral and supporting obligations that constitute property of the types described in clauses (a) through (g) of this <u>Section 1</u> and this clause (h)) and, to the extent not otherwise included, all (A) payments under insurance (whether or not the Lender is the loss payee thereof), or any indemnity, warranty or guaranty, payable by reason of loss or damage to or otherwise with respect to any of the foregoing Collateral, (B) tort claims, including, without limitation, all commercial tort claims and (C) cash;

<u>provided, however</u>, that (i) the Collateral shall not include any Avoidance Actions and the proceeds and recoveries therefrom and (ii) notwithstanding anything to the contrary contained in clause (f) above, Intellectual Property Collateral shall not include intellectual property in relation

4

to which any applicable law, regulation, agreement with a domain name registrar, or other contractual arrangement, prohibits the creation of a security interest therein or would otherwise invalidate the Grantor's right, title or interest therein (but proceeds and receivables thereof shall not be deemed excluded from the Collateral regardless of such prohibition).

Section 2. **Security for Obligations.**  This Agreement secures the payment of all Obligations of the Grantor now or hereafter existing under the Loan Documents, whether direct or indirect, absolute or contingent, and whether for principal, reimbursement obligations, interest, fees, premiums, penalties, indemnifications, contract causes of action, costs, expenses or otherwise (all such Obligations being the "Secured Obligations").

Section 3. **Grantor Remains Liable.**  Anything herein to the contrary notwithstanding, (a) the Grantor shall remain liable under the contracts and agreements included in the Collateral to the extent set forth therein to perform all of its duties and obligations thereunder to the same extent as if this Agreement had not been executed, (b) the exercise by the Lender of any of the rights hereunder shall not release the Grantor from any of its duties or obligations under the contracts and agreements included in the Collateral and (c) the Lender shall have no obligation or liability under the contracts and agreements included in the Collateral by reason of this Agreement or any other Loan Document, nor shall the Lender be obligated to perform any of the obligations or duties of the Grantor thereunder or to take any action to collect or enforce any claim for payment assigned hereunder.

Section 4. **Delivery and Control of Security Collateral.** (a) If any certificates or instruments represent or evidence Security Collateral, all such certificates or instruments shall be delivered to and held by or on behalf of the Lender pursuant hereto and shall be in suitable form for transfer by delivery, or shall be accompanied by duly executed instruments of transfer or assignment in blank, all in form and substance reasonably satisfactory to the Lender. If an Event of Default shall have occurred and be continuing, the Lender shall have the right (i) at any time to exchange certificates or instruments representing or evidencing Security Collateral for certificates or instruments of smaller or larger denominations and (ii) at any time in its discretion and without notice to the Grantor, to transfer to or to register in the name of the Lender or any of its nominees any or all of the Security Collateral, subject only to the revocable rights specified in Section 10(a).

(b)      With respect to any Security Collateral in which the Grantor has any right, title or interest and that constitutes an uncertificated security, upon reasonable request from the Lender, the Grantor will use commercially reasonable efforts to cause the issuer thereof, either (i) to register the Lender as the registered owner of such security or (ii) to agree in an authenticated record with the Grantor and the Lender that such issuer will comply with instructions with respect to such security originated by the Lender without further consent of the Grantor, such authenticated record to be in form and substance reasonably satisfactory to the Lender. With respect to any Security Collateral in which the Grantor has any right, title or interest and that is not an uncertificated security, upon the request of the Lender upon the occurrence and during the continuance of an Event of Default, the Grantor will notify each issuer of Pledged Interests pledged by the Grantor that such Pledged Interests is subject to the security interest granted hereunder.

7460991-v10

(c)      With respect to any Security Collateral in which the Grantor has any right, title or interest and that constitutes a security entitlement in which the Lender is not the entitlement holder, upon reasonable request from the Lender, the Grantor will use commercially reasonable efforts to cause the securities intermediary with respect to such security entitlement either (i) to identify in its records the Lender as the entitlement holder of such security entitlement against such securities intermediary or (ii) to agree in an authenticated record with the Grantor and the Lender that such securities intermediary will comply with entitlement orders (that is, notifications communicated to such securities intermediary directing transfer or redemption of the financial asset to which the Grantor has a security entitlement) originated by the Lender without further consent of the Grantor, such authenticated record to be in form and substance reasonably satisfactory to the Lender.

(d)      Upon the request of the Lender upon the occurrence and during the continuance of an Event of Default and without further order from the Bankruptcy Court, but subject to the Order, the Grantor will notify each such issuer of Pledged Debt that such Pledged Debt pledged by the Grantor is subject to the security interest granted hereunder.

(e)      Without the prior written consent of the Lender, the Grantor shall not vote to enable or take any other action to cause any issuer of any Pledged Interests which are not securities (for purposes of the UCC) on the date hereof to elect or otherwise take any action to cause such Pledged Interests to be treated as securities for purposes of the UCC unless the Grantor shall promptly notify the Lender in writing of any such proposed election or action and shall take all steps necessary or advisable to establish the Lender's "control" on the date such Pledged Interests are treated as securities for purposes of the UCC.

**Section 5. Superpriority Claim and Liens.** So long as the Loans or any other Obligation (other than indemnification Obligations for which no claims have been made) of the Grantor under any Loan Document shall remain unpaid or unsatisfied or the Lender shall have any Commitment under the Credit Agreement, the Grantor hereby covenants, represents and warrants that, upon entry of the Order, the Obligations and the obligations of the Grantor under the Loan Documents shall be secured by the Liens and claims to the extent and with the priorities, validity and enforceability provided in the Order and Sections 2.9 and 2.10 of the Credit Agreement.

**Section 6. Representations and Warranties.** The Grantor represents and warrants as follows:

(a)      The Grantor's exact legal name, as defined in Section 9-503(a) of the UCC, is correctly set forth in Schedule IV hereto. The Grantor is located (within the meaning of Section 9-307 of the UCC) and has its chief executive office and the office in which it maintains the copies of each Related Contract to which it is a party and all originals of all chattel paper that evidence Receivables of the Grantor, in the state or jurisdiction set forth in Schedule IV hereto. The information set forth in Schedule IV hereto with respect to the Grantor is true and accurate in all respects. The Grantor has not within the last year changed its name, location, chief executive office, place where it maintains its agreements, type of organization, jurisdiction of organization or organizational identification number from those set forth in Schedule IV hereto.

6

(b)    Subject to the Permitted Liens, the Grantor is the legal and beneficial owner of the Collateral free and clear of any Lien, claim, option, or right of others, other than Liens permitted under the Credit Agreement and the Order. No effective financing statement or other instrument similar in effect covering all or any part of the Collateral or listing the Grantor or any trade name of the Grantor as debtor is on file in any recording office, except such as may have been filed in favor of the Lender relating to the Loan Documents or as otherwise permitted under the Credit Agreement, hereunder and the Order.

(c)    The Initial Pledged Interests pledged by the Grantor constitute the percentage of the issued and outstanding Capital Stock of the issuers thereof indicated on Schedule I hereto. The Initial Pledged Interests have not been pledged to any Person other than the Lender.

(d)    As of the Effective Date, the Grantor has no deposit accounts, other than the Account Collateral listed on Schedule II hereto, as such Schedule II may be amended from time to time upon the reasonable request of the Lender. No Person other than the Grantor is in control of the Account Collateral.

(e)    All filings and other actions (other than (A) actions necessary to obtain control of Collateral as provided in Sections 9-104, 9-105 and 9-107 of the UCC and Section 16 of Uniform Electronic Transactions Act and (B) actions necessary to perfect the Lender's security interest with respect to Collateral evidenced by a certificate of ownership) necessary to perfect, to the extent that perfection can be accomplished by such filings or other actions, the security interest in the Collateral of the Grantor created under this Agreement in addition to entry of the Order have been (or contemporaneously herewith will be) duly made or taken if requested by the Lender and, upon the entry by the Bankruptcy Court of the Order, are (or, upon filing or taking of such other actions, will be) in full force and effect, and upon the entry by the Bankruptcy Court of the Order and without in any way diminishing or limiting the effect of the Order, this Agreement creates in favor of the Lender a valid and, together with such filings and other actions, perfected first priority security interest in the Collateral of the Grantor, to the extent that perfection can be accomplished by such filings or actions or entry of the Order, subject to Permitted Liens and Liens permitted under the Order, securing the payment of the Secured Obligations. Notwithstanding the foregoing, nothing in this Agreement shall require the Grantor to make any filings or take any actions to record or perfect the security interest in any Intellectual Property Collateral outside the United States.

(f)    Upon the entry of the Order, no further authorization or approval or other action by, and no further notice to or filing with, any governmental authority or regulatory body or any other third party is required for (i) the grant by the Grantor of the security interest granted hereunder or for the execution, delivery or performance of this Agreement by the Grantor, (ii) the perfection or maintenance of the security interest created hereunder (including the first priority nature of such security interest, subject to the Permitted Liens and Liens permitted under the Order), or (iii) the exercise by the Lender of its voting or other rights provided for in this Agreement or the remedies in respect of the Collateral pursuant to this Agreement and the Order, except as may be required in connection with the disposition of any portion of the Security Collateral by laws affecting the offering and sale of securities generally.

7

(g)    Upon the entry of the Order, the Grantor has the corporate power and authority and the legal right to execute and deliver, to perform its obligations under, and to grant the Lien on the Collateral pursuant to, this Agreement and has taken all necessary corporate actions to authorize its execution, delivery and performance of, and grant of the Lien on the Collateral pursuant to, this Agreement.

(h)    Upon the entry of the Order, the Grantor is duly authorized to execute and deliver this Agreement to the Lender, and this Agreement constitutes the legal, valid and binding obligation of the Grantor, enforceable against the Grantor in accordance with its terms (subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law).

**Section 7.  Further Assurances.**  (a) The Grantor agrees that from time to time, upon the Lender's request and at the expense of the Grantor, the Grantor will promptly execute and deliver, or otherwise authenticate, all further instruments and documents, and take all further action that may be necessary or desirable, or that the Lender may reasonably request, in order to perfect and protect any pledge or security interest granted or purported to be granted by the Grantor hereunder or to enable the Lender to exercise and enforce its rights and remedies hereunder with respect to any Collateral. Without limiting the generality of the foregoing, the Grantor will promptly with respect to Collateral: (i) if an Event of Default shall have occurred and be continuing or if requested by the Lender, and without further order of the Bankruptcy Court, mark conspicuously each document included in Inventory, each chattel paper included in Receivables, each Related Contract and, at the request of the Lender, each of its records pertaining to such Collateral with a legend, in form and substance satisfactory to the Lender, indicating that such document, chattel paper, Related Contract or Collateral is subject to the security interest granted hereby; (ii) if any such Collateral shall be evidenced by a promissory note or other instrument or chattel paper individually or in the aggregate in an amount in excess of $50,000, at the reasonable request of the Lender, deliver and pledge to the Lender hereunder such note or instrument or chattel paper duly indorsed and accompanied by duly executed instruments of transfer or assignment, all in form and substance reasonably satisfactory to the Lender; (iii) execute or authenticate and file such financing or continuation statements, or amendments thereto, and such other instruments or notices, as may be necessary, or as the Lender may reasonably request, in order to perfect and preserve the security interest granted or purported to be granted by the Grantor hereunder; (iv) at the reasonable request of the Lender, deliver and pledge to the Lender certificates representing Security Collateral that constitutes certificated securities, accompanied by undated stock or bond powers executed in blank; (v) at the reasonable request of the Lender, take all action necessary to ensure that the Lender has control of Collateral consisting of deposit accounts, electronic chattel paper, investment property, letter-of-credit rights and transferable records as provided in Sections 9-104, 9-105, 9-106 and 9-107 of the UCC and in Section 16 of Uniform Electronic Transactions Act; (vi) at the reasonable request of the Lender, take all action to ensure that the Lender's security interest is noted on any certificate of ownership related to any Collateral evidenced by a certificate of ownership; (vii) at the reasonable request of the Lender, cause the Lender to be the beneficiary under all letters of credit that constitute Pledged Collateral, with the exclusive right to make all draws under such letters of credit, and with all rights of a transferee under Section 5-114(e) of the UCC; and (viii) at the reasonable request of the Lender, deliver to the Lender evidence that all other action that

8

the Lender may reasonably deem necessary in order to perfect and protect the security interest created by the Grantor under this Agreement has been taken.

(b)    The Grantor hereby authorizes the Lender to file one or more financing or continuation statements, and amendments thereto, including, without limitation, one or more financing statements indicating that such financing statements cover all assets or all personal property (or words of similar effect) of the Grantor, in each case without the signature of the Grantor, and regardless of whether any particular asset described in such financing statements falls within the scope of the UCC or the granting clause of this Agreement or the Order. A photocopy or other reproduction of the Order or this Agreement or any financing statement covering the Collateral or any part thereof shall be sufficient as a financing statement where permitted by law. The Grantor ratifies its authorization for the Lender to have filed such financing statements, continuation statements or amendments filed prior to the date hereof.

(c)    The Grantor will furnish to the Lender from time to time statements and schedules further identifying and describing the Collateral and such other reports in connection with the Collateral as the Lender may reasonably request, all in reasonable detail and similar in nature and scope to other statements and schedules required under or constituting a part of this Agreement.

(d)    Without limiting anything in this Agreement, the Grantor agrees to (i) preserve, renew and maintain in full force and effect its legal existence and good standing under the laws of the jurisdiction of its organization; (ii) take all reasonable action to maintain all rights, privileges, permits, licenses and franchises necessary in the normal conduct of its Business; (iii) preserve or renew all of its material registered patents, trademarks, trade names and service marks; and (iv) maintain and operate its Business in substantially the manner in which it is presently conducted and operated, and in compliance with all covenants of the Grantor and/or FMBank set forth in the Acquisition Agreement.

**Section 8.    Post-Closing Changes; Collections on Receivables and Related Contracts.** (a) The Grantor will not change its name, type of organization, jurisdiction of organization, organizational identification number or location from those set forth in Section 6(a) of this Agreement without first giving at least 15 days' prior written notice to the Lender and taking all action reasonably required by the Lender, in addition to the Order, for the purpose of perfecting or protecting the security interest granted by this Agreement. The Grantor will hold and preserve its records relating to the Collateral, including, without limitation, the Related Contracts. If the Grantor does not have an organizational identification number and later obtains one, it will forthwith notify the Lender of such organizational identification number.

(b)    Except as otherwise provided in this subsection (b), the Grantor will continue to have the right to collect, at its own expense, all amounts due or to become due to the Grantor under the Receivables and Related Contracts. In connection with such collections, the Grantor may take (and, during an Event of Default at the Lender's direction, will take) such action as the Grantor or, during an Event of Default, the Lender may deem necessary or advisable to enforce collection of the Receivables and Related Contracts; provided, however, that the Lender shall have the right at any time, upon the occurrence and during the continuance of an Event of Default and upon written notice to the Grantor of its intention to do so, to notify each

9

person obligated under any Receivables and Related Contracts (each, an "Obligor") of the assignment of such Receivables and Related Contracts to the Lender and to direct such Obligors to make payment of all amounts due or to become due to the Grantor thereunder directly to the Lender and, upon such notification and at the reasonable expense of the Grantor, to enforce collection of any such Receivables and Related Contracts, to adjust, settle or compromise the amount or payment thereof, in the same manner and to the same extent as the Grantor might have done, and to otherwise exercise all rights with respect to such Receivables and Related Contracts, including, without limitation, those set forth set forth in Section 9-607 of the UCC. After receipt by the Grantor of the notice from the Lender referred to in the proviso to the preceding sentence, (i) all amounts and proceeds (including, without limitation, instruments) received by the Grantor in respect of the Receivables and Related Contracts of the Grantor shall be received in trust for the benefit of the Lender hereunder, shall be segregated from other funds of the Grantor and shall be forthwith paid over to the Lender in the same form as so received (with any necessary indorsement) to be applied as provided in Section 15(b) and (ii) the Grantor will not adjust, settle or compromise the amount or payment of any Receivable or amount due on any Related Contract, release wholly or partly any Obligor thereof, or allow any credit or discount thereon. The Grantor will not permit or consent to the subordination of its right to payment under any of the Receivables and Related Contracts to any other indebtedness or obligations of the Obligor thereof.

**Section 9.   Intellectual Property Collateral.** (a) The Grantor shall take all steps which it or the Lender deems reasonable and appropriate under the circumstances to preserve and protect each item of its material Intellectual Property Collateral, including, without limitation, maintaining the quality of any and all products or services used or provided in connection with any of the Trademarks.

(b)     The Grantor agrees that should it obtain an ownership interest in any item of the type set forth in Section 1(f) that is not on the date hereof a part of the Intellectual Property Collateral ("After-Acquired Intellectual Property") (i) the provisions of this Agreement shall automatically apply thereto, and (ii) any such After-Acquired Intellectual Property and, in the case of trademarks, the goodwill symbolized thereby, shall automatically become part of the Intellectual Property Collateral subject to the terms and conditions of this Agreement with respect thereto. Within ten days of acquiring After-Acquired Intellectual Property, the Grantor shall give prompt written notice to the Lender identifying the After-Acquired Intellectual Property acquired, and the Grantor shall execute and deliver to the Lender with such written notice, or otherwise authenticate, an agreement, in form and substance satisfactory to the Lender in its sole and absolute discretion (an "Intellectual Property Security Agreement") covering the registered or applied for After-Acquired Intellectual Property, which Intellectual Property Security Agreement the Lender may record with the U.S. Patent and Trademark Office, the U.S. Copyright Office, or any other U.S. governmental authorities necessary to perfect the security interest hereunder in such registered or applied for After-Acquired Intellectual Property.

**Section 10.     Voting Rights; Dividends; Etc.** (a) So long as no Event of Default shall have occurred and be continuing:

10

(i)    The Grantor shall be entitled to exercise any and all voting and other consensual rights pertaining to the Security Collateral of the Grantor or any part thereof for any purpose;

(ii)    The Grantor shall be entitled to receive and retain any and all dividends, interest and other distributions paid in respect of the Security Collateral of the Grantor if and to the extent that the payment thereof is not otherwise prohibited by the terms of the Loan Documents or the Acquisition Agreement; provided, however, that any and all (A) dividends, interest and other distributions paid or payable other than in cash in respect of, and instruments and other property received, receivable or otherwise distributed in respect of, or in exchange for, any Security Collateral, (B) dividends and other distributions paid or payable in cash in respect of any Security Collateral of the Grantor in connection with a partial or total liquidation or dissolution or in connection with a reduction of capital, capital surplus or paid-in-surplus, and (C) cash paid, payable or otherwise distributed in respect of principal of, or in redemption of, or in exchange for, any Security Collateral of the Grantor, shall be, and shall be forthwith delivered to the Lender to hold as, Security Collateral and shall, if received by the Grantor, be received in trust for the benefit of the Lender, be segregated from the other property or funds of the Grantor and be forthwith delivered to the Lender as Security Collateral in the same form as so received (with any necessary indorsement).

(iii)    The Lender will execute and deliver (or cause to be executed and delivered) to the Grantor all such instruments as the Grantor may reasonably request for the purpose of enabling the Grantor to exercise the voting and other rights that it is entitled to exercise pursuant to paragraph (i) above and to receive the dividends or interest payments that it is authorized to receive and retain pursuant to paragraph (ii) above.

(b)    Upon the occurrence and during the continuance of an Event of Default and without further order from the Bankruptcy Court, but subject to the Order and the Permitted Liens:

(i)    All rights of the Grantor (A) to exercise or refrain from exercising the voting and other consensual rights that it would otherwise be entitled to exercise pursuant to Section 10(a)(i) shall, upon notice to the Grantor by the Lender, cease and (B) to receive the dividends, interest and other distributions that it would otherwise be authorized to receive and retain pursuant to Section 10(a)(ii) shall automatically cease, and all such rights shall thereupon become vested in the Lender, which shall thereupon have the sole right to exercise or refrain from exercising such voting and other consensual rights and to receive and hold as Security Collateral such dividends, interest and other distributions.

(ii)    All dividends, interest and other distributions that are received by the Grantor contrary to the provisions of paragraph (i) of this Section 10(b) shall be received in trust for the benefit of the Lender, shall be segregated from other

11

funds of the Grantor and shall be forthwith paid over to the Lender as Security Collateral in the same form as so received (with any necessary indorsement).

**Section 11.    Transfers and Other Liens; Additional Shares.** (a) The Grantor agrees that it will not (i) sell, assign or otherwise dispose of, or grant any Lien with respect to, any of the Collateral, other than sales, assignments and other dispositions of Collateral, and options relating to Collateral, permitted under the terms of the Credit Agreement or expressly permitted by the Order, or (ii) create or suffer to exist any Lien upon or with respect to any of the Collateral of the Grantor except for the pledge, assignment and security interest created under this Agreement and Liens permitted under Section 6.1 of the Credit Agreement or expressly permitted by the Order; provided that in no event shall any of the Security Collateral be sold, assigned or disposed of or be or become subject to a Lien (other than the Liens created under this Agreement and the Order).

(b)    The Grantor agrees that it will (i) cause each issuer of the Pledged Interests pledged by the Grantor not to issue any Capital Stock or other securities in addition to or in substitution for the Pledged Interests issued by such issuer, except to the Grantor, and (ii) pledge hereunder, immediately upon its acquisition (directly or indirectly) thereof, any and all additional Capital Stock or other securities and concurrently deliver possession of all certificates representing such Capital Stock to the Lender.

**Section 12.    Lender Appointed Attorney-in-Fact.**  Subject to the Order, the Grantor hereby irrevocably appoints the Lender the Grantor's attorney-in-fact, with full authority in the place and stead of the Grantor and in the name of the Grantor or otherwise, from time to time, upon the occurrence and during the continuance of an Event of Default, in the Lender's discretion, to take any action and to execute any instrument that the Lender may deem necessary or advisable to accomplish the purposes of this Agreement, including, without limitation:

(a)    to obtain and adjust insurance claims with respect to the Collateral,

(b)    to ask for, demand, collect, sue for, recover, compromise, receive and give acquittance and receipts for moneys due and to become due under or in respect of any of the Collateral,

(c)    to receive, indorse and collect any drafts or other instruments, documents and chattel paper, in connection with clause (a) or (b) above, and

(d)    to file any claims or take any action or institute any proceedings that the Lender may deem necessary for the collection of any of the Collateral or otherwise to enforce the rights of the Lender with respect to any of the Collateral.

**Section 13.    Lender May Perform.**  If the Grantor fails to perform any agreement contained herein, the Lender may, but without any obligation to do so and without notice, itself perform, or cause performance of, such agreement, and the expenses of the Lender incurred in connection therewith shall be payable under Section 15.

**Section 14.    The Lender's Duties.** The powers conferred on the Lender hereunder are solely to protect the Lender's interest in the Collateral and shall not impose any duty upon it to

12

7460991-v10

exercise any such powers. Except for the safe custody of any Collateral in its possession and the accounting for moneys actually received by it hereunder, the Lender shall have no duty as to any Collateral, as to ascertaining or taking action with respect to calls, conversions, exchanges, maturities, tenders or other matters relative to any Collateral, or as to the taking of any necessary steps to preserve rights against any parties or any other rights pertaining to any Collateral. The Lender shall be deemed to have exercised reasonable care in the custody and preservation of any Collateral in its possession if such Collateral is accorded treatment substantially equal to that which it accords its own property. The Lender shall not have any fiduciary relationship with or duty to the Grantor arising out of or in connection with this Agreement or any of the other Loan Documents and the relationship between the Grantor and the Lender in connection herewith or therewith is solely that of debtor and creditor.

**Section 15.    Remedies.** If any Event of Default shall have occurred and be continuing, subject to the Order and without further order of or application to the Bankruptcy Court but subject to the Permitted Liens:

(a)    The Lender may exercise in respect of the Collateral, in addition to other rights and remedies provided for herein or otherwise available to it, all the rights and remedies of a secured party upon default under the UCC (whether or not the UCC applies to the affected Collateral) and also may: (i) require the Grantor to, and the Grantor hereby agrees that it will at its expense and upon request of the Lender forthwith, assemble all or part of the Collateral as directed by the Lender and make it available to the Lender at a place and time to be designated by the Lender that is reasonably convenient to both parties; (ii) without notice except as specified below, sell the Collateral or any part thereof in one or more parcels at public or private sale, at any of the Lender's offices or elsewhere, for cash, on credit or for future delivery, and upon such other terms as the Lender may deem commercially reasonable; (iii) occupy any premises owned or leased by the Grantor where the Collateral or any part thereof is assembled or located for a reasonable period in order to effectuate its rights and remedies hereunder or under law, without obligation to the Grantor in respect of such occupation; and (iv) exercise any and all rights and remedies of the Grantor under or in connection with the Collateral, or otherwise in respect of the Collateral, including, without limitation, (A) any and all rights of the Grantor to demand or otherwise require payment of any amount under, or performance of any provision of, the Receivables, the Related Contracts and the other Collateral, (B) withdraw, or cause or direct the withdrawal, of all funds with respect to the Account Collateral and (C) exercise all other rights and remedies with respect to the Receivables, the Related Contracts and the other Collateral, including, without limitation, those set forth in Section 9-607 of the UCC. The Grantor agrees that, to the extent notice of sale shall be required by law, at least ten days' notice to the Grantor of the time and place of any public sale or the time after which any private sale is to be made shall constitute reasonable notification. The Lender shall not be obligated to make any sale of Collateral regardless of notice of sale having been given. The Lender may adjourn any public or private sale from time to time by announcement at the time and place fixed therefor, and such sale may, without further notice, be made at the time and place to which it was so adjourned.

(b)    Any cash held by or on behalf or under the control of the Lender and all cash proceeds received by or on behalf or under the control of the Lender in respect of any sale of, collection from, or other realization upon all or any part of the Collateral may, in the discretion of the Lender, be held by the Lender as collateral for, and/or then or at any time

13

thereafter applied (after payment of any amounts payable to the Lender pursuant to Section 15) in whole or in part by the Lender against, all or any part of the Secured Obligations, as set forth in Section 7.2 of the Credit Agreement. Any surplus of such cash or cash proceeds held by or on behalf or under the control of the Lender and remaining after the indefeasible payment in full of all of the Secured Obligations shall be paid over to the Grantor or to whomsoever may be lawfully entitled to receive such surplus.

(c)     All payments received by the Grantor in respect of the Collateral shall be received in trust for the benefit of the Lender, shall be segregated from other funds of the Grantor and shall be forthwith paid over to the Lender in the same form as so received (with any necessary indorsement).

(d)     The Lender may at any time or from time to time, charge, set-off and otherwise apply all or any part of the Secured Obligations against any funds held with respect to the Account Collateral or in any other deposit account. The Lender agrees to notify the Grantor promptly after any such charge or set-off; provided that failure to give such notice shall not affect the validity of such charge or set-off.

(e)     In the event of any sale or other disposition of any of the Intellectual Property Collateral of the Grantor, the goodwill symbolized by any Trademarks subject to such sale or other disposition shall be included therein, and the Grantor shall supply to the Lender or its designee the Grantor's know-how and expertise relating to such Intellectual Property Collateral, and documents relating to any Intellectual Property Collateral subject to such sale or other disposition, and the Grantor's customer lists and other records and documents relating to such Intellectual Property Collateral and to the manufacture, distribution, advertising and sale of products and services of the Grantor that relate to such Intellectual Property Collateral.

(f)     If the Lender shall determine to exercise its right to sell all or any of the Security Collateral pursuant to this Section 15, the Grantor agrees that, upon request of the Lender, the Grantor will, at its own expense, do or cause to be done all such other acts and things as may be necessary to make such sale of such Security Collateral or any part thereof valid and binding and in compliance with applicable law.

(g)     The Lender is authorized, in connection with any sale of the Security Collateral pursuant to this Section 15, to deliver or otherwise disclose to any prospective purchaser of the Security Collateral any information in its possession relating to such Security Collateral.

(h)     At any public (or, to the extent permitted by law, private) sale made pursuant to this Agreement, the Lender may credit or cash bid for or purchase, free (to the extent permitted by applicable law) from any right of redemption, stay, valuation or appraisal on the part of the Grantor (all said rights being also hereby waived and released to the extent permitted by applicable law), the Collateral or any part thereof offered for sale and may make payment on account thereof by using any Secured Obligation to the Lender from the Grantor as a credit against the purchase price, and the Lender may, upon compliance with the terms of sale, hold, retain and dispose of such property without further accountability to the Grantor therefor. For purposes hereof, a written agreement to purchase the Collateral or any portion thereof shall be

14

treated as a sale thereof; the Lender shall be free to carry out such sale pursuant to such agreement and the Grantor shall not be entitled to the return of the Collateral or any portion thereof subject thereto, notwithstanding the fact that after the Lender shall have entered into such an agreement all Events of Default shall have been remedied and the Obligations paid in full.

(i)    Notwithstanding anything in this Agreement or the other Loan Documents to the contrary, the Lender shall not foreclose on Collateral consisting of Capital Stock of FMBank without the prior consent of the Board of Governors of the Federal Reserve System.

(j)    In the event and to the extent that the provisions of this Section 15 conflict with what is set forth in the Order, the Order shall govern.

**Section 16.    Indemnity and Expenses.    (a) THE GRANTOR AGREES TO INDEMNIFY, DEFEND AND SAVE THE LENDER AND EACH OF ITS AFFILIATES AND ITS RESPECTIVE OFFICERS, DIRECTORS, EMPLOYEES, AGENTS, SUB-AGENTS AND ADVISORS (EACH, AN "INDEMNIFIED PARTY") FROM, AND HOLD HARMLESS EACH INDEMNIFIED PARTY AGAINST, AND SHALL PAY ON DEMAND, ANY AND ALL CLAIMS, DAMAGES, LOSSES, LIABILITIES AND RELATED EXPENSES (INCLUDING, WITHOUT LIMITATION, THE REASONABLE FEES, CHARGES AND DISBURSEMENTS OF COUNSEL FOR ANY INDEMNIFIED PARTY) INCURRED BY OR ASSERTED AGAINST ANY INDEMNIFIED PARTY, IN EACH CASE ARISING OUT OF OR IN CONNECTION WITH OR RESULTING FROM THIS AGREEMENT (INCLUDING, WITHOUT LIMITATION, ENFORCEMENT OF THIS AGREEMENT), EXCEPT TO THE EXTENT SUCH CLAIM, DAMAGE, LOSS, LIABILITY OR EXPENSE IS FOUND IN A FINAL, NON-APPEALABLE JUDGMENT BY A COURT OF COMPETENT JURISDICTION TO HAVE RESULTED FROM SUCH INDEMNIFIED PARTY'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT.**

(b)    To the extent that the Grantor is required to reimburse the Lender's expenses pursuant to Section 8.5 of the Credit Agreement, the Grantor will upon demand jointly and severally pay to the Lender the amount of any and all reasonable documented out-of-pocket expenses, including, without limitation, the reasonable and documented out-of-pocket fees and expenses of its counsel and of any experts and agents, that the Lender may incur in connection with (i) the administration of this Agreement, (ii) the custody, preservation, use or operation of, or the sale of, collection from or other realization upon, any of the Collateral of the Grantor, (iii) the exercise or enforcement of any of the rights of the Lender or (iv) the failure by the Grantor to perform or observe any of the provisions hereof.

**Section 17.    Amendments; Waivers; Etc.**  No amendment or waiver of any provision of this Agreement, and no consent to any departure by the Grantor herefrom, shall in any event be effective unless the same shall be in writing and signed by the Lender and, with respect to any amendment, the Grantor, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; provided, that this Agreement may be amended without the consent of the Grantor for the purpose of adding any other Person as a "Grantor" hereunder. No failure on the part of the Lender to exercise, and no delay in exercising any right hereunder, shall operate as a waiver thereof; nor shall any single or partial exercise of any such right preclude any other or further exercise thereof or the exercise of any other right.

15

**Section 18.    Notices, Etc.**  All notices, requests and demands to or upon the Lender or the Grantor hereunder shall be effected in the manner provided for in Section 8.2 of the Credit Agreement.

**Section 19.    Continuing Security Interest; Assignments under the Credit Agreement.**  This Agreement shall create a continuing security interest in the Collateral and shall (a) remain in full force and effect until such time as the Secured Obligations (other than indemnification Obligations for which no claims have been made) shall have been indefeasibly paid in full in immediately available funds and the Commitment has been terminated, (b) be binding upon the Grantor, its successors and assigns and (c) inure, together with the rights and remedies of the Lender hereunder and its respective successors and permitted assigns. Without limiting the generality of the foregoing clause (c), the Lender may assign or otherwise transfer all or any portion of its rights and obligations under the Credit Agreement (including, without limitation, all or any portion of the Commitment, the Loans owing to it and the Note, if any, held by it) to any other Person, and such other Person shall thereupon become vested with all the benefits in respect thereof granted to the Lender herein or otherwise, in each case as provided in Section 8.7 of the Credit Agreement.

**Section 20.    Release; Termination.**  At such time as the Secured Obligations (other than indemnification Obligations for which no claims have been made) shall have been indefeasibly paid in full in immediately available funds and the Commitment has been terminated, the pledge and security interest granted hereby shall terminate and all rights to the Collateral shall revert to the Grantor. Upon any such termination, the Lender will, at the Grantor's expense, promptly execute and deliver to the Grantor such documents as the Grantor shall reasonably request to evidence such termination.

**Section 21.    Execution in Counterparts.**  This Agreement may be executed by one or more of the parties to this Agreement on any number of separate counterparts, and all of said counterparts taken together shall be deemed to constitute one and the same instrument. Delivery of an executed signature page of this Agreement by facsimile transmission shall be effective as delivery of a manually executed counterpart hereof.

**Section 22.    Governing Law.**  This Agreement and the rights and obligations of the parties under this Agreement shall be governed by, and construed and interpreted in accordance with, the law of the State of Maryland, and to the extent applicable, the Bankruptcy Code.

**Section 23.    Certain Defined Terms.**  Unless otherwise defined in this Agreement or in the Credit Agreement, terms defined in Article 8 or 9 of the UCC (as defined below) and/or in the Federal Book Entry Regulations (as defined below) are used in this Agreement as such terms are defined in such Article 8 or 9 and/or the Federal Book Entry Regulations. "UCC" means the Uniform Commercial Code as in effect, from time to time, in the State of Maryland. The term "Federal Book Entry Regulations" means (a) the federal regulations contained in Subpart B ("Treasury/Reserve Automated Debt Entry System (TRADES)") governing book-entry securities consisting of U.S. Treasury bills, notes and bonds and Subpart D ("Additional Provisions") of 31 C.F.R. Part 357, 31 C.F.R. § 357.2, § 357.10 through § 357.15 and § 357.40 through § 357.45 and (b) to the extent substantially similar to the federal regulations referred to in clause (a) above (as in effect from time to time), the federal regulations governing other book-entry securities. In

16

addition, the term "Permitted Liens," as used in this Agreement with respect to FMBank, shall mean (i) Liens for taxes not yet due and payable; (ii) any validly attached and properly perfected Liens on property of FMBank existing on the Petition Date; and (iii) Capital Lease Obligations or purchase money financings permitted to be entered into under the Loan Documents.

      **Section 24.    Certain Matters of Construction.**   Words in the singular shall include the plural and words in the plural shall include the singular. References to Grantor shall mean, each Person comprising same, jointly and severally.

*[Remainder of page left blank]*

7460991-v10

IN WITNESS WHEREOF, each of the undersigned has caused this Agreement to be duly executed and delivered as of the date first above written.

**GRANTOR**:

**FIRST MARINER BANCORP,**
a Maryland corporation

By: _Mark A. Keidel_ (SEAL)

Name: Mark A. Keidel

Title: Interim Chief Executive Officer


**LENDER**:

**RKJS BANK,**
a Maryland corporation

By:_____(SEAL)

Name: _____

Title: _____


**[Signature Page to Superpriority Debtor-In-Possession Security Agreement]**

18

IN WITNESS WHEREOF, each of the undersigned has caused this Agreement to be duly executed and delivered as of the date first above written.

GRANTOR:

FIRST MARINER BANCORP,
a Maryland corporation

By:_____(SEAL)

Name:_____

Title:_____

LENDER:

RKJS BANK,
a Maryland corporation

By:_____(SEAL)

Name: Robert D. Kunisch, Jr.

Title: President, Chief Operating Officer and
        Secretary_____

[Signature Page to Superpriority Debtor-In-Possession Security Agreement]

18

## SCHEDULE I

Initial Pledged Interests

| Grantor | Issuer | Certificate Number | Number of Shares |
|---|---|---|---|
| First Mariner Bancorp | First Mariner Bank | 001 | 76,150 |
| First Mariner Bancorp | First Mariner Bank | * | 76,150 |

\*      Additional shares were authorized pursuant to the Articles of Amendment dated September 21, 2004.

7460991-v10

## SCHEDULE II

Deposit Accounts

| Account Type | Bank/Investment Company | Account Number |
|---|---|---|
| Investment Account | RBC Wealth Management | 350-42128 |
| Investment Account | Morgan Stanley | 633-142545-004 |
| Deposit Account | First Mariner Bank | 25140013012 |

7460991-v10

## SCHEDULE III

Intellectual Property

1. FMAR's interest in the trademarks known as "1ST MARINER BANCORP and Design" (SN: 78-622150; RN: 3,089,942) and "1ST MARINER BANCORP" (SN: 78-622244; RN: 3,089,944), and all other intellectual property, including both registered and unregistered rights, that are owned by FMAR or FMAR Subsidiaries and relate to the business of FMBank.

## <u>SCHEDULE IV</u>

Grantor's exact legal name:   FIRST MARINER BANCORP
Grantor's state of organization: Maryland
Location of Grantor's chief executive office: 1501 South Clinton Street
Baltimore, Maryland 21224
Location of Grantor's records: 1501 South Clinton Street
Baltimore, Maryland 21224

7460991-v10

## SCHEDULE V

Certain Claims

None.

**EXHIBIT B**

**FORM OF SALE ORDER**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
(Baltimore Division)

| | | |
|---|---|---|
| In re: | * | |
| FIRST MARINER BANCORP | * | Case No: 14-11952 DER |
| | | (Chapter 11) |
| Debtor | * | |

\* \* \* \* \* \* \* \* \* \* \* \*

**ORDER (A) AUTHORIZING THE DEBTOR TO TRANSFER AND SELL CERTAIN
ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND OTHER
INTERESTS, (B) AUTHORIZING THE DEBTOR TO TRANSFER AND SELL SUCH
ASSETS AND TO CONSUMMATE OTHER TRANSACTIONS IN ACCORDANCE WITH
THAT CERTAIN MERGER AND ACQUISITION AGREEMENT,
AND (C) GRANTING RELATED RELIEF**

Upon the motion, dated February 10, 2014 [Docket No. 15] (the "Motion"),[1] of First

Mariner Bancorp ("FMAR" or the "Debtor"), debtor and debtor-in-possession, filed in the above-

captioned chapter 11 case (the "Bankruptcy Case"), for entry of (i) the Auction Procedures Order

and (ii) this order (the "Sale Order") approving the transfer and sale of the Purchased Assets, free

and clear of all liens, claims, encumbrances, and other interests; and the Court having entered an

Auction Procedures Order on March 8, 2014 [Docket No. 122]; and an Auction having been held

on April 10 and April 15, 2014, in accordance with the Auction Procedures and the Auction

Procedures Order and as required by the Court at the Sale Hearing on April 15, 2014; and the

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

8005277-v2

Debtor (in consultation with the Committee) having determined at the conclusion of the Auction that the bid from the Stalking Horse Bidder, RKJS Bank ("RKJS" or the "Purchaser"), was the highest and best bid for the Purchased Assets (the "Successful Bid"); and this Bankruptcy Court having conducted the Sale Hearing on April 14 and 15, 2014 (the "Sale Hearing") to consider the transfer and sale of the Purchased Assets and the other transactions contemplated by the Amended and Restated Merger and Acquisition Agreement dated as of April 15, 2014, by and among the Debtor, the Bank and RKJS, a copy of which is attached hereto as Exhibit A (together with all schedules and exhibits thereto, the "M&A Agreement") (the transactions including the merger thereunder, collectively, the "M&A Transaction"); and upon the record of the hearing to approve the Auction Procedures Order and the Sale Hearing, and the full record in this Bankruptcy Case; and the Court having determined that the relief sought in the Motion is in the best interests of the Debtor, its estate, creditors and parties-in-interest, and that the legal and factual bases set forth in the Motion and presented at the Sale Hearing establish just cause for the relief granted herein; and all objections to the Motion, if any, having been resolved; and after due deliberation and sufficient good cause appearing therefor,

## THE COURT HEREBY FINDS AND CONCLUDES THAT:[2]

A.      Jurisdiction and Venue.  The Court has jurisdiction to hear and determine the Motion pursuant to 28 U.S.C.§§ 157(b)(1) and 1334(a). This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper in this District and in the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

B.      Statutory Predicates.  The statutory bases for the relief requested in the Motion are (i) sections 105(a), 363(b), (f), and (m), 365, 503, and 507 of title 11 of the United States

---

[2] The findings of fact and conclusions of law set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to these proceedings by Bankruptcy Rule 9014. To the extent any of the following findings constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

Code (the "Bankruptcy Code"); (ii) Rules 2002(a)(2), 6004(a), (b), (c), (e), (f), and (h), 6006(a) and (c), 9007, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"); and (iii) Rules 2002-1, 2002-2, 6004-1 and 6006-1 of the Local Bankruptcy Rules for the District of Maryland (the "Local Bankruptcy Rules").

      C.    <u>Notice</u>.  The Debtor has provided good and sufficient notice with respect to the following: (i) the Motion and the relief sought therein, including the entry of this Sale Order and the transfer and sale of the Purchased Assets and consummation of the other transactions contemplated under the M&A Transaction, (ii) the Auction and the Sale Hearing, and (iii) the assumption and assignment of leases and contracts and cure amount (if any); and no further notice of the Motion, the relief requested therein or the Sale Hearing is required.  A reasonable opportunity to object and to be heard regarding the relief provided herein has been afforded to parties-in-interest.

      D.    <u>Compliance with the Auction Procedures</u>.  The marketing and auction procedures as set forth or described in the Motion, the Auction Procedures Order, and the Auction Procedures were fair, proper, and reasonably calculated to result in the best value received for the Purchased Assets. The Auction process set forth in the Auction Procedures afforded a full, fair, and reasonable opportunity for any party-in-interest to become a Qualified Bidder and to submit a Qualified Bid and participate in the Auction. As demonstrated by (i) the testimony and other evidence proffered and adduced at the Sale Hearing and (ii) the representations of counsel made on the record at the Sale Hearing, the Debtor has conducted the bidding process (including the selection of the Successful Bid), the Auction (including the proceedings held on April 15, 2014 with respect to the reopened Auction), and the sale process, in good faith, without collusion and in accordance with the Auction Procedures, the Auction Procedures Order and this Court's ruling to reopen the

Auction made on the record at the Sale Hearing on April 15, 2014.

      E.      <u>Highest or Otherwise Best</u>.  The M&A Agreement constitutes the highest and best offer for the Bank Shares and Other Purchased Assets, and will provide a greater recovery for the Debtor's estate than would be provided by any other available alternative, including any other Qualified Bids. The Debtor's determination that the M&A Agreement constitutes the highest and best offer for the Bank Shares and Other Purchased Assets constitutes a reasonable, valid and sound exercise of the Debtor's business judgment, and is in the best interests of the Debtor, its estate and its creditors.  The consideration to be paid by the Purchaser for the Purchased Assets is fair and reasonable, is the highest and best offer therefor, and constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code, the Uniform Fraudulent Conveyance Act, the Uniform Fraudulent Transfer Act, and the laws of the United States, any state, territory or possession thereof, the District of Columbia or any other applicable law.

      F.      <u>Arm's Length Transaction</u>. The M&A Agreement and other documents and instruments related to and connected with the M&A Transaction and the consummation thereof, as each may have been amended through the date hereof (the "Transaction Documents") were negotiated, proposed and entered into by the Debtor and the Purchaser without collusion, in good faith and through an arm's length bargaining process. Neither the Purchaser nor any of its affiliates or representatives is an "insider" of the Debtor, as that term is defined in section 101(31) of the Bankruptcy Code. None of the Debtor, the Purchaser, or their respective representatives engaged in any conduct that would cause or permit the M&A Agreement, any of the other Transaction Documents or the transactions contemplated therein to be avoided under section 363(n) of the Bankruptcy Code, or has acted in any improper or collusive manner with any Person. The terms

and conditions of the M&A Agreement and the other Transaction Documents, including, without limitation, the consideration provided in respect thereof, are fair and reasonable, and the M&A Transaction, including the transfer and sale of the Bank Shares and Other Purchased Assets is not avoidable and shall not be avoided, and no damages may be assessed against the Purchaser or any other party, under section 363(n) of the Bankruptcy Code.

H.    <u>Good Faith Purchaser</u>. The Purchaser has proceeded in good faith and without collusion in all respects in connection with the sale process, in that: (i) the Purchaser, in proposing and proceeding with the M&A Transaction in accordance with the M&A Agreement, recognized that the Debtor was free to deal with other interested parties; (ii) the Purchaser agreed to provisions in the M&A Agreement that would enable the Debtor to accept a higher and better offer; (iii) the Purchaser complied with all of the provisions in the Auction Procedures and the Auction Procedures Order applicable to the Purchaser; (iv) all payments to be made by the Purchaser and other agreements entered into or to be entered into between the Purchaser and the Debtor in connection with the M&A Transaction have been disclosed; (v) the negotiation and execution of the M&A Agreement and related agreements were conducted in good faith and constituted an arm's length transaction; (vi) the disclosure requirements required by the applicable Bankruptcy Rules and Local Bankruptcy Rules have been satisfied; and (vii) the M&A Agreement was not entered into, and the M&A Transaction being consummated pursuant to and in accordance with the M&A Agreement, is not being consummated, for the purpose of hindering, delaying or defrauding creditors of the Debtor.  The Purchaser is therefore entitled to all of the benefits and protections provided to a good-faith purchaser under section 363(m) of the Bankruptcy Code. Accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the M&A Transaction shall not affect the validity of such transaction or the Purchaser's status as a "good faith" purchaser.

I.    Corporate Authority.  Subject to the entry of this Sale Order, the Debtor has (i) full corporate power and authority to enter into and perform all of its obligations under the Transaction Documents, and the Debtor's prior execution and delivery of, and performance of obligations under, the Transaction Documents is hereby ratified; (ii) all of the corporate power and authority necessary to consummate the M&A Transaction including the transfer and sale of the Bank Shares and Other Purchased Assets as set forth in the M&A Agreement; and (iii) taken all corporate action necessary to authorize and approve the Transaction Documents. Further, except as otherwise expressly provided in the M&A Agreement, no consents or approvals are required for the Debtor to consummate the M&A Transaction including the transfer and sale of the Bank Shares and Other Purchased Assets other than the consent and approval of this Bankruptcy Court.

J.    Justification for Relief.  Good and sufficient reasons for approval of the M&A Agreement and the other Transaction Documents and the M&A Transaction including the transfer and sale of the Bank Shares and Other Purchased Assets have been articulated to the Court in the Motion and at the Sale Hearing, and the relief requested in the Motion and set forth in this Sale Order is in the best interests of the Debtor, its estate, creditors and other parties-in-interest in the Bankruptcy Case.  The Debtor has demonstrated through the Motion and other evidence and arguments at the Sale Hearing both (i) good, sufficient and sound business purpose and justification and (ii) compelling circumstances for the transfer and sale of the Bank Shares and Other Purchased Assets to the Purchaser as provided in the M&A Agreement outside the ordinary course of business, and before, and outside of, a plan of reorganization, and such action is an appropriate exercise of the Debtor's business judgment and in the best interests of the Debtor, its estate and its creditors.

K.    Property of the Estate.  The Bank Shares and Other Purchased Assets constitute property of the Debtor's estate and title thereto is vested in the Debtor's estate within the meaning

- 6 -

of section 541(a) of the Bankruptcy Code. Accordingly, the Debtor has or will have as of the date of Closing all right, title and interest to and in the Bank Shares and Other Purchased Assets that may be required to implement and effectuate the M&A Transaction in the manner contemplated by the M&A Agreement and the other Transaction Documents.

L.    <u>Free and Clear</u>.  In accordance with sections 363(b) and 363(f) of the Bankruptcy Code, the consummation of the M&A Transaction pursuant to the Transaction Documents will be a legal, valid, and effective transfer and sale of the Bank Shares outstanding prior to the M&A Transaction and the Other Purchased Assets and will vest (i) in the Investors, through the consummation of the M&A Transaction, all of the Debtor's right, title, and interest in and to the Bank Shares outstanding after the M&A Transaction, and (ii) in the Bank, through the consummation of the M&A Transaction, all of the Debtor's right, title and interest in and to the Other Purchased Assets, in each case, free and clear of all liens, claims, encumbrances, and other interests of any kind or nature whatsoever, including, but not limited to, all encumbrances, security interests, pledges, hypothecations, obligations, liabilities, demands, guarantees, charges, options, rights, restrictions, contractual commitments, rights of first refusal, rights of setoff, and interests of any kind or nature that have been, are or could be asserted against the Debtor, whether known or unknown, legal or equitable, matured or unmatured, contingent or noncontingent, liquidated or unliquidated, asserted or unasserted, whether arising prior to or subsequent to the commencement of the Bankruptcy Case, whether known or unknown, whether imposed by agreement, understanding, law, equity or otherwise, and all rights and claims under any bulk transfer statutes and related laws, whether arising by agreement, statute, or otherwise, and whether arising before or after commencement of the Bankruptcy Case, including liens, claims, and other interests of any of the creditors, vendors, employers, employees, suppliers, or lessors of the Debtor or any other third party (collectively, the

"Encumbrances"). The Debtor has demonstrated that one or more of the standards set forth in section 363(f)(1) - (5) of the Bankruptcy Code have been satisfied. All holders of Encumbrances in the Bank Shares and Other Purchased Assets are adequately protected by having their respective Encumbrances attach to the net Purchase Price proceeds attributable to the Bank Shares and Other Purchased Assets (excluding, for the avoidance of doubt, the Recapitalization Amount) to the extent any such Encumbrances existed as of the Petition Date and subject to the terms of such Encumbrances with the same validity, force and effect, and in the same order of priority, which such Encumbrances had against the Bank Shares and/or Other Purchased Assets as of the Petition Date, subject to any rights, claims and defenses the Debtor or its estate may possess with respect thereto.

M.     Condition of the M&A Transaction. The Purchaser would not have entered into the M&A Agreement and would not consummate the transactions contemplated thereby if the M&A Transaction including the transfer and sale of the Bank Shares and Other Purchased Assets as provided therein were not free and clear of all Encumbrances, or if the Purchaser, the Investors or the Bank would, or in the future could, be liable for any of such Encumbrances.

N.     Prompt Consummation. The Debtor has demonstrated good and sufficient cause to waive the stay requirement under Bankruptcy Rules 6004(h) and 6006(d). Time is of the essence in consummating the M&A Transaction including the transfer and sale of the Bank Shares and Other Purchased Assets as provided in the M&A Agreement and the other transactions contemplated by the M&A Agreement and the other Transaction Documents, and it is in the best interests of the Debtor and its estate to consummate such transaction within the timeline set forth in the Motion and the M&A Agreement.

**NOW THEREFORE, IT IS HEREBY ORDERED THAT:**

1.     The relief requested in the Motion is GRANTED and APPROVED in all respects to

the extent provided herein.

2.      All objections with regard to the relief sought in the Motion that have not been withdrawn, waived, settled, or otherwise dealt with as expressly provided herein and in the Auction Procedures Order, and all reservation of rights included in such objections, are overruled on the merits with prejudice.

3.      Pursuant to sections 105(a), 363(b), 363(f), and 365 of the Bankruptcy Code, the M&A Transaction with RKJS, including without limitation the transfer and sale of the Bank Shares and Other Purchased Assets on the terms set forth in the M&A Agreement attached hereto as Exhibit A, is approved, and the Debtor is authorized and directed to consummate the M&A Transaction in accordance with the M&A Agreement including without limitation by executing all documents (including without limitation the Transaction Documents) and taking all actions necessary and appropriate to effectuate and consummate the M&A Transaction including without limitation the transfer and sale of the Bank Shares and Other Purchased Assets in consideration of the Purchase Price and the Equity Contribution to be made to the Bank (through the Merger) upon the terms set forth in the M&A Agreement, the transactions contemplated in Exhibit D to the M&A Agreement or any alternative thereto as provided in Section 2.02(b) of the M&A Agreement and changing the name of the Debtor in accordance with section 5.27 of the M&A Agreement.  The releases set forth in section 5.11 of the M&A Agreement are authorized and approved.

4.      No later than one (1) business day following the date of entry of this Order, the Purchaser shall make the Deposit as provided in and subject to the terms of section 2.02(c) of the M&A Agreement.  The Deposit shall only be disbursed (a) pursuant to a written agreement between FMAR and FMIB directing to whom to make the distribution; (b) by Order of the Bankruptcy Court directing to whom to make the distribution; or (c) to apply the Deposit to the

Purchase Price at Closing.

5.       As of the closing of the M&A Transaction in accordance with the M&A Agreement (the "Closing"), (i) the transactions set forth in the M&A Agreement shall effect a legal, valid, enforceable and effective transfer and sale of the Bank Shares (through the merger as set forth therein) to the Investors and sale of the Other Purchased Assets to the Bank free and clear of all Encumbrances, as further set forth in the M&A Agreement and this Order, including without limitation paragraphs L and 8 hereof; and (ii) the M&A Agreement, and the other Transaction Documents, and the transactions related thereto and the consummation of such transactions including without limitation the M&A Transaction, shall be enforceable against and binding upon, and not subject to rejection or avoidance by, the Debtor, any successor thereto including a trustee or estate representative appointed in the Bankruptcy Case, and all other persons and entities.

6.       Subject to the fulfillment of the terms and conditions of the M&A Agreement, this Sale Order shall, as of the Closing, be considered and constitute for all purposes a full and complete general assignment, conveyance, and transfer of the Bank Shares and Other Purchased Assets and/or a bill of sale transferring all of the Debtor's rights, title and interest in and to the Bank Shares and Other Purchased Assets. Consistent with, but not in limitation of the foregoing, each and every federal, state, and local governmental agency or department is hereby authorized and directed to accept all documents and instruments necessary and appropriate to consummate the transactions contemplated by the M&A Agreement and approved in this Order.

7.       Any person or entity that is currently, or on the Closing Date may be, in possession of some or all of the Bank Shares and Other Purchased Assets are hereby directed to surrender possession of such Bank Shares and Other Purchased Assets either to (a) the Debtor before the Closing or (b) to Purchaser or its designee upon the Closing.

- 10 -

8.    The transfer of the Bank Shares and Other Purchased Assets pursuant to the Transaction Documents is a legal, valid, and effective transfer and shall, in accordance with sections 105(a) and 363(f) of the Bankruptcy Code, and upon consummation of the M&A Transaction, including, without limitation, payment of the Purchase Price to the Debtor and the making of the Equity Contribution to the Bank, vest RKJS, the Investors and the Bank (as the surviving entity in the M&A Transaction) (collectively, the "Acquiring Parties") with all right, title, and interest in the Bank Shares and Other Purchased Assets, free and clear of all Encumbrances.

9.    Following the Closing, no holder of any liens, claims, and other interests against the Debtor, the Bank Shares or the Other Purchased Assets shall interfere with the Acquiring Parties' respective rights in, title to or use and enjoyment of the Bank Shares and Other Purchased Assets.  All valid and perfected Encumbrances in the Bank Shares and/or Other Purchased Assets shall attach to the net Purchase Price proceeds attributable to the Bank Shares and Other Purchased Assets (except, for the avoidance of doubt, the Recapitalization Amount) immediately upon receipt of such Purchase Price proceeds by the Debtor in the order of priority, and with the same validity, force and effect, which such Encumbrances had against such Bank Shares and/or Other Purchased Assets as of the filing of the Bankruptcy Case, subject to any rights, claims and defenses the Debtor, its estate or any trustee for the Debtor, as applicable, may possess with respect thereto and any limitations on the use of such proceeds pursuant to any provision of the M&A Agreement or this Sale Order.

10.    The Acquiring Parties shall not be deemed, as a result of any action taken in connection with, or as a result of the M&A Transaction including the transfer and sale of the Bank Shares and Other Purchased Assets, to: (i) be a successor (or other such similarly situated party) to the Debtor (except as otherwise specified in the M&A Agreement); or (ii) have, *de*

*facto* or otherwise, merged with or into the Debtor. The Purchaser is not acquiring or assuming any liens, claims, and other interests, including, without limitation, any liability arising from any of the following: (i) any employment or labor agreements, consulting agreements, severance agreements, change in control agreements or other similar agreements to which the Debtor is or was a party; (ii) any pension, welfare, compensation or other employee benefit plans, agreements, practices, and programs, including without limitation, any pension plan of the Debtor; (iii) the cessation of the Debtor's operations, dismissal of employees, or termination of employment or labor agreements or pension, welfare, compensation or other employee benefit plans, agreements, practices and programs and any obligations with respect thereto that arise from the Employee Retirement Income Security Act of 1974 ("ERISA"), the Fair Labor Standard Act, Title VII of the Civil Rights Act of 1964, the Age Discrimination and Employment Act of 1967, the Federal Rehabilitation Act of 1973, the National Labor Relations Act, the Consolidated Omnibus Budget Reconciliation Act of 1985 or the Worker Adjustment and Retraining Notification Act (the "WARN Act"); (iv) workmen's compensation, occupational disease or unemployment or temporary disability insurance claims; (v) environment liabilities, debts, claims or obligations which may be asserted on any basis, including, without limitation, under the Comprehensive Environmental Response, Compensation and Liability Act or any other environmental, health and safety requirements; (vi) any bulk sales or similar law, (vii) any litigation by or against the Debtor; and (viii) the laws of the United States, any state, territory or possession thereof, or the District of Columbia, based, in whole or in part, directly or indirectly, in any theory of law or equity, including without limitation, any theory of antitrust or successor or transferee liability. None of the Acquiring Parties nor any of their respective employees, members, directors, advisors, lenders, affiliates, owners, successors and assigns shall have any successor or vicarious liabilities with respect to the Debtor, the Bank Shares, the Other Purchased Assets or any

liens, claims, and other interests of any kind or character.

11.    Except for the holders of any assumed liabilities (and then only as and to the extent expressly permitted by the M&A Agreement), all persons and/or entities asserting liens, claims, and other interests against the Debtor, or its interest in the Bank Shares and Other Purchased Assets, are hereby forever estopped, permanently enjoined, and precluded from (i) pursuing such liens, claims, and other interests against the Bank Shares and Other Purchased Assets, other than against the net Purchase Price proceeds as provided herein; (ii) asserting, commencing or continuing in any manner any action against the Acquiring Parties or against any of their respective assets or properties (including, without limitation, the Bank Shares and Other Purchased Assets) on account of such liens, claims, and other interests; (iii) the enforcement, attachment, collection or recovery, by any manner or means, of any judgment, award or decree of order against the Acquiring Parties or any of their respective assets or properties (including, without limitation, the Bank Shares and Other Purchased Assets) on account of such liens, claims, and other interests; (iv) creating, perfecting or enforcing any Encumbrance of any kind against the Acquiring Parties or any of their respective properties or assets (including, without limitation, the Bank Shares and Other Purchased Assets) on account of such liens, claims, and other interests; (v) asserting any set off, right of subrogation or recoupment or other affirmative defense of any kind against any obligations due to the any of the Acquiring Parties on account of such liens, claims, and other interests; (vi) taking any action, in any manner, in any place whatsoever, that does not conform to or comply with the provisions of this Sale Order or the M&A Agreement; and (vii) asserting with respect to the Debtor that any of the Acquiring Parties is a successor, successor-in-interest, or otherwise liable for the liens, claims, and other interests pursuant to any other statutory or legal or equitable theory, including, without limitation, worker's compensation, occupational disease,

pension and employee benefits, labor and employment, bulk sales or tax laws or obligations.

12.    This Sale Order (i) shall be effective as a determination that, on Closing, all liens, claims, and other interests of any kind or nature whatsoever existing as to the Bank Shares and Other Purchased Assets before the Closing, have been unconditionally released, discharged and terminated, and that the transfers and conveyances described herein have been effected, and (ii) shall be binding upon and shall govern the acts of all persons and entities. On Closing, the Debtor, and persons holding any liens, claims, and other interests in the Bank Shares and Other Purchased Assets as of the Closing, are authorized and directed to execute such documents and take all other actions as may be reasonably necessary to release their liens, claims, and other interests in the Bank Shares and Other Purchased Assets, if any, as such liens, claims, and other interests may have been recorded or may otherwise exist. If any person or entity that has filed financing statements or other documents or agreements evidencing any liens, claims, and other interests in the Bank Shares and Other Purchased Assets shall not have delivered to the Debtor before the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of all liens, claims, and other interests which the person or entity has with respect to the Bank Shares and Other Purchased Assets, then the Purchaser, Bank and/or the Debtor are hereby authorized to execute and file such statements, instruments, releases and other documents on behalf of the person or entity with respect to such Bank Shares and Other Purchased Assets.

13.    The Debtor shall apply the net Purchase Price in accordance with the applicable orders of this Bankruptcy Court in the Bankruptcy Case.  Any Encumbrances encumbering the Bank Shares and Other Purchased Assets shall be released and attach to the net Purchase Price proceeds as provided for in this Sale Order.

14.    The Debtor is hereby authorized and empowered, in connection with the Closing,

to change its corporate name and the caption of this Bankruptcy Case, consistent with section 5.27 of the M&A Agreement and applicable law. The Debtor shall file a notice of change of case caption within five days after the Closing, and the change of case caption for this Bankruptcy Case shall be deemed effective as of such date.

15.     This Sale Order shall be binding upon and shall govern the acts of all Persons, including without limitation all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of the Bank Shares or Other Purchased Assets. The terms and provisions of the M&A Agreement and all other Transaction Documents, the M&A Transaction including the transfer and the sale of the Bank Shares and Other Purchased Assets, and this Sale Order shall be binding in all respects upon the Debtor, its estate, all creditors of (whether known or unknown) and holders of equity interests in the Debtor, any successor to the Debtor including any liquidating trust or trustee, the Acquiring Parties and their respective affiliates, successors and assigns, and all third parties, notwithstanding the subsequent appointment of any trustee of the Debtor under any chapter of the Bankruptcy Code, as to which trustee(s) such terms and provisions likewise shall be binding. The provisions of this Sale Order and any actions taken pursuant hereto shall survive any conversion or dismissal of the Bankruptcy Case and the entry of any other order that may be entered in the Bankruptcy Case, including any order (i) confirming any plan of reorganization; (ii) converting the Bankruptcy Case from chapter 11 to chapter 7; (iii) appointing a trustee or examiner in the Bankruptcy Case; or (iv) dismissing the Bankruptcy Case. The terms and provisions of this Sale Order, as well as the rights granted under

the Transaction Documents, shall continue in full force and effect and are binding upon any reorganized debtor, successor to the debtor or chapter 7 or chapter 11 trustee applicable to the Debtor, notwithstanding any such conversion, dismissal or order entry.  Nothing contained in any chapter 11 plan confirmed in this bankruptcy case or in an order confirming such plan, nor any order dismissing this case or converting it to a case under chapter 7 of the Bankruptcy Code, shall conflict with or derogate from the provisions of the M&A Agreement, any documents or instruments executed in connection therewith, or the terms of this Sale Order.

16.     The transactions contemplated by the M&A Agreement and other Transaction Documents are undertaken by the Acquiring Parties without collusion and in "good faith," as that term is defined in section 363(m) of the Bankruptcy Code. The Acquiring Parties are good faith purchasers within the meaning of section 363(m) of the Bankruptcy Code and, as such, are entitled to the full protections of section 363(m) of the Bankruptcy Code.

17.     The failure specifically to include any particular provision of the M&A Agreement or the other Transaction Documents in this Sale Order shall not diminish or impair the effectiveness of such provisions, it being the intent of the Court that the M&A Agreement and the other Transaction Documents be authorized and approved in their entirety. Likewise, all of the provisions of this Sale Order are non-severable and mutually dependent.

18.     Notwithstanding Bankruptcy Rules 6004, 6006(d), 7062, or 9014, if applicable, or any other Local Bankruptcy Rule or otherwise, this Sale Order shall not be stayed for 14-days after the entry hereof, but shall be effective and enforceable immediately upon entry pursuant to Bankruptcy Rule 6004(h). Time is of the essence in approving the M&A Transaction including the transfer and sale of the Bank Shares and Other Purchased Assets and the transactions related thereto, and the Debtor and the Acquiring Parties intend to close the sale of the Bank Shares and Other Purchased Assets and related transactions as soon as practicable.

19.     The automatic stay pursuant to section 362 is hereby lifted with respect to the Debtor to the extent necessary, without further order of this Bankruptcy Court, to (i) allow the Purchaser to deliver any notice provided for in the M&A Agreement and Transaction Documents and (ii) allow the Acquiring Parties to take any and all actions permitted under the M&A Agreement and Transaction Documents in accordance with the terms and conditions thereof.

20.     Nothing in this Sale Order shall modify or waive any closing conditions or termination rights in the M&A Agreement, and all such conditions and rights shall remain in full force and effect in accordance with their terms.

21.     Unless otherwise provided in this Sale Order, to the extent any inconsistency exists between the provisions of the M&A Agreement and this Sale Order, the provisions contained in this Sale Order shall govern.

22.     The Court shall retain jurisdiction to interpret, construe, and enforce the provisions of the M&A Agreement and this Sale Order in all respects, and further, to hear and determine all disputes between the Debtor and/or the Purchaser, as the case may be, and any other non-debtor party relating to the M&A Agreement, the other Transaction Documents, the M&A Transaction or this Sale Order and any dispute between any of the Acquiring Parties and the Debtor as to their respective obligations with respect to any asset, liability, or claim arising hereunder.

23.     For the avoidance of doubt, the *Order (A) Authorizing and Approving Debtor-In-Possession Financing and Granting Security Interests and a Superpriority Administrative Claim In Connection Therewith, (B) Approving the Terms And Conditions of That Certain Superpriority Debtor-In-Possession Credit Agreement and Related Documents, and (C) Modifying The Automatic Stay to the Extent Necessary to Enter Into the Debtor-In-Possession Financing and*

*Effectuate the Terms Thereof*, entered by the Bankruptcy Court on March 12, 2014 [Dkt. No. 133], (the "DIP Order") and the Superpriority Debtor-in-Possession Credit Agreement, dated February 7, 2014, by and between the Debtor and the Purchaser as lender (the "DIP Credit Agreement"), that was approved by the DIP Order, a copy of which is attached as Exhibit B to FMAR's motion to obtain postpetition credit under section 364 of the Bankruptcy Code [Dkt. No. 9], as modified by submission dated March 11, 2014 [Dkt. No. 130] shall remain in full force and effect and the Debtor is authorized, upon entry of this Order, to (i) draw up to $2,5000,000 in accordance with the DIP Credit Agreement and (ii) deposit such funds into a segregated account to pay for fees and expenses contemplated under the DIP Credit Agreement and the DIP Order.

24.    Nothing in this Sale Order, the M&A Agreement, or any other related document with any other party shall relieve or excuse the Debtor, the Purchaser or any other party from complying with any and all applicable federal securities laws, rules, and regulations with respect to the offer, sale, purchase or distribution of securities or otherwise.

**END OF ORDER**

**Exhibit A**

**Successful Bidder's M&A Agreement**

**EXHIBIT C**

**FORM OF ARTICLES OF MERGER**

## ARTICLES OF MERGER

merging

## RKJS BANK,
a Maryland chartered trust company

with and into

## FIRST MARINER BANK,
a Maryland chartered trust company

THIS IS TO CERTIFY THAT:

FIRST: RKJS Bank, a Maryland chartered trust company (the "Merging Company"), and First Mariner Bank, a Maryland chartered trust company (the "Surviving Company"), agree to effect a merger of the Merging Company with and into the Surviving Company, on the terms and conditions herein set forth (the "Merger").

SECOND: The Merging Company is a chartered trust company formed under the laws of the State of Maryland. The principal office of the Merging Company in the State of Maryland is located in Baltimore County. The Merging Company does not own an interest in land in the State of Maryland.

THIRD: The Surviving Company is a chartered trust company formed under the laws of the State of Maryland and will continue as the successor chartered trust company in the Merger. The principal office of the Surviving Company in the State of Maryland is located in Baltimore City.

FOURTH: At the Effective Time (as defined below), the charter of the Surviving Company shall be amended, restated and replaced in its entirety with the Amended and Restated Charter of the Surviving Company attached hereto as Exhibit A (the "Amended and Restated Charter").

FIFTH: The total number of shares of all classes of stock which the Merging Company has the authority to issue is 20,000,000 shares of common stock, $10 par value per share, consisting of 10,000,000 shares of Class A Common Stock ("Merging Company Class A Stock") and 10,000,000 shares of Class B Common Stock (the "Merging Company Class B Stock"). The aggregate par value of all authorized shares of all classes of stock of the Merging Company having a par value is $200,000,000.

SIXTH: Immediately prior to the Effective Time, the total number of shares of all classes of stock which the Surviving Company has the authority to issue is 152,300 shares of common stock, $10.00 par value per share. Immediately prior to the Effective Time, the aggregate par value of all authorized shares of all classes of stock of the Surviving Company having a par value is $1,523,000.

At the Effective Time and pursuant to the Amended and Restated Charter, the total number of shares of all classes of stock which the Surviving Company shall have the authority to issue shall be 20,000,000 shares of common stock, $10 par value per share, consisting of 10,000,000 shares of Class A Common Stock ("Surviving Company Class A Stock") and 10,000,000 shares of Class B Common Stock ("Surviving Company Class B Stock"). At the Effective Time, the aggregate par value of all authorized shares of all classes stock of the Surviving Company having a par value is $200,000,000.

SEVENTH: At the Effective Time, the Merging Company shall be merged with and into the Surviving Company, the separate existence of the Merging Company will cease and the Merger will have the effects set forth in the Maryland General Corporation Law. At the Effective Time:

(a)     Each share of Merging Company Class A Stock issued and outstanding immediately prior to the Effective Time shall be converted into and exchanged for one share of Surviving Company Class A Stock.

(b)     Each share of Merging Company Class B Stock issued and outstanding immediately prior to the Effective Time shall be converted into and exchanged for one share of Surviving Company Class B Stock.

(c)     Each share of stock of the Surviving Company issued and outstanding immediately prior to the Effective Time shall be converted into and exchanged for the right to receive an amount in cash equal to [$_____] **[NTD: PURCHASE PRICE/# OUTSTANDING SHARES]** (the "Per Share Consideration"), payable in accordance with the Merger and Acquisition Agreement, dated [February ___, 2014] (the "Merger Agreement"), among the Surviving Company, the Merging Company, and First Mariner Bancorp, a Maryland corporation, and each such share shall automatically be cancelled and retired and shall cease to exist and, from and after the Effective Time, shall no longer be outstanding, and each holder of a certificate representing any such share shall cease to have any other rights with respect thereto, other than to receive the Per Share Consideration.

EIGHTH: The terms and conditions of the Merger were advised, authorized and approved by the Merging Company in the manner and by the vote required by the laws of the State of Maryland and the charter of Merging Company b y the Board of Directors of the Merging Company which, pursuant to Subtitle 7 of Title 3 of the Financial Institutions Article of the Annotated Code of Maryland, as amended (the "FI Article"), adopted, by unanimous written consent, resolutions declaring that the terms and conditions of the Merger were advisable and approving the Merger and the Merger Agreement. At the time of the approval of the Merger and the Merger Agreement, the Merging Company had no stock outstanding or subscribed for and entitled to vote on the Merger.

NINTH:  The terms and conditions of the Merger were advised, authorized and approved by the Surviving Company in the manner and by the vote required by the laws of the State of Maryland and the charter of Surviving Company, by the Board of Directors and the sole stockholder of the Surviving Company, which, pursuant to Subtitle 7 of Title 3 of the FI Article, adopted, by unanimous written consent, resolutions declaring that the terms and conditions of the Merger were advisable and approving the Merger and the Merger Agreement.

TENTH:  The Merger shall become effective upon the acceptance for record of these Articles of Merger by the State Department of Assessments and Taxation of Maryland (the "Effective Time").

ELEVENTH:  At the Effective Time, the directors of the Surviving Company shall be:

Jack Edward Steil

Robert Dietrich Kunisch, Jr.

Otto James Talbott, II

Josh Evan Fidler

Jennifer Ward Reynolds

Howard Paul Feinglass

Boris Michael Gutin

James Thomas Dresher, Jr.

William Gary Dorsch

Michael Barley High

TWELFTH:  Each of the undersigned individuals acknowledges these Articles of Merger to be the act and deed of the respective chartered trust company on whose behalf he or she has signed, and further, as to all matters or facts required to be verified under oath, each of the undersigned acknowledges that, to the best of his or her knowledge, information and belief, these matters and facts relating to the chartered trust company on whose behalf he or she has signed are true in all material respects and that this statement is made under the penalties of perjury.

*- Signature page follows -*

7544925-v7

      IN WITNESS WHEREOF, these Articles of Merger have been duly executed by the parties hereto this [_____day of _____, 2014].

ATTEST:                      MERGING COMPANY:

                                RKJS BANK,
                                  a Maryland chartered trust company

_____    By: _____
Name:                         Name:
Title:                           Title:

ATTEST:                      SURVIVING COMPANY:

                                FIRST MARINER BANK,
                                  a Maryland chartered trust company

_____    By: _____
Name:                         Name:
Title:                           Title:

7544925-v7

**EXHIBIT D**

**ADDITIONAL CLOSING DELIVERABLES**

EXHIBIT D
Additional Closing Deliverables

(a)     Written documentation or other evidence reasonably acceptable to FMIB that an excess loss account within the meaning of Treasury Regulation Section 1.1502-19 does not exist in the stock of FMB Holdings, Inc. or any other direct or indirect subsidiary of FMAR;

(b)     A representation letter, in form and substance reasonably acceptable to FMIB, containing applicable representations required in connection with Section 368(a)(1)(A) and (a)(2)(D) of the Code mergers including, but not limited to, those set forth in Rev. Proc. 86-42;

(c)     Written documentation or other evidence reasonably acceptable to FMIB that:

(i)     the aggregate amount of all intercompany accounts receivable of FMB Holdings, Inc. from FMBank, which as of February 28, 2014 consisted of (A) an intercompany loan by FMB Holdings, Inc. to FMBank in the outstanding principal amount of $18,200,000 and (B) accrued interest thereon of $1,126,654.78 (together, the "FMB Holdings Receivable"), have been reduced, settled and discharged without any payment therefor by FMBank such that, immediately prior to the Stock Dividend (defined below), the FMB Holdings Receivable shall be less than or equal to $500,000;

(ii)     thereafter all outstanding shares of capital stock of FMB Holdings, Inc. have been distributed by FMBank to FMAR (the "Stock Dividend"); and

(iii)     thereafter the FMB Holdings Receivable would be payable in eight quarterly installments, as follows:

(1)     $225,000 on the three-month anniversary of the Year-End Date;

(2)     $225,000 on the six-month anniversary of the Year-End Date;

(3)     $8,350 on each of the nine-, twelve-, fifteen-, eighteen-, and twenty-first month anniversaries of the Year-End Date; and

(4)     $8,250 on the twenty-fourth month anniversary of the Year-End Date.

(d)     Written documentation or other evidence reasonably acceptable to FMIB that FMB Holdings, Inc. is engaged in business activity such that, immediately prior to Closing, it should be regarded for U.S. federal income tax purposes; and

(e)     An executed Side Letter Agreement between FMAR and FMIB, in a form and substance reasonably acceptable to FMIB, pursuant to which FMAR shall cause FMB Holdings, Inc. (i) to continue in existence and not liquidate until the liquidation of FMAR and,

(ii) during such time, to engage in business activity such that FMB Holdings, Inc. should be regarded for U.S. federal income tax purposes.