IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| In Re | : | Case No.: 14-11952-DER |
| | : | Chapter 11 |
| FIRST MARINER BANCORP | : | |
| | : | |
| Debtor | : | |
| | : | |
| | : | |

**HILDENE CAPITAL MANAGEMENT, LLC AND HILDENE OPPORTUNITIES MASTER FUND, LTD.'s JOINDER IN THE UNITED STATES TRUSTEE'S AMENDED OBJECTION TO SANDLER O'NEILL & PARTNERS' REQUEST FOR COMPENSATION**

Hildene Capital Management, LLC ("Hildene") and Hildene Opportunities Master Fund, Ltd. ("HOMF") hereby submit this joinder to the United States Trustee's May 20, 2014 Amended Objection to Sandler O'Neill & Partners' Request for Compensation [Doc # 210].[1]

Hildene is an asset management firm focused on structured finance investments with over $2 billion in assets under management. HOMF is one of the funds that Hildene manages, which is comprised primarily of trust preferred securities (TruPS) CDOs, including CDOs that own TruPS issued by the Debtor in this case, First Mariner Bancorp ("First Mariner").

---

[1] On May 22, 2014 Hildene and HOMF conferred with the United States Trustee, who registered no objection to the filing this joinder.

1

The US Trustee has described the auction process in this case that resulted in the sale of First Mariner Bank to RKJS Bank as a "debacle," caused primarily because of Sandler's undisclosed conflicts of interest. But for the re-opening of the auction process in this case, First Mariner's creditors (including ultimately HOMF) would have suffered material harm on account of Sandler's attempted manipulation of the auction process for its own benefit and that of one of its preferred clients.

The US Trustee has sought as a remedy for Sandler's misconduct the full or partial reduction of its fee in order to "prevent future lapses."

Hildene and HOMF agree that Sandler's lapses in this case should be punished in order to prevent further misconduct. Sandler's inappropriate conduct in this case, however, is not unique or aberrational. Rather, detailed below are other known instances of Sandler's self-dealing and advocating for transactions that would result in debtors breaching their contractual obligations to TruPS holders. This case is thus yet just another instance in a string of cases where Sandler has run roughshod over the rights of TruPS holders, with seeming impunity. Hildene and HOMF believe that the remedy for Sandler's conflicts in this case should be calibrated to ensure that it receives the message that its lapses will no longer go unpunished. We respectfully submit that the only way to accomplish that goal is by the total denial of Sandler's fee.

**I.      Background**

1. Hildene is an asset manager based in Stamford, Connecticut with approximately $2 billion in assets under management.

2. Hildene manages HOMF, which is one of, if not the, single largest holder of TruPS CDOs in the world.

3.  HOMF owns substantial interests in three CDOs, which in turn own a total of $17 million in face value of TruPS issued by First Mariner.

4.  Specifically, HOMF has an ownership interest in First Mariner's TruPS through its ownership interests in Trapeza CDO II, LLC (Mariner Capital Trust II), Alesco Preferred Funding I, Ltd. (Mariner Capital Trust V), and Preferred Term Securities XIX, Ltd. (Mariner Capital Trust VII).

5.  As a consequence of its substantial financial exposure to First Mariner's TruPS, HOMF has a significant financial stake in this case.

6.  Sandler's misconduct in this case, which is thoroughly detailed in the US Trustee's Amended Objection, had the potential to deprive First Mariner's TruPS creditors of hundreds of thousands if not millions of dollars. Sandler, which should have been acting in the best interests of First Mariner's creditors (including its TruPS holders) during the auction process here, instead placed its own interests first along with those of a preferred client for which it had just completed a lucrative transaction.

7.  Sandler has repeatedly provided investment-banking advice to debtors similar to First Mariner where that advice was tainted by conflicts of interest or was otherwise inappropriate, considering that it would have resulted in bank holding companies breaching contractual obligations to TruPS holders. Hildene and HOMF have on prior occasions taken issue with Sandler's conduct, but now believe that a strong judicial response to its egregious conduct in his case is the only way to change its disregard for the law.

## II.     BankAtlantic Bancorp and Sandler's Role in Advising a Client to Breach a TruPS Indenture

8. Sandler's most notorious foray into questionable conduct involves its role in advising BankAtlantic Bancorp Inc. ("Bancorp") to disregard its contractual obligations under governing TruPS indentures, which would have resulted in Bancorp defaulting on TruPS with a face value of $285 million. At great expense, Hildene and HOMF (along with other TruPS creditors) were able to stop this transaction in its tracks in *In re BankAtlantic Bancorp, Inc. Litigation*, 39 A.3d 824 (Del. Sup. Ct. 2012).

9. Sandler served as co-lead investment banker to Bancorp, which because of financial distress sought to sell its sole substantial asset, BankAtlantic, a federal savings bank. Sandler was instrumental in helping Bancorp structure a sale that would result in its selling BankAtlantic's performing assets to a buyer (BB&T Corp.), while leaving its poorly performing assets in a new vehicle. Under this so-called "good bank/bad bank" concept, Bancorp would no longer own a bank and no longer would be a federally regulated bank holding company.

10. The TruPS-holder plaintiffs in the *BankAtlantic* case, including Hildene and HOMF, sued to enforce debt covenants in Bancorp's TruPS indentures that prohibited Bancorp from selling "all or substantially all" of its assets unless the acquirer assumed the debt.

11. The case went to trial and the evidence established that Bancorp was selling substantially all of its assets and that the buyer (BB&T) had not agreed to assume

Case 14-11952 Doc 219 Filed 05/27/14 Page 5 of 11

Bancorp's TruPS's debt. Under the proposed transaction, Bancorp would default on its obligations under its TruPS and the ensuing event of default would result in Bancorp's debt accelerating, which it could not pay.

12. Because the sale Sandler had helped structure (and on which it had provided a fairness opinion to Bancorp's shareholders) would result in a plain breach of Bancorp's contractual obligations under its TruPS indentures, the Delaware Supreme Court issued an injunction enjoining Bancorp's sale of BankAtlantic to BB&T.

13. Incredibly, Sandler had advocated a transaction that it must have known would result in a breach of the successor obligation covenants in Bancorp's TruPS indentures. A responsible investment bank would not lead a client down a path that would result in a breach of contract. Sandler, by contrast, was willing for a fee to throw all caution aside and press forward with a transaction that it defended at trial in the *BankAtlantic* case, even though it was patently unlawful and materially injurious to TruPS holders, as the Court's decision in *BankAtlantic* makes clear.[2]

14. While Sandler's undisclosed conflict of interest in this case differs from its conduct in the *BankAtlantic* case, what is not different is Sandler's decision to act irresponsibly in exchange for a fee.[3]

---

[2] Ironically, Sandler's asset management group, Sandler Asset Management, manages some TruPS CDOs, thereby making Sandler's advice in the *BanAtlantic* case even more absurd. If Sandler had succeeded in pushing through its "good bank / bad bank" deal, the result could have adversely affected other Sandler managed TruPS CDO transactions.

[3] Sandler also served as lead banker to Prosperity Bank Co.'s "good bank/bad bank" structure" in 2011 and 2012, by which Prosperity sought to sell 90% of its 16-branch

5

### III. The AmericanWest Bancorporation Bankruptcy and Sandler's Conflict of Interest in Representing Both the Debtor and the Buyer of the Debtor's Sole Asset

15. In another example of Sandler not letting a patently obvious conflict of interest stand in its way, in *In Re AmericanWest Bancorporation,* 10-06097-PCW11 (Bkrty. E.D. Wa. 2010), Sandler represented both the Debtor (a bank holding company) and the buyer of the Debtor's largest asset, a bank.

16. Shortly after commencing its Chapter 11 case, the Debtor, AmericanWest Bancorporation ("AmericanWest"), sold its largest asset, AmericanWest Bank (the "Bank"), in an "emergency sale" on a rushed basis to SKBHC Hawks Nest Acquisition Corp. ("SKBHC") under Section 363 of the Bankruptcy Code.

17. Sandler, under a clear conflict, represented both the AmericanWest *and* SKBHC in the transaction. No other parties bid to purchase the Bank, despite Sandler's allegedly thorough marketing efforts. Indeed, interested parties were essentially turned away by bidding procedures that appeared designed to ensure that Sandler procured the Bank for minimal value, including a $1 million "Stalking Horse Bidder Fee" and a minimum overbid amount of $1 million, which Sandler was involved in helping determine, meaning that any other bidder would have to pay

---

banking unit to Patriot Financial Partners LP and Castle Creek Capital LLC. The FDIC opposed the transaction and it was eventually withdrawn in February 2012. But again, Sandler was helping its client to structure a deal that would have resulted in that client breaching its obligations under its TruPS indentures.

6

at least an additional $2 million over the $6.5 million stalking horse bid, *a staggering 30% premium*.[4]

18. Although the Bankruptcy Court approved the sale, Sandler nonetheless had an undeniable conflict in representing the parties on both sides of the transaction. It also had no obvious incentive to maximize the value of the transaction for AmericanWest, in light of the fact that it was entitled to fee from AmericaWest in an amount equal to just 1.0% of the aggregate purchase price of AmericanWest's stock, whereas it was entitled to fees of at least $3 million from SKBHC for its role as a financial advisor to SKBHC in other transactions. Because the Bank ultimately sold for $6.5 million, Sandler apparently earned a nominal $65,000 from AmericanWest, whereas its fee potential from SKBHC was nearly 46 times greater.

19. Sandler's disregard for obvious conflicts of interest tainted the sale process in AmericanWest, just as it disregarded a conflict of interest that tainted the auction process in this case.

### IV. The *Premier Bank Holding Company* Litigation

20. In 2012, Sandler was engaged as investment banker by Premier Bank Holding Company ("PBHC"), which filed a Chapter 11 case and eventually sold its sole significant asset, Premier Bank, Tallahassee, Florida, to Home BancShares, Inc. ("BancShares") in a § 363 transaction. *In re Premier Bank Holding Company*, 12-40550-KKS (Bktcy., N.D. Florida).

---

[4] Hildene objected to this bidding procedure, but it was denied standing in the case on account of the manner in which it owned AmericanWest's TruPS through CDOs.

21. In the *Premier* case, under Sandler's guidance, PBHC rejected a restructuring proposal offered in part by Hildene that would have preserved nearly $14 million in deferred tax assets and resulted in a better outcome than the § 363 sale that Sandler structured, which resulted in TruPS creditors recovering just cents on the dollar and the cancellation of $9.7 million in TARP taxpayer dollars.

22. Sandler's fee deal with PBHC also gave it little incentive to maximize value for PBHC's creditors. Under its fee deal with PBHC, Sandler was due a $1 million fee under any transaction where Premier Bank was recapitalized. Additionally, the incremental compensation Sandler stood to gain through a larger offer for Premier Bank was dwarfed in comparison to the guaranteed $1 million fee. Sandler admitted to the Bankruptcy Court that it never actively solicited a plan of reorganization or marketed the investment structure proposed by Hildene to any potential investors.

23. The case remains mired in litigation. PBHC was unable to garner sufficient votes for its Chapter 11 plan, and the case was converted to a Chapter 7 liquidation plan. It also included the spectacle of a contested Chapter 7 trustee election, where the creditors succeeded in electing their chosen trustee. That trustee is now investigating whether PBHC's CEO misrepresented to the Bankruptcy Court the fact that he would not be employed by BancShares' subsidiary (Centennial Bank) into which Premier Bank was merged.[5]

---

[5] PBHC's President and CEO, G. Matthew Brown ("Brown"), who was also Premier Bank's President and CEO, seemingly misrepresented to the Court his job prospects with the purchaser in order to conceal the fact that he would benefit personally from the § 363(b) sale. Specifically, on December 1, 2012, Brown was featured in a press release issued by BancShares as the "Tallahassee Market President for Centennial Bank." Brown moved

8

**24.**     Sandler's conduct in the *Premier* case is instructive of how it places its own financial consideration over those of a bankrupt estate's creditors, in violation of its fiduciary duties.

### V.         Conclusion

25.    As the forgoing, disparate examples demonstrate, Sandler has repeatedly engaged in highly questionable conduct for a fee.  The unifying threads among the cases are that Sandler has threatened the integrity of the judicial system by ignoring conflicts of interest, placing its fee ahead of the interests of the creditors or advocating for conduct that undermines the sanctity of contractual agreements.

26.    In this case, the US Trustee has presented a compelling case that Sandler disregarded basic rules regarding conflicts of interest.  In past cases, in spite of Sandler engaging in similarly questionable conduct, it has not suffered any obvious consequences that served to dissuade it from continuing to push and exceed the envelope of acceptable behavior.

27.    This Court can once and for all ensure that Sandler, as a major player in the bank holding restructuring business, ceases its "rogue" behavior.

---

directly into this job from his role as President and CEO of Premier Bank. Yet, in his testimony before this Court on September 6, 2012, Brown asserted that his job prospects with BancShares following a § 363(b) sale were uncertain and tenuous at best. Moreover, on November 27, 2012, just two days before this Court approved the final sale, Brown proffered testimony, which the Court accepted, denying the existence of any deals or arrangements between any of PBHC's officers and directors, including himself, and BancShares.  In light of his immediate hiring by Centennial Bank following the Court's approval of the § 363(b) sale, the credibility of Brown's September 6 and November 27 testimony is highly suspect, especially considering that BancShares claimed publicly during the fall of 2012 that part of its rationale for acquiring Premier was driven by the prospect of employing Premier's management team.

28. Accordingly, Hildene and HOMF join in the US Trustee's request for an appropriate sanction in the form of the complete elimination of Sandler's fee in this case.

Dated this 27th day of May, 2014

Respectfully submitted,

/s/ Ethan A. Brecher
**ETHAN A. BRECHER** (*Pro Hac Vice* Motion Pending)
Law Office of Ethan A. Brecher, LLC
600 Third Avenue, 2nd Floor
New York, NY 10016
Phone: (646) 571-2440
Fax: (888) 821-0246
Email: ethan@ethanbrecherlaw.com


   /s/ Jan I. Berlage
Jan I. Berlage #23937
Gohn, Hankey & Stichel, LLP
201 N. Charles Street, Suite 2101
Baltimore, Maryland 21201
Phone:  410-752-9300
Fax: 410-752-2519
Email:  jberlage@ghsllp.com

Attorneys for Hildene Capital Management, LLC and Hildene Opportunities Master Fund, Ltd.

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 27th day of May, 2014 a copy of Hildene Capital Management, LLC and Hildene Opportunities Master Fund, Ltd.'s Joinder in the United States Trustee's Amended Objection to Sandler O'Neill & Partners' Request for Compensation was served via electronically and/or via first class mail, postage pre-paid to the following, as well as to the creditors listed on the attached list of 20 largest unsecured creditors:

>Lawrence Joseph Yumkas
>Yumaks, Vidmar & Sweeney, LLC
>2530 Riva Road, Suite 400
>Annapolis, Maryland 21401
>
>Edmund A. Goldberg
>US Trustee's Office
>101 W. Lombard Street
>Suite 2625
>Baltimore, Maryland 21201
>
>Joel I. Sher
>Daniel Joseph Zeller
>Shapiro Sher Guinot & Sandler
>36 South Charles Street
>Suite 2000
>Baltimore, Maryland 21201
>
>Paul H. Deutch
>Rust Consulting/Omni Bankruptcy
>1120 Avenue of the Americas
>4th Floor
>New York, New York 10036

       /s/ Jan I. Berlage
      Jan I. Berlage

11